IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FLUOR ENTERPRISES, INC.<br>f/k/a FLUOR DANIEL, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 00-207C<br>(Judge Block) |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**
**AND SUPPORTING MEMORANDUM**

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Fluor Enterprises, Inc. ("FDI") respectfully moves the Court for summary judgment, pursuant to RCFC 56, on Count I of FDI's complaint against the United States.

The grounds for this motion are that there is no genuine issue as to any material fact and that FDI is entitled to judgment on Count I as a matter of law. A statement of uncontested facts, memorandum of law in support of the motion, and an Appendix ("App.") containing all exhibits and testimony upon which this motion relies accompany this motion.

WHEREFORE, FDI respectfully requests that its Motion for Summary Judgment on Count I of it's Complaint be granted.

TABLE OF CONTENTS

PAGE

STATEMENT OF THE ISSUES ........ 1

STATEMENT OF THE CASE ........ 1

BACKGROUND ........ 4

STATEMENT OF UNDISPUTED FACTS ........ 11

ARGUMENT ........ 13

I. THE LIMITATION SET FORTH IN 41 U.S.C. § 254(B) DOES NOT APPLY TO THE CONTRACT AS A MATTER OF LAW; THE AGENCY'S ATTEMPT TO APPLY THIS LIMITATION IS UNLAWFUL AND CONSTITUTES BREACH OF CONTRACT 14

A. The Plain Language of the Statute and the Legislative History Show that the Statute Applies Narrowly to Contracts for the Delivery of Plans, Designs, Drawings and Specifications ........ 15

B. FDI's Integrated Professional Services Contract Is Not a Contract for Plans, Designs, Drawings, and Specifications Covered by the Statute ........ 18

C. Congress Did Not Intend the Six Percent Limitation to Apply to Level of Effort Contracts of the Sort at Issue Here ........ 20

D. The Uncontested Facts and the Applicable Law Demonstrate that the Statute Was Not Intended to Apply to this Type of Contract; Summary Judgment is Therefore Appropriate ........ 21

II. THE LIMITATION SET FORTH IN 41 U.S.C. § 254(B) CANNOT BE APPLIED TO THE CONTRACT AS A MATTER OF LAW; THE AGENCY'S ATTEMPT TO APPLY THIS LIMITATION IS UNLAWFUL AND CONSTITUTES BREACH OF CONTRACT 23

A. The Statute's Plain Language and its Legislative History Show that the Statute Applies Only to Contracts Where the Construction Costs Are Estimated By the Head of the Agency Prior to Entering the Contract ........ 23

B. The FAR Requires the Contracting Officer to Ensure Compliance with the Statutory Limitation Prior to the Start of Contract Performance ........ 24

C. The Structure of NOAA's Implementation of the WFO Program Made It Impossible for the Agency To Perform the Predicates Necessary for Application of the Statute ........ 25

D. The Uncontested Facts and the Applicable Law Demonstrate that the Statute Was Not Intended to Apply to this Type of Contract; Summary Judgment Is Therefore Appropriate .......... 27

III. EVEN IF THE STATUTE COULD BE APPLIED TO THE CONTRACT, THE CONTRACTING OFFICER'S DETERMINATION OF THE SIX PERCENT LIMITATION FAILED TO UTILIZE THE COMPLETE ESTIMATE OF PROJECT COSTS AND WAS THEREFORE IMPROPER AS A MATTER OF LAW 28

A. The Statute Limits the Contractor's Fee to Six Percent of the Costs of the Entire Project Based on an Estimate Created at the Time the Parties Entered the Contract .......... 28

B. The Agency's Use of Only a Portion of the Estimate of Project Costs Is Unsupported by Law or Reason .......... 29

C. If the Statute Were Applicable and the Contracting Officer Used the Complete Estimate of Project Costs, FDI's Costs Would Be Within the Six Percent Statutory Limitation .......... 32

D. The Uncontested Facts and the Applicable Law Demonstrate that Provided the Statute Applies to the Contract the Agency Used a Method to Apply the Statute that Was Contrary to Law; Summary Judgment is Therefore Appropriate .......... 33

CONCLUSION .......... 33


Appendix


1. Contracting Officer's Price and Cost Analysis .......... 5,11,12,18

2. Contracting Officer's Memorandum for the Record .......... 4,11,18

3. Defendant's Supplemental Response to Plaintiff's Requests for Admission .......... 5,12,13,26,30, n.27

4. 2/13/87 Memorandum of Negotiation .......... 5,12

5. Contracting Officer's Negotiation Plan .......... 5

6. 5/30/87 Memorandum of Understanding between Jesse Arredondo, Contracting Officer, NOAA and K Sawyer, Project Manager, FDI .......... 6

7. 10/21/86 Memorandum from W. Becker, Contracting Officer, Central Administrative Support Center, to Janet Stine, Audit Manager, Systems Acquisition Division, OIG .......... 6

8. Audit Report No. 4181-7D210225, dated 12/2/86, from DCAA to OIG .......... 6

9. 1/8/87 Memorandum from Janet Stine to William Becker .......... 6

10. Summary of Contracting Officer's Analysis of Incurred Costs .......... 6,10,12,13,30, n.21

11. Defendant's Response to Plaintiff's First Set of Interrogatories .......... 6,12,27

12. 4/8/87 Letter from Jack Toliver FDI to Jesse Arredondo CO NOAA .......... 7

13. 10/6/90 Draft OIG Audit Report .......... 7

14. 6/11/90 e-mail from Edward Mische SEPO to Jack Tolliver FDI .......... 7

15. 6/25/90 facsimile from FDI illustrating agreement from 6/12/90 meeting between FDI and NOAA .......... 8

16. Agency's 10/5/90 Internal Letter from Max Entrikin SEPO .........., n.15

17. Defendant's Response to Plaintiff's Request for Admissions ..........,12

18. OIG Audit Report No. NOA-4436-3-001 "Weather Forecast Office Construction Support Contract Needed Improved Management and Administration" (1993) .......... 8,18,19,26

19. H.R. 670, 1949 U.S.C.C.A.N. 1475, 1499 .......... 16,24

20. Letter from Rep. Jack Brooks, Chairman of the Government Activities Subcommittee of the House Committee on Government Operations to the Comptroller General of the United States (November 16, 1967) .......... 16,n.12,n.15

21. Affidavit of Kenneth W. Forsyth .......... 18,21,26

22. 10/6/86 NOAA Program Work Breakdown Structure .......... 18

23. H.R. 4278, 72d Congress (1939) .......... 20

24. FAR §§ 15.903(d)(1) and 16.306(c) (1986) .......... 24,25

25. EP 715-1-7 US Army Corps of Engineers "Architect-Engineer Contracting" .......... 26

26. Comptroller General Warren to the Secretary of War, B-18,126, 21 Comp. Gen. 580, 191 WL 925 (December 18, 1941) .......... 29

27. To the Administrator, Veteran Administration, B-156,469, 1967 CPD ¶ 31, 1967 WL 1686 (July 21, 1967) .......... 31

28. Skidmore, Owings & Marrill, ASBCA No. 5593, 61-1 BCA ¶ 2974 (February 28, 1961) ........ 31

29. 1992 WFO Facilities Budget ........ 2

# TABLE OF AUTHORITIES

Page

Cases

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ........ 13
Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) ........ 13
Connecticut Dept. of Income Maint. v. Heckler, 471 U.S. 524, 532 (1985) ........ 25
Curtis v. United States, 168 F. Supp. 213, 216 (Ct. Cl. 1959) ........ 13
Forshey v. Principi, 284 F.3d 1335, 1348 (Fed. Cir. 2002) ........ 29
Hammontree v. N.L.R.B., 925 F.2d 486, 496 (D.C. Cir. 1991) ........ 24
Hoechst Aktiengesellscheaft v. Quigg, 917 F.2d 522, 526 (Fed. Cir. 1990) ........ 15, 23
Humana, Inc. v. Forsyth, 525 U.S. 299, 309-10 (1999) ........ 29
In re Donaldson Co., 16 F.3d 1189, 1192-93 (Fed. Cir. 1994) ........ 15, 23
In re Sealed Case, 67 F.3d 965, 967 (D.C. Cir. 1995) ........ 13
Mansell v. Mansell, 490 U.S. 581, 588 (1989) ........ 15
MCI Telecomms. Corp. v. Am. Tel & Tel. Co., 512 U.S. 218, 225-27 (1994) ........ 29
Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987) ........ 13
Muscarello v. United States, 524 U.S. 125, 128 (1998) ........ 29
Ralph L. Jones Co. v. United States, 33 Fed. Cl. 327 (1995) ........ 29
Reves v. Ernst & Young, 507 U.S. 170, 177-79 (1993) ........ 29
Rubin v. United States, 449 U.S. 424, 430 (1981) ........ 16
Rubin, 101 S. Ct. at 701 ........ 23
Smith v. United States, 508 U.S. 223, 228 (1993) ........ 28
Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562 (Fed. Cir. 1987) ........ 14
United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 84 (1932) ........ 25
United States v. Uzzell, 648 F. Supp. 1362, 1363 (D.D.C. 1986) ........ 13

Administrative Decisions

Inman, B-205,793, B-205793 L/M, 1982 WL 28374 (Comp. Gen. 1982) ........ 18, 22
Comptroller General Warren to the Secretary of War, B-18,126, 21 Comp. Gen. 580, 1941 WL 925 at *7 (December 18, 1941) ........ 29
Skidmore, Owings & Marrill, ASBCA No. 5593, 61-1 BCA ¶ 2974 (February 28, 1961) ........ 31
To the Administrator, Veteran Administration, B-156,469, 1967 CPD ¶ 31, 1967 WL 1686 (July 21, 1967) ........ 31

Rules

31 U.S.C. § 1341 .......... 24
41 U.S.C. § 254(b) .......... passim
RCFC 56 .......... 13

Legislative History

H.R. 4278 .......... 20, 21
H.R. 670, 1949 U.S.C.C.A.N. 1475, 1499 .......... 16, 24

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## STATEMENT OF THE ISSUES

1. Whether the statutory limitation on fees in contracts for architectural and engineering ("A&E") services set forth in 41 U.S.C. § 254(b) ("the statute" or "the Act") applies to the level of effort professional services contract between FDI and the National Oceanographic and Atmospheric Administration ("NOAA" or "the agency") of the United States Department of Commerce ("DOC").

2. Whether, if applicable generally, the statutory limitation on fees in contracts for A&E services in 41 U.S.C. § 254(b) applies where there was no estimate of the costs of the project by the head of the agency at the time the contract was entered as required by the statute.

3. Whether, if applicable, the statutory limitation on fees in contracts for A&E services in 41 U.S.C. § 254(b) can be calculated using a denominator less than the estimated cost of the project.

## STATEMENT OF THE CASE

This case is not about contractor performance. It is about how NOAA responded to comprehensive and stinging Office of Inspector General ("OIG") criticism of its own performance by attempting retroactively to recover payments properly made to FDI under a contract for valuable work performed and accepted by NOAA.

In 1986, NOAA entered a contract with FDI to obtain from FDI comprehensive management services for NOAA's National Weather Service modernization program. Because the agency did not expect to know precisely what services it would require from FDI until after commencement of performance of the contract, the agency elected to use a cost-type, level of effort contract. The contract contemplated a wide-range of program planning, management and

logistical services in addition to A&E services necessary for the adaptation of another firm's generic Weather Forecasting Office ("WFO") design.

Because the contract scope included provision of some A&E services, the contracting officer considered application of the statutory six percent fee limitation applicable to contracts for A&E services set forth in 41 U.S.C. § 254(b).[1] However, because of the broad, professional services nature of the contract and the agency's inability to define the precise nature of the work required in advance of entering into the contract, the contracting officer determined that the statute did not apply.

As a result, the head of the agency never performed the mandatory estimate of project costs at the time of entering into the contract to limit A&E contract costs as would have been necessary had the statute applied. The contracting officer never negotiated FDI's contract price to ensure FDI's payment remained within the six percent limitation that would have existed had the statute applied, and the contracting officer never communicated any estimate of the project costs to FDI.

FDI successfully performed the contract, providing valuable and necessary services. The agency ordered and accepted all such services. FDI's costs were deemed reasonable and allocable and, with limited exceptions not relevant here, allowable under FAR 31.205.

Nevertheless, NOAA, thirteen years after entering into the contract and seven years after the conclusion of the contract, under pressure from intense OIG criticism of its own management of the program, asserted that the statute was applicable to the contract and required FDI to repay

---

[1] 41 U.S.C. § 254(b) provides, in pertinent part: "in the case of a cost-plus-a-fixed-fee contract . . . a fee inclusive of the contractor's costs and not in excess of 6 percent of the estimated cost, exclusive of fees, as determined by the agency head at the time of entering into the contract, of the project to which such fee is applicable is authorized in contracts for architectural or

monies received for costs incurred in excess of the six percent limitation. This was so even though these costs were incurred at the direction of the agency and were reasonably necessary to perform the contract.

The contracting officer's after-the-fact effort to prove to the OIG that it could "crack the whip" is as unjust as it is illegal. Indeed, in § 254(b), Congress specified only a narrow payment limitation on contracts for A&E services. It never contemplated application of the statute to integrated and complex services contracts of the sort at issue here. It never contemplated application of the statute to level of effort contracts in which the government contracted for no completed task and, if the limitation were applied, could end up with no finished product to show for its expense. It never contemplated application to level of effort and incrementally funded contracts where the changing cost of work due to funding gaps/transfer of partial designs between contractors becomes almost impossible to predict. Moreover, it never contemplated application to circumstances in which there would be no estimate of project costs by the agency head at the time of entering into the contact and a contractor would be placed at extreme risk because the information necessary to calculate any fee limitation only would be available after the contractor performed and the government accepted the work. Finally, it never contemplated application of the statute using less than the estimate of project costs as required by the statute.

The contracting officer may not lawfully demand repayment of money paid for work properly performed and accepted by the agency. Accordingly, the contracting officer's unlawful demand constitutes breach of contract and should be overturned by this Court.[2]

---

engineering services relating to any public works or utility project . . . " 41 U.S.C. § 254(b) (2001 Supp.).

[2] Pursuant to the parties' October 18, 2000 Joint Status Report and the Court's October 18, 2000 Scheduling Order related thereto, the issues to be addressed in Plaintiff's Motion for Summary Judgment are limited to whether the six percent statute applies to the contract at bar and whether,

## BACKGROUND

In July, 1986, FDI and NOAA entered into a level of effort, cost type, professional services contract, Letter Contract, No. 50WCNA606099 (the "Letter Contract"), whereby FDI agreed to provide NOAA with a wide range of professional services in support of NOAA's WFO Modernization Program. These services included, but were not limited to, program development, support and management services, construction management services, construction inspection, and technical A&E design services. See Complaint App. 1, CO's Final Decision, p. 1.[3] Only a small portion of the work related to A&E services. See App. 1, CO's Price and Cost Analysis, G004709; App. 2, CO's Memorandum for the Record, G004708. The Letter Contract was later modified to include the Next Generation Weather Radar Program construction and land acquisition.[4] See Complaint App. 1 at p. 1.

On May 30, 1987, the Letter Contract was definitized (Contract No. 50WCNW606099) (the "Definitized Contract"). See Complaint App. 1, CO's Final Decision, p. 1. The contract remained a cost reimbursable plus fixed-fee level of effort, professional services contract pursuant to which FDI was required to provide labor hours not to exceed specified quantities.

---

on the uncontested facts, the agency properly calculated the estimated costs of the project required by the statute. Issues involving contested facts, including whether FDI actually incurred costs in excess of the six percent limitation (if applicable) are not addressed in this motion.

[3] For simplicity, Plaintiff cites to the contracting officer's Final Decision already a part of the record as Appendix 1 to Plaintiff's Complaint, rather than filing a second copy of the contracting officer's Final Decision as an exhibit to this brief.

[4] Both pieces of the project were part of NOAA's significant efforts to modernize the National Weather Service through major construction and consolidation of weather service offices and the upgrade of radar coverage areas.

See Complaint, App. 9, Definitized Contract, § B.2, pp. 4-5.[5] Accordingly, rather than obligating FDI to complete specific pre-defined tasks, the contract obligated FDI to expend a pre-defined number of hours towards the completion of tasks including program planning and management, construction management, A&E and other services, related to modernization of over 100 WFO offices. See App. 3, D's Supp. Answer to P's Req. for Admis. No. 1, p. 1. The agency ordered FDI to expend hours on these tasks in annual task orders issued by NOAA. See Complaint App. 9 at SOW § 1.2, pp. 8-9. The contract contained FAR Clause 52.232-22 -- Limitation of Funds -- required when incrementally funded cost-reimbursement is contemplated. See id. at § B.6, p. 7.

Because the contract scope included provision of some A&E services, the contracting officer considered application of the statutory six percent fee limitation applicable to contracts for A&E services set forth in 41 U.S.C. §254(b). However, because of the broad, professional services nature of the contract and the agency's inability to define the precise nature of the work required in advance of entering into the contract, the contracting officer determined that the statute did not apply. As noted in the contracting officer's Memorandum of Negotiation, the contracting officer concluded that the negotiated price was fair and reasonable based upon consideration of proposed labor costs/manhours and the costs for reprographics irrespective of estimated project costs and costs for A&E services. See App. 4, 2/13/87 Memorandum of Negotiation, G007398; see also App. 1, CO's Price and Cost Analysis, G004709 (no application of six percent limitation); App. 5, CO's Negotiation Plan, G004734 (same); App. 6, 5/30/87 Memorandum of Understanding between Jesse Arredondo, Contracting Officer, NOAA and K

[5] For simplicity, Plaintiff cites to the Definitized Contract already a part of the record as Appendix 9 to Plaintiff's Complaint, rather than filing a second copy of the Definitized Contract as an exhibit to this brief.

Sawyer, Project Manager, FDI, G005113 (establishing agreed maximum contract price and understandings related to the pricing of subsequent modifications, options and changes without reference to the six percent limitation).

In October 1986, the NOAA contracts personnel requested that the DOC OIG review FDI's pricing proposal and identify issues related to negotiation of the definitized contract and determination of profit objectives. See App. 7, 10/21/86 Memorandum from W. Becker, Contracting Officer, Central Administrative Support Center, to Janet Stine, Audit Manager, Systems Acquisition Division, OIG, G004754. The OIG, in turn, requested evaluation of the price proposal by the Defense Contract Audit Agency ("DCAA"). See App. 8, Audit Report No. 4181-7D210225, dated 12/2/86, from DCAA to OIG, G004743. Neither DCAA nor the OIG questioned any proposed costs on grounds relating to application of the six percent limitation or indicated in any way that costs under the contract were required to be limited by the Act. See id.; App. 9, 1/8/87 Memorandum from Janet Stine to William Becker, G004741.

Moreover, neither the letter contract nor the definitized contract contained any reference to the six percent statutory limitation on the fee in contracts for A&E services set forth in 41 U.S.C. § 254(b) or the related FAR guidance. See App. 10, Summ. of CO's Analysis of Incurred Costs, FDCO 1805.

As a result, the head of the agency never performed the mandatory estimate of project costs at the time of entering into the contract to limit A&E contract costs as would have been required had the statute applied. Indeed, due to the nature of the contract negotiated, the agency could not provide an estimate of project costs to FDI at any time during contract performance. See App. 11, D's Resp. to P's Interrogatory No. 9, pp. 9a-9b. Development of such estimates was part of the work that FDI was required to perform under the contract. See id.

Because the agency was unable to define the work to be performed under the contract and was unable to perform the statutory estimate, the parties, in negotiating the contract, specifically agreed that the six percent limitation set forth in Section 254(b) did not apply to the contract.[6] See App. 12, 4/8/87 Letter from Jack Toliver FDI to Jesse Arredondo CO NOAA, G004447-48 (objecting to suggestion that six percent statute applied and confirming parties' agreement not to apply statute in light of impossibility of creating required estimate); Complaint App. 1 at p. 4 (stating "It appears that neither NOAA nor FDI fully understood how the statute would apply").

NOAA exercised four option years and extended the contract three times prior to expiration of the contract in October, 1992.[7] See Complaint App. 1 at p. 1. Throughout the term of the contract, the agency ordered FDI to expend hours towards the numerous tasks in the statement of work without any reference to application of the statute. See id. at p. 2.

In late 1989 and early 1990, the DOC OIG audited NOAA in connection with its Joint System Program Officer participation in the NEXRAD program. One of the issues raised by the OIG was its belief that --its previous review notwithstanding-- the six percent limitation on costs of contracts for A&E services was applicable to costs incurred under FDI's contract. See App. 13, 10/16/90 Draft OIG Audit Report, FD007622.

After the OIG completed its audit and formally stated its position regarding the fee limitation, NOAA and FDI met in June of 1990 to ascertain whether the statute, even if applicable, might require any adjustment to the payments made to FDI for work performed and might affect payments going forward. See Complaint App. 1 at p. 2; App. 14, 6/11/90 e-mail

---

[6] The parties agreed that the contract should be a "level of effort professional services contract" and not subject to the six percent fee limitation set forth in the statute and FAR 15.903(d)(1)(iii).

[7] Following expiration of the contract, FDI was awarded follow-on contracts to continue work on completing the WFO modernization program. See Complaint App. 1 at p. 1.

from Edward Mische SEPO to Jack Tolliver FDI. The parties reached an agreement that was articulated and documented regarding the services that they understood would be subject to the six percent statute were the statute applicable. See Complaint App. 1 at p. 2; App. 15, 6/25/90 facsimile from FDI illustrating agreement from 6/12/90 meeting between FDI and NOAA.

Following this meeting, the agency did not indicate that FDI had performed services in excess of the six percent limitation and confirmed that the pricing going forward from that point was in compliance with the statute to the extent it was applicable. See App. 16, Agency's 10/5/90 Internal Letter from Max Entrikin SEPO (providing FDI costs in line with six percent limitation). Indeed, prior to 1992 when the contract expired, the agency did not object to any of FDI's costs on grounds that they would violate the six percent statute. See App. 17, D's Resp. to P's Req. for Admis. No. 30, p. 30.

In August 1993, after the contract had been performed, the DOC OIG issued Audit Report No. NOA-4436-3-001 "Weather Forecast Office Construction Support Contract Needed Improved Management and Administration," which delivered a scathing indictment of NOAA's implementation and management of the WFO modernization program. See App. 18, OIG Audit Report No. NOA-4436-3-001 (1993). The report criticized NOAA for entering a contract that required FDI to administer each and every aspect of planning and implementing the WFO modernization program, and for the extent to which NOAA placed control over the WFO modernization program in FDI's hands. It concluded that under the contract:

> The range of Fluor Daniel's activities extended to virtually every aspect of the WFO construction program. Fluor Daniel reviewed policies and developed strategies that affected the program's priorities and budget . . . Fluor Daniel personnel also developed WFO budget figures, including estimated costs for its own professional services, and made budget presentations to the Department's budget officials. Fluor Daniel maintained most of the corporate knowledge concerning the WFO project status and

> costs and kept most of the program records and documents for [the agency].

Id. at p. 14.

Moreover, the report concluded that "[t]he contract was administered as if it were a contract for personal services which allowed the contractor to perform inherently governmental functions." Id. at p. 13. It revealed that due to the exceptionally broad and vague nature of the statement of work, NOAA was able to set up a system under which FDI implemented the program from start to finish. Indeed, under the contract, the contracting officer ordered FDI to establish program priorities and work requirements and, based thereon, establish estimated budgets, which the agency would then adopt. See id. at p. 11. The agency also directed FDI to generate detailed work plans for each year, which the contracting officer would then issue to FDI as a task order, and which FDI would carry out. See id.

Finally, despite the report's conclusion that FDI's contract was clearly for a range of services that far exceeded a contract for A&E services, the report accused NOAA of failing to comply with the six percent statutory limitation on contracts for A&E services.

The OIG did not release a final audit report until March of 1995. See Complaint App. 1 at p. 2. Not until October 1995, a full three years after conclusion of the contract, did the then current contracting officer officially take the position that the statute applied and that payments made to FDI by the agency were in excess of the six percent limitation set forth in statute.[8] See id. Not until almost seven years after conclusion of the contract, following unsuccessful negotiations between the parties did the contracting officer issue her Final Decision seeking

[8] Importantly, the parties at this point essentially were functioning in dispute mode. Both parties' original contracting officers were deceased. The new NOAA contracting officer's revision of the prior agency position regarding application of the statute, in response to pressure by OIG, must be viewed as both arbitrary and capricious.

repayment of funds paid to FDI for the work that FDI had performed.

The Final Decision took the position, first raised in the OIG interim audit report, that the six percent limitation applies to FDI's contract while simultaneously acknowledging both that the head of the agency did not perform any estimate of construction costs prior to entering the contract, and that the fee limitation requires the head of the agency to perform an estimate of construction cost prior to entering the contract. See App. 10 at FDCO 1805.

The Final Decision also took the position that the statute should be applied using actual construction costs computed by FDI during contract performance after FDI had performed the A&E services purportedly subject to the Act. See Complaint App. 1 at App. II, p. 13 (denominator based on 1992 WFO Facilities Budget created by FDI as part of performing the contract); App. 10 at FDCO 1805.

Further, the Final Decision utilized only a portion of the construction costs identified in the 1992 Facilities Budget on grounds that FDI had expended level of effort hours toward only fifty-four of the 100 plus WFOs. See Complaint App. 1 at App. II, pp. 17-18; App. 10 at FDCO 1810-11. In addition, the Final Decision took the position that only a portion of the construction cost for twelve WFOs should be included because FDI had not completed one hundred percent of the design on those sites when the contract expired, and excluded leased sites because although the sites originally required new buildings, they were later converted to leased sites on which FDI conducted only partial design. See Complaint App. 1 at App. II, pp. 13-14; App. 10 at FDCO 1808. The contracting officer chose this methodology despite the OIG interim audit report that included the full construction cost set forth in the 1992 WFO Facilities Budget,

including sites completed, in-process, or proposed.[9] See Complaint App. 10, OIG Interim Audit Report No. DEN-4613-3-0001, App. II, p. 1.

The contracting officer's Final Decision not only fails to account for the agency's inability and failure to make the cost estimates prerequisite to applying the statute, but also seeks to recoup money rightfully paid to FDI for work accepted by the government over the six-year course of contract performance. The contracting officer is seeking -- over seven years after the conclusion of the contract and thirteen years after the parties negotiated the contract with the understanding that the statute did not apply -- repayment from FDI for charges that NOAA itself contemporaneously deemed legal and proper. The final decision by the contracting officer is contrary to statute, without legal merit and simply unjust.

## STATEMENT OF UNDISPUTED FACTS

The undisputed facts material to this motion for summary judgment are, at minimum, the following:

1. FDI's contract was a professional services contract, only a minor portion of which required FDI to perform A&E services. See App. 1, CO's Price & Cost Analysis, G004709; App. 2, CO's Memorandum for the Record, G004708

2. FDI's contract was a level of effort contract and contains FAR Clause 52.232-22 -- Limitation of Funds required by the FAR when the government contemplates use of an incrementally funded contract. See Complaint App. 9, Definitized Contract, § B.2, pp. 4-5, § B.6, p. 7.

3. Neither the contracting officer's Memorandum of Negotiation, Price and Cost Analysis,

[9] The final OIG audit report appears to have adopted, without explanation, the methodology ultimately used by the contracting officer in her Final Decision. See Complaint, App. 11, OIG Final Audit Report, App. II, p. 1.

nor Negotiation Plan analyzed the costs of the A&E services proposed under the contract by comparing them to an estimate of project costs. See App. 4, 2/13/87 Memorandum of Negotiation, G007398; App. 1, CO's Price and Cost Analysis, G004709; App. 5, CO's Negotiation Plan, G004734.

4. The contract between the parties did not address either the applicability of the six percent limitation or, if applicable, the manner in which the limitation would be applied to A&E services performed under the contract. See App. 10, Summ. of CO's Analysis, FDCO 1805; App. 17, D's Resp. to Req. for Admis. No. 21, p. 21.

5. The agency head did not perform an estimate of costs of the project by the agency head prior to award of the contract. See App. 3, D's Suppl. Resp. to Req. for Admis. Nos. 1, 4, 18, pp. 1-1a, 4-4a, 18.

6. Neither the letter contract, nor the definitized contract, contained an estimate of project costs. See id.

7. Because of the way NOAA implemented the WFO program, the agency could not estimate the costs of the project prior to award of the contract because estimation of construction costs was itself a requirement of FDI's contract performance. See App. 11, D's Resp. to Interog. No. 9, pp. 9-9b; App. 17, D's Resp. to Req. for Admis. No. 1, p. 1.

8. FDI delivered, and the agency accepted, FDI's work during the course of the contract and did not object to FDI's costs on grounds that the reimbursement of such costs or a portion thereof would violate 41 U.S.C. § 254(b) prior to the OIG audit that occurred after expiration of the contract. See App. 17, D's Resp. to Req. for Admis. Nos. 30, 32, pp. 30, 32.

9. The contracting officer's 1999 Final Decision adopted an approach to applying the statute that used the 1992 WFO Facilities Budget created by FDI during contract performance rather

than an estimate of construction costs created by the head of the agency prior to contract award. See App. 10, Summ. of CO's Analysis, FDCO 1805.

10. The project at the time of entering into the contract included construction of over 100 WFOs. See App. 3, D's Supp. Resp. to P's Req. for Admis. No. 1, p. 1.

11. The contracting officer's Final Decision included, in the estimated cost of the project, only a portion of the WFOs contemplated by the contract. See Complaint App. 1, CO's Final Decision, App. II pp. 17-18; App. 10, Summ. of CO's Analysis FDCO 1810-11.

**ARGUMENT**

The standards for summary judgment are well-established. Summary judgment is appropriate when there is no genuine issue as to material fact, and the moving party is entitled to prevail as a matter of law. RCFC 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); In re Sealed Case, 67 F.3d 965, 967 (D.C. Cir. 1995) (citing Sherwood v. Washington Post, 871 F.2d 1144, 1146 (D.C. Cir. 1989)). A material fact is one that is outcome determinative. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Curtis v. United States, 168 F. Supp. 213, 216 (Ct. Cl. 1959).

For purposes of summary judgment, "[t]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party . . . . If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." United States v. Uzzell, 648 F. Supp. 1362, 1363 (D.D.C. 1986) (alteration in original) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986)).

Although this Court must examine the factual issues in the light most favorable to the nonmoving party, Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987), the Federal Circuit has also explained:

> Where a movant has supported its motion with affidavits and other evidence which, unopposed, would establish its right to judgment, the non-movant may not rest upon general denials in its pleadings or otherwise, but must proffer countering evidence sufficient to create a genuine factual dispute. A dispute is *genuine* only if, on the entirety of the record, a reasonable jury could resolve a factual matter in favor of the non-movant.

Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The contracting officer's decision in the instant case is predicated on the applicability of Section 254(b). The statute does not apply. Even if the statute were to apply generally, it cannot be applied in the instant case because the agency did not take the steps that are statutory predicates to application of the statute. Moreover, even if the statute could be applied, the contracting officer's decision adopts a standard for implementing the statute inconsistent with the statute and reason.

Viewing the evidence in this case in the light most favorable to Defendant, there are no issues of material fact. Accordingly, FDI is entitled to summary judgment as a matter of law on Count I of its Complaint.[10]

## I. THE LIMITATION SET FORTH IN 41 U.S.C. § 254(b) DOES NOT APPLY TO THE CONTRACT AS A MATTER OF LAW; THE AGENCY'S ATTEMPT TO APPLY THIS LIMITATION IS UNLAWFUL AND CONSTITUTES BREACH OF CONTRACT

The plain language of the statute and the legislative history of 41 U.S.C. § 254(b) demonstrate that the six percent limitation on fees prescribed therein was intended to apply narrowly to contracts where A&E services represent the majority of the work required, and not to services contracts of the sort at issue here where only a minor portion of the required work

[10] FDI's decision to move this Court for summary judgment based solely on Count I of its Complaint, does not affect FDI's intent to present arguments on any or all of the counts of FDI's Complaint should this case go to trial and does not waive FDI's entitlement to do so.

constituted covered A&E services.

Moreover, the statute was never intended to apply to level of effort contracts in which the government did not contract for a completed task and, if the limitation were applied, could end up without a finished product to show for its expense. Finally, it was never intended to apply to incrementally funded contracts where the changing cost of work due to funding gaps becomes almost impossible to predict.

**A. The Plain Language of the Statute and the Legislative History Show that the Statute Applies Narrowly to Contracts for the Delivery of Plans, Designs, Drawings and Specifications**

The plain language of the statute and the legislative history of 41 U.S.C. § 254(b) demonstrate that the six percent limitation on fees prescribed therein was intended to apply narrowly to contracts where A&E services constitute the majority of the work, and not to services contracts for a wide range of planning and management services where only a minor portion of the required work was comprised of covered A&E services.

Section 254(b) provides in pertinent part:

> [I]n the case of a cost-plus-a-fixed-fee contract . . . a fee inclusive of the contractor's costs and not in excess of 6 percent of the estimated cost, exclusive of fees, as determined by the agency head at the time of entering into the contract, of the project to which such fee is applicable is authorized in contracts for architectural or engineering services relating to any public works or utility project.

41 U.S.C. § 254(b).

When the issue is one of statutory interpretation, courts begin with the language of the statute itself. See Mansell v. Mansell, 490 U.S. 581, 588 (1989). The statute's plain and unambiguous meaning prevails in the absence of a clearly expressed legislative intent to the contrary. See In re Donaldson Co., 16 F.3d 1189, 1192-93 (Fed. Cir. 1994); Hoechst Aktiengesellscheaft v. Quigg, 917 F.2d 522, 526 (Fed. Cir. 1990). Thus, when the terms of the

statute are unambiguous, the inquiry is complete except under rare circumstances. See Rubin v. United States, 449 U.S. 424, 430 (1981).

The statute unambiguously states that it applies to *contracts for architectural and engineering services*. It does not provide that the limitation applies to *any* contract that includes A&E services regardless of whether those services constitute only a minor portion of the work required.

Moreover, even if one were to look to the legislative history, there is nothing that indicates a contrary intent. See H.R. 670, 1949 U.S.C.C.A.N. 1475, 1499 (merely stating that "[t]his subsection . . . prescribes maximum fees in connection with cost-plus-a-fixed-fee contracts").[11] Indeed, it is clear from Congress' own interpretation of the legislative history that the statute was intended to apply narrowly to contracts for a limited range of services.

The history and intended application of 41 U.S.C. § 254(b) was fully discussed in a November 16, 1967 letter sent by the Government Activities Subcommittee of the House Committee on Government Operations to the Comptroller General in response to a 1967 report by the Comptroller General interpreting the statute to apply broadly to all manner of services. The Subcommittee, in rejecting the Comptroller General's recommendation, explained Congress' intent regarding application of the statute and that the term "architectural and engineering services" was no different in meaning than the original language of the predecessor military statutes that applied to contracts for the "production and delivery of plans, designs, drawings, and specifications." See App. 20, Letter from Rep. Jack Brooks, Chairman of the Government Activities Subcommittee of the House Committee on Government Operations to the Comptroller General of the United States, p. 3 (November 16, 1967). Referencing the six

[11] The relevant excerpt of this document is provided at Appendix 19 to this brief.

percent limitation in the Procurement Act of 1947, Chairman Brooks further explained:[12]

> It seems obvious that all Congress did, in an effort to avoid ambiguity, was to make it clear that the traditional limitation as contained in earlier statutes (which were not repealed at that time) would also extend to cost-plus-fixed-fee contracts, notwithstanding the other limitations placed on this type of contract in the statute. To make this so clear as to be beyond question, the House Armed Services Committee in its report . . .expressly stated, 'This provision follows section 3 of the Act of April 25, 1939 above referred to * * *;' or, in other words, the Navy statute which originally described the limitation in terms of the 'production and delivery of plans, designs, drawings, and specifications'

Id. at 4.

These conclusions clearly show that the statute was not intended to apply broadly to services contracts calling for a wide variety of planning and management services as well as A&E services, but rather, was intended to apply narrowly to contracts for the production and delivery of plans, designs, drawings and specifications originally contemplated by Congress in the 1939 statutes.[13]

Based on the Congressional guidance in the 1967 letter, as well the legislative history of the Brooks Act of 1972, Pub L. No. 92-582, which addressed the method for selecting A&E contractors, the Comptroller General held that the costs included in the fee limitation must be construed narrowly. See Inman, B-205,793, B-205793 L/M, 1982 WL 28374 (Comp. Gen.

---

[12] The six percent limitation in the Procurement Act of 1947 is no different in meaning than the Federal Property and Administrative Services Act of 1949 in which "Congress extended the same general procurement concepts as outlined [in the earlier statutes] to the civil side of the Government." See App. 20, Letter from Rep. Jack Brooks, Chairman of the Government Activities Subcommittee of the House Committee on Government Operations to the Comptroller General of the United States, p. 2 (November 16, 1967).

[13] C.f., FAR 36.601-3(c) requiring use of other than the procedures set forth in Part 36 when the statement of work does not "substantially or to a dominant extent" require performance by a registered or licensed architect or engineer.

1982).[14] In Inman, the Comptroller General explicitly rejected earlier suggestions that "the costs included in the fee limitation are all those incurred by the A-E firm in performing the contract" and, instead, held that "the fee limitation relates only to the production of plans, drawings and specifications." Inman, 1982 WL 28374 at *3.

**B. FDI's Integrated Professional Services Contract Is Not a Contract for Plans, Designs, Drawings, and Specifications Covered by the Statute**

FDI's contract was *not* a contract principally for the production of plans, designs, drawings, and specifications. Rather, it was a highly complex level of effort contract pursuant to which FDI was responsible for planning and management of virtually every aspect of the design and construction phases of the WFO program. See App. 18, OIG Audit Report No. NOA-4436-3-001 (1993) ("The range of Fluor Daniel's activities extended to virtually every aspect of the WFO construction program"); App. 21, Affidavit of Kenneth W. Forsyth, ¶ 3; App. 22, 10/6/86 NOAA Program Work Breakdown Structure, G008778. Indeed, total A&E services, not to mention the much smaller subset of services involving production of plans, designs, drawings and specifications, accounted for only a minor part incidental to the other work required rather than the opposite. See App. 1, CO's Price and Cost Analysis, G004709 ("The proposal is to provide a small portion of architect-engineer design service to site adapt a conceptually designed Weather Service office building, by another contractor . . ."); App. 2, CO's Memorandum for the Record, G004708 ("Solicitation, interviews, and selection based on A-E criteria/standards, with most of the work in project and construction management. The A-E portion is minor: to site adapt a conceptual design developed by Burns and McDonnell").

Under the terms of the contract, FDI was required to perform a wide range of services including, but not limited to, program development and support and management services,

[14] The Inman decision is included as Appendix 13 to Plaintiff's Complaint.

construction management services, construction inspection, and technical A&E design services. See Complaint App. 1 at p. 1. The Statement of Work ("SOW") required FDI, among other things, to:

- Develop program planning, tracking systems, and cost estimating systems to allow the agency to evaluate the effect of changes on all project associated tasks (See Complaint App. 9 at SOW § 2.1, p. 9);

- Prepare a work breakdown structure to be used to reflect all program elements for the A&E, construction management and construction inspection phases and to serve as the primary framework for integrating program planning and scheduling and for reporting and tracking all costs (See id. at SOW § 2.1.1, pp. 9-10);

- Prepare program plans and progress reports and conduct periodic program management meetings. (See id. at SOW §§ 2.1.4 - 2.1.9, pp. 10-12);

- Develop complete design and construction procurement packages, perform numerous services in relation to the contract bid phase, including making award recommendations (See id. at SOW §§ 2.3.1, p. 14-15, 2.3.8, pp. 16-17);

- Assist the agency in negotiating change orders, and resolving disputes and claims with construction contractors (See id. at SOW § 2.3.8, pp. 16-17).

It is clear from this partial list of tasks that this was far more than a contract for the delivery of plans, designs, drawings and specifications, or even for incidental services related thereto. Indeed, the OIG's 1993 Audit report No. NOA-4436-3-001 "Weather Forecast Office Construction Support Contract Needed Improved Management and Administration," highly critical of NOAA, revealed that due to the exceptionally broad and vague nature of the statement of work, NOAA was able to set up a system under which FDI implemented the WFO modernization program from start to finish. See App. 18, OIG Audit Report No. NOA-4436-3-001 (1993). Under the contract, the contracting officer ordered FDI to establish program priorities and work requirements and, based thereon, establish estimated budgets, which the agency adopted. See id. at p. 11. The agency would then direct FDI to generate detailed work plans for each year, which the contracting officer would issue to FDI as a task order and which

FDI would then carry out. See id.

It is clear that FDI was expected to expend its required level of effort hours towards the overall management of the NOAA WFO Modernization Program and accomplish many tasks that would typically fall in the hands of government employees. See id. at p. 13. Indeed, in the words of the OIG auditors: "By allowing Fluor Daniel to perform inherently governmental functions, NOAA and NWS officials, in effect, surrendered control of the WFO construction program to Fluor Daniel." Id. at p. 14. Accordingly, FDI's contract was not the type of contract to which the statutory limitation applied.

### C. Congress Did Not Intend the Six Percent Limitation to Apply to Level of Effort Contracts of the Sort at Issue Here

As indicated in the legislative history, the six percent threshold contained in the statute was intended to reflect a relationship, existing in the industry more than fifty years ago, between the costs of fully designing a building and the costs of fully constructing a building under traditional contracts for A&E services. See App. 23, H.R. 4278, 72d Congress, pp. 1, 8-9 (1939). The express purpose for which the limitation arose was to facilitate military construction of bases in the United States, its territories, and possessions by allowing the government to enter cost-type contracts for the production of designs, plans, drawings and specifications where contractors could not accept the risk posed by fixed-price contracts site unseen. See id.

Nowhere does the legislative history suggest that Congress intended to apply the six percent limitation to level of effort contracts in which completion of design is not even a contract requirement. Indeed, application to such contracts makes no sense, since (a) no completed design is required; (b) the percentage of the design that ultimately will be completed is variable and unknown under the contract; and (c) the actual cost to obtain a completed design under a follow-on contract therefore is impossible to predict. Moreover, because the level of effort

contract form implies the possibility for gaps in the design process and/or work on the design by multiple contractors as follow-on procurements are conducted following contract expiration/expenditure of the required level of effort with design incomplete, any notion that design costs in such cases exhibit a six percent relationship to construction costs is patently absurd. See App. 21, Affidavit of Kenneth W. Forsyth, ¶ 8.

Finally, the legislative history also does not suggest that Congress intended the statute to apply to incrementally funded contracts. As with level of effort contracts, the potential for funding gaps with the corresponding ramp-up/learning curve costs renders ultimate cost of design highly variable, renders the contractor's ability to perform within a six percent limitation impossible for the contractor to assess at the time of award, and destroys any possibility for a traditional six percent relationship between design and construction. See id.

### D. The Uncontested Facts and the Applicable Law Demonstrate that the Statute Was Not Intended to Apply to this Type of Contract; Summary Judgment is Therefore Appropriate

It is uncontested that the FDI professional services contract required FDI to perform a wide variety of program planning and management tasks, only a minor part of which related to A&E services including those relating to the production of plans, designs, drawings and specifications. It is also uncontested that the contract was intended to be an incrementally funded, level of effort contract. Because the statute applies narrowly to contracts for A&E services in which such services constitute the dominant portion of the work required, and was not intended to apply to incrementally funded or level of effort contracts, the contract at bar was not the type of contract contemplated by 41 U.S.C. § 254(b). Accordingly, the statutory limitation does not apply to the contract at bar and FDI is therefore entitled to summary judgment.[15]

[15] In filing this motion, FDI seeks efficiently to resolve this case by having the Court determine that the statute, which the agency claims requires repayment of monies received for work

performed, does not apply. Even if the Court were to hold that the statute has some application to the contract at bar, Plaintiff contends that the agency, even after a full airing of the aged facts in the case, would still not be entitled to recover any money because FDI's costs did not exceed six percent of the cost of the project. None of the counts of Plaintiff's Complaint would be resolved by a ruling that the statute applies. Plaintiff has alleged breach of contract and breach of implied contract. Plaintiff has alleged fraudulent inducement. Plaintiff also has alleged that the agency is estopped from denying prior agreements that FDI's costs complied with the six percent limitations and its agreement to follow Army Corps of Engineers guidelines for costs included. Under all of these counts, the agency is not entitled to recover the money demanded.

As recognized by both parties, the issues in this case, should the Court deem the statute applicable, otherwise are complex, contested and difficult -- particularly, the magnitude of the costs incurred in production of designs, plans, drawings and specifications under the contract. Moreover, the information in this case is very old. Key witnesses on both sides are deceased. Procedurally, no discovery has been permitted or occurred on issues relating to the nature of FDI's costs and the agency's contentions thereon. No depositions have been taken, nor experts retained.

Finally, the contracting officer in her Final Decision has flatly admitted that the agency reached an agreement with Fluor in 1990 that addressed which design tasks fell under the six percent limitation. See Complaint App. 1 at p. 2. This agreement plainly incorporated the parties' understanding that, even if the statute were applicable, Fluor had not incurred costs in excess of the statutory limitation prior to that time and designated costs going forward which would fall within the limitation, if applicable. See App. 15, 6/25/90 facsimile from FDI illustrating agreement from 6/12/90 meeting between FDI and NOAA; App. 16, Agency's 10/5/90 Internal Letter from Max Entrikin SEPO. The agency is clearly estopped from denying these agreements and recovering monies paid to FDI for costs incurred in compliance with its terms. Moreover, the contracting officer's calculation of FDI's costs was plainly in violation of the statutory language and GAO precedent explicitly defining the costs subject to the statutory limitation. The law is clear that the six percent limitation applies only to the production of plans, designs, drawings and specifications. See App. 20, Letter from Rep. Jack Brooks, Chairman of the Government Activities Subcommittee of the House Committee on Government Operations to the Comptroller General of the United States, p. 3 (November 16, 1967); Inman, 1982 WL 28374 at *2-3 (citing Brooks Letter). In complete disregard of this clear and unambiguous precedent, the contracting officer's Final Decision held that numerous costs that were wholly unrelated to the production of plans, designs, drawings, and specifications were subject to the six percent limitation. When the costs improperly included by the contracting officer in her calculation are removed, FDI's costs for the production of plans, designs, drawings and specifications fall within six percent of the estimated costs of the project, even as calculated by the contracting officer. Accordingly, even if FDI is denied summary judgment at this stage, the agency will not be able to recover money from FDI and the parties will be needlessly required to conduct discovery on aged matters where FDI will prevail anyway.

## II. THE LIMITATION SET FORTH IN 41 U.S.C. § 254(b) CANNOT BE APPLIED TO THE CONTRACT AS A MATTER OF LAW; THE AGENCY'S ATTEMPT TO APPLY THIS LIMITATION IS UNLAWFUL AND CONSTITUTES BREACH OF CONTRACT

Even if the six percent statutory limitation were generally applicable to the sort of complex, integrated professional services contract at issue here, the plain language of the statute clearly states that the statute can only apply to a contract where the costs of the underlying project are estimated by the head of the agency at the time the parties enter the contract. In the instant case, the head of the agency produced no such estimate. Indeed, the contract required FDI itself to develop the estimated costs of constructing each WFO facility during the period of performance. Accordingly, the statute cannot, and was not intended to, apply to the contract as a matter of law.

### A. The Statute's Plain Language and its Legislative History Show that the Statute Applies Only to Contracts Where the Construction Costs Are Estimated By the Head of the Agency Prior to Entering the Contract

The statutory language and the legislative history of 41 U.S.C. § 254(b) expressly provide that the six percent limitation on fees prescribed therein apply only to contracts where the costs of the project, on which the fee is based, are estimated "by the agency head at the time of entering into the contract." 41 U.S.C. § 254(b).

As set forth in Section I, a statute's plain and unambiguous language prevails in the absence of a clearly expressed legislative intent to the contrary, and when the statute's language is unambiguous, the inquiry is complete except under rare circumstances. See In re Donaldson Co., 16 F. 3d at 1192-93; Hoechst, 917 F. 2d at 526; Rubin, 449 U.S. at 430.

In the instant case, the statutory language states unambiguously that the estimate of construction costs must be completed by the agency head at the time of entering into the contract. Moreover, nothing in the legislative history indicates a contrary intent. See H.R. 670,

1949 U.S.C.C.A.N. 1475, 1499 (stating only that "[t]his subsection . . . prescribes maximum fees in connection with cost-plus-a-fixed-fee contracts"). Were it otherwise, neither the government nor the contractor would know whether the agency was authorized by Congress to pay the contractor a single penny of its costs until after the contractor had expended these costs. Such a result would place every contracting officer party to such a contract in potential violation of the Anti Deficiency Act, which prohibits contracting officers from entering into contracts for payments in excess of appropriated funds. See 31 U.S.C. § 1341.[16] Moreover, such a result would place every contractor completely and entirely at risk for every dollar expended.[17]

### B. The FAR Requires the Contracting Officer to Ensure Compliance with the Statutory Limitation Prior to the Start of Contract Performance

The regulations regarding the six percent statute in the FAR require that the contracting officer have an estimate from the agency head at the time that the contract is entered. Specifically, the FAR prohibits the contracting officer from awarding a cost-plus-a-fixed-fee contract unless he first formally determines that the price negotiated with the contractor is not in excess of the statutory limitation set forth in 41 U.S.C. 254(b). See App. 24, FAR 16.306 (c) (1986)("No cost-plus-fixed-fee contract shall be awarded unless . . .the agency head or designee has signed a determination and findings establishing the basis for application of the statutory

[16] Fundamental to the construction of statutes is the proposition that a statute must be interpreted if at all possible consistent with the requirements of other statutes. See e.g., Hammontree v. N.L.R.B., 925 F.2d 486, 496 (D.C. Cir. 1991).

[17] Furthermore, were the statute interpreted to apply so broadly as to encompass contracts where the parties could not perform the required estimate prior to entering into the contract, the agency would find itself constrained from entering into highly technical and complex contracts for planning and management services, such as the contract at bar. It would also have a chilling effect on contractors' willingness to enter into this type of services contract, where provision of A&E services constitutes only a minor portion of the work required, because the contractor could not be assured that it would be paid in full for the work it was directed to complete until the contract ended.

price or fee limitation [in 15.903(d)]"),[18] FAR 15.903(d)(1) (1986)("The contracting officer shall not negotiate a price or fee that exceeds the . . . statutory limitations, imposed by . . . 41 U.S.C. 254(b)").[19] Accordingly, the contracting officer is expressly required to ensure *prior to awarding* a cost-plus-fixed-fee contract that the contract price is not in excess of "6 percent of the estimated cost of construction of the public work or utility, excluding fees." See App. 24, FAR 15.903(d)(1)(ii)(1986).

An interpretation of an agency charged with the administration of a statute is entitled to substantial deference. See Connecticut Dept. of Income Maint. v. Heckler, 471 U.S. 524, 532 (1985). In cases of doubtful meaning, an agency's construction "is accepted unless there are cogent and persuasive reasons for rejecting it." United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 84 (1932).

The FAR's implementation of the six percent limitation confirms the statute's requirement for an estimate of project costs prior to entering into a contract as a predicate to application of the statute. The FAR's implementation is entitled great deference and clearly demonstrates that the statute is only applicable where the agency head performs an estimate of the project costs prior to execution of the contract.

### C. The Structure of NOAA's Implementation of the WFO Program Made It Impossible for the Agency To Perform the Predicates Necessary for Application of the Statute

NOAA failed to implement the WFO Program in accordance with industry-wide and government-wide practices permitting application of the statute. Selection of A&E contractors and negotiation of contracts for A&E services subject to the Act occur, industry-wide and

[18] This provision still exists in the FAR. See FAR 16.306(c) (2003).

[19] This provision still exists in the FAR. See FAR 15.404-4(c)(4) (2003).

government-wide, at a particular point in government construction programs permitting application of the Act, if appropriate. While minor variations occur between agencies, invariably, an agency engaged in such programs will identify project needs, create design and construction cost estimates and prepare A&E statements of work before selecting an A&E contractor and before negotiating a contract with that contractor. See App. 25, EP 715-1-7 US Army Corps of Engineers "Architect-Engineer Contracting," §§ 4-10, 4-13(b)(2), 4-16, App. K, pp. K-1, K-3, App. X, p. X-1 ¶ 5;[20] App. 21, Affidavit of Kenneth W. Forsyth, ¶¶ 5-8. This makes it possible for the agency to apply the six percent limitation as required under both the statute and the FAR prior to entering into the contract with the A&E contractor. See App. 25, EP 715-1-7 US Army Corps of Engineers "Architect-Engineer Contracting," § 4-13(b). It also ensures that A&E contractors negotiate contracts for A&E services with the absolute certainty that the six percent limitation will not prevent them from being paid the contract price and/or recovering costs up to the specified limits.

In the instant case, the agency did not create the necessary estimate of project costs so as to permit application of the statute.[21] See App. 3, D's Supp. Resp. to P's Req. for Admis. No. 1, pp. 1-1a; App. 18, OIG Audit Report No. NOA-4436-3-001 (1993), p. 6 (finding the agency "did not prepare independent, detailed, government estimates of the A&E effort as required by Part 36.605 of the FAR"). Rather, it is undisputed that FDI's integrated services contract itself required FDI to develop estimates of construction costs as part of the contract work. See Complaint App. 9, at SOW § 2.1.3, p. 10;

[20] Due to the length of this document, Plaintiff has provided only the portions relevant to this brief in the Appendix. A full copy can be provided at the Court's request.

[21] The agency acknowledges that because it did not complete the required estimate prior to entering into the contract, the only way it can now apply the statute is "in retrospect based upon logical interpretation." See App. 10, Summ. of CO's Analysis, FDCO 1805.

App. 11, D's Resp. to P's Interrogatory No. 9, pp. 9-9b.

Specifically, the SOW provided:

> The PSC [professional services contractor] shall prepare cost estimates for construction contract packages prepared under this contract. Initial estimates shall be prepared during the early stages of the program management and planning effort. Estimates shall be prepared in such a level of detail as is practical at the time the estimates are made, and shall be refined and updated as the program progresses.

Complaint App. 9 at SOW § 2.1.3, p. 10.

It is further undisputed that because creation of the estimate of construction costs was part of the work covered by the contract, the agency head did not develop the necessary estimate of construction costs prior to execution of either the letter contract or the definitized contract. See App. B, D's Resp. to P's Interrogatory No. 9, pp. 9-9b.

Accordingly, even if the statute were applicable to complex integrated services contracts of the sort at issue here, the statute does not apply and cannot be applied where, as here, the predicate estimate by the agency head was not done at the time of entering the contract. Were it otherwise, neither the agency nor the contractor would have any idea whether the agency was authorized to pay the contractor for its work until after performance of the contract.

**D. The Uncontested Facts and the Applicable Law Demonstrate that the Statute Was Not Intended to Apply to this Type of Contract; Summary Judgment Is Therefore Appropriate**

It is uncontested that neither party completed an estimate of construction costs for the project prior to entering into the contract because calculation of the estimate was required as part of FDI's performance. Because the statute only applies to contracts where the estimate of the construction costs of the project can be calculated prior to the start of contract performance, the contract at bar was not the type of contract contemplated by 41 U.S.C. § 254(b). Accordingly, the statutory limitation does not apply to the contract at bar and FDI is therefore entitled to

summary judgment.

## III. EVEN IF THE STATUTE COULD BE APPLIED TO THE CONTRACT, THE CONTRACTING OFFICER'S DETERMINATION OF THE SIX PERCENT LIMITATION FAILED TO UTILIZE THE COMPLETE ESTIMATE OF PROJECT COSTS AND WAS THEREFORE IMPROPER AS A MATTER OF LAW

Even were the statute applicable and were it possible to apply the statute without an estimate by the head of the agency at the time of entering into the contract, the contracting officer's Final Decision still would be flawed as a matter of law because it does not use the estimated cost of the project in calculating the six percent limitation as required by the statute. Rather, the contracting officer's Final Decision uses an estimate of only *part of the project* set forth in the contract. The Court should not permit the agency to misread the statute to its benefit and should hold that, if a retrospective "estimate" lawfully may be used, this estimate must utilize the entire estimated cost of the project contemplated by the parties at the time the contract was entered.[22]

### A. The Statute Limits the Contractor's Fee to Six Percent of the Costs of the Entire Project Based on an Estimate Created at the Time the Parties Entered the Contract

As previously set forth, the statute provides for a fee "not in excess of 6 percent of the estimated cost . . .of the project," that must be "determined by the agency head at the time of entering into the contract." 41 U.S.C. § 254(b). Neither the statute itself nor the legislative history address what Congress meant by the term "project." It is a well established that when a word is not defined by a statute it should be construed in accordance with its ordinary or natural meaning. See Smith v. United States, 508 U.S. 223, 228 (1993). Courts will look to the

[22] As set forth below, an affirmative decision on this point effectively resolves the case since the FDI costs allegedly subject to the Act (as set forth by the contracting officer in her Final Decision) indisputably are within six percent of the full post-award project "estimate" of which the contracting officer used only a portion.

dictionary for assistance regarding a word's ordinary meaning. See Forshey v. Principi, 284 F.3d 1335, 1348 (Fed. Cir. 2002) (superceded by statute on other grounds) (citing as examples Humana, Inc. v. Forsyth, 525 U.S. 299, 309-10 (1999); Muscarello v. United States, 524 U.S. 125, 128 (1998); MCI Telecomms. Corp. v. Am. Tel & Tel. Co., 512 U.S. 218, 225-27 (1994); Reves v. Ernst & Young, 507 U.S. 170, 177-79 (1993)).

Webster's Dictionary defines "project" as "a specific plan or design. . .a devised or proposed plan." Webster's Third New International Dictionary (1993). Accordingly, a natural reading of statute is "not in excess of 6 percent of the estimated cost of the plan or proposed plan at the time the contract is entered." This reading is consistent with the Court's dicta on the subject. In Ralph L. Jones Co. v. United States, 33 Fed. Cl. 327 (1995), the court stated that "in architect and engineering cost-plus-fixed-fee contracts, the contractor receives a fixed fee to design a project and costs for the construction effort . . . . The fixed fee usually is based on a percentage of the estimated cost of the construction project." Ralph L. Jones, Co., 33 Fed. Cl. at 332. Similarly, interpreting the original language of the 1939 Act, the Comptroller General held that the architect's fee is "based upon the estimated cost of the project work to be performed by the construction contractor." Comptroller General Warren to the Secretary of War, B-18,126, 21 Comp. Gen. 580, 1941 WL 925 at *7 (December 18, 1941).[23] Based on the plain meaning of the statute, therefore, the fee must be based on all of the WFOs that were contemplated as part of the project when the parties entered the contract.

**B. The Agency's Use of Only a Portion of the Estimate of Project Costs Is Unsupported by Law or Reason**

The agency's use of only a portion of the estimated project costs is contrary to the plain meaning of the statute or reason. It is undisputed that the scope of work contemplated by the

[23] This decision is provided as Appendix 26 hereto.

contract was "the construction of over 100 separate Weather Forecast Offices (WFO)." App. 3, D's Supp. Answer to P's Req. for Admis. No. 1, p. 1; Complaint App. 9 at SOW § 1.2. The contract was never modified to reduce this scope. To the contrary, it simply expired upon its terms, i.e., expiration of the contract period/expenditure of the required level of effort hours. Had the head of the agency fulfilled his or her obligation to perform an estimate of the cost of the project at the time that the parties entered into the contract, these 100 plus WFOs would have been the basis of the estimate, the basis upon which the limitation on FDI's fees would have been negotiated, and thus the basis against which FDI would have performed. Indeed, the agency expressly has admitted that "under normal circumstances, the six percent fee limitation is derived from a pre-defined . . . denominator agreed to by the Contracting Officer and the potential Contractor prior to contract award. That is . . . the Government's estimated cost of construction of the project (the denominator)." App. 10, Summ. of CO's Analysis, FDCO 1805.

Despite the agency's acknowledgment that the statute requires use of an estimate of project costs, see App. 10, Summary of CO's Analysis, FDCO 1805, the contracting officer's Final Decision summarily takes the position that "NOAA, the OIG and the CO agree that only those sites incurring design costs included in the numerator of the six percent fraction are included in the denominator of the fraction." See id. at FDCO 1811.[24]

[24] The contracting officer further takes the position that, for any site as to which FDI began but did not complete design, only a fraction of that site's contribution to the project estimate should be included. This also is contrary to the plain meaning of the statute as set forth above. More importantly, it further illustrates why the statute is inapplicable to this contract in the first instance. In contracts such as this, where the contractor is not required to complete any task but is required to expend work hours, neither the government nor the agency can know whether the contracting officer is authorized by Congress to pay the contractor a single penny of its costs until after the contractor has expended these costs and, in the government's view, its progress toward design completion has been determined. As noted above, application of the statute in this manner instantly would place every contracting officer party to such a contract in potential violation of the Anti Deficiency Act and would place every contractor completely and entirely at

The contracting officer cites no law in support of her interpretation of the statute. To the contrary, the Comptroller General has held that "the project to which an architect-engineer fee is applicable is the project for which the architect-engineer undertakes in his contract to prepare plans, etc." To the Administrator, Veteran Administration, B-156,469, 1967 CPD ¶ 31, 1967 WL 1686 (July 21, 1967);[25] see also Skidmore, Owings & Marrill, ASBCA No. 5593, 61-1 BCA ¶ 2974 (February 28, 1961) (holding statutory limitation applies to fee for overall project and not individual line items).[26] This definition clearly comports with a plain reading of the statutory language and a common reading of the word "project." Under this interpretation of the term "project," the fee would be based on the costs of the planned construction work. In the case at bar, it is undisputed that the contract statement of work contemplated design of over 100 WFOs.

Use of the full estimated cost of the project work to be performed by the construction contractor is particularly important if the statute is to be applied to the level of effort type contracts involving multiple site designs of the sort at issue here. This is so because, in such contracts, the contractor is entitled to expend level of effort hours -- either toward as much of the design as possible on all sites, or toward a higher percentage of design on fewer than all sites -- up to six percent of the estimated project cost. Were the agency permitted to use less than the full project cost estimate on grounds that the contractor's effort had been expended on less than all sites included in that estimate, whether and how much the contractor would be entitled to recover would vary widely and arbitrarily depending on the number of sites on which he worked,

---

risk for every dollar expended. Clearly, this was not the result Congress had in mind when it enacted the statute.

[25] This decision is provided as Appendix 27 hereto.

[26] This decision is provided as Appendix 28 hereto.

even though in either case all work would have been proper under the contract. Were the statute applicable, Congress would not have intended such result.

### C. If the Statute Were Applicable and the Contracting Officer Used the Complete Estimate of Project Costs, FDI's Costs Would Be Within the Six Percent Statutory Limitation

The 1992 WFO Facilities Budget created by Fluor during performance undisputedly represents the only document in this case aggregating the estimated costs of the 100 plus facilities contemplated by the project. See Complaint App. 1 App. II, p. 13; see also App. 29, 1992 Facilities Budget (representing the only such estimate produced by the agency during discovery).

Although this estimate was not prepared by the agency head and was not prepared at the time of entering into the contract, it is the "best estimate" of the costs of the project as implemented by the agency, and reflects an estimated project cost of approximately $114 million.[27] Were the statute applicable to the contract, and applicable without the required estimate by the agency head, a ruling by the Court that the statute requires use of the full estimate of project costs nevertheless would resolve this case. It is undisputed that even if the costs alleged by the contracting officer to be costs for A&E services subject to the six percent limitation were so limited,[28] those costs would be within the six percent limitation computed using the $114 million project cost set forth in the 1992 Facilities Budget. See Complaint App. 1 at p. 1 (alleging $5,551,549 in A&E costs subject to the Act).

---

[27] The OIG interim audit report utilizes this complete estimate of project costs in calculating the alleged limitation on FDI's recovery of costs. See Complaint, App. 10, OIG Interim Audit Report, App. II, p. 1, n. d; App. 3, March 1992 WFO Facilities Budget (illustrating figures on which denominator is based).

[28] See footnote 15 addressing the complex issues that would need to be resolved in any trial on the numerator-type issues.

**D. <u>The Uncontested Facts and the Applicable Law Demonstrate that Provided the Statute Applies to the Contract the Agency Used a Method to Apply the Statute that Was Contrary to Law; Summary Judgment is Therefore Appropriate</u>**

It is undisputed that the statute required the head of the agency to perform a full estimate of project costs prior to the time the parties entered into the contract. It is further undisputed that the project contemplated at the time the parties entered into the contract was the construction of more than 100 WFOs. Accordingly, the contracting officer's use of only part of the estimated project costs is contrary to law. Therefore even if the statute were applicable and could be applied without an estimate by the agency head at the time the parties entered the contract, Plaintiff would still be entitled to summary judgment on grounds that the costs alleged by the contracting officer to be A&E costs subject to the six percent limitation are within that limitation calculated using the full estimate of project costs set forth in the 1992 Facilities Budget.

## CONCLUSION

Based on the undisputed material facts, Plaintiff respectfully requests that the Court grant it summary judgment on Count I of Plaintiff's Complaint.

Respectfully submitted,

s/ *Frank M. Rapoport*

FRANK M. RAPOPORT
STEPHEN E. RUSCUS
DAVID M. GLYNN
McKENNA LONG & ALDRIDGE LLP
1900 K Street, N.W.
Washington, DC 20006
(202)496-7500

Attorneys for Plaintiff,
Fluor Enterprises, Inc.

Date: <u>January 12, 2004</u>

**National Oceanic and Atmospheric Administration,**
Host Agency serving:
Bureau of the Census
Economic Development Administration
International Trade Administration
Minority Business Development Agency
Office of the Inspector General

**U.S. DEPARTMENT OF COMMERCE**
**Central Administrative Support Center**
Federal Building, Room 1736
601 East 12th Street
Kansas City, Missouri 64106

MEMORANDUM FOR: The Record

FROM: Jesus Arredondo, Contracting Officer

SUBJECT: Price and Cost Analysis -- Solicitation No. NWWR0700006000

The proposal is to provide a small portion of architect-engineer design service to site adapt a conceptually designed Weather Service office building, by another contractor, and to furnish engineering/project management services including construction management and inspection, equipment studies, and geotechnical surveys for some 52 new offices, 17 offices needing major retrofit, 17 offices needing minor modifications, and 27 offices needing expansion to accommodate the new NEXRAD system. Additionally, inspection services will be required at 113 radar data acquisition sites. The construction will be throughout CONUS and at DOD sites in Europe and the Pacific. Funding for the NEXRAD program comes from a tri-party agreement between Commerce (NWS), Transportation (FAA), and DOD.

Total design effort in FY 87 will be approximately $70,000.00; and total estimated cost for all services in FY 87 should be approximately $1.8 million, excluding fee. The estimated cost is based upon a level of effort consisting of 27,500 direct productive man-hours.

## I. PROFESSIONAL SERVICES CONTRACT

Base Period -- August 1, 1986 through September 30, 1987

Approximately 27,500 Direct Productive Man-Hours (DPMH)

1. Work for latter part of FY 86 to be done by Fluor Technology, Inc., in Irvine, California, except for Gould-Evans in Kansas City, Missouri. Expect two trips to Irvine for Bob Gould.

2. Requires two trips to Irvine for Max Entrikin.

   Award + 15
   Award + 30

   Provides funds for one trip to Kansas City in two months period for up to three Fluor planners.



G 004709

3. Includes space and furnishings at Fluor Technology, Inc., in Irvine, California, in overhead markup.

4. Provides for development of:

   * Work Breakdown Structure
   * Program Schedule
   * Initial Review (H+30)
   * Planning Workshop (A+15)
   * Cost Allocation Report Methodology
   * Program Cost Estimate
   * Progress Report

5. Commence work on:

   * Construction Materials Study
   * Life Cycle Cost Study
   * Design Manual
   * Project Procedure Manual (See Below)
   * Site Manuals

     --Data Acquisition Checklist
     --Inspection and Reporting

   * Annual Work Plan (Particular Focus on Kansas City vs. Irvine Location)
   * Engineering/Architect Procedures

     --Drawing Preparation, Size, Format, Quality, Drafting Standards, Numbering System, Squad Checks, Reviews

     --Specifications - Same

     --CAD - Computer - Hardware

     --Software - Control - Interfaces Data Link

     --Repro Planning

     --Document Control

* Engineering Procedures Manual

--Engineering Design Criteria Manual

--Develop Material Management Plan - Long Lead Items - GFM

--Modularization

--Construction Systems

--Contracts Manual - Procedures

--Procurement Manual

--Office Procedures - Interfaces, NOAA, NEXRAD-JSPO, Correspondence, Files, Property, Travel Control, Pay/Timekeeping

--Develop Format and Control Level Schedules

--Develop Cost Code of Accounts

--Briefing/Aids for Government Presentation

--Estimates in Connection with Studies

--Format for Construction Scheduling

--Project Controls Procedures

--Annual Work Plan Refinement

--Annual Budget Plan

--Develop Cost Trend System

--Turn-over Schedule Planning

6. During FY 87, the estimated level of effort will be 13 man-years and will include a Project Director, Engineering (3), Construction (2), Contracts (2), Controls (3), and Architecture (2).

7. In FY 87, work locations will be:

| | |
|---|---|
| Kansas City | 10 |
| Irvine | 3 |

In Kansas City, Fluor will use leased space in Bob Gould's present office. Fluor understands that they will get all furniture for the cost of shipment to Kansas City from Irvine.

8. Fluor expects to complete all planning work started in FY 86, in FY 87 (see paragraph 5, previous summary). Additional planning will be done on safety, security, and information packaging.

9. In Irvine and Kansas City, Fluor/Gould-Evans will complete detailed design for two WFO's and one mod., site acquisition permitting. In the third and fourth quarter, detailed design of the following year portion of the program (12 sites) will be started (site acquisition permitting).

10. Fluor will collect data on as many sites as acquisition processing will permit. Their work will cover Davis-Bacon rates, zoning, telephone and engineering.

11. Three subcontracts per site for engineering data acquisition; these would be Fluor subcontracts, passing down all Department of Commerce requirements, and will be the basis for an effective small and disadvantaged business program on engineering aspects of the program.

12. The contract specifications packages developed by Fluor/Gould-Evans and reviewed in Kansas City will include drawings, specifications, calculations, cost estimates, and a schedule for use in evaluating bids, and the inquiry package.

13. The final quarter of FY 87: Fluor would expect to develop bidders lists for the first three solicitations.

A productive year for 13 people should cause little risk to the Government regarding successful performance of these tasks. Some delays in obtaining legal descriptions, maps, drawings, or appraisals should not seriously impact what should be accomplished this first year.

## II. COST ESTIMATE

| FISCAL YEAR | DIRECT PRODUCTIVE MANHOURS | ESTIMATED COST | ESTIMATED COST | TOTAL |
|---|---|---|---|---|
| 1986-87 | 27,500 | $1,750,000 | $145,000 | $1,875,000 |

## III. A & E FEE -- FY 87

(a) Four percent (4%) of $1,750,000.00 or $70,000.00.

(b) Fee estimates projected throughout span of contract, based on DPMH.

| | |
|---|---|
| FY 87 | 70,000 |
| 88 | 60,000 |
| 89 | 303,000 |
| 90 | 640,000 |
| 91 | 529,000 |
| | 1,602,000 |

(c) Project Management estimate projected throughout span of contract.

| | |
|---|---|
| FY 87 | 0 |
| 88 | 115,000 |
| 89 | 295,000 |
| 90 | 750,000 |
| 91 | 1,000,000 |
| | 2,160,000 |

(d) Radar Data Acquisition Management = radar, wind profiler, etc.

| | |
|---|---|
| FY 87 | 0 |
| 88 | 15,000 |
| 89 | 160,000 |
| 90 | 530,000 |
| 91 | 720,000 |
| | 1,425,000 |

Labor Rates proposed by Fluor, and verified by audit, compare favorably with previous A-E contracts awarded by CASC and NCASC:

CLASSIFICATIONS -- HOURLY RATES:

| | Fluor | Burns and McDonnell | AEPA |
|---|---|---|---|
| Principal | 35.00 | 35.00 | 26.00 |
| Project Manager | 25.00 | 25.00 | 18.00 |
| Construction Inspector | 21.50 | 25.00 | 18.00 |
| Senior Architect | 22.00 | 21.50 | 18.00 |
| Architect | 17.00 | 22.00 | 20.00 |
| Landscape Architect | 18.00 | 17.00 | 16.00 |
| Senior Mechanical Engineer | 23.00 | 18.00 | 16.00 |
| Mechanical Engineer | 17.00 | 23.00 | 22.00 |
| Senior Electrical Engineer | 23.00 | 17.00 | 17.08 |
| Electrical Engineer | 17.00 | 23.00 | 22.00 |
| Senior Structural Engineer | 23.00 | 17.00 | 15.86 |
| Structural Engineer | 16.00 | 23.00 | 22.00 |
| Senior Civil Engineer | 22.00 | 16.00 | 16.00 |
| Civil Engineer | 16.00 | 22.00 | 22.00 |
| Space Planner | 12.50 | 16.00 | 16.00 |
| Cost Estimator | 19.00 | 12.50 | 16.00 |
| Designer | 15.00 | 19.00 | 25.00 |
| Interior Designer | 13.50 | 15.00 | 12.00 |
| Draftsperson | 10.00 | 13.50 | 12.00 |
| Word Processor | 8.00 | 10.00 | 10.00 |
| Senior Environmental Engineer | 23.00 | 23.00 | -0- |
| Environmental Engineer | 16.00 | 16.00 | -0- |
| Specifications Writer | 19.00 | 19.00 | -0- |
| Typist | 6.50 | 6.50 | -0- |

Overhead, and General and Administrative Rates verified by audit are also comparable to rates in other contracts:

| | | |
|---|---|---|
| Overhead Rate: | 29.13% | (Payroll) |
| General and Administrative Rate: | 100.37% | |
| Total: | 129.50% | |

INDIRECT COSTS

(a) For expenses incurred by the A/E, such as authorized travel and subsistence (including airfare, food, lodging, automobile rental, commercial services, and incidental expenses)--the cost to A/E plus five percent (5%).

(b) For reproduction, printing, long distance telephone calls, vehicles, testing apparatus, computer and computer-aided design and drafting (CADD) services--amounts as determined from A/E's schedule of rates in effect at the time service is provided.

(c) For services rendered by others, such as subcontractor(s) to A/E, surveying, real property descriptions, soil borings, subsurface investigations, laboratory testing, field quality control tests, progress photos, or other activities required or requested by COTR--the cost to A/E plus ten percent (10%).

Based upon the above information and the DCAA audit, and on comparison with the DOE contract administered by Mr. Jeff Hoyles, DOE-Oak Ridge Operations, the prices for the level of effort/direct productive man-hours and other rates appear to be fair and reasonable.

A Certificate of Current Cost and Pricing Data has been received from Fluor Technology for this procurement.

In conclusion, I have determined that the proposal for 27.141 Direct Productive Manhours total $1,750,746.00, is fair and reasonable price and other factors considered.

**National Oceanic and Atmospheric A  nistration,**
Host Agency serving:
Bureau of the Census
Economic Development Administration
International Trade Administration
Minority Business Development Agency
Office of the Inspector General

L **DEPARTMENT OF COMMERCE**
**Central Administrative Support Center**
Federal Building, Room 1736
601 East 12th Street
Kansas City, Missouri 64106

TO: Memorandum for the Record

SUBJECT: Weighted Guideline Factors and Other Items Discussed September 17-22, 1987 between Arredondo and Tate/Toliver of Fluor Technology, Inc.

I. Initial Fluor Offer Based Upon --

| | | |
|---|---|---|
| 1. | Project Labor Skill Level | 18% |
| 2. | Subcontracts | 5% |
| 3. | Other Direct Costs | 8% |
| 4. | OH & GA | 7% |
| 5. | Cost Risks | 5% |
| 6. | Other Factors: (Fluor developed systems) | 8% |

Excessive percentage risks--developed systems either too high or recovery should be spread thru all contracts.

II. Second Fluor Proposal Based Upon --

| | | |
|---|---|---|
| 1. | Project Labor Skill Level | 15% |
| 2. | Subcontracts | 3% |
| 3. | Other Direct Costs | 5% |
| 4. | OH & GA | 1% |
| 5. | Cost Risks | 5% |
| 6. | Other Factors: (Fluor developed systems) | 5% |

III. I suggested joining other direct costs, O/H, and G&A into one factor. CPFF risks to Fluor are low; labor skills high. Therefore, overall percent too high. I proposed, after several discussions, the following:

| | | |
|---|---|---|
| 1. | Project Labor Skill Level | 13% |
| 2. | Subcontracts | 3% |
| 3. | Other Direct Costs, OH, and G&A | 5% |
| 4. | Cost Risks | 1% |
| 6. | Other Factors (as above) | 3% |

Fluor finds percent reasonable--fee based on above:

1. 174,951.00
2. 161,246.00
3. 158,606.00
4. 144,958.00 = $145,000.00

Based on level of effort estimated at 27,141 DPMH then:

| | |
|---|---|
| F.F. - Original Proposal | $174,951.00 |
| F.F. - Revised | 145,000.00 |
| Deduct from FTI Cost Proposal | 29,941.00 |

NOTE: Recommended DOC percentile, per factor in Acquisition Letter:

| | |
|---|---|
| Labor | 1 to 18 |
| Subcontracts | 1 to 5 |
| Other Direct, G&A | 3 to 9 |
| Cost Risks | 0 to 6 |
| Other Factors | -3 to +3 |

IV. Proposed subcontractor, Gould-Evans, is acceptable to NOAA. Same standards and provisions as the prime contractor.

V. OSDBU is favorable towards small-disadvantaged business subcontracting plan. Will let FTI know as soon as possible when we hear.

Tate wanted to know a date for definitization. I stated the audit was not complete and did not have a target date. Tate: Provisional rates, etc. were accepted by DCAA/DOE. The only question was office building sold in FY 85 and leased back in FY 86.

VI. Solicitation, interviews, and selection based on A-E criteria/standards, with most of the work in project and construction management. The A-E portion is minor: to site adapt a conceptual design developed by Burns and McDonnell.

Jesus Arredondo, Contracting Officer

RECEIVED 3-24-03

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FLUOR ENTERPRISES, INC.<br>f/k/a FLUOR DANIEL, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 00-207C<br>(Judge Bush) |

DEFENDANT'S SUPPLEMENTAL RESPONSES TO DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSIONS

Pursuant to Rule 26 of the Rules of the United States Court of Federal Claims (RCFC), and plaintiff's letter dated December 20, 2002, defendant provides defendant's supplemental responses to defendant's responses to plaintiff's first set of requests for admissions. Defendant has made a good faith effort to respond fully to plaintiff's for supplemental responses. However, discovery is continuing and defendant reserves the right to supplement its supplemental responses, including any objections that may be applicable, based upon any additional information that may be discovered subsequent to these responses. Defendant responds to plaintiff's request for supplemental responses to plaintiff's first requests for admission as follows:

REQUEST FOR ADMISSION NO. 1:

In this request for admission, plaintiff requested that defendant admit or deny that prior to the Government's execution of Letter Contract No. 50WCNA606099, the Government did not determine, either separately or as part of any other estimate, the estimated cost of construction applicable to the NWSWFO Design and Construction Program.

RESPONSE:

In our response to plaintiff's request for admission no. 1, defendant objected upon the ground that the reference to "the estimated cost of construction applicable to the NWSWFO Design and Construction Program" is vague and ambiguous. Nonetheless, without waiving this objection, defendant admits that defendant did not develop the estimated cost of construction of individual Weather Forecast Offices (WFOs) prior to execution of either the letter or definitized contracts. Defendant further avers that the statement of work for both the letter contract and definitized contract provided that plaintiff would provide comprehensive program support, engineering and architectural design services, as well as construction management and inspection services in support of the National Weather Service's (NWS) modernization program, which included the construction of over 100 separate Weather Forecast Offices (WFO). Pursuant to the contract, plaintiff

was to provide NWS the estimated cost of construction of each WFO.

In plaintiff's December 20, 2002 letter, plaintiff asks defendant to "confirm that Defendant's statement that the government did not make an estimated cost of construction of individual WFOs, meant that the government did not make any estimated cost of construction for WFOs either individually or in the aggregate (or some part thereof) prior to the execution of the government's letter contract."

Defendant provided an adequate and complete response to request for admissions no. 1. However, without waiving any objection defendant may have to request for admission no. 1 or plaintiff's supplemental request, to the best of defendant's information and belief, defendant has no record of an estimated cost of construction for all planned WFOs in the aggregate prior to execution of the letter contract.

REQUEST FOR ADMISSION NO. 2:

In plaintiff's request for admission no. 2, plaintiff requested defendant to admit or deny that prior to the government's execution of definitized contract no. 50WCNA606099, the government did not determine, either separately or as part of any other estimate, the estimated cost of construction applicable to the NWSWFO Design and Construction Program.

RESPONSE:

In our response to this request for admission, we advised plaintiff to see our response to request No. 1. In plaintiff's December 20, 2002 letter, plaintiff requested that to "the extent that Defendant's revised response to request No. 1 does not accurately respond to No. 2. . ., please provide revised responses. . . ."

Without waiving any objection defendant may have to plaintiff's request for admission no. 2, or plaintiff's supplemental request, defendant's response to plaintiff's request for admission no. 2 accurately responded to that request. However, see defendant's supplemental response to request for admission no. 1, which accurately responds to plaintiff's supplemental request concerning request for admission no. 2.

REQUEST FOR ADMISSION NO. 3:

Neither Letter Contract No. 50WCNA606099 nor definitized Contract No. 50WCNA606099 expressly includes or incorporates by reference the 6 percent limitation set forth in 41 U.S.C. § 254(b) and the implementing regulations.

RESPONSE:

Defendant objects to this request for admission upon the grounds that contracts speak for themselves and are the best evidence of their contents. Without waiving this objection, pursuant to 41 U.S.C. § 254(b), the limitation of design fees to 6 percent of the estimated cost of construction is statutorily mandated and cannot be waived.

REQUEST FOR ADMISSION NO. 4:

In plaintiff's request for admission no. 4, plaintiff asked defendant to admit or deny that at "no point prior to the government's execution of Letter Contract No. 50WCNA606099 did the government communicate to Plaintiff an estimated cost of construction applicable to the NWSWFO Design and Construction Program.

RESPONSE:

In our response to this request for admission, defendant advised plaintiff to see defendant's response to request no. 1. In plaintiff's December 20, 2002 letter, plaintiff requested that to "the extent that Defendant's revised response to request No. 1 does not accurately respond to No. 4. . ., please provide revised responses. . . ." Plaintiff's December 20, 2002 letter also requested that defendant "confirm that Defendant's response, 'See defendant's response to request No.1,' meant that prior to the execution of the letter contract the government did not communicate an estimated cost of construction, whether the estimate was created by the government or communicated to the government by a third party."

Without waiving any objection defendant may have to plaintiff's request for admission no. 4, or plaintiff's

supplemental request, defendant's response to plaintiff's request for admission no. 4 accurately responded to that request. However, see defendant's supplemental response to request for admission no. 1, which accurately responds to plaintiff's supplemental requests concerning request for admission no. 4.

Moreover, the estimated cost of construction "applicable to the NWSFO Design and Construction Program" is irrelevant because the statutory limitation applied only to the WFO portion of the NWS modernization program. Nonetheless, defendant has no record of communicating an estimated cost of construction of Weather Forecast Offices to plaintiff.

REQUEST FOR ADMISSION NO. 5:

In request for admission no. 5, plaintiff requested defendant to admit or deny that at "no point prior to the government's execution of definitized Contract No. 50WCNA606099 did the government communicate to Plaintiff an estimated cost of construction applicable to the NWSWFO Design and Construction Program."

RESPONSE:

In our response to this request for admission, defendant advised plaintiff to see defendant's response to request no. 1. In plaintiff's December 20, 2002 letter, plaintiff requested that to "the extent that Defendant's revised response to request No. 1 does not accurately respond to No. 5. . ., please provide revised responses. . . ." Plaintiff's December 20, 2002 letter also requested that defendant "confirm that Defendant's response, 'See defendant's response to request No.1,' meant that prior to the execution of the definitized contract the government did not communicate an estimated cost of construction, whether the estimate was created by the government or communicated to the government by a third party."

Without waiving any objection defendant may have to plaintiff's request for admission no. 5, or plaintiff's

supplemental request, defendant's response to plaintiff's request for admission no. 5 accurately responded to that request. However, see defendant's supplemental response to request for admission no. 1, which accurately responds to plaintiff's supplemental requests concerning request for admission no. 5.

REQUEST FOR ADMISSION NO. 15:

In plaintiff's request for admission no. 15, plaintiff requested defendant to admit or deny that the "contract required Plaintiff to engage in design efforts within government guidelines including a building design for a base-line new WFO and existing engineering information from government files for existing offices requiring expansion or modification."

RESPONSE:

In our response to this request for admission, defendant objected to this request for admission upon the grounds that the contract speaks for itself and is the best evidence of its contents. Nonetheless, defendant, further responded, without waiving this objection, that defendant could neither admit nor deny this request for admission because defendant did not understand what plaintiff was alleging that the contract required and, if plaintiff clarified this request, defendant, subject to objection, would attempt to provide an answer.

In plaintiff's December 20, 2002 letter, plaintiff clarified its request for admission no. 15 by stating that plaintiff was requesting defendant to admit or deny that "when Fluor created the designs, plans, drawings for WFOs required under the Statement of Work, Fluor was required to base its

designs, plans and drawings on already existing designs, plans or drawings that had been provided to Fluor by the Government."

Defendant objects to the request as now clarified upon the ground that it requests information beyond the scope of the discovery limitations set forth in the parties' October 13, 2000 Joint Preliminary Status Report, which limited discovery to (1) whether the six percent limitation is applicable to the contract that is the subject this dispute; and (2) if the six percent limitation is applicable, what is the appropriate "estimated cost of construction" to use as the denominator when calculating whether the amounts paid to the contractor exceed the statutory limitation. Further, defendant also objects to this request for admission upon the ground that by asking defendant what the contract required calls for a legal conclusion. For these reasons, defendant will not supplement its previous response to request for admission no. 15.

REQUEST FOR ADMISSION NO. 17:

In plaintiff's request for admission no. 17, plaintiff requested defendant to admit or deny that neither the "Letter Contract No. 50WCNA606099 nor definitized Contract No. 50WCNA606099 contains an estimate of construction costs."

RESPONSE:

In our response to this request for admission, we advised plaintiff to see our response to request No. 1. In plaintiff's December 20, 2002 letter, plaintiff requested that to "the extent that Defendant's revised response to request No. 1 does not accurately respond to No. 17. . ., please provide revised responses. . . ."

Without waiving any objection defendant may have to plaintiff's request for admission no. 17, or plaintiff's supplemental request, defendant's original response to plaintiff's request for admission no. 17 accurately responded to that request. However, see defendant's supplemental response to request for admission no. 1, which accurately responds to plaintiff's supplemental request concerning request for admission no. 17.

REQUEST FOR ADMISSION NO. 18:

In plaintiff's request for admission no. 18, plaintiff requested that defendant admit or deny that at "all times during performance of the contract prior to the Office of Inspector General audit reported in Audit Report No. DEN-4613-30001, the only estimates of construction costs available were those prepared by Plaintiff."

RESPONSE:

In our response, defendant objected to this request for admission upon the ground that the term "only" is overly broad. However, without waiving this objection, defendant admitted that plaintiff prepared estimates of construction costs.

In plaintiff's December 20, 2002 letter, plaintiff requested defendant to admit or deny request for admission no. 18 that was reworded as follows: "At all times during performance of the contract prior to the Office of Inspector General audit reported in Audit Report No. DEN-4613-30001, there was no estimate of construction costs (whether created by Defendant or provided to Defendant by a third party other than Plaintiff) for the WFOs other than the estimate prepared by Plaintiff." Without waiving any objection defendant may have to this request for admission, defendant admits request for admission no. 18, as reworded.

REQUEST FOR ADMISSION NO. 19:

In plaintiff's request for admission no. 19, plaintiff requested defendant to admit or deny that at the "time of entering into Letter Contract No. 50WCNA606099, defendant was unable to determine the estimated cost of construction applicable to the NWSWFO Design and Construction Program.

RESPONSE:

In our response to this request for admission, we advised plaintiff to see our response to request No. 1. In plaintiff's December 20, 2002 letter, plaintiff requested that to "the extent that Defendant's revised response to request No. 1 does not accurately respond to No. 19. . ., please provide revised responses. . . ."

Without waiving any objection defendant may have to plaintiff's request for admission no. 19, or plaintiff's supplemental request, defendant's original response to plaintiff's request for admission no. 19 accurately responded to that request. However, see defendant's supplemental response to request for admission no. 1, which accurately responds to plaintiff's supplemental request concerning request for admission no. 19.

Moreover, the estimated cost of construction "applicable to the NWSFO Design and Construction Program" is irrelevant

because the statutory limitation applied only to the WFO portion of the NWS modernization program. Nonetheless, defendant has no record of communicating an estimated cost of construction of Weather Forecast Offices to plaintiff.

ROBERT D. MCCALLUM, JR.
Assistant Attorney General

DAVID M. COHEN
Director

DONALD E. KINNER
Assistant Director

STEVEN J. ABELSON
Attorney
Commercial Litigation Branch
Department of Justice
Civil Division
Attn: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tele: (202) 514-4325

Attorneys for Defendant

OF COUNSEL:

FRED KOPATICH
Attorney
Department of Commerce
14th & Constitution Ave., N.W.
Room 5893
Washington, D.C. 20230

March 24, 2002

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 24th day of March 2003, I caused to be delivered by hand copies of "DEFENDANT'S SUPPLEMENTAL RESPONSES TO DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSIONS" addressed as follows:

FRANK M. RAPPORT, ESQ.
MCKENNA & CUNEO, L.L.P.
1900 K Street
Washington, D.C. 20006

Dana Chase

National Oceanic and Atmospheric Administration
Host Agency serving:
Bureau of the Census
Economic Development Administration
International Trade Administration
Minority Business Development Agency
Office of the Inspector General

U.S. DEPARTMENT OF COMMERCE
Central Administrative Support Center
Federal Building, Room 1736
601 East 12th Street
Kansas City, Missouri 64106

MEMORANDUM OF NEGOTIATION

4.1

Contractor: Fluor Technology, Inc.
Subcontractor: Gould Evans Architects, P.A.

BACKGROUND

The Contractor is to perform a diversity of duties for the construction phase of the NEXRAD Program--project and construction management; construction inspection; geotechnical studies; and architect-engineer services to site adapt Weather Forecast Office Buildings conceptually designed by others. The NEXRAD project is a result of a multi-agreement between the Department of Commerce, National Weather Service; Department of Transportation, Federal Aviation Administration; and the Department of Defense. The work-site will be throughout CONUS, the Caribbean, and at various military installations in Europe and the Far East. It is anticipated the project will encompass a seven-year period, although this contract is for a maximum five-year period.

OBJECTIVES

The proposal was reviewed and evaluated by a technical panel consisting of registered architects and professional engineers. The panel chairman also had prepared an estimated cost based upon a yearly level-of-effort productive man-hours for the five-year period.

Fluor rated substantially higher than the other five competitors--Austin Company; Burns and McDonnell; 3-D International; Kaiser Engineers; and Howard, Needles, Tanenbaum and Bergendoff. The higher rating can be attributed to the credentials, expertise and experience of the Fluor team, and to the proposed plan to manage and oversee the project. The latter is best reflected by the team leader who has extensive management experience, both in private industry and the Government in managing large complex projects; and of the subcontractor who has earned industry acclaim, i.e., they have merited 14 A.I.A. awards in the preceding eight years, a very high number for a small business concern.

The panel chairman provided written memorandum of the technical acceptability of both the prime contractor's and subcontractor's proposals (memo in file).

The Contract Specialist discussed pricing with the Cognizant Contract Administrative Officer (Jeffrey Hoyles, Oak Ridge Office of DOE), and then requested audits of both the prime and subcontractor's cost proposals through the Department of Commerce Inspector General's Audit Division. Mr. Hoyles stated in discussion that DOE had a contract in place with Fluor, and the only pricing questions were FY 86 provisional wage rates and the lease-back of the office space which Fluor had recently sold.

The Contract Specialist, while awaiting audit results, reviewed the Fluor small business subcontracting plan for adequacy. This plan was then forwarded to the Department's OSDBU for review and approval in accordance with P.L. 98-504. After various telephone discussions between the Contract Specialist and Fluor (Messrs. Tate and Toliver), and the OSDBU Director (Mr. Maruca) and OSDBU staff (Mr. Leak), an agrement on the proposed plan was reached. OSDBU approval was given in writing (OSDBU memo in file). As part of the plan, Fluor will first seek small business survey concerns, with special emphasis on minority and women-owned businesses, and will only subcontract with large businesses as a last resort.

The DCAA audit findings for the prime contractor were accomplished by the Santa Ana, California office; Gould Evans was audited by the Kansas City office. Audit findings for the life of the contract were then broken down by the Contract Specialist and the COTR to the following:

<u>Prime Contractor: Fluor Technology, Inc.</u>

| | | | |
|---|---|---|---|
| Direct Labor Hours | 95,680/MH x 1.15 | = | $110,032.00 |
| Overhead | 64.6% | = | 71,081.00 |
| Other Direct (reprographics) | 200,649/MH x 1.21 | = | <u>200,649.00</u> |
| | | | 381,762.00 |
| G and A | 9.8% | | <u>37,413.00</u> |
| | FLUOR TOTALS | = | $419,175.00 |

<u>Subcontractor: Gould Evans</u>

| | | | |
|---|---|---|---|
| Direct Labor | | | $79,460.00 |
| Fringe Benefits | | | 20,898.00 |
| Overhead | | | <u>58,319.00</u> |
| | GOULD EVANS TOTALS | = | $159,319.00 |

FLUOR AND GOULD EVANS TOTALS FOR 5-YEAR PERIOD = $579,494.00

<u>Breakdown Applied to Base Period (Year 1)</u>

<u>Fluor</u>

| | | | |
|---|---|---|---|
| Direct Labor Hours | 11,040/MH x 1.15 | = | $12,696.00 |
| Overhead | 64.6% | = | 8,201.00 |
| Other Direct (reprographics) | 20,985/MH x 1.21 | = | <u>25,392.00</u> |
| | | | 46,289.00 |
| G and A | 9.8% | | <u>4,536.00</u> |
| TOTAL | | | $50,825.00 |

Subcontractor: Gould Evans

| | |
|---|---|
| Direct Labor | $17,591.00 |
| Fringe Benefits | 4,627.00 |
| Overhead | 13,053.00 |
| | $35,271.00 |

TOTALS (QUESTIONED COSTS YEAR 1) = $86,096.00

The Government's objective is to obtain as much of the questioned costs plus any additional amounts.

NEGOTIATION

On December 5, 1986, the Contract Specialist contacted Fluor to open negotiations. The Fluor representatives were Tom Tate and Jack Toliver. Both individuals are Fluor's Senior Contractor Administrators and have been delegated authority to negotiate for Fluor; however, the final contract signatory will be Mr. Sacker, Vice President.

The Contract Specialist asked for concessions on the cost for the first contract year, and advised Fluor that all option year renewals were to be subjected to yearly audit prior to finalizing yearly renewals. The discussion included questions for the proposed labor costs/manhours for both the prime contractor and subcontractor, and costs for reprographics. I advised Fluor that we questioned the proposed cost for their 11,040 direct man-hours in Year One.

The Fluor contention was that there had been several changes to the Kansas City staffing plan, and that these changes equaled 33% of the staff and exceeded proposal costs for these positions.

| | | | |
|---|---|---|---|
| Proposed $23.69/HR | Changed to $30.89 | = | + $7.20/HR |
| Proposed $24.75/HR | Changed to $29.19 | = | + $4.44/HR |

Home Office Specialists used are on an as-needed basis for the project, with labor rates generally exceeding hourly rates in the proposal by $4.00 to $6.00 per hour; i.e., during a period covered by letter contract (December 8, 1986 to December 21, 1986), typical personnel working on project were:

| | |
|---|---|
| Relocation Specialist | + 6.91/HR |
| Procurement Specialist | + .75/HR |
| Administrative Coordinator | + 4.04/HR |
| Supervising Engineer | + 5.47/HR |
| Supervising Engineer | + 4.75/HR |
| Property Administrator | + 8.36/HR |
| Manager | + 6.91/HR |

Fluor strongly indicated that these variances are demonstrative that actual versus proposed costs will vary, and that the Government will pay actual costs. Mr. Toliver and Mr. Tate, during this discussion and at other times, strongly objected to the audit findings and each stated Fluor could make concessions in the Direct Labor costs.

The Contract Specialist, during the above discussion and on January 27, 1987, continued to raise the issue of proposed reprographics costs. Fluor states the proposed reprographics costs were based upon the Direct Productive Manhours planned for direct hire in both Irvine and Kansas City; that if they had had actual number of units of reproduction (each square foot, rolls, negatives, plates, etc.) the proposal costs would have been built-up on that basis using the Fluor in-house service center charge schedule, times a factor to convert the charges to cost--however, without those figures the proposed costs were derived from historical data that included total home office hours and total reprographic costs. The historical data included 219 projects of which 85% were commercial versus Government. Of the above number, there were 53 without discrete reproduction costs identified; of the other 156 projects, 30 had identifiable discrete reproduction costs which exceeded $2.00/MH, with a high of $10.00/MH. Mr. Toliver offered that 24 of the 30 projects were either Government or Government-related projects. Moreover, they contended and presented evidence that all of the 219 projects were on one site versus +120 sites for NOAA; and that most projects required five copies of deliverables while requiring 20-100 design documents, and that with the inclusion of the Joint Services Project Office, the required progress reports had more than doubled.

Fluor additionally contended that the more selective review by DCAA is not indicative of the NEXRAD project's unique requirements. They further contended that the actual reproduction rate based on total business volume in 1986 was less than previous years, and that their Provisional and Forward Pricing rate for converting that center to cost was estimated at 80%, as indicated in Fluor's proposal as well as in their internal memorandum (copy in file) which had been approved by Mr. Hoyles, ACO/DOE. They also insisted that the actual rate for the provisional rate of 80%, and that it should be, as an example 65%, Fluor would credit the difference.

On January 27th and again on February 11th, we discussed the questioned costs for Gould Evans where the audit revealed a difference between proposed and actual labor costs of $35,271.00 in the first year. I advised Fluor that this was double-dipping and must insist that the proposal be reduced by at least the above cited figure.

On February 13, 1987, Fluor faxed a modification to their subcontract reducing the first year from $305,332.00 to $267,304.00, or a total reduction of $38,638.00. The modification also reflected future year changes as follows--

| | | | | | |
|---|---|---|---|---|---|
| Option Year 1 | 292,306.00 | to | 233,668.00 | = | -38,638.00 |
| Option Year 2 | 301,546.00 | to | 262,598.00 | = | -38,948.00 |
| Option Year 3 | 302,866.00 | to | 263,899.00 | = | -38,967.00 |
| Option Year 4 | 223,871.00 | to | 193,981.00 | = | -29,890.00 |

or a total reduction of $185,081.00.

FEE

The Contract Specialist, in discussion with Tate/Toliver, raised the issue that the Fee was too high based upon a Weighted Guidelines Index developed for this contract. Initially, Fluor sought a Fee of $174,941.00. Subsequent negotiations reduced the Fee to $158,000.00. Again, the Contract Specialist continued to press for further reductions of the Fee.

Continued discussions between the parties reduced the Fee to $145,000.00 (8.3%) for the first year.

SUMMARY

The negotiations really addressed only the 14-month base period because it is proposed to request yearly audits for each option year renewal. The Cost Accounting System in place is acceptable and in accordance with CAR-CAS standards, so there is sufficient and clear evidence that the yearly audits will reflect costs and expenditures.

CONCLUSION

Upon completion of negotiations with Fluor Technology, the following determination was made.

The Fluor offer was found to be technically acceptable in all respects. Negotiations were conducted to arrive at a fair and reasonable price for the DPMH and Fee.

Based upon the foregoing, it has been determined that the prices are the best that can be obtained and it is in the interest of the Government to award a contract to Fluor Technology, Inc.

Jesus Arredondo, Contracting Officer

2-13-87
Date

CONTRACT No. 50WCNA606099 -- MODIFICATION No. 2

MEMORANDUM OF NEGOTIATIONS

AUGUST 13, 1987

PURPOSE

This Memorandum documents the substance and detail of negotiations between J. Arredondo, NOAA, and J. M. Toliver, Fluor Technology, Inc., relative to an increase in the Fixed Fee of the Contract Base Period to accommodate the Government's Task Order No. 02, Revision B, as authorized effective July 21, 1987.

BACKGROUND

The above-referenced tasking increased the Level of Effort as set forth in Clause B.2(2)(a) beyond that limit set forth in Clause B.2(c)(2), and increased the estimated cost of the Contract beyond that contemplated for the Base Period. The result of this increase in the estimated cost will necessitate an increase in the Limitation of Funds set forth in Clause B.6 to $2,200,000.00. This increase is acknowledged in SEPO letter CC44, dated July 21, 1987.

AGREEMENTS IN PRINCIPLE

1. Fluor and the Government agreed that the added work was similar to that included in Task Order No. 02 through Revision-A and that the fee basis developed and agreed upon for the definitive Contract is appropriate for this revision in the Level of Effort. That fee basis was documented in the Memorandum of Understanding dated September 22, 1986 and forwarded to the Contracting Officer by Fluor's letter FI/NK/0015 of that same date.

2. Fluor's Cost Estimate for this work dated July 24, 1987, was based upon its approved Provisional Indirect Rates for FY1987. Subsequently, Fluor's third quarter outlook has indicated that these rates would reduce to:

| | |
|---|---|
| Home Office Overhead ----------------- | 102.0% |
| Field Office Overhead ---------------- | 76.9% |
| General and Administration ----------- | 9.8% |
| FCCM - Direct Labor Base ------------- | .07% |
| FCCM - Value Added Base -------------- | .15% |

The site visit to Wichita on August 4, 1987 revealed that as-built drawings of the site were sufficient as to negate the need for a topographic survey as contemplated in the Work Plan for this Revision. The 100 DPMH estimated for this work has been re-allocated to Irvine Direct Labor for other tasks in this Revision.

MEMORANDUM OF NEGOTIATIONS -- AUGUST 13, 1987 (cont'd)

The above results in the following cost breakdown for this Revision:

| | July 24, 1987 | Revised August 13, 1987 |
|---|---|---|
| Labor | $ 55,200 | $ 57,360 |
| Subcontracts | 29,600 | 25,400 |
| ODC/OH/G&A | 100,300 | 97,240 |
| | $ 185,100 | $ 180,000 |

NEGOTIATED FEE

Utilizing the agreed-upon weights and the revised Level of Effort cost estimate above, the fixed fee for this Revision was computed as follows:

| Factor | Weight | LOE $ | Fee $ | |
|---|---|---|---|---|
| Labor Skill Level | 13 | 57,360 | 7,457 | |
| Subcontracts | 3 | 25,400 | 762 | |
| ODC/OH/G&A | 5 | 97,240 | 4,862 | 13,081 |
| Cost Risk | 1 | 180,000 | 1,800 | |
| Developed System Use | 3 | 13,081 | 392 | |
| | | | $15,273 | |

The agreed-upon Fixed Fee for this Revision to the Level of Effort is $ 15000

This Negotiation was witnessed by J. A. Wagner, Fluor Technology, Inc.

J. Arredondo
Contracting Officer

J. M. Toliver
FLUOR TECHNOLOGY, INC.

J. A. Wagner
FLUOR TECHNOLOGY, INC.

National Oceanic and Atmospheric A. inistration,
Host Agency serving:
Bureau of the Census
Economic Development Administration
International Trade Administration
Minority Business Development Agency
Office of the Inspector General

U. DEPARTMENT OF COMMERCE
Central Administrative Support Center
Federal Building, Room 1736
601 East 12th Street
Kansas City, Missouri 64106

MEMORANDUM FOR: The Record

FROM: Jesus Arredondo, Contracting Officer

SUBJECT: Price and Cost Analysis -- Solicitation No. NWWR0700006000

The proposal is to provide a small portion of architect-engineer design service to site adapt a conceptually designed Weather Service office building, by another contractor, and to furnish engineering/project management services including construction management and inspection, equipment studies, and geotechnical surveys for some 52 new offices, 17 offices needing major retrofit, 17 offices needing minor modifications, and 27 offices needing expansion to accommodate the new NEXRAD system. Additionally, inspection services will be required at 113 radar data acquisition sites. The construction will be throughout CONUS and at DOD sites in Europe and the Pacific. Funding for the NEXRAD program comes from a tri-party agreement between Commerce (NWS), Transportation (FAA), and DOD.

Total design effort in FY 87 will be approximately $70,000.00; and total estimated cost for all services in FY 87 should be approximately $1.8 million, excluding fee. The estimated cost is based upon a level of effort consisting of 27,500 direct productive man-hours.

## I. PROFESSIONAL SERVICES CONTRACT

Base Period -- August 1, 1986 through September 30, 1987

Approximately 27,500 Direct Productive Man-Hours (DPMH)

1. Work for latter part of FY 86 to be done by Fluor Technology, Inc., in Irvine, California, except for Gould-Evans in Kansas City, Missouri. Expect two trips to Irvine for Bob Gould.

2. Requires two trips to Irvine for Max Entrikin.

   Award + 15
   Award + 30

   Provides funds for one trip to Kansas City in two months period for up to three Fluor planners.

3. Includes space and furnishings at Fluor Technology, Inc., in Irvine, California, in overhead markup.

4. Provides for development of:

   * Work Breakdown Structure
   * Program Schedule
   * Initial Review (H+30)
   * Planning Workshop (A+15)
   * Cost Allocation Report Methodology
   * Program Cost Estimate
   * Progress Report

5. Commence work on:

   * Construction Materials Study
   * Life Cycle Cost Study
   * Design Manual
   * Project Procedure Manual (See Below)
   * Site Manuals

     --Data Acquisition Checklist
     --Inspection and Reporting

   * Annual Work Plan (Particular Focus on Kansas City vs. Irvine Location)
   * Engineering/Architect Procedures

     --Drawing Preparation, Size, Format, Quality, Drafting Standards, Numbering System, Squad Checks, Reviews

     --Specifications - Same

     --CAD - Computer - Hardware

     --Software - Control - Interfaces Data Link

     --Repro Planning

     --Document Control

* Engineering Procedures Manual

--Engineering Design Criteria Manual

--Develop Material Management Plan - Long Lead Items - GFM

--Modularization

--Construction Systems

--Contracts Manual - Procedures

--Procurement Manual

--Office Procedures - Interfaces, NOAA, NEXRAD-JSPO, Correspondence, Files, Property, Travel Control, Pay/Timekeeping

--Develop Format and Control Level Schedules

--Develop Cost Code of Accounts

--Briefing/Aids for Government Presentation

--Estimates in Connection with Studies

--Format for Construction Scheduling

--Project Controls Procedures

--Annual Work Plan Refinement

--Annual Budget Plan

--Develop Cost Trend System

--Turn-over Schedule Planning

6. During FY 87, the estimated level of effort will be 13 man-years and will include a Project Director, Engineering (3), Construction (2), Contracts (2), Controls (3), and Architecture (2).

7. In FY 87, work locations will be:

| | |
|---|---|
| Kansas City | 10 |
| Irvine | 3 |

In Kansas City, Fluor will use leased space in Bob Gould's present office. Fluor understands that they will get all furniture for the cost of shipment to Kansas City from Irvine.

8. Fluor expects to complete all planning work started in FY 86, in FY 87 (see paragraph 5, previous summary). Additional planning will be done on safety, security, and information packaging.

9. In Irvine and Kansas City, Fluor/Gould-Evans will complete detailed design for two WFO's and one mod., site acquisition permitting. In the third and fourth quarter, detailed design of the following year portion of the program (12 sites) will be started (site acquisition permitting).

10. Fluor will collect data on as many sites as acquisition processing will permit. Their work will cover Davis-Bacon rates, zoning, telephone and engineering.

11. Three subcontracts per site for engineering data acquisition; these would be Fluor subcontracts, passing down all Department of Commerce requirements, and will be the basis for an effective small and disadvantaged business program on engineering aspects of the program.

12. The contract specifications packages developed by Fluor/Gould-Evans and reviewed in Kansas City will include drawings, specifications, calculations, cost estimates, and a schedule for use in evaluating bids, and the inquiry package.

13. The final quarter of FY 87: Fluor would expect to develop bidders lists for the first three solicitations.

A productive year for 13 people should cause little risk to the Government regarding successful performance of these tasks. Some delays in obtaining legal descriptions, maps, drawings, or appraisals should not seriously impact what should be accomplished this first year.

## II. COST ESTIMATE

| FISCAL YEAR | DIRECT PRODUCTIVE MANHOURS | ESTIMATED COST | ESTIMATED COST | TOTAL |
|---|---|---|---|---|
| 1986-87 | 27,500 | $1,750,000 | $145,000 | $1,875,000 |

## III. A & E FEE -- FY 87

(a) Four percent (4%) of $1,750,000.00 or $70,000.00.

(b) Fee estimates projected throughout span of contract, based on DPMH.

| | |
|---|---|
| FY 87 | 70,000 |
| 88 | 60,000 |
| 89 | 303,000 |
| 90 | 640,000 |
| 91 | 529,000 |
| | 1,602,000 |

(c) Project Management estimate projected throughout span of contract.

| | |
|---|---|
| FY 87 | 0 |
| 88 | 115,000 |
| 89 | 295,000 |
| 90 | 750,000 |
| 91 | 1,000,000 |
| | 2,160,000 |

(d) Radar Data Acquisition Management = radar, wind profiler, etc.

| | |
|---|---|
| FY 87 | 0 |
| 88 | 15,000 |
| 89 | 160,000 |
| 90 | 530,000 |
| 91 | 720,000 |
| | 1,425,000 |

Labor Rates proposed by Fluor, and verified by audit, compare favorably with previous A-E contracts awarded by CASC and NCASC:

CLASSIFICATIONS -- HOURLY RATES:

| | Fluor | Burns and McDonnell | AEPA |
|---|---|---|---|
| Principal | 35.00 | 35.00 | 26.00 |
| Project Manager | 25.00 | 25.00 | 18.00 |
| Construction Inspector | 21.50 | 25.00 | 18.00 |
| Senior Architect | 22.00 | 21.50 | 18.00 |
| Architect | 17.00 | 22.00 | 20.00 |
| Landscape Architect | 18.00 | 17.00 | 16.00 |
| Senior Mechanical Engineer | 23.00 | 18.00 | 16.00 |
| Mechanical Engineer | 17.00 | 23.00 | 22.00 |
| Senior Electrical Engineer | 23.00 | 17.00 | 17.08 |
| Electrical Engineer | 17.00 | 23.00 | 22.00 |
| Senior Structural Engineer | 23.00 | 17.00 | 15.86 |
| Structural Engineer | 16.00 | 23.00 | 22.00 |
| Senior Civil Engineer | 22.00 | 16.00 | 16.00 |
| Civil Engineer | 16.00 | 22.00 | 22.00 |
| Space Planner | 12.50 | 16.00 | 16.00 |
| Cost Estimator | 19.00 | 12.50 | 16.00 |
| Designer | 15.00 | 19.00 | 25.00 |
| Interior Designer | 13.50 | 15.00 | 12.00 |
| Draftsperson | 10.00 | 13.50 | 12.00 |
| Word Processor | 8.00 | 10.00 | 10.00 |
| Senior Environmental Engineer | 23.00 | 23.00 | -0- |
| Environmental Engineer | 16.00 | 16.00 | -0- |
| Specifications Writer | 19.00 | 19.00 | -0- |
| Typist | 6.50 | 6.50 | -0- |

Overhead, and General and Administrative Rates verified by audit are also comparable to rates in other contracts:

| | | |
|---|---|---|
| Overhead Rate: | 29.13% | (Payroll) |
| General and Administrative Rate: | 100.37% | |
| Total: | 129.50% | |

INDIRECT COSTS

(a) For expenses incurred by the A/E, such as authorized travel and subsistence (including airfare, food, lodging, automobile rental, commercial services, and incidental expenses)--the cost to A/E plus five percent (5%).

(b) For reproduction, printing, long distance telephone calls, vehicles, testing apparatus, computer and computer-aided design and drafting (CADD) services--amounts as determined from A/E's schedule of rates in effect at the time service is provided.

(c) For services rendered by others, such as subcontractor(s) to A/E, surveying, real property descriptions, soil borings, subsurface investigations, laboratory testing, field quality control tests, progress photos, or other activities required or requested by COTR--the cost to A/E plus ten percent (10%).

Based upon the above information and the DCAA audit, and on comparison with the DOE contract administered by Mr. Jeff Hoyles, DOE-Oak Ridge Operations, the prices for the level of effort/direct productive man-hours and other rates appear to be fair and reasonable.

A Certificate of Current Cost and Pricing Data has been received from Fluor Technology for this procurement.

In conclusion, I have determined that the proposal for 27.141 Direct Productive Manhours total $1,750,746.00, is fair and reasonable price and other factors considered.

**National Oceanic and Atmospheric A nistration,**
Host Agency serving:
Bureau of the Census
Economic Development Administration
International Trade Administration
Minority Business Development Agency
Office of the Inspector General

**L DEPARTMENT OF COMMERCE**
**Central Administrative Support Center**
Federal Building, Room 1736
601 East 12th Street
Kansas City, Missouri 64106

TO: Memorandum for the Record

SUBJECT: Weighted Guideline Factors and Other Items Discussed September 17-22, 1987 between Arredondo and Tate/Toliver of Fluor Technology, Inc.

I. Initial Fluor Offer Based Upon --

| | | |
|---|---|---|
| 1. | Project Labor Skill Level | 18% |
| 2. | Subcontracts | 5% |
| 3. | Other Direct Costs | 8% |
| 4. | OH & GA | 7% |
| 5. | Cost Risks | 5% |
| 6. | Other Factors: (Fluor developed systems) | 8% |

Excessive percentage risks--developed systems either too high or recovery should be spread thru all contracts.

II. Second Fluor Proposal Based Upon --

| | | |
|---|---|---|
| 1. | Project Labor Skill Level | 15% |
| 2. | Subcontracts | 3% |
| 3. | Other Direct Costs | 5% |
| 4. | OH & GA | 1% |
| 5. | Cost Risks | 5% |
| 6. | Other Factors: (Fluor developed systems) | 5% |

III. I suggested joining other direct costs, O/H, and G&A into one factor. CPFF risks to Fluor are low; labor skills high. Therefore, overall percent too high. I proposed, after several discussions, the following:

| | | |
|---|---|---|
| 1. | Project Labor Skill Level | 13% |
| 2. | Subcontracts | 3% |
| 3. | Other Direct Costs, OH, and G&A | 5% |
| 4. | Cost Risks | 1% |
| 6. | Other Factors (as above) | 3% |

Fluor finds percent reasonable--fee based on above:

1. 174,951.00
2. 161,246.00
3. 158,606.00
4. 144,958.00 = $145,000.00



Based on level of effort estimated at 27,141 DPMH then:

| | |
|---|---|
| F.F. - Original Proposal | $174,951.00 |
| F.F. - Revised | 145,000.00 |
| Deduct from FTI Cost Proposal | 29,941.00 |

NOTE: Recommended DOC percentile, per factor in Acquisition Letter:

| | |
|---|---|
| Labor | 1 to 18 |
| Subcontracts | 1 to 5 |
| Other Direct, G&A | 3 to 9 |
| Cost Risks | 0 to 6 |
| Other Factors | -3 to +3 |

IV. Proposed subcontractor, Gould-Evans, is acceptable to NOAA. Same standards and provisions as the prime contractor.

V. OSDBU is favorable towards small-disadvantaged business subcontracting plan. Will let FTI know as soon as possible when we hear.

Tate wanted to know a date for definitization. I stated the audit was not complete and did not have a target date. Tate: Provisional rates, etc. were accepted by DCAA/DOE. The only question was office building sold in FY 85 and leased back in FY 86.

VI. Solicitation, interviews, and selection based on A-E criteria/standards, with most of the work in project and construction management. The A-E portion is minor: to site adapt a conceptual design developed by Burns and McDonnell.

Jesus Arredondo, Contracting Officer

**National Oceanic and Atmospheric A istration,**
Host Agency serving:
Bureau of the Census
Economic Development Administration
International Trade Administration
Minority Business Development Agency
Office of the Inspector General

**L DEPARTMENT OF COMMERCE**
**Central Administrative Support Center**
Federal Building, Room 1736
601 East 12th Street
Kansas City, Missouri 64106

NEGOTIATION PLAN

Introduction: The contract is intended to obtain technical support for the CASC Special Engineering Office to accomplish the construction aspect of the Next Generation Radar (NEXRAD). The Contractor is required to furnish complete A-E services to: site adapt offices (conceptually designed by others), perform project and construction management, and conduct site surveys and construction inspection, including acceptance of completed construction.

The Contractor is to provide the above services throughout CONUS on DOD, FAA, and NWS sites. It is projected that the project and construction management aspect will be the major portion of services, with A-E design to encompass only a minor portion.

It is proposed to negotiate a cost reimbursement plus fee contract based upon a level of effort with a pre-established Productive Manhours level. The initial period was for a 14-month period with options to be incrementally increased in one-year periods, not to exceed a contract total of five years.

Award fee is to be based upon weighted guidelines as noted elsewhere in the file. It is intended that this fee should be at less than 8.5 percent of the Productive Manhours cost, including technical assistance in evaluation of construction contractors, geo-technical site surveys, etc.

Because of a need for proximity to the Special Engineering Office, the prime contractor has located a staff of six to eight in Kansas City, with the other support either from the home office or from field offices near the particular job site. The Contractor located his staff along with the sub-contractor's staff near to the Federal Office Building. This has eased communications, and has avoid delays during the construction of the weather forecast offices and modifications (minor and major) to existing offices.

This also has avoided duplication of drawings, specifications, as-builts, inspection punch-lists, and approval of contractor submittals so as not to create construction delays.

Additionally, by locating in the sub-contractor's office, there have been some savings from rental of office space and purchase of office furniture.



G 004734

I. Level of Effort

A. It is proposed by the Government that the Level of Effort (LOE) for this period will be between 46,000 and 47,500 Direct Productive Manhours, totaling an estimated cost of $2,500,000.00 to $3,000,000.00 inclusive of fee.

B. Proposed work break-out included the following preparation of Construction Costs Estimates for:

| | |
|---|---|
| Melbourne, FL | Wichita, KS |
| St. Louis, MO | Topeka, KS |
| Denver, CO | Kansas City, MO |
| Tulsa, OK | Grand Island, NE |
| Dodge City, KS | Washington, D.C. (Sterling, VA) |
| Goodland, KS | |

C. Engineering tasks included in the FY 88 plan shall include:

Site Surveys (geo-technical, access roads, etc.)
Life Cycle Costs Analysis
Property Disposal Plans (demolition; excess real property and personal property)
Facility Maintenance Plans

(1) Construction Management and Inspection Services

(2) Review of NEXRAD program materials, including ROA and MLOS design review.

II. Review Conceptual Design for:

San Francisco/San Jose, CA
Houston/Galveston, TX
San Diego, CA

III. Goals

The Level of Effort to accomplish the requirements under Task Order Number 03 to the contract in Option Year One is targeted not to exceed the following:

(A) Direct Productive Manhours: 47,000
(B) Cost (including O/H, indirect costs and G/A): $2,650,000.00
(C) Fee at 8.5 percent: $220,530.00

(D) Totals: Costs: $2,650,000.00
Fee: 220,530.00

$2,870,530.00

Jesus Arredondo, Contracting Officer

# NEGOTIATION PLAN

Introduction: The contract is intended to obtain technical support for the CASC Special Engineering Office to accomplish the construction aspect of the Next Generation Radar (NEXRAD). The Contractor is required to furnish A-E services to: site adapt offices conceptually designed by others, perform project and construction management, and conduct site surveys and construction inspection, including acceptance of completed construction.

The Contractor is to provide the above services throughout CONUS on DOD, FAA, and NWS sites. It is projected that the project and construction management aspect will be the major portion of services, with A-E design to encompass only a minor portion.

It is proposed to negotiate a cost reimbursement plus fee contract based upon a level of effort with a pre-established Productive Manhours level. The initial period is for a 14-month period with options to be incrementially increased in one-year periods, not to exceed a contract total of five years.

Award fee is to be based upon weighted guidelines as noted elsewhere in the file. It is intended that this fee should be at less than nine percent (9%) of the Productive Manhours cost, including technical assistance in evaluation of construction contractors, geo-technical site surveys, etc.

Because of a need for proximity to the Special Engineering Office, the prime contractor will relocate a technical staff of six to eight to Kansas City, with the other support either from the home office or from field offices located near the particular job site. The Contractor will house his staff along with the sub-contractor's staff near to the Federal Office Building. This should ease communications, and will avoid delays during the construction of the weather forecast offices and modifications (minor and major) to existing offices.

This also will avoid duplication of drawings, specifications, as-builts, inspection punch-lists, and approval of contractor submittals so as not to create construction delays.

Additionally, by locating in the sub-contractor's office, there should be some savings from rental of office space and purchase of office furniture.

I. Audit Costs Questioned

A. DCAA questioned costs based upon a five-year (if options are exercised) contract period.

1. Fluor (Prime Contractor) -- Kansas City Office

| | | |
|---|---|---|
| Direct Labor Hours | $110,032 | (95,680 Hrs x 1.15) |
| O/H | 71,081 | (64.6%) |
| Other Direct (reprographics) | 200,649 | (165,825 x 1.21) |
| G&A | 37,413 | (9.8% x 381,762) |
| | $419,175 | |

2. Gould-Evans (Sub-Contractor)

| | |
|---|---|
| Labor | 79,460 |
| Fringe Benefits | 20,898 |
| O/H | 58,961 |
| | 159,319 |

B. A breakdown of the above audit figures, applied only to the base period, is as follows:

1. Fluor

| | | |
|---|---|---|
| *Direct Labor | 12,696 | (11,040 x 1.15) |
| *O/H | 8,201 | (64.6%) |
| Other Direct | 25,392 | (20,985 x 1.21) |
| G&A | 4,536 | (46,289 x 9.8%) |
| | 50,825 | |

2. Gould-Evans -- Questioned costs for Gould-Evans arose because these costs are duplicated.

| | |
|---|---|
| Direct Labor | 17,591 |
| Fringe Benefits | 4,627 |
| O/H | 13,053 |
| | $35,271 |

The labor portion of the proposal is acceptable as submitted, and was discussed between J. Arredondo-NOAA, and Tom Tate/Jack Toliver-Fluor. The proposal costs/manhours included 10% uplift as noted in Fluor's personnel policy of July 23, 1986, and this uplift was deleted from the proposal during discussions of September 22, 1986.

II. Goals

Accordingly, questioned costs should be based as follows for the base period:

Fluor

| | | |
|---|---|---|
| Other Direct | 25,392 | (11,040 x 1.15) |
| G&A | 2,488 | (9.8%) |
| Sub-Total | 27,880 | |

Gould-Evans

| | |
|---|---|
| Direct Labor | 17,591 |
| Fringe Benefits | 4,627 |
| O/H | 13,053 |
| Sub-Total | 35,271 |
| Total Questioned Costs | 63,151 |

In compliance with FAR requirements, an audit will be requested prior to exercising any of the option years. Therefore, costs for option years are not included in this negotiation. This should be particularly helpful because of inadequate rate forecasts for future years.

Nonetheless, because DCAA staffs looked into the entire possible period of the contract, their findings will be of great assistance in the development of future year estimated costs.

Jesus Arredondo, Contracting Officer

NOAA Contr No. 50WCNA606099
FTI Contra No. 449404

ORIGINAL

MEMORANDUM OF UNDERSTANDING

May 30, 1987

PURPOSE:

To establish an agreed maximum Contract Price for the Base Period of subject Contract through Task Order 2, Revision A and understandings related to the pricing of subsequent modifications, options and changes.

BACKGROUND:

(1) The Contract is a Cost Plus Fixed Fee Term Form (Level-of-Effort) providing for a base period and four (4) option years. Fluor commenced work on August 4, 1986 under Letter Contract of the same number.

(2) The definitive Contract was executed on May 30, 1987 and, pursuant to FAR Clause 52.232-22, Limitation of Funds, allots a total of $2.0 million available for payment of allowable costs and fixed fee to be incurred from August 4, 1986 through the period estimated to end September 30, 1987, e.g. Base Period.

(3) The estimated total cost of the Contract was based upon FTI's cost proposal dated July 24, 1986. This proposal incorporates FTI's approved billing rates for its Southern California Division for its fiscal year 1986. The rates are:

| | | |
|---|---|---|
| o | Home Office Overhead | 90.7% |
| o | Field Overhead | 64.6% |
| o | General and Administrative Expense | 9.8% |
| o | Cost of Capital Overhead (Home Office Labor Base) | 0.2% |

(4) Subsequently, during FY1987, FTI was included in a reorganization into "business sectors" rather than divisions. This resulted in the establishment of a single set of indirect rates for all the units operating from a given office, regardless of division or business sector. In essence, it eliminated the former divisions entitled Advanced Technology Division (ATD), Southern California Division (SCD) and Telecommunications Services Division (TSD). By letter dated April 6, 1987, the Contracting Officer was advised that the Proposed Billing rates for all FTI business units headquartered in Irvine, California were:

| | | |
|---|---|---|
| o | Overhead - Home Office | 108.9% |
| | - Field Office | 85.3% |
| o | General and Administrative | 10.2% |
| o | Facilities Capital Cost of Money | |
| | Overhead Base | 0.076% |
| | G&A Base | 0.086% |

NOAA Contr ~ No. 50WCNA606099
FTI Contra.. No. 449404

MEMORANDUM OF UNDERSTANDING (Continued)

The resulting cost impact of applying these new rates, in lieu of the approved billing rates for SCD, is to increase the forecasted cost (including fee) from $1,981,702 to $2,095,578 for the Base Period.

(5) As required, Fluor has identified the probable indirect rates for FY1987 as if it had not reorganized its business units. The rates for SCD would have been:

| | | |
|---|---|---|
| o | Overhead - Home Office | 94.7% |
| | - Field Office | 71.1% |
| o | General and Administrative | 8.9% |
| o | Facilities Capital Cost of Money | |
| | Overhead Base | 0.076% |
| | G&A Base | 0.086% |

Using these rates, the resulting forecasted cost (including fee) for the Base Period would have been $1,997,719.

(6) The forecasted costs, set forth in paragraphs (4) and (5) above, include the proposed billing rates by Gould Evans Architects, P.A. (GEA) for its FY1987. The Contracting Officer has advised that these rates are to be audited by DCAA prior to their approval or application by the Government or Fluor.

(7) The Contracting Officer has refused to accept Fluor's proposed billing rates for FY1987, as they relate to the Base Period of this Contract. The reason for this refusal is that some of the cost increase is due solely to Fluor's reorganization.

AGREEMENT:

In view of the above, the parties to the Contract agree to the following:

(1) For the Base Period only, the Total Contract Price payable to Fluor (inclusive of fee) for Work included in Task Order Nos. 1, 1A, 2 and 2A shall not exceed $2.0 million.

(2) For any modifications to the Base Period Contract, dated after the date of this Agreement, Fluor shall use its most current Irvine pricing rate in its cost proposal and, subject to audit, the Contracting Officer shall accept these Irvine rates as a reasonable basis of the indirect costs projected.

(3) For pricing, billing and final indirect rates for any other modifications, options or changes, the Contracting Officer accepts the Irvine, California office as the approved basis of the applicable indirect rates.

NOAA Contr : No. 50WCNA606099
FTI Contra.. No. 449404

MEMORANDUM OF UNDERSTANDING (Continued)

(4) For invoicing costs of the Base Period, Fluor will use its approved Irvine billing rates to compute the total invoiced value. At such time as this value exceeds $2.0 million, Fluor will credit the Government for the amount exceeding $2.0 million. The Government shall pay all costs and fee up to and including $2.0 million for the Base Period, exclusive of any modifications thereto.

This Agreement shall in no way alter any other terms or conditions of the Contract, but shall be made a part thereof and considered in precedence as a part of the schedule thereof.

This Agreement shall be effective as of the date and year first set forth above.

| For the United States Of America | For Fluor Technology, Inc. |
|---|---|
| [signature] Signature | [signature] Signature |
| J. Arredondo<br>Name | K. T. Sawyer<br>Name |
| Contracting Officer<br>Title | Project Manager<br>Title |
| May 30, 1987<br>Date | May 29, 1987<br>Date |

CONTRACT ADMIN. APPROVED

October 21, 1986 RAS/OC31;WJB

MEMORANDUM FOR: OIG - Janet Stine

FROM: RAS/OC31 - William Becker WB 21 OCT 86

SUBJECT: Request for Field Pricing Support, Letter Contract No. 50-WCNA-6-06099

Please provide field pricing support for our use in definitizing the subject letter contract with Fluor Technology, Inc., 3333 Michelson Drive, Irvine, CA 92730. That contract, two copies of which are attached, is for engineering, architectural design, construction management, and construction inspection services related to National Weather Service facilities upgrages and NEXRAD installations during a base contract year and four one-year options.

Two copies of each of the following documents are also attached to assist you in performing this review.

A. Solicitation No. NWWRO700060000JA, dated July 11, 1986.

B. Flour Technology, Inc., Proposal No. GS-5621, Presentaiton for WFO-Facilities Upgrade and RDA-NEXRAD Installations, April, 1986.

C. Fluor Technology, Inc., Proposal No. GA-5621, Cost Proposal, July, 1986.

D. Department of Energy letter to Fluor Technology, Inc., dated October 6, 1986, Subject: Provisional Indirect-Cost Rates for Fiscal Year Ended October 1, 1986.

I ask that your review address, particularly, the proposed elements of cost stated below:

1. Composite direct labor rates for Irvine and Kansas City personnel during all five years.

2. Irvine and Kansas City/Other locations direct labor overhead rates for base year and four option periods.

3. The rates for travel, computer, reprographics, telephone and telegraph, and other costs that are applied to a base of direct labor manhours in the five years proposed.

4. The subcontract with Gould Evans Architects, P.A., and the other geotechnical, survey, and site evaluation subcontracts in each year.

5. The general and administative rates for 1986 through 1991.

6. The Facilities Capital Cost of Money rates and current Treasury Department interest rate for this procurement.

7. Any other information on this contractor which would be beneficial in developing a Weighted Guidelines Profit Objectivew and negotiating the letter contract definitization.

The initial period for definitizing this contract expires November 1, 1986. Although that is a very short response time, we would appreciate a verbal report of your findings as near to that date as possible to facilitate finalization of this contract.

Should you have questions or need additional information, you can contact me at FTS 758-7267 or Mr. Jesse Arredondo at FTS 758-7129. Thank you for your prompt attention to this request.

RAS/CC31:WJBecker:7267:10-22-86:jm

DEFENSE CONTRACT AUDIT AGENCY
LOS ANGELES REGION
SANTA ANA BRANCH OFFICE
34 CIVIC CENTER PLAZA
FOURTH FLOOR
SANTA ANA, CALIFORNIA 92701

IN REPLY REFER TO

Audit Report No. 4181-7D210225

2 December 1986

SUBJECT: Report on Review of Proposal
For Initial Pricing
Under Prime Contract No. 50-WCNA-6-06099
Submitted by Fluor Technology, Inc.
Southern California Division
Irvine, California

TO: Officer of Inspector General
Systems Acquisition Division
U.S. Department of Commerce
HCHB, Room 7099-C
14th and Constitution Avenue, N.W.
Washington, D. C. 20230
Attn: Ms. Janet A. Stine
Audit Manager

1. Purpose and Scope of Review.

a. As requested by your letter dated 24 October 1986, reference H7099-C/Control No. 87-N152, we have evaluated Fluor Technology, Inc., Southern California Division's proposal dated 24 July 1986 in the amount of $12,379,125. The CPFF proposal provides for the architectural and engineering design, program management support, construction management, and construction inspection services. The proposed period of performance is from 1 August 1986 through 30 September 1991.

b. The evaluation was performed in accordance with generally accepted Government auditing standards and included such tests of the contractor's data and records and such other auditing procedures we considered necessary in the circumstances except as noted in Paragraph 2. The cost principles contained in FAR and the DoD Far Supplement Subpart 31.2 and the practices required by the applicable Cost Accounting Standards were used as criteria in the evaluation of proposed costs.

Audit Report No. 4181-7D210225

2. Circumstances Affecting the Review.

a. The technical evaluation (Enclosure 1) dated 28 October 1986, did not take any exceptions to the contractor's proposal.

b. The contractor's proposal incorporates the cost of facilities capital calculations for negotiated contracts. However, the cost of money interest factor used for the subject proposal may not be in effect at the time of negotiations. Accordingly, this report is qualified regarding the allocable amount for cost of facilities capital. If a new interest rate is available prior to completing negotiations, the acquisition office should consider recomputing the cost of money amount.

3. Summary Results of Review.

a. The detailed conclusions and recommendations resulting from our review are presented as follows:

| | PROPOSED COST | RESULTS OF AUDIT (SUBPARAGRAPH (1)) QUESTIONED COST | UNRESOLVED COST | REFERENCE NOTES |
|---|---|---|---|---|
| | $ | $ | $ | |
| DIRECT LABOR | 3945819 | 110032 | | (2) |
| OVERHEAD: | | | | |
| IRVINE LOCATION | 1179189 | 0 | | |
| K.C. & OTHER LOCATIONS | 1709135 | 71081 | | (3) |
| TOTAL OVERHEAD | 2888324 | 71081 | | |
| OTHER DIRECT COSTS | 1982720 | 200649 | | (4)(a) |
| SUBCONTRACTS (G/E) | 1425921 | | 1425921 | (4)(b) |
| SUBTOTAL | 10242784 | 381762 | | |
| G&A EXPENSE | 1003792 | 37413 | | (5) |
| SUBTOTAL | 11246576 | 419175 | | |
| COST OF MONEY | 7891 | 0 | | |
| TOTAL | 11254467 | 419175 | 1425921 | |
| FEE | 1124657 | | | |
| TOTAL PROJECT | 12379124 | | | |

G 004744



FOR OFFICIAL USE ONLY

Audit Report No. 4181-7D210225

(1) The results of this report are qualified as stated in paragraph 2. of this report.

(2) Direct Labor. Based on the Technical Report (Enclosure 1) direct labor hours are accepted as proposed. The proposed direct labor rates are based on composites of actuals rates for known individuals and weighted averages of composite actuals of labor categories when the individual in specific categories are not known. Escalation was not applied by the contractor in computing forward years rates. Our recommended rates are based on 10 November 1986 actuals for named individuals and 17 September 1986 weighted average actuals for the unnamed individuals. In accordance with the contractor's procedures we did not apply escalation. Computation of questioned direct labor cost is detailed as follows:

| | Proposed Hours | Rates Proposed | Rates Questioned | Questioned Amount |
|---|---|---|---|---|
| Kansas City Personnel | 95,680 | $24.27 | $1.15 | $110.032 |
| | | | | ======== |

(3) Overhead. The questioned Kansas City and other locations overhead costs represent the proposed and accepted overhead rate applied to questioned direct labor.

$110.032 X 64.6% = $71,081
=======

(4) Other direct Costs and Subcontract Costs.

(a) The contractor proposed $414,563 for reprographics based on a unit rate of $2.50 for a quantity of 165,825. We recommended a unit rate of $1.29 based on contractor's experienced weighted average rate for the six months period ended 2 April 1986. Questioned cost is detailed below.

| Quantity | Questioned Rate | Questioned Cost |
|---|---|---|
| 165,825 | $1.21 | $200,649 |

(b) An assist audit of the Gould Evans Architects, PA, subcontract was requested by the procurement office. The results of the assist audit have not been received at the date of this report. Accordingly, proposed subcontract costs have been set out as unresolved pending receipt of the assist report. G&A expenses allocable to the unresolved costs has not been quantified. Our recommended G&A rate should be applied to any portion of the unresolved costs not accepted by the contracting officer.

(5) G&A Expense. The questioned cost represent the proposed and accepted 9.8% G&A expense rate applied to questioned base costs.

9.8% X $381,762 = $37,413.

b. In our opinion, the cost or pricing data submitted by the offeror were inadequate in some respects. However, the proposal has been prepared in accordance with applicable Cost Accounting Standards and FAR and the DoD FAR Supplement Subpart 31.2. Therefore, we consider the proposal to be acceptable for negotiating a price. This statement should not be interpreted to mean that the data are necessarily accurate, complete, and current in accordance with 10 USC 2306(f), since a postaward audit review may disclose evidence not now discernible. Nor should the statement be interpreted to mean that the offeror is necessarily in compliance in all respects with Public Law 91-379, since a final recommendation cannot be made in a preaward evaluation. Instances of noncompliance with Public Law 91-379 may be reported during contract performance.

c. Factual matters concerning audit findings were discussed with Mr. Jack Toliver, Sr. Contracts Manager. The dollar impact of our conclusions and recommendations was not disclosed to the contractor. The contractor's representative(s) reserved comment on the audit findings.

d. The information in this report pertains to the subject proposal and should not be used for other purposes without prior consultation with this office regarding applicability.

4. Disposition of Audit Recommendations.

a. Upon request, accounting counsel and additional audit services will be made available to the contracting officer in advance of or during the negotiations of the contract price covered by this report. In any case, additional audit support should be requested if changed requirements or more current cost or pricing data have a significant impact on the proposed price. Request for assistance should be made directly to Mr. Paul Greene, Supervisory Auditor, at (714) 836-2931 (Autovon 873-2931, FTS 799-2931).

Audit Report No. 4181-7D210225

b. As required by FAR 15.808(b), please provide us a record of the negotiations as promptly as possible. If no award is made, please so advise.

Defense Contract Audit Agency

for THOMAS A. SINCLAIR
Branch Manager

Advance Copy:
Audit Manager
Office of Inspector General
Systems Acquisition Division
U.S. Department of Commerce
Washington, D.C. 20230
Attn: Ms. Janet A. Stine, Audit Manager

Enclosure:
Gov't Technical Report dated 28 October 1986

**UNITED STATES DEPARTMENT OF COMMERCE**
**Office of Inspector General**
Washington, D.C. 20230

January 8, 1987

MEMORANDUM FOR: William Becker
Contracting Officer
Central Administrative Support Center

FROM : Janet A. Stine
Audit Manager
Systems Acquisition Division

SUBJECT : Transmittal of Audit Report
Letter Contract No.: 50-WCNA-6-06099
Prime Contractor : Fluor Technology, Inc.
Subcontractor : Gould Evans Architects, P.A.

Two copies of the separate reports on the above two offerors are attached for your use. The incorporation of the subcontractor audit results into the report on the prime contractor's proposal results in the following conclusions.

| Cost Categories | | Questioned Costs |
|---|---|---|
| Direct Labor | | $ 110,032 |
| Overhead: | | |
| Irvine Location | $ 0 | |
| K.C. & Other Locations | 71,081 | |
| Total Overhead | 71,081 | 71,081 |
| Other Direct Costs | | 200,649 |
| Subcontracts | | 159,319 |
| Subtotal | | 541,081 |
| G&A Expense | | 53,025 |
| Total | | $ 594,106 |

The $159,319 of questioned subcontract costs above represents the entire amount questioned in the audit of the Gould Evans proposal. The $1,425,921 listed as unresolved in the Fluor audit (report no. 4181-7D210225) is totally eliminated as a result of the Gould Evans audit (report no. 3201-7F210036). Fluor's questioned G&A expense amount is increased to reflect the portion of G&A attributable to the questioned subcontract costs.

The auditors have qualified the report regarding the allocable amount for facilities capital since the cost of money interest factor used in the proposal may not be in effect at the time of negotiations. The results of the review are also qualified to the extent that the subcontractor did not provide fringe and overhead rate forecasts for fiscal years 1988 through 1991, which limited the review to evaluation of the fiscal year 1987 rates. The report is further qualified to the extent that there may be questioned costs related to the quantitative and qualitative aspects of the subcontractor's proposal. The contracting official is responsible for assessing the impact of the above qualifications on negotiation of the contract and documenting the resolution of these issues.

The auditors have noted that Gould Evans, Architects, P.A. objects to releasing the report on their proposal to Fluor Technology, Inc.

In accordance with FAR 15.808, please send our office a copy of the negotiation memorandum your office prepares at the conclusion of the negotiations with the contractor. If negotiations do not result in award, please notify us of that information as well.

If you have any questions on this report, please contact me on FTS 377-0279 or (202)377-0279. All correspondence on this report should refer to the OIG reference number. In accordance with the billing procedures developed by OIG, the agency requesting this audit report will be billed for the cost of the audit service.

Attachments

OIG Reference No. 87-N152

# SUMMARY OF THE CONTRACTING OFFICER'S ANALYSIS OF INCURRED COSTS

## CONTRACT NUMBER 50WCNA606099
## FLUOR DANIEL, INCORPORATED

## OIG AUDIT NUMBER DEN-6927-5-0001

## AUGUST, 1995

U.S. DEPARTMENT OF COMMERCE
NATIONAL OCEANIC & ATMOSPHERIC ADMINISTRATION
CENTRAL ADMINISTRATIVE SUPPORT CENTER
PROCUREMENT DIVISION
KANSAS CITY, MISSOURI

-- PROCUREMENT SENSITIVE INFORMATION --

SUMMARY OF THE CONTRACTING OFFICER'S ANALYSIS OF INCURRED COSTS
AS IT COMPARES TO THE NOAA ANALYSIS AND OIG AUDIT REPORT
CONTRACT NUMBER 50WCNA606099
AUGUST 4, 1986 THROUGH OCTOBER 31, 1992

## 1.0 INTRODUCTION

Contract number 50WCNA606099 was awarded to Fluor Daniel (FDI) on May 30, 1987 definitizing the letter contract awarded July 29, 1986. The purpose of the cost-plus-fixed-fee contract was to provide project and program management, architect-engineering (A/E) design and construction management and inspection services in support of the installation phase of the Next Generation Weather Radar (NEXRAD) and National Weather Service, Weather Forecast Office (WFO) design and construction program. The contract covered the period August 4, 1986 through October 31, 1992.

The information contained in the pages that follow summarizes the basis for the Contracting Officer's (CO) conclusions relative to the audit findings and a brief explanation for differences between the CO's findings and that of the OIG and NOAA.

## 2.0 BACKGROUND

The Office of Inspector General (OIG) conducted an <u>interim</u> audit of costs incurred on contract number 50WCNA606099 and published its findings in report number DEN-4613-3-0001, dated March, 1993. The interim report covered costs incurred from contract inception, August 4, 1986, through April 30, 1992. The OIG questioned $7,171,743. The questioned costs consisted of $184,524 for unallocable or duplicative direct labor charges; subcontract costs and indirect costs; and $6,987,218 for design fees billed in excess of the statutory limitation on architectural and engineering design fees.

In June, 1993, Fluor Daniel (FDI) provided an unsolicited response to the OIG interim audit report summarizing FDI's position on the audit findings. In that response, FDI asserted that it was overpaid only a small amount of the questioned labor charges and rejected the OIG's conclusions that the statutory limitation design fees had been exceeded.

Following issuance of the OIG audit report, NOAA formed a task team, under the direction of the National Weather Service Transition Program Office, to analyze the audit findings. The team performed an extensive study on the design costs incurred on the contract, and analyzed the OIG's questioned costs relative to design. The team was not tasked to analyze questioned costs other than those related to the 6% fee limitation. The NOAA team submitted its final report to the CO in December, 1993. NOAA identified "grey areas" which with further review could result in an upward adjustment in total design costs and fees. NOAA concluded that FDI exceeded the statutory limit by approximately $609,697 to $1,260,573.

In March, 1995, the OIG issued the <u>final</u> audit report number DEN-6927-5-0001, summarizing the audit of costs incurred on the contract from inception through contract completion, October 31, 1992. As a result, the OIG questions $4,826,860. The questioned costs consist of $245,062 for direct labor, subcontract costs, excessive travel costs, and indirect costs; and $4,581,798 for design fees billed in excess of the 6% statutory limitation.

In order to resolve the OIG audit findings, the CO conducted an analysis of costs incurred on the contract using information contained in the OIG audit report, data provided by NOAA personnel, FDI, and other sources. As a result, the Contracting Officer questions $3,961,998. The questioned costs consist of $152,468 for direct labor; excessive travel charges and indirect costs and $3,809,530 for total design fees billed in excess of the 6% statutory fee limitation.

## 3.0 QUESTIONED AND UNALLOWABLE COSTS

The OIG questioned $245,062 of claimed costs in addition to its finding of excessive design cost. These question costs consist of $18,416 for administrative labor costs related to non-NOAA activities at FDI's Kansas City office; $4,969 for duplicative time-sheet data entry; $69,208 for human resources activities duplicated in the overhead cost pool; $145,747 in subcontract costs; $837 for excessive travel costs; $263 for unsupported travel costs; and a net amount of $5,622 for FDI indirect charges.

The Contracting Officer questions $152,468 of claimed costs not related to the 6% fee limitation. The question costs consist of $18,416 for administrative salaries for the performance of non-NOAA activities; $4,969 for duplicative time-sheet data entry; $145,747 for subcontract costs; $837 for travel costs; and a net credit of $17,501 for FDI indirect charges.

Based on information provided by FDI and the DCAA, the Contracting Officer has no basis to question $69,208 unburdened direct labor costs for human resources activities that the IG believes may be duplicated in the overhead cost pool. In addition, the Contracting Officer found documentation to support $263 for travel costs questioned by the OIG.

The indirect costs rates recommended by the OIG were used to compute FDI indirect costs. Applying these rates to the costs accepted by the Contracting Officer resulted in underclaimed indirect charges.

APPENDIX I provides a detailed summary of the CO's questioned and unallowable costs.

## 4.0 6% STATUTORY FEE LIMITATION

The Federal Property and Administrative Service Act of 1949 (41 USC 254(b)) established a 6% statutory limit on the fee for A/E services for public works or utility projects. It reads in part as follows:

> "...a fee inclusive of the contractor's costs and not in excess of 6 per centum of the estimated costs, exclusive of fees, as determined by the agency head at the time of entering into the contract, of the project to which such fee is applicable is authorized in contracts for architectural and engineering services relating to any public works or utility project...."

The Federal Acquisition Regulations (FAR) 15.903(d)(1)(ii) further defines this limitation as:

"For architect-engineering services for public works or utilities, the contract price or the estimated cost and fee for production and delivery of designs, plans, drawings, and specification shall not exceed 6% of the estimated costs of construction of the public work or utility, excluding fees."

Contract number 50WCNA606099 did not contain any reference to the statutory limitation or FAR guidance on the fee limitation. The lack of reference to the statutory limitation in the contract does not preclude enforcement of the statute. The Contracting Officer does not have the authority to waive statutory limitations. Both NOAA and the Contracting Officer agree that since the terms and conditions of the contract did not explain or otherwise address the statutory limitation, a definition for the statute and it's implication on this contract must be determined in retrospect based upon logical interpretation.

Under normal circumstances, the 6% fee limitation is derived from a pre-defined numerator and denominator agreed to by the Contracting Officer and the potential Contractor prior to contract award. That is, the design work germane to the statute (the numerator) and the Government's estimated cost of construction of the project (the denominator). The quotient represents the maximum amount the Government can pay for the production and delivery of designs and specifications for a project.

In a meeting in June, 1990, the Government and Contractor discussed the 6% fee limitation. Following the meeting, FDI prepared a chart that briefly summarized the discussion and illustrates a common understanding for the FAR regulation that limits design fees to 6% of the estimated cost of construction. The chart, titled "Profit and Fee Limitation," lists, in general terms, activities that constitute the pre-design, design, and post design functions.

However, the chart does not provide a comprehensive definition for each of the activities. Further, no record has been found that documents the discussions that took place at the meeting or a mutual understanding of what specific "design phase" costs are considered subject to the 6% fee limitation. For this reason, the Contracting Officer does not consider the chart a comprehensive, governing document. The Contracting Officer and NOAA used the chart as a guide along with the guidelines published by the Corp of Engineers to calculate design costs.

## 5.0 NUMERATOR

Information contained in file documentation confirms that actual design did not begin until April, 1987, midway through task order 2. Consequently costs incurred prior to that time were not considered in the analysis of design costs.

NOAA's numerator for the 6% fraction is comprised of the following costs: (i) direct design labor, (ii) overhead and capital cost of money rates allocated to labor costs, (iii) subcontract costs related to design services, (iv) allocations of Kansas City office rental, (v) general and administrative expense and capital cost of money rates allocated to total cost input, (vi) and allocations of earned fixed fees.

In addition to these costs, the OIG and the CO included a portion of administrative labor support costs.

The following paragraphs summarize the major differences between the OIG, CO and NOAA's computation of design costs and fees. EXHIBIT I provides summary of the design cost tabulations.

## 5.1 Accounting for Design Costs

The FDI charge system contained a series of two-digit alphanumeric codes "loosely" tied to the requirements in the statement of work. NOAA, the CO and the OIG agree that costs charged to FDI area code charge account number(s) 13, Site Specific Design (Task Orders 1 through 4); 31 Site Specific Design (Task Orders 5 through 8); and 33, Design Package Review are subject to the 6% fee limitation.

FDI agreed that it erred in charging some design costs to a pre-design account during task orders 7 and 8. Consequently, in addition to the above, NOAA's maximum calculation, the OIG's and the CO's calculations include consideration of costs charged to area code 3A, conceptual design (Task Orders 7 and 8).

NOAA excluded labor costs for the preparation of cost estimates from its computation of the 6% fee limitation since it was not listed as an activity on the chart that resulted from the June, 1990 meeting.

The Corp of Engineers, Engineer Federal Acquisition Supplement, dated July 30, 1989, provides a list of examples of services that are not considered "an integral part of the production and delivery of designs, plans and specifications and may be excluded" from the A-E fee when determining compliance with the statute. The preparation of costs estimates is not listed as an exclusion.

In the contract, FDI was initially required to deliver a cost estimate at the 15%, 35%, 90% and 100% milestone. The Contracting Officer considers the preparation of cost estimates "an integral part" of the preparation of designs and specifications. The estimates provide a mechanism to monitor costs and ensure that the design approach is within the budget. Further, in a meeting with the OIG and the Contracting Officer, on January 8, 1993, FDI agreed to consider including, as a design cost, the cost associated with the preparation of one cost estimate for each site.

Based on the foregoing, the cost for preparing one construction cost estimate, for each site design completed prior to the expiration of the contract, is included in the CO's calculation of design costs.

During task order three (10/1/87 through 9/30/88), FDI assigned a two digit alpha code (CLIN code) to each site to assist in identifying site specific effort. The CLIN code was intended to be used in conjunction with the area code charge account number. The CLIN code was not used consistently during task orders three through five. Numerous hours were charged to the design area code account numbers and CLIN 00, a "non-site specific CLIN code."

NOAA's minimum calculation of design costs and fee excludes all design labor costs charged to CLIN 00 on the basis that the 6% limitation does not apply to costs that are not charged to specific WFO project codes. However, NOAA recommended that the Contracting Officer question FDI charges to CLIN 00 in 6% related work area codes.

The OIG questions why FDI charged direct labor costs for non-site specific design effort to site specific design accounting codes. The OIG included all CLIN 00 charges to site specific design area codes.

The CO analyzed charges to CLIN 00 and discovered discrepancies in the accounting for site specific design effort. The analysis revealed instances where file documentation substantiated the performance of 6% related design activities for a particular WFO. However, labor reports did not reflect design costs to the specific site CLIN codes or included minimal costs for the effort performed. Further, the review of some timesheets confirmed that some site specific design costs had been charged to CLIN 00.

Based on the foregoing, the CO's computations of direct labor costs include those charges to CLIN 00 unless documentation otherwise substantiates an exclusion.

### 5.2 Methodology for Tabulating Design Costs and Fee

(a) Design Labor

NOAA introduced the design window concept to identify and tabulate design labor costs. By establishing a design start date and design ending date, actual design costs charged to specific site codes could be segregated for each site and charges for pre-design and post design activities, restarts and other non-design activities eliminated. Both the OIG and the CO accepted NOAA's design window concept.

NOAA used file documentation and a "Master Schedule" prepared by Fluor Daniel to establish a design window for each site. According to NOAA, the design start date was generally defined as the date 15% detailed design began and the design completion date was the date the 100% site drawings and specifications were submitted to the Government. NOAA tabulated design labor costs charged to design area codes from labor reports included in the FDI invoices. NOAA excluded all design costs outside of the design window.

The CO relied on information contained in Monthly Progress Reports, Task Order Reports, Technical Review Meeting Notes, and the dates on drawings and specifications to establish the design window and substantiate the design dates published in the Master Schedule. The CO accepts NOAA's definition for the design start date. However, the CO does not accept the date the 100%

drawing and specification was submitted to the Government as the design completion date. Information contained in contract files and monthly progress reports confirms that changes to drawings and specifications were initiated after the 100% submission. Some of the changes were initiated by the Government and some changes were necessary to correct errors and omissions made by FDI. For some sites the changes were made prior to the issuance of a solicitation. For others, amendments to solicitations were issued to incorporate changes. For this reason the design window period used by the CO deviates from that set by NOAA. For example, for some sites the design completion date used by the CO may be the date a solicitation was issued; the latest date on a drawing or specification; the date of an amendment; or the solicitation closing date. Consequently, this expanded the design window established by NOAA resulting in an increase in design labor costs subject to the 6% fee limitation.

Labor costs associated with the preparation of designs and specifications for this contract were incurred at FDI offices located in Irvine, California, Kansas City, Missouri, and during task order 8, in San Juan, Puerto Rico. NOAA, the OIG and the CO used the weekly labor reports included in the FDI invoices to analyze and tabulate the design costs incurred.

NOAA excluded all design costs associated with leased sites except for Boston, Minneapolis, Great Falls and Little Rock. According to NOAA, these sites were originally planned as new builds but were later converted to leased sites. In some instances the design was completed but not used.

The Contracting Officer accepted NOAA's rationale for excluding leased sites from the 6% computation but takes exception to including Minneapolis and Little Rock in the computation. The design costs recorded for these sites are minimal and do not provide an accurate representation of the costs associated with the preparation of a site design. Including an unreasonable design cost for these sites in the numerator of the 6% fraction and the full value estimated cost for construction in the denominator, distorts the 6% fee limitation computation.

(b) <u>Administrative Support Cost Labor</u>

Administrative support costs include but are not limited to the costs for preparation of NOAA invoices, payroll accounting services for the staff supporting the NOAA contract, and costs for processing payments to subcontractors on the NOAA contract.

NOAA's calculation of design costs did not include consideration for costs associated with administrative type support services. NOAA believed that the costs for administrative types of services "do not directly or indirectly contribute toward the preparation of plans and specifications." Also, NOAA presumes that the cost should not be allocated because it was not included in the "Price and Fee Limitation" chart that resulted from the June, 1990 meeting.

On July 28, 1994, the OIG requested an opinion from the General Accounting Office (GAO) regarding "the allocation of a portion of administrative costs to direct design costs for the purpose of determining compliance with the statutory 6% fee limitation." On May 8, 1995, the Comptroller General issued Decision B-258058. The GAO is in agreement with the OIG, "that the administrative costs at issue are associated with the delivery of design services, and, as such, covered by the 6-percent limitation."

Based on the foregoing, the CO has included a portion of administrative support costs in the computation of design costs subject to the 6% fee limitation. As suggested by the OIG, the CO used proposed costs rather than actual costs to compute the allocation. FDI proposed program management and administrative support costs separately. However, actual costs for both of these tasks were charged to the same work area code, making it difficult to separate actual costs incurred for the two tasks. Accordingly, the CO used the method the OIG used to calculate the administrative costs apportioned to design. Inclusion of an administrative cost allocation increased the CO's total design costs by approximately $1,141,084.

(c) <u>Overhead</u>

Since FDI's fiscal years do not correspond directly with the performance period on each task order, NOAA and the OIG recommended use of weighted average indirect cost rates. The CO accepted the recommendation. The weighted average overhead rates used in the OIG and CO calculations are based on the most recent claimed and approved rates.

(d) <u>Subcontract Costs</u>

Costs for design effort performed by subcontractors, specifically Gould Evans Architects (GEA) and A.C. Kirkwood, are included in the total design costs computation.

NOAA prorated GEA design costs for task order 2; used GEA timesheets to tabulate design costs for tasks orders 3 through 6; and estimated design costs for task orders 7 and 8 because timesheets were not readily available.

The OIG accepted, for the most part, NOAA's tabulation of GEA design hours. To compute the GEA design costs, the OIG applied the ratio of total design hours to total hours to the total GEA adjusted costs billed.

The CO prorated GEA design costs for task order 2 and tabulated design costs for all other task orders from the GEA timesheets. The CO and GEA discussed the methods used to account for design costs. Based on information provided by GEA, the CO identified a broader range of design costs subject to the 6% fee limitation. In addition, the CO included the costs for Computer Aided Design (CAD) effort. Consequently, the total design hours included in the CO's tabulation of GEA design costs is significantly higher than that tabulated by NOAA and the OIG. The CO used the OIG's method of computing GEA design costs.

A.C. Kirkwood provided design support services during task order(s) 7 and 8. NOAA tabulated costs from invoices included in the FDI billings submitted during task order 7. The OIG accepted NOAA's tabulation.

In addition to those costs billed in task order 7, the CO's tabulation includes costs from A.C. Kirkwood billings submitted in task order 8.

(e) Rent

Design costs include a portion of Kansas City Office rent. NOAA, the OIG and the CO used the same method to compute rental costs. The differences in the calculations of rent is the result of the differences in the total design labor costs tabulated by the OIG, the CO and NOAA.

(f) General & Administrative (G&A) Expense, and Cost of Capital Charges

NOAA, the OIG and the CO used weighted average indirect cost rates to compute the G&A expense and cost of capital charges. (Reference Section 5.2(c)

(g) Fixed Fee

The 6% fee limitation applies to total design cost and fee. Thus a portion of the fixed fee (profit) paid is included in the total design costs computation.

The fixed fee is allocated in the same ratios as FDI's fixed fee to total costs billed for each task order. NOAA, the CO and the OIG used the same method to compute the fixed fee.

**5.3 Recapitulation - Numerator**

The methods used by NOAA, the OIG and the CO to compute design costs are relatively consistent. The difference between the total design costs calculated by NOAA, the OIG and the CO is primarily the result of the disparities in the tabulation of FDI and GEA labor costs.

The following table exemplifies the differences in total design costs.

| | OIG | CO | NOAA |
|---|---|---|---|
| TOTAL DESIGN COSTS | $7,204,941 | $6,787,844 | $3,585,740 |

## 6.0 DENOMINATOR

The denominator is the sum of the estimated cost of construction (ECC) for each site included in the numerator. The ECC is the sum of the estimated cost of the construction contract and estimated cost of the Government furnished equipment (GFE) associated with the facility. For most of the projects, GFE includes the diesel driven generators, the uninterruptable power supplies, the packaged air conditioning units and NOAA signage. GFE does not include any systems or free-standing furniture. Land acquisition costs are not included in the denominator.

NOAA, the OIG and the CO agree that only those sites incurring design costs included in the numerator of the 6% fraction are included in the denominator of the fraction. The ECC used by NOAA, the CO and the OIG for site designs completed during task orders 2 through 7 is based on the March 1992 WFO Facilities Budget.

For those site designs partially complete as of April 30, 1992, NOAA used a prorated construction cost based on the number of design days prior to May 1, 1992 to the total number of full design days. As a result, NOAA's denominator is $49,601,000.

The OIG computed a weighted estimated construction cost based on the ratio of actual design labor hours charged during the contract period ending October 31, 1992 to the total design hours charged. The value of the denominator used by the OIG is $43,719,055.

The CO used information provided by PGAS as a basis for computing the denominator for these sites. PGAS used a weighted facility cost to identify the extent of site design effort to be complete under the follow-on letter contract. The ratio of the weighted facility cost to the total facility cost less furniture provided PGAS the percentage of total design scheduled to be completed under the letter contract. For the purpose of this analysis, the CO presumed that the balance of the design effort not scheduled on the PGAS contract was completed on contract number 50WCNA606099. The denominator used by the CO is $49,638,562.

6.1 Recapitulation - Denominator

The different methods used by NOAA, the OIG and the CO to compute the denominator and the specific sites each included it's computation of a denominator varies.

The following table illustrates the differences in the maximum allowable design costs payable based on the different denominators estimated by the OIG, the CO and NOAA.

| | OIG | CO | NOAA |
|---|---|---|---|
| ESTIMATED COST OF CONSTRUCTION | $43,719,055 | $49,638,600 | $49,601,000 |
| LIMITATION FACTOR | x 0.06 | x 0.06 | x 0.06 |
| MAXIMUM ALLOWABLE DESIGN COST | $ 2,623,143 | $ 2,978,314 | $ 2,976,060 |

## 7.0 SUMMARY OF FINDINGS - 6% FEE LIMITATION

According to Federal statute 41 U.S.C. 254(b), the design costs and fees paid by the Government for the production and delivery of designs, plans, drawings, and specifications cannot exceed 6% of the estimated cost of the project.

Although NOAA, the OIG and the CO agree that this limitation has been exceeded on contract 50WCNA606099, the magnitude of the costs paid in excess of the limitation varies.

The following table illustrates the differences between results of the analysis conducted by NOAA, the OIG and the CO.

| | OIG | CO | NOAA |
|---|---|---|---|
| TOTAL DESIGN AND FEE | $7,204,941 | $6,787,844 | $3,585,740 |
| MAX ALLOWABLE DESIGN COST | (2,623,143) | (2,978,314) | (2,976,054) |
| QUESTION DESIGN COSTS & FEE | $ 4,581,798 | $3,809,530 | $ 609,686* |

* NOAA's report questions $609,687. The difference is due to rounding.

APPENDIX II provides a detailed summary of the CO's questioned design costs and fee.

8.0 CONCLUSION

The Contracting Officer will question a total cost of $3,961,998. This cost consists of $152,468 for questioned and unallowable costs and $3,809,530 for charges for design services in excess of the 6% statutory fee limitation.

The questioned costs will be submitted to FDI in a letter that outlines the CO's findings and computations. FDI will be afforded an opportunity to submit a settlement proposal and negotiate a resolution. If negotiations are unsuccessful or if FDI declines the opportunity to negotiate in an expeditious manner, the CO will then issue a final decision accompanied by a formal demand for payment.

According to the OGC, if the CO's final decision is not appealed in accordance with the Contract Disputes Act, then the decision "shall be final and conclusive and not subject to review by any forum, tribunal or Government agency."

If FDI does appeal the decision, then it may choose to file the appeal with either the General Service Board of Contract Appeals (GSBCA) or the Court of Federal Claims (CFC). An appeal to GSBCA must be submitted within 90 days after a final decision is rendered. A contractor has one year from the date of the final decision to appeal to the CFC.

EXHIBIT

SUMMARY OF DESIGN COSTS
CONTRACTING OFFICER - OFFICE OF INSPECTOR GENERAL - NOAA

| | OIG TOTALS | CONTRACTING OFFICER'S TOTALS | NOAA TOTALS MIN |
|---|---|---|---|
| Direct Design Labor | $2,057,618 | $1,854,798 | $1,172,421 |
| Allocated Admin Labor | 582,902 | 504,046 | 0 |
| Subtotal - Labor | $2,640,520 | $2,358,844 | $1,172,421 |
| Overhead | | | |
| Kansas City | 1,594,282 | 1,485,701 | 711,028 |
| Irvine | 622,161 | 426,601 | 218,530 |
| San Juan | 7,775 | 35,484 | 0 |
| Gould Evans Design Cost | 862,247 | 1,061,001 | 749,641 |
| Other Subcontracts | 60,400 | 99,687 | 60,400 |
| K.C. Office Rent | 195,676 | 176,041 | 79,541 |
| San Juan ODC | | | 6629 |
| Subtotal | $5,983,061 | $5,643,359 | $2,998,190 |
| General & Administrative | 623,604 | 579,911 | 298,440 |
| Cost of Capital (OH) | 29,903 | 25,451 | 11,499 |
| Cost of Capital (G&A) | 5,179 | 4,097 | 1,919 |
| Subtotal | $6,641,747 | $6,252,817 | $3,310,048 |
| Fixed Fee | 563,194 | 535,027 | 275,692 |
| TOTAL DESIGN COSTS | $7,204,941 | $6,787,844 | $3,585,740 |

-- PROCUREMENT SENSITIVE INFORMATION --

# SUMMARY OF COSTS AND FEES CLAIMED
# CONTRACTING OFFICER'S CONCLUSIONS
# CONTRACT NUMBER 50WCNA606099

## AUGUST 4, 1986 THROUGH OCTOBER 31, 1992

| | Costs and Fee Claimed | Costs Questioned/ Unallowable | Costs Accepted | Notes |
|---|---|---|---|---|
| Direct Labor | $13,764,060 | $ 23,385 | $ 13,740,675 | (a) |
| Other Direct Costs | 10,679,702 | 146,584 | 10,533,118 | (b) |
| Overhead | 10,901,811 | (10,154) | 10,911,965 | (c) |
| Subtotal | $35,345,573 | $ 159,815 | $35,185,758 | |
| G&A | 3,633,415 | (6,686) | 3,640,101 | (c) |
| Cost of Money (O/H) | 149,874 | (314) | 150,188 | (c) |
| Cost of Money (G&A) | 25,226 | (347) | 25,573 | (c) |
| Total Costs | $39,154,088 | $ 152,468 | $39,001,620 | |
| Fixed Fee | 3,418,100 | ________ | 3,418,100 | (d) |
| Total Invoices | $42,572,188 | $ 152,468 | $42,419,720 | |
| Compliance Adjustment | ________ | 3,809,530 | (3,809,530) | APPENDIX II |
| Total | $42,572,188 | $3,961,998 | $38,610,190 | |

## NOTES TO SUMMARY OF CONTRACTING OFFICER'S CONCLUSIONS

### (a) DIRECT LABOR COSTS

Direct labor costs in the amount of $23,385 for the performance of administrative services for non-NOAA activities ($18,416) and duplicative data entry charges ($4,969) have been disallowed under this contract.

**Unallocable Administrative Labor Costs for Non-NOAA Activities**

Administrative labor costs in the amount of $18,416 relating to non-NOAA activities performed at the Kansas City project office are unallocable.

FDI agreed with the audit findings as evidenced by an electronic mail message dated September 17, 1992 from Jim Wagner to Dwayne Wilson, Jack Toliver and other FDI personnel. The agreement between the OIG and FDI was confirmed in a letter dated September 18, 1994 from the OIG to Dwayne Wilson. FDI identified 1568.7 direct labor hours and $18,416 billed to the NOAA contract in error and agreed to credit the NOAA contract for these charges. To date, a credit has not been issued.

The following table summarizes the computation of unallocable administrative labor costs.

| | Non-NOAA Labor Percentage | Unallocable Labor Cost |
|---|---|---|
| Task Order 4 | 4.592% | $ 2,494 |
| Task Order 5 | 6.650% | 5,036 |
| Task Order 6 | 5.381% | 6,526 |
| Task Order 7 | 4.318% | 4,360 |
| Total Unallocable Labor | | $18,416 |

**Unallowable Duplicative Costs for Time-sheet Data Entry**

Direct labor costs, in the amount of $4,969, for time-sheet data entry functions that duplicate functions in the overhead cost pool are unallowable.

In its response to the OIG audit, FDI acknowledged "duplicative time-sheet data entry costs" and agreed to credit NOAA "with the questioned direct labor cost, plus appropriate burdens, G&A, and cost of capital." To date a credit has not been issued.

The following table summarizes the computation of unallowable direct labor costs for time-sheet data entry.

| | Calculated Data Entry Hours | Calculated Data Entry Costs |
|---|---|---|
| Task Order 5 | 74.0 | $ 503 |
| Task Order 6 | 370.0 | 2,612 |
| Task Order 7 | 255.0 | 1,854 |
| Total Unallowable Direct Labor | 699.0 | $4,969 |

Human Resources Activities - Duplicative Costs

FDI charged labor for performing human resources activities including recruitment, hiring and employee benefits administration as a direct cost to the contract.

The indirect cost (overhead) charged to direct labor includes allocations from the support cost pool and the employee benefits cost pool. The support cost "pool is comprised of costs for project support functions" including: indirect labor and expenses, standards and procedures, recruitment, training, personnel and related payroll burdens and facility costs. Insurance and other benefits administration costs are allocated from the employee benefits pool.

It appears that FDI charged human resources activities as both direct and indirect costs to the contract, thereby duplicating costs. However, FDI's explanation provided in letters to the Contracting Officer, dated March 3, 1995 and March 30, 1995, along with information provided by Howard Dameron, DCAA, Santa Ana, California, DCAA, is sufficient to forego further discussion on this issue.

(b) OTHER DIRECT COSTS

Other direct costs in the amount of $146,584 for improper indirect cost allocations ($18,61 charged by Gould Evans Architects, other subcontract costs incurred outside the performance period of this contract ($127,133) and excessive travel costs ($837) are questioned or disallowed.

Gould Evans Architects (GEA) Subcontract

GEA subcontract costs in the amount of $18,614 are questioned. These questioned costs involve improper indirect cost allocations ($19,465), offset by a credit ($851) for underclaimed direct labor. The computations for the questioned costs are summarized on page 9, EXHIBIT 1.

Other Subcontracts

The OIG identified numerous costs incurred, totalling $127,133, for subcontracted services rendered after October 31, 1992. Such services included but were not limited to, title searches, site surveys and moving and storage services.

Contract number 50WCNA606099 was a term, level of effort, cost reimbursement type contract with a definite performance period. FDI had the authority, under this contract, to incur expenditures for a specified level of effort through October 31, 1992. It did not have the authority to commit to providing services or incur charges for services beyond that date. Therefore, subcontract charges in the amount of $127,133, for services performed after October 31, 1993, are unallowable.

A complete list of subcontract costs disallowed is provided on page 10, EXHIBIT 2.

Unallowable Travel Charges

FDI was reimbursed for excessive travel expenses totalling $837.00. The amount claimed for lodging costs, meals, and incidental expense (per diem) on four expense reports billed on invoice number 04-00067208 are in excess of what is allowed.

On expense report number I309682, the traveler (Scott) claimed an extra day's per diem. On expense report number I309616 the traveler (Blackard) claimed an extra nights lodging. On expense report number (s) I314141 and I314112, the travelers (Pond and Baird) claimed lodging costs in excess of that stated on the travel itinerary.

The following table summarizes the questioned travel costs.

| Report Number | Traveler | Claimed Per Diem | Authorized Per Diem | Questioned Costs |
|---|---|---|---|---|
| I309682 | Scott, Tim | $ 179.60 | $ 119.60 | $ 82 |
| I309616 | Blackard, Chas | 264.20 | 252.80 | 69 |
| I314141 | Pond, Duane | 1,715.00 | 1,372.00 | 343 |
| I314112 | Baird, George | 1,715.00 | 1,372.00 | 343 |
| Total Questioned Travel Costs | | | | $837 |

(c) INDIRECT COST CHARGES

FDI indirect costs include, overhead, general and administrative expenses (G&A) and facilities capital cost of money charges. The weighted average indirect costs rates, established by the OIG, were used to compute allowable indirect cost charges. The weighted average indirect cost rates established by the OIG are provided on page 11, EXHIBIT 3.

The indirect cost charges claimed by FDI were below that applied to allowable costs. A credit in the amount of $17,501 for underclaimed indirect costs, $10,154 for overhead; $6,686 for G&A expense; $314 for facilities capital cost of money based on the overhead cost base; and $347 for facilities capital cost of money based on G&A expense cost base, was applied to the total unallowable/questioned costs.

Overhead Costs

Overhead costs on direct labor was computed using the weighted average rates established by the OIG. The overhead costs claimed were $10,154 below the allowable overhead costs for the period August 4, 1986 through October 31, 1992. The credit was applied to the total questioned/unallowable costs.

The following table summarizes the computation of overhead costs.

| | Claimed Overhead | Direct Labor Accepted | Weighted Average Rate | Accepted Overhead | Questioned Overhead |
|---|---|---|---|---|---|
| Task Order #1 | | | | | |
| Irvine | $ 76,655 | $ 86,226 | 0.8890 | $ 76,655 | $ 0 |
| Task Order #2 | | | | | |
| Irvine | 275,741 | 289,223 | 0.9511 | 275,080 | 661 |
| Kansas City | 186,052 | 272,284 | 0.6778 | 184,554 | 1,498 |
| Task Order #3 | | | | | |
| Irvine | 603,021 | 552,301 | 1.0730 | 592,619 | 10,402 |
| Kansas City | 695,966 | 872,467 | 0.7817 | 682,007 | 13,959 |
| Task Order #4 | | | | | |
| Irvine | 58,452 | 52,712 | 1.1088 | 58,447 | 5 |
| Kansas City | 1,598,384 | 1,951,242 | 0.8176 | 1,595,335 | 3,049 |
| Task Order #5 | | | | | |
| Irvine | 10,807 | 9,955 | 1.0852 | 10,803 | 4 |
| Kansas City | 1,953,234 | 2,319,842 | 0.8418 | 1,952,843 | 391 |
| Task Order #6 | | | | | |
| Irvine | 5,521 | 5,653 | 0.9724 | 5,497 | 24 |
| Kansas City | 2,349,359 | 3,100,989 | 0.7585 | 2,352,100 | (2,741) |
| Task Order #7 | | | | | |
| Irvine | 10,043 | 11,006 | 0.9278 | 10,211 | (168) |
| Kansas City | 1,583,529 | 2,176,997 | 0.7372 | 1,604,882 | (21,353) |
| Task Order #8 | | | | | |
| Irvine | 7,088 | 7,694 | 0.9220 | 7,094 | (6) |
| Kansas City | 1,443,794 | 1,977,248 | 0.735 | 1,453,277 | (9,483) |
| San Juan | 44,165 | 54,836 | 0.922 | 50,559 | (6,394) |
| TOTAL | $10,901,811 | $13,740,675 | | $10,911,965[a] | $(10,154) |

[a]Columns may not sum exactly to totals due to rounding.

-- PROCUREMENT SENSITIVE INFORMATION --

General and Administrative Expenses

G&A allocated to total direct costs (direct labor, other direct costs and overhead) were computed using the weighted average rates established by the OIG. The G&A expense claimed was $6.686 below the allowable expense for the period August 4, 1986 through October 31, 1992. The credit was applied to the total questioned/unallowable costs.

The following table summarizes the computation of G&A expense.

| | Claimed G & A | Cost Base Accepted | Weighted Average Rate | Accepted G & A | Questioned G & A |
|---|---|---|---|---|---|
| Task Order #1 | $ 17,714 | $ 204,434 | 0.0830 | $ 16,968 | $ 746 |
| Task Order #2 | 176,253 | 1,616,478 | 0.1071 | 173,125 | 3,12[illegible] |
| Task Order #3 | 443,774 | 4,168,843 | 0.1067 | 444,816 | (1,042) |
| Task Order #4 | 516,943 | 5,269,219 | 0.0972 | 512,168 | 4,775 |
| Task Order #5 | 698,252 | 5,729,977 | 0.1172 | 671,553 | 26,699 |
| Task Order #6 | 788,772 | 7,403,313 | 0.1073 | 794,375 | (5,603) |
| Task Order #7 | 503,076 | 5,452,371 | 0.0960 | 523,428 | (20,352) |
| Task Order #8 | 488,631 | 5,341,121 | 0.0943 | 503,668 | (15 037) |
| TOTAL | $3,633,415 | $35,185,756 | | $3,640,101 | $ (6,6[illegible]) |

Facilities Capital Cost of Money

Two separate facilities capital cost of money rates were used to compute allowable capital cost of money charges. One rate was applied to the overhead cost base (direct labor) and the other rate was applied to the G&A cost base which is the sum of total direct costs and overhead. The weighted average rates established OIG were used to calculate the allowable cost of money charges.

Overhead Cost Base - The weighted facilities capital cost of money rate was applied to the total allowed direct labor costs. As a result, the capital cost of money claimed was $314 below the allowable charge for the period August 4, 1986 through October 31, 1992.

The following table summarizes the computation of the allowable facilities capital cost of money charges.

| | Claimed Cost of Money | Cost Labor Base Accepted | Weighted Average Rate | Accepted Cost of Money | Questioned Cost of Money |
|---|---|---|---|---|---|
| Task Order #1 | $ 69 | $ 86,226 | 0.00080 | $ 69 | $ 0 |
| Task Order #2 | 6,503 | 561,507 | 0.01094 | 6,143 | 360 |
| Task Order #3 | 18,608 | 1,424,768 | 0.01289 | 18,365 | 243 |
| Task Order #4 | 23,632 | 2,003,954 | 0.01182 | 23,687 | (55) |
| Task Order #5 | 33,648 | 2,329,797 | 0.01433 | 33,386 | 262 |
| Task Order #6 | 38,967 | 3,106,642 | 0.01257 | 39,050 | (83) |
| Task Order #7 | 15,504 | 2,188,003 | 0.00738 | 16,147 | (643) |
| Task Order #8 | 12,943 | 2,039,778 | 0.00654 | 13,340 | (397) |
| TOTAL | $149,874 | $13,740,675 | | $150,188[b] | $(314)[b] |

**G&A Cost Base** - The weighted facilities capital cost of money rate was applied to the sum of the allowed direct costs and overhead. As a result, the capital cost of money claimed was $347 below the allowable charge for the period August 4, 1986 through October 31, 1992.

The following table summarizes the computation of the allowable facilities capital cost of money charges.

| | Claimed Cost of Money | Cost Base Accepted | Weighted Average Rate | Accepted Cost of Money | Questioned Cost of Money |
|---|---|---|---|---|---|
| Task Order #1 | $ 571 | $ 204,434 | 0.00306 | $ 626 | $ (55) |
| Task Order #2 | 1,851 | 1,616,478 | 0.00126 | 2,037 | (186) |
| Task Order #3 | 5,364 | 4,168,843 | 0.00127 | 5,294 | 70 |
| Task Order #4 | 5,350 | 5,269,219 | 0.00103 | 5,427 | (77) |
| Task Order #5 | 5,732 | 5,729,977 | 0.00099 | 5,673 | 59 |
| Task Order #6 | 3,725 | 7,403,313 | 0.00053 | 3,924 | (199) |
| Task Order #7 | 1,422 | 5,452,371 | 0.00026 | 1,418 | 4 |
| Task Order #8 | 1,211 | 5,341,121 | 0.00022 | 1,175 | 36 |
| TOTAL | $25,226 | $35,185,756 | | $25,574[b] | $(347)[b] |

[b] Columns may not sum exactly to totals due to rounding.

-- PROCUREMENT SENSITIVE INFORMATION --

(d) PROFIT

Each task order had a separate fixed fee that was established at the outset of the task performance period. Payment of the entire amount of fixed fee was contingent upon the expenditure of a specified level of effort within a definite period of time. The total fixed fee is the sum of the total fee billed on each task order.

The following table is a summary of the total fixed fee billed.

| | |
|---|---|
| Task Order # 1 | $ 23,166 |
| Task Order # 2 | 136,834 |
| Task Order # 3 | 370,900 |
| Task Order # 4 | 512,000 |
| Task Order # 5 | 550,000 |
| Task Order # 6 | 796,000 |
| Task Order # 7 | 509,200 |
| Task Order # 8 | 520,000 |
| TOTAL | $3,418,100 |

EXHIBIT 1

Gould Evans Architects
Summary of Indirect Cost Allocations

| | Labor Claimed | Labor Questioned | Labor Accepted | Overhead Claimed | Audited Rate | Overhead Accepted | Overhead Questioned | Total Questioned |
|---|---|---|---|---|---|---|---|---|
| Task Order #1 | | | | | | | | |
| 08/04/86-09/30/86 | $ 10,787 | | $ 10,787 | $ 14,679 | 1.351815 | $ 14,582 | $ 97 | $ 97 |
| Task Order #2 | | | | | | | | |
| 10/01/86-12/31/86 | 35,158 | | 35,158 | 47,845 | 1.351815 | 47,527 | 318 | 318 |
| 01/01/87-09/30/87 | 74,155 | (236) | 74,391 | 91,211 | 1.196185 | 88,985 | 2,226 | 1,990 |
| TO #2 Quest. Costs | | | | | | | | $2,308 |
| Task Order #3 | | | | | | | | |
| 10/01/87-12/31/87 | 24,174 | (263) | 24,437 | 29,734 | 1.196185 | 29,231 | 503 | 240 |
| 01/01/88-09/30/88 | 131,206 | 130 | 131,076 | 182,376 | 1.364786 | 178,891 | 3,485 | 3,615 |
| TO #3 Quest.Costs | | | | | | | | $3,855 |
| Task Order #4 | | | | | | | | |
| 10/01/88-12/31/88 | 26,746 | | 26,746 | 37,177 | 1.364786 | 36,503 | 674 | 674 |
| 01/89-09/30/89 | 162,994 | (23) | 163,017 | 226,561 | 1.359258 | 221,582 | 4,979 | 4,956 |
| TO #4 Quest. Costs | | | | | | | | $5,630 |
| Task Order #5 | | | | | | | | |
| 10/01/89-12/31/89 | 45,220 | | 45,220 | 62,856 | 1.359258 | 61,466 | 1,390 | 1,390 |
| 01/01/90-09/30/90 | 138,558 | 62 | 138,496 | 190,064 | 1.356628 | 187,888 | 2,176 | 2,238 |
| TO #5 Quest. Costs | | | | | | | | $3,628 |
| Task Order #6 | | | | | | | | |
| 10/01/90-12/31/90 | 50,533 | | 50,533 | 69,318 | 1.356628 | 68,554 | 764 | 764 |
| 01/01/91-09/30/91 | 201,117 | (336) | 201,453 | 279,552 | 1.411459 | 284,343 | (4,791) | (5,127) |
| TO #6 Quest. Costs | | | | | | | | ($4,363) |
| Task Order #7 | | | | | | | | |
| 10/01/91-12/31/91 | 70,671 | | 70,671 | 98,233 | 1.411459 | 99,749 | (1,516) | (1,516) |
| 01/01/92-04/30/92 | 125,064 | (185) | 125,249 | 173,839 | 1.360000 | 170,339 | 3,500 | 3,315 |
| TO #7 Quest. Costs | | | | | | | | $1,799 |
| Task Order #8 | | | | | | | | |
| 05/01/92-10/31/92 | 188,668 | | 188,668 | 262,248 | 1.360000 | 256,588 | 5,660 | 5,660 |
| Totals | $1,285,051 | ($851) | $1,285,902 | $1,765,693 | | $1,746,228 | $19,465 | $18,614 |

**-- PROCUREMENT SENSITIVE INFORMATION --**

EXHIBIT 2

Subcontracts for Services
Performed After October 31, 1992

| Invoice Number | Vendor | Questioned | Vendor Performance Period |
|---|---|---|---|
| 04-00067054 | Carter & Burgess | $ 3,200.00 | 11/01/92 through 11/30/92 |
| | Dowl Engineers | 10,367.50 | Through 11/22/92 |
| | Dowl Engineers | 6,175.00 | Through 11/22/92 |
| | Dowl Engineers | 1,320.00 | Through 11/22/92 |
| | Dowl Engineers | 12,837.50 | Through 11/22/92 |
| | Dowl Engineers | 9,307.50 | Through 11/22/92 |
| | Herbert S. Saffir | 600.00 | 11/16/92 and 12/30/92 |
| | Anthony W. Kast, Inc. | 2,730.00 | Invoice dated 12/18/92 |
| 04-00068349 | Davis Moving & Storage | 2,075.09 | 11/01/92 through 01/07/93 |
| | Dowl Engineers | 6,160.00 | 11/23/92 through 12/22/92 |
| | Herbert S. Saffir | 808.75 | 01/04/93 through 01/05/93 |
| | Hoy Transfer, Inc. | 2,080.00 | 10/06/92 through 01/06/93 |
| | Major Engineering | 1,320.00 | Invoice dated 01/11/93 |
| | Miss. Moving Systems | 91.77 | January 1993 |
| | RLDA | 4,333.50 | Invoice dated 02/02/93 |
| | Simmons Engineering, Inc. | 2,000.00 | Invoice dated 01/05/93 |
| | Twin City Testing | 4,580.00 | Invoice dated 01/14/93 |
| 04-00069142 | Aavon Moving & Storage | 149.64 | 02/01/93 through 03/01/93 |
| | Apple Transportation | 2,972.74 | 12/07/92 through 04/07/93 |
| | Derby Van & Storage | 350.00 | 02/08/93 through 02/12/93 |
| | First American Title Ins. | 2,339.50 | Invoice dated 02/18/93 |
| | Herbert S. Saffir | 1,700.00 | 02/04/93 through 02/17/93 |
| | Hunter Land Surveying | 3,402.50 | Invoice dated 02/16/93 |
| | Miss. Moving Systems | 1,073.35 | 02/03/93 |
| | Shamrock Moving & Stor. | 775.84 | 01/07/93 through 02/26/93 |
| 04-00070008 | Derby Van & Storage | 116.48 | 03/05/93 |
| | Gore Engineering, Inc. | 1,250.00 | Invoice dated 03/29/93 |
| | Jenkins & Associates | 1,897.40 | Invoice dated 03/18/93 |
| | Miss. Moving Systems | 77.41 | January 1993 |
| | Shamrock Moving & Stor. | 680.25 | March 1993 |
| | Trinity Eng. Testing Corp. | 3,042.00 | Invoice dated 01/25/93 |
| 04-00070867 | Aavon Moving & Storage | 163.88 | March 1993 |
| | Dowl Engineers | 3,190.00 | 11/23/92 through 12/22/92 |
| | Dowl Engineers | 1,900.00 | 11/23/92 through 12/22/92 |
| | Dowl Engineers | 1,425.00 | 12/23/92 through 03/25/93 |
| | Dowl Engineers | 1,320.00 | 03/26/93 through 04/25/93 |
| | Dowl Engineers | 3,950.00 | 11/23/92 through 12/22/92 |
| | Dowl Engineers | 2,962.50 | 12/23/92 through 03/25/93 |
| | Executive Relocation | 1,874.18 | 04/07/93 and 05/03/93 |
| | Herbert S. Saffir | 2,400.00 | 03/03/93 through 03/26/93 |
| | John West Engineering | 400.00 | Invoice dated 04/22/93 |
| | RLDA | 481.50 | Invoice dated 04/21/93 |
| | Shamrock Moving & Stor. | 1,417.36 | April 1993 |
| 04-00072516 | Dowl Engineers | 7,272.50 | 12/23/92 through 06/24/93 |
| | Dowl Engineers | 6,667.50 | 11/23/92 through 06/24/93 |
| | Herbert S. Saffir | 1,000.00 | 06/01/93 through 06/25/93 |
| | Rogers Trucking | 895.00 | 04/12/93 through 06/29/93 |
| | Total Questioned | $127,133.14 | |

-- **PROCUREMENT SENSITIVE INFORMATION** --

EXHIBIT 3

**Weighted Indirect Cost Rates**

| | Irvine Overhead | Field Overhead | G & A | Cost of Cap. (O/H Base) | Cost of Cap. (G & A Base) |
|---|---|---|---|---|---|
| Task Order #1 (a) | 0.8890 | 0.6170 | 0.0830 | 0.00080 | 0.00306 |
| Task Order #2 (b) | 0.9511 | 0.6778 | 0.1071 | 0.01094 | 0.00126 |
| Task Order #3 (c) | 1.0730 | 0.7817 | 0.1067 | 0.01289 | 0.00127 |
| Task Order #4 (d) | 1.1088 | 0.8176 | 0.0972 | 0.01182 | 0.001[illegible] |
| Task Order #5 (e) | 1.0852 | 0.8418 | 0.1172 | 0.01433 | 0.00099 |
| Task Order #6 (f) | 0.9724 | 0.7585 | 0.1073 | 0.01257 | 0.00053 |
| Task Order #7 (g) | 0.9278 | 0.7372 | 0.0960 | 0.00738 | 0.00026 |
| Task Order #8 (h) | 0.9220 | 0.7350 | 0.0943 | 0.00654 | 0.000[illegible]2 |

a. Based on 2 months of FY 1986 final rates.
b. Based on 1 month of FY 1986 final rates and 11 months of FY 1987 final rates.
c. Based on 2 months of FY 1987 final rates and 10 months of FY 1988 final rates.
d. Based on 1 month of FY 1988 final rates and 11 months of FY 1989 final rates.
e. Based on 1 month of FY 1989 final rates and 11 months of FY 1990 final rates.
f. Based on 1 month of FY 1990 final rates and 11 months of FY 1991 final claimed rates.
g. Based on 1 month of FY 1991 final claimed rates and 6 months of FY 1992 final claimed ra.
h. Based on 6 months of FY 1992 final claimed rates

# SUMMARY OF INCURRED AND QUESTIONED ENGINEERING DESIGN COSTS CONTRACT NUMBER 50WCNA606099

## AUGUST 4, 1986 THROUGH OCTOBER 31, 1992

| | | |
|---|---|---|
| Total Design Cost and Fee | | $6,787,844[a] |
| Estimated Cost of Construction | $49,638,562[b] | |
| Limitation Factor | x 0.06[c] | |
| Maximum Allowable Design Cost | | $2,978,314 |
| Question Design Cost and Fee | | $3,809,530 |

[a] See Appendix II, Pages 2 through 13

[b] See Appendix II, Pages 13 through 14

[c] 41 U.S.C. 254(b) limits engineering design costs plus fee to six percent of the estimated construction costs

-- PROCUREMENT SENSITIVE INFORMATION --

SUMMARY OF DESIGN COSTS
August 4, 1986 through October 31, 1992

| | Task Order #2 | Task Order #3 | Task Order #4 | Task Order #5 | Task Order #6 | Task Order #7 | Task Order #8 | TOTALS | NOTES |
|---|---|---|---|---|---|---|---|---|---|
| rect Design Labor | | | | | | | | | |
| Kansas City | $7,308 | $124,235 | $206,633 | $317,583 | $207,200 | $379,510 | $265,675 | $1,508,144 | (a) |
| Irvine | 40,491 | 267,677 | 0 | 0 | 0 | 0 | 0 | 308,168 | (a) |
| San Juan | 0 | 0 | 0 | 0 | 0 | 0 | 38,486 | 38,486 | (a) |
| located Admin Labor | | | | | | | | | |
| Kansas City | 14,475 | 37,508 | 66,620 | 83,070 | 42,949 | 89,670 | 72,016 | 406,308 | (b) |
| Irvine | 32,818 | 64,920 | 0 | 0 | 0 | 0 | 0 | 97,738 | (b) |
| Subtotal - Labor | $95,092 | $494,340 | $273,253 | $400,653 | $250,149 | $469,180 | $376,177 | $2,358,844 | |
| erhead | | | | | | | | | |
| Kansas City | 14,765 | 126,435 | 223,412 | 337,270 | 189,738 | 345,879 | 248,203 | 1,485,701 | (c) |
| Irvine | 69,724 | 356,877 | 0 | 0 | 0 | 0 | 0 | 426,601 | (c) |
| San Juan | 0 | 0 | 0 | 0 | 0 | 0 | 35,484 | 35,484 | (c) |
| Gould Evans Design Cost | 21,899 | 169,550 | 150,130 | 66,205 | 117,961 | 245,213 | 290,043 | 1,061,001 | (d) |
| her Subcontracts | 0 | 0 | 0 | 0 | 0 | 62,165 | 37,522 | 99,687 | (d) |
| C. Office Rent | 1,768 | 18,724 | 29,154 | 35,435 | 20,573 | 40,623 | 29,764 | 176,041 | (e) |
| Subtotal | $203,248 | $1,165,925 | $675,949 | $839,563 | $578,421 | $1,163,060 | $1,017,193 | $5,643,359 | |
| neral & Administrative | 21,768 | 124,404 | 65,702 | 98,397 | 62,065 | 111,654 | 95,921 | 579,911 | (f) |
| st of Capital (OH) | 1,040 | 6,372 | 3,230 | 5,741 | 3,144 | 3,463 | 2,460 | 25,451 | (f) |
| st of Capital (G&A) | 256 | 1,481 | 696 | 831 | 307 | 302 | 224 | 4,097 | (f) |
| Subtotal | $226,312 | $1,298,182 | $745,577 | $944,532 | $643,937 | $1,278,479 | $1,115,798 | $6,252,817 | |
| Fixed Fee | 17,154 | 103,205 | 65,536 | 80,191 | 62,204 | 109,438 | 97,298 | 535,027 | (g) |
| TOTAL DESIGN COSTS | $243,466 | $1,401,388 | $311,113 | $1,024,72 | $706,141 | $1,387,917 | $1,213,096 | $6,787,844 | |

FDCO 1826

## NOTES TO SUMMARY OF DESIGN COSTS INCURRED

### 1.0 NUMERATOR

#### (a) DIRECT DESIGN LABOR

The design window concept was applied to costs tabulated for task orders 3 through 8. EXHIBIT 4 provides the design window dates for each site subject to the 6% fee limitation. Costs incurred prior to the design start date and after the design completion date are excluded from the computation of design cost.

Task Order #1 - August 1, 1986 through September 30, 1986 and
Task Order #2 - October 1, 1986 through September 30, 1987

The CSSR report included labor costs applicable to effort performed from the inception of the contract, August 4, 1986. The costs were not charged to site specific CLIN codes thereby precluding application of the design window methodology. Information contained in source documents demonstrates that there was no design effort performed prior to April 15, 1987. Therefore, all costs charged to area code 13 prior to April 15, 1987 are excluded from the 6% design fee computation.

In addition, some non site specific design effort such as site surveys, site programming studies, conceptual design, access road design, foundation study and a soil study at Sterling, Virginia (CLIN BC), were performed during the period April 15, 1987 through September 30, 1987 and charged to area code 13. An adjustment was made to exclude costs for this work from the 6% design fee computation.

The following table summarizes the computation of total direct design labor incurred during the performance of task order 2.

Task Order #2 Direct Design Labor

| | Irvine Labor | | Kansas City Labor | | Total Costs |
|---|---|---|---|---|---|
| | Hours | Costs | Hours | Costs | |
| Area Code 13 | 2868.0 | $72,773 | 638.0 | $14,649 | $87,422 |
| Exclusions | | | | | |
| Pre-Design (TO #1) | (248.0) | (5,344) | | | (5,344) |
| Pre-Design (TO #2) | (259.0) | (7,581) | (155.0) | (3,461) | (11,042) |
| Non-Design | (763.0) | (19,357) | (169.0) | (3,880) | (23,237) |
| Task Order #2 Design | 1598.0 | $40,491 | 314.0 | $ 7,308 | $47,799 |

Task Order #3 - October 1, 1987 through September 30, 1988

During task order 3, FDI began using site CLIN codes for area code 13 charges, however, usage was infrequent and inconsistent. The design window methodology was applied to area code 13 charges to site specific CLIN codes.

A substantial amount of charges were made to CLIN 00 which is not a specific site identifier. FDI contends that the work charged to CLIN 00 was primarily for conducting studies and performing non site-specific design functions. Information from source documentation supports FDI's explanation in part. Some of the charges to area code 13, CLIN 00 were for the performance of pre-design functions such as site investigations, preparing conceptual designs and for completing other surveys such as the asbestos survey at Jackson, Mississippi (CLIN FC). However, the review time-sheets revealed that at least some of the costs charged to CLIN 00 were for site specific design and should have been charged to a site CLIN code. Based on information provided in source documentation, a portion of costs charged to area code 13, CLIN 00, are excluded from the 6% design fee computation.

Designs for seven sites were completed in task order 3. Since cost estimating was charged to area code 13, no further adjustment was made for the preparation of cost estimates.

The following table summarizes the computation of total direct design labor incurred during the performance of task order 3.

Task Order #3 Direct Design Labor

| | Irvine Labor | | Kansas City Labor | | Total Costs |
|---|---|---|---|---|---|
| | Hours | Costs | Hours | Costs | |
| Area Code 13 | 18148.0 | $392,709 | 12918.0 | $216,190 | $608,899 |
| Exclusions | | | | | |
| Design Window | | | (1659.0) | (23,197) | (23,197) |
| Non-Design | (5777.8) | (125,032) | (4112.3) | (68,758) | (193,790) |
| Task Order #3 Design | 12370.2 | $267,677 | 7146.7 | $124,235 | $391,912 |

Task Order #4 - October 1, 1988 through September 30, 1989

Throughout task order 4, FDI continued to charge all site specific design costs to area code 13. Although use of site CLIN codes was more frequent and consistent than in task order 3, evidence of incorrect charging to CLIN 00 remained. With the exception of those documented exclusions, charges to CLIN 00 are included in the design costs computations.

Designs for seven sites were completed in task order 4. Since cost estimating was charged to area code 13, no further adjustment was made for the preparation of cost estimates.

The following table summarizes the computation of total direct design labor incurred during the performance of task order 4.

Task Order #4 Direct Design Labor

| | Kansas City Labor Hours | Kansas City Labor Total Cost |
|---|---|---|
| **Area Code 13** | 31453.7 | $451,034 |
| Exclusions | | |
| Design Window | (10192.3) | (141,451) |
| Non WFO/Leases | (552.0) | (8,071) |
| Non-Design | (6621.0) | (94,879) |
| Task Order #4 Design | 14088.4 | $206,633 |

Task Order #5 - October 1, 1989 through September 30, 1990

Prior to the beginning of task order 5, FDI made changes to the timecard work area charge codes. Area code 13 was no longer used for design effort. New work/cost area codes were established. These new work/cost codes were separated into four major groupings coinciding with the Statement of Work. The new cost areas were labeled "Project Management," "General Design/Engineering," "Site Specific Design/Engineering/Construction," and "JSPO/NEXRAD Program." Time-sheet instructions provided directions for charging work associated with site specific design, and design package submittal coordination and review, to area code(s) 31 and 33 respectively. The instructions also provided for the continued use of the two character facility identifier, CLIN code. Charges to these two area codes were the primary focus of the Contracting Officer's analysis of task orders 5 through 8.

Although definite instructions existed for charging site specific design, engineering, and construction activities to the appropriate area code and specific CLIN codes, a significant amount of hours, were charged CLIN 00.

FDI provided a copy of a revision to the original time-sheet instructions issued September 29, 1989. The revision made significant changes in the accounting for tasks performed, particularly in the Design and Engineering area.

According to the revised instructions, the accounting for work related to "Misc. General Engineering," (area code 20) which was originally grouped under "General Design/Engineering," was changed to "General Engineering," area code 31, CLIN 00 and re-grouped under "Site Specific Design/Engineering/Construction." It seems illogical to categorize general, non-site specific work

under the "Site Specific Design" rather than under the "General Design/Engineering" group. The revision is undated and no clear explanation for the change has been provided. Consequently, there is no basis to exclude all charges to area code 31, CLIN 00, in task order 5, from the design computation.

Three site designs were completed in task order 5. The cost for one construction cost estimate for each of the three sites is included in the design computation. The cost is based on the average proposed costs for estimating in task order 5.

The following table summarizes the computation of total direct design labor incurred during the performance of task order 5.

Task Order #5 Direct Design Labor

| | Kansas City Labor | |
|---|---|---|
| | Hours | Total Costs |
| **Area Code 31** | 22154.8 | $378,508 |
| Exclusions | | |
| Design Window | (4430.2) | (74,324) |
| Other Exclusions | (30.0) | (694) |
| **Subtotal Area Code 31** | 17694.6 | $303,490 |
| **Area Code 33** | 1240.7 | $ 20,836 |
| Exclusions | | |
| Design Window | (602.6) | (10,457) |
| Subtotal Area Code 33 | 638.1 | $ 10,379 |
| Estimates | 189.0 | 3,714 |
| Task Order #5 Design | 18521.7 | $317,583 |

Task Order #6 - October 1, 1990 through September 30, 1991

New time-sheet instructions were published at the beginning of task order 6. Site specific charges to area codes 31 and 33 continued to be the primary focus on the analysis of this task. The number of hours charged to CLIN 00 was significantly less than that in the previous task orders. Source documentation supports the exclusion of some of the CLIN 00 charges to area codes 31 and 33.

The designs for three sites were completed during task order 6. The cost for one construction cost estimate for each of the three sites is included in the design computation for task order 6.

The following table summarizes the computation of total direct design labor incurred during the performance of task order 6.

Task Order #6 Direct Design Labor

| | Kansas City Labor | |
|---|---|---|
| | Hours | Total Costs |
| **Area Code 31** | 18076.4 | $351,672 |
| Exclusions | | |
| Design Window | (8705.8) | (168,533) |
| Other Exclusions | (5.0) | (115) |
| **Subtotal Area Code 31** | 9365.6 | $183,024 |
| **Area Code 33** | 1887.9 | $ 27,084 |
| Exclusions | | |
| Design Window | (888.5) | (13,151) |
| Other Exclusions | (27.6) | (602) |
| **Subtotal Area Code 33** | 971.8 | $ 13,331 |
| Estimates | 219.0 | 10,845 |
| Task Order #6 Design | 10556.4 | $207,200 |

Task Order #7 - October 1, 1991 through April 30, 1992

The system for charging design costs in task order 7 was consistent with that used for task order 6. Accordingly, the same methodology used to reconstruct 6% related design costs in task order 6 was used for task order 7. The cost for four construction cost estimates is included in the computation.

As discussed in the analysis summary, at least some 6% related design costs incurred in task order 7 were incorrectly charged to area code 3A rather than area code 31. In a letter to the OIG dated January 14, 1993, FDI estimated that approximately 41% of the hours charged to area code 3A during January, 1992 through April, 1992 (task order 7) should have been charged to area code 31.

Based on the foregoing, FDI's estimated hours and costs for detailed design, that were incorrectly charged to area code 3A, are included in the computation of design incurred during task order 7.

The following table summarizes the computation of total direct design labor incurred during the performance of task order 7.

Task Order #7 Direct Design Labor

| | Kansas City Labor | |
|---|---|---|
| | Hours | Total Costs |
| **Area Code 31** | 15024.0 | $318,056 |
| Exclusions | | |
| Design Window | (133.4) | (2,821) |
| Other Exclusions | (10.0) | (105) |
| **Subtotal Area Code 31** | 14880.6 | $315,130 |
| **Area Code 33** | 2655.1 | $39,149 |
| Exclusions | | |
| Design Window | (57.7) | (1,065) |
| Other Exclusions | (4.5) | (160) |
| **Subtotal Area Code 33** | 2592.9 | $37,924 |
| **Area Code 3A** | 5880.8 | $124,911 |
| Exclusions | (4906.6) | (104,462) |
| **Subtotal Area Code 3A** | 974.2 | $20,449 |
| **Estimates** | 270.0 | 6,007 |
| Task Order #7 Design | 18717.7 | $379,510 |

Task Order # 8 - May 1, 1992 through October 31, 1992

The same methodology for computing design cost in task order 7 was used to compute the design cost for task order 8. The computation of direct labor for task order 8 includes the estimated hours and costs that were incorrectly charged to area code 3A.

The following table summarizes the computation of total direct design labor incurred during the performance of task order 8.

Task Order #8 Direct Design Labor

| | Kansas City Labor | |
|---|---|---|
| | Hours | Total Costs |
| **Area Code 31** | 7280.8 | $148,117 |
| Exclusions | | |
| Design Window | (155.1) | (3,159) |
| **Subtotal Area Code 31** | 7125.7 | $144,958 |
| **Area Code 33** | 2301.1 | $35,188 |
| Exclusions | | |
| Design Window | (373.1) | (6,599) |
| **Subtotal Area Code 33** | 1928.0 | $28,589 |
| **Area Code 3A** | 8084.9 | $170,160 |
| Exclusions | (5059.8) | (106,560) |
| **Subtotal Area Code 3A** | 3025.1 | 63,600 |
| Estimates | 1330.0 | 28,528 |
| San Juan | 2340.0 | 38,486 |
| Task Order #8 Design | 15748.8 | $304,161 |

(b) ALLOCATIONS OF ADMINISTRATIVE LABOR

The methodology used by the OIG to compute the administrative labor costs to be apportioned to costs for design services was used in this analysis. The distribution of administrative labor to design costs is based on the relative ratio (administrative ratio) of proposed administrative labor hours to proposed "productive labor" hours for each contract task order. The grouping of proposed hours as administrative or productive is based on information provided to the OIG as a result of its discussions with FDI personnel. "Productive labor" is defined as the difference between total proposed direct labor hours and proposed administrative labor hours. The hourly rate is the average rate for administrative labor based on a composite of the departmental salary rates in the proposals.

The following tables illustrate the calculation of administrative labor costs. The first table establishes the administrative ratio by dividing proposed administrative hours by proposed "productive hours." The second table illustrates the calculation of total administrative labor cost applicable to design services. The sum of the design labor hours for the Irvine office and Kansas City office multiplied by the administrative ratio equals the administrative labor hours apportioned to design. Administrative labor hours multiplied by the hourly rate equals the total administrative labor costs included in the 6% design calculation.

| | Total Proposed Direct Labor | Proposed Administrative Hours | Proposed Productive Hours | Administrative Ratio | Hourly Rate |
|---|---|---|---|---|---|
| Task Order #2 | | | | | |
| Kansas City | 11040.0 | 7360.0 | 3680.0 | 2.0000 | $23.05 |
| Irvine | 7075.0 | 3440.0 | 3635.0 | 0.9464 | $21.70 |
| Task Order #3 | 88853.4* | 19063.6* | 69789.8* | 0.2732* | $19.21* |
| Task Order #4 | 118200.0 | 25100.0 | 93100.0 | 0.2696 | $17.54 |
| Task Order #5 | 118590.0 | 23720.0 | 94870.0 | 0.2500 | $17.94 |
| Task Order #6 | 170250.0 | 30450.0 | 139800.0 | 0.2178 | $18.68 |
| Task Order #7 | 111420.0 | 23025.0 | 88395.0 | 0.2605 | $18.39 |
| Task Order #8 | 85399.0 | 20350.0 | 65049.0 | 0.3128 | $17.17 |

* Hours for task order 3 are based on the weighted average ratios from task order 2 and 4 through 8.

| | Design Labor Hours | Total Administrative Ratio | Total Administrative Hours | Hourly Rate | Administrative Labor Cost |
|---|---|---|---|---|---|
| Task Order #2 | | | | | |
| Kansas City | 314.0 | 2.0000 | 628.0 | $23.05 | $14,475 |
| Irvine | 1598.0 | 0.9464 | 1512.3 | $21.70 | 32,818 |
| Task Order #3 | | | | | |
| Kansas City | 7146.7 | 0.2732 | 1952.5 | $19.21 | 37,508 |
| Irvine | 12370.2 | 0.2732 | 3379.5 | $19.21 | 64,920 |
| Task Order #4 | 14088.4 | 0.2696 | 3798.2 | $17.54 | 66,620 |
| Task Order #5 | 18521.7 | 0.2500 | 4630.4 | $17.94 | 83,070 |
| Task Order #6 | 10556.4 | 0.2178 | 2299.2 | $18.68 | 42,949 |
| Task Order #7 | 18717.7 | 0.2605 | 4876.0 | $18.39 | 89,670 |
| Task Order #8 | 13408.8 | 0.3128 | 4194.3 | $17.17 | 72,016 |
| TOTAL | | | | | $504,046 |

(c) OVERHEAD ALLOCATED TO DIRECT LABOR

The following weighted average overhead rates, established by the OIG, were applied to the sum of direct design labor costs and allocated administrative labor for each task order. (Reference APPENDIX I, page 11, EXHIBIT 3) Rates for the Irvine office were applied to direct labor incurred at the FDI office in San Juan.

| | Irvine Overhead | Field Overhead |
|---|---|---|
| Task Order #2 | 0.9511 | 0.6778 |
| Task Order #3 | 1.0730 | 0.7817 |
| Task Order #4 | 1.1088 | 0.8176 |
| Task Order #5 | 1.0852 | 0.8418 |
| Task Order #6 | 0.9724 | 0.7585 |
| Task Order #7 | 0.9278 | 0.7372 |
| Task Order #8 | 0.9220 | 0.7350 |

(d) SUBCONTRACTS

Design costs for subcontracts were tabulated from documentation included in FDI billings. GEA provided substantial design and engineering support to FDI throughout the entire contract period. A complete analysis of GEA costs was conducted using the timesheets that accompanied most of the GEA invoices and information provided by FDI and GEA.

The total GEA design cost is based on the relative percentage of GEA 6% direct design labor hours plus CADD hours to total GEA direct labor hours plus CADD hours charged to FDI. The total GEA costs billed are adjusted for questioned indirect cost allocations (Reference: APPENDIX I, Note (b), page 3). The total GEA design cost is the result of multiplying the adjusted billed amount by the ratio of design hours to total hours.

As with some FDI design costs in task order(s) 7 and 8, GEA incurred and charged costs for detailed design to a pre-design account as well. Again, referring to FDI's January 14, 1993 letter addressing this issue, FDI estimated GEA design costs that were incorrectly charged to a pre-design account. These costs are included in the GEA direct labor design cost computation.

The following table summarizes GEA design costs included in the 6% design fee calculation.

| | Total Design Labor & CADD Hours | Total Direct Labor Hours | Design Ratio | Adjusted Total Billings | Total GEA Design Cost |
|---|---|---|---|---|---|
| Task Order #2 | 492.0 | 2444.5 | 0.2013 | $108,789 | $ 21,899 |
| Task Order #3 | 4456.0 | 11318.0 | 0.3937 | $430,659 | 169,550 |
| Task Order #4 | 4394.3 | 15639.6 | 0.2810 | $534,271 | 150,130 |
| Task Order #5 | 1847.5 | 13739.0 | 0.1345 | $492,229 | 66,205 |
| Task Order #6 | 2972.0 | 17527.5 | 0.1696 | $695,524 | 117,961 |
| Task Order #7 | 6544.0 | 13653.6 | 0.4793 | $511,606 | 245,213 |
| Task Order #8 | 7708.1 | 13063.5 | 0.5900 | $491,599 | 290,043 |
| TOTAL | | | | | $1,061,001 |

A.C. Kirkwood provided design services during task order(s) 7 and 8. The costs included in the 6% design computation for these services was taken from invoices included in the FDI billings.

(e) ALLOCATIONS OF KANSAS CITY OFFICE RENTAL

Design costs include a portion of Kansas City Office rental. The ratio of total Kansas City direct design labor hours plus allocated administrative labor to the total FDI Kansas City direct labor hours is applied to the total office rent invoiced for each task order. The total office rent multiplied by the design labor percentage yields the appropriate Kansas City office rent applicable to design.

The following table illustrates the computation for the allocation of Kansas City office costs.

| | KC Direct Design Hours | Admin Hours | Total Design Hours | Total Labor Hours | Design Rental Ratio | Total Office Rent | Total Design Rent |
|---|---|---|---|---|---|---|---|
| Task Order #2 | 314.0 | 628.0 | 942.0 | 11029.0 | 0.0854 | $ 20,700 | $ 1,768 |
| Task Order #3 | 7146.7 | 1952.5 | 9099.2 | 41770.0 | 0.2178 | 85,967 | 18,724 |
| Task Order #4 | 14088.4 | 3798.0 | 17886.4 | 103752.8 | 0.1724 | 169,108 | 29,154 |
| Task Order #5 | 18521.7 | 4630.4 | 23152.1 | 118701.4 | 0.1950 | 181,719 | 35,435 |
| Task Order #6 | 10556.4 | 2299.2 | 12855.6 | 147804.1 | 0.0870 | 236,476 | 20,573 |
| Task Order #7 | 18717.7 | 4876.0 | 23593.7 | 101976.7 | 0.2314 | 175,551 | 40,623 |
| Task Order #8 | 13408.8 | 4194.3 | 17603.1 | 94495.0 | 0.1863 | 159,762 | 29,764 |
| TOTAL | | | | | | | $176,041[d] |

(f) GENERAL AND ADMINISTRATIVE (G&A)/ CAPITAL COST OF MONEY

For the purpose of computing design costs the following weighted average G&A and Cost of Capital rates established by the OIG, were applied to the total design cost. (Reference APPENDIX I, page 11, EXHIBIT 3)

| | G&A | Cost of Capital Overhead Base | Cost of Capital G&A Base |
|---|---|---|---|
| Task Order #2 | 0.1071 | 0.01094 | 0.00126 |
| Task Order #3 | 0.1067 | 0.01289 | 0.00127 |
| Task Order #4 | 0.0972 | 0.01182 | 0.00103 |
| Task Order #5 | 0.1172 | 0.01433 | 0.00099 |
| Task Order #6 | 0.1073 | 0.01257 | 0.00053 |
| Task Order #7 | 0.0960 | 0.00738 | 0.00026 |
| Task Order #8 | 0.0943 | 0.00654 | 0.00022 |

[d] Columns may not sum exactly due to rounding

(g) ALLOCATIONS OF FIXED FEES

Using the methodology employed by the OIG, fixed fee is allocated in the same ratios as FDI's fixed fee to total costs billed for each task order. The following table summarizes the calculation of fixed fee allocated to design costs.

| | Total Invoice | Fixed Fee Billed | Total Costs Billed | Fee Ratio | Design Costs | Design Fee |
|---|---|---|---|---|---|---|
| Task Order #2 | $1,942,386 | $136,834 | $1,805,552 | 0.0758 | $ 226,312 | $ 17,154 |
| Task Order #3 | 5,035,705 | 370,900 | 4,664,805 | 0.0795 | 1,298,182 | 103,205 |
| Task Order #4 | 6,338,322 | 512,000 | 5,826,322 | 0.0879 | 745,577 | 65,536 |
| Task Order #5 | 7,027,171 | 550,000 | 6,477,171 | 0.0849 | 944,532 | 80,191 |
| Task Order #6 | 9,032,834 | 796,000 | 8,236,834 | 0.0966 | 643,937 | 62,204 |
| Task Order #7 | 6,468,065 | 509,200 | 5,958,865 | 0.0856 | 1,278,479 | 109,438 |
| Task Order #8 | 6,481,653 | 520,000 | 5,961,653 | 0.0872 | 1,115,798 | 97,298 |
| TOTAL | | | | | | $535,027[e] |

2.0 DENOMINATOR

Only those sites incurring six percent charges in the numerator are included in the denominator of the 6% fraction. The denominator is the sum of the estimated cost of construction (ECC) of all sites included in the numerator.

The ECC for designs completed in task order(s) 2 through 8 are based on the March 1992 WFO Facilities Budget (exclusive of furniture), provided by FDI. A pro-rated construction estimate was included in the denominator for those designs which started in task order 8 but were completed under the letter contract awarded by the NOAA, PGAS office.

The designs for the following twelve (12) sites were started in task order 8 but were completed under the letter contract.

| CLIN | LOCATION |
|---|---|
| CA | Aberdeen, SD |
| GB | Miami, FL |
| GG | Missoula, MT |
| GH | Mobile, AL |
| GM | Nashville, TN |
| GO | San Juan, PR |
| GS | Midland/Odessa, TX |
| GW | Paducah, KY |
| HE | Pueblo, CO |
| HI | Reno, NV |
| HY | Springfield, MO |
| IQ | Wilmington, NC |

[e] Columns may not sum exactly due to rounding

A weighted facility cost was used to identify the extent of site design effort to be completed under the letter contract. The ratio of the weighted facility cost to the total facility cost less furniture provides the percentage of total design scheduled to be completed under the letter contract. The balance of the design effort is presumed to have been completed under contract 50WCNA606099. The ECC for these twelve sites was determined by multiplying the percentage of design completed by the ECC.

The following tables illustrate the computation of the portion of the ECC included in the denominator of the 6% fraction, for the above twelve sites.

| LOCATION | PGAS WEIGHTED FACILITY COST | ECC | PERCENTAGE OF DESIGN PGAS | PERCENTAGE OF DESIGN TASK ORDER 8 |
|---|---|---|---|---|
| CA-Aberdeen | $ 867,423 | $1,029,400 | 0.8426 | 0.1574 |
| GB-Miami | $3,341,188 | $4,761,500 | 0.7017 | 0.2983 |
| GG-Missoula | $ 790,609 | $1,055,900 | 0.7488 | 0.2512 |
| GH-Mobile | $ 366,114 | $ 964,900 | 0.3794 | 0.6206 |
| GM-Nashville | $ 645,277 | $1,035,700 | 0.6230 | 0.3770 |
| GO-San Juan | $ 565,122 | $1,090,200 | 0.5184 | 0.4816 |
| GS-Midland | $ 772,507 | $ 909,800 | 0.8491 | 0.1509 |
| GW-Paducah | $ 699,989 | $ 974,000 | 0.7187 | 0.2813 |
| HE-Pueblo | $ 373,315 | $1,004,500 | 0.3716 | 0.6284 |
| HI-Reno | $1,570,532 | $1,624,900 | 0.9665 | 0.0335 |
| HY-Springfield | $ 563,324 | $1,121,000 | 0.5025 | 0.4975 |
| IQ-Wilmington | $ 863,743 | $ 916,700 | 0.9422 | 0.0578 |

| LOCATION | ECC | PERCENTAGE OF DESIGN TASK ORDER 8 | TASK ORDER 8 DENOMINATOR |
|---|---|---|---|
| CA-Aberdeen | $1,029,400 | 0.1574 | $ 162,028 |
| GB-Miami | $4,761,500 | 0.2983 | $1,420,355 |
| GG-Missoula | $1,055,900 | 0.2512 | $ 265,242 |
| GH-Mobile | $ 964,900 | 0.6206 | $ 598,817 |
| GM-Nashville | $1,035,700 | 0.3770 | $ 390,459 |
| GO-San Juan | $1,090,200 | 0.4816 | $ 525,040 |
| GS-Midland | $ 909,800 | 0.1509 | $ 137,289 |
| GW-Paducah | $ 974,000 | 0.2813 | $ 273,986 |
| HE-Pueblo | $1,004,500 | 0.6284 | $ 631,429 |
| HI-Reno | $1,624,900 | 0.0335 | $ 54,434 |
| HY-Springfield | $1,121,000 | 0.4975 | $ 557,698 |
| IQ-Wilmington | $ 916,700 | 0.0578 | $ 52,985 |

A list of the sites included in the denominator and the ECC for each site is provided in EXHIBIT 5. Summing the fifty-four (54) whole and partial ECC's yields a denominator of $49,638,562.

**EXHIBIT 4**
Page 1 of 2

Site Specific Design Windows
Task Orders 1 through 8
Contract Number 50WCNA606099

| CLIN | SITE | CONTRACTING OFFICER'S DESIGN WINDOW | SOURCE | SEPTEMBER, 1994 MASTER SCHEDULE | |
|---|---|---|---|---|---|
| BB | Melbourne, FL | 02/12/88 - 09/13/88 | (1)(3)(4) | 02/12/88 - 07/11/88 | |
| BC | Sterling, VA | 04/14/87 - 08/24/88 | (1)(3)(4) | 05/15/87 - 05/26/88 | |
| BJ | St. Louis, MO | 01/25/88 - 09/28/88 | (1)(3)(4) | 01/25/88 - 07/25/88 | |
| CA | Aberdeen, SD | 08/27/92 - 10/31/92 | (3)(5) | 09/28/92 - 02/24/93 | ** |
| CE | Amarillo, TX | 02/27/88 - 09/15/88 | (3)(4) | 04/13/88 - 07/13/88 | |
| CK | Atlanta, GA | 07/01/92 - 11/05/92 | (1)(3) | 07/01/92 - 11/05/92 | |
| CN | Binghamton, NY | 08/22/89 - 07/26/91 | (3)(4) | 09/13/89 - 05/13/91 | |
| CO | Birmingham, AL | 07/01/91 - 05/15/92 | (2)(4) | 07/15/91 - 12/03/91 | |
| CQ | Boise, ID | 07/15/91 - 03/31/92 | (1)(3)(4) | 07/15/91 - 02/16/92 | |
| CR | Boston, MA | 09/16/91 - 02/24/92 | (1)(3) | 09/18/91 - 02/24/92 | * |
| DD | Cheyenne, WY | 10/23/91 - 05/26/92 | (1)(3)(4) | 10/23/91 - 03/26/92 | |
| DF | Chicago, IL | 04/11/90 - 09/22/90 | (3)(4) | 03/01/89 - 08/08/90 | |
| DG | Cincinnati, OH | 03/11/92 - 09/22/92 | (1)(2)(4) | 03/11/92 - 08/13/92 | |
| DI | Cleveland, OH | 02/21/92 - 09/01/92 | (2)(4) | 02/24/92 - 06/29/92 | |
| DK | Columbia, SC | 04/13/92 - 12/15/92 | (1)(2)(4) | 04/13/92 - 10/16/92 | |
| DR | Des Moines, IA | 05/08/91 - 03/24/92 | (2)(4) | 05/06/91 - 10/08/91 | |
| DS | Detroit, MI | 04/11/90 - 04/08/91 | (1)(3)(4) | 03/16/89 - 09/19/90 | |
| DT | Dodge City, KS | 02/15/88 - 09/19/88 | (1)(3)(4) | 02/15/88 - 06/27/88 | |
| EL | Goodland, KS | 02/28/88 - 09/14/88 | (3)(4) | 03/15/88 - 07/01/88 | |
| EM | Grand Island, NE | 02/17/89 - 08/23/89 | (3)(4) | 02/27/89 - 07/13/89 | |
| EQ | Great Falls MT | 10/14/91 - 04/10/92 | (1)(3) | 10/14/91 - 04/10/92 | * |
| ER | Green Bay, WI | 05/18/92 - 10/31/92 | (1)(2)(3)(5) | 05/18/92 - 10/07/92 | |
| EV | Morehead City, NC | 07/30/90 - 07/28/92 | (1)(3)(4) | 07/30/90 - 08/13/91 | |
| EY | Houston, TX | 01/30/89 - 08/29/89 | (1)(4) | 01/30/89 - 07/08/89 | |
| FB | Indianapolis, IN | 02/17/92 - 06/30/92 | (1)(3)(4) | 02/17/92 - 05/29/92 | |
| FC | Jackson, MS | 11/15/91 - 06/08/92 | (2)(3)(4) | 12/09/91 - 04/02/92 | |
| FH | Kansas City, RFC | 02/28/89 - 12/01/89 | (3)(4) | 03/06/89 - 08/01/89 | |
| FL | Knoxville, TN | 05/04/92 - 09/09/92 | (1)(3) | 05/04/92 - 09/09/92 | |
| FU | Los Angeles, CA | 09/23/91 - 06/25/92 | (1)(3)(4) | 09/23/91 - 03/25/92 | |
| FV | Louisville, KY | 10/02/90 - 04/04/91 | (1)(3)(4) | 10/02/89 - 02/08/91 | |
| GB | Miami, FL | 09/21/92 - 10/31/92 | (2)(5) | 09/21/92 - 01/19/94 | ** |
| GC | Milwaukee, WI | 03/18/88 - 09/16/88 | (1)(3)(4) | 03/18/88 - 07/15/88 | |

-- PROCUREMENT SENSITIVE INFORMATION --

FDCO 1839

EXHIBIT 4
Page 2 of 2

Site Specific Design Windows
Task Orders 1 through 8
Contract Number 50WCNA606099

| CLIN | SITE | CONTRACTING OFFICER'S DESIGN WINDOW | SOURCE | SEPTEMBER, 1994 MASTER SCHEDULE |
|---|---|---|---|---|
| GG | Missoula, MT | 06/29/92 - 10/31/92 | (3)(5) | 10/06/92 - 02/26/93 ** |
| GH | Mobile, AL | 08/13/92 - 10/31/92 | (2)(3)(5) | 08/24/92 - 12/09/92 ** |
| GM | Nashville, TN | 09/24/91 - 10/31/92 | (3)(5) | 10/26/92 - 03/05/92 ** |
| GO | San Juan, PR | 07/24/92 - 10/31/92 | (1)(5) | 07/24/92 - 01/14/93 * |
| GP | New York (Brookhaven) | 09/03/91 - 05/29/92 | (1)(3)(4) | 09/03/91 - 04/02/92 |
| GQ | Norfolk, VA | 01/22/91 - 10/31/92 | (3)(5) | 02/06/92 - 07/30/92 |
| GS | Midland/Odessa, TX | 09/14/92 - 10/31/92 | (3)(5) | 09/28/92 - 02/05/93 ** |
| GW | Paducah, KY | 08/27/92 - 10/31/92 | (2)(3)(5) | 09/14/92 - 02/01/93 ** |
| GY | Philadelphia, PA | 01/23/92 - 09/04/92 | (1)(2)(4) | 01/24/92 - 04/22/92 |
| HB | Pittsburgh, PA | 11/15/91 - 06/17/92 | (2)(4) | 12/09/91 - 04/24/92 |
| HD | Portland, ME | 03/02/92 - 10/31/92 | (1)(2)(3)(5) | 03/02/92 - 06/12/92 |
| HE | Pueblo, CO | 07/27/92 - 10/31/92 | (2)(3)(5) | 08/10/92 - 12/14/92 ** |
| HI | Reno, NV | 10/08/92 - 10/31/92 | (3)(5) | 10/16/92 - 03/17/93 ** |
| HO | Austin/San Antonio, TX | 08/19/91 - 10/23/92 | (1)(4) | 08/19/91 - 03/30/92 |
| HQ | Monterey, CA | 09/23/91 - 09/15/92 | (1)(3)(4) | 09/23/91 - 05/17/92 |
| HU | Sioux Falls, SD | 09/19/91 - 06/04/92 | (1)(3)(4) | 09/20/91 - 04/15/92 |
| HV | New Orleans, LA | 03/02/92 - 10/31/92 | (2)(3)(4) | 03/02/92 - 08/18/92 |
| HY | Springfield, MO | 08/03/92 - 10/31/92 | (2)(3)(5) | 08/17/92 - 01/06/93 ** |
| IE | Topeka, KS | 07/18/88 - 07/28/89 | (1)(3)(4) | 07/18/88 - 05/18/89 |
| IP | Wichita, KS | 08/18/89 - 08/29/90 | (3)(4) | 09/12/89 - 06/27/90 |
| IQ | Wilmington, NC | 09/28/92 - 10/31/92 | (2)(3)(5) | 10/12/92 - 03/01/93 * |
| TA | WSTTC | 03/16/89 - 09/07/89 | (3) | Not Listed |

* Converted to Leased Sites

** Design completed under follow-on contract

SOURCE KEY:
(1) - Master Schedule
(2) - Date of Kick-off Letter or Site Requirements Letter
(3) - Monthly Progress Report
(4) - Solicitati. Closing Date
(5) - Contract 50WCNA606099 Comple.ion Date

-- PROCUREMENT SENSITIVE INFORMATION --

EXHIBIT 5

Page 2 of 2

ESTIMATED COST OF CONSTRUCTION (ECC)
DENOMINATOR

| CLIN | LOCATION | PERCENTAGE OF DESIGN COMPLETE | ESTIMATED COST OF CONSTRUCTION | DENOMINATOR |
|---|---|---|---|---|
| HB | Pittsburgh, PA | 100.00% | $810,200 | $810,200 |
| HD | Portland, ME | 100.00% | $1,207,000 | $1,207,000 |
| HE | Pueblo, CO | 62.86% | $1,004,500 | $631,429 |
| HI | Reno, NV | 3.35% | $1,624,900 | $54,434 |
| HO | Austin/San Antonio, TX | 100.00% | $1,045,700 | $1,045,700 |
| HQ | Monterey, CA | 100.00% | $1,672,200 | $1,672,200 |
| HU | Sioux Falls, SD | 100.00% | $985.500 | $985,500 |
| HV | New Orleans, LA | 100.00% | $1,681,300 | $1,681,300 |
| HY | Springfield, MO | 49.75% | $1,121,000 | $557,698 |
| IE | Topeka, KS | 100.00% | $316,600 | $316,600 |
| IP | Wichita, KS | 100.00% | $655,400 | $655,400 |
| IQ | Wilmington, NC | 5.78% | $916,700 | $52,985 |
| TA | WSTC, Kansas City, MO | 100.00% | $229,500 | $229,500 |
| TOTAL | | | | $49,638,562 |

EXHIBIT 5

Page 1 of 2

ESTIMATED COST OF CONSTRUCTION (ECC)
DENOMINATOR

| CLIN | LOCATION | PERCENTAGE OF DESIGN COMPLETE | ESTIMATED COST OF CONSTRUCTION | DENOMINATOR |
|---|---|---|---|---|
| BB | Melbourne, FL | 100.00% | $839,200 | $839,200 |
| BC | Sterling, VA | 100.00% | $1,281,400 | $1,281,400 |
| BJ | St. Louis, MO | 100.00% | $909,400 | $909,400 |
| CA | Aberdeen, SD | 15.74% | $1,029,400 | $162,028 |
| CE | Amarillo, TX | 100.00% | $791,900 | $791,900 |
| CK | Atlanta, GA | 100.00% | $2,172,700 | $2,172,700 |
| CN | Binghamton, NY | 100.00% | $802,700 | $802,700 |
| CO | Birmingham, AL | 100.00% | $1,291,000 | $1,291,000 |
| CQ | Boise, ID | 100.00% | $1,076,600 | $1,076,600 |
| CR | Boston, MA | 100.00% | $1,843,000 | $1,843,000 |
| DD | Cheyenne, WY | 100.00% | $1,085,800 | $1,085,800 |
| DF | Chicago, IL | 100.00% | $991,600 | $991,600 |
| DG | Cincinnati, OH | 100.00% | $1,723,600 | $1,723,600 |
| DI | Cleveland, OH | 100.00% | $708,000 | $708,000 |
| DK | Columbia, SC | 100.00% | $486,800 | $486,800 |
| DR | Des Moines, IA | 100.00% | $1,125,600 | $1,125,600 |
| DS | Detroit, MI | 100.00% | $1,158,600 | $1,158,600 |
| DT | Dodge, City, KS | 100.00% | $778,200 | $778,200 |
| EL | Goodland, KS | 100.00% | $823,400 | $823,400 |
| EM | Grand Island, NE | 100.00% | $786,700 | $786,700 |
| EQ | Great Falls, MT | 100.00% | $1,235,000 | $1,235,000 |
| ER | Green Bay, WI | 100.00% | $1,228,300 | $1,228,300 |
| EV | Morehead City, NC | 100.00% | $1,074,200 | $1,074,200 |
| EY | Houston, TX | 100.00% | $681,000 | $681,000 |
| FB | Indianapolis, IN | 100.00% | $1,211,800 | $1,211,800 |
| FC | Jackson, MS | 100.00% | $709,300 | $709,300 |
| FH | Kansas City, RFC, MO | 100.00% | $1,055,700 | $1,055,700 |
| FL | Knoxville, TN | 100.00% | $936,100 | $936,100 |
| FU | Los Angeles, CA | 100.00% | $1,246,500 | $1,246,500 |
| FV | Louisville, KY | 100.00% | $738,800 | $738,800 |
| GB | Miami, FL | 29.83% | $4,761,500 | $1,420,355 |
| GC | Milwaukee, WI | 100.00% | $904,900 | $904,900 |
| GG | Missoula, MT | 25.12% | $1,055,900 | $265,242 |
| GH | Mobile, AL | 62.06% | $964,900 | $598,817 |
| GM | Nashville, TN | 37.70% | $1,035,700 | $390,459 |
| GO | San Juan, PR | 48.16% | $1,090,200 | $525,040 |
| GP | Brookhaven MY | 100.00% | $1,902,000 | $1,902,000 |
| GQ | Norfolk, VA | 100.00% | $1,013,100 | $1,013,100 |
| GS | Midland, TX | 15.09% | $909,800 | $137,289 |
| GW | Paducah, KY | 28.13% | $974,000 | $273,986 |
| GY | Philadelphia, PA | 100.00% | $1,352,500 | $1,352,500 |

RECEIVED 2-19-03

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| FLUOR ENTERPRISES, INC. f/k/a FLUOR DANIEL, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 00-207C<br>(Judge Bush) |

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Rules of the United States Court of Federal Claims (RCFC), defendant has made a good faith effort to respond fully to plaintiff's first set of interrogatories to defendant. However, discovery is continuing, and defendant reserves the right to supplement its responses, in accordance with RCFC 26, including any objections that may be applicable, based upon any additional information that may be discovered subsequent to this response.

GENERAL OBJECTION

Defendant objects to plaintiff's first set of interrogatories insofar as any interrogatory or request requires defendant to provide plaintiff with information or documents wherein the advice of Government attorneys is given or requested; such information is protected by the attorney-

client privilege. Defendant further objects to any interrogatory or request for the production of documents that requires defendant to provide plaintiff with information or documentation that was obtained or created in anticipation of litigation or for trial, upon the ground that any such documents are protected by the attorney work-product privilege.

Without waiving this objection, defendant responds to plaintiff's first set of interrogatories as follows:

DEFENDANT'S RESPONSES TO INTERROGATORIES

INTERROGATORY NO. 1:

Does Defendant contend that the six percent statutory limitation on architectural and engineering services set out at 41 U.S.C. § 254(b) applies to the contract? If so, provide all legal and factual bases for such a contention including those Defendant asserts support its position that the contract was the type of architectural and engineering services contract to which the statute applies.

RESPONSE:

Defendant objects to this interrogatory upon the grounds that it calls for a legal conclusion. Without waiving this objection, or any other objection defendant may have to this interrogatory, defendant contends that the six percent statutory limitation at 41 U.S.C. § 254(b) applies to the contract. The plain language of the statute provides that the limitation on design fees applies to contracts for architectural or engineering services relating to any public works. The contract's statement of work provided that plaintiff was to provide the full range of professional services required for design and construction of Weather Forecast Offices (Section 2.2), which included plaintiff

providing site specific architecture and engineering for each Weather Forecast Office ("WFO")(Section 2.3). Indeed, in plaintiff's June 21, 1993 response to OIG's Final Audit Report No. DEN-4613-3-0001, upon which plaintiff based many of its responses to defendant's interrogatories, plaintiff conceded that 41 U.S.C. § 254(b) applied to those portions of the contract relating to architectural and engineering services for the WFOs.

INTERROGATORY NO. 2:

Please identify each communication made by Defendant, including any employee, office or agent of NOAA or the Department of Commerce, to any representative of Plaintiff, prior to contract award or during the period of performance, that the six percent limitation in 41 U.S.C. § 254(b) applied to the contract. For each communication, also identify:

a. The name of the employee, office or agent originating the communication;

b. The date of the communication;

c. The substance of the communication;

d. The circumstances under which the communication was made;

e. All individuals to whom or in whose presence the communication was made;

f. All documents recording such communication; and

g. All documents relating to such communication.

RESPONSE:

Defendant objects to this interrogatory upon the ground that it is overly broad and unduly burdensome considering that plaintiff is asking for defendant to provide information between anyone within the United States Government with any individual within plaintiff. Defendant further objects upon

the grounds that the information about communications that plaintiff seeks concerning the applicability of the six percent limitation would constitute a conclusion of law. Defendant also objects upon the ground of relevancy in that the information plaintiff seeks in this interrogatory appears to be beyond the scope of the discovery limitations set forth in the parties' October 13, 2000 Joint Preliminary Status Report ("JPSR"), which limited discovery to the issues of (1) whether the six percent limitation is applicable to the contract that is the subject this dispute; and (2) if the six percent limitation is applicable, what is the appropriate "estimated cost of construction" to use as the denominator when calculating whether the amounts paid to the contractor exceed the statutory limitation.

Without waiving these objections, or any other objections defendant may have to this interrogatory, regardless of any communications defendant may have had with plaintiff, the six percent limitation is statutory. Consequently, the limitation was applicable to the contract by the operation of law and, therefore, could not be waived by defendant. Moreover, in plaintiff's June 21, 1993 response to OIG's Final Audit Report No. DEN-4613-3-0001, upon which plaintiff based many of its responses to defendant's interrogatories, plaintiff conceded

that 41 U.S.C. § 254(b) applied to those portions of the contract relating to architectural and engineering services for the Weather Forecast Offices. Finally, defendant is aware of occasions before or during performance of the contract when defendant communicated to plaintiff that the statutory limitation applied, including, but not limited to, the following:

a. The transmittal of a Department of Commerce legal opinion from the Contracting Officer to Mr. Jack Tolliver in April, 1987 that stated that the statutory six percent limitation applied; and

b. Discussions between plaintiff and defendant in early 1990 concerning option year four of the contract.

INTERROGATORY NO. 3:

Please identify each communication made by anyone within Defendant, including any employee, office or agent of NOAA or the Department of Commerce, to any other person within defendant, including any employee, office, representative, member, or agent of NOAA, the Department of Commerce, any other federal agency, or Congress, prior to contract award or during the period of performance, regarding applicability of the six percent limitation in 41 U.S.C. § 254(b) to the contract or to the provision of architecture and engineering services generally under the contract. For each communication identify:

a. The name of the employee, office or agent originating the communication;

b. The date of the communication;

c. The substance of the communication;

d. The circumstances under which the communication was made;

e. All individuals to whom or in whose presence the communication was made;

f. All documents recording such communication; and

g. All documents relating to such communication.

RESPONSE:

Defendant objects to this interrogatory upon the ground that it is overly broad and unduly burdensome considering that plaintiff is asking for defendant to provide information between anyone within the United States Government with any other individual within the United States Government. Defendant also objects upon the grounds that the information plaintiff seeks may be privileged pursuant to the attorney-client and attorney work product privileges. Defendant further objects upon the grounds that the information plaintiff seeks concerning the applicability of the six percent limitation would constitute a conclusion of law. Defendant also objects upon the grounds that the information plaintiff seeks in this interrogatory appears to be beyond the scope of the discovery limitations set forth in the parties' October 13, 2000 JPSR, which limited discovery to (1) whether the six percent limitation is applicable to the contract that is the subject this dispute; and (2) if the six percent limitation is applicable, what is the appropriate "estimated cost of construction" to use as the denominator when calculating whether the amounts paid to the contractor exceed the statutory limitation.

Without waiving these objections, or any other objections

defendant may have to this interrogatory, the six percent limitation is statutory and was applicable to the contract by the operation of law. Moreover, plaintiff's June 21, 1993 response to OIG's Final Audit Report No. DEN-4613-3-0001, upon which plaintiff based many of its responses to defendant's interrogatories, plaintiff conceded that 41 U.S.C. § 254(b) applied to those portions of the contract relating to architectural and engineering services for the WFOs.

INTERROGATORY NO. 4:

Please identify all agreements between the parties relating to the application of six percent limitation to the contact.

For each such agreement, identify:

a. All individuals involved in negotiating the agreement;

b. The date of the agreement;

c. The substance of the agreement;

d. The circumstances under which the agreement was made;

e. All individuals with knowledge of the agreement;

f. All documents recording such agreement;

g. All documents relating to such agreement.

RESPONSE:

Plaintiff objects to the interrogatory upon the grounds that it is overly broad because plaintiff's reference to all agreements between the parties is vague and ambiguous. Without waiving this objection, or any other objection defendant may have to this interrogatory, when the parties entered into Contract No. 50WCNA606099, the six percent limitation upon design fees for WFOs applied by operation of law. Therefore, no separate agreements were required for the

six percent limitation to apply. Further, because the limitation was required by statute, the parties could not enter into an agreement waiving or modifying the limitation.

INTERROGATORY NO. 5:

Identify each guideline, policy, procedure, directive or other document created by NOAA, the Department of Commerce, or any other federal agency or component thereof, related to application of 41 U.S.C. § 254(b) and Federal Acquisition Regulations ("FAR") § 15.903(d)(1)(ii)(1986), and consulted or utilized by Defendant in the preparation of the contracting officer's decision of April 13, 1999.

RESPONSE:

Defendant objects to this interrogatory upon the grounds that is overly broad and unduly burdensome because plaintiff asks defendant identify guidelines, policy, procedure, directives, or other documents created by "any other federal agency." Defendant also objects to this interrogatory upon the grounds it may request information that is privileged pursuant to the attorney-client privilege and/or attorney work product privilege. Without waiving this objection, or any other objection defendant may have to this interrogatory, defendant is unaware of any document, that is not privileged, created by NOAA or the Department of Commerce which provides guidance, policy, or other direction relating to 41 U.S.C. § 254(b) and FAR 15.903(d)(1)(ii)(1986). In preparing her final decision, the contracting officer was aware of the fact

that the six percent limitation was statutorily required. Moreover, the contracting officer was aware of, and reviewed, regulations and other guidance promulgated by the General Services Administration (48 C.F.R. § 516.603-3 and a portion of the GSA handbook relating to architecture and engineering contracts); Department of Defense (48 C.F.R. § 236.6); and the Army Corps of Engineers("COE") (COE FAR Supplement § 36 605(101) and Architect-Engineer Contracting Handbook of the Huntsville Division).

INTERROGATORY NO. 6:

In paragraph 146 of Defendant's Amended Answer to Plaintiff's Complaint and Defendant's Counterclaim, Defendant alleges that "[t]he estimated cost of construction totaled $49,852,262." In relation to this allegation, explain in detail each respect in which Defendant contends that the $49,852,262 figure constitutes an "estimate" as the term "estimated cost" is used in the referenced paragraph.

RESPONSE:

Defendant objects to this interrogatory upon the ground that it is vague and ambiguous. The term "estimate" is a commonly used word in the English language. Without waiving this objection, or any other objection defendant may have to this interrogatory, if plaintiff is asking what was the basis for the estimate in the referenced paragraph, this estimate was taken from the contracting officer's final decision, which sets out, in detail, the basis for that calculation.

INTERROGATORY NO. 7:

In paragraph 146 of Defendant's Amended Answer to Plaintiff's Complaint and Defendant's Counterclaim, Defendant alleges that "[t]he estimated cost of construction. . . totaled $49,852,262."

a. Does Defendant contend that Defendant's alleged estimate was prepared "at the time of entering into the contract" as that phrase is used in 41 U.S.C. § 254(b)?

b. If Defendant's answers to subpart (a) above is affirmative, explain in detail the factual and legal basis for Defendant's allegation that Defendant's alleged estimate was prepared at the time of entering into the contract between the parties.

RESPONSE:

Defendant objects to this interrogatory upon the grounds that it calls for a legal conclusion concerning the phrase "'at the time of entering into the contract' as that phrase is used in 41 U.S.C. § 254(b). Defendant further objects to this interrogatory upon the ground that it requests information that may be privileged pursuant to the attorney-client and/or attorney work product privileges. Without waiving these objections, or any other objection defendant may have to this interrogatory, the contracting officer's final decision

explains, in detail, the calculation of the "estimated cost of construction" and the source of the figures used in that calculation.

INTERROGATORY NO. 8:

In paragraph 146 of Defendant's Amended Answer to Plaintiff's Complaint and Defendant's Counterclaim, Defendant alleges that "[t]he estimated cost of construction. . . totaled $49,852,262." Identify this estimated cost and

a. Explain in detail how this estimate was calculated;

b. Identify each facility included in the "estimated cost of construction" referenced above, state the reason it was included in the estimate, and state the cost included for that facility;

c. State when the $49,852,262 amount referenced in this interrogatory was calculated;

d. Identify the person(s) who requested that the referenced estimate be performed;

e. Identify the person(s) who performed the estimate;

f. Identify all data used in performing the estimate, including all data considered with reference to the facility costs referenced in subpart 8(b) above;

g. Identify all guidelines policies, procedures, directives or other documents constraining, explaining, suggesting, specifying, or otherwise relating to the manner in which the estimate was performed;

h. Identify all agreements between the parties related

to the manner in which the referenced estimate should be performed;

i. Identify all correspondence between the parties regarding the manner in which the referenced estimate should be performed; and

j. Identify all documents related to performance of the calculation.

RESPONSE:

Defendant objects to this interrogatory upon the ground that it seeks information that may be privileged pursuant to the attorney-client and/or attorney work product privilege. Without waiving this objection, or any other objection defendant may have to this interrogatory, see our response to interrogatory no. 7. Also, any documents concerning the contract, not privileged, were provided plaintiff in response to plaintiff's requests for production for documents.

INTERROGATORY NO. 9:

Identify each estimate of the cost of the project or any part thereof performed at or prior to execution of the July 1986 letter contract between the parties or definitization of the contract in May 1987. For each such estimate:

a. Explain in detail how this amount was calculated;

b. State when this amount was calculated;

c. State the purpose of performing the estimate;

d. Identify the person(s) who requested that the referenced estimate be performed;

e. Identify the person(s) who performed the estimate;

f. Identify all data used in performing the estimate;

g. Identify all guidelines, policies, procedures, directives and other documents constraining, explaining, suggesting, specifying, or otherwise relating to the manner in which the estimate was performed;

h. Identify the date on which the estimate was communicated to Plaintiff;

i. Identify each representative of Plaintiff to whom the estimate was communicated;

j. Identify all correspondence between the parties regarding this estimate; and

k. Identify all documents related to performance of the

estimate.

RESPONSE:

Defendant objects to this interrogatory upon the ground that it is vague and ambiguous in that plaintiff does not provide a definition of what plaintiff means by the phrase "cost of the project." Defendant further objects to this interrogatory upon the ground that it seeks information that may be privileged pursuant to the attorney-client and/or attorney work product privileges. Without waiving these objections, or any other objection defendant may have to this interrogatory, the statement of work for both the letter contract and definitized contract concerned the National Weather Service's (NWS) modernization program, which included the construction of over 100 separate WFOs. Pursuant to the letter and definitized contracts, plaintiff provided comprehensive program support, engineering and architectural design services, as well as construction management and inspection services in support of NWS modernization program. One of the requirements of the contract was for plaintiff was to provide NWS the estimated cost of construction of each Weather Forecast Office. Consequently, defendant could not develop the estimated cost of construction individual WFOs prior to execution of either the letter or definitized

contracts because this was a contract requirement for plaintiff to provide to defendant.

Concerning the portions of the interrogatory requesting documents, defendant, pursuant to plaintiff's requests for production of documents, has provided plaintiff all non-privileged documents concerning the contract that are in defendant's possession and control.

INTERROGATORY NO. 10:

Does Defendant contend that NOAA and Plaintiff did not agree to employ the Army Corps of Engineers guidelines set forth in the July 31, 1989 Engineer Federal Acquisition Regulation Supplement, Subpart 36.6, Architect Engineer Services, referenced and attached as Tab 12 to Plaintiff's June 21, 1993 position paper submitted to Defendant, in the determination of services constituting architect and engineering services?

RESPONSE:

Defendant objects to this interrogatory upon the ground that it seeks information beyond the scope of the discovery limitations set forth in the parties' October 13, 2000 JPSR, which limited discovery to (1) whether the six percent limitation is applicable to the contract that is the subject this dispute; and (2) if the six percent limitation is applicable, what is the appropriate "estimated cost of construction" to use as the denominator when calculating whether the amounts paid to the contractor exceed the statutory limitation. If plaintiff can establish that this interrogatory seeks information that is not beyond the scope of discovery set forth in the JPSR, defendant will reconsider this objection.

INTERROGATORY NO.11:

Please identify each communication between Plaintiff and Defendant or within or among NOAA, the Department of Commerce and the OIG regarding standards considered or employed with regard to categorization of architecture and engineering services under the contract or the categorization of such services for purposes of implementing 41 U.S.C. § 254(b), generally For each such communication:

a. Identify the person originating the communication;

b. Identify the person(s) party to the communication;

c. Identify the date of the communication;

d. Identify the form of the communication;

e. Identify the substance of the communication;

f. Identify all documents recording or reflecting the substance of the communication; and

g. Identify all documents relating to the communication.

RESPONSE:

Defendant objects to this interrogatory upon the ground that it seeks information beyond the scope of the discovery limitations set forth in the parties' October 13, 2000 JPSR, which limited discovery to (1) whether the six percent limitation is applicable to the contract that is the subject

this dispute; and (2) if the six percent limitation is applicable, what is the appropriate "estimated cost of construction" to use as the denominator when calculating whether the amounts paid to the contractor exceed the statutory limitation. If plaintiff can establish that this interrogatory seeks information that is not beyond the scope of discovery set forth in the JPSR, defendant will reconsider this objection. Moreover, defendant objects to this interrogatory upon the grounds that it seeks information that may be privileged pursuant to the attorney-client and/or attorney work product privileges.

INTERROGATORY NO. 12:

Please identify estimate of cost of construction performed relative to the project, including each estimate of "cost of construction" as that term is used in FAR 15.903(d)(1)(ii)(1986). For each estimate:

a. Explain in detail how this amount was calculated;

b. State when this amount was calculated;

c. Identify each construction site included in the estimate and the applicable estimated cost of construction for each site so included;

d. State the purpose of performing the estimate;

e. Identify the person(s) who requested the referenced estimate;

f. Identify the person(s) who performed the estimate;

g. Identify all data used in performing the estimate;

h. Identify all guidelines, policies, procedures, directives and other documents constraining, explaining, suggesting, specifying, or otherwise relating to the manner in which the estimate was performed;

i. Identify the date on which the estimate was communicated to Plaintiff;

j. Identify each representative of Plaintiff to whom the estimate was communicated; and

k. Identify all documents related to performance of the estimate.

RESPONSE:

Defendant objects to this interrogatory upon the ground that it is vague and ambiguous because plaintiff does not define the term "project" as it is used in the interrogatory. Defendant also objects upon the ground that it calls for a legal conclusion upon the meaning of "'estimate of cost of construction' as that term is used in FAR 15.903(d)(1)(ii)(1986)." Without waiving these objections, or any other objection defendant may have to this interrogatory, the contracting officer's final decision explains, in detail, the calculation of the "estimated cost of construction" and the source of the figures used in that calculation, upon which she based her final decision.

INTERROGATORY NO.13:

Does Defendant contend that leased sites must be excluded from the calculation of "estimated cost" of "the project" as those terms are employed in 41 U.S.C. § 254? If so, please provide the basis for this belief and explain in detail all the grounds upon which Defendant has concluded that it can exclude leased sites from the calculation of estimated project cost.

RESPONSE:

Defendant objects to this interrogatory upon the ground that it requests defendant to provide a legal conclusion as to how the terms "estimated cost of the project" are employed in 41 U.S.C. § 254. Defendant also objects to this interrogatory upon the grounds that it requests information that may be privileged pursuant to the attorney-client and/or the attorney work-product privileges. Defendant further objects to this interrogatory upon the ground that it is vague and ambiguous in that plaintiff does not provide an explanation of the term "project."

Without waiving these objections, or any other objection defendant may have to this interrogatory, the leased sites should be excluded. As plaintiff conceded in its June 21, 1993 response to OIG's Final Audit Report No. DEN-4613-3-0001,

the amount of plaintiff's engineering was relatively small because the lessor was required to retain its own design professionals to prepare substantive designs and construction documents. Thus, inclusion of the cost of construction for leased sites upon which plaintiff performed little or no design work would not reflect who actually performed the design work. Therefore, the contracting officer properly excluded the sites from her calculation.

INTERROGATORY NO. 14:

Does Defendant contend that leased sites must be excluded from the calculation of "estimated cost of construction" as that term is used in FAR 15.903(d)(1)(ii)(1986)? If so, please provide the basis for this belief and explain in detail all the grounds upon which Defendant has concluded that it can exclude leased sites from the calculation of estimated cost of construction.

RESPONSE:

See our objections and response to interrogatory no. 13.

INTERROGATORY NO.15:

If the Court determines that the limitation on architectural and engineering services set out at 41 U.S.C. § 254(b) applies to the contract, does Defendant contend that the fixed fee under the contract should be excluded from the calculation of the denominator? If so, please explain in detail all legal and factual bases for this conclusion.

RESPONSE:

Please refer to the contracting officer's final decision, which explains the calculation of the "estimated cost of construction" and the source of the figures used in that calculation, upon which the contracting officer based her final decision.

INTERROGATORY NO. 16:

Please identify:

(a) all person(s) who Defendant may call as witnesses upon the subject of estimated project costs or estimated costs of construction; and

(b) each person Defendant may not call as a witness, who, to the best of Defendant's knowledge and belief, may have information concerning such estimate.

RESPONSE:

Defendant objects to this interrogatory upon the grounds of relevancy. Pursuant to the JPSR filed with the Court on October 13, 2000, the parties agreed that discovery would be conducted for the limited purpose of filing dispositive motions. The parties agreed that dispositive motions were appropriate upon the issues of (1) whether the six percent limitation set forth in 41 U.S.C. 254(b) was applicable to the contract was the subject of the dispute; and (2) if the six percent fee was applicable, what is the estimated cost of construction to use as the denominator when calculating whether the amounts paid to the contractor exceed the statutory limitation. Consequently, because parties are attempting to resolve the issue of estimated costs of construction through dispositive motions, defendant, at the

present time, does not intend to call any witnesses. Should the issue not be resolved by dispositive motion, defendant will advise plaintiff, at the appropriate time, who its witnesses, upon this issue, will be.

INTERROGATORY NO. 17:

Please identify each price (as that term is used in FAR 15.903(d)(1)(1986)) negotiated by the contracting officer with Plaintiff related to the project or any part thereof. For each such price identified:

a. State the date upon which the agreement reflecting the negotiated price was executed;

b. State the amount of the price negotiated;

c. Identify each contractual document incorporating the price agreement; and

d. Identify each "estimated cost of construction" as that term is used in FAR 15.903(d)(1)(ii)(1986) utilized by the contracting officer in determining that the negotiated price did not exceed six percent of the "estimated cost of construction" requested by the referenced subsection.

RESPONSE:

Defendant objects to this interrogatory upon the ground that it is vague and ambiguous because plaintiff does not define what it means by the term "project." Defendant also objects upon the ground that this interrogatory calls for a legal conclusion in that plaintiff asks defendant to identify the terms "price" and "estimated cost of construction" as those terms are used in the FAR. Defendant further objects to

this interrogatory upon the ground that subparagraphs a, b, and c do not fall within the October 13, 2000 JPSR, which limited discovery to (1) whether the six percent limitation is applicable to the contract that is the subject this dispute; and (2) if the six percent limitation is applicable, what is the appropriate "estimated cost of construction" to use as the denominator when calculating whether the amounts paid to the contractor exceed the statutory limitation. Without waiving any of these objections, or any other objection defendant may have to this interrogatory, defendant responds to subparagraph d by referring plaintiff to the contracting officer's final decision that explains, in detail, the calculation of the "estimated cost of construction" and the source of the figures used in that calculation.

<u>INTERROGATORY NO. 18</u>:

With regard to each "estimated cost of construction" listed in Interrogatory No. 17, subpart (d), please identify the estimated cost of construction and:

a. Explain in detail how the estimate was calculated;

b. Identify each facility included in the "estimated cost of construction" referenced above, state the reason it was included in the calculation, and state the cost included for that facility;

c. State when the estimate was calculated;

d. Identify the person(s) who requested that the referenced calculation be performed;

e. Identify the person(s) who performed the calculation;

f. Identify all data used in performing the calculation, including all data considered with reference to the facility costs referenced in subpart paragraph (b) above;

g. Identify all guidelines, policies, procedures, directives and other documents constraining, explaining, suggesting, specifying, or otherwise relating to the manner in which the estimate was performed;

h. Identify all documents related to performance of the estimate.

RESPONSE:

See defendant's objections and response to interrogatory no. 17. Further, all documents concerning the contract, which are not privileged, were provided plaintiff pursuant to plaintiff's request for production of documents.

INTERROGATORY NO. 19:

Please explain in detail the procedures, if any, employed by Defendant, during the contract performance period from July 29, 1986 to October 31, 1992 to monitor or ascertain whether contract payments made to Plaintiff, pursuant to the contract, for architectural and engineering services performed pursuant to the contract, complied with the six percent limitation in 41 U.S.C. § 254(b)

RESPONSE:

Defendant objects to this interrogatory upon the ground that it seeks information beyond the scope of the discovery limitations set forth in the parties' October 13, 2000 JPSR, which limited discovery to (1) whether the six percent limitation is applicable to the contract that is the subject this dispute; and (2) if the six percent limitation is applicable, what is the appropriate "estimated cost of construction" to use as the denominator when calculating whether the amounts paid to the contractor exceed the statutory limitation. Without waiving this objection, or any other objection defendant may have to this interrogatory, the six percent limitation is required by statute and cannot be waived. Therefore, if plaintiff was overpaid, i.e., if plaintiff was paid more than the six percent allowed by

41 U.S.C. §254(b), upon the design and engineering portions of the contract, plaintiff is liable to the government for those overpayments.

INTERROGATORY NO. 20:

For each task order issued under Section B-7 of the contract, by the contracting officer, requiring Plaintiff to expend Direct Production Man Hours as that term is used in the contract, explain the process by which the contracting officer verified that the price for the hours he was ordering Plaintiff to expend complied with the six percent limitation in 41 U.S.C. § 254(b).

RESPONSE:

See defendant's objection and response to interrogatory no. 19.

INTERROGATORY NO. 21:

Please identify each estimate of program costs performed with regard to the National Weather Service Warning and Forecast Office Designed Construction Program, the Next Generation Weather Radar Program, or both programs, or any part thereof, including estimates included in agency budget, planning, and report documents. For each such estimate, identify:

a. Explain in detail how this amount was calculated;

b. State when this amount was calculated;

c. State the purpose of performing the estimate;

d. Identify the person(s) who requested that the referenced estimation be performed;

e. Identify the person(s) who performed the estimate;

f. Identify all data used in performing the estimate;

g. Identify all guidelines, policies, procedures, directives and other documents constraining, explaining, suggesting, specifying, or otherwise relating to the manner in which the estimate was performed;

h. Identify each individual, federal agency, or branch of federal government to whom the estimate was communicated; and

i. Identify all documents related to performance of the

estimate.

RESPONSE:

Defendant objects to this interrogatory upon the grounds that it is overly broad, unduly burdensome, irrelevant in that it seeks the estimated costs of the Next Generation Weather Radar Program ("NEXRAD"). Pursuant to the October 13, 2000 JPSR, discovery is limited to determining (1) whether the six percent limitation is applicable to the contract that is the subject this dispute; and (2) if the six percent limitation is applicable, what is the appropriate "estimated cost of construction" to use as the denominator when calculating whether the amounts paid to the contractor exceed the statutory limitation. Without waiving these objections, or any other objection defendant may have to this interrogatory, please refer to the contracting officer's final decision, which explains the calculation of the "estimated cost of construction" and the source of the figures used in that calculation. Further, all documents concerning the contract, which are not privileged, that are within defendant's possession and control were provided plaintiff pursuant to plaintiff's requests for production of documents.

INTERROGATORY NO. 22:

For each of the preceding interrogatories, please identify each individual who provided assistance in responding to the Interrogatory, including, but no limited to, complete names, addresses, employer, agency (if applicable), position held during contract performance, position held at present, a description of information provided.

RESPONSE:

Donita McCullough, Department of Commerce contracting officer.

INTERROGATORY NO. 23:

Please identify each and every individual Defendant intends to call, or may call, as a witness to testify before the Court should this case go to trial and/or whose affidavit or declaration Defendant intends to or may use in support of a motion for summary judgment or any other dispositive motion. Your response should include, but is not limited to, the complete name and address of each individual, his or her relation to the Defendant, and the substance of the evidence that he or she would provide in court or in an affidavit or declaration in support of a dispositive motion.

RESPONSE:

Defendant objects to this interrogatory upon the grounds it is overly broad in that it seeks the names of witnesses who may testify in this case if it should go to trial. Pursuant to the October 13, 2000 JPSR, at the present time discovery is limited to (1) whether the six percent limitation is applicable to the contract that is the subject this dispute; and (2) if the six percent limitation is applicable, what is the appropriate "estimated cost of construction" to use as the denominator when calculating whether the amounts paid to the contractor exceed the statutory limitation. As to declarations defendant intends to submit in support of a

dispositive motion, defendant intends, at the present time, to submit the declaration of Donita McCullough, Department of Commerce contracting officer. The subject matter of Ms. McCullough's declaration will be how she calculated, for purposes of 41 U.S.C. § 254(b), the "estimated cost of construction" in her final decision. Should defendant decide to submit declarations from other individuals, it will amend this response and notify plaintiff immediately.

INTERROGATORY NO. 24:

Please identify each and every individual, if any, Defendant intends to call or may offer to the Court as an expert witness for purpose of giving expert testimony should this case go to trial or for the purpose of providing affidavits or declarations in support of a motion for summary judgment or other dispositive motion. Your response should include, but is not limited to, the complete name and address of each individual, his or her curriculum vitae, and the substance of the evidence that each such witness is expected to give or provide in affidavit or declaration.

RESPONSE:

At the present time, defendant does not anticipate submitting a declaration by an expert upon the issues to which discovery is presently limited, i.e., (1) whether the six percent limitation is applicable to the contract that is the subject this dispute; and (2) if the six percent limitation is applicable, what is the appropriate "estimated cost of construction" to use as the denominator when calculating whether the amounts paid to the contractor exceed the statutory limitation. Should defendant decide to use expert testimony upon these issues, plaintiff will be immediately notified and defendant will amend this response.

ROBERT D. MCCALLUM, JR.
Assistant Attorney General

DAVID M. COHEN
Director

DONALD E. KINNER
Assistant Director

STEVEN J. ABELSON
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tele: (202) 514-4325

Attorneys for Defendant

OF COUNSEL:

FRED KOPATICH
Attorney
Office of the General Counsel
Department of Commerce
14th & Constitution Ave, N.W.
Room 5893
Washington, D.C. 20230

January 28, 2002

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 19th day of March, 2003, I caused to be delivered by hand copies of "DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES" addressed as follows:

FRANK M. RAPPORT, ESQ.
MCKENNA, LONG & ALDRIDGE, L.L.P.
1900 K Street
Washington, D.C. 20006

Dana Chase

# FLUOR DANIEL

INTEROFFICE CORRESPONDENCE CONTINUATION

JESSE ARREDONDO April 8, 1987
NOAA, Kansas City 3

4. Your attorney questions the need for both FAR 52.243-2, Alternate 1 and FAR 52.251-1.

   It is our understanding that we included FAR 52.251-1, Government Supply Sources, for its possible use in the event you task us with "procurement", as set forth in the last sentence of PART I, Section C, paragraph 2.3.8.

   If it serves your purpose, we have no objection to the deletion of FAR 52.251-1 at this time. It could later be inserted by Modification, if and when we were tasked with procurement.

5. No comment. Internal CASC documentation.

6. Your attorney says to delete FAR 52.232-19, Availability of Funds for the Next Fiscal Year. That is located at PART I, Section H.8 and the draft, if left in the Contract, needs to be changed to read "September 30, 1987", as we discussed previously.

   It would seem to us that you should delete FAR 52.232-18, Availability of Funds, rather than 52.232-19. The former clause says you do not have funds for this Contract. That may have been the case during solicitation, but it obviously is not the case now, since your checks are not bouncing. If you leave 52.232-18 in the Contract, we will require your written confirmation that funds for the base period are available.

   Strongly suggest you delete 52.232-18. If I were the Buyer, I would not eliminate 52.232-19. As the Seller, we do not object to its deletion.

7. Your attorney states that an Architect-Engineer fee limitation of 6% is applicable here.

   We have been over this a number of times. We are not performing only Architect-Engineer services. We all agreed that we fit under the definition of 15.903(d)(iii), with a fee limitation of 10%.

   If we could have estimated the cost of construction for each of the WFO's, then we could have negotiated two fee structures--one for Architect-Engineer and one for Program, Project and Construction Management. Assuming each WFO cost $500,000; that would be about $30,000 fee times say 90 (60-120) WFO's or $2,700,000 fee for Architect-Engineer services, plus 10% fee on the balance.

   First, we could not estimate the cost back in July, 1986 and probably still cannot accurately. Therefore, we opted for a Level of Effort, Professional Services Contract. This is defined in PART I, Section C, Paragraph 1.2.

   Second, the probable total fee on a split fee structure basis would have far exceeded what we negotiated in September.



FORM G-1041 1/87
PRINTED IN U.S.A.

**FLUOR DANIEL**

INTEROFFICE CORRESPONDENCE CONTINUATION



In summary, we do not agree with the attorney's comment on fee limitation.

That concludes our review and comments on your FAX of 4/7/87. These are informal, but reflect our views and we can send you a formal letter if you require one.

Jesse, I am really a little taken back by the fact that the "final legal review," which we have all been awaiting for months has missed the mark on so many major aspects of our Contract. I hope that your procedures allow you to document your position (with the help of this memo) and proceed to award the Contract.

Best regards.

Jack Toliver

JMT/1007/023:nas



FORM G-1041 1/87
PRINTED IN U.S.A.

UNITED STATES DEPARTMENT OF COMMERCE
The Inspector General
Washington, D.C. 20230

OCT 16 1990

MEMORANDUM FOR: Thomas J. Collamore
Assistant Secretary for
Administration

FROM: Frank DeGeorge
Inspector General

SUBJECT: Joint System Program Office--Contracts
Poorly Managed and Funds Improperly Spent
Draft Report No. STD-0199-1-000X

The Office of Inspector General has completed the subject audit and prepared the attached draft report. An executive summary begins on page i. The report contains a recommendation for your action on page 13.

We would appreciate receiving your written comments on the draft report within 30 calendar days, in accordance with the provisions of Department Administrative Order 213-3. Your comments will be considered in preparing the final report.

Attachment

'90 OCT 16 PM 4:04

GCP

ORIGINAL TO: OBPO Cordwic
PREPARE FOR TOM COLLAMORE
SIGNATURE: ✓
APPROPRIATE ACTION:
W/ ATT. OR ENCL:
RETURN TO ADMIN. BY: 10/23/90
DATE: 10/16/90
CONTROL NUMBER:

FD 007612

DRAFT

TABLE OF CONTENTS

PAGE

EXECUTIVE SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . i

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Tri-Agency Organizational Structure . . . . . . . . . . . . 1
Purpose and Scope of Audit . . . . . . . . . . . . . . . . 2

FINDINGS AND RECOMMENDATIONS . . . . . . . . . . . . . . . . . 3

STRENGTHENED CONTRACTING PRACTICES WOULD HELP AVOID EXCESSIVE PROGRAM COSTS . . . . . . . . . . . . . 3

Contract Obligations Are Major Portion of Costs . . . . 3
Statements of Work Not Clearly Defined . . . . . . . . 5
Unpriced Modifications Issued . . . . . . . . . . . . . 5
Regulations Not Followed . . . . . . . . . . . . . . . . 6
Contract Terms Not Adequately Enforced . . . . . . . . . 7
Oversight, Guidance, and Assistance Inadequate . . . . 7
Recommendations . . . . . . . . . . . . . . . . . . . . 8

$24.1 MILLION SPENT ON NON-JSPO PROGRAM REQUIREMENTS . . 10

NEXRAD Joint Development Plan Not Followed . . . . . . . 10
Established Funding Controls Ignored . . . . . . . . . . 12
Misclassification of Non-JSPO Construction Costs . . . 13
Recommendations . . . . . . . . . . . . . . . . . . . . 13

EXECUTIVE SUMMARY

In 1979 the National Weather Service began planning a replacement for its aging weather forecast radar system. The new system is to consist of 175 Doppler radar units with related equipment and computer software. The units will be installed throughout the United States and at several overseas locations. The anticipated cost of the new system has increased from an original estimate of $350 million to a 1989 estimate of one billion dollars.

Because of their common meteorological requirements, the Departments of Commerce, Defense, and Transportation entered into an agreement to jointly develop and acquire the new radar system. A Joint System Program Office was created within the National Weather Service.

During related program audits of the weather forecasting modernization effort, we found that the National Weather Service was experiencing significant development problems. These problems were compounded by improper procurement practices and ineffective contract practices. (See page 3.)

These program problems and procurement deficiencies resulted in millions of dollars in program cost overruns. Because of this, JSPO was unable to (1) provide any assurance that program funds were efficiently spent and that all incurred contract costs were necessary, or (2) determine the level of funding necessary to complete the planned radar system.

We recommend that the Under Secretary for Oceans and Atmosphere coordinate with the Department's Office of Procurement to help ensure that procurement and program officials do the following:

-- Prepare well-defined statements of work designed to help Joint System Program Office officials hold the contractors accountable for delivery of acceptable goods and services.

-- Refrain from using unpriced modifications that allow program officials to procure services for an unknown amount of additional costs on the basis of an equitable adjustment to be negotiated at a later date.

-- Comply with the Federal Acquisition Regulation and other requirements restricting sole source procurements, awards for advisory and assistance services, and fees for architectural and engineering work.

-- Monitor and strictly enforce all contract terms relative to the work performed and payments requested.

DRAFT

-- Discontinue the use of cost reimbursable, level-of-effort type contracts that provide insufficient controls to ensure adequate direction and management of contractor costs and services.

In addition, our audit of JSPO's financial management controls disclosed that joint system funds were used improperly.

- o Funds totaling $24.1 million were applied to costs that were not related to the acquisition of the tri-agency radar system. Rather, these funds were used by NWS for the construction and renovation of weather forecast offices. (See page 10.)

- o Established procedures requiring each sponsoring agency to approve all system expenditures were not followed. (See page 12.)

- o Weather forecast office construction costs were inappropriately classified as unique-agency system requirements, thereby making them allowable under the terms of the tri-agency memorandum of agreement. (See page 13.)

As a result, JSPO spent $11 million of other agency funds for NWS's share of radar system expenses. JSPO's failure to adhere to the commitment to properly manage the tri-agency funds has compromised Commerce Department's ability to participate as lead agency in this joint venture.

We recommend that the Under Secretary for Oceans and Atmosphere require the Director, NEXRAD Joint System Program Office to:

(1) Adhere to established procedures for controlling expenditures of tri-agency funds.

(2) Develop and implement a control plan whereby

-- agency-unique requirements to be funded by tri-agency funds are reviewed and approved by all agency sponsors prior to obligation, and

-- tri-agency requirements are funded before agency-unique requirements are approved and funded.

We further recommend that the Under Secretary develop a plan for reimbursing the tri-agency fund for all amounts spent on NWS's forecast office modernization program that are not joint system requirements.

In addition, we recommend that the Assistant Secretary for Administration provide budget guidance and oversight to NOAA in planning for the repayment of $24.1 million to the JSPO.

DRAFT

## INTRODUCTION

The Departments of Commerce, Defense, and Transportation are acquiring a Next Generation Weather Radar System to replace the existing radar system. The new system's advanced Doppler technology and radar software should significantly improve weather forecasting, particularly in the area of severe weather systems. When fully operational, the network will include 175 Doppler radar units servicing weather forecast offices, air traffic routes, and air bases throughout the United States, as well as at some overseas locations.

The three agencies established a joint program in 1979 with the intention of having the NEXRAD system fully installed and operational by the end of 1996. From fiscal year 1980 through 1989, these agencies have advanced a total of $397.7 million for NEXRAD system costs. The Department of Defense had advanced $114.3 million, the Department of Transportation advanced $112.9 million, and the Department of Commerce advanced $170.5 million. Meanwhile, the estimated acquisition costs for the complete system have increased from $340 million to about one billion dollars.

The NEXRAD program is only one part of the National Weather Service's overall modernization initiative. Other major systems are being developed to improve and expand information processing and communication capabilities, and to modernize NWS weather forecast offices.

### Tri-Agency Organizational Structure

To manage the NEXRAD program the three agencies established the Joint System Program Office (JSPO) within the National Weather Service, which is part of the Commerce Department's National Oceanic and Atmospheric Administration. JSPO operates as a tri-agency organization with Commerce as the lead agency. JSPO (1) manages all aspects of the design, development, acquisition, and deployment of the NEXRAD system; and (2) ensures that the common meteorological requirements of all three Departments are met. This includes overall planning and technical and financial program management.

JSPO reports to a NEXRAD Program Council comprised of the Director, Joint System Program Office; the Assistant Administrator, National Weather Service; the Federal Coordinator for Meteorological Services and Supporting Research; and representatives from the Departments of Defense and Transportation.

The JSPO Headquarters personnel are located at the National Weather Service in Silver Spring, Maryland. They are responsible for the development, and implementation of the NEXRAD system.





DRAFT

DRAFT

System personnel are located at the Operational Support Facility in Norman, Oklahoma and are responsible for establishing the system operating procedures.

Once the NEXRAD system is installed and fully operating, the joint office will be disbanded and each of the three sponsoring agencies will assume responsibility for operating and maintaining its own radar units. NWS's Office of Systems Operation will be responsible for operating and maintaining the overall system.

Purpose and Scope of Audit

The purpose of our audit was to determine whether (1) all of JSPO's obligations were applicable to the NEXRAD program; and (2) cognizant officials from the Departments of Defense and Transportation were involved in, and fully aware of, all NEXRAD funding decisions and expenditures.

We reviewed and evaluated JSPO's obligations and expenditures to determine whether all NEXRAD funds were spent efficiently, effectively, and according to plans, agreements, budgetary authority, and other applicable guidelines. Focusing on obligations incurred during fiscal years 1987 through 1989, we reviewed accounting records, program financial records, and supporting documentation and interviewed cognizant government and contractor officials.

Our review also included an examination of practices used to award and administer contracts, exclusive of the major systems contract awarded to Unisys Corporation. Our office is conducting a separate audit of that award.

We performed the audit at the Silver Spring office and at the Special Engineering Project Office in the Central Administrative Support Center, Kansas City, Missouri. We also visited two contractors involved in the construction and modernization of the National Weather Service's field offices and radar sites. This included the site-selection contractor in Menlo Park, California, and the architectural and engineering firm in Kansas City, Missouri.

The audit was conducted in accordance with generally accepted government auditing standards and was performed under the authority of the Inspector General Act of 1978, as amended, and Department Organization Order 10-13, as amended.

DRAFT

## FINDINGS AND RECOMMENDATIONS

### STRENGTHENED CONTRACTING PRACTICES WOULD HELP AVOID EXCESSIVE PROGRAM COSTS

In 1980, NOAA estimated that $340 million would be required to complete the NEXRAD system. However, by 1989 the estimated costs had risen to one billion dollars. About 95 percent of these costs are being incurred to pay the contractors who are designing, testing, and building this system.

In reviewing selected NEXRAD contracts, we found a number of significant problems in the practices used to award and administer the contracts:

- o Statements of work were poorly defined, providing little basis for controlling costs.
- o Contract modifications were unpriced, allowing program officials to continually add work for unknown costs to be negotiated at later dates.
- o Requirements of the Federal Acquisition Regulation were not met. These requirements restricted such activities as sole source procurements, awards for advisory and assistance services, and fees for architectural and engineering work.
- o Contract terms relating to work performed and payments made were not adequately monitored and enforced.
- o Oversight and guidance for the NWS personnel administering the contracts were not effective.

Without adequate controls over contract functions, JSPO is not in a position to ensure that the contractors' tasks are clearly defined, carefully monitored, and properly compensated. We believe these conditions have contributed to the dramatic and unexpected increases in the cost of NEXRAD contract work.

#### Contract Obligations Are Major Portion of Costs

According to JSPO, NEXRAD program costs totaled $253.2 million from fiscal year 1980 through 1989. About $240 million of that amount was used for contract obligations. An additional $560 million is estimated for future contracts.

To help meet the procurement needs of the joint system office, the Department of Commerce assigned contracting officers from its Major Systems Procurement Division and NOAA's Central Administrative Support Center to work with JSPO in awarding and administering the major contracts. These officers were responsible for undertaking all actions necessary for effective contracting, ensuring compliance with the contract terms, and

DRAFT

generally safeguarding the overall interests of the government. Most of the contract work performed for the NEXRAD system has been provided by six contractors. We reviewed selected activities associated with four of these contractors, as identified below. (Dollar figures are through fiscal year 1989.)

| Contractor/Contract No. Amount | Types of Goods or Services Provided |
|---|---|
| Raytheon Co.: NA-83-SAC-00619 $60 Million | One of two system design contractors that competed for but did not win the production contract. |
| MITRE Corporation: NA-83-SAC-00668 50-SANW-9-00051 $10 Million | One of two technical support contractors that assist JSPO in all program areas, including technical review of the major system contractor's performance and monitoring the budget. |
| SRI International: NA-83-SAC-00626 $12.4 Million | The site selection contractor, responsible for locating radar and weather office sites, preparing environmental assessments, and performing related services needed for land acquisition. |
| Fluor Daniel, Inc.: 50-WCNA-6-06099 $13.4 Million | The architectural and engineering firm that provides program support and manages the modernization of the weather forecast offices for the NWS. The project scope was increased to include real estate services, program management support, and oversight of JSPO's radar site construction. |

We also reviewed several agreements with NOAA laboratories for research and development including software design and verification, and technical reviews.

Our office is conducting a separate audit of the largest contract awarded to Unisys Corporation, covering systems definition, validation, and production. Issues that arise from that audit will be addressed in a separate report.

DRAFT

Statements of Work Not Clearly Defined

Two of the four contracts were cost reimbursable type awards which lacked clearly defined statements of work. Without a firm basis for determining what the contractor was expected to do, the JSPO staff and other technical officials had no basis for ensuring that the desired work was accomplished or that the government paid only the appropriate amount.

- o The radar site selection contract was modified to provide for changing the contractor's scope of work. Instead of focusing on the survey of potential radar sites, the contractor was to begin performing program management activities. However, no specific statements of work were prepared to describe the nature of the program management activities to be conducted. Notwithstanding the new type of work prescribed by the modification, the contractor basically continued to perform the site surveys and to bill JSPO for the costs incurred.

  According to the contractor, (1) JSPO's technical representatives directed and continuously revised the contractor's work through an electronic mail system, and (2) the company was not required to complete any specific task, but rather provided a specific level of effort. We attempted, but were unable to compare the amounts billed with specific tasks. Neither the JSPO technical representatives nor the contracting officer could provide sufficient documentation to show us the contractor's progress relative to the costs charged.

  The architectural and engineering contract was awarded as a task order contract. From award through fiscal year 1990, only one general task order per year was issued. This task order lacked specific assignments, costs, and delivery schedules. In addition, keeping track of the total obligations and work covered by the contract was difficult because the annual task orders were issued and administered by the projects office rather than the contracting office.

Under these circumstances, the contractors received full payment for expenses incurred while not being held accountable for completing any specific work products.

Unpriced Modifications Issued

Contracting officers issued unpriced modifications for two contracts that allowed program officials to add more work for unknown amounts of contract costs, and negotiate an equitable adjustment at a later date. Under these terms, JSPO could incur future financial liabilities without obligating sufficient funds to cover them. The use of such open-ended contracting methods can seriously impair an agency's financial controls. It can lead to obtaining contract services in one year and paying for them with the next year's funds. This incremental funding approach is prohibited by federal appropriations law.

DRAFT

Examples of several unpriced modifications follow.

- During fiscal year 1987, the contracting officer issued four unpriced modifications to the radar site selection contractor for additional survey work to reflect changing conditions. Again in fiscal year 1988, two more unpriced modifications were issued for the same reason. Obligations on these six unpriced obligations totaled $1.75 million, including $1 million in 1987 and $750,000 in 1988.

  However, the payment amounts ultimately negotiated were far greater than the amounts obligated when the unpriced modifications were awarded. Specifically, the negotiations resulted in agreements to pay the contractor $3.3 million for the six unpriced modifications, or $1.55 million more than originally had been obligated.

- In June and September 1988, the contracting officer issued unpriced modifications to Raytheon Co. The contractor was to conduct an inventory of the contractor's Government-furnished equipment and dismantle and ship the NEXRAD pre-production system and associated property. Obligations of $780,000 were recorded when the unpriced modifications were issued and, at a later date, a final equitable adjustment of the contract costs and fees were to be made.

Moreover, because the contractors usually received additional fees as costs increased, the contracts took on the characteristics of a cost-plus-percentage-of-cost contract. This type of contract is also prohibited by federal procurement laws and regulations.

<u>Regulations Not Followed</u>

Contracting officers did not consistently comply with the Federal Acquisition Regulation and Department requirements for three of the four contracts. For example, the contracting officer added millions of dollars in new tasks to the existing contract for architectural and engineering services. The tasks included real property procurement support for the forecast offices and the NEXRAD sites, and advisory and program management support to JSPO. These tasks were added without any attempt to obtain competition for the expanded scope of work.

Under the provisions of the Federal Acquisition Regulation (Part 6) competition should be obtained when acquiring goods and services outside the original scope and terms of the existing contract. Likewise, Department Administrative Order No. 208-15 emphasizes the importance of obtaining competition to obtain more favorable contract terms.

FD 007621

DRAFT

Further, no approval for adding large-scale advisory and program management services to the contract was requested or received from the Department's deputy secretary. The Department requires that the deputy secretary or his designee, assisted by an advisory and assistance panel, approve actions when the total cost of the services will exceed $25,000.

The contracting officers also did not comply with all of the Federal Acquisition Regulation and Brooks Act requirements for architectural and engineering procurements. The result was excessive architectural and engineering fees because (1) the contract did not include a budgeted amount for the construction costs, which would have required the firm to redesign offices at no additional fee if construction costs exceeded the government's budget, and (2) the mandatory six percent fee limitation for design work was not considered during negotiations. Subsequently, JSPO may have overpaid for architectural and engineering services.

Contract Terms Not Adequately Enforced

Our audit also disclosed that for three of the contracts reviewed, the contracting officers did not adequately enforce contract terms to ensure that contractors submitted invoices, financial data, progress reports, or other information to allow proper monitoring of the contract work and cost. In one case, the contracting officer approved a $6 million payment based on documentation that was totally inadequate to substantiate the claim. The documentation did not describe the work completed and the contracting officer could not specifically describe to us the work performed by the contractor during the period the costs were incurred.

In another case, the contracting officer did not require the radar site-selection contractor to comply with the financial terms of the contract. The contract was awarded based on an estimated cost per site and a cost for preparing environmental assessments. Neither the financial reports nor the invoices showed the individual costs for each requirement. The contractor could perform several surveys and issue more than one assessment report during the billing period. However, because the contractor reported only total costs incurred, JSPO had no method for monitoring costs or determining whether the contractor remained within or exceeded the estimates.

Oversight, Guidance, and Assistance Inadequate

The contracting officers responsible for awarding and administering the contracts received little, if any supervisory oversight. As a result some contracting officers acquiesced to program officials requests for procurement actions that were not in accordance with the procurement regulations nor in the best interests of the government. These kinds of procurement actions have contributed to the significant escalation of contract costs. For instance:

DRAFT

- o The JSPO should have been required to prepare adequate statements of work and perform technical oversight of the radar site selection contractor's progress, instead of allowing the contractor to be funded incrementally by a cost reimbursable, level-of-effort contract.

- o The Special Engineering Project Office should have been required to procure architectural and engineering services needed to design weather forecast offices on a fixed price basis instead of allowing the award of a cost reimbursable level-of-effort contract. A fixed price contract would have limited design changes and ensured that the six percent mandatory fee limitation was not exceeded.

We discussed our concerns about the lack of proper supervision with the Department's Deputy Director for Procurement. He acknowledged that JSPO's contracting function needed tighter controls. He said that:

- o Neither he nor his staff had reviewed recent contracts or modifications awarded with tri-agency funds.

- o He was unaware of the scope and amounts of the procurements.

In February 1990 the Deputy Director established a NEXRAD procurement support staff to better control JSPO's procurement activities. This staff will review and ensure that all procurements adhere to federal acquisition regulations, and that all contracts are properly administered.

The absence of needed oversight resulted in inadequate cost controls over major program acquisitions. As a result, JSPO has incurred significant contract cost overruns without any assurance that the costs were necessary and correct.

<u>Recommendations</u>

We recommend that the Under Secretary for Oceans and Atmosphere coordinate with the Department's Office of Procurement to strengthen the contracting practices relating to the NEXRAD program. At a minimum, procurement and program officials should be directed to do the following:

-- Prepare well-defined statements of work designed to help Joint System Program Office officials hold the contractors accountable for delivery of acceptable goods and services.

-- Refrain from using unpriced modifications that allow program officials to procure services for an unknown amount of additional costs on the basis of an equitable adjustment to be negotiated at a later date.





DRAFT

DRAFT

-- Comply with the Federal Acquisition Regulation and other requirements restricting sole source procurements, awards for advisory and assistance services, and fees for architectural and engineering work.

-- Monitor and strictly enforce all contract terms relative to the work performed and payments requested.

-- Discontinue the use of cost reimbursable, level-of-effort type contracts that provide insufficient controls to ensure adequate control and management of contractor costs and services.

DRAFT

$24.1 MILLION SPENT ON NON-JSPO PROGRAM REQUIREMENTS

The Joint System Program Office improperly used $24.1 million in NEXRAD tri-agency funds to modernize the National Weather Service's forecast offices. JSPO accepted these office modernization costs as unique-agency NEXRAD requirements, thereby attempting to make them an appropriate use of the tri-agency funds. However, the NEXRAD Joint Development Plan, which defines the NEXRAD system, does not include the construction and renovation of these offices in its definition.

This improper use of NEXRAD funds left the JSPO with a shortfall in the Department of Commerce funds. To compensate, JSPO used about $11 million of Department of Defense and Department of Transportation tri-agency funds to pay a portion of the Department of Commerce costs.

If Commerce is not able to obtain the funding needed to repay the $24.1 million as well as to meet future requirements of system funding, JSPO may need to seek additional funds from the other two agencies. Thus, JSPO's failure to properly manage the NEXRAD program funds has compromised the integrity of the Department of Commerce in the eyes of the other two agencies. This could impede Commerce's ability to participate as the lead agency in other joint ventures.

NEXRAD Joint Development Plan Not Followed

From fiscal year 1980 through 1989, the JSPO reported costs of approximately $253.2 million. Included in that amount is the $24.1 million of tri-agency system funds improperly spent on costs for constructing and renovating the NWS forecast offices. These costs include the following:

- $12.5 million paid to Fluor Daniel, Inc., an architectural and engineering firm for design services, real estate services, and program management and assistance.

- $8 million paid to construction firms for building new forecast offices or extensively renovating existing ones.

- $2.4 million paid for the acquisition of land for office sites.

- $1 million paid to SRI, Inc. for site selection services, environmental assessments, and impact statements.

- $0.2 million paid to NOAA's Special Engineering Project Office for managing the NWS modernization program.

DRAFT

Through its improper use of Commerce's share of tri-agency funds to modernize NWS forecast offices, JSPO failed to comply with the NEXRAD Joint Development Plan. This plan, approved by the three sponsoring agencies, defines the scope of the joint office's authority and provides the criteria for determining what is to be included in the NEXRAD system.

According to the plan, JSPO has technical, program, and financial management responsibility for developing, acquiring, and deploying a NEXRAD system that meets all sponsoring agencies' common meteorological needs. The system includes the radar equipment, software, processing sites, and communications necessary for operating the NEXRAD radar. The system also includes the logistics, training, and maintenance required to keep it operating. It does not, however, include constructing NWS forecast offices or the facilities at local, regional, or national operations offices and centers. Thus, the offices that are being constructed with Commerce's share of tri-agency funds are not under JSPO's purview and should not be paid for with the office's NEXRAD funds.

A memorandum of agreement signed by the three sponsoring agencies provides the basis for allocating the various NEXRAD system costs to each agency. Since the beginning of the project, several revisions have been made to the agreement. The present agreement allocates salaries and unique-agency requirements to each agency. With few exceptions, all other costs are prorated to the agencies based on their share of the system equipment.

Our review disclosed that NWS never established a separate account for the weather forecast field office facility funds. Instead, the facility funds were included in NWS's contribution to the tri-agency fund. NWS also showed the facility construction costs as part of the NEXRAD system in its congressional budget submission, and defined them as NEXRAD user sites.

NWS did not encounter any problems with financing the construction of the forecast offices with funds from the JSPO account until fiscal year 1988. In December 1987 Congress reduced NWS's budget request from $56 million to $38.9 million. This action was taken based on information provided Congress by the Department's Office of Budget. Budget officials told us that they had reviewed JSPO's financial and budgetary information and concluded that the major system contract's up-front costs had been reduced by $15 million. The budget officials were unable to provide information or explain how they reached their conclusion.

In May 1988, NOAA's Office of Budget directed NWS to reallocate another $15.2 million (later reduced to $13.6 million) as unneeded because of system slippage and up-front savings. Congress approved the reprogramming in June 1988 again based on

DRAFT

information provided by the Department's Office of Budget. This programming resulted in a total fiscal year appropriation of $25.3 million which was insufficient to cover both NWS's contribution to the tri-agency NEXRAD systems and construction of the forecast offices. Departmental budget officials stated that they passed on NOAA's reprogramming request but they had no supporting documents to show that funds were available for reprogramming.

In fiscal year 1990, the Department's Office of Budget again notified Congress that $4.6 million of NEXRAD appropriations would not be needed for the major system contracts, and that these funds could be reprogrammed. JSPO officials informed us that they had planned to use these funds to begin paying back the other agencies' funds ahead of schedule. Departmental budget officials stated that the JSPO had not requested approval to use these funds to repay the other agencies earlier than planned and therefore allowed the reprogramming.

Based on our audit, we concluded that at the end of fiscal year 1989, the National Weather Service needed to reimburse the tri-agency fund $24.1 million. This included $11 million of other agency funds, and $13.1 million of Department of Commerce funds needed to meet its share of total system costs. We also concluded that the Departmental and NOAA budget offices need to coordinate their budget formulation to ensure that JSPO is provided the level of funding needed to repay the other agency funds.

Established Funding Controls Ignored

JSPO has authority over the use of NEXRAD funds and is responsible for spending and allocating the funds properly. However, the office ignored its established procedures for controlling expenditures in order to fund the NWS's modernization program. Under the established procedures, all requests for funds were to be authorized by the joint system program manager and approved by all three agencies. However, the program office did not follow these procedures in spending the $24.1 million:

- o The joint system program manager and the two other sponsoring agencies did not review and approve the funding requests for forecast offices as they did for other NEXRAD funding requests. NOAA's Special Engineering Project Office prepared and authorized its own requisitions in these cases.

- o Contracting officers were collocated with the Special Engineering Project Office at the Central Administrative Support Center in Kansas City, Missouri, rather than being assigned to the joint system office.

- o JSPO did not maintain control over the use of tri-agency funds. The Special Engineering Project Office and NWS officials made the decisions concerning how and where the construction funds should be spent.



DRAFT

DRAFT

Misclassification of Non-JSPO Construction Costs

JSPO officials abused the memorandum of agreement terms that allowed each agency to fund "agency-unique" NEXRAD requirements. The agreement allows the JSPO to use other agency funds if, in any one year, it could not fully cover that year's cost allocation. These terms were included in the agreement to allow the three agencies to (1) purchase extra NEXRAD components and (2) prevent the mission from being delayed if any one agency had its NEXRAD appropriation funds reduced during the budget process. These provisions were not included to allow the NWS to use NEXRAD funds to build new or completely renovate forecast offices.

We found that the JSPO allowed the NWS to reclassify its forecast offices as "NEXRAD user facilities." The office construction then became a unique agency requirement which, under the agreement, allowed JSPO to use Commerce's tri-agency funds to cover these costs.

We have concluded that JSPO's lack of financial control over the tri-agency funds has compromised the integrity of the Department of Commerce and could limit its ability to participate as the lead agency in other joint ventures. The sponsoring agencies advanced funds to the program office and expected the office to spend these funds on their agency's valid NEXRAD program expenses At least one sponsoring agency has complained to the Congress concerning alleged spending improprieties. The controls over the tri-agency funds must be strengthened.

Recommendations

We recommend that the Under Secretary for Oceans and Atmosphere require the Director, NEXRAD Joint System Program Office to:

(1) Adhere to established procedures for controlling expenditures of tri-agency funds.

(2) Develop and implement a control plan whereby

-- agency-unique requirements to be funded by tri-agency funds are reviewed and approved by all agency sponsors prior to obligation, and

-- tri-agency requirements are funded before agency-unique requirements are approved and funded.

We further recommend that the Under Secretary develop a plan for reimbursing the tri-agency fund for all amounts spent on the National Weather Service's forecast office modernization program that are not joint system requirements.

In addition, we recommend that the Assistant Secretary for Administration provide budget guidance and oversight to NOAA in planning for the repayment of $24.1 million to the JSPO.

To: JackT@mail@fdi kcmo
Cc: MaxE,RonR,RonaldA@proc@casc,DonitaM@proc@casc
Bcc:
From: Edward H. Mische@SEPO@CASC
Subject: Contract Review Meeting
Date: Monday, June 11, 1990 at 12:55:26 pm CDT
Attach:
Certify: N
Forwarded by:

---

The monthly subject meeting is scheduled for June 12th, in the CASC Procurement Bid Room, at 10:00 am.

Items to be discussed includes the development and contents of the draft FY91 Level of Effort Plan, preparation guidelines outlined in the May 24, 1990 E-Mail message, and 6% fixed fee limitation for specific design and contract incorporation.

Ron Rusch and I will attend this meeting from SEPO.

Ed.

4600 Madison, Suite 900
Kansas City, MO 64112
(816) 561-5757

# LETTER OF TRANSMITTAL

No.: T1124

Project: NEXRAD/WFO Job: NOAA

U.S. DOC,NOAA,SEPO
601 E. 12th Street, Rm. 1836
Kansas City, MO 64106

June 25, 1990

Attn: Ron Rusch

RE: Graphs of Meeting of
June 12, 1990, CNFK-155

X Attached _ Separate Cover Via:

_ Shop Dwg _ Prints _ Plans _ Samples _ Specifications
_ Letter _ Change Order X Other: GRAPHS

| Copies | Date | Item | Number | Description |
|---|---|---|---|---|
| 1 | 21JUN90 | | | Price and Profit Limitations |
| 1 | 21JUN90 | | | Reduce Design Cost |

These above items are transmitted for your action as noted:

_ For Approval
X For Your Use
_ As Requested
_ Bids Due:

_ For Review And Comment
_ Approved As Submitted
_ Approved As Noted
_ Returned After Loan

_ Returned For Corrections
_ Resubmit _ Copies For Approval
_ Submit _ Copy For Distribution
_ Return _ Copies Corrected Print

As discussed, these two graphs are transmitted to you to replace the graphs sent in the original minutes of Meeting of June 12, 1990.

Transmitted by: FLUOR DANIEL, INC.

Signed: [signature]
By: L.L. SUTTON
Date: 6/25/90

G 008754

cc: M. ENTRIKIN, R. ANIELAK, D. MCCULLOUGH, E. MISCHE, FDI ATTENDEES, FILE

# PRICE & PROFIT LIMITATIONS

- **ARCHITECTURAL & ENGINEERING SERVICES**

  FAR 15.903 (d) (1) (ii)

  Price (Cost + Fee) for Design, Plans, Drawings and Specifications ≤ 6% Estimated Cost of Construction.

- **CPFF CONTRACTS**

  FAR 15.903 (d) (1) (iii)

  Fee (Profit) ≤ 10% Contract's Estimated Cost

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

*Example of (ii):*

WFO = $700,000
GFE = <u>$100,000</u>
$800,000 x 0.06 = $48,000 max for design/plans/specifications

**DESIGN PHASE COSTS ARE INCLUDED IN THE 6% LIMITATION**
**PRE-DESIGN & POST-DESIGN COSTS ARE EXCLUDED FROM THE 6% LIMITATION**




**PRE-DESIGN**
**(0% - 15%)**

- INITIAL SITE VISITS
- TOPO/GEOTECH
- STUDIES
- STANDARDS/CRITERIA
- CONCEPTUAL WORK
- VERIFICATION OF AS-BUILT CONDITIONS
- REPRODUCTION FOR REVIEW
- MILESTONE ESTIMATES

**DESIGN PHASE**
**(15% - 100%)**

- DESIGNS
- PLANS
- SPECIFICATIONS
(PART I/SEC.C)

**POST DESIGN**
**(AFTER 100%)**

- QA/QC
- SHOP DRAWINGS
- SUBMITTALS
- MANUALS
- AS-BUILTS
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

# WAYS TO REDUCE "DESIGN" COST

## CLIENT

- REDUCE NO. OF REVIEWS ON STANDARD DESIGNS
- REDUCE NO. OF REVIEWERS
- CONSOLIDATE & LIMIT COMMENTS
- STANDARDIZE FORMAT OF REVIEW PACKAGE
- REDUCE (ELIMINATE) "WHAT-IFS"
- MINIMIZE LATE "DRUTHER" CHANGES

## FDI

- REVIEW & "HARDEN" MANHOUR BUDGET FOR DESIGNS
- CLEAN-UP THE MANHOUR BUDGET FOR UNIQUE DESIGNS
- HIP SHOOT ON COSTS OF REDESIGN - ie, PUT-UP OR SHUT-UP
- SEGREGATE (INSULATE) PRODUCTION DESIGNERS, ie,:
  PRODUCTION = X people
  OTHER = Y people

FDI/JMT/MG

JUNE 21, 1990

National Oceanic and Atmospheric Administration
Host Agency serving:
Bureau of the Census
Economic Development Administration
International Trade Administration
Minority Business Development Agency
Office of Export Enforcement
Office of the Inspector General
U.S. Travel and Tourism Administration

U.S. DEPARTMENT OF COMMERCE
Central Administrative Support Center
Federal Building, Room 1736
601 East 12th Street
Kansas City, Missouri 64106

October 5, 1990 CCx1

MEMORANDUM FOR: See Distribution

FROM: Max Entrikin, Chief
Special Engineering Program Office

SUBJECT: Design Costs

Many of you have at one time or another expressed concern about the design costs associated with the WFO development.

The attachment projects the design work and construction estimates for the FY91 work plan. Six percent of the $25,263K construction estimate is $1,516K. The forecast design cost is $1,363K, or 5.4 percent, of the estimated construction cost.

The point is that the design cost (15 percent through 100 percent) is not out of line with the Brooks Bill limitation of 6 percent for drawings and specification preparation.

Attachment

cc: W/TPO - Lou Boezi
W/TPO - Gary Knebel
W/TPO - Ron Warren
W/OSO323 - Mike Jacob
W/JS6 - Dave Smiley
CC - Martha Lumpkin
CC4 - Mike Tucker
WC4 - John Allen
MC4 - Kent Groninger
EC4 - Rob Hull
CCx1 - Frank Rabuse
CCx1 - Jerry Britton
CCx1 - Ed Mische
CCx1 - Ron Rusch

6 % DESIGN TEST - T.O. #6 (FY91)
BASIS: STATEMENT OF WORK SUBMITTAL, DATED 12 SEP 90, AND
1 AUG 90 EDD SCHEDULE.

DESIGN PROGRESS BASIS

| | CONCEPTUAL | DETAIL DESIGN & SPECS | | | |
|---|---|---|---|---|---|
| DESIGN PKGS | 0-15% | 15-35% | 35-90% | 90-100% | |
| | | 23% + | 65% + | 12% | = 100% |

SITES IN DESIGN DURING FY91

| CLIN | SYSTEM | PR | CCE | % DES | WTD CCE $$ |
|---|---|---|---|---|---|
| CN | BINGHAMTON | 19 | 895,100 | 77% | 689,000 |
| GY | PHILADELPHIA | 20 | 923,200 | 12% | 111,000 |
| EV | MOREHEAD CITY | 21 | 901,200 | 77% | 694,000 |
| FV | LOUISVILLE | 22 | 862,800 | 35% | 302,000 |
| FB | INDIANAPOLIS | 23 | 1,001,700 | 100% | 1,002,000 |
| GO | SAN JUAN | 24 | $1,093,000 | 100% | 1,093,000 |
| HB | PITTSBURGH | 25 | 386,300 | 100% | 386,000 |
| FZ | MEMPHIS | 28 | 332,100 | 100% | 332,000 |
| DK | COLUMBIA SC | 29 | 320,500 | 100% | 321,000 |
| FC | JACKSON MS. | 30 | 324,600 | 100% | 325,000 |
| HU | SIOUX FALLS SD | 31 | 324,600 | 100% | 325,000 |
| DI | CLEVELAND | 33 | 437,300 | 94% | 411,000 |
| CT | BUFFALO | 34 | 1,132,400 | 100% | 1,132,000 |
| CR | BOSTON | 36 | 1,654,700 | 100% | 1,655,000 |
| HD | PORTLAND ME | 37 | 904,400 | 100% | 904,000 |
| GU | OMAHA | 38 | 1,007,800 | 95% | 957,000 |
| DR | DES MOINES | 39 | 903,700 | 100% | 904,000 |
| HV | NEW ORLEANS | 41 | 1,432,500 | 94% | 1,347,000 |
| DO | DALLAS | 42 | 1,467,800 | 88% | 1,292,000 |
| FW | LUBBOCK | 43 | 877,900 | 100% | 878,000 |
| GB | MIAMI | 44 | 328,000 | 72% | 236,000 |
| FT | LITTLE ROCK | 45 | 276,100 | 56% | 155,000 |
| HQ | SAN FRAN/MONTEREY | 47 | 1,350,700 | 100% | 1,351,000 |
| HS | SEATTLE | 48 | 366,900 | 39% | 143,000 |
| CQ | BOISE ID | 49 | 931,600 | 88% | 820,000 |
| FU | LOS ANGELES | 50 | 1,060,500 | 94% | 997,000 |
| DG | CINCINNATI | 51 | 1,579,600 | 56% | 885,000 |
| FP | LAKE CHARLES | 52 | 807,800 | 56% | 452,000 |
| EQ | GREAT FALLS MT | 53 | 936,300 | 23% | 215,000 |
| CO | BIRMINGHAM AL | 54 | 965,600 | 39% | 377,000 |
| HO | AUSTIN | 55 | 890,500 | 23% | 205,000 |
| CK | ATLANTA | 56 | 1,469,200 | 39% | 573,000 |
| CC | ALBUQUERQUE | 57 | 1,050,800 | 23% | 242,000 |
| DC | CHARLESTON WV | 58 | 828,300 | 17% | 141,000 |
| GE | MINNEAPOLIS | 59 | 2,188,600 | 30% | 657,000 |

03-Oct-90 RUN DATE

SIX%.WK1

| | | | | | |
|---|---|---|---|---|---|
| DN | ANCHORAGE | 60 | 1,024,000 | 88% | 901,000 |
| FL | KNOXVILLE | 61 | 873,600 | 13% | 114,000 |
| HA | FAIRBANKS | 63 | 1,795,000 | 88% | 1,580,000 |
| DD | CHEYENNE | 64 | 879,200 | 17% | 149,000 |
| GG | MISSOULA | 65 | 348,500 | 3% | 10,000 |
| | AVG PER SITE (40 SITES) | | $928,000 | TOTAL | $25,263,000 |
| | NOT TO EXCEED A&E COST @ | | $25,263,000 x | 6% | $1,516,000 |
| | FORECAST A&E COST FROM T.O.6.3 PLAN = | | | 5.40% | $1,363,000 |

PRIORITY RECONCILIATION

| | | |
|---|---|---|
| DETROIT | 26 | DESIGN COMPLETE IN FY90 |
| PHOENIX | 27 | LEASE |
| SACRAMENTO | 32 | LEASE |
| ALBANY | 35 | LEASE |
| MILWAUKEE | 40 | DESIGN & CONSTRUCTION COMPLETE |
| RALEIGH/DURHAM | 46 | LEASE |
| RENO | 62 | CONCEPTUAL DESIGN COMPLETE IN FY91 |

03-Oct-90 RUN DATE

SIX%.WK1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FLUOR ENTERPRISES, INC.<br>f/k/a FLUOR DANIEL, INC. | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 00-207C<br>(Judge Bush) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSIONS

Pursuant to Rule 36 of the Rules of the United States Court of Federal Claims (RCFC), defendant has made a good faith effort to respond fully to plaintiff's requests for admissions. However, discovery is continuing and defendant reserves the right to supplement its responses, including any objections that may be applicable, based upon any additional information that may be discovered subsequent to these responses. Defendant responds to plaintiff's first requests for admission as follows:

REQUEST FOR ADMISSION NO. 1:

Prior to the Government's execution of Letter Contract No. 50WCNA606099, the Government did not determine, either separately or as part of any other estimate, the estimated cost of construction applicable to the NWSWFO Design and Construction Program.

RESPONSE:

Defendant objects to this request for admission upon the ground that the reference to "the estimated cost of construction applicable to the NWSWFO Design and Construction Program" is vague and ambiguous. Without waiving this objection, defendant admits that defendant did not develop an estimated cost of construction of individual Weather Forecast Offices (WFOs) prior to execution of either the letter or definitized contracts. Defendant further avers that the statement of work for both the letter contract and definitized contract provided that plaintiff would provide comprehensive program support, engineering and architectural design services, as well as construction management and inspection services in support of the National Weather Service's (NWS) modernization program, which included the construction of over 100 separate Weather Forecast Offices (WFO). Pursuant to the contract, plaintiff was to provide NWS the estimated cost of construction of each WFO.

REQUEST FOR ADMISSION NO. 2:

Prior to the government's execution of definitized contract no. 50WCNA606099, the government did not determine, either separately or as part of any other estimate, the estimated cost of construction applicable to the NWSWFO Design and Construction Program.

RESPONSE:

See our response to request No. 1.

REQUEST FOR ADMISSION NO. 3:

Neither Letter Contract No. 50WCNA606099 nor definitized Contract No. 50WCNA606099 expressly includes or incorporates by reference the 6 percent limitation set forth in 41 U.S.C. § 254(b) and the implementing regulations.

RESPONSE:

Defendant objects to this request for admission upon the grounds that contracts speak for themselves and are the best evidence of their contents. Without waiving this objection, pursuant to 41 U.S.C. § 254(b), the limitation of design fees to 6 percent of the estimated cost of construction is statutorily mandated and cannot be waived.

REQUEST FOR ADMISSION NO. 4:

At no point prior to the government's execution of Letter Contract No. 50WCNA606099 did the government communicate to Plaintiff an estimated cost of construction applicable to the NWSWFO Design and Construction Program.

RESPONSE:

See defendant's response to request no. 1.

REQUEST FOR ADMISSION NO. 5:

At no point prior to the government's execution of definitized Contract No. 50WCNA606099 did the government communicate to Plaintiff an estimated cost of construction applicable to the NWSWFO Design and Construction Program.

RESPONSE:

See defendant's response to request no. 1.

REQUEST FOR ADMISSION NO. 6:

At no point prior to the government's execution of Letter Contract No. 50WCNA606099 did the government communicate to Plaintiff a contract ceiling price based on application of the 6 percent limitation set forth in 41 U.S.C. § 254(b) and the implementing regulations.

RESPONSE:

Defendant objects to this request for admission upon the ground that the term "contract ceiling price" is vague and overly broad. Without waiving this objection, defendant denies this request for admission. The contract contained an "estimated cost" for project management and other services, not a contract ceiling price. Moreover, as early as March, 1987, defendant communicated to plaintiff that, pursuant to 41 U.S.C. § 254(b), the statutorily mandated 6 percent limitation upon design fee was applicable to the design services plaintiff was to perform pursuant to the contract.

REQUEST FOR ADMISSION NO. 7:

At no point prior to the government's execution of definitized Contract No. 50WCNA606099 did the government communicate to Plaintiff a contract ceiling price based on application of the 6 percent limitation set forth in 41 U.S.C. § 254(b) and the implementing regulations.

RESPONSE:

See the response to request for admission no. 6.

REQUEST FOR ADMISSION NO. 8:

At no point prior to the government's execution of Letter Contract No. 50WCNA606099 did the government communicate to Plaintiff a contract ceiling price on architecture/engineering services based on application of the 6 percent limitation set forth in 41 U.S.C. § 254(b) and the implementing regulations.

RESPONSE:

See our response to request for admission no. 6.

REQUEST FOR ADMISSION NO. 9:

At no point prior to the government's execution of definitized Contract No. 50WCNA606099 did the government communicate to Plaintiff a contract ceiling price on architecture/engineering services based on application of the 6 percent limitation set forth in 41 U.S.C. § 254(b) and the implementing regulations.

RESPONSE:

See the response to request for admission no. 6.

REQUEST FOR ADMISSION NO. 10:

The government issued a notice authorizing Plaintiff to proceed with the requirements of Task Order No. 1 under the contract.

RESPONSE:

Admitted with the further clarification that modifications were issued to the contract that authorized plaintiff to proceed with the requirements of the task orders.

REQUEST FOR ADMISSION NO. 11:

The government issued a notice authorizing Plaintiff to proceed with the requirements of Task Order No. 2 under the contract.

RESPONSE:

See the response to request for admission no. 10.

REQUEST FOR ADMISSION NO. 12:

The government issued a notice authorizing Plaintiff to proceed with the requirements of Task Order No. 3 under the contract.

RESPONSE:

See the response to request for admission no. 10.

REQUEST FOR ADMISSION NO. 13:

The government issued a notice authorizing Plaintiff to proceed with the requirements of Task Order No. 4 under the contract.

RESPONSE:

See the response to request for admission no. 10.

REQUEST FOR ADMISSION NO. 14:

The government issued a notice authorizing Plaintiff to proceed with the requirements of Task Order No. 5 under the contract.

RESPONSE:

See the response to request for admission no. 10.

REQUEST FOR ADMISSION NO. 15:

The contract required Plaintiff to engage in design efforts within government guidelines including a building design for a base-line new WFO and existing engineering information from government files for existing offices requiring expansion or modification.

RESPONSE:

Defendant objects to this request for admission upon the grounds that the contract speaks for itself and is the best evidence of its contents. Without waiving this objection, defendant can neither admit nor deny this request for admission because defendant does not understand plaintiff's allegations regarding the contract requirements. If plaintiff clarifies this request for admission, defendant, subject to objection, will attempt to provide an answer.

REQUEST FOR ADMISSION NO. 16:

The performance of the contract required that Plaintiff perform architect/engineer services relative to specific sites prior to Plaintiff's submission of final cost estimates for those sites to the government.

RESPONSE:

Defendant objects to this request for admission upon the grounds that the contract is the best evidence of its contents and speaks for itself. Without waiving this objection, defendant denies the request for admission.

REQUEST FOR ADMISSION NO. 17:

Neither the Letter Contract No. 50WCNA606099 nor definitized Contract No. 50WCNA606099 contains an estimate of construction costs.

RESPONSE:

See the response to request for admission no. 1.

REQUEST FOR ADMISSION NO. 18:

At all times during performance of the contract prior to the Office of Inspector General audit reported in Audit Report No. DEN-4613-30001, the only estimates of construction costs available were those prepared by Plaintiff.

RESPONSE:

Defendant objects to this request for admission upon the ground that the term "only" is overly broad. Without waiving this objection, defendant admits that plaintiff prepared estimates of construction costs. See also our response to request no. 1.

REQUEST FOR ADMISSION NO. 19:

At the time of entering into Letter Contract No. 50WCNA606099, defendant was unable to determine the estimated cost of construction applicable to the NWSWFO Design and Construction Program.

RESPONSE:

See the response to request for admission no. 1.

REQUEST FOR ADMISSION NO. 20:

Due to the inability of the parties to estimate the cost of construction at the time of entering into Letter Contract No. 50WCNA606099, Plaintiff and the Contracting Officer Jesus Arredondo agreed to enter into a level of effort professional services contract.

RESPONSE:

Denied.

REQUEST FOR ADMISSION NO. 21:

Prior to the negotiations related to Option Year Four that took place on June 12, 1990, no express agreement existed between the parties that addressed the limitations set forth by 41 U.S.C. § 254(b).

RESPONSE:

Admitted with the further clarification that the requirements imposed upon the parties pursuant to 41 U.S.C. § 254(b) are statutorily mandated. Therefore, there does not have to be an agreement, express or otherwise, for the statutory requirements of 41 U.S.C. § 254(b) to be applicable to the design services which plaintiff performed pursuant to the contract. Moreover, as early as March, 1987, defendant informed plaintiff that the design fee limitation of 41 U.S.C. § 254(b) applied to the design services plaintiff was to perform pursuant to the contract.

REQUEST FOR ADMISSION NO. 22:

Present on behalf of Defendant at the negotiations related to Option Year Four that took place on June 12, 1990, were Contracting Officer Donita McCullough, Contracting Officer Technical Representative Max Entrikin, Assistant Contracting Officer Technical Representative Ron Rusch, and Assistant Contracting Officer Technical Representative Ed Mische.

RESPONSE:

Admitted.

REQUEST FOR ADMISSION NO. 23:

Contracting Officer Donita McCullough and Contracting Officer Technical Representative Max Entrikin were both representatives of the Department of Commerce, NOAA, Central Administrative Support Center.

RESPONSE:

Defendant objects to this request for admission upon the grounds that it is vague and overly broad. The request for admission does not refer to any specific matter or time frame. Without waiving this objection, defendant admits that, at certain times during the administration of contract no. 50WCNA606099, Donita McCullough acted as the contracting officer and Max Entrikin acted as the contracting officer's technical representative.

REQUEST FOR ADMISSION NO. 24:

The parties present during the negotiations related to Option Year 4 that took place on June 12, 1990 orally agreed concerning which design tasks would be subject to the fee limitation set forth in 41 U.S.C. § 254(b).

RESPONSE:

Denied. Moreover, because the fee limitation was statutorily mandated, no one within the Government was authorized to change the services that were subject to the fee limitation.

REQUEST FOR ADMISSION NO. 25:

On June 15, 1990 Defendant received a document labeled "Price & Profit Limitations" that summarized the agreement made by the parties at the June 12, 1990 meeting.

RESPONSE:

Defendant admits it received a document entitled "Price and Profit Limitations." Defendant objects to the remainder of this request for admission upon the grounds that it is vague and overly broad. Plaintiff does not explain what is meant by the terms "summarized" and "agreement." Moreover, defendant also objects upon the grounds that the document speaks for itself and is the best evidence of its contents. Without waiving this objection, if by the term "agreement" plaintiff is claiming that the cited letter modified the contract, plaintiff knew, or should have known, that the letter could not constitute a modification to the contract. Further, because 41 U.S.C. § 254(b) statutorily mandated those services that were subject to the 6 percent fee limitation, plaintiff knew, or should have known that defendant could not waive the requirements of that statute.

REQUEST FOR ADMISSION NO. 26:

At no time prior to April 1992 did Defendant assert to Plaintiff that the "Price & Profit Limitations" document received by Defendant on June 15, 1990 did not represent the agreement of the parties.

RESPONSE:

Defendant objects to this request for admission upon the grounds that it is vague and overly broad. Plaintiff does not explain what plaintiff means by the term "assert" or "agreement." Without waiving this objection, plaintiff knew, or should have known that the alleged letter did not constitute a modification to the contract. Moreover, the requirements of 41 U.S.C. § 254(b) are statutorily mandated. Therefore, defendant could not change, modify, or waive those requirements.

REQUEST FOR ADMISSION NO. 27:

After the negotiations that took place on June 12, 1990, Contracting Officer Donita McCullough and Contracting Officer Technical Representative Max Entrikin believed that the resulting agreement between the parties regarding the fee limitation set forth by 41 U.S.C. § 254(b) complied with the statute.

RESPONSE:

Defendant objects to this request for admission upon the ground that whether plaintiff complied with the statute is a conclusion of law. Without waiving this objection, defendant denies the request for admission. Only the contract, as properly modified, constituted the complete agreement between plaintiff and defendant. Moreover, the requirements of 41 U.S.C. § 254(b) are statutorily mandated. Therefore, defendant could not change, modify, or waive those requirements. Accordingly, the beliefs of specific Government employees regarding compliance with the statute is irrelevant. If plaintiff did not comply with the statute, plaintiff is liable for any resultant overpayment plaintiff received.

<u>REQUEST FOR ADMISSION NO. 28</u>:

Prior to April 1992, Defendant at no time communicated to Plaintiff that Defendant believed Plaintiff was not in compliance with the terms of the agreement reached during the meeting of June 12, 1990 regarding the fee limitation set forth by 41 U.S.C. § 254(b).

<u>RESPONSE</u>:

Defendant objects to this request for admission upon the grounds that the phrase "at no time" is vague and overly broad. Without waiving this objection, the requirements of 41 U.S.C. § 254(b) were statutorily mandated. Therefore, defendant could not change, modify, or waive those requirements. Thus, it is irrelevant whether defendant communicated with plaintiff concerning compliance with the statute. Moreover, because the design services plaintiff performed pursuant to the contract were subject to 6 percent fee limitation imposed by 41 U.S.C. § 254(b), plaintiff knew, or should have known, whether plaintiff was in compliance with the statute.

REQUEST FOR ADMISSION NO. 29:

During the negotiations regarding Option Year Four, the parties used the Army Corps of Engineers guidelines to determine what tasks constituted architect-design services.

RESPONSE:

Denied.

REQUEST FOR ADMISSION NO. 30:

Prior to April 1992, Defendant did not object to any of the costs claimed by Plaintiff for the work that Plaintiff completed on the contract on grounds that reimbursement of such costs or a portion thereof would violate 41 U.S.C. § 254(b) or the implementing regulations.

RESPONSE:

Admitted with the further clarification that the design fee limitation of 6 percent of the estimated cost of construction is statutorily mandated. Therefore, defendant cannot change, modify, or waive that requirement. Accordingly, pursuant to the statute, plaintiff is liable to defendant for any overpayment made to plaintiff in excess of the 6 percent design fee limitation imposed by the statute. Whether defendant objected to costs that may have been subject to the statute is irrelevant to that legal conclusion.

REQUEST FOR ADMISSION NO. 31:

Plaintiff completed all of the work required under the contract.

RESPONSE:

Denied.

REQUEST FOR ADMISSION NO. 32:

NOAA accepted Plaintiff's applications for payment under the contract after review and evaluation.

RESPONSE:

Admitted.

REQUEST FOR ADMISSION NO. 33:

Defendant accepted CAS disclosure statements from Plaintiff and did not object to these disclosure statements prior to the Office of Inspector General audit reported in Audit Report No. DEN-4613-30001.

RESPONSE:

Admitted with the further clarification that the requirements of 41 U.S.C. § 254(b) are statutorily mandated. Therefore, defendant could not change, modify, or waive the requirements of that statute even if defendant did not object to the plaintiff's disclosure statements.

REQUEST FOR ADMISSION NO. 34:

Prior to the Office of Inspector General audit reported in Audit Report No. DEN-4613-30001, NOAA and the Defense Contract Audit Agency reviewed and approved Plaintiff's accounting system.

RESPONSE:

Admitted with the further clarification that the requirements of 41 U.S.C. § 254(b) are statutorily mandated. Therefore, defendant could not change, modify, or waive the requirements of that statute even if plaintiff's accounting system was approved.

REQUEST FOR ADMISSION NO. 35:

Defendant ordered all of the work performed by Plaintiff under the contract.

RESPONSE:

Admitted with the further clarification that the requirements of 41 U.S.C. § 254(b) are statutorily mandated. Therefore, defendant could not change, modify, or waive the requirements of that statute. Consequently, the work ordered by defendant, where applicable, was subject to the 6 percent fee limitation of the statute.

REQUEST FOR ADMISSION NO. 36:

The estimated cost of construction utilized in the Office of Inspector General audit reported in Audit Report No. DEN-4613-30001 was developed after the contract was terminated.

RESPONSE:

Admitted.

REQUEST FOR ADMISSION NO. 37:

Defendant did not make an Independent Government Estimate of architect-engineer fees prior to each task order under the contract.

RESPONSE:

Admitted with the further clarification that the requirements of 41 U.S.C. § 254(b) are statutorily mandated. Therefore, defendant could not change, modify, or waive the requirements of that statute. Consequently, where applicable, plaintiff's architect-engineer fees were subject to the statute's 6 percent limitation.

REQUEST FOR ADMISSION NO. 38:

The Office of Inspector General audit reported in Audit Report No. DEN-4613-30001 did not limit application of the 6 percent fee solely to the preparation of plans, drawings and specifications.

RESPONSE:

Defendant objects to this request for admission upon the grounds it is vague and overly broad. Plaintiff does not identify those areas, other than plans, drawings, and specifications, to which the audit report applied the 6 percent limitation upon the fee. Without waiving this objection, defendant denies the request for admission.

REQUEST FOR ADMISSION NO. 39:

During the negotiations that took place on June 12, 1990, the parties agreed that architect-engineer services costs incurred by Plaintiffs under the contract and paid by Defendant did not exceed the 6 percent limitation set forth in 41 U.S.C. § 254(b) and the implementing regulations.

RESPONSE:

Denied. Plaintiff knew, or should have known, that the contract, as properly modified, constituted the complete agreement between the parties. Moreover, the requirements of 41 U.S.C. § 254(b) are statutorily mandated. Therefore, defendant could not change, modify, or waive the requirements of that statute. Consequently, if plaintiff was paid more than the 6 percent for services subject to the statute, plaintiff is liable to defendant for those overpayments.

ROBERT D. MCCALLUM, JR.
Assistant Attorney General

DAVID M. COHEN
Director

DONALD E. KINNER
Assistant Director

STEVEN J. ABELSON
Attorney
Commercial Litigation Branch
Department of Justice
Civil Division
Attn: Classification Unit
8th Floor, 1100 L St.,

Washington, D.C. 20530
Tele: (202) 514-4325

Attorneys for Defendant

OF COUNSEL:

FRED KOPATICH
Attorney
Department of Commerce
14th & Constitution Ave., N.W.
Room 5893
N.W.
Washington, D.C. 20230

November 6, 2002

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 6th day of November 2002, I caused to be placed in the United States mail (first class, postage prepaid) copies of "DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSIONS" addressed as follows:

FRANK M. RAPPORT, ESQ.
MCKENNA & CUNEO, L.L.P.
1900 K Street
Washington, D.C. 20006

Ena M. Goddard

5.12

NOTE: APPENDIX IV, the agency response to the audit, is not included in this copy of the document. The FOIA Officer is seeking authorization to release that portion of the document from the responsible authority.

# WEATHER FORECAST OFFICE CONSTRUCTION SUPPORT CONTRACT NEEDED IMPROVED MANAGEMENT AND ADMINISTRATION

NOA-4436-3-0001

AUGUST 1993

U.S. DEPARTMENT OF COMMERCE
OFFICE OF INSPECTOR GENERAL
OFFICE OF AUDITS
NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION DIVISION

## TABLE OF CONTENTS

EXECUTIVE SUMMARY . . . . . . . . . . i

INTRODUCTION . . . . . . . . . . 1
Purpose and Scope of Audit . . . . . . . . . . 2

FINDINGS AND RECOMMENDATIONS . . . . . . . . . . 4

PROCUREMENT OFFICIALS SHOULD FOLLOW PROPER CONTRACT MANAGEMENT PRACTICES . . . . . . . . . . 4

Contract Files Lack Sufficient Information . . . . . . . . . . 5
Independent Government Estimate for Architectural and Engineering Effort Not Obtained . . . . . . . . . . 6
Contracting Officer Circumvented Requirements and Controls . . . . . . . . . . 6
Questionable Costs Included in Fee Calculation . . . . . . . . . . 7
Potential Conflict of Interest Not Mitigated . . . . . . . . . . 8

EFFECTIVE MANAGEMENT NEEDED OVER CONTRACTOR PERFORMANCE . . . . . . . . . . 10

Statement of Work Did Not Limit Specific Work Assignments . . . . . . . . . . 10
Work Priorities and Requirements Set By Contractor . . . . . . . . . . 10
Change Request System Ineffective and Costly . . . . . . . . . . 11
Costs for New or Redirected Work Not Negotiated or Audited . . . . . . . . . . 12
Work Products Not Independently Approved or Monitored . . . . . . . . . . 12
Costs Not Adequately Tracked to Tasks or Work Performed . . . . . . . . . . 13
Contractor Performed Inherently Governmental Functions . . . . . . . . . . 13

RECOMMENDATIONS . . . . . . . . . . 16
Funds to Be Put to Better Use . . . . . . . . . . 19
NOAA Comments and OIG Response . . . . . . . . . . 19

CORRECTIVE ACTIONS IMPLEMENTED BY NOAA . . . . . . . . . . 20

APPENDIXES
I WFO Designs
II Pictures of WFO and NEXRAD Unit
III Summary of NOAA Response and OIG Comments

Weather Forecast Office
Construction Support Contract
Needed Improved Management
and Administration

Final Audit Report
August 1993

---

## EXECUTIVE SUMMARY


The National Weather Service is constructing or modifying weather forecast offices throughout the country and in Puerto Rico. The estimated cost to acquire the land and build or modify the WFOs is $125 million (an average of about $1.1 million per site).

In 1986, the National Weather Service contracted with Fluor Daniel, Inc. to provide professional services for WFO and NEXRAD (Next Generation of Weather Radar) program management, site studies, office designs, construction bid packages, and real estate acquisition support. The contract was a cost-reimbursable type, with a negotiated fixed fee. The term was for a base period covering fiscal years 1986 and 1987 and four options extending the contract through 1991. In July 1992, a separate contract was issued to Fluor Daniel for future support services to the NEXRAD program. NOAA extended the WFO contract to October 31, 1992, then issued a letter contract to continue the WFO support services until a new contract is negotiated. The new contract would extend full WFO support services through fiscal year 1997.

Our performance audit disclosed the following problems in NOAA's administration of the contract with Fluor Daniel:

- Insufficient documentation to account for continuous contract cost growth, from an initial estimate of $9 million in 1986 to an estimate by NOAA of $79 million. Fluor Daniel's estimate was $94.2 million, $15.2 million higher than NOAA's estimate. (See page 5.)

- Lack of required independent government estimates for use in negotiating the contract and subsequent tasks. (See page 6.)

- Circumvention of requirements for competitive procurements and departmental controls by adding unrelated services to an architectural and engineering contract. (See page 6.)

- Questionable inclusion of administrative functions in direct hours to meet the contractual requirements to earn the fixed fee.
(See page 7.)

- Failure to mitigate potential organizational conflicts of interest. (See page 8.)




FD 000770

- Reliance upon a very general statement of work which permitted the COTR to add millions of dollars in new or redefined services. (See page 10.)
- Inappropriate reliance upon Fluor Daniel to establish its own priorities and requirements. (See page 10.)
- Use of an ineffective and costly change request system intended to control work assignments. (See page 11.)
- Failure to negotiate new or redirected work or obtain audits of incurred costs. (See page 12.)
- Lack of monitoring, reviewing, or coordinating tasks, associated costs and funding. (See page 12.)
- Inappropriate use of Fluor Daniel for personal services and inherently governmental functions. (See page 13.)

Due to the severity of the problems and the need to resolve them before awarding new contracts for such services, we informed the appropriate NOAA and Departmental officials of our audit findings and recommendations throughout the audit and in a memorandum on September 30, 1992. NOAA management officials and OIG auditors began a coordinated effort to resolve the issues identified during the audit fieldwork. On November 17, 1992, NOAA officials replied to our memorandum of September 30 and agreed to many of the recommendations in the memorandum, reiterated on page 16 of the report.

As a result, NOAA undertook a major Fluor Daniel recovery effort and actions to implement most of our recommendations are already completed or underway. Actions taken by NOAA include reassigning the new contract to a more experienced contracting office. NOAA should realize significant savings upon full implementation of the recommendations. With the new management controls and rigorous oversight, we anticipate approximately $10 million in funds put to better use.

On March 31, 1993, NOAA responded to our draft audit report. The agency reiterated that it had already agreed with most of the report's recommendations and was in the process of implementing them. A summary of NOAA's response and our comments is presented in Appendix III.

## INTRODUCTION

The National Oceanic and Atmospheric Administration is currently restructuring its National Weather Service to take advantage of scientific advances in understanding weather phenomena and new technologies for observing the atmosphere and processing information. These technologies include the next generation weather radar (NEXRAD), an automated surface observing system, geostationary operational environmental satellites, and an advanced weather interactive processing system.

The weather service plans to consolidate its 249 weather offices into 116 weather forecast offices, 13 river forecast centers collocated with the WFOs, and four national centers. The WFOs must be located in proximity to NEXRAD radar sites, which are placed to provide a national grid of weather radars. The WFO buildings are generally three basic sizes (4,555, 5,366, and 5,858 square feet) depending on the individual office's planned functions (see Appendix I). The offices usually are one story without basements (see Appendix II).

WFO construction management functions are divided between the Central Administrative Support Center (CASC) in Kansas City, Missouri, and various National Weather Service offices including the NEXRAD Program Office (since moved to NOAA's Systems Program Office), the Transition Program Office (TPO), the Office of Systems Operations, and the weather service regional offices. The weather service provided the WFO requirements, the project budget, and the NEXRAD equipment delivery dates to SEPO.

The modernization will involve a significant amount of construction. Sites for radar installation and weather facilities have to be acquired and existing weather offices modified or new offices built for the incoming new systems. NOAA assigned the real estate acquisition and facilities construction for the WFOs to the Special Engineering Program Office. SEPO, which is under the Central Administrative Support Center, is responsible for ensuring that the WFOs are ready for the installation of the NEXRAD equipment. SEPO's responsibilities include:

- obtaining land for NEXRAD radar sites,
- establishing schedules for meeting equipment delivery dates,
- developing prototype designs,
- preparing architectural and engineering designs,

FD 000772

- obtaining construction contractors, and
- managing and inspecting the construction of the weather facilities.

In 1986 SEPO procured a support contractor, Fluor Daniel, Inc., to provide program management, architectural and engineering services, and construction management and inspections. The contract was modified later to include support services for NEXRAD program construction efforts and real property acquisition.

The contract is a cost-reimbursable type with a negotiated fixed fee. The term was for a base period covering fiscal years 1986 and 1987 and four options extending the contract through 1991. In July 1992, NOAA awarded Fluor Daniel a new contract to separately continue the NEXRAD program support. In October 1992, NOAA issued a letter contract while it negotiates a new contract with Fluor Daniel to obtain WFO support services through fiscal year 1997.

A March 1991 audit of several NOAA support contractors, "JSPO - Contracts Poorly Managed and Funds Improperly Spent," STD-0199-1-0001, identified several significant problems with NOAA's management of the Fluor Daniel and other contracts. Concerned about increasing costs for the services provided by Fluor Daniel, the Inspector General initiated performance and contract audits focused in greater detail on the Fluor Daniel contract. This report addresses the significant management issues identified during the performance audit. Our preaward audit reports of the proposed contracts with Fluor Daniel were issued on June 15, 1992 (report nos. DEN-4596-2-0001 and DEN-4598-2-0001). On March 25, 1993, we issued a separate audit report covering our detailed review of costs incurred under this contract (report no. DEN-4613-3-0001).

## Purpose and Scope of Audit

The purpose of this performance audit was to (1) evaluate the causes of the significant increase in estimated contract costs for Fluor Daniel's services to the WFO and NEXRAD projects since 1986, and (2) assess the adequacy of program and contract management in controlling costs.

We identified the elements that comprised the increase in the estimated costs, traced these elements to their origins in the contract management process, and determined whether the increases were properly supported and justified. We examined the policies, procedures, and practices used to administer the contract to determine if they (1) were sufficient to control the

contract costs, and (2) complied with applicable laws, rules, regulations and other criteria that govern these types of contracts.

The scope of our performance audit spans the entire contract period from its planning stage in fiscal year 1985 through contract completion in 1992. We also reviewed the first proposal for the follow-up contract. The results of that review were included in an earlier audit report. We began our fieldwork in September 1991 and continued through July 1992. During this period, we reviewed documentation including rules, regulations, and other criteria that govern the types of services provided by Fluor Daniel; analyzed program financial and management records; and interviewed cognizant government and nongovernment officials. We performed our performance audit at the Central Administrative Support Center in Kansas City, Missouri, and at NOAA in Silver Spring, Maryland, and Washington, D.C.

Our assessment of internal controls concentrated on the policies, procedures, practices, and controls applicable to the administration of the contract. We found significant weaknesses in administrative controls that negatively affected the work and costs associated with the Fluor Daniel contract awarded in 1986. These issues are addressed in the findings and recommendations section of the report. We did not audit the internal controls designed to ensure reliability of data generated by computers because the pertinent data we reviewed was not computer-generated.

We performed certain tests of compliance with applicable laws and regulations relevant to the audit objectives to determine compliance with applicable laws, regulations and department procedures. This included testing to determine compliance with the Federal Acquisition Regulation and Office of Management and Budget circulars and policy letters. We found instances of noncompliance, which are discussed in the report.

Our audit was conducted in accordance with generally accepted government auditing standards and was performed under the authority of the Inspector General Act of 1978, as amended, and Department Organization Order 10-13, dated May 22, 1980, as amended.

## FINDINGS AND RECOMMENDATIONS

We found that the costs for services provided by Fluor Daniel have dramatically increased over the course of the National Weather Service's modernization. Contract costs increased from NOAA's initial estimate of $9 million to an estimate of $79 million. As of the completion of audit work, Fluor Daniel's own estimates were $15.2 million higher -- $94.2 million. Yet neither NOAA nor Fluor Daniel could provide sufficient documentation on the reasons for the cost increases.

We also found other serious problems in NOAA contract management and administration and a lack of oversight of Fluor Daniel's activities. For example, no independent government estimates of the costs were prepared; advisory and assistance services and real estate acquisition services were improperly procured under an A&E contract; the contractor was allowed to establish its own priorities and requirements; work assigned to the contractor was not covered by a reasonably specific statement of work or controlled by an effective change request system; new or redirected work was not adequately negotiated with the contractor; funding and costs were inadequately monitored and coordinated; and the contractor improperly provided personal services and performed inherently governmental functions.

We informed NOAA and Departmental officials of our audit findings and recommendations throughout the audit. A coordinated effort was begun to resolve the issues and actions are underway to correct most of the problems identified. Implementation of many of the recommendations contained in the draft audit report have already resulted in important cost avoidances.

### PROCUREMENT OFFICIALS SHOULD FOLLOW PROPER CONTRACT MANAGEMENT PRACTICES

We found that the Central Administrative Support Center's contracting officer[1] did not comply with procurement laws and regulations or follow sound contract management practices.

---

[1] Numerous contracting officers exercised responsibility for procurement actions during the contract period. As used in our report, the term refers to each contracting officer who took the action indicated.

---

**Contract Files Lack Sufficient Information**

The contracting officer did not include sufficient information in contract files. Part 4.8 of the FAR requires that contract files must provide a complete and accurate history of the transactions. The files should contain sufficient information to enable contracting officials and program managers to make informed decisions, maintain control over the expenditure of their program's funds, and furnish essential information for reviews, investigations, litigation, or congressional inquiries.

NOAA's estimates of the total costs rose from $9 million in 1986 to $48 million in May 1988, $71 million in April 1991, and $79 million in April 1992. Fluor Daniel proposed to continue its services through the end of the project at an even higher cost to NOAA of $94.2 million, $15.2 million more than the NOAA estimate early in 1992. Yet SEPO officials were unable to satisfactorily explain to us what specific services were acquired to account for the huge contract cost increases.

Twice we requested documentation of the reasons for the increases. In September 1991, SEPO officials provided us with a list of eight factors that caused the budget increase from $48 million to $71 million between 1988 and 1991. Examples included $5.3 million for real estate acquisition and NEXRAD program support and $6.1 million defined by Fluor Daniel as stemming from "other schedule delays." When we asked for the underlying records used to support the figures, SEPO referred us to Fluor Daniel. However, Fluor Daniel officials informed us that the figures were based only on their personal knowledge; they had not used or prepared any written financial records to support the costs.

Again in November 1991, Fluor Daniel provided us with a more detailed analysis of the professional services contract cost growth. This analysis listed 11 factors in the increases, including "facility square foot" growth and "unplanned escalation," defined by Fluor Daniel as delays due to economic analysis requirements, NEXRAD's major system contract disputes, and funding deferrals.

We were still unable to obtain adequate documentation to either fully justify or explain these factors. For instance, we were unable to determine what additional engineering work was done to justify an increase in design fees in direct proportion to the increase in office size. Neither could we determine what services they received or expected to receive as a result of program delays, which Fluor Daniel estimated to cost $3.5 million. Although some of this information

may be available in change order documentation, the system was not implemented until 1991 and proved an ineffective method for monitoring contract cost growth.

NOAA estimates that total WFO construction costs for 116 weather forecast offices will be $125 million upon completion (an average of $1.1 million per site). If NOAA had accepted Fluor Daniel's proposal for future WFO support services, WFO support service costs would total about $71 million. This equates to an average of over $600,000 per site for WFO support services, over one-half of the total site costs. (Even using NOAA's lower estimate of $64 million, the WFO support service costs would average about $520,000 per site.) Considering the simplicity of weather office design, the projected costs of Fluor Daniel's services appears unwarranted.

**Independent Government Estimate for Architectural and Engineering Effort Not Obtained**

SEPO officials did not prepare independent, detailed, government estimates of the A&E effort as required by Part 36.605 of the FAR. As a result, the contracting officer did not have sufficient information for negotiating fair and reasonable prices with Fluor Daniel. The contracting officer should have requested such an estimate before negotiating and approving the contract.

The FAR requires an independent estimate for each proposed contract or modification expected to exceed $25,000. The estimate is prepared prior to receiving the A&E cost proposal, and is based on a detailed analysis of the required work as though the government were submitting a proposal. Its purpose is to ensure that all parties understand what is needed. Although Fluor Daniel's costs and work effort increased significantly over the years, we found no evidence that SEPO developed independent estimates of need for or costs of Fluor Daniel's services after fiscal year 1986. Instead, SEPO used Fluor Daniel's historical costs and level of effort to evaluate Fluor Daniel's proposed costs and effort for new work.

**Contracting Officer Circumvented Requirements and Controls**

The contracting officer circumvented legal and FAR requirements for competitive procurements and other OMB and departmental procurement procedures by improperly adding unrelated services to an A&E contract. As a result, the contracting officer failed to ensure that the unrelated services were procured from the most qualified firm at a fair and reasonable price.

The Competition in Contracting Act and its implementing regulations in the FAR prescribe policies and procedures to promote full and open competition in the procurement process. Part 6.1 of the FAR requires, with certain limited exceptions, that contracting officers promote and provide for full and open competition in soliciting offers and awarding government contracts. Full and open competition means that all responsible sources are permitted to compete on an equitable basis. Competitive procurements are more likely to result in acquisitions from qualified firms, at fair and reasonable prices, than are noncompetitive procurements.

However, the procedures used for procuring A&E services, which are set forth in Part 36 of the FAR, do not promote or provide for full and open competition with respect to price. Instead, the government determines a fair and reasonable price for the needed services by establishing an independent government estimate and limiting fees paid to 6 percent of the estimated construction costs.[2] The contracting officer who awarded the contract used those procedures to originally award the contract to Fluor Daniel.

The contracting officer repeatedly approved modifications to the existing contract to procure unrelated services of advisory and assistance support and real estate acquisition assistance from Fluor Daniel. The contracting officer did not establish a competitive bidding procurement process in which other firms that may have provided the services were invited to submit bids.

By modifying the contract to obtain advisory and assistance services from Fluor Daniel, the contracting officer also failed to comply with required procedures for procuring advisory and assistance support under OMB Circular A-120 and Department Administrative Order 216-13. These procedures require acquisition of such services in compliance with the Competition in Contracting Act and departmental approval of agency procurements of such services above a dollar threshold ($25,000 for the Department). By applying the procedures applicable to A&E contracts, the contracting officer also bypassed this departmental control.

**Questionable Costs Included in Fee Calculation**

The contracting officer allowed Fluor Daniel to include hours worked by nontechnical personnel such as secretaries, bookkeepers, and other administrative employees, in calculating the direct

[2] The limit is set by section 304(b) of the Federal Property and Administrative Services Act of 1949, 41 U.S.C. §254(b).

---

productive hours billed by Fluor Daniel. According to Part 16.306 of the FAR, in level-of-effort contracts such as the Fluor Daniel contract, the payment of the negotiated fixed fee is contingent upon the contractor providing a specified level of direct productive hours. If the contractor does not provide the specified level, the fee is reduced proportionately.

We found that Fluor Daniel considered *all* labor hours performed at its Kansas City office, including nontechnical personnel, to be "productive" for purposes of calculating the direct productive hours billed to NOAA. We believe this could result in an overpayment of fixed fees. The contracting officer responsible for negotiating the contract and approving contractual payments exercised poor judgment by not limiting the direct productive hours to *only* those hours provided for support services. This happened because the contracting officer relied on the Defense Contract Audit Agency to identify any problems. However, DCAA's preaward audit did not take exception to the manner in which Fluor Daniel allocated, segregated, accumulated and reported costs. The contracting officer also believed that any questionable or unallowable costs paid over the course of the contract would be identified by DCAA and resolved upon completion of the contract. However, the contracting officer failed to request an audit by DCAA of incurred costs, which might have identified and questioned this practice.

**Potential Conflict of Interest Not Mitigated**

The contracting officer did not mitigate a potential organizational conflict of interest created by Fluor Daniel's management involvement in the program. According to Part 9.5 of the FAR, an organizational conflict of interest exists when the nature of the work performed may, without some restriction on future activities, (a) result in an unfair competitive advantage for the contractor or (b) impair the contractor's objectivity in performing the contract work. In our opinion, allowing the same contractor to perform both program planning and support work, as well as the subsequent A&E work, is not in the best interest of the government because the contractor's objectivity may become impaired when performing the contract work.

Nevertheless, as part of their program management functions, Fluor Daniel assisted SEPO and the weather service in defining and planning the facilities program's future work and budget requirements. Fluor Daniel worked with NOAA in developing program priorities and then provided the future contract requirements, estimated level of effort, and estimated costs for accomplishing those priorities. Fluor Daniel developed design and construction schedules used by the weather service's program manager and the SEPO's engineers to ensure that the offices were completed on time. In turn, Fluor Daniel through task orders, modifications, and change

orders, was assigned the work they had previously planned and budgeted. Fluor Daniel also assisted the COTR and contracting officer in preparing the solicitation package and statement of work for the follow-on A&E contract that NOAA planned to award to Fluor Daniel. The FAR requires that, under the above situation, the contracting officer take the necessary actions to resolve or mitigate the conflict.

## EFFECTIVE MANAGEMENT NEEDED OVER CONTRACTOR PERFORMANCE

Part 36.609-3 of the FAR requires "oversight, supervision, direction, control, and approval" by the contracting officer of the extent and character of the work done by the contractor. During our review we found that the support center's contracting officer and the SEPO officials who acted as the contracting officer's technical representatives did not exercise these responsibilities with respect to the contractor's performance and costs. Neither did they negotiate the addition of new or redirected work, as required by Part 15 of the FAR.

### Statement of Work Did Not Limit Specific Work Assignments

The contracting officer issued a statement of work in the original contract that contained no specific work requirements; described services in broad terms such as "attend meetings" and "accomplish all necessary engineering effort;" and referred to services, such as NEXRAD program support and real estate acquisition support, that were not negotiated during the award process. By including these all-encompassing terms and casual interpretations of work requirements in the contract, the contracting officer permitted the COTR to add millions of dollars in new or redefined services through the issuance of task orders, as discussed below. These services included NEXRAD program support, real estate acquisition, cost/benefit analysis, and additional conceptual and redesign work. According to the contracting officer this was not "scope creep" but simply "the redefinition of work assignments." As a result, Fluor Daniel's level of effort increased by more than 100,000 hours per year over the original annual estimate and contract costs rose continuously.

### Work Priorities and Requirements Set by Contractor

The contracting officer allowed Fluor Daniel to establish its own estimated budget, program priorities and work requirements through the use of task orders. The contracting officer, COTR, and the facilities program manager described the procedures which were used in issuing task orders under the contract as follows:

Towards the end of each fiscal year, Fluor Daniel would provide SEPO with the budget estimate for the next fiscal year's task order. According to senior SEPO officials, this estimate was

---

based upon what Fluor Daniel determined it would need to complete the design and construction program schedule that Fluor Daniel produced under its program management function.

SEPO would send this estimate to the weather service, which in turn issued a requisition for that amount to the contracting officer. The contracting officer would then give Fluor Daniel the amount available for the year along with a general set of work requirements such as "Perform program management functions."

In response, Fluor Daniel generated a several-thousand-item work plan describing in great detail what it planned to do during the year. The contracting officer issued the work plan, which had been prepared on Fluor Daniel letterhead, as the annual task order. The contracting officer then sent a copy of this plan to the COTR, who gave the plan to the assistant COTRs with instructions that this would be the year's "statement of work."

Thereafter, the contracting officer failed to limit the work to that assigned in the task orders. According to documentation found in the contract file (including a memorandum from the head of the support center's Procurement Division), the contracting officer allowed Fluor Daniel to accept verbal changes in work assignments, including assignments from unauthorized personnel, without monitoring or documenting the changes.

For all practical purposes, contract work priorities and requirements were set by Fluor Daniel without effective oversight by NOAA employees. We found little evidence of critical review by NOAA employees of Fluor Daniel's cost estimates or proposed work plan during the contract.

## Change Request System Ineffective and Costly

To improve control over work assignments, the contracting officer implemented a change request system in April 1991. We found little evidence, however, that this system has actually improved NOAA's oversight or direction of Fluor Daniel's work.

The support center issued over 200 change orders from April 1991 through September 1992. These ran the gamut from preparing slides for a presentation to agreeing to reimburse Fluor Daniel $45,000 to assist NOAA in preparing for a WFO program status meeting with members of our staff. We reviewed most of the change orders and found that Fluor Daniel identified the work requirements, prepared the change orders, developed the work statements, and established

the costs. Moreover, documentation attached to these change orders indicated that support center officials rarely questioned the need for or the costs of the services. The contracting officer's approval was, in our opinion, a mere formality since only a few change orders were ever disapproved.

The system also proved costly to maintain. Fluor Daniel estimates its extra cost to prepare and control the system's paperwork at over $1 million through 1996.

**Costs for New or Redirected Work Not Negotiated or Audited**

We reviewed the change orders and found that the contracting officer approved millions of dollars in new or redirected work to the existing contract without adequately negotiating either the level of effort or the costs proposed, as required by the FAR.

Part 15.8 of the FAR requires that contracting officers purchase services from responsible sources at fair and reasonable prices. Price negotiation is intended to permit the contracting officer and the contractor to agree on a fair and reasonable price. The price negotiation should be based on the contracting officer's analysis of the contractor's proposed costs and, at a minimum, a technical assessment of the labor mix and the number and kinds of labor hours proposed.

According to the support center officials, they planned to use audits of incurred costs by the Defense Contract Audit Agency upon the completion of the contract to identify any improperly charged costs. However, no audits of incurred costs had been requested as of the date of our review. Moreover, these audits are limited in scope and do not determine whether the costs incurred are fair and reasonable.

**Work Products Not Independently Approved or Monitored**

The COTR and assistant COTRs allowed Fluor Daniel to review its own technical products and identify its own mistakes. The contracting officer delegated to the COTRs the responsibility for reviewing and ensuring that Fluor Daniel performed the technical requirements in accordance with contract terms, conditions and specifications. Yet according to SEPO officials, they have no formal procedures for approving Fluor Daniel's work products. Moreover, we found little

evidence that the COTRs analyzed the contractor's level of effort to determine if it was reasonable for the work produced. For instance, although the COTRs established an engineering master plan to guide Fluor Daniel in its design work, we found no indication that they monitored Fluor Daniel's performance against the plan. As a result, the COTRs did not ensure the adequacy of Fluor Daniel's work.

**Costs Not Adequately Tracked to Tasks or Work Performed**

Support center officials did not adequately monitor Fluor Daniel's costs to ensure that they accurately reflected the work performed or stated in the task orders. Although the contractor submitted financial status reports, these reports did not provide sufficient detail for a thorough evaluation. For instance, monthly reports contained only total amounts such as total labor for the month. Thus the contracting officer was unable to readily assess the accuracy of the costs, compare the costs to progress made, or determine whether the program costs and work were on target.

**Contractor Performed Inherently Governmental Functions**

Support center personnel treated Fluor Daniel employees as if they were an extension of the SEPO staff. The contract was administered as if it were a contract for personal services which allowed the contractor to perform inherently governmental functions. According to FAR Part 37 and federal personnel laws (5 U.S.C. §3109), agencies are prohibited from using personal services contracts unless specifically authorized by statute. OMB Circular No. A-76 also prohibits contractors from performing certain types of services that are so intimately related to the public interest as to mandate performance by government employees.

Nevertheless, SEPO assigned work to Fluor Daniel that required direct government supervision of Fluor Daniel employees and resulted in a contractor making program decisions that should have been made by federal employees. For instance, the NEXRAD program is managed by a joint system program office comprised of representatives from the Departments of Commerce, Transportation, and Defense. A Fluor Daniel employee acted on behalf of the Department of Transportation as their representative to this office. In another instance, a Fluor Daniel employee acted as an integral part of NOAA's team in the negotiation of the comprehensive settlement of the NEXRAD major system contract. He coordinated the presentation of financial

---

information used by the government's negotiators and weather service officials in developing the government's negotiating position and policy decisions. He worked directly with the government's negotiator. SEPO also gave Fluor Daniel responsibility for obtaining and negotiating prices for the land needed to build radar sites and weather forecast offices. A subsequent audit revealed that SEPO gave Fluor Daniel responsibility for procuring many of the leases for the WFOs. Fluor Daniel conducted market surveys, prepared solicitations and leases, reviewed offers, and negotiated with offerors with little oversight from the SEPO real property officer.

Fluor Daniel considered itself an extension of the SEPO staff. At facility program meetings, program tasks were assigned to "SEPO/FDI." Program documentation referred to "SEPO/FDI" to such an extent that we could not distinguish where SEPO's responsibilities ended and the contractor's began. Fluor Daniel employees are included in NOAA's internal electronic mail system.

The range of Fluor Daniel's activities extended to virtually every aspect of the WFO construction program. Fluor Daniel reviewed policies and developed strategies that affected the program's priorities and budget. For instance, Fluor Daniel performed the economic analyses used in determining whether to lease or build new weather forecast offices. Fluor Daniel personnel also developed WFO budget figures, including the estimated costs for its own professional services, and made budget presentations to the Department's budget officials. Fluor Daniel maintained most of the corporate knowledge concerning the WFO project status and costs and kept most of the program records and documents for SEPO. We understand that Fluor Daniel provided the responses for many of our audit inquiries during the course of our audit.

By allowing Fluor Daniel personnel to perform inherently governmental functions, NOAA and NWS officials, in effect, surrendered control of the WFO construction program to Fluor Daniel.

OMB's Office of Federal Procurement Policy recently issued new procurement guidance relating to inherent government functions. According to the new guidelines, these functions require the use of discretion or judgment in decisions or fund expenditures. Examples include (1) determining Federal program priorities or budget requests, (2) determining what property or services are to be acquired by the government, (3) approving any contractual documents to include documents that define requirements, incentive plans, and evaluation criteria, and (4) administering contracts, including the ordering of changes in contract performance and evaluating performance. Moreover, the new guidance further requires strong management

controls and additional oversight for functions that can approach inherent government functions because of the way the contractor performs the work or the manner in which the government administers that performance. Examples include services which involve planning activities or which relate to analyses and strategy options used by agency personnel in developing policy.

The purpose of these new policies is to provide proper accountability, ensure that final agency actions reflect the conclusions of government officials, and ensure compliance with the laws and policies of the United States. Government agencies must maintain control over decisions which commit the government to a course of action.

---

## RECOMMENDATIONS

We recommend that the Director, Transition Program Office and Director, NOAA Office of Administration instruct the contracting officer and program officials with responsibility for the WFO and NEXRAD projects to take the following action:

1. Relating to the contract instruments for Fluor Daniel's services:

    a. Consider splitting out A&E work, advisory and assistance work, real estate acquisition, and other unrelated services into separate contract instruments.

    b. Specify that the direct labor hours used for determining the level of effort and fee are based on technical and not administrative functions.

    c. Include specific procedures for preparing and issuing task orders that will ensure task orders are prepared and issued by the government based on established priorities and requirements.

    d. Include specific requirements that incurred cost information be provided in sufficient detail to enable the contracting officer to match costs with the level of effort and work performed.

2. Relating to preparation for contract negotiations:

    a. Obtain the Department's approval for the advisory and assistance portion of the contracts.

    b. Mitigate any organizational conflicts of interest in the source selection process.

    c. Follow the new policies and guidance on inherently governmental functions and managing service contracts recently issued by OMB. (Circulars A-76 and A-120 have been revised.)

3. Relating to future management:

   a. Reevaluate NOAA's projected level of Fluor Daniel support services and, if possible, reduce the projected level, justify the level of proposed expenditures for Fluor Daniel before awarding and implementing the contracts and commit to limiting contract costs to approved levels.

   b. Develop independent government estimates (not based on Fluor Daniel's historical costs, level of effort, or labor mix) to use as the basis for negotiating the contracts, task orders, modifications, and change requests.

   c. Assess the status of the WFO and NEXRAD projects for use in developing future contract requirements and statements of work.

   d. Have a more precise statement of work to outline categories of tasks and limit the types of services that can be acquired.

   e. Improve the Fluor Daniel change request system to ensure that only appropriate services are acquired, requests follow established procedures, and costs are negotiated. Control the system in the appropriate program offices in NWS.

   f. Have enough staff to oversee Fluor Daniel and the WFO and NEXRAD projects (Fluor Daniel could provide support).

   g. Formalize the responsibilities and duties for the various organizations involved in the two projects. This should include limiting direct involvement in design decisions to designated employees. Decisions and questions affecting the program should be directed to the appropriate program offices in NOAA and not to Fluor Daniel in accordance with revised OMB guidance on the performance of inherently governemental functions.

   h. Separate Fluor Daniel support services budget formulation from Fluor Daniel.

i. Have government employees negotiate real estate acquisition and construction contracts.

j. Maintain an adequate distance from Fluor Daniel personnel, so that Fluor Daniel is no longer perceived as an extension of the SEPO staff.

4. Relating to contract administration:

a. Issue multiple task orders that define the specific work needed, are based on known requirements, and that specify the deliverables and completion times.

b. Discontinue using Fluor Daniel's 2,800 item work plan as the basis of the task order and contract administration.

c. Obtain audits of incurred costs at specific intervals rather than waiting to the end of the contract.

d. Negotiate all modifications and changes in work, level of effort, or costs prior to issuance to Fluor Daniel.

e. Review invoices, progress reports, and financial reports.

f. Maintain complete, auditable contract files.

g. Periodically match obligations and incurred costs to work performed and level-of-effort.

h. Make NWS's own budget and program presentations to high-level officials and not use Fluor Daniel employees to present and justify program and budgetary strategies and requests.

## Funds to be Put to Better Use

The NOAA estimate to complete the WFO construction portion of the Fluor Daniel contract was approximately $33 million as of October 1992. Without the timely management changes instituted by NOAA and improvements in the new contract as a direct result of this audit, it is probable that the actual cost to complete would have exceeded $40 million, $7 million more than the October 1992 estimate. With the new management controls and rigorous oversight imposed in response to the audit, NOAA anticipates that cost avoidance of an additional 10 percent of the estimate could realistically be achieved, providing an additional savings of $3 million. Therefore, the total cost to complete is now estimated at approximately $30 million, with $10 million in funds to be put to better use because of the timely action taken by NOAA.

## NOAA Comments and OIG Response

Due to the length of NOAA's response to our draft audit report we have included a summary of NOAA's comments and our analysis as Appendix III.

---

## CORRECTIVE ACTIONS IMPLEMENTED BY NOAA

Beginning in June 1992, NOAA management officials and OIG auditors began a coordinated effort to resolve the issues identified during the audit fieldwork. As a result, NOAA officials undertook an aggressive recovery effort. Actions taken by NOAA included reassigning the award and administration of the proposed new contract for the WFO construction project to NOAA's Procurement Operations Division in Silver Spring, Maryland. By locating the contract closer to NOAA headquarters, the Department will be able to continue working with the new Fluor Daniel contract team, and provide the structured oversight and training necessary to ensure that the contract is adequately administered and managed.

NOAA awarded the new NEXRAD support service contract to Fluor Daniel with the commitment that the contract will be reviewed and revised in accordance with the conditions of the new WFO support contract. At our urging, NOAA deferred award of the WFO support contract until the contract could be better defined and administered in accordance with our recommendations. An interim letter contract was awarded to bridge the gap between the expiration of the prior contract and the award date of the new support contract.

We expressed our concerns about the Fluor Daniel contract cost growth and NOAA contract administration throughout the audit and in a memorandum to the appropriate NOAA and Departmental officials on September 30, 1992. NOAA officials replied on November 17, 1992, and agreed to address those concerns, as well as documenting substantial corrective actions already completed. This report formally documents our findings and recommendations expressed in our September 30 memorandum and allows for audit resolution and follow-up as appropriate.




FIGURE 6.12.4 - FURNITURE/EQUIPMENT PLAN--FY91I-12/2/1 - POST DUAL OPS (OPTION A)



FIGURE 6.12.6 - FURNITURE/EQUIPMENT PLAN--FY91I-14/4/2
- POST DUAL OPS (OPTION A)



FIGURE 6.12.8 - FURNITURE/EQUIPMENT PLAN--FY911-18/1/2 - POST DUAL OPS (OPTION A)

Appendix II
Page 1 of 2





## SUMMARY OF NOAA RESPONSE AND OIG COMMENTS

The following is a summary of NOAA's response to the draft report's findings and recommendations, and our comments. Page references are to pages in the draft report; references to pages in the final report have been added where necessary.

NOAA's General Comments:

[redacted]

OIG Analysis:

We agree to this request. NOAA has made strides toward improving its management and administration of the Fluor Daniel contract.

The following discusses specific points raised by NOAA's response.

1. Page i, draft report, Executive Summary, first bullet, read:

**"Fluor Daniel's estimates are $94.2 million, $15.2 million higher than NOAA's estimates."**

[redacted]

OIG Analysis: We believe our method of computing the cost savings figure was sound. Our cost savings of $15.2 million was justified by the audit which identified significant problems with management of the FDI contract and TPO's assurance that it would stay within its budget. Our use of FDI's proposal is proper. It was a legitimate proposal submitted at CASC's request after FDI won a competitive procurement to obtain the follow-on contract. The fact that this proposal is no longer valid is a direct result of our audit work.

Nevertheless, we recognize that these figures are only estimates. NOAA's estimate for only the WFO program's portion of the savings is $10 million. We agree to accept this amount and have amended the report accordingly.

2. Page i, Executive Summary, third bullet, read:

> "circumvention of requirements for competitive procurement and departmental controls by adding unrelated services to an architectural and engineering contract."

NOAA Response: [redacted]

OIG Analysis: We disagree with NOAA; the contracting officer acted improperly by adding millions in such unrelated services as real property acquisition and NEXRAD major systems support to the contract. In addition, FAR Part 36 states that incidental services cannot be the dominant service on the A&E contract. In this instance, the incidental services added by the contracting officer exceeded A&E services by millions of dollars.

3. Page i, third paragraph, fourth bullet, read:

> **"Inappropriate inclusion of administrative functions in direct hours to allow Fluor Daniel to meet the contractual requirements to earn the fixed fee. (See page 7.)"**

NOAA Response: [redacted]

OIG Analysis: We agree and have revised the report accordingly.

4. Page 2, last paragraph, read:

> **"The scope of our performance audit spans the entire contract period from its planning stage in fiscal year 1985 through proposed contract completion in 1999. This includes the services provided under the existing Fluor Daniel contract and proposed new Fluor Daniel contracts for support services for the**

WFO and NEXRAD projects. We began our fieldwork in September 1991, and continued through July 1992...."

NOAA Response: [redacted]

OIG Analysis: We revised our audit report to more clearly define the scope of our audit.

5. Page 4, paragraph 2, read:

**"We also found other serious problems in NOAA contract management and administration and a lack of oversight of Fluor Daniel's activities. For example, no independent government estimate of the costs were prepared; advisory and assistance services and real estate acquisition services were improperly procured under an A&E contract; the contractor was allowed to establish its own priorities and requirements; work assigned to the contractor was not covered by a reasonably specific statement of work or controlled by an effective change request system; new or redirected work was not adequately negotiated with the contractor; funding and costs were inadequately monitored and coordinated; and the contractor improperly provided personal services and performed inherently governmental functions."**

NOAA Response: [redacted]

OIG response: NOAA's interpretation of inherent government functions is too limiting. OMB's new guidelines require officials to maintain accountability over their programs by exercising judgment and critically examining ideas, recommendations, and advice provided by contractors. Our audit clearly shows that NOAA officials did not maintain this level of accountability in its dealings with FDI.

6. Page 5, paragraph 4 (paragraph 5 in the final report), read:

**"We were still unable to obtain adequate documentation to fully justify or explain these vaguely phrased factors from weather service personnel who manage the WFO facilities program and who are accountable for the programs's expenditures. For instance they could not tell us what additional engineering work was done to justify an increase in design fees in direct proportion to the increase in office size. Neither could these officials tell us**

what services they received or expected to receive as a result of program delays, which Fluor Daniel estimated to cost $3.5 million.

NOAA Response: [redacted] sts.

OIG analysis: NOAA misunderstood our finding; the finding did not address a lack of a paper trail. Prior to our audit, NOAA provided us with figures to support the contract cost increases. When we requested NOAA's support for and an explanation of these figures, NOAA responded that they were unable to comply because the figures had been prepared by Fluor Daniel. Subsequently, we obtained the contractor's financial records, reviewed change orders, and examined progress reports. However, we maintain that since NOAA's contracting officials provided us with the cost figures, it was also their responsibility to know how these figures were derived. In fact, NOAA's inability to justify the contract cost increases played a major role in our decision to perform a detailed audit of the contract. Nevertheless, we revised the final report to clarify our position and include a reference to NOAA's change order procedures.

7. Page 5, last paragraph (page 6, first full paragraph in the final report), fifth sentence, read:

> **"Considering the simplicity of weather office design, the projected costs of Fluor Daniel's services appears unwarranted."**

NOAA Response: [redacted] the

OIG Analysis: NOAA's response does not address the audit finding. We are concerned with the extraordinarily high percentage of administrative-type costs incurred by NWS to build 4,500-5,800 square foot, single-level facilities. The costs for the support services provided by Fluor Daniel have grown from an estimated $9 million to $79 million, of which $64 million is for WFO construction support. The program management and unanticipated costs referred to in NOAA's response contributed heavily to this cost increase. We find it incomprehensible that NOAA could allow the costs of the Fluor Daniel contract to grow to such an extent or justify spending this amount of money to manage and administer a program where land and construction costs of facilities are approximately $125 million.

Furthermore, their response shows a lack of understanding concerning GAO accounting standards which require full cost accounting and would preclude excluding program management and similar types of costs. We also note that the Office of Inspector General does not consider the design fee issue resolved or closed.

8. Page 6, third paragraph (fourth paragraph in the final report), read:

> **"The contracting officer circumvented legal and FAR requirements for competitive procurement by improperly adding unrelated services to an A&E contract. As a result, the contracting officer failed to ensure that the unrelated services were procured from the most qualified firm at a fair and reasonable price."**

NOAA Response: [redacted]

OIG Analysis: We found no evidence of any actions the contracting officer took to ensure that maximum competition and fair and reasonable prices were obtained. Moreover, we are unable to understand how a contracting officer could let a contract grow from $9 million to $35 million with another $58 million proposed for the follow-on contract and still maintain that he maximized competition and obtained fair and reasonable prices.

9. Page 6, sixth paragraph (page 7, second paragraph in the final report), read:

> **"However, the procedures used for procuring A&E services, which are set forth in Part 36 of the FAR, do not promote or provide for full and open competition with respect to price. Instead, the government determines a fair and reasonable price for the needed services by establishing an independent government estimate and limiting fees paid to 6 percent of the estimated construction costs."**

NOAA Response: [redacted] to [redacted]

OIG Analysis: We commend NOAA on taking action to limit design fees to the statutory limit. However, this finding concerns the millions of dollars of other services added to the contract. While NOAA may not have acted willfully or purposely to avoid

competition, the effect of its actions are the same, circumvention of competition requirements.

10. Page 8, "Potential Conflicts of Interest Not Mitigated"

NOAA Response: [redacted]

OIG Analysis: Based on the subsequent documentation sent to us by the contracting officer we agree to delete the appropriate portion of this finding.

11. Page 11, next to last paragraph (last paragraph in the final report), third sentence, read:

> **"We reviewed most of the change orders and found that Fluor Daniel identified the work requirements, prepared the change orders, developed the work statement, and established the costs."**

NOAA Response: [redacted]

OIG Analysis: Simply because FDI performed these activities at the request of SEPO does not make these activities proper. These are inherently governmental functions which should not be assigned to a contractor. Moreover, by assigning them to FDI, the contractor who in turn will be performing the work, NOAA has placed itself in an improper organizational conflict of interest situation.

12. Page 12, second paragraph (third paragraph in the final report), read:

> **"Part 15.8 of the FAR requires that contracting officers purchase services from responsible sources at fair and reasonable prices. Price negotiation is intended to permit the contracting officer and the contractor to agree on a fair and reasonable price. The price negotiation should be based on the contracting officer's analysis of the contractor's proposed costs and, at a minimum, a technical assessment of the labor mix and the number and kinds of labor hours proposed."**

NOAA Response: [redacted]

OIG Analysis: We agree that the contracting officer may have performed some analysis to justify contract modifications. However, the contracting officer did not perform any cost analysis or negotiate millions of dollars in work added to the contract under the change order system.

13. Page 12, fourth paragraph (last paragraph in the final report), first sentence, read:

> **"The COTR and assistant COTRs allowed Fluor Daniel to review its own technical products and identify its own mistakes."**

NOAA Response: [redacted] cts.

OIG Analysis: FAR Part 46.105 refers to a firm's internal quality control requirements and does not alleviate the necessity for the Government to perform its own quality assurance required by FAR 46.102. In addition, while NOAA may have the necessary evaluation tools, we found no evidence that they used them to approve or monitor FDI's work efforts.

14. Page 13, last paragraph (page 14, second paragraph in the final report), first sentence, read:

> **"Nevertheless, SEPO assigned work to Fluor Daniel that required direct government supervision of Fluor Daniel employees and resulted in a contractor making program decisions that should have been made by federal employees."**

NOAA Response [redacted]

OIG Analysis: We believe that more than the appearance of direct supervision existed. In one instance, an FDI employee temporarily took the place of a federal employee and performed the work normally assigned that employee. In the other instance an FDI employee was a key member of a government team of negotiators.

15. Page 14, first full sentence (fifth sentence in the final report), read:

"He coordinated the presentation of financial information used by the government's negotiators and weather service officials in developing the government's negotiation position and policy decisions."

NOAA Response: [redacted]

OIG Analysis: NOAA's description of the FDI employee's responsibilities does not coincide with on-site auditors who observed that the individual was one of the key members of the government's negotiation team. In addition, NOAA's use of the FAR's A&E provision to justify using this individual is inappropriate since his assignment involved renegotiating a major system contract and had nothing to do with A&E or related services.

16. Page 15, (page 20 in the final report), second paragraph, read:

**"The Department and NOAA awarded the new NEXRAD support services contract to Fluor Daniel with the commitment that the contract will be reviewed and revised in accordance with the conditions of the new WFO support contract. At our urging, NOAA deferred award of the WFO support contract until the contract could be better defined and administered in accordance with our recommendations. An interim letter contract was awarded to bridge the gap between the expiration of the prior contract and the award date of the new support contract."**

NOAA Response: [redacted]

[redacted]

APPENDIX III

OIG Analysis: We discussed this issue with the Director of the Transition Program Office who agreed we should leave the paragraph as it was originally written. We made one revision deleting the reference to the Department.

17. Page 16 "RECOMMENDATIONS," read:

> **"We recommend that the Deputy Secretary for Oceans and Atmosphere instruct the contracting officer and program officials... to take the following action:"**

NOAA Response: [redacted]

OIG Analysis: We revised the report to indicate that the recommendations are directed to NOAA's Transition Program Office and the Office of Administration since NOAA has already taken action to implement the recommendations.

18. Page 18, final two paragraphs on page (page 19 of the final report), read:

> **"Throughout the period of the audited contract, NOAA's cost estimates for Fluor Daniel's services continually understated actual costs because the estimates did not consider the ever-increasing level of effort provided by Fluor Daniel. Instead, Fluor Daniel's proposals for support services eventually served as the basis for determining contract costs. As of the completion of our audit work, Fluor Daniel's cost estimates for its services ($94.2 million) were $15.2 higher than the budget estimates prepared by NOAA ($79 million).**
>
> **If the recommendations in this report are implemented, Fluor Daniel's level of effort should be more narrowly defined in advance of their undertaking the work. Moreover, the management improvements we recommend should help the NWS program office to provide improved project and contract management over Fluor Daniel personnel. By limiting Fluor Daniel's services to those defined in the new contracts, total costs should be within the NOAA budget estimates, and NOAA should save as much as $15.2 million. We will determine the amount of savings when the new contract for WFO support services is awarded."**

NOAA Response: [redacted]

OIG Analysis: We amended the final report to refer to SEPO and PGAS as well as the National Weather Service since NWS's Transition Program Office manages the program that FDI supports. We have addressed our comments concerning the cost savings under item 1. Our office and NOAA agreed to amend this section based on a new estimate of cost savings.

19. NOAA Response: [redacted]

OIG Analysis: We commend NOAA on taking action to resolve the contract management and administration problems identified in this report and look forward to maintaining this working relationship during future audits.

# FEDERAL PROPERTY AND ADMINISTRATIVE SERVICES ACT OF 1949

*For text of Act see p. 372*

Senate Report No. 338, May 9, 1949 [To accompany S. 1809]

Senate Report No. 475, June 8, 1949 [To accompany S. 2020]

House Report No. 670, May 24, 1949 [To accompany H. R. 4754]

Conference Report No. 935, June 28, 1949 [To accompany H. R. 4754]

The House Bill was passed in lieu of the Senate Bills and the House Report is more comprehensive than the Senate Reports.

The Conference Report also set out outlines changes to the bill accepted by the Conference.

*House Report No. 670*

THE Committee on Expenditures in the Executive Departments, to whom was referred the bill (H. R. 4754) to simplify the procurement, utilization, and disposal of Government property, to reorganize certain agencies of the Government, and for other purposes, having considered the same, report favorably thereon with amendment and recommend that the bill, as amended, do pass.

## DEVELOPMENT IN FIELD OF PROPERTY MANAGEMENT

The need for an improved and efficient property management program, dealing with the problems facing the Federal Government in this respect, is becoming ever more apparent. The House with the passage of a bill in 1943 (H. R. 2795) took the initial step toward the recognition and solution of this complex phase of government. However, the Congress deferred action on that legislation, owing to the pressing necessity of disposal of war-surplus goods without dislocating the national economy. Instead the Surplus Property Act of 1944 was passed. This act had for its major purpose the handling of our war-generated surplus, with a limited lifetime of 3 years following the date of cessation of hostilities. This act will terminate on December 31, 1949.

The President, by special message dated March 5, 1948, recommended to the Congress renewed consideration of legislation in the field of property management. With this in mind, the Federal Works Administrator was directed to draft for evaluation a bill to effect such purpose. This bill, termed "The Federal Property Act of 1948" (S. 2754, 80th Cong.) was unanimously reported out by the Senate Committee on Expenditures in the Executive Departments, and would have established a sound system for property management. This bill was never taken up by the Senate prior to adjournment because of the pressure of other matters.

is deemed advisable. The question as to whether a particular bidder is a responsible bidder requires sound business judgment and involves evaluation of the bidder's experience, facilities, technical organization, reputation, financial resources, and other factors and a broad discretion is accordingly reserved to the agency with respect to the making of such determination.

Section 304. Requirements of negotiated contracts

(a) The right to use the most suitable type of contract is a necessary and inseparable adjunct to the right to negotiate and this subsection therefore permits negotiated contracts to be of any type which in the opinion of the agency head will promote the best interests of the Government, except as provided in subsection (b). Authority to negotiate contracts in the first instance carries with it equal authority to negotiate subsequent changes in the terms of negotiated contracts, and such amendments may also be of such type as the agency head believes will promote the best interests of the Government. This subsection also provides that every negotiated contract shall contain a suitable warranty against contingent fees.

(b) This subsection prohibits the cost-plus-a-percentage-of-cost system of contracting and prescribes maximum fees in connection with cost-plus-a-fixed-fee contracts. Neither a cost nor a cost-plus-a-fixed-fee contract nor an incentive-type contract may be used unless it is determined that such method is likely to be less costly than other methods or that it is impracticable to secure supplies or services of the kind or quality without the use of such type of contract.

Section 305. Advance payments

(a) This permits the agency head to make advance payments under negotiated contracts upon adequate security if the agency head determines such payments to be in the public interest or in the interest of the national defense and necessary and appropriate in order to procure the required supplies or services. This authority is essential in periods of emergency and in peacetime it is often the only way in which it can be made possible for a small-business concern to handle Government contracts. Often institutions of learning, research laboratories, inventors, and similar contractors who perform most of the experimental, re-research, and developmental contracts need advance payments because they do not have sufficient funds to finance or are unwilling to finance such contracts completely out of their own resources. The power to make advance payments is permissive only, and under section 307 (b) of this title may not be delegated by the agency head. The committee expects the civilian agencies to be very sparing in the making of advance payments in normal times and to use the authority, even in times of national emergency, only when it is thoroughly justified.

(b) The additional form of security by way of lien which is provided for by this subsection is a permissive feature which may be very useful,

JACK BROOKS, TEX., CHAIRMAN
WILLIAM S. MOORHEAD, PA.
WILLIAM J. RANDALL, MO.
DANTE B. FASCELL, FLA.

OGDEN R. REID, N.Y.
FLETCHER THOMPSON, GA.
MARGARET M. HECKLER, MASS.

CAPITOL [illegible]

NINETIETH CONGRESS

# Congress of the United States

## House of Representatives

GOVERNMENT ACTIVITIES SUBCOMMITTEE
OF THE
COMMITTEE ON GOVERNMENT OPERATIONS
RAYBURN HOUSE OFFICE BUILDING, ROOM B350-B
WASHINGTON, D.C. 20515

November 16, 1967

The Honorable Elmer B. Staats
Comptroller General of the
United States
Washington, D. C. 20548

Dear Mr. Staats:

Your April report relating to architect-engineer (A-E) fees has been referred to this Subcommittee for review. In your report you suggest that:

1. Federal agencies have misinterpreted the extent of the services covered by the 6 percent statutory limitation Congress has placed on A-E fees.

2. Federal agencies do not award A-E contracts under procedures you consider clearly in compliance with applicable statutes requiring "competitive" negotiation. You object that the amount to be paid as fee is not considered in the initial stage of the selection process when the agency ranks various A-Es according to relative capability to perform the particular project preliminary to negotiating with them in the order of their qualifications.

3. Many Federal agencies fail to consider all A-E firms that might be qualified and, therefore, "within the competitive range" as required by statute, and do not negotiate on the basis of cost (as distinguished from references to the cost of A-E services stated in terms of percentages of estimated project cost) in determining the amount of the A-E fee.

You recommend that Congress:

1. Repeal the "arbitrary" 6 percent fee limitation on A-E fees because they are unsound and unworkable, and

2. Clarify by legislation whether the negotiation of such contracts should be the subject of or an exception to what you consider to be the general intent of the law requiring "competitive" negotiation; that is, where the amount the A-E is to receive as a fee is considered in determining the relative qualifications of the A-Es during the initial stage of the selection process.

2 - The Honorable Elmer B. Staats November 16, 1967

Interpretation of Statutes Relating to the 6 Percent Limitation

The conclusions in your report stem from an interpretation of five statutes. Three of these are early statutes dealing individually with the Navy, Army, and Air Force, limiting A-E fees to 6 percent. The other two statutes are the subsequently enacted Armed Services Procurement Act of 1947 and the Federal Property and Administrative Services Act of 1949, dealing with Defense and civil agencies respectively.

Congress, in 1939, imposed a limitation on fees to be paid under A-E contracts of 6 percent of the estimated construction cost for "the production and delivery of the designs, plans, drawings, and specifications required for the accomplishment of any Naval public works or utilities project" (10 U.S.C. 7212). The same limitation embodying the same description of the services to be covered was then extended to the Army (10 U.S.C. 2540) and the Air Force (10 U.S.C. 9540).

In 1947, Congress enacted the Armed Services Procurement Act providing the defense establishment with a comprehensive procedure for the procurement of goods and services. This statute forbade the use of cost-plus-a-percentage-of-cost contracts, and, among other things, set limitations on the fees to be paid under various general types of cost-plus-fixed-fee contracts:

for experimental, developmental and research work, the limitation was 15 percent of the estimated cost of the contract;

on cost-plus-fixed-fee contracts for "architectural or engineering services for a public work or utility" the 6 percent limitation expressed in the earlier statutes was maintained;

fees on other types of cost-plus-fixed-fee contracts were set at not more than 10 percent.

In 1949, Congress extended the same general procurement concepts as outlined above to the civil side of Government by enactment of Title II of the Federal Property and Administrative Services Act. As in the Procurement Act of 1947, the work subject to the 6 percent limitation was described as "architectural or engineering services" as contrasted to the "production and delivery of the designs, plans, drawings, and specifications" as contained in the earlier statutes dealing with the Army, Navy, and Air Force.

Up until the time of your report, most Federal agencies have interpreted the term "architectural or engineering services" as used in the 1947 Procurement Act and the 1949 Property Act as having comparable application as the limitation contained in the three earlier statutes. Other types of work A-Es performed not relating directly to the basic services described in detail in the earlier statutes have not been considered as coming within the 6 percent limitation. As indicated in your report, there have been numerous instances where the total amount paid to A-Es relating to some particular public work or utility exceeded 6 percent.

It is your conclusion that the term "architectural or engineering services," as used in the 1947 Procurement Act and the 1949 Property Act, has a broader meaning than the description of the limitation imposed by the earlier statutes. You suggest that this subsequent language extended the limitation to cover all A-E services performed regarding any particular public work or utility.

We cannot agree with your interpretation of these statutes. It is the Subcommittee's opinion that the present statutes relating to A-E fees are clear and unambiguous. Under our interpretation of the law, there is at present a 6 percent limitation on the fees of architect-engineers relating to the "production and delivery of plans, drawings, and specifications." Regarding the Department of Defense, the earlier statutes apply to all type contracts and the 1947 Procurement Act makes it clear that the limitation also applies to cost-plus-fixed-fee contracts, notwithstanding the other fee limitation provisions that statutes might contain.

The 1947 Procurement Act did not alter the nature of the services included within the limitation. Your report, starting at page 47, contains an exhaustive statement of the law in support of the premise that recodification does not alter the meaning of statutes. There is no evidence that the switch from the language describing the limitation as extending to the "production and delivery of plans, designs, drawings, and specifications" to "architectural or engineering services" was anything more than a simplification of the language of an earlier statute. Had Congress intended to alter the meaning of the limitation, some vestige of this intent would have been manifest. Certainly the earlier statutes applying to the Navy, Army, and Air Force would either have been repealed or they would have been amended so as to conform to the new description of the services Congress had in mind in the enactment of the 1947 statute.

In 1947, Congress enacted a comprehensive, detailed procedure for the negotiation of defense contracts. It was concluded that statutory fee limitations would be imposed on cost-plus-fixed-fee contracts. Having described a fee limitation for R & D contracts and having in mind a 10 percent limitation on the fees falling within the general cost-type category, there was an obvious need to make some reference to the traditional 6 percent limitation previously imposed on A-E fees. Without mention of the earlier A-E fee limitation and its applicability to cost-plus contracts, there would have been significant question whether this type of contract was subject to any fee limitation at all or whether cost-plus-fixed-fee A-E contracts would fall within the 10 percent category. It seems obvious that all Congress did, in an effort to avoid an ambiguity, was to make it clear that the traditional limitation as contained in earlier statutes (which were not repealed at that time) would also extend to cost-plus-fixed-fee contracts, notwithstanding the other limitations placed on this type of contract in the statute. To make

this so clear as to be beyond question, the House Armed Services Committee in its report (House Report 109) expressly stated, "This provision follows section 3 of the Act of April 25, 1939, above referred to * * *"; or, in other words, the Navy statute which originally described the limitation in terms of the "production and delivery of plans, designs, drawings, and specifications."

Your interpretation of the limitation is also subject to one extremely important and practical consideration. There are a number of instances which arise where Federal agencies require the services of A-Es involving "public works or utilities" and otherwise coming within the statute, when there is no facility to be constructed and, therefore, no estimated construction costs. In these cases, no fee could be paid. It is unreasonable to assume that Congress would provide for such a result.

Statutory Requirements Relating to the Need for Agency Consideration of Price in the Selection of Architect-Engineers

The second principal legal question presented in your report relates to the legality of current agency procedures relating to the selection and award of A-E contracts. Agencies in the Government have traditionally ranked A-Es, regarding a particular project, according to capability and acceptability. The agency then negotiates with the A-E determined to be the most capable and qualified at that time to design that project. And, assuming that a satisfactory fee cannot be agreed upon, then negotiates with the second A-E on the list. This procedure is continued until a contract is agreed upon.

You suggest that this procedure is not in conformance with provisions of the 1947 Procurement Act requiring that "proposals shall be solicited from the maximum number of qualified sources consistent with the nature and requirements of the supplies or services to be procured, and written or oral discussions shall be conducted with all responsible offerors who submit proposals within a competitive range, price, and other factors considered * * *."

We do not agree. First, we believe that provisions of the 1947 Procurement Act permit the type of negotiation traditionally followed by the various agencies where fee is not considered in determining the relative qualifications of A-Es to perform a particular project. Congress intended to provide broad flexibility in this statutory provision -- to permit the negotiation to be "consistent with the nature and requirements of the supplies or services to be procured." On p. 117 of your report, your Deputy General Counsel, in testimony before the House Committee on this very provision of the proposed 1947 Procurement Act confirms our interpretation of this statutory direction.

Furthermore, we believe the traditional agency approach reflects the best interest of the Government. The procurement of A-E services is not an end in itself. Nor is this phase of any project the most costly. The quality and

the cost of the facilities the A-E designs are the true test of his capability. Thus, it behooves the Government to optimize in every way the chances of selecting the A-E who will design the best possible building that can be constructed at the least possible cost.

If the amount to be paid the A-E enters into the initial stage of the selection process when the relative qualifications of A-Es aré determined, the chances of achieving this optimum result are compromised. As there is no available standard of performance at the time of A-E selection, any reduction in the amount of the A-E's fee resulting from the type of "competitive negotiation" you have in mind could as easily come out of the quality of the successful A-E's subsequent performance as out of his margin of profit. Furthermore, this approach openly discourages the more painstaking, careful, and thorough A-E whose offer of higher quality services could be at the mercy of less responsible members of his profession.

You have reservations on this point, for in the General Accounting Office report (p. 32) you state:

> "We recognize that there is some basis for the argument that language of the statute which requires that competitive negotiations 'shall be consistent with the nature and requirements of the supplies or services to be procured' justifies the procedures presently being followed in the negotiation of A-E contracts and that the present methods of negotiation A-E contracts are based on well-established traditional methods of doing business with A-Es."

<u>The Need to Negotiate with the Highest Qualified A-E on a Cost Basis</u>

While A-Es and agency contracting officers may normally "negotiate" in terms of a percentage of estimated project construction cost, more than likely in most instances both parties think of these percentages in terms of A-E costs. In any event, we agree that Federal agencies in negotiating A-E contracts should use a cost base. It is, of course, necessary incident to negotiations that a collateral determination be made to assure the parties that the fee under discussion falls within 6 percent of the estimated cost of the project in conformance with the statutory limitation.

This leads to the final question of what legislative action, if any, is necessary based upon the findings in this report. As far as the repeal of the statutory limitation is concerned, we have serious doubts as to the advisability of this course of action -- at least at this time. Nor are we of the opinion that they are either useless or unworkable. The A-E services as described in the 1939 Navy statute relating to the production and delivery of plans, designs, drawings and specifications are the predominant services provided the Government by members of this profession. According to the various

agencies, representatives of the A-Es, as well as your staff, few Government A-E contracts violate this traditional interpretation of the limitation. Furthermore, if these limitations on A-E fees are to be repealed, arguments of equal persuasion might be levied against other fee limitation provisions in our procurement statutes which are essential to the protection of the public's interest.

Also, if we were to repeal the limitations on A-E contracts, no practical and acceptable substitute is available for the overall protection of the public against ill-advised action on the part of executive officials. The extension of "competitive negotiation" (as you use the term) to this type contract would not only be an unacceptable substitute, but could seriously compromise the quality of A-E services the Government receives.

Nor do we see any virtue in the type of legislative proposal your staff has been discussing with representatives of the various professional groups. Copies of these proposals we have seen provide for the repeal of the 6 per cent limitation and the express exception of A-E services from the statutory requirements for competitive negotiations. For reasons stated above, we believe these objectives are inadvisable and unnecessary, respectively.

But, the principal thrust of these proposals is to put into language the requirement that agencies obtain proposals from "the maximum number of qualified sources * * *" consistent with the requirement. There is no factual basis in your report to suggest that agencies have not achieved this result in the past. However, in any event, if a problem does exist, it is administrative and not legal in nature. In our opinion, present statutes require agencies to include all A-Es within the "competitive range." For this reason, additional legislation is not needed and would not solve any problems.

The 1947 Procurement Act and the 1949 Property Act are taut, beautifully drafted statutes which give the Executive effective legislative guidelines and direction throughout the entire spectrum of Federal procurement. We should avoid cluttering these statutes with language of specific applicability, and particularly when the proposed amendments are not subject to exact interpretation.

Three statutory problems remain:

First, the 1949 Federal Property and Administrative Services Act does not extend to fixed-price contracts. This was a minor, inadvertent oversight of this Committee (and the only oversight that can be levied against Congress under our interpretation of the statutes). But, this has been corrected by appropriate agency regulation. This minor deficiency could be corrected, if necessary, during consideration of other amendments to the Property Act at some future date.

7 - The Honorable Elmer B. Staats November 16, 1967

Second, in discussions with agency officials, your staff, as well as representatives of the A-Es, it is apparent that a real problem exists, even under the traditional interpretation of the 6 percent limitation, regarding small projects and renovation work. It might be appropriate for Congress to consider amendatory legislation both to the 1947 Procurement Act and the 1949 Property Act to permit a larger fee for these classes of projects. This Subcommittee will give consideration to this question.

Third, there is a problem of the larger projects presenting unique, complex engineering problems where the 6 percent limitation would be unworkable. It is our opinion that there are relatively few such projects. When an agency wishes to build a structure, such as NASA's "Moon Palace" at Cape Kennedy, it would not be unreasonable for the agency to seek authorization for a larger A-E fee incident to obtaining project authorization from Congress. Under our interpretation of the statutory limitation, preliminary A-E work leading to the presentation of the project to Congress for authorization would not come within the 6 percent limitation.

We believe that the General Accounting Office should give further study to the Subcommittee's interpretation of these statutes. The meaning we give these statutes is that traditionally applied by Federal departments and agencies for almost two decades, a meaning which is clear and consistent, and does not rely or depend upon any assumed errors or omissions on the part of Congress, and which does provide reasonable protection to the taxpayers regarding a dominant portion of services A-Es render the Government. On the other hand, your interpretation is based upon a series of inadvertent errors or omissions by Congress, and could compromise the Government's ability to obtain optimum plans and specifications for the construction of public works and utilities.

If we can agree upon the interpretation of the statutes, then the General Accounting Office and the Subcommittee can coordinate efforts to see that Federal agencies discuss proposed projects with all A-Es within the competitive range and that subsequent negotiations with individual A-Es be on a cost basis.

It is deeply regretted that the Subcommittee cannot agree with you in connection with certain aspects of this report. However, we believe that under our interpretation of these statutes, with emphasis upon those aspects of this problem in which we are in accord, the extensive work that your staff has devoted to this study can accrue to the best interest of the Government.

Sincerely,

/s/ Jack Brooks

Jack Brooks
Chairman

89-34
3/11 all

Aerospace Industries Association

LeRoy J. Haugh
Vice President
Procurement and Finance
371-8520

May 3, 1991

Ms. Beverly Fayson
General Services Administration
FAR Secretariat
18th and F Streets, N.W., Room 4041
Washington, D.C. 20405

Dear Ms. Fayson:

Industry has identified an inconsistency in defining the basis for determining Architectural-Engineering (A/E) fee limits between the Federal Acquisition Regulation (FAR) and United States Code (U.S.C.). The terms used in FAR 15.903(d)(1)(ii) are more restrictive than the terms in the 10 U.S.C. 2306(d) and 41 U.S.C. 254(b).

10 U.S.C. 2306(d) "The fee for performing a cost-plus-a-fixed-fee contract for architectural or engineering services for a public work or utility plus the cost of those services to the contractor may not be more than 6 percent of the estimated cost of that work or project, not including fees."

41 U.S.C. 154(b) "A fee inclusive of the contractor's cost and not in excess of 6 per centum of the estimated cost, exclusive of fees, as determined by the agency head at the time of entering into the contract, of the project to which such fee is applicable is authorized in contracts for architectural or engineering services relating to any public works or utility project."

Both 10 U.S.C. 2306(d) and 41 U.S.C. 254(b) are interpreted as basing the limit on fees for A-E Services to six percent of the estimated cost of the project. A reasonable interpretation of "project cost" would be the total estimated cost to the government of the project or the total estimated cost of a particular project

MAY 13 1991

as established by a Contract Line Item. However, the applicable FAR clause, 15.903(d)(ii), provides a much more restrictive description of the basis for determining the limit on Architectural-Engineering Services:

FAR 15.903(d)(ii) For architectural-engineering services for public works or utilities, the contract price or the estimated cost and fee for production and delivery of designs, plans, drawings, and specifications shall not exceed six percent of the estimated cost of construction of the public work or utility, excluding fees.

This FAR clause defined the basis for determining the six percent limit on A-E fees as being the estimated construction cost instead of the estimated project cost as used in 10 U.S.C. 2306(d) and 41 U.S.C. 254(d).

FAR defined the term construction in Part 36, Section 102, Paragraph (d) and includes the cost of construction, alteration or repair of buildings, structures, or other real property, but specifically excludes the furnishing, production, etc., of any kind of personal property from the definition of what composes construction.

Some government interpretations have seized upon this exclusion of personal property from the definition of construction to claim that in some cases, the estimated cost of equipment should be excluded from the basis for determining the six percent limit. Their interpretation is probably derived from the Air Force Regulation (AFR) 78-22 or FAR 45.101, definitions for Real Property which describe Real Property as "Lands, buildings, structures, utility systems, but excludes plant equipment." Plant Equipment is defined by AFR 78-22 and FAR 45.101 as personal property ... used or capable of use in the manufacture of supplies ....

Therefore, if equipment to be procured under a Facilities Contract meets the following criteria, then according to existing regulations, that equipment is considered to be personal property/plant equipment and its estimated cost is to be excluded from the basis for determining the six percent limit for A-E services:

1. Equipment which is not to be attached to and made part of a building or structure.

2. Equipment which is severable and relocatable.

3. Equipment which is to be used or is capable of use for manufacturing purposes.

Existing regulations exclude the estimated cost of plant equipment from the cost basis used in determining the six percent limit on A-E fees.

There has been a reported instance where, prior to A-E award, the government has considered the associated equipment to be plant equipment and therefore excluded the estimated cost from the basis for determining the six percent limit for A-E fees.

This objection occurred during efforts to contract for the design to install an Aluminum Ion Vapor Deposition System. This project was to replace an existing cadmium plating process with an aluminum ion deposition process. This equipment was clearly to be used for a manufacturing process and was therefore considered to be plant equipment.

Questions as to whether equipment costs should be excluded from the basis for determining the six percent limit on A-E fees could be resolved by a revision to FAR 15.903(d)(ii).

The substitution of the words "estimated project cost" in place of "estimated cost of construction" in FAR 15.903(d)(ii), would render irrelevant all questions as to whether a particular piece of equipment should be classified as plant equipment and therefore excluded from the basis for determining the six percent statutory limit. As part of the "project cost," all equipment, regardless of use or classification, would be included in the basis.

If you have any questions or require additional information, we are available at your convenience to discuss this issue.

Sincerely,

LeRoy J. Haugh

pds/pw

MAY 13 1991

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FLUOR ENTERPRISES, INC. f/k/a FLUOR DANIEL, INC. | ) | |
| Plaintiff, | ) | No. 00-207C |
| v. | ) | (Judge Block) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**AFFIDAVIT OF KENNETH W. FORSYTH IN SUPPORT OF MOTION OF FLUOR DANIEL, INC. FOR SUMMARY JUDGMENT**

I, Kenneth W. Forsyth, being first duly sworn, state as follows:

1. I have personal knowledge of the facts set forth herein having reviewed relevant portions of the contract file related to the contract between Fluor Daniel, Inc. ("FDI") and the National Oceanographic and Atmospheric Administration("NOAA") of the United States Department of Commerce ("DOC").

2. I have been registered as a professional engineer in the State of Alabama since 1976. During my 24 years with the U. S. Army Corps of Engineers (USACE), I was an electrical design engineer and then a project manager, prior to working for 18 years in architect-engineer (A&E) contracting. I negotiated contracts, supervised contract negotiators, served as member and chairperson of A&E Pre-selection and Selection Boards, and was an instructor for the USACE Headquarters sponsored course, Architect-Engineer Contracting. This training course is required for all individuals who work as A&E contract negotiators or as A&E Pre-selection or Selection Board Chairpersons in USACE. I also served as a Contracting Officer's Representative for A&E contracts in the Mobile District. Since my retirement from USACE in 1997, I have worked as a professional consultant for A&E firms in the areas of A&E contracts and design-build proposals.

3. FDI's contract does not resemble any contract for A&E services that I have seen. While NOAA used A&E selection

procedures to select a contractor, the agency advertised and subsequently negotiated and awarded a service contract primarily for Program and Project Management, Construction Management and Inspection Services for an entire program. NOAA's Negotiation Plan acknowledges that project and construction management aspects would be the major aspects of services, with A&E design to encompass only a minor portion. Similarly, the USACE does not consider design-build contracts, of which A&E services also constitute a minor portion, to be "contracts for A&E services" subject to the 6% statutory limitation.

4. In my 24-years of experience at USACE I never saw, or even heard of, a level of effort cost reimbursement contract for A&E services.

5. There are significant discrepancies between the selection process used by NOAA and that used for A&E contracting:

The CBD synopsis for the contract appeared in Section R, Professional, Administrative, and Management Support Services, whereas it is the policy of USACE to place advertisements for A&E design services in Section C, Architect and Engineering Services. USACE announcements for other types of services contracts, such as surveying and mapping, are placed in other sections, for example Sections R or T.

Neither the CBD synopsis nor the A&E Selection Board Memorandum requires use of registered architects and/or engineers, which is a key element distinguishing announcements for contracts for A&E services from announcements for other services contracts.

The Contracting Officer's determinations and findings developed to justify use of a cost-reimbursable contract provides that "It is unknown what type of architectural or engineering tasks will be required…" See Exh. 1. In the procurements in which I have been involved, knowledge of the type of services to be provided is fundamental to meaningful public announcement and selection of a contractor if the contract is for A&E services. NOAA did not carry-out the project programming steps necessary to enter into an A&E contract, most notably the creation of the required estimate of the cost to construct the project. In my experience, and at USACE, the government must develop an estimated cost of the project prior to entering into negotiations with an A&E contractor because it is otherwise

impossible for the government to predict whether the contractor's fee will fall within the six percent of the estimated costs of the project as required by statute.

6. The FDI contract does not include several important clauses that appear in USACE contracts intended as contracts for A&E services:

FAR 52.235-22 -- Design within Funding Limitations (requires that the contractor/A&E firm produce a design package that can be constructed within the construction funds available). While this clause is mandated only for fixed-price A&E contracts, the USACE would have used this clause in contracts such as this one.

FAR 52.236-25 -- Requirements for Registration of Designers (used to ensure performance by registered architects and engineers). While this clause is mandated only for fixed-price A&E contracts, the USACE would have used this clause in contracts such as this one.

FAR 52.244-4 -- Subcontractors and Outside Associates and Consultants (requires approval by the CO of change in subcontractors). While this clause is mandated only for fixed-price A&E contracts, the USACE would have used this clause in contracts such as this one.

7. The FDI contract also includes clauses that are not found in USACE contracts intended as contracts for A&E services, and are in some cases proscribed from use in such contracts:

FAR 52.244-5 -- Competition in Subcontracting . This clause encourages the use of price competition by the prime Contractor in awarding subcontracts, and its use in A&E contracts is expressly prohibited by instructions in the clause. While appropriate for a service contract, in my experience it would not be found in an A&E contract.

FAR 52.246-25 -- Limitation of Liability-Services. FAR 46.801(a) specifies that FAR 46.805, requiring insertion of FAR 52.246-25, does not apply to contracts for A&E services.

FAR 52.248-1 -- Value Engineering. Contracting Officers are prohibited from including, and the USACE does not include, this clause in contracts for A&E services. Rather, FAR 52.248-2 is required for use in contracts for A&E services.

8. Design costs, where design work is stopped and then restarted with the same contractor, or is transferred to a different contractor, are higher than design costs in traditional contracts for A&E services where there are no such breaks and, importantly, bear no fixed or predictable relationship to such costs.

I declare under penalty of perjury that the foregoing is true and correct.

_______________________ Kenneth W. Forsyth

Sworn to (or affirmed) and subscribed before me this 8th day of January, 2004.

Notary Public ______________________

My commission expires ______________ NOTARY PUBLIC STATE OF ALABAMA AT LARGE MY COMMISSION EXPIRES: Apr 21, 2004 BONDED THRU NOTARY PUBLIC UNDERWRITERS

# Exhibit 1

**National Oceanic and Atmosph... A...ninistration,**
Host Agency serving:
Bureau of the Census
Economic Development Administration
International Trade Administration
Minority Business Development Agency
National BankCard Center
Office of Export Enforcement
Office of the Inspector General
U.S. Travel and Tourism Administration

**U.S. DEPARTMENT OF COMMERCE**
**Central Administrative Support Center**
Federal Building, Room 1736
601 East 12th Street
Kansas City, Missouri 64106

## Determination and Findings

Solicitation No. 52WCNA806099

The Procurement Division proposes to acquire the services necessary to provide professional architect-engineer services, project management, and construction inspection for the NEXRAD Program. The estimated value of the proposed contract is $10,000,000.00.

Pursuant to the authority of 41 U.S.C. 254(b) Section 304(b) as implemented by paragraph 16.301-1 of the Federal Acquisition Regulations, cost type contracts may be utilized.

## Findings

An adequate estimate cannot be established because of the nature of the work. It is unknown what type of architectural or engineering tasks will be required or how many, depending on the number of sites. Because of the uncertainty of the volume of the work to be required, undertaking the work on fixed price basis is not advisable.

The firm recommended for award shall be reviewed to ensure an adequate accounting system to accurately track costs exists. Government surveillance will be provided by a member of the NOAA, SEPO office to ensure that efficient methods and effective cost controls are used by the Contractor. The anticipated cost to the Government will be less, since only actual costs will be reimbursed, instead of a fixed cost for an unknown quantity of work.

## Determination

Based on the preceding findings a fixed-price contract is impracticable and not in the best interest of the Government. Authority to utilize a cost type contract is granted.

Jesus Arredondo
Contracting Officer

12-10-87
Date

G 004338


NOAA PROGRAMS
PROJECT CONTROL STRUCTURE
NOAA CONTRACT 50WCNA606099
FLUOR CONTRACT 449486
6 October 1986
Revision 1
WORK BREAKDOWN STRUCTURE
(WBS)
NOAA Programs
Program Management
Other Programs
NEXRAD Program
WFO Program
Operations Maintenance & Training
Program Management
Engineering
Facilities
Site
Site
Typical for all sites
Prog. & Proj. Management & Planning
Construction Management & Inspection
General A&E
Site Specific A&E
Site Selection & Acquisitioning
Site Work
Operational Equipment Installation
Land Acquisition & Disposal
Disposal of Installed Property
LEVELS
1) Total Programs
2) Programs (Systems)
3) Functions
4) Facility (Project)
5) Activity
6) Tasks
RESPONSIBILITY BREAKDOWN STRUCTURE (RBS)
FLUOR
NEXRAD CONTRACTOR
CASC / SEPO
JSPO
NWS
WFO Contractors
NEXRAD Subcontractors
TPO
RESPONSIBILITY LEGEND
Prime
Management
Coordinate
Subcontractor To Prime
Inspection Only
G 008778
G9

OPTIONAL FORM 99 (7-90)

**FAX TRANSMITTAL** # of pages ▸ 8

| To Mary McCullough | From Kate Goudreau |
|---|---|
| Dept./Agency | Phone # 202-501-5350 |
| Fax # 202-496-7756 | Fax # 202-501-7001 |

NSN 7540-01-317-7368 5099-101 GENERAL SERVICES ADMINISTRATION

Seventy-fifth Congress (Public, No. ...)

The committee, after considering the facts presented, unanimously report the same favorably and urge its passage.

In compliance with paragraph 2-A of rule XIII of the Rules of the House of Representatives, changes in existing law (Public, No. 160, 74th Cong.) are shown as follows (existing law in which no change is made is printed in roman; omitted matter is printed within black brackets; new matter is printed in italics):

[PUBLIC—No. 149—72D CONGRESS]

[H. R. 6477]

AN ACT To further amend the naturalization laws, and for other purposes

Approved May 25, 1932.

[PUBLIC—No. 160—74TH CONGRESS]

[H. R. 2739]

AN ACT To extend further time for naturalization to alien veterans of the World War under the Act approved May 25, 1932 (47 Stat. 165), to extend the same privileges to certain veterans of countries allied with the United States during the World War, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That subdivision (a) of section 1 of the Act entitled "An Act to further amend the naturalization laws, and for other purposes", approved May 25, 1932 (47 Stat. 165; U. S. C., Supp. VII, title 8, sec. 392b (a) shall, as herein amended, continue in force and effect to include petitions for citizenship filed prior to May 25, [1937] *1938*, with any court having naturalization jurisdiction: *Provided*, That for the purposes of this Act, clause (1) of subdivision (a) of section 1 of the aforesaid Act of May 25, 1932, is amended by striking out the words "all such period" and in lieu thereof inserting the words "the five years immediately preceding the filing of his petition."

SEC. 2. The provisions of section 1 of this Act are hereby extended to include any alien lawfully admitted into the United States for permanent residence who departed therefrom between August , 1914,[1] and April 5, 1917; or who, [having] been denied entry into the military and naval forces of the United States,] departed therefrom subsequent to April 5, 1917, for the purpose of serving and actually served prior to November 11, 1918, in the military or naval forces of any of the countries allied with the United States in the World War and was discharged from such service under honorable circumstances: *Provided*, That before any applicant for citizenship under this section is admitted to citizenship, the court shall be satisfied by competent proof that he is entitled to, and has complied in all respects with, the provisions of this Act; and that he was and had been a bona fide lawfully admitted resident in the United States for two years before the passage of this Act.

SEC. 3. The Commissioner of Immigration and Naturalization, with the approval of the Secretary of Labor, shall prescribe such rules and regulations as may be necessary for the enforcement of this Act.

O

76TH CONGRESS } HOUSE OF REPRESENTATIVES { REPORT
1st Session } { No. 76

# AUTHORIZING THE SECRETARY OF THE NAVY TO PROCEED WITH THE CONSTRUCTION OF CERTAIN PUBLIC WORKS

FEBRUARY 17, 1939.—Committed to the Committee of the Whole House on the state of the Union and ordered to be printed

Mr. VINSON of Georgia, from the Committee on Naval Affairs, submitted the following

## REPORT

[To accompany H. R. 4278]

The Committee on Naval Affairs, to whom was referred the bill (H. R. 4278) to authorize the Secretary of the Navy to proceed with the construction of certain public works, and for other purposes, having considered the same, report favorably thereon without amendment and recommends that the bill do pass.

The object and purposes of this bill are (1) to authorize the Secretary of the Navy to proceed with the construction of certain of the aviation facilities in line with the recommendations of the board of officers appointed in accordance with the act of May 17, 1938; (2) to give the Secretary of the Navy authority, whenever deemed by him to be advantageous to the national defense, to contract with or employ individuals, firms, or corporations for the production of designs, plans, drawings and specifications for construction of public works without reference to the Classification Act of 1923, or to section 3709 of the Revised Statutes of the United States; and, (3) to authorize the Secretary of the Navy to make contracts for the execution of the projects herein authorized under terms at variance with the usual procedure followed in making contracts for work of a similar nature in the continental United States.

The act of May 17, 1938, provided that the authorized strength of the Navy in naval vessels be increased by 20 percent and in naval aircraft by about 50 percent.

In view of the increases for the Navy as specified above, the Committee on Naval Affairs, when considering the bill providing for these increases, felt that additional naval operating bases for some of the units of the fleet would be necessary, and accordingly recommended section 10 of the act of 1938 which authorized and directed the Secretary of the Navy to appoint a board of officers to investigate and

Dec 27 02 04:04p Legislative Archives 2025017006 p.2



report upon the need, for the purpose of national defense, for the establishment of additional submarine, destroyer, and naval air bases on the continental coasts of the United States, its territories and possessions, and provided that the report of the board so appointed should be transmitted to the Speaker of the House.

The report of this board, known as the Hepburn Board, has been transmitted to the Speaker of the House and is printed as House Document 65, Seventy-sixth Congress. It recommends the establishment of some new bases and improvements in or expansion of some others now in existence. The Board reached its conclusions after a searching investigation and exhaustive study and the report contains substantiating reasons for its decisions. It deals solely with the additional needs for the Navy primarily as the result of the expansion program of the last Congress. The Board's conclusions were based only on the point of view of the requirements necessary better to promote the national defense of the country. The report is very comprehensive and invaluable. Due to budgetary considerations and limitations only a very limited number of the improvements recommended by the Board have been approved by the Budget for authorization in this bill.

The bill herewith favorably reported to the House to establish, develop, or increase naval aviation facilities would authorize the Navy Department to carry out certain of the recommendations of the Hepburn Board which are recommended by that Board as being of immediate strategic importance.

These items are Kaneohe Bay, T. H., Midway Island, Wake Island, Guam, Johnston and Palmyra Islands, in the mid-Pacific area; Kodiak and Sitka in the Alaskan area; San Juan, Puerto Rico, in the Atlantic area; and an increase in training facilities at the naval aviation training center at Pensacola, Fla.

In addition, there are included provision for expansion of the fleet air base at Pearl Harbor and expansion of the Naval Aircraft Factory at Philadelphia, for acquisition of additional land adjoining the naval air station at Norfolk for later necessary expansion there, and for minor seaplane facilities at Tongue Point, Oreg. The establishment of all these recommended naval aviation facilities is mandatory if our naval aviation is to reach the efficiency for which it is built. Also, the bill authorizes the Secretary of the Navy to accept the land at Corpus Christi, Tex., necessary for the later establishment of an additional air station for training purposes.

It is estimated that the expenditures for the facilities recommended in the bill will be approximately as follows:

| Locality: | | Locality—Continued. | |
|---|---|---|---|
| Kaneohe | $5,800,000 | Pensacola | $5,850,000 |
| Midway | 5,350,000 | Norfolk | 500,000 |
| Wake | 2,000,000 | Tongue Point | 1,500,000 |
| Johnston | 1,150,000 | Pearl Harbor | 2,800,000 |
| Palmyra | 1,100,000 | Guam | 5,000,000 |
| Kodiak | 8,750,000 | Philadelphia | 1,800,000 |
| Sitka | 2,900,000 | | |
| San Juan | 9,300,000 | Total | 53,800,000 |

The expenditure of the $53,800,000, authorized herein will be spread over a period of 3 years and will occur approximately as follows: 1940, $19,450,000; 1941, $21,350,000; 1942, $13,000,000.



The President, in his national defense message to Congress on January 12, 1939, suggested an appropriation for the creation or strengthening of Navy bases in both oceans in general agreement with the report of the special board (Hepburn Board) which has already been submitted to the Congress.

A detailed list of the projects to be undertaken with the necessity therefor follows:

### KANEOHE BAY

The Kaneohe Bay base will form an adjunct or auxiliary operating base for the main naval Hawaiian base at Pearl Harbor. In peace time it will serve as a training base for patrol planes to carry out expeditiously and efficiently those practices required to maintain an adequate state of training. The crowded conditions of Pearl Harbor render it hazardous to carry out some forms of necessary training because of its restricted waters. Kaneohe Bay, on the other hand, has sufficient water area to permit full load take-offs with safety and will be used solely as an operating base since only minor repair facilities are contemplated. In time of national emergency, the congestion in Pearl Harbor from surface craft will necessitate the use of Kaneohe as a main operating base to support the fleet. This support will consist of necessary patrol plane squadrons which would base thereon temporarily dependent upon fleet movements, and other squadrons which would operate therefrom for the patrol of vital areas about the Hawaiian Islands.

It is estimated that the cost of this project will be $5,800,000, with the expenditure occurring over a period of 3 years approximately as follows:

| | |
|---|---|
| 1940 | $3,000,000 |
| 1941 | 2,500,000 |
| 1942 | 300,000 |

### MIDWAY ISLAND

The secondary naval air base to be established on this island will provide facilities for the peacetime basing and training of one patrol plane squadron with emergency accommodations for a second squadron. It will permit training in conjunction with the fleet in an area which is vital to the successful defense of the Hawaiian area. It will provide in both peace and war the facilities necessary to project tender-based patrol plane squadrons to other outlying operating areas in the mid-Pacific, such as Wake, Palmyra, and Johnston, in support of the fleet and for training purposes. Only minor repair and maintenance facilities will be provided since all the overhaul activities for the mid-Pacific area are located at the fleet air base, Pearl Harbor.

It is estimated that the cost of this project will be $5,350,000, with the expenditure occurring over a period of 3 years approximately as follows:

| | |
|---|---|
| 1940 | $1,500,000 |
| 1941 | 1,500,000 |
| 1942 | 2,350,000 |

### WAKE ISLAND

To provide harbor facilities (channel, turning basin, etc.) to permit the operation of tender-based patrol planes. The shore facilities

Case 1:00-cv-00207-LB Document 48-31 Filed 01/12/2004 Page 3 of 4

Dec 27 02 04:05p Legislative Archives 2025017006 p.3



which will be provided are to be very minor in nature. This so-called base is not a base in the full sense of the word but only insofar as any protected harbor with water area sufficient for patrol plane take-offs might be considered a base. It will provide in peacetime an area for the training of patrol plane squadrons in advanced base work, and in time of emergency will provide an operating base in support of the fleet in the strategic mid-Pacific area. Its importance is considered second only to Midway in the defense of Hawaii.

It is estimated that the cost of this project will be $2,000,000, with the expenditure occurring over a period of 2 years approximately as follows:

| | |
|---|---|
| 1940 | $1,000,000 |
| 1941 | 1,000,000 |

JOHNSTON AND PALMYRA ISLANDS

The foregoing remarks outlining the purpose of a tender-based, patrol-plane operating area at Wake apply with equal force to the developments projected at Johnston and Palmyra. They are identical in scope, since no shore-based planes are to be provided, except for some very minor items such as a seaplane ramp, parking area, and pier. These two protected water areas will provide operating bases in peacetime for advanced base training of patrol planes and in wartime would greatly assist fleet operations to the south and west of Hawaii in the defense of that area.

It is estimated that the cost of these projects will be $2,250,000, with the expenditure occurring over a period of 2 years approximately, as follows:

| | |
|---|---|
| 1940 | $2,000,000 |
| 1941 | 250,000 |

KODIAK

The purpose of the project at Kodiak is to provide a naval-aviation base in the Alaskan area with many of the features of a major air station. In particular, it will provide permanent facilities for the necessary training of two patrol-plane squadrons thereon in effective flight operations under the generally poor atmospheric conditions of the Alaskan area. Also, it will provide peacetime maintenance, repair, and storage facilities for the entire area, and would permit temporary basing of tender-based patrol planes enroute to advanced bases. In time of emergency, part of the vitally important strategic Alaskan area will be patrolled, and fleet operations will be supported from this base.

It is estimated that the cost of the project at Kodiak will be $8,750,000 with the expenditure occurring over a period of 3 years approximately, as follows:

| | |
|---|---|
| 1940 | $2,000,000 |
| 1941 | 4,500,000 |
| 1942 | 2,250,000 |

SITKA

This project primarily provides an intermediate station between Seattle and stations farther westward and also necessary permanent facilities to permit the training of one patrol plane squadron in the southern Alaskan area. Facilities for temporary overloads will be provided to accommodate the movements of patrol planes in the area. In time of emergency, area patrol and operations to support the fleet in southern Alaskan waters would be conducted from this base.



It is estimated that the cost of this project will be $2,900,000 with the expenditure occurring over a period of 3 years approximately as follows:

| | |
|---|---|
| 1940 | $750,000 |
| 1941 | 1,530,000 |
| 1942 | 620,000 |

SAN JUAN

The purpose of the project at San Juan is to provide a secondary air base for the operations of two patrol plane squadrons permanently based with additional facilities for an additional patrol plane squadron to carry out training and maintenance in this strategic area in peacetime and in time of war to participate in the defense of the Canal Zone and the Caribbean.

It is estimated that the cost of this project will be $9,300,000, with the expenditure occurring over a period of 3 years approximately as follows:

| | |
|---|---|
| 1940 | $2,000,000 |
| 1941 | 3,500,000 |
| 1942 | 3,800,000 |

PENSACOLA

The purpose of the Naval Air Station, Pensacola, Fla., is well known. As the Navy's only training school for heavier-than-air pilots, it must necessarily produce naval pilots in sufficient numbers to meet any contemplated naval-aviation program. Its present facilities, if expanded, can properly handle a 50-percent increase in normal capacity in output of graduates which will meet the requirements of the 3,000-plane program, providing these additional facilities are furnished. The present expansion contemplated by the current bill under discussion will provide only the minimum needed to accommodate the additional load.

It is estimated that the cost of this project will be $5,850,000, with the expenditure occurring over a period of 3 years approximately as follows:

| | |
|---|---|
| 1940 | $2,500,000 |
| 1941 | 1,500,000 |
| 1942 | 1,850,000 |

PEARL HARBOR

The strategic considerations incident to this major base are too well known to require detailing. Since sufficient facilities at Pearl Harbor must exist in peacetime in order to receive and maintain the large numbers of long-range-patrol planes which will be required in the theater of operations if hostilities should take place in the mid-Pacific, its development is essential. Present facilities are inadequate for the efficient operation and maintenance of the present complement of planes and the overhaul activities must be expanded in order to

Case 1:00-cv-00207-LB Document 48-31 Filed 01/12/2004 Page 4 of 4

Dec 27 02 04:05p Legislative Archives 2025017006 p.4



make it function properly at the sole naval-aircraft-overhaul base in the mid-Pacific area.

It is estimated that the cost of this project will be $2,800,000, with the expenditures occurring over a period of 2 years approximately as follows:

| | |
|---|---|
| 1940 | $1,500,000 |
| 1941 | 1,300,000 |

### GUAM

Under the terms of the bill the Navy will be authorized (1) to build a breakwater at a cost not to exceed $2,200,000; (2) to dredge the harbor to remove coral heads, to provide channels for ships and for seaplane operations at a cost not to exceed $1,900,000; and (3) to build seaplane ramps and parking space, small power plant, and necessary accessories, at a cost not to exceed $900,000.

From the above it can be seen that there is no provision to fortify Guam, as has been widely and incorrectly understood to be the case. The improvements contemplated are no more than is done year after year by this country in improving our harbors so as to make them safe and tenable under all conditions for surface vessels as well as for aircraft.

In speaking for the Navy Department, Hon. Charles Edison, The Assistant Secretary of the Navy, assured the committee that it was not the policy of the Department to fortify Guam nor did the Department now contemplate doing any more than is provided for in this bill. In referring to Guam The Assistant Secretary stated:

> It is the present policy of the Navy Department now to ask for development only to the extent stated in the bill before this committee.
>
> If unforeseen changes in the international situation should indicate a necessity for further development of an airplane base then Congress will be so informed.
>
> We hope that there will be no necessity for further development; none is contemplated at the present time.

The officials in the Navy Department have had the improvements recommended in this bill for Guam under consideration for a considerable period of time. On March 15, 1937, over a year before the Hepburn Board was authorized, the Chief of the Bureau of Aeronautics addressed the following letter to the Chief of Naval Operations:

> 1. The present available operating area for seaplanes in Apra Harbor is restricted and dangerous, due to the open harbor and to the presence of coral reefs. The removal of coral heads and outcroppings would greatly lessen the hazards of landing and taking-off, and would increase the available area for operating and mooring so that a limited number of patrol planes could readily use the harbor as a base of operations.
>
> 2. The removal of the shoals in the eastern section of the outer harbor would greatly extend and improve the seaplane operating and mooring area. It would enable operations to be safely carried out in this section when heavy swells in the western section, outside of the protecting reefs in the central part of the harbor, would render operations dangerous or preclude them entirely. This eastern section would also furnish a large, protected, smooth-water mooring area in normal weather.
>
> 3. A channel leading into the southern, inner portion of the harbor, and the removal of certain of the shoals therein, would make available a large, sheltered mooring area for use during typhoon weather when the outer harbor would be untenable. It is believed that the availability of this inner area would be a necessity if extended seaplane operations were to be conducted in this vicinity.
>
> 4. Suggested projects, designed to carry out the desirable improvements to Apra Harbor for seaplane operations as stated above, are shown on enclosure (a). These proposed projects are:



> (a) Removal of the tops of the coral heads and outcroppings in the outer harbor to give a depth of 6 feet at low low water. Shoals to be removed are shown on enclosed chart at "A."
>
> (b) Construction of a channel, 400 feet wide and 6 feet deep at mean low water, east of Fort Santa Cruz, joining the outer harbor with the inner area. Shoals to be removed are shown on the enclosed chart at "B," depth of water to be 6 feet at mean low water.
>
> 5. It is requested that this recommendation for harbor improvements be forwarded to the Commandant, United States Naval Station, Guam, for his comment as to the feasibility and his estimate of the costs of the separate projects.

### NAVAL AIRCRAFT FACTORY

The item for the Naval Aircraft Factory at Philadelphia has been passed by the Budget and is included in H. R. 2878, but due to the urgent need for the improved facilities there, the committee has included the project in this bill. It will provide a new aeronautical engineering laboratory at a total cost for both of $1,800,000. Provision for both these activities is now inadequate, scattered, and obsolete and the need for them is far in excess of what they now can handle. The improved facilities are essential for handling with due efficiency the problems and the tests involved in the Navy's expanded aircraft building program.

It is estimated that the cost of this project will be $1,800,000, with the expenditure occurring over a period of 2 years approximately as follows:

| | |
|---|---|
| 1940 | $1,200,000 |
| 1941 | 600,000 |

### NORFOLK

The committee has included an authorization to acquire the necessary land adjacent to the Naval Air Station at Norfolk for use later on when the very necessary expansion at that station is authorized. This was strongly recommended by the Hepburn Board. To do this the bill provides an amendment to the act of June 14, 1934 (Public, No. 347, 73d Cong.), which authorized the acquisition of some of the needed land, so as to permit all of the needed additional land to be included.

It is estimated that the total cost of this project will be $500,000, $100,000 increase over the original authorization.

### TONGUE POINT

This project provides an important intermediate station between bases farther to the south and the Alaskan area. It also provides necessary permanent facilities for the training of one patrol plane squadron in the highly important industrial area controlled by the mouth of the Columbia River. The physical characteristics of this site are excellent for patrol plane operations and the project can readily be expanded in emergency to a very valuable defense adjunct.

It is estimated that the cost of this project will be $1,500,000, with the expenditures occurring over a period of 2 years approximately as follows:

| | |
|---|---|
| 1940 | $500,000 |
| 1941 | 1,000,000 |

Dec 27 02 04:05p Legislative Archives 2025017006 p.5



Section 2 of this bill authorizes to be appropriated out of any money in the Treasury of the United States not otherwise appropriated such sums as may be necessary to effectuate the purpose of this act.

Section 3 of the proposed bill would give to the Secretary of the Navy authority to contract with or employ individuals, firms, or corporations for the production of designs, plans, drawings, and specifications of naval vessels, aircraft, public works, or utilities without reference to the Classification Act of 1923, as amended, or to section 3709 of the Revised Statutes which requires advertising and competitive bidding, whenever, in the opinion of the Secretary of the Navy, such would be advantageous to the national defense.

Expansion of the Navy both afloat and ashore in an emergency must of necessity be preceded by field investigations and the preparation of plans and specifications for the building of ships or aircraft, the erection of structures, and the provision of public utilities. Expansion of the forces afloat requires an increase of training stations, facilities, industrial facilities at navy yards and in all other branches of the naval shore establishment. The rapid expansion of shore facilities is a condition precendent to expansion of the forces afloat.

Past experience has shown that to achieve such expansion the Navy must avail itself of the services of private individuals and organizations. The expansion of the professional and engineering forces within the material bureaus of the Navy Department cannot be accomplished expeditiously. The current emergency shore construction program has demonstrated that neither personnel nor the space required for their work can be obtained quickly.

The obvious alternative is to engage the services of private engineering and architectural firms or individuals to supplement the work of the Navy Department. In such manner the Navy could not only expedite the preparation of plans and specifications for important shipbuilding and engineering works, but could also obtain the services of the country's outstanding specialists.

At the present time the Navy Department may engage individual engineering consultants at the rate of $20 to $25 per day. Experience has shown that this authority does not accomplish the results desired. The pay of $20 to $25 per day is too low to obtain the best talent. Further, it is usually desirable to engage the services of an engineering firm with its staff of specialists rather than the services of an individual. This cannot be done under the present arrangement.

It is desired to eliminate advertising for engineering and architectural services, as is required by section 3709 of the Revised Statutes, for two reasons: (1) Because such advertising would delay the initiation of the work and, (2) because responding to advertising for professional services of this character is considered to be unethical. The American Society of Civil Engineers have gone on record as being opposed to this practice.

Furthermore, it is as illogical to advertise for the services of a shipbuilding or other engineering specialist as it would be to advertise for the services of a medical specialist. Standard fees have been established by reputable professional societies for various kinds of engineering and architectural works, so that the question of the magnitude of



the fee does not enter into the selection of an engineering or architectural firm. The question in each case should be decided upon the special qualifications of the firms under consideration.

Enactment of the proposed legislation would result in a very material speeding up of all public works planning and shipbuilding and execution in time of emergency. The principle involved in the proposed bill is not new. A similar provision was made for the Secretary of the Treasury in the act of March 31, 1930 (46 Stat. 137). It is believed that the Navy Department which has to do with the national defense where expeditious action is of paramount importance should have the authority proposed herewith.

The difference of cost of performing the work contemplated in the proposed legislation by private contract as against performing it by the Navy Department personnel would be so small as to be completely negligible.

Section 4 of the proposed bill would authorize the Secretary of the Navy to negotiate cost-plus fixed-fee contracts for construction at places beyond the continental limits of the United States. Such authority would serve four purposes:

(a) It would permit initiating the work at the earliest practicable date, since complete plans and specifications will not be necessary under such an arrangement.

(b) It would permit the work to be carried on at a faster rate, since necessary changes in the design and construction procedures which are inevitable in work of this character will be made with a minimum of delay.

(c) It would result in lower ultimate cost to the Government.

(d) It would permit a much greater degree of secrecy as to the details of the improvements constructed, since public advertising for bids would not be necessary.

The experience of the Navy Department has shown that it is impracticable to obtain competitive bids from reliable and experienced contractors on work at outlying stations except at exorbitant prices. This arises from the fact that unusual hazards, the uncertainty of weather conditions, the distance from material and labor markets, and the cost of overcoming unforeseen construction difficulties all contribute to the element of uncertainty which requires that a prudent bidder include in his bid a very large item for contingencies. If these contingencies do not arise the Government will pay an excessive profit to the contractor.

The principle of noninsurance of Government property is firmly established. The procedure embodied in section 4 represents no more than an extension of that principle, in that the Government in effect carries the insurance for contingencies which, under ordinary circumstances, would be carried by the contractor and indirectly paid for by the Government.

For work within the continental limits of the United States, where it is practicable to obtain competitive bids and where the contingency item is not large, the usual procedure of competitive bidding is to be preferred. However, in the case of work at outlying stations the procedure recommended in section 4 would be more advantageous to the Government.

Dec 27 02 04:09p Legislative Archives 2025017006 p.6



In conclusion, no other nation can logically object to any nation improving the purely defensive facilities of its own land unless that other nation should have aggressive designs on the territory thus defended.

We do not seek war with anyone. We do not intend to get entangled in any alien quarrels. As a democratic people we are a peaceful people.

We respect the rights of other nations; we expect other nations to respect our rights.

We do not covet one foot of soil of any other nation. The purpose of this program is to insure that no covetous nation shall secure a foot of ours.

The views and recommendations of the Navy Department on the proposed legislation are set forth in the letter of the Acting Secretary of the Navy to the Speaker of the House of Representatives dated January 19, 1939, which is hereby made a part of this report.

NAVY DEPARTMENT,
*Washington, January 19, 1939.*

THE SPEAKER OF THE HOUSE OF REPRESENTATIVES,
*Washington, D. C.*

MY DEAR MR. SPEAKER: There is transmitted herewith a draft of a proposed bill to authorize the Secretary of the Navy to proceed with the construction of certain public works, and for other purposes.

Section 10 of the act of May 17, 1938 (52 Stat. 403; 34 U. S. C. 498i), authorized and directed the Secretary of the Navy to appoint a board of officers to investigate and report upon the need, for purposes of national defense, for the establishment of additional submarine, destroyer, mine, and naval air bases on the coasts of the United States, its Territories, and possessions.

The Secretary of the Navy was also directed to cause the report of this board to be transmitted to the Speaker of the House of Representatives during the first session of the Seventy-sixth Congress.

The board of officers convened pursuant to section 10 of the act of May 17, 1938, has completed its investigations. Its report has been transmitted to the Speaker of the House of Representatives and printed as House of Representatives Document No. 65, Seventy-sixth Congress.

Sections 1 and 2 of the proposed bill transmitted herewith would authorize the construction of certain of the aviation facilities recommended by the board and would provide authority for appropriations to effectuate the construction authorized.

The Navy Department will welcome an opportunity to explain in detail to the appropriate committees of the Congress the necessity or desirability to the national defense for construction of the facilities specified in the proposed bill.

Section 3 of the proposed bill would give to the Secretary of the Navy authority to contract with or employ individuals, firms, or corporations for the production of designs, plans, drawings, and specifications of naval vessels, aircraft, public works, or utilities without reference to the Classification Act of 1923, as amended, or to section 3709 of the Revised Statutes, which requires advertising and competitive bidding whenever, in the opinion of the Secretary of the Navy, such would be advantageous to the national defense.

Expansion of the Navy both afloat and ashore in an emergency must of necessity be preceded by field investigations and the preparation of plans and specifications for the building of ships or aircraft, the erection of structures, and the provision of public utilities. Expansion of the forces afloat requires an increase of training-station facilities, industrial facilities at navy yards, and in all other branches of the naval shore establishments. The rapid expansion of shore facilities is a condition precedent to expansion of the forces afloat.

Past experience has shown that to achieve such expansion the Navy must avail itself of the services of private individuals and organizations. The expansion of the professional and engineering forces within the material bureaus of the Navy Department cannot be accomplished expeditiously. The current emergency shore construction program has demonstrated that neither personnel nor the space required for their work can be obtained quickly.



The obvious alternative is to engage the services of private engineering and architectural firms or individuals to supplement the work of the Navy Department. In such manner the Navy could not only expedite the preparation of plans and specifications for important shipbuilding and engineering works, but could also obtain the services of the country's outstanding specialists.

At the present time the Navy Department may engage individual engineering consultants at the rate of $20 to $25 per day. Experience has shown that this authority does not accomplish the results desired. The pay of $20 to $25 per day is too low to obtain the best talent. Further, it is usually desirable to engage the services of an engineering firm with its staff of specialists rather than the services of an individual. This cannot be done under the present arrangement.

It is desired to eliminate advertising for engineering and architectural services, as is required by section 3709 of the Revised Statutes, for two reasons; first, because such advertising would delay the initiation of the work and, second, because responding to advertising for professional services of this character is considered to be unethical. The American Society of Civil Engineers and the American Society of Consulting Engineers have gone on record as being opposed to this practice.

Furthermore, it is as illogical to advertise for the services of a shipbuilding or other engineering specialist as it would be to advertise for the services of a medical specialist. Standard fees have been established by reputable professional societies for various kinds of engineering and architectural works, so that the question of the magnitude of the fee does not enter into the selection of an engineering or architectural firm. The question in each case should be decided upon the special qualifications of the firms under consideration.

Enactment of the proposed legislation would result in a very material speeding up of all public works planning and shipbuilding and execution in time of emergency. The principle involved in the proposed bill is not new. A similar provision was made for the Secretary of the Treasury in the act of March 31, 1930 (46 Stat. 137). It is believed that the Navy Department which has to do with the national defense where expeditious action is of paramount importance should have the authority proposed herewith.

The difference of cost of performing the work contemplated in the proposed legislation by private contract as against performing it by the Navy Department personnel would be so small as to be completely negligible.

Section 4 of the proposed bill would authorize the Secretary of the Navy to negotiate cost plus fixed fee contracts for construction at places beyond the continental limits of the United States. Such authority would serve three purposes.

(*a*) It would permit initiating the work at the earliest practicable date since complete plans and specifications will not be necessary under such an arrangement.

(*b*) It would permit the work to be carried on at a faster rate since necessary changes in the design and construction procedures which are inevitable in work of this character will be made with a minimum of delay.

(*c*) It would result in lower ultimate cost to the Government.

The experience of the Navy Department has shown that it is impracticable to obtain competitive bids from reliable and experienced contractors on work at outlying stations except at exorbitant prices. This arises from the fact that unusual hazards, the uncertainty of weather conditions, the distance from material and labor markets, and the cost of overcoming unforeseen construction difficulties all contribute to the element of uncertainty which requires that a prudent bidder include in his bid a very large item for contingencies. If these contingencies do not arise the Government will pay an excessive profit to the contractor.

The principle of noninsurance of Government property is firmly established. The procedure embodied in section 4 represents no more than an extension of that principle, in that the Government in effect carries the insurance for contingencies which, under ordinary circumstances, would be carried by the contractor and indirectly paid for by the Government.

For work within the continental limits of the United States, where it is practicable to obtain competitive bids and where the contingency item is not large, the usual procedure of competitive bidding is to be preferred. However, in the case of work at outlying stations the procedure recommended in section 4 would be more advantageous to the Government.

The Navy Department recommends that the proposed legislation be enacted.

Sincerely yours,

WILLIAM D. LEAHY, *Acting.*

Dec 27 06 04:06p Legislative Archives 2025017006 p.7



In compliance with clause 2a of rule XIII of the Rules of the House of Representatives, there is herewith printed in parallel columns (1) the parts of the bill making the amendment and (2) the text of provisions of existing law which it is proposed to amend:

SEC. 3. Whenever deemed by him to be advantageous to the national defense the Secretary of the Navy is hereby authorized to employ by contract or otherwise outside architectural or engineering corporations, firms, or individuals for the production and delivery of the designs, plans, drawings, and specifications required for the accomplishment of any naval public works or utilities project without reference to the Classification Act of 1923 (42 Stat. 1488), as amended (5 U. S. C., ch. 13), or to section 3709 of the Revised Statutes of the United States (41 U. S. C. 5). In no case shall the fee paid for any service authorized by this Section exceed 6 per centum for the estimated cost, as determined by the Secretary of the Navy, of the project to which such fee is applicable.

Section 3 of the Classification Act of 1923 (42 Stat. 1489), as amended (5 U. S. C. 663):

That there is hereby established an ex officio board, to be known as the Personnel Classification Board, to consist of the Director of the Bureau of the Budget or an alternate from that Bureau designated by the Director, a member of the Civil Service Commission or an alternate from that commission designated by the Commission, and the Chief of the United States Bureau of Efficiency or an alternate from that bureau designated by the chief of the bureau. The Director of the Bureau of the Budget or his alternate shall be chairman of the board.

Subject to the approval of the President, the heads of the departments shall detail to the board, at its request, for temporary service under its direction, officers or employees possessed of special knowledge, ability, or experience required in the classification and allocation of positions. The Civil Service Commission, the Bureau of the Budget, and the Bureau of Efficiency shall render the board such cooperation and assistance as the board may require for the performance of its duties under this Act.

The board shall make all necessary rules and regulations not inconsistent with the provisions of this Act and provide such subdivisions of the grades contained in section 13 hereof and such titles and definitions as it may deem necessary according to the kind and difficulty of the work. Its regulations shall provide for ascertaining and recording the duties of positions and the qualifications required of incumbents, and it shall prepare and publish an adequate statement giving (1) the duties and responsibilities involved in the classes to be established within the several grades, illustrated where necessary by examples of typical tasks; (2) the minimum qualifications required for the satisfactory performance of such duties and tasks; and (3) the titles given to said classes. In performing the foregoing duties, the board shall follow as nearly as practicable the classification made pursuant to the Executive order of October 24, 1921. The board may from time to time designate additional classes within the several grades and may combine, divide, alter, or abolish existing classes. Department heads shall promptly report the duties and responsibilities of new positions to the board. The board shall make necessary adjustments in compensation for positions carrying maintenance and for positions requiring only part-time service.



SEC. 4. (a) To enable the Secretary of the Navy to accomplish without delay or excessive cost those public-works projects authorized by this Act to be located outside the continental limits of the United States, he is hereby authorized to enter into contracts upon a cost-plus a fixed-fee basis after such negotiations as he may authorize and approve and without advertising for proposals with reference thereto. Approval by the President shall be necessary to the validity of any contract entered into under authority of this section. The fixed fee to be paid the contractor as a result of any contract entered into under authority of this section shall be determined at or before the time such contract is made, and shall be set forth in such contract. Such fee shall not exceed 10 per centum of the estimated cost of the contract, exclusive of the fee, as determined by the Secretary of the Navy. Changes in the amount of the fee shall be made only upon material changes in the scope of the work concerned as determined by the Secretary of the Navy whose determination shall be conclusive.

(b) Negotiations under this section shall be between the Secretary of the Navy, or a duly authorized representative, and three or more reputable and qualified contracting individuals, firms, or corporations regularly engaged in work of comparable magnitude and class to that contemplated by the negotiations, as determined by the Secretary of the Navy, and contracts may be made with any such individual, firm, or corporation, or with any two or more of them jointly, upon such terms and conditions as the Secretary of the Navy may determine to be fair and equitable, and in the interests of the national defense. For each contract entered into under authority of this section, the Secretary of the Navy may detail a naval officer to duty, without additional compensation, as an executive representative of the contracting officer. The contract may provide that the officer so detailed shall have the right to attend any meetings of the board of directors or other executive or administrative board or committee of any corporation, partnership, firm, or syndicate which is or may become a

Section 3709 of the Revised Statutes (41 U. S. C. 5). All purchases and contracts for supplies or services, in any of the Departments of the Government, except for personal services, shall be made by advertising a sufficient time previously for proposals respecting the same, when the public exigencies do not require the immediate delivery of the articles, or performance of the service. When immediate delivery or performance is required by the public exigency, the articles or service required may be procured by open purchase or contract, at the places and in the manner in which such articles are usually bought and sold, or such services engaged, between individuals.

Section 3710 of the Revised Statutes (41 U. S. C. 8). Whenever proposals for supplies have been solicited, the parties responding to such solicitation shall be duly notified of the time and place of opening the bids, and be permitted to be present either in person or by attorney, and a record of each bid shall then and there be made.

Case 1:00-cv-00207-LB Document 48-32 Filed 01/12/2004 Page 4 of 4

Legislative Archives 2025017006 p.8



party thereto for the purpose of submitting propositions, propounding questions and receiving information relative to any matter within the purview of the contract with the intent and for the purpose of safeguarding the interests of the United States, coordinating efforts, and promoting mutually beneficial relationships, and making decisions within the scope of his delegated authority and not in conflict with any provision of the contract.

SEC. 5. Amend the Act of June 14, 1934 (48 Stat. 957), after the enacting clause to read as follows: "That the Secretary of the Navy be, and he is hereby, authorized to acquire, by purchase or condemnation, additional lands adjacent to the Hampton Roads Naval Operating Base, Norfolk, Virginia, such lands lying north of the Virginian Railway and west of Granby Street. The sum of $500,000 authorized by Section 1 of the bill (H. R. 4278), as enacted, for the acquisition of land at or in the vicinity of Norfolk, Virginia, shall be available for the purposes of this Act."

The Act of June 14, 1934 (48 Stat. 957):

That the Secretary of the Navy be, and he hereby is, authorized and directed to acquire, by purchase or condemnation, additional tracts of land adjacent to and lying southeastwardly from the Hampton Roads Naval Operating Base, Norfolk, Virginia, said land being generally known as "East Camp", together with such additional land adjoining same as is necessary for the development and expansion of naval air activities at said station, and comprising approximately five hundred and forty acres and being bounded by Mason Creek on the north and east, Bou Creek on the west, and the Virginian Railway on the south; and there is hereby authorized to be appropriated for the purchase of this entire tract the sum of $400,000.

## MINORITY VIEWS—GUAM

After 1946, when the present program for the political independence of the Philippine Islands will have been made complete, the Island of Guam will be the most westerly insular possession of the United States. It is 5,400 miles west of San Francisco, 3,337 miles west of Hawaii, 1,309 miles west of Wake Island and within 1,500 miles of Yokohama, Japan. Inhabited by approximately 20,000 persons, it is 30 miles in length and 6 miles in width. Like Midway, Johnston, Palmyra, and Wake Islands, Guam is under the supervision of the Navy Department.

We recognize the right of the United States to establish military facilities at Guam. We recognize and approve of the necessity of harbor improvement provided by this measure for the purpose of aiding commercial trans-Pacific aviation. Were this work to be done by the United States as a regular river and harbor improvement by the Army Engineers, as is the case of the improvements being made at Midway Island which are similar to those now proposed for Guam, we would have no objection. To do this work by the Navy Department as a part of its program to increase and improve the air facilities and bases for the purposes of military preparedness is involved with implications of such grave importance as to justify its omission from a naval defense measure.

Although the work is of a minor military nature and the Navy Department has definitely declared that there is no present intention to seek further naval improvement at Guam, it is obvious that this work is the first and essential step to the ultimate fortification of the island. The hazards involved in taking a step such as this, minor though it is in itself, when done by the military establishment of the country are, to our minds, too great a price to pay for the benefits that might inure either to commercial aviation or to the naval air service. Divorce these improvements from any military implication, make them as a civil improvement and there can be no objection from any source.

JOSEPH B. SHANNON.
RALPH E. CHURCH.
W. STERLING COLE.
GEORGE J. BATES.
WILLIAM E. HESS.
ARTHUR B. JENKS.



O

15.813-5 **Contract clause.**

The contracting officer shall insert the clause at 52.215-32, Certification of Commercial Pricing, in all solicitations and contracts unless exempted under 15.813-3(a) or (b)(1).

[50 FR 27562, July 3, 1985]

## Subpart 15.9—Profit

15.900 **Scope of subpart.**

This subpart—

(a) Prescribes policies for establishing the profit or fee portion of the Government prenegotiation objective;

(b) Applies to price negotiations based on cost analysis;

(c) Prescribes policies for agencies' development and use of a structured approach for determining the profit or fee prenegotiation objective (see 15.905 for the contents of a structured approach); and

(d) Specifies (1) situations requiring contracting officers to analyze profit and (2) considerations for that analysis.

15.901 **General.**

(a) Profit or fee prenegotiation objectives do not necessarily represent net income to contractors. Rather, they represent that element of the potential total remuneration that contractors *may* receive for contract performance over and above allowable costs. This potential remuneration element and the Government's estimate of allowable costs to be incurred in contract performance together equal the Government's total prenegotiation objective. Just as actual costs may vary from estimated costs, the contractor's actual realized profit or fee may vary from negotiated profit or fee, because of such factors as efficiency of performance, incurrence of costs the Government does not recognize as allowable, and contract type.

(b) It is in the Government's interest to offer contractors opportunities for financial rewards sufficient to (1) stimulate efficient contract performance, (2) attract the best capabilities of qualified large and small business concerns to Government contracts, and (3) maintain a viable industrial base.

(c) Both the Government and contractors should be concerned with profit as a motivator of efficient and effective contract performance. Negotiations aimed merely at reducing prices by reducing profit, without proper recognition of the function of profit, are not in the Government's interest. Negotiation of extremely low profits, use of historical averages, or automatic application of predetermined percentages to total estimated costs do not provide proper motivation for optimum contract performance. With the exception of statutory ceilings in 15.903(d) on profit and fee, agencies shall not (1) establish administrative ceilings or (2) create administrative procedures that could be represented to contractors as de facto ceilings.

15.902 **Policy.**

(a) Structured approaches (see 15.905) for determining profit or fee prenegotiation objectives provide a discipline for ensuring that all relevant factors are considered. Subject to the authorities in 1.301(c), agencies making noncompetitive contract awards over $100,000 totaling $50 million or more a year—

(1) Shall use a structured approach for determining the profit or fee objective in those acquisitions that require cost analysis; and

(2) May prescribe specific exemptions for situations in which mandatory use of a structured approach would be clearly inappropriate.

(b) Agencies may use another agency's structured approach.

15.903 **Contracting officer responsibilities.**

(a) When the price negotiation is not based on cost analysis, contracting officers are not required to analyze profit.

(b) When the price negotiation is based on cost analysis, contracting officers in agencies that have a structured approach shall use it to analyze profit. When not using a structured approach, contracting officers shall comply with 15.905-1 in developing profit or fee prenegotiation objectives.

(c) Contracting officers shall use the Government prenegotiation cost objec-

tive amounts as the basis for calculating the profit or fee prenegotiation objective. Before the allowability of facilities capital cost of money, this cost was included in profits or fees. Therefore, before applying profit or fee factors, the contracting officer shall exclude any facilities capital cost of money included in the cost objective amounts. If the prospective contractor fails to identify or propose facilities capital cost of money in a proposal for a contract that will be subject to the cost principles for contracts with commercial organizations (see Subpart 31.2), facilities capital cost of money will not be an allowable cost in any resulting contract (see 15.904).

(d) (1) The contracting officer shall not negotiate a price or fee that exceeds the following statutory limitations, imposed by 10 U.S.C. 2306(d) and 41 U.S.C. 254(b):

(i) For experimental, developmental, or research work performed under a cost-plus-fixed-fee contract, the fee shall not exceed 15 percent of the contract's estimated cost, excluding fee.

(ii) For architect-engineering services for public works or utilities, the contract price or the estimated cost and fee for production and delivery of designs, plans, drawings, and specifications shall not exceed 6 percent of the estimated cost of construction of the public work or utility, excluding fees.

(iii) For other cost-plus-fixed-fee contracts, the fee shall not exceed 10 percent of the contract's estimated cost, excluding fee.

(2) The limitations in subdivisions (1)(i) and (iii) above shall apply also to the maximum fees on cost-plus-incentive-fee and cost-plus-award-fee contracts. However, a deviation to the maximum-fee limitation for a specific cost-plus-incentive-fee or cost-plus-award-fee contract may be authorized in accordance with Subpart 1.4.

(e) The contracting officer shall not require any prospective contractor to submit details of its profit or fee objective but shall consider them if they are submitted voluntarily.

(f) If a change or modification (1) calls for essentially the same type and mix of work as the basic contract and (2) is of relatively small dollar value compared to the total contract value, the contracting officer may use the basic contract's profit or fee rate as the prenegotiation objective for that change or modification.

[48 FR 42187, Sept. 19, 1983, as amended at 50 FR 23606, June 4, 1985]

### 15.904 Solicitation provision and contract clause.

The contracting officer shall insert the clause at 52.215-30, Facilities Capital Cost of Money, and the clause at 52.215-31, Waiver of Facilities Capital Cost of Money, in solicitations and contracts that are subject to the cost principles for contracts with commercial organizations (see Subpart 31.2). If, however, the contractor elects to claim facilities capital cost of money as an allowable cost in the contractor's proposal, the clause at 52.215-31 is inapplicable in the resulting contract.

### 15.905 Profit-analysis factors.

### 15.905-1 Common factors.

Unless it is clearly inappropriate or not applicable, each factor outlined in paragraphs (a) through (f) following shall be considered by agencies in developing their structured approaches and by contracting officers in analyzing profit whether or not using a structured approach.

(a) *Contractor effort.* This factor measures the complexity of the work and the resources required of the prospective contractor for contract performance. Greater profit opportunity should be provided under contracts requiring a high degree of professional and managerial skill and to prospective contractors whose skills, facilities, and technical assets can be expected to lead to efficient and economical contract performance. Subfactors (1) through (4) following shall be considered in determining contractor effort, but they may be modified in specific situations to accommodate differences in the categories used by prospective contractors for listing costs:

(1) *Material acquisition.* This subfactor measures the managerial and technical effort needed to obtain the required purchased parts and material, subcontracted items, and special tooling. Considerations include (i) the

**16.301-2 Application.**

Cost-reimbursement contracts are suitable for use only when uncertainties involved in contract performance do not permit costs to be estimated with sufficient accuracy to use any type of fixed-price contract.

**16.301-3 Limitations.**

A cost-reimbursement contract may be used only when—

(a) The contractor's accounting system is adequate for determining costs applicable to the contract;

(b) Appropriate Government surveillance during performance will provide reasonable assurance that efficient methods and effective cost controls are used; and

(c) A determination and findings has been executed, in accordance with agency procedures, showing that (1) this contract type is likely to be less costly than any other type or (2) it is impractical to obtain supplies or services of the kind or quality required without the use of this contract type (see 10 U.S.C. 2306(c), 2310(b), and 2311 or 41 U.S.C. 254(b), 257(b), and 257(a)).

(d) See 15.903(d) for statutory limitations on price or fee.

[48 FR 42219, Sept. 19, 1983, as amended at 50 FR 1742, Jan. 11, 1985; 50 FR 52429, Dec. 23, 1985]

**16.302 Cost contracts.**

(a) *Description.* A cost contract is a cost-reimbursement contract in which the contractor receives no fee.

(b) *Application.* A cost contract may be appropriate for research and development work, particularly with nonprofit educational institutions or other nonprofit organizations, and for facilities contracts.

(c) *Limitations.* See 16.301-3.

**16.303 Cost-sharing contracts.**

(a) *Description.* A cost-sharing contract is a cost-reimbursement contract in which the contractor receives no fee and is reimbursed only for an agreed-upon portion of its allowable costs.

(b) *Application.* A cost-sharing contract may be used when the contractor agrees to absorb a portion of the costs, in the expectation of substantial compensating benefits.

(c) *Limitations.* See 16.301-3.

**16.304 Cost-plus-incentive-fee contracts.**

A cost-plus-incentive-fee contract is a cost-reimbursement contract that provides for an initially negotiated fee to be adjusted later by a formula based on the relationship of total allowable costs to total target costs. Cost-plus-incentive-fee contracts are covered in Subpart 16.4, Incentive Contracts. See 16.404-1 for a more complete description and discussion of application of these contracts. See 16.301-3 for limitations.

**16.305 Cost-plus-award-fee contracts.**

A cost-plus-award-fee contract is a cost-reimbursement contract that provides for a fee consisting of (a) a base amount (which may be zero) fixed at inception of the contract and (b) an award amount, based upon a judgmental evaluation by the Government, sufficient to provide motivation for excellence in contract performance. Cost-plus-award-fee contracts are covered in Subpart 16.4, Incentive Contracts. See 16.404-2 for a more complete description and discussion of application of these contracts. See 16.301-3 and 16.404-2(c) for limitations.

**16.306 Cost-plus-fixed-fee contracts.**

(a) *Description.* A cost-plus-fixed-fee contract is a cost-reimbursement contract that provides for payment to the contractor of a negotiated fee that is fixed at the inception of the contract. The fixed fee does not vary with actual cost, but may be adjusted as a result of changes in the work to be performed under the contract. This contract type permits contracting for efforts that might otherwise present too great a risk to contractors, but it provides the contractor only a minimum incentive to control costs.

(b) *Application.* (1) A cost-plus-fixed-fee contract is suitable for use when the conditions of 16.301-2 are present and, for example—

(i) The contract is for the performance of research or preliminary exploration or study, and the level of effort required is unknown; or

(ii) The contract is for development and test, and using a cost-plus- incentive-fee contract is not practical.

(2) A cost-plus-fixed-fee contract normally should not be used in development of major systems (see Part 34) once preliminary exploration, studies, and risk reduction have indicated a high degree of probability that the development is achievable and the Government has established reasonably firm performance objectives and schedules.

(c) *Limitations*. No cost-plus-fixed-fee contract shall be awarded unless—

(1) All limitations in 16.301-3 are complied with; and

(2) The agency head or designee has signed a determination and findings establishing the basis for application of the statutory price or fee limitation (see 15.903(d)).

(d) *Completion and term forms*. A cost-plus-fixed-fee contract may take one of two basic forms—completion or term.

(1) The completion form describes the scope of work by stating a definite goal or target and specifying an end product. This form of contract normally requires the contractor to complete and deliver the specified end product (e.g., a final report of research accomplishing the goal or target) within the estimated cost, if possible, as a condition for payment of the entire fixed fee. However, in the event the work cannot be completed within the estimated cost, the Government may require more effort without increase in fee, provided the Government increases the estimated cost.

(2) The term form describes the scope of work in general terms and obligates the contractor to devote a specified level of effort for a stated time period. Under this form, if the performance is considered satisfactory by the Government, the fixed fee is payable at the expiration of the agreed-upon period, upon contractor certification that the level of effort specified in the contract has been expended in performing the contract work. Renewal for further periods of performance is a new acquisition that involves new cost and fee arrangements.

(3) Because of the differences in obligation assumed by the contractor, the completion form is preferred over the term form whenever the work, or specific milestones for the work, can be defined well enough to permit development of estimates within which the contractor can be expected to complete the work.

(4) The term form shall not be used unless the contractor is obligated by the contract to provide a specific level of effort within a definite time period.

[48 FR 42219, Sept. 19, 1983, as amended at 50 FR 1742, Jan. 11, 1985; 50 FR 52429, Dec. 23, 1985]

### 16.307 Contract clauses.

(a) The contracting officer shall insert the clause at 52.216-7, Allowable Cost and Payment, in solicitations and contracts when a cost-reimbursement contract (other than a facilities contract) is contemplated. If the contract is with an educational institution, modify the clause by deleting from paragraph (a) the words "Subpart 31.2" and substituting for them "Subpart 31.3." If the contract is with a State or local government, modify the clause by deleting from paragraph (a) the words "Subpart 31.2" and substituting for them "Subpart 31.6." If the contract is with a nonprofit organization other than an educational institution, a State or local government, or a nonprofit organization exempted under OMB Circular No. A-122, modify the clause by deleting from paragraph (a) the words "Subpart 31.2" and substituting for them "Subpart 31.7."

(b) The contracting officer shall insert the clause at 52.216-8, Fixed Fee, in solicitations and contracts when a cost-plus-fixed-fee contract (other than a facilities contract or a construction contract) is contemplated.

(c) The contracting officer shall insert the clause at 52.216-9, Fixed-Fee—Construction, in solicitations and contracts when a cost-plus-fixed-fee construction contract is contemplated.

(d) The contracting officer shall insert the clause at 52.216-10, Incentive Fee, in solicitations and contracts when a cost-plus-incentive-fee contract (other than a facilities contract) is contemplated.

US Army Corps
of Engineers®

EP 715-1-7
31 July 2002

# ARCHITECT-ENGINEER CONTRACTING



Approved for public release. Distribution is unlimited.

CECW-ET
CEPR-P

**DEPARTMENT OF THE ARMY**
**U.S. Army Corps of Engineers**
**Washington, DC 20314-1000**

EP 715-1-7

Pamphlet
No. 715-1-7

31 July 2002

# Procurement
# ARCHITECT-ENGINEER CONTRACTING

1. Purpose.

a. This pamphlet provides guidance and procedures for contracting for architect-engineer (A-E) services in accordance with the Brooks Architect-Engineer Act and the acquisition regulations referenced below. The guidance and procedures in this pamphlet are intended to promote fair, efficient and consistent A-E contracting practices throughout the U.S. Army Corps of Engineers (USACE).

b. Adherence to the guidance and procedures herein will ensure proper compliance with the acquisition regulations, and any variations therefrom must be documented in the contract file (provided the variations do not violate the acquisition regulations).

c. This pamphlet provides guidance and procedures for implementing certain key portions of the acquisition regulations relevant to A-E contracting. However, it is not intended to cover all aspects of the A-E contracting process and should not be used as a substitute for the current acquisition regulations (the FAR system) which provide procurement policy. If a conflict arises between this pamphlet and the acquisition regulations, the acquisition regulations govern.

2. Applicability. This pamphlet applies to all USACE commands authorized to procure A-E services, and to all USACE programs.

3. Distribution Statement. Approved for public release. Distribution is unlimited.

4. References.

a. Brooks Architect-Engineer Act; Public Law 92-582, as amended; 40 United States Code (U.S.C.) 541-544 (Appendix A).

b. Federal Acquisition Regulation (FAR) and the Defense (DFARS), Army (AFARS) and Corps of Engineers (EFARS) supplements thereto.

c. Army Regulation (AR) 25-55, The Department of the Army Freedom of Information Act Program.

d. AR 215-4, Nonappropriated Fund Contracting.

---

This pamphlet supersedes EP 715-1-7, dated 31 May 1999.

e. Engineer Regulation (ER) 5-1-11, U.S. Army Corps of Engineers Business Process.

f. ER 1105-2-100, Planning Guidance Notebook.

g. ER 1110-1-12, Engineering and Design Quality Management.

h. ER 1110-1-8152, Professional Registration.

i. ER 1180-1-9, Design-Build Contracting.

j. Engineer Pamphlet (EP) 715-1-4, Architect-Engineer Contracts: Competing for Architect-Engineer Contracts Awarded by the U.S. Army Corps of Engineers.

k. Engineer Manual (EM) 1110-1-1000, Photogrammetric Mapping.

5. Acronyms. Appendix B contains a list of acronyms used in this pamphlet.

FOR THE COMMANDER:

31 Appendices
(See Table of Contents)

JOSEPH SCHROEDEL
Colonel, Corps of Engineers
Chief of Staff

# CHAPTER 4
# NEGOTIATION AND AWARD

4-1. Principles.

a. Contract negotiation is a team effort among properly trained and well-prepared personnel in engineering, contracting, counsel, project management and other appropriate functional elements.

b. Negotiation will be based on a thorough SOW that fully conveys the customer's requirements and the pertinent technical criteria.

c. Negotiations will be conducted in a professional and sincere manner.

d. The primary objective in negotiation is to agree on a price which is fair and reasonable to the Government (not necessarily the lowest price) and gives the A-E firm sufficient financial incentive to produce quality services and products on schedule.

4-2. Responsibilities. Commanders will ensure that personnel who negotiate A-E services are properly trained.

4-3. Regulatory Basis. A-E contract negotiations will be primarily conducted in accordance with FAR 15.4, 36.605 and 36.606, and supplements thereto.

4-4. Negotiation Team.

a. Team Members.

(1) A-E contract negotiation is a team effort among engineers, architects, contracting specialists, counsel, contract auditors (provide advisory support) and other specialists, under the authority of the KO who is solely responsible for the final price agreement (FAR 15.405(a)). The negotiation team must collectively have a thorough knowledge and understanding of the A-E business community, the detailed project requirements, applicable technical criteria, and contracting policies. (In this pamphlet, negotiators means the members of the Government negotiation team.)

(2) There is no regulation that precludes a Government employee who sat on an evaluation board for an A-E contract from participating on the negotiation team for that contract. Also, there is no regulation that precludes a member of the negotiation team from participating in the administration of the contract. However, the KO may impose such restrictions if necessary to ensure the integrity of the system of checks and balances.

b. Training. Engineers, architects and surveyors who are primary participants in A-E negotiations will have the following minimum contracting training:

(1) "Architect-Engineer Contracting," PROSPECT course 004; or DAU course CON

243 (same title).

(2) A course on basic Federal contracting, approved by the local Director/Chief of Contracting, such as DAU course 101, Basics of Contracting, or a commercial course.

(3) A course on Government contract law, approved by the local Director/Chief of Contracting, such as DAU course 210, Government Contract Law, or a commercial course.

4-5. Statement of Work. A thorough SOW is the basis for negotiating a fair and reasonable price, successful performance, and fair and effective administration of an A-E contract or task order. The SOW is included as Section C in the Uniform Contract Format (UCF; FAR 15.204-1 and EFARS 15.204(a)). A SOW will typically include the following topics:

a. General responsibilities of the A-E firm.

b. Project description, including estimated construction cost, if relevant.

c. Scope of A-E services.

d. Schedule and deliverables. Refer to the most recent guidance from the Tri-Service CADD/GIS Technology Center on sample contract language for CADD and GIS deliverables.

e. Reviews and conferences.

f. Technical criteria and standards, including Government-furnished information.

g. Administrative instructions.

h. General provisions.

Appendix V is an example statement of work for a task order.

4-6. Request for Price Proposal. A firm will be notified by the KO in writing (except for urgent situations) of its selection for negotiation of a contract action (contract, task order, or modification to a contract or task order) and requested to submit a price proposal (FAR 36.606(b)). Appendix W provides RFPP instructions.

4-7. Preproposal Conference.

a. General. When appropriate, a preproposal conference(s) may be held between the A-E firm and pertinent Government representatives to discuss and resolve questions concerning the contract requirements, SOW, and RFPP instructions. The project site may also be inspected if appropriate. An A-E firm's costs for preparing proposals and attending preproposal conferences are normal costs of doing business and are included in a firm's overhead rate. A firm is not compensated for attending a preproposal conference unless the

firm performs work of tangible benefit to the Government in connection with the conference, and the work is properly authorized in advance by the KO.

b. Contract Requirements. At the preproposal conference or at some other time early in the negotiation period, the Government will discuss the following contract requirements with the A-E firm and document these discussions in the price negotiation memorandum (PNM):

(1) Performance evaluation process (FAR 36.604, EFARS 36.604 and Chapter 6 of this pamphlet).

(2) Liability for Government costs resulting from design errors or deficiencies (FAR 36.608, 36.609-2, and 52.236-23, and Chapter 7 of this pamphlet).

(3) Design within funding limitations (FAR 36.609-1 and 52.236-22), when applicable.

(4) Registration of designers (FAR 36.609-4 and 52.236-25), when applicable.

(5) Payments (FAR 32.111(d)(1) and 52.232-10, and paragraph 5-7 of this pamphlet).

(6) Subcontractors and Outside Associates and Consultants (Architect-Engineer Services) (FAR 36.606(e), 44.204(b) and 52.244-4)[1].

(7) Subcontracting plan requirements and reporting if the A-E firm is a large business and the contract is over $500,000 (see paragraphs 4-15 and 5-8).

4-8. Partnering.

a. General. Partnering is the development and sustainment of a relationship that promotes achievement of mutually beneficial goals. See ER 1110-1-12 for additional guidance on partnering, including a sample partnering agreement. If a formal partnering agreement is desired by the Government and/or the A-E firm, it should be discussed during negotiations. However, partnering is voluntary and does not begin until after contract award.

b. Costs. Since it is voluntary, a firm is not directly compensated for partnering on its contract. Typically, the Government and the A-E firm share the costs of partnering, with the A-E firm absorbing its costs in its overhead. However, an A-E firm may be compensated for participating in partnering meetings during construction when the firm's attendance is

[1] The prime A-E firm must obtain the KO's consent to change any subcontractors that were identified during selection and negotiation. The KO should refer the qualifications of any new subcontractor to the original selection board (to the extent that these individuals are available) for evaluation. The KO and negotiators may and should strongly encourage contractors to use a qualification-based selection process like the Brooks A-E Act instead of bidding when selecting subcontractors for professional services.

necessary to discuss the design intent, procedures for responding to the construction contractor's questions on the drawings and specifications, scheduling considerations, or similar project issues. Partnering meetings should be scheduled concurrently with required meetings to minimize costs.

4-9. Service Contract Act (SCA). The SCA (FAR 22.10) applies to an A-E contract if the SOW involves the use of service employees (such as drilling and survey crews, clerks, CADD operators, photographers, and laboratory technicians) to a significant or substantial extent. If the SCA applies, a wage determination (WD) must be obtained from the U.S. Department of Labor (DoL) for the service employees anticipated in the contract. In most cases, the WD may be obtained electronically through the Labor Advisor in the local Office of Counsel. The WD must be provided to the firm for use in preparing its proposal. The proposed labor rates and benefits for service employees must be at least equal to the WD. For surveying and mapping contracts, the WD for the location of the performing office shall be used instead for the WD for the location of the work[2].

4-10. Independent Government Estimate (IGE). In accordance with FAR 36.605(a), an IGE is required for each A-E contract action expected to exceed $100,000 (total absolute value of all elements of the action, including credits). An informal or working estimate is recommended for actions of $100,000 or less. An IGE will be prepared and approved in accordance with the procedures in Appendices X and Y. Disclosure of the IGE will comply with FAR 36.605(b).

4-11. Fact-Finding Sessions. The negotiators may hold fact-finding sessions (FAR 15.406-1(a)) with a firm after receiving its price proposal and prior to negotiations. The purpose of fact-finding is to obtain information to better understand the proposal and its assumptions, and to clarify any ambiguities, omissions or uncertainties in the RFPP and SOW apparent after review of the proposal. After fact-finding, a revised proposal may be requested. Detailed proposal analysis or audit should not be performed until a conforming proposal (a proposal that properly reflects the SOW and complies with the RFPP instructions) is received. No negotiation will take place during fact-finding; that is, the Government will not state its bargaining position or objectives during fact-finding.

4-12. Proposal Analysis and Prenegotiation Objectives.

a. Proposal Analysis. An A-E proposal will be analyzed in accordance with FAR 15.404 and Appendix Z. Proposal analysis includes technical analysis, price analysis and cost analysis.

b. Audit. An audit should be considered for the cases listed in DFARS 215.404-

---

[2] In accordance with CIR Information Letter No. 96-3, CECC-L, 26 July 1996, subject: Service Contract Act Wage Determinations Relating to Surveying and Mapping Services.

2(a)(i)[3], and this consideration documented in the PNM. An audit is appropriate if the available information is inadequate to determine the reasonableness of the proposed price (FAR 15.404-2(a)). The Defense Contract Audit Agency (DCAA) is the cognizant audit agency for most USACE contracts.

c. Prenegotiation Objectives (PNO).

(1) PNO are developed after a proposal has been analyzed. The PNO are the pertinent negotiation issues and the cost and profit objectives (FAR 15.406-1). The numerical objectives will be shown in a tabular comparison with the corresponding elements of the proposal, IGE, and audit (if available). Keyed to the numerical objectives will be a discussion of the significant differences among the IGE, audit (if performed), PNO and proposal, and the issues to be covered during the negotiations. The PNO may be organized by phase of work, task, discipline, or other appropriate manner. The PNO are documented in a Prenegotiation Memorandum (PnM) which includes the significant details of the contracting action and the course of action the negotiators intend to pursue (AFARS 5115.406-1(b)).

(2) The review and approval of the PnM will be in accordance with local procedures and at the lowest practicable level appropriate for the complexity, risk and dollar value of the contract action. Local procedures may exempt the review and approval of PnM for small or routine actions.

4-13. Negotiation of FFP Contracts.

a. Conduct of Negotiations. Negotiations should be conducted in an atmosphere of professionalism, patience, and trust. The KO will assign appropriate responsibilities to the team members according to their expertise and maintain overall positive control of the negotiations. The negotiation team must be fully prepared and know what flexibility there is in the Government position. The negotiators must focus on the pertinent issues and be willing to adjust the Government's position when appropriate.

b. Statement of Work.

(1) General. The Government and A-E firm should have a common understanding of the SOW before discussing effort and price. The negotiators must ensure that the firm is proposing to use personnel and procedures appropriate for the required work. The negotiators must know if there is any flexibility in the SOW requirements, including the performance schedule. It might be possible to reach agreement if one or more items in the SOW are modified or deleted, or provided by the Government.

---

[3] Also consider an audit for an ID contract where the total contract amount, including all option periods, exceeds the pertinent threshold in DFARS 215.404-2(a)(i) for the anticipated type of task order (fixed-price or cost-reimbursement).

(2) Construction Cost. For a contract involving design, agreement must be reached on the estimated construction cost (ECC) of the project because it directly impacts compliance with the 6 percent statutory limitation (paragraph 4-13.c(3)) and the Design within Funding Limitation clause (paragraph 4-7.b(6)). The A-E firm must submit evidence of any perceived deficiencies in the Government cost estimate before the Government agrees to any adjustment to the ECC.

c. Price. Bottom-line price agreement is the primary negotiation objective. However, the negotiators should make a bottom-line price offer only as a final attempt to reach agreement after there is a common understanding of the SOW. The negotiators should not be preoccupied with any single cost item (such as labor hours, labor rates, overhead rates or profit) since agreement on every item is not required to reach overall price agreement (FAR 15.405(a) and (b)). Conversely, final agreement does not indicate agreement on all elements of the proposal. Significant items affecting price agreement must be discussed in accordance with the PNO. The negotiators should not place themselves in a position where they are defending the Government's position. Rather, a firm should be requested to explain and support its proposal and to offer appropriate revisions. Significant elements in price negotiation are discussed below.

(1) Labor and Overhead Costs.

(a) Position classifications and labor hours will be evaluated in the technical analysis (Appendix Z). Labor rates will be examined by audit or review of payroll records and evaluated for reasonableness. Overhead costs will be reviewed, which may include an audit, for allowability in accordance with FAR 31.2. The review will address the allocability of overhead costs to the contract, the acceptability of specific costs according to FAR 31.205, conformance with accounting standards (FAR 30), and reasonableness.

(b) Labor and overhead rates are negotiable. The reasonableness of labor and overhead rates will be evaluated by comparison with relevant market surveys (Appendix Y) and similar recent proposals (FAR 15.404-1(c)). When assessing reasonableness, a firm's costs should be compared to efficient, competitive firms in the same class (see Appendix X, paragraph 6.a). Verification of the actuality of labor rates and overhead rates, such as by audit, does not necessarily mean that they are reasonable. Also, firms can properly allocate costs in different ways. Hence, overhead rates, labor rates and the assignment of costs as direct or overhead must be considered together to fairly evaluate reasonableness.

(c) Accordingly, the PNO for labor rates and overhead rates shall not be based upon arbitrary caps. If labor rates and/or overhead rates are so high as to make the total price unreasonable, the negotiators should first seek justifiable reductions in the judgmental elements of the proposal (such as labor hours and position classifications) before negotiating the labor rates and overhead rates.

(2) Profit. It is in the Government's interest to negotiate sufficient profit to stimulate efficient contract performance and to attract the best qualified firms (FAR 15.404-4(a)(2) and (3)). Profit must not be negotiated until all costs have been agreed to. The negotiators

should be primarily concerned with the total dollar amount of proposed profit, and not the method or rationale used by the firm to estimate profit for itself and any subcontractors (FAR 15.404-4(c)(5)). The profit method for A-E contracts in EFARS 15.404-73-101 is only used in preparing the Government estimate of a fair and reasonable price. A firm is not required to compute its profit by this method.

(3) Statutory Limitation. The portion of the contract price for A-E services for the preparation of designs, plans, drawings and specifications may not exceed 6 percent of the project's ECC (FAR 15.404-4(c)(4)(i)(B) and 36.606(a), and DFARS 236.606-70). This limitation is statutory (10 U.S.C. 4540(b)). EFARS 36.606-70(c) provides examples of services that may be excluded from the A-E contract price when determining compliance with the statutory limitation. These examples will be used as a guide in determining other types of services that may be excluded. Preparation of the construction cost estimate is not excluded.[4] The 6 percent statutory limitation does not apply to a design-build contract, but does apply to an A-E contract for developing a design-build solicitation.

d. Acceptance or Termination of Negotiations. If agreement is reached, the firm will be advised not to begin work until directed by the KO. If agreement can not be reached, the firm will be requested to submit its best and final offer in writing (FAR 36.606(f)) within a reasonable time. If the firm does not submit a final offer in the stated time, its last written proposal will be used as the final offer. No further discussions will be held with a firm if its final offer is not completely acceptable. The firm will be sent a brief letter stating that negotiations are terminated. A PNM will be prepared documenting the unsuccessful negotiations and be approved by the KO. Negotiations may then begin with the next ranked firm. To preclude complaint or protest by the unsuccessful firm, no significant changes should be made in the SOW during negotiations with the next firm.

e. Modifications. The negotiation of modifications generally follows the same procedures as the negotiation of contracts in accordance with FAR Part 43.

4-14. Negotiation of ID Contracts. The negotiation of an ID contract is similar to a FFP contract, however the negotiation of total prices pertains only to the task orders issued under an ID contract. Agreement on labor rates and overhead rates is the central issue in the negotiation of an ID contract.

a. Labor and Overhead Rates.

---

[4] Preparation of the cost estimate is an integral part of "producing and delivering designs, plans, drawings and specifications" and is therefore, subject to the 6 percent limitation. The mandatory Design within Funding Limitation Clause (FAR 52.236-22) requires an A-E firm to design a project within the construction budget. The estimate must be prepared coincident with the construction documents to guide the selection of materials, components, and systems and keep the project within budget. Hence, the estimate is a necessary and integral part of the design process, and is not excludable.

(1) Labor and overhead rates will be evaluated similar to a FFP contract. Negotiation should concentrate on the important position classifications anticipated to be used in the contract. A specific hourly or daily rate must be negotiated for each position classification, and a common understanding reached on the type of work that each level of employee will do.

(2) Disagreement over the labor rate for a certain position classification might be resolved by the use of additional classification levels (such as three experience levels for an architect instead of one), or by adjusting the proportion of time of individual employees with different labor rates which comprise that classification. Also, disagreement over labor and/or overhead rates may be resolved by negotiating composite labor and overhead rates. Rates (or a method for determining rates, such as reference to Engineering News-Record cost indices) for contract option periods must also be negotiated.

b. Travel. The schedule of negotiated contract rates will include unit costs for all anticipated travel items such as vehicle cost per mile or day and per diem for certain locations of work. For travel that can not be anticipated, the contract may include a statement that travel costs will be computed in accordance with FAR 31.205-46.

c. Other Direct Costs. A unit cost or price should be negotiated for all anticipated supplies (such as survey monuments) or support services (such as soils tests or computer use). Unit costs or prices may also be negotiated for specific types of services, such as a daily rate for a survey crew or per acre rate for a topographic survey.

d. Profit. Profit will usually be negotiated for each task order under an ID contract. However, a standard profit rate for all task orders may be established in an ID contract if all orders will be very similar in nature, complexity, risk, price, and performance period. In either case, the profit rate will be applied to the total of the prime firm's costs and any subcontractors' costs (without profit) to avoid unreasonable layering of profit (i.e., no profit on profit).

e. Acceptance or Termination of Negotiations. Agreement on every rate, such as labor, overhead, or travel, is not necessary. The negotiators should consider the impact of specific rates on the prices of typical task orders anticipated under the contract. The rates for certain classifications (such as a principal) may exceed the PNO but may not be significant costs in typical task orders. If the final offer is not acceptable, negotiations will be terminated similar to a FFP contract.

f. Task Orders.

(1) The negotiation of a FFP task order is very similar to a FFP contract, except that the labor rates, overhead rates, and certain other unit costs or prices (and maybe profit) are already fixed in the ID contract. Also, there is a limitation in an ID contract on the cumulative amount of all orders that must be considered, and possibly a limitation on the price of individual task orders. Negotiation typically concerns the quantity and mix of various position classifications. A task order may be modified, have options, or include work

involving minor cost elements that are not in the contract rate schedule.

(2) The SOW of a task order must be within the scope of the ID contract (FAR 16.505(a)(2)). For any task order over $500,000, the contract file must be documented to justify why a task order was used instead of publicly announcing the requirement (EFARS 36.601-3-90(c)). The reasons should relate to the basic reasons for using an ID contract in EFARS 16.501(S-103)(a). Also, the contract file must be documented to justify the basis for issuing a task order under a particular ID contract when the order could have been issued under more than one ID contract (EFARS 16.505(b)(1)). Price can not be considered.

4-15. Subcontracting Plan. A Small Business Subcontracting Plan is required for any A-E contract over $500,000 (including any options) with a large business if there are subcontracting possibilities (FAR 19.702, 19.704, 19.705-2 and 52.219-8). See Appendix J for further details. The subcontracting plan is an element of the negotiation process and is made a part of the contract. A change in subcontractors from those proposed on the SF 255 must be approved by the KO (FAR 44.201-3(a)); see paragraph 4-7(b)(6)).

4-16. Price Negotiation Memorandum. The negotiators will complete the PNM (FAR 15.406-3 and supplements thereto) promptly after concluding negotiations. A PNM will discuss the principal elements of the negotiation. The PNM will demonstrate that the final accepted price complies with the 6 percent statutory limitation, if applicable. If an audit was performed, the PNM will discuss any deviations from the audit recommendations in the final negotiated price. A PNM shall be prepared, reviewed and approved in accordance with local procedures (EFARS 15.406-3(a)). Ordinarily, review and approval of a PNM should be concurrent with the review and approval of the final contract instrument.

4-17. Preaward Survey. The selection process addresses the technical capability, production resources and quality assurance methods of the firm. Hence, a short-form preaward survey report (only SF 1403, Preaward Survey of Prospective Contractor (General)) in accordance with FAR 9.106-4(d) is typically adequate. The preaward survey can be initiated after selection approval to avoid delaying award of a contract. The main emphasis of the preaward survey should be checking the financial capability of the firm through Dunn and Bradsteet reports, statements from the firm's bank, annual financial statements, or other appropriate means. Also, a contractor must be registered in the DoD Central Contractor Registration (CCR)[5] to be eligible for a contract (DFARS 204.73 and 252.204-7004).

4-18. Contract Preparation and Award.

a. General. An A-E contract will be prepared using the uniform contract format in

[5] A firm does not have to be registered in the CCR, nor have a Data Universal Numbering System (DUNS) number or Commercial and Government Entity (CAGE) code (both of which are required by the CCR), to be considered by an A-E evaluation board. Hence, a synopsis may request that interested firms include their DUNS number and/or CAGE code on their SF 255, if already assigned, but not mandate that firms obtain these identifiers as a condition of submission.

FAR 15.204.1, using SF 252, "Architect-Engineer Contract," as the cover sheet (FAR 36.702(a)). The contract may state a notice to proceed (NTP) date or the KO may send a separate NTP letter after contract award. If a contract is executed by mail, the KO should sign the contract after it has been signed by the contractor (FAR 4.101). However, if the action is urgent, an award letter (Appendix M) can be used, which also serves as the NTP.

b. ID Contracts. In order to satisfy the minimum contract guarantee (EFARS 16.504(a)(1)), the best practice is to issue the first task order using project funds at the same time the ID contract is awarded. If the first task order is not issued simultaneously with award of the ID contract, then the minimum guarantee shall be obligated[6] at the time of contract award using project funds, if the contract is customer-specific, or using the appropriate departmental overhead or revolving funds, if the contract serves many customers.

4-19. Task Order Issuance. IDC task orders are prepared using DD Form 1155, Order for Supplies or Services (DFARS 216.506). A DD Form 1155 for an ID contract task order need only be signed by the KO or ordering officer. The DD Form 1155 is a NTP.

4-20. NAF Contracts. AR 215-4 specifies the general procedures for NAF contracting. The FAR and its supplements, including the 6 percent statutory limitation, do not apply. Otherwise, the negotiation of an A-E contract for an NAF project should generally comply with this pamphlet.

4-21. Continuing Contracts Clause. The alternate continuing contracts clause prescribed at EFARS 32.705-100(b), and found at 52.232-5002, is appropriate for use in A-E contracts for civil works projects, including ID contracts[7]. The clause is used for incrementally-funded contracts when no contracting authority exists to obligate the entire contract price in advance of appropriations. Each increment of funding should produce a deliverable, such a required interim submittal.

---

[6] Immediately upon award of a task order(s) in sufficient amount to satisfy the minimum guarantee, the KO must deobligate the funds used to award the ID contract.

[7] A change to EFARS 32.705-100 is pending that will allow use of the "true" continuing contracts clause in A-E contracts for civil works water resource projects specifically adopted by Congress in authorizing legislation.

# APPENDIX K
# A-E CONTRACTING PROCESS



## A-E CONTRACTING PROCESS
## ACTIVITY DEFINITIONS

### ACQUISITION PLANNING PHASE

Authorization. Receipt of a formal authorization or customer request to initiate a project or A-E contract. Assignment of the project or contract to project delivery team members in project management, engineering, contracting and other appropriate functional areas.

Review of Requirements. Review of the project or contract requirements. Coordination with the customer to understand and refine the requirements, and obtain other pertinent information.

Preliminary Scope of Work (SOW). Preparation of the preliminary SOW based on review of the requirements and coordination with technical personnel and the customer.

Acquisition Plan. Decision on performance by the traditional design-bid-build method or an alternative method such as design-build (not procured as A-E services). Decision on which portion of work, if any, will be done by in-house personnel. Decision on packaging in one or multiple A-E contracts. Decision on appropriate A-E contract type. Development of a project management plan, including preliminary SOW, preliminary project budget (including preliminary estimate of A-E fee), schedule, and informal or formal acquisition plan, and their coordination with the customer and/or higher authority. Verification of the availability of funding with the customer.

Small Business Coordination. Coordination with the DSB and the SBA to identify prime contract and subcontracting opportunities for SB and SDB firms. Decision on set-aside for SB, ESB, 8(a) or HUBZone A-E firms. Preparation of DD Form 2579, Small Business Coordination Record.

**SELECTION PHASE** (Not applicable for task orders. However, if a task order can be issued under more than one ID contract, then the decision on which contract to use must be documented in the contract file. See EFARS 16.505(b)(1).)

Preparation of Synopsis. Preparation of the synopsis based on the preliminary SOW, and review and approval, as required. Electronic transmission of the synopsis to the FedBizOpps.

Synopsis Period. Minimum 30 days response period as required by FAR 5.203(c), for contracts expected to exceed the SAT.

Detailed Scope of Work. Development of a detailed SOW, including a description of the facility or project, design criteria, specific contract services and products, performance schedule, quality control requirements, and administrative instructions.

Preselection. A preselection board is optional. If a preselection board is not held, its functions will be performed by the selection board. Gathering and organizing documents for

evaluation by preselection and selection boards, including SFs 254 and 255 and performance evaluations. Conducting the preselection board and preparation of the board report. Scheduling board meetings, appointing board members, and preparing worksheets for both the preselection and selection boards should be done during the synopsis period.

Selection. Conducting a selection board and preparation of the board report.

Selection Approval. Review and approval of the selection report in accordance with the delegated selection authority in EFARS 36.602-4.

**PROPOSAL PHASE**

Request for Price Proposal (RFPP). Formal notification of selection for negotiation of a contract and RFPP sent to the most highly qualified firm. An RFPP is also sent for a task order under an ID contract. The RFPP includes the draft contract (not applicable to task orders), SOW, project documentation and design criteria.

Scope of Work Review by A-E. Review of the SOW, project documentation and design criteria by the A-E firm to prepare for the preproposal conference, if needed, and the development of its proposal.

Preproposal Conference. Conference(s) among the A-E firm, USACE personnel, customer and others as appropriate to discuss and refine project and contract requirements. Conference(s) may be by telephone, at the project site, in the firm's office or elsewhere, as appropriate.

Revised Scope Of Work. Resolution of any issues raised at the preproposal conference(s) and revision of the SOW accordingly.

Detailed Government Estimate. Preparation and approval of an IGE based on a detailed analysis of the SOW as required by FAR 36.605. Coordination with the customer and/or higher authority on estimated funding requirements.

A-E Price Proposal. Preparation and submission of a price proposal by the A-E firm. Includes preparation of a small business subcontracting plan if the A-E firm is a large business and the proposal exceeds $500,000 (not applicable for task orders).

Fact-Finding. Obtaining information in order to understand the A-E price proposal and its assumptions, and to clarify any ambiguities, omissions or uncertainties in the RFPP and SOW prior to negotiations (FAR 15.406-1(a)). After fact-finding, a revised proposal may be requested.

**NEGOTIATION PHASE**

Technical Analysis. Evaluation of the judgmental elements of the A-E proposal in accordance with FAR 15.404-1(e).

Audit. If considered necessary by the KO (FAR 15.404-2(a)).

Cost/Price Analyses and Prenegotiation Objectives (PNO). Evaluation of all cost elements of the A-E proposal in accordance with FAR 15.404-1(c), using the results of the technical analysis and the audit, if performed. Evaluation of the total price of the proposal and, as appropriate, the prices of phases or items of work in accordance with FAR 15.404-1(b). Based on the technical, cost and price analyses, development of the PNO in accordance with FAR 15.406-1. The proposal analysis and PNO are documented in a Prenegotiation Memorandum (PnM). Coordination with customer and/or higher authority on estimated funding requirements.

PnM Review and Approval. Review and approval of the PnM, in accordance with local procedures.

Negotiation. Negotiation of a fair and reasonable price in accordance with the PnM. Includes negotiation of an acceptable small business subcontracting plan (if applicable) and approval by the KO prior to contract award.

**CONTRACT AWARD PHASE**

Negotiation Documentation. Preparation of a PNM in accordance with FAR 15.406-3, preparation of the final SOW as a result of clarifications and changes during negotiations, and receipt of the final A-E proposal.

Funding Certification. Requesting, receiving and certifying the funds to award the contract or issue the task order.

Price Negotiation Memorandum (PNM) Review and Approval. Review and approval of the PNM in accordance with local procedures.

Contract Preparation. Preparation of SF 252, Architect-Engineer Contract, or preparation of DD Form 1155, Order for Supplies or Services, for a task order.

Contract Review and Award. Final review of the contract documentation and signing of the contract by the KO and the A-E firm, or signing of the task order by the KO.

# APPENDIX X
# INDEPENDENT GOVERNMENT ESTIMATES

1. General. An IGE for A-E services will be developed from a detailed analysis of the SOW, assuming reasonable economy and efficiency, and modern and effective methods. An IGE shall not be based on a percentage of construction cost, arbitrary ceilings, the availability of funds, or any cost or pricing information provided by the A-E firm. The intent of an IGE is to determine a price for the required work which is fair and reasonable to the Government (Comptroller General decision Dworsky Associates, B-248216, June 18, 1992, 92-1 CPD ¶ 533).

2. Preparation. An IGE will be prepared by engineers, architects, and/or other appropriate personnel having expertise (education, training and professional experience) in the type of work being contracted. Where available, cost and pricing specialists or auditors should be consulted for information on overhead, labor rates, and other pertinent unit costs and prices. An IGE will be marked "FOR OFFICIAL USE ONLY" and protected accordingly.

3. Approval. An IGE will be approved by a supervisor having expertise in the type of work being contracted. The level of supervisory approval will be appropriate for the complexity and dollar value of the contract action. An IGE will be approved prior to opening the related A-E price proposal. Internal management controls will be established to ensure that each IGE is prepared independently of the A-E proposal.

4. Revision. An IGE should be revised whenever there is a significant change in the SOW or a significant error or omission is discovered in the IGE. A revised IGE should normally be approved by the same person who approved the original IGE. Revision of an IGE is not required to justify accepting a proposal greater than the IGE if the significant differences are adequately explained in the PNM.

5. Statutory Limitation. The 6 percent statutory limitation for the "production and delivery of designs, plans, drawings and specifications" (FAR 15.404-4(c)(4)(i)(B) and 36.606(a), and EFARS 36.606-70(c)) will be carefully considered when preparing an IGE. An IGE will be clearly organized to show the elements of estimated price, including associated overhead and profit, subject to the 6 percent limitation, and the total of these elements of price expressed as a percentage of the estimated construction cost (excluding contingencies, and supervision and administration). For additional work or redesigned work, the estimated construction cost will be increased by the value of the additional or redesigned work (DFARS 236.606-70(b)).

6. Labor and Overhead Rates.

a. FFP Contracts. An IGE for a FFP contract will use labor and overhead rates representative of the class of A-E firms that have been selected as most highly qualified to perform the required work (EFARS 36.605(a)). Class includes such factors as firm size,

market area, specialization, and capabilities[1]. Appendix Y lists sources of information on labor and overhead costs in the A-E industry. Rates for the Government or the firm under negotiation will not be used since the objective of an IGE is to independently estimate a fair price for a competitive and efficient private firm, not the Government nor the firm under negotiation, to perform the required A-E services. Arbitrary limits on the overhead and labor rates used in an IGE are prohibited.

b. ID Contracts. An IGE for an ID contract will consist of an independent analysis of fair and reasonable rates for labor, overhead and other costs. An IGE for a task order will use the contract rates for labor, overhead, travel, supplies, services, and possibly profit (if the same profit rate is applicable to all orders).

7. Breakdown of Costs. An IGE will be organized to correspond to each phase or sub-phase of work in the SOW. The estimated price for each phase or sub-phase will be itemized to show the direct labor costs, overhead costs, travel costs, other direct costs, and profit.

a. Direct Labor Costs. The labor-hours needed for each position classification (types of disciplines at certain levels of expertise) are determined by analysis of the required tasks and products in the SOW. Reasonable effort must also be included for project management, quality control and assurance, clerical support, and coordination between disciplines. The estimated labor rates for work of extended duration or for later phases of work will be adjusted for escalation. If the SCA applies to the contract, the labor rates and benefits for service employees must be at least equal to those in the appropriate DoL wage determination.

b. Overhead. Overhead costs (also called indirect costs) include overhead on direct labor and general and administrative overhead. FAR 31 provides detailed guidance on overhead costs. An IGE will normally be prepared using a single overhead factor which combines overhead on direct labor with general and administrative overhead, expressed as a percentage of the total direct labor costs. This method is representative of the accounting practices of most A-E firms and is compatible with the market surveys in Appendix Y. Other overhead structures may be used in an IGE if representative of the class of firms selected for the work. An IGE may be prepared using separate overhead rates for the prime contractor and primary subcontractors if considered reasonable and typical for the type of work.

c. Travel. Travel requirements are determined from analysis of the SOW for tasks such as field investigation and meetings, based on the location of the firm selected for negotiation. Typical travel costs include rental car, company car mileage, airfare, parking fees, and per diem expenses. The labor of personnel when traveling will be included in the direct labor portion of an IGE. The unit cost and quantity of each travel item will be identified. Per diem and airfare costs are limited by FAR 31.205-46. The prevailing

[1] For example, for a major military command headquarters, the IGE would likely use labor and overhead rates representative of national, "top 100" firms. Conversely, for a standard vehicle maintenance building at a typical Army installation, the IGE would likely use rates of local, small-to-medium size firms.

privately owned vehicle mileage reimbursement rate for Government personnel will be used to estimate car mileage costs.

d. Other Direct Costs. Include all other necessary direct costs not included in direct labor and travel, and not ordinarily included in the overhead of an A-E firm. Commercial quotes from suppliers are usually available for these items. Typical other direct costs include: reproduction of documents for Government review, supplies, photographs, renderings, models, colorboards, long distance communications, laboratory tests, computer use, and postage.

e. Profit. Profit rates will be determined in accordance with EFARS 15.404-73-101. The profit rate will be applied to all costs (direct labor, overhead, travel and other direct) to estimate the dollar amount of profit. An IGE will not be structured with redundant levels of profit (no profit on profit)[2]. Hence, if an IGE is structured with subcontractors, the estimated costs (without profit) for the prime contractor and the subcontractors will be added to give the total cost base for applying the profit rate.

---

[2] The EFARS alternate structured approach to the weighted guidelines method (WGM) for A-E contracts yields profits that are substantially greater than the WGM in DFARS 215.404-71. Hence, estimating additional profit for layering of subcontractors is not warranted.

C

***1** COMPTROLLER GENERAL WARREN TO THE SECRETARY OF WAR
DECEMBER 18, 1941

****580** FEES - ARCHITECT-ENGINEERS - LIMITATIONS

PAYMENTS ON A COST-PLUS-A-FIXED-FEE BASIS TO ARCHITECT-ENGINEERS UNDER A WAR DEPARTMENT CONTRACT FOR SUCH SERVICES AUTHORIZED BY SECTION 2 OF THE ACT OF AUGUST 7, 1939, MAY NOT EXCEED THE STATUTORY MAXIMUM OF 6 PERCENT OF THE ESTIMATED COST OF THE PROJECT TO WHICH THE SERVICES ARE APPLICABLE, REGARDLESS OF WHETHER SUCH PAYMENTS ARE MADE AS REIMBURSEMENT OF EXPENDITURES OR AS A FIXED FEE, EXCEPT THAT THERE MAY BE EXCLUDED--- WITHIN THE LIMITS SET BY THE CONTRACT--- REIMBURSEMENT OF TRAVELING EXPENSES, EXPENDITURES FOR EXPERT TECHNICAL ASSISTANTS AND SERVICES, AND EXPENDITURES FOR SUCH SUPPLIES AND EQUIPMENT AS THE GOVERNMENT MAY HAVE FAILED TO FURNISH IN ACCORDANCE WITH THE CONTRACT. 20 COMP. GEN. 632, DISTINGUISHED.

THERE HAS BEEN CONSIDERED YOUR LETTER OF SEPTEMBER 16, 1941, AS FOLLOWS:
RECEIPT IS ACKNOWLEDGED OF A LETTER DATED JULY 29, 1941 (A-1WHS-1CE), FROM THE CHIEF, AUDIT DIVISION, GENERAL ACCOUNTING OFFICE, ADDRESSED TO THE DIRECTOR OF PURCHASES AND CONTRACTS, OFFICE OF THE UNDER SECRETARY OF WAR, IN WHICH REFERENCE IS MADE TO VARIOUS CONTRACTS RECEIVED IN THAT OFFICE, ENTERED INTO ON A COST-PLUS-A-FIXED-FEE BASIS UNDER THE PROVISIONS OF THE ACT OF AUGUST 7, 1939 (53 STAT. 1239), THE ACT OF JUNE 13, 1940 (54 STAT. 350), AND THE ACT OF JULY 2, 1940 (54 STAT. 712), COVERING ARCHITECTURAL AND ENGINEERING SERVICES.

IN THAT LETTER THE CHIEF, AUDIT DIVISION, INVITES ATTENTION TO SECTION 2 OF THE ACT OF AUGUST 7, 1939, WHICH RESTRICTS THE FEES OF ARCHITECTS AND ENGINEERS TO A MAXIMUM OF 6 PERCENT OF THE ESTIMATED COST OF THE INVOLVED PROJECT AND STATES THAT THE 'MAXIMUM FEE IS CONSIDERED TO BE INCLUSIVE OF ALL PAYMENTS FOR THE WORK PERFORMED, WHETHER AS REIMBURSEMENT FOR EXPENDITURES OR IN PAYMENT OF ****581** THE FIXED FEE.' HE THEN REQUESTS THAT HIS OFFICE BE ADVISED WHETHER IT HAS BEEN DETERMINED THAT THE COST OF ARCHITECTURAL AND ENGINEERING SERVICES COVERED BY THE VARIOUS CONTRACTS OF THE TYPE REFERRED TO WILL NOT EXCEED THE LIMITATION OF 6 PERCENT OF THE ESTIMATED COST OF THE PROJECTS TO WHICH APPLICABLE.

WITH REFERENCE TO THE REQUEST FOR INFORMATION AS TO THESE COSTS, YOU ARE ADVISED THAT DETAILED INFORMATION AND DATA ARE BEING SECURED FROM ALL BRANCHES OF THE SERVICE CONCERNING OPERATIONS UNDER THE ARCHITECT-ENGINEER CONTRACTS. CONSIDERABLE TIME WILL BE REQUIRED WITHIN WHICH TO ASSEMBLE AND ANALYZE THIS INFORMATION. IT MAY BE STATED THAT FROM A TENTATIVE STUDY MADE BY THE DIRECTOR OF PURCHASES AND CONTRACTS IT APPEARS THAT THE TOTAL FIXED-FEES OF THE VARIOUS CONTRACTS FOR ARCHITECT-ENGINEER SERVICES DURING THE FISCAL (YEAR) 1941, EXCLUSIVE OF REIMBURSEMENT FOR EXPENDITURES, WAS 10.52 PERCENT OF THE TOTAL ESTIMATED COSTS OF THE PROJECTS INVOLVED.

IN THIS CONNECTION THE WAR DEPARTMENT DOES NOT AGREE WITH THE CONCLUSIONS REACHED BY THE CHIEF, AUDIT DIVISION, GENERAL ACCOUNTING OFFICE, THAT THE MAXIMUM FEE IS CONSIDERED TO BE INCLUSIVE OF ALL PAYMENTS FOR THE WORK PERFORMED, WHETHER AS REIMBURSEMENT FOR EXPENDITURES OR IN PAYMENT OF THE FIXED-FEE. THE VIEWS OF THE WAR DEPARTMENT ARE EXPRESSED IN AN OPINION OF THE JUDGE ADVOCATE GENERAL ( JAG 161, SEPT. 4, 1941), A COPY OF WHICH IS ENCLOSED HEREWITH.

***2** THE WAR DEPARTMENT WOULD APPRECIATE YOUR CONSIDERATION OF THE QUESTION INVOLVED AND AN EXPRESSION OF YOUR VIEWS THEREON.

CONTRACT NO. W-6101-QM-147, DATED OCTOBER 7, 1940, WITH FRANK A. BARBOUR, IS TYPICAL OF

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

THE CONTRACTS HERE INVOLVED. UNDER THE TERMS THEREOF THE CONTRACTOR, DESIGNATED AS THE ARCHITECT-ENGINEER, AGREED TO PERFORM ALL THE NECESSARY SERVICES FOR THE PREPARATION OF DESIGNS, DRAWINGS, SPECIFICATIONS, AND TECHNICAL SUPERVISION FOR THE CONSTRUCTION OF A COMPLETE CANTONMENT, INCLUDING NECESSARY BUILDINGS, TEMPORARY STRUCTURES, UTILITIES, AND APPURTENANCES, ETC., AT FORT DEVENS, AYER, MASS. IN ARTICLE I OF THE CONTRACT THE ESTIMATED COST OF THE PROJECT WAS SHOWN AS $8,255,824, AND THE ESTIMATED TIME FOR COMPLETION AS THREE MONTHS.

ARTICLE IV OF THE CONTRACT CONTAINS THE FOLLOWING PROVISIONS:

1. EQUIPMENT AND SERVICES TO BE FURNISHED BY THE GOVERNMENT.--- THE GOVERNMENT SHALL PROVIDE FOR THE USE OF THE ARCHITECT-1ENGINEER'S FIELD ORGANIZATION DURING THE PERIOD COVERED BY THIS CONTRACT, ALL OFFICE AND DRAFTING ROOM SPACE, SUPPLIES, AND FACILITIES NECESSARY FOR THE PROPER PERFORMANCE OF WORK HEREUNDER INCLUDING, BUT NOT RESTRICTED TO, THE FOLLOWING: OFFICE AND DRAFTING ROOM SUPPLIES AND EQUIPMENT, SURVEYING EQUIPMENT, ELECTRICITY, HEATING, OFFICE AND DRAFTING SPACE, TYPEWRITERS, ADDING MACHINES, CALCULATORS, DESKS, FILING CASES AND CHAIRS, AND ALL BLUEPRINTING, DUPLICATING, PHOTOSTATING, TELEPHONE AND TELEGRAPH. THE FOREGOING ARTICLES, EQUIPMENT, OR SERVICES MAY BE FURNISHED AT THE ARCHITECT- ENGINEER'S HOME OFFICE IF APPROVED BY THE CONTRACTING OFFICER.

2. IN THE EVENT ANY OF THE FOREGOING ARTICLES, EQUIPMENT OR SERVICES, OR OTHER ITEMS REQUIRED BUT NOT MENTIONED, ARE NOT FURNISHED PROMPTLY BY THE GOVERNMENT, THE ARCHITECT-ENGINEER, WITH THE APPROVAL OF THE CONTRACTING OFFICER, SHALL PROCURE THE REQUIRED ARTICLES OR SERVICES, AND HE SHALL BE REIMBURSED THEREFOR, ON THE BASIS OF THE ACTUAL COST AS HEREINAFTER PROVIDED IN ARTICLE VI. UPON SUCH REIMBURSEMENT THE TITLE TO SUCH PURCHASED ITEMS SHALL IMMEDIATELY PASS TO THE GOVERNMENT.

IN ARTICLE V OF THE CONTRACT THE ESTIMATED PERIOD OF SERVICE REQUIRED OF THE ARCHITECT-ENGINEER WAS SHOWN AS FOUR MONTHS. ARTICLE VI OF THE CONTRACT PROVIDED THAT THE ARCHITECT-ENGINEER SHOULD BE PAID A FIXED FEE OF $43,620, WHICH SHOULD CONSTITUTE COMPLETE COMPENSATION FOR THE ARCHITECT-ENGINEER'S SERVICES, INCLUDING THE SERVICES OF THE RESIDENT ARCHITECT OR ENGINEER IN DIRECT CHARGE OF THE FIELD OFFICE, AND ALL OVERHEAD EXPENSES EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE ****582** CONTRACT. ARTICLE XII PROVIDED THAT AN EQUITABLE ADJUSTMENT SHOULD BE MADE IN THE FIXED FEE IF THE SCOPE OF THE WORK SHOULD BE MATERIALLY CHANGED, OR IF THE TIME REQUIRED OF THE ARCHITECT- ENGINEER SHOULD BE EXTENDED FOR MORE THAN 30 DAYS BEYOND THE 4-MONTH PERIOD ESTIMATED IN ARTICLE V. ARTICLE VII PROVIDED THAT, UNDER CERTAIN CONDITIONS, THE ARCHITECT-ENGINEER, WITH THE CONSENT AND APPROVAL OF THE CONTRACTING OFFICER, MIGHT EMPLOY SUCH SUPPLEMENTAL PROFESSIONAL SERVICES AS WERE NECESSARY FOR THE PROPER DESIGN AND EXECUTION OF THE PROJECT.

***3** IN ADDITION TO THE FIXED FEE OF $43,620 SPECIFIED IN ARTICLE VI, SAID ARTICLE PROVIDED, UNDER ' THAT THE ARCHITECT-ENGINEER SHOULD BE REIMBURSED FOR THE FOLLOWING EXPENDITURES:

(1) ACTUAL SALARIES OR WAGES PAID TO PRINCIPAL ASSISTANT ENGINEERS, ENGINEERS, ARCHITECTS AND OTHER TECHNICAL, ADMINISTRATIVE AND FIELD EMPLOYEES OF THE ARCHITECT-1ENGINEER DIRECTLY ENGAGED ON THE WORK INCLUDING THOSE IN BOTH HIS HOME AND FIELD OFFICE.

(2) IN CASE THE FULL TIME OF ANY EMPLOYEE OF THE ARCHITECT-1ENGINEER IS NOT APPLIED TO THE WORK HEREUNDER, THE SALARIES OR WAGES OF SUCH EMPLOYEES SHALL BE INCLUDED IN THIS ITEM ONLY IN PROPORTION TO THE ACTUAL TIME APPLIED THERETO.

(3) REIMBURSEMENT UNDER THIS ARTICLE SHALL INCLUDE EXPENDITURES DIRECTLY CHARGEABLE TO THE SERVICES AND WORK ORDERED UNDER THE TERMS OF THIS CONTRACT AT THE ARCHITECT-ENGINEER'S HOME AND FIELD OFFICES.

(4) THE ACTUAL COST OF EXPENDITURES MADE BY THE ARCHITECT-1ENGINEER UNDER THE PROVISIONS OF ARTICLE IV AND ARTICLE VII OF THIS CONTRACT, SUBJECT TO THE PROVISIONS OF PARAGRAPH B (2) ABOVE.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

(5) TRAVEL.--- IF THE ARCHITECT-1ENGINEER AND/OR HIS REPRESENTATIVES SHALL BE REQUIRED TO TRAVEL, THE GOVERNMENT WILL REIMBURSE THE ARCHITECT-1ENGINEER FOR THE TRANSPORTATION, INCLUDING PULLMAN WHERE NECESSARY, AND WILL ALLOW THE TRAVELER SIX DOLLARS ($6.00) PER DAY IN LIEU OF ALL OTHER EXPENSES. ALL AUTHORIZATIONS FOR TRAVEL MUST BE APPLIED FOR IN WRITING AND APPROVED BY THE CONTRACTING OFFICER. SHOULD THE ARCHITECT-1ENGINEER, OR ANY REPRESENTATIVE THEREOF, REMAIN IN A TRAVEL STATUS IN EXCESS OF SIX (6) DAYS AT ANY ONE TIME, NOT INCLUDING THE TIME CONSUMED IN TRAVEL, THE COST FOR SUCH EXCESS TRAVEL STATUS SHALL BE AT THE EXPENSE OF THE ARCHITECT-1ENGINEER, UNLESS OTHERWISE ORDERED IN WRITING BY THE CONTRACTING OFFICER?

AUTHORIZED TRAVEL BY AUTOMOBILE SHALL BE REIMBURSED AT THE RATE OF FIVE CENTS (0.05) PER MILE AS REPRESENTING THE ACTUAL COST OF SUCH TRAVEL.

(6) PAYMENTS FROM HIS OWN FUNDS MADE BY THE ARCHITECT-1ENGINEER UNDER THE FEDERAL SOCIAL SECURITY ACT, AND ANY APPLICABLE STATE OR LOCAL TAXES, FEES OR CHARGES WHICH THE ARCHITECT-1ENGINEER MAY BE REQUIRED TO PAY FROM HIS OWN FUNDS ON ACCOUNT OF THIS CONTRACT; AND, IF APPROVED IN WRITING BY THE CONTRACTING OFFICER IN ADVANCE, PERMITS AND LICENSE FEES, AND ROYALTIES ON PATENTS.

(7) COSTS OF SUCH BONDS AND INSURANCE POLICIES AND PREMIUMS THEREON AS THE CONTRACTING OFFICER MAY REQUIRE FOR THE PROTECTION OF THE GOVERNMENT AND MAY APPROVE AS REASONABLY NECESSARY FOR THE PROTECTION OF THE ARCHITECT- 1ENGINEER.

(8) SUCH OTHER ITEMS AS SHOULD, IN THE OPINION OF THE CONTRACTING OFFICER, BE INCLUDED IN THE COST OF THE SERVICES AND WORK, PROVIDED THAT WHEN SUCH ITEMS ARE ALLOWED BY THE CONTRACTING OFFICER, THEY SHALL BE SPECIFICALLY CERTIFIED AS BEING ALLOWED UNDER THIS PARAGRAPH.

THE ACT OF AUGUST 7, 1939, 53 STAT. 1239, INSOFAR AS HERE MATERIAL PROVIDES:

THAT TO ENABLE THE SECRETARY OF WAR TO ACCOMPLISH WITHOUT DELAY OR EXCESSIVE COST THOSE PUBLIC/WORKS PROJECTS FOR WHICH APPROPRIATIONS ARE AVAILABLE OR MAY BECOME AVAILABLE, TO BE LOCATED IN ALASKA AND THE PANAMA CANAL ZONE, HE IS HEREBY AUTHORIZED TO ENTER INTO CONTRACTS UPON A COST-PLUS-A-FIXED-FEE BASIS AFTER SUCH NEGOTIATIONS AS HE MAY AUTHORIZE AND APPROVE AND WITHOUT ADVERTISING FOR PROPOSALS WITH REFERENCE THERETO. APPROVAL BY THE PRESIDENT SHALL BE NECESSARY TO THE VALIDITY OF ANY CONTRACT ENTERED INTO UNDER AUTHORITY ****583** OF THIS SECTION. THE FIXED FEE TO BE PAID THE CONTRACTOR AS A RESULT OF ANY CONTRACT ENTERED INTO UNDER AUTHORITY OF THIS SECTION SHALL BE DETERMINED AT OR BEFORE THE TIME SUCH CONTRACT IS MADE, AND SHALL BE SET FORTH IN SUCH CONTRACT. SUCH FEE SHALL NOT EXCEED 10 PERCENTUM OF THE ESTIMATED COST OF THE CONTRACT, EXCLUSIVE OF THE FEE, AS DETERMINED BY THE SECRETARY OF WAR. CHANGES IN THE AMOUNT OF THE FEE SHALL BE MADE ONLY UPON MATERIAL CHANGES IN THE SCOPE OF THE WORK CONCERNED AS DETERMINED BY THE SECRETARY OF WAR WHOSE DETERMINATION SHALL BE CONCLUSIVE.

* * * * * * *

***4** SEC. 2. WHENEVER DEEMED BY HIM TO BE ADVANTAGEOUS TO THE NATIONAL DEFENSE, AND PROVIDING THAT IN THE OPINION OF THE SECRETARY OF WAR THE EXISTING FACILITIES OF THE WAR DEPARTMENT ARE INADEQUATE, THE SECRETARY OF WAR IS HEREBY AUTHORIZED TO EMPLOY, BY CONTRACT OR OTHERWISE, OUTSIDE ARCHITECTURAL OR ENGINEERING CORPORATIONS, FIRMS, OR INDIVIDUALS FOR THE PRODUCTION AND DELIVERY OF THE DESIGNS, PLANS, DRAWINGS, AND SPECIFICATIONS REQUIRED FOR THE ACCOMPLISHMENT OF ANY PUBLIC WORKS OR UTILITIES PROJECT OF THE WAR DEPARTMENT WITHOUT REFERENCE TO THE CLASSIFICATION ACT OF 1923 (42 STAT. 1488), AS AMENDED (5 U.S.C., CH. 13), OR TO SECTION 3709 OF THE REVISED STATUTES OF THE UNITED STATES (41 U.S.C. 5). IN NO CASE SHALL THE FEE PAID FOR ANY SERVICE AUTHORIZED BY THIS SECTION EXCEED 6 PERCENTUM OF THE ESTIMATED COST, AS DETERMINED BY THE SECRETARY OF WAR, OF THE PROJECT TO WHICH SUCH FEE IS APPLICABLE.

THE COPY OF THE OPINION ( JAG 161, SEPTEMBER 4, 1941) OF THE JUDGE ADVOCATE GENERAL, WHICH WAS TRANSMITTED WITH YOUR LETTER, IS, IN PERTINENT PART, AS FOLLOWS:

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

5. SECTION 1 OF THE ACT OF AUGUST 7, 1939 ( PUBLIC, NO. 309, 76TH CONG.), AUTHORIZES THE SECRETARY OF WAR TO ENTER INTO COST-PLUS-A-FIXED-FEE CONTRACTS FOR THE CONSTRUCTION OF CERTAIN PUBLIC WORKS UPON A FEE NOT TO EXCEED 10 PERCENTUM OF THE ESTIMATED COST OF THE PROJECT. SECTION 2 OF THE SAME STATUTE AUTHORIZES THE SECRETARY OF WAR, WHEN DEEMED ADVANTAGEOUS BY HIM, TO ENGAGE THE SERVICES OF ARCHITECTS AND ENGINEERS BY CONTRACT OR OTHERWISE, AND STATES THAT THE FEE PAID SHALL NOT EXCEED '6 PERCENTUM OF THE ESTIMATED COST, AS DETERMINED BY THE SECRETARY OF WAR, OF THE PROJECT TO WHICH SUCH FEE IS APPLICABLE.' BY THE SAME ACT CONGRESS HAS LIMITED THE CONTRACTOR'S FEE FOR CONSTRUCTION WORK TO 10 PERCENTUM OF THE ESTIMATED COST OF THE PROJECT AND DIRECTED THAT HE BE COMPLETELY REIMBURSED FOR ALL INCIDENTAL COSTS AND EXPENSES, AND THEN AUTHORIZED THE SECRETARY OF WAR TO ENGAGE THE SERVICES OF ARCHITECTS AND ENGINEERS WITH THE BASIS OF COMPENSATION OR FEE FIXED AT A MAXIMUM OF 6 PERCENTUM OF THE ESTIMATED COST OF THE PROJECT INVOLVED. OBVIOUSLY, CONGRESS COULD NOT HAVE INTENDED TO ALLOW A CONSTRUCTION CONTRACTOR REIMBURSEMENT OF COSTS AND EXPENSES AND FIX HIS MAXIMUM FEE AT 10 PERCENTUM OF THE ESTIMATED COST, AND THEN, IN THE SAME STATUTE, COMPEL AN ARCHITECT OR ENGINEER TO ABSORB ALL OF HIS INCIDENTAL COSTS AND EXPENSES WITHIN HIS MAXIMUM FEE OF ONLY 6 PERCENTUM. NEITHER CAN IT BE IMAGINED THAT THE CONGRESS WOULD HAVE USED THE WORD 'FEE' TWICE IN THE SAME STATUTE, INTENDING THAT IT SHOULD HAVE A DIFFERENT MEANING IN SECTION 2 THAN IT HAS IN SECTION 1, WITHOUT USING MORE SPECIFIC LANGUAGE TO SHOW THAT INTENT THAN THE WORDS 'FIXED FEE' IN THE ONE CASE AND 'FEE' IN THE OTHER. THIS STATUTE ALONE IS CLEARLY INDICATIVE OF CONGRESSIONAL INTENTION THAT IN ADDITION TO THEIR PROFESSIONAL FEES, ARCHITECTS AND ENGINEERS ARE TO BE REIMBURSED FOR INCIDENTAL COSTS AND EXPENSES IN PERFORMING THE SERVICES.

6. IN THIS CONNECTION, A RECENT STATEMENT OF THE COMPTROLLER GENERAL IN HIS DISCUSSION OF COST-PLUS-A-FIXED-FEE CONSTRUCTION CONTRACTS IS RELEVANT:

***5** 'READING THESE PROVISIONS TOGETHER SHOWS THAT THE CONTRACT BASICALLY CONTEMPLATES THAT THE ACTUAL COST OF THE WHOLE WORK AND THE RISK THEREOF ARE TO BE ASSUMED BY THE GOVERNMENT; THAT IS, THAT THE CONTRACTOR IS TO COME OUT WHOLE, REGARDLESS OF CONTINGENCIES, IN PERFORMING THE WORK IN ACCORDANCE WITH THE CONTRACT AND THE DIRECTIONS AND INSTRUCTIONS OF THE CONTRACTING OFFICER, PLUS ONLY A LIMITED FIXED FEE AS COMPENSATION FOR SERVICES, GENERAL OVERHEAD, USE OF THE CONTRACTOR'S OWN OR BORROWED MONEY, AND PROFIT * * * ' (20 COMP. GEN. 632, 636, APRIL 14, 1941).

THE COMPTROLLER GENERAL IN A DECISION (B-18974) DATED AUGUST 16, 1941, AFTER HOLDING THAT LOSSES SUSTAINED BY COST-PLUS-A-FIXED-FEE CONTRACTORS, OCCASIONED ****584** BY NEGLIGENCE OF THEIR OWN EMPLOYEES ARE REIMBURSABLE ITEMS, REITERATES THE ABOVE EXPRESSED PRINCIPLE.

THE SAME PRINCIPLE MUST BE APPLICABLE TO COST-PLUS-A-FIXED-FEE CONTRACTS WITH ARCHITECT-ENGINEERS IF CONSISTENCY OF LEGAL INTERPRETATION AND OPERATION IS TO BE MAINTAINED. NO SOUND REASON EXISTS FOR DIFFERENTIATING BETWEEN A CONSTRUCTION CONTRACTOR AND AN ARCHITECT-ENGINEER CONTRACTOR IN THE MATTER OF REIMBURSABLE COSTS. THE CONSTRUCTION CONTRACTOR IN REGARD TO HIS FIXED FEE, IS IN THE IDENTICAL LEGAL STATUS AS THE PROFESSIONAL MAN. AS TO BOTH OF THEM, THE FIXED FEE IS TO COVER 'COMPENSATION FOR SERVICES, GENERAL OVERHEAD, USE OF THE CONTRACTOR'S OWN OR BORROWED MONEY, AND PROFIT.'

7. THE RELATIONSHIP BETWEEN THE GOVERNMENT AND ARCHITECTS AND ENGINEERS MAKES IT SELF-EVIDENT THAT THE FEE AUTHORIZED BY CONGRESS TO BE PAID THEM WAS NOT INTENDED TO INCLUDE COSTS AND EXPENSES ARISING IN CONNECTION WITH OR INCIDENT TO THEIR WORK. THESE ARCHITECTS AND ENGINEERS RENDER PROFESSIONAL SERVICES, AND IT WAS SO UNDERSTOOD BY CONGRESS WHEN CONSIDERING PERTINENT LEGISLATION (SEE REPORT NO. 263 OF COMMITTEE OF NAVAL AFFAIRS ( SENATE), DATED APRIL 13, 1939; REPORT NO. 667 OF COMMITTEE ON MILITARY AFFAIRS ( SENATE), DATED JUNE 26 (LEGISLATIVE DAY, JUNE 22, 1939; REPORT NO. 76 OF COMMITTEE OF THE WHOLE HOUSE, DATED FEBRUARY 17, 1939; AND REPORT NO. 1312 OF COMMITTEE OF THE WHOLE HOUSE DATED JULY 25, 1939.)

IT IS COMMON KNOWLEDGE THAT WHEN THE SERVICES OF PROFESSIONAL MEN ARE ENGAGED, THE CLIENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

OR PATIENT MAKES HIS OWN ARRANGEMENTS WITH THE LAWYER, THE ENGINEER, OR THE DOCTOR, NOT ONLY AS TO THE AMOUNT AND TIME OF PAYMENT OF THE PROFESSIONAL FEE, BUT ALSO AS TO WHEN AND BY WHOM COSTS AND EXPENSES INCIDENT TO THE SERVICE WILL BE PAID. IN PRIVATE UNDERTAKINGS SUCH ARRANGEMENTS ARE IN FACT EQUIVALENT TO 'COST-PLUS-A-FIXED-FEE' CONTRACT. THE SECRETARY OF WAR CERTAINLY IS NOT INHIBITED BY THE STATUTES FROM RECOGNIZING SUCH USUAL AND ORDINARY PROFESSIONAL CUSTOM AND PRACTICE.

MANIFESTLY, NO ARCHITECT OR ENGINEER WOULD ASSUME THE PAYMENT OF THE INCIDENTAL EXPENSES UNLESS HIS FEE WAS SUFFICIENT TO AFFORD LIBERAL PROTECTION FROM UNFORESEEN AS WELL AS FORESEEN EXPENSES. IN MOST CASES WHEN SUCH A CONTRACT IS WRITTEN THE PARTIES CANNOT DETERMINE IN ADVANCE, WITH ANY DEGREE OF ACCURACY, THE OVER-ALL COSTS. SHOULD THE RESPONSIBILITY FOR ALL INCIDENTAL COSTS BE SHIFTED TO THE ARCHITECT-ENGINEER HE MUST OF NECESSITY 'LOAD' HIS CHARGES IN ORDER TO SAFEGUARD HIMSELF AGAINST UNFORESEEN CONTINGENCIES. IN TURN, SUCH PRACTICE WOULD NECESSARILY RESULT IN INCREASED CHARGES AGAINST THE GOVERNMENT.

***6** 8. THE ACT OF AUGUST 7, 1939 ( PUBLIC NO. 309, 76TH CONG.) DECLARES THAT 'IN NO CASE SHALL THE FEE PAID FOR ANY SERVICE AUTHORIZED BY THIS SECTION EXCEED 6 PERCENTUM OF THE ESTIMATED COST, * * *.' ( ITALICS SUPPLIED.) THE WORD 'FEE' HAS BEEN CONSTRUED BY THE COURTS AS DESCRIBING THE COMPENSATION PAID TO PROFESSIONAL MEN, AND DOES NOT, IN THE ABSENCE OF OTHER FACTS OR CIRCUMSTANCES, CARRY ANY IMPLICATION THAT IT REPRESENTS, IN WHOLE OR IN PART, REIMBURSEMENT FOR EXPENDITURES, MADE BY THE PAYEE, OR THE RETURN OF MONEY ADVANCED BY THE PAYEE ON BEHALF OF THE PAYOR. NEITHER DOES IT IMPLY AN INDEMNIFICATION OF THE PAYEE, BUT RATHER A RECOMPENSE TO THE PAYEE FOR SERVICES RENDERED TO THE PAYOR.

THE CLEAR DISTINCTION BETWEEN FEES AND COSTS IS EXPRESSED BY BOUVIER AS FOLLOWS:

'FEES DIFFER FROM COSTS IN THIS, THAT THE FORMER ARE, AS ABOVE MENTIONED, A RECOMPENSE TO THE OFFICER FOR HIS SERVICES; AND THE LATTER, AN INDEMNIFICATION TO THE PARTY FOR MONEY LAID OUT AND EXPENDED IN HIS SUIT.'

'IN NO CASE EXCEPT BY A DISTORTION OF TERMS CAN THE WORD BE APPLIED TO THE DISCHARGE OF A PECUNIARY LIABILITY OR THE PURCHASE PRICE OF GOODS OR EVEN TO A BOARD BILL. WEBSTER DEFINES THE WORD 'SERVICE' AS USED IN THIS CONNECTION AS FOLLOWS: 'ACT OF SERVING; THE OCCUPATION OF A SERVANT; THE PERFORMANCE OF LABOR FOR THE BENEFIT OF ANOTHER, OR AT ANOTHER'S COMMAND' ( STATE V. PRICE (246 S.W. ( MO.) 572) ).

IT SEEMS LOGICAL TO CONCLUDE THAT CONGRESS USED THE WORD 'FEE' IN THE CONTROLLING STATUTES IN ITS ORDINARILY ACCEPTED LEGAL MEANING AND THEREBY INTENDED TO APPLY THE 6 PERCENT LIMITATION ONLY TO THE COMPENSATION TO BE PAID THE ARCHITECTS AND ENGINEERS FOR PROFESSIONAL SERVICES RENDERED AND DID NOT INTEND THAT SUCH CEILING SHOULD COVER THE REIMBURSABLE CHARGES.

9. THIS OFFICE, THEREFORE, CANNOT CONCUR IN THE INTERPRETATION OF THE AUDIT DIVISION, GENERAL ACCOUNTING OFFICE, SET FORTH IN THE BASIC COMMUNICATION, BUT ON THE CONTRARY IS OF THE OPINION THAT THE 6 PERCENTUM LIMITATION IN THE ACT OF AUGUST 7, 1939, HAS NO REFERENCE TO THE REIMBURSEMENTS OF EXPENDITURES UNDER COST-PLUS-A-FIXED-FEE CONTRACTS, BUT ONLY TO THE PROFESSIONAL FEE TO BE PAID THE ARCHITECT-ENGINEER.

****585** IT IS APPARENT THAT WHEN THE FEE OF AN ARCHITECT OR ENGINEER IS BASED UPON A PERCENTAGE OF THE COST OF A PROJECT, THE WORD 'FEE' MAY HAVE DIFFERENT MEANINGS, DEPENDING UPON THE FORM OF THE CONTRACT UNDER WHICH THE FEE IS TO BE PAID. HENCE, IN APPLYING THE SIX-PERCENT LIMITATION IMPOSED UPON THE FEE PAYABLE UNDER CONTRACTS AUTHORIZED BY SECTION 2 OF THE ABOVE-QUOTED ACT OF AUGUST 7, 1939, IT IS NECESSARY TO DETERMINE WHETHER THE CONGRESS CONTEMPLATED THE USE OF A COST-PLUS-A-FIXED-FEE CONTRACT UNDER WHICH THE ARCHITECT-ENGINEER WOULD BE REIMBURSED FOR HIS COSTS AND EXPENSES AND WOULD RECEIVE, IN ADDITION, A 'FEE' AS COMPENSATION FOR HIS SERVICES, OR A PERCENTAGE-FEE CONTRACT UNDER WHICH THE 'FEE' PAID TO THE ARCHITECT-ENGINEER WOULD COVER NOT ONLY HIS COMPENSATION BUT,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

ALSO, HIS COSTS AND EXPENSES IN RENDERING SUCH CUSTOMARY ARCHITECTURAL OR ENGINEERING SERVICES AS ARE AUTHORIZED BY THE AFORESAID SECTION, VIZ., THE 'PRODUCTION AND DELIVERY OF THE DESIGNS, PLANS, DRAWINGS, AND SPECIFICATIONS' REQUIRED FOR A PARTICULAR PROJECT.

***7** SECTION 2 OF THE ACT OF AUGUST 7, 1939, SUPRA, CONTAINS NO INDICATION AS TO THE TYPE OF CONTRACT CONTEMPLATED BY THE SIX-PERCENT LIMITATION. WHILE SECTION 1 OF THE ACT RELATES TO COST-PLUS-A-FIXED-FEE CONTRACTS, THERE IS NO DIRECT CONNECTION BETWEEN THE PROVISIONS OF THE TWO SECTIONS WHICH WOULD SERVE TO INDICATE THAT SECTION 2, ALSO, WAS INTENDED TO RELATE TO COST-PLUS-A-FIXED- FEE CONTRACTS. SINCE IT IS CLEAR THAT THE TERM 'FIXED FEE' WAS USED ADVISEDLY IN SECTION 1, WHICH RELATES TO COST-PLUS-A-FIXED-FEE CONTRACTS, IT WOULD SEEM THAT THE WORD 'FEE' WAS EQUALLY WELL CHOSEN IN SECTION 2, WHICH CONTAINS NO REFERENCE TO SUCH CONTRACTS. IT IS NOT TO BE PRESUMED THAT THE CONGRESS USED THE WORD 'FEE' IN SECTION 2 WHEN THE TERM 'FIXED FEE' WAS INTENDED, PARTICULARLY SINCE REFERENCE TO SECTION 1 SHOWS THAT THE USE OF THE LATTER TERM IS WELL UNDERSTOOD. AS THE JUDGE ADVOCATE GENERAL SUGGESTS, THERE IS A CONSIDERABLE DISCREPANCY BETWEEN THE LIMITATIONS PROVIDED IN THE TWO SECTIONS IF THE ARCHITECT OR ENGINEER IS REQUIRED TO ABSORB HIS COSTS AND EXPENSES IN A FEE LIMITED TO SIX PERCENT OF THE ESTIMATED COST OF THE PROJECT, WHILE THE CONSTRUCTION CONTRACTOR MAY RECEIVE A FIXED FEE OF TEN PERCENT OF SUCH ESTIMATED COST, IN ADDITION TO REIMBURSEMENT FOR HIS COSTS AND EXPENSES. HOWEVER, THE DISCREPANCY IS APPARENT RATHER THAN REAL, SINCE BOTH FEES ARE BASED UPON THE ESTIMATED COST OF THE PROJECT WORK TO BE PERFORMED BY THE CONSTRUCTION CONTRACTOR, WHEREAS THE COMPARISON WOULD BE PROPER ONLY IF THE ARCHITECT-ENGINEER'S PERCENTAGE WERE BASED UPON THE ESTIMATED COST OF THE PLANS AND SPECIFICATIONS TO BE PRODUCED AND DELIVERED BY HIM.

IN THE HEARINGS BEFORE THE SENATE COMMITTEE ON MILITARY AFFAIRS ON THE BILL (S. 2562, 76TH ONG., ST SESS.) WHICH LATER BECAME THE ACT OF AUGUST 7, 1939, SUPRA, COLONEL HARTMAN, ON BEHALF OF THE WAR DEPARTMENT, MADE THE FOLLOWING STATEMENT (P. 13):

IT WILL BE NOTED THAT IN THE BILL THE MAXIMUM FEE IS SET AT 6 PERCENT OF THE ESTIMATED COST OF THE PROJECT. THIS WOULD BE AN ABSOLUTE MAXIMUM AND IS NOT ****586** INTENDED TO SET A STANDARD. THE FEES PAID FOR ARCHITECTURAL AND ENGINEERING SERVICES ON WORKS SIMILAR TO THOSE CONTEMPLATED BY THE WAR DEPARTMENT VARY FROM 4 TO 6 PERCENT. THERE IS NO DANGER THAT THE WAR DEPARTMENT WILL PAY EXORBITANT FEES FOR THIS WORK AS DEFINITE STANDARDS HAVE BEEN ESTABLISHED BY THE AMERICAN INSTITUTE OF ARCHITECTS, THE AMERICAN SOCIETY OF CIVIL ENGINEERS, AND OTHER REPUTABLE PROFESSIONAL SOCIETIES.

SINCE THE FIXED FEES SPECIFIED IN THE CONTRACTS HERE INVOLVED RANGE FROM 10.44 PERCENT UP TO 1 PERCENT OF THE ESTIMATED COST OF THE PROJECTS INVOLVED, AND SINCE YOUR LETTER INDICATES THAT THE AVERAGE OF THE FIXED FEES SPECIFIED UNDER SUCH CONTRACTS DURING THE FISCAL YEAR 1941 WAS 10.52 PERCENT, IT SEEMS UNLIKELY THAT COLONEL HARTMAN SHOULD HAVE BEEN REFERRING TO FIXED FEES UNDER COST-PLUS- A-FIXED-FEE CONTRACTS WHEN HE SPOKE OF FEES VARYING 'FROM 4 TO 6 PERCENT.' IT WOULD SEEM, RATHER, THAT HIS STATEMENT HAD REFERENCE TO PERCENTAGE-FEE CONTRACTS, UNDER WHICH THE ARCHITECT OR ENGINEER WOULD BE EXPECTED TO ABSORB HIS COSTS AND EXPENSES IN THE SPECIFIED FEE, AND I HAVE BEEN REFERRED TO NOTHING IN THE LEGISLATIVE HISTORY EITHER OF THE ACT OF AUGUST 7, 1939, OR THE ACT OF APRIL 25, 1939, 53 STAT. 590, GRANTING LIKE AUTHORITY TO THE NAVY DEPARTMENT WITH RESPECT TO THE MAKING OF CONTRACTS FOR ARCHITECTURAL OR ENGINEERING SERVICES, WHICH WOULD SUPPORT A CONTRARY VIEW.

***8** AS POINTED OUT IN THE JUDGE ADVOCATE GENERAL'S OPINION, SECTION 2 OF THE ACT OF AUGUST 7, 1939, AUTHORIZES THE EMPLOYMENT OF ARCHITECTS, ETC., 'BY CONTRACT OR OTHERWISE,' WITHOUT LIMITATION UPON THE FORM OR THE SUBSTANCE OF THE CONTRACTS THUS AUTHORIZED. HOWEVER, IT DOES NOT FOLLOW THAT THE CONGRESS, IN FIXING THE PERCENTAGE FOR THE MAXIMUM FEE FOR SUCH EMPLOYMENTS, CONTEMPLATED THE USE OF COST-PLUS-A-FIXED-FEE CONTRACTS UNDER THIS SECTION, SIMPLY BECAUSE THE SECTION DOES NOT INHIBIT THEM. AT THE DATE OF PASSAGE OF THE ACT OF AUGUST 7, 1939, THE COST-PLUS-A-FIXED-FEE FORM OF CONTRACT WAS NOT GENERALLY EMPLOYED BY THE WAR DEPARTMENT IN CONTRACTS FOR ANY TYPE OF SERVICES, NOR IS IT UNDERSTOOD

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

THAT SUCH A FORM OF CONTRACT USUALLY WAS EMPLOYED EITHER BY THE GOVERNMENT DEPARTMENTS OR BY PRIVATE BUILDERS IN OBTAINING SERVICES OF THE TYPE HERE INVOLVED. THE AMERICAN INSTITUTE OF ARCHITECTS, IN A.I.A. DOCUMENT NO. 299D, MAY 15, 1941, STATES:

THE MOST USUAL FORM OF ARCHITECT'S FEE IS THE PERCENTAGE FEE FORM, WHEREUNDER THE ARCHITECT IS PAID AN AGREED PERCENTAGE OF THE TOTAL COST OF THE PROJECT.

SUMMARIZING, I FIND NOTHING IN THE ACT OF AUGUST 7, 1939, OR IN THE LEGISLATIVE HISTORY OF THAT ACT, OR IN THE GENERAL PRACTICE OBTAINING WITH RESPECT TO GOVERNMENT OR PRIVATE CONTRACTS FOR ARCHITECTURAL OR ENGINEERING SERVICES WHICH SERVES TO ESTABLISH THAT THE SIX-PERCENT LIMITATION IMPOSED ON THE FEES PAYABLE UNDER CONTRACTS AUTHORIZED BY SECTION 2 OF THE ACT WAS INTENDED TO RELATE TO FIXED FEES UNDER COST-PLUS-A-FIXED-FEE CONTRACTS. ON THE CONTRARY, AN EXAMINATION OF EACH OF THE FACTORS WHICH IT IS PERMISSIBLE TO CONSIDER IN AID OF STATUTORY ****587** CONSTRUCTION DISCLOSES MANY INDICATIONS THAT THE CONGRESS, IN IMPOSING THE LIMITATION, CONTEMPLATED THAT THE FEE WHICH WAS LIMITED TO SIX PERCENT SHOULD INCLUDE EVERYTHING ORDINARILY COVERED BY THE FEE IN PERCENTAGE-FEE CONTRACTS FOR SERVICES OF THE TYPE HERE INVOLVED.

THE JUDGE ADVOCATE GENERAL'S OPINION REFERS TO MY DECISION OF APRIL 14, 1941, 20 COMP. GEN. 632, TO THE EFFECT THAT THE COST-PLUS-A-FIXED-FEE CONTRACT THERE UNDER CONSIDERATION CONTEMPLATED THAT THE GOVERNMENT WOULD BEAR THE COST AND ASSUME THE RISK INVOLVED IN PERFORMING THE CONTRACT WORK, BUT THAT THE CONTRACTOR WAS TO COME OUT WHOLE, REGARDLESS OF CONTINGENCIES. IT IS OBVIOUS, HOWEVER, THAT ANY GENERAL THEORIES UNDERLYING COST-PLUS-A-FIXED-FEE CONTRACTS MUST YIELD TO LIMITATIONS SPECIFICALLY IMPOSED BY THE CONGRESS ON CONTRACTS FOR SERVICES OF THE TYPE HERE IN QUESTION, NOTWITHSTANDING THAT THE CONTRACTS HERE INVOLVED WERE MADE UPON A COST-PLUS-A-FIXED-FEE BASIS. CONSEQUENTLY, I BELIEVE IT WAS THE INTENT OF THE LIMITATION THAT THE ARCHITECT-ENGINEERS WERE NOT TO BE PAID IN EXCESS OF SIX PERCENT OF THE ESTIMATED COST OF THE PROJECT ON ACCOUNT OF ALL ITEMS WHICH NORMALLY ARE INCLUDED IN THE 'FEE' PAID UNDER PERCENTAGE-FEE CONTRACTS FOR ARCHITECTURAL OR ENGINEERING SERVICES.

WHILE, AS STATED ABOVE, THE FEE PAID UNDER A PERCENTAGE-FEE CONTRACT FOR SERVICES OF THE TYPE HERE INVOLVED INCLUDES THE COSTS AND EXPENSES INCURRED IN THE PERFORMANCE OF THE SERVICES, SUCH FEE DOES NOT ORDINARILY INCLUDE TRAVEL EXPENSES INCURRED BY THE ARCHITECT, OR EXPENSES WHICH MAY BE INCURRED IN EMPLOYING EXPERT TECHNICAL OR PROFESSIONAL CONSULTANTS. SEE A.I.A. DOCUMENT NO. 299D, SUPRA. FURTHER, IT IS CUSTOMARY FOR GOVERNMENT CONTRACTS FOR ARCHITECTURAL SERVICES TO PROVIDE THAT THE ARCHITECT SHALL BE REIMBURSED, IN ADDITION TO HIS FEE, FOR EXPENSES INCURRED IN THE PERFORMANCE OF TRAVEL AND IN THE EMPLOYING OF CONSULTANTS. IT WOULD APPEAR, THEREFORE, THAT THE WORD 'FEE, ' AS HERE USED, SHOULD NOT COVER EXPENSES SO INCURRED. LIKEWISE, IT WOULD APPEAR THAT THE WORD 'FEE' AS USED IN THE LIMITATION SHOULD NOT BE INTERPRETED AS COVERING EXPENSES INCURRED BY THE ARCHITECT-ENGINEER IN SUPPLYING THE ITEMS THE GOVERNMENT, UNDER PARAGRAPH 1 OF ARTICLE IV OF THE CONTRACT, AGREED TO FURNISH. IN THIS CONNECTION, IT IS NOTED THAT PARAGRAPH 1 OF ARTICLE II OF THE CONTRACT REQUIRED THAT THE ARCHITECT-ENGINEER ESTABLISH AND MAINTAIN A FIELD OFFICE AT THE SITE OF THE WORK AND, SINCE THE FACILITIES AT THE SITE FOR ESTABLISHING AND MAINTAINING SUCH AN OFFICE PRESUMABLY WERE WHOLLY WITHIN THE CONTROL OF THE GOVERNMENT, IT DOES NOT APPEAR THAT THE CONTRACT REQUIREMENTS IN THIS RESPECT WERE SUCH AS NORMALLY WOULD BE INCLUDED IN THE FEE PAYABLE UNDER AN ORDINARY ARCHITECTURAL OR ENGINEERING CONTRACT. IT IS NOTED, ALSO, THAT THE MAJOR ITEMS OF EQUIPMENT AND SUPPLIES TO BE FURNISHED UNDER PARAGRAPH 1 OF ARTICLE IV WOULD REMAIN THE PROPERTY OF THE GOVERNMENT; OR, IF SUCH ITEMS WERE NOT FURNISHED BY THE GOVERNMENT AND THE ARCHITECT-ENGINEER WAS REQUIRED TO PROCURE THEM AND ****588** SEEK REIMBURSEMENT UNDER PARAGRAPH 2 OF ARTICLE IV, TITLE TO SUCH ITEMS IMMEDIATELY WOULD PASS TO THE GOVERNMENT UNDER THE TERMS OF SAID PARAGRAPH.

***9** ACCORDINGLY, I AM CONSTRAINED TO HOLD THAT, UNDER THE LIMITATION IMPOSED BY SECTION 2

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

OF THE ACT OF AUGUST 7, 1939, PAYMENTS TO ARCHITECT-ENGINEERS EMPLOYED UNDER CONTRACTS AUTHORIZED BY THAT SECTION MAY NOT EXCEED SIX PERCENT OF THE ESTIMATED COST OF THE PROJECT, REGARDLESS OF WHETHER SUCH PAYMENTS ARE MADE AS REIMBURSEMENT OF EXPENDITURES OR AS A FIXED FEE; EXCEPT THAT IN DETERMINING WHETHER THE SIX-PERCENT LIMITATION HAS BEEN EXCEEDED, THE FOLLOWING SHOULD BE EXCLUDED FROM THE COMPUTATION: (1) PAYMENTS MADE UNDER THE PROVISIONS OF ARTICLE VI B (5) AS REIMBURSEMENT OF TRAVEL EXPENSES; (2) PAYMENTS MADE UNDER ARTICLE VI B (4) AS REIMBURSEMENT OF EXPENDITURES FOR SUCH EXPERT TECHNICAL ASSISTANTS AND SERVICES AS THE ARCHITECT-ENGINEER MAY EMPLOY UNDER THE TERMS OF ARTICLE VII; AND (3) PAYMENTS UNDER ARTICLE VI B (4) AS REIMBURSEMENT OF EXPENDITURES INCURRED BY THE ARCHITECT-ENGINEER UNDER PARAGRAPH 2 OF ARTICLE IV IN PROCURING SUCH SUPPLIES AND EQUIPMENT AS THE GOVERNMENT MAY HAVE FAILED TO FURNISH IN ACCORDANCE WITH ITS AGREEMENT UNDER PARAGRAPH 1 OF SAID ARTICLE.

AUDIT ACTION BY THIS OFFICE IN CONNECTION WITH PAYMENTS MADE UNDER THE ARCHITECT-ENGINEER CONTRACTS HERE INVOLVED WILL BE IN ACCORDANCE WITH THE FOREGOING.

21 Comp. Gen. 580, 1941 WL 925 (Comp.Gen.), B- 18,126

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

C

***1** TO THE ADMINISTRATOR, VETERANS ADMINISTRATION
JULY 21, 1967

****61** LEASES - REPAIRS AND IMPROVEMENTS - LIMITATIONS - RULE

THE CONSTRUCTION OF A VETERANS ADMINISTRATION (VA) HOSPITAL ADJACENT TO A UNIVERSITY MEDICAL SCHOOL ON LAND LEASED FROM THE UNIVERSITY ON A LONG-TERM BASIS AT A NOMINAL RENTAL MAY NOT BE APPROVED UNDER THE RULE THAT APPROPRIATED FUNDS MAY NOT BE USED FOR THE PERMANENT IMPROVEMENT OF PRIVATELY OWNED PROPERTY IN THE ABSENCE OF EXPRESS STATUTORY AUTHORITY, NEITHER 38 U.S.C. 5001 NOR 5012 (B) IN PROVIDING FOR THE ACQUISITION OF SITES AND SPACE TO IMPLEMENT THE PURPOSES OF THE SECTIONS AUTHORIZING THE CONSTRUCTION OF HOSPITALS OR ANY PERMANENT TYPE OF IMPROVEMENT ON LEASED PROPERTY, AND THE USE OF THE TERM 'OTHERWISE' IN SECTION 5001 RELATING TO SITES FOR THE CONSTRUCTION OF VA HOSPITALS IS INTERPRETED TO MEAN ACQUISITION OF NOT LESS THAN A FEE INTEREST IN LAND AND TO COVER SITUATIONS WHICH ****62** DO NOT PRECISELY COME WITHIN THE ENUMERATED MEANS OF ACQUIRING LAND THAT IS PRESCRIBED IN THE SECTION.

VETERANS ADMINISTRATION - PARKING FACILITIES - AT HOSPITALS

FUNDS APPROPRIATED TO THE VETERANS ADMINISTRATION (VA) FOR THE CONSTRUCTION OF A HOSPITAL ADJACENT TO THE MEDICAL SCHOOL OF A UNIVERSITY MAY NOT BE USED TO DEFRAY A PORTION OF THE COST OF CONSTRUCTING A PARKING STRUCTURE BY THE UNIVERSITY IN RETURN FOR A CONTRACTUAL RIGHT TO USE A STIPULATED NUMBER OF PARKING SPACES, NOR MAY VA LEASE LAND FROM THE UNIVERSITY TO CONSTRUCT A PARKING FACILITY, THE AMENDMENT OF 38 U.S.C. 5004 ALTHOUGH DESIGNED TO OVERCOME 45 COMP. GEN. 27, RESPECTING THE DISPOSITION OF PARKING FEES NOT AFFECTING THE CONCLUSION THAT VA FUNDS MAY NOT BE USED TO OBTAIN PARKING FACILITIES VALUED IN EXCESS OF $200,000, BY CONSTRUCTION OR LEASE WITHOUT THE SPECIFIC APPROVAL BY THE APPROPRIATE CONGRESSIONAL COMMITTEES.

CONTRACTS - ARCHITECT, ENGINEERING, ETC., SERVICES - FEES - LIMITATION - DESIGN, LOCATION, ETC., CHANGES

WHERE THE SITE AND NATURE OF A PROJECT ARE SO CHANGED AS TO RENDER VIRTUALLY USELESS ANY ARCHITECT-ENGINEER (A-E) WORK DONE PRIOR TO THE ADMINISTRATIVE DETERMINATION TO AFFECT A CHANGE, IT WOULD BE UNREASONABLE TO CARRY FORWARD AGAINST A NEW PROJECT ANY CHARGE MADE AGAINST THE FEE LIMITATION IMPOSED BY 41 U.S.C. 254 (B) THAT WAS INCURRED UNDER THE ORIGINAL PROJECT, FOR EVEN THOUGH THE PURPOSE OF THE PROJECT MAY REMAIN UNCHANGED, THE SUBSEQUENT ALTERATION OF THE CONCEPTUAL DESIGN OF A BUILDING AND ITS LOCATION AT SOME POINT GIVES RISE TO A NEW PROJECT FOR THE PURPOSE OF APPLYING THE STATUTORY FEE LIMITATION.

BY LETTER OF JUNE 14, 1967, YOU REQUESTED OUR OPINION WITH RESPECT TO SEVERAL QUESTIONS RELATED TO A CONTEMPLATED CHANGE IN SITE FOR A HOSPITAL TO BE CONSTRUCTED IN SOUTHSIDE CHICAGO, UNDER THE FOLLOWING CIRCUMSTANCES:

THE VETERANS ADMINISTRATION HAS COMPLETED DESIGN OF A 760-BED HOSPITAL FOR CONSTRUCTION ON A SITE LOCATED IN SOUTHSIDE CHICAGO ACROSS THE MIDWAY FROM THE MEDICAL SCHOOL OF THE UNIVERSITY OF CHICAGO. THE SITE WAS TO BE ACQUIRED IN PART FROM THE URBAN RENEWAL AUTHORITY OF CHICAGO AND IN PART FROM THE UNIVERSITY. SITE ACQUISITION AND DESIGN FUNDS WERE INCLUDED IN THE INDEPENDENT OFFICES APPROPRIATION ACT, 1965, 78 STAT. 640, 660, UNDER THE HEADING 'CONSTRUCTION OF HOSPITAL AND DOMICILIARY FACILITIES.' FUNDS FOR CONSTRUCTION OF THE HOSPITAL WERE INCLUDED UNDER THE SAME HEADING IN THE ACT MAKING APPROPRIATIONS FOR FISCAL YEAR 1966, 79 STAT. 537.

***2** THE UNIVERSITY AND THE VETERANS ADMINISTRATION NOW CONSIDER THAT A 500-BED HOSPITAL ON

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

A DIFFERENT SITE, IMMEDIATELY NEXT TO THE MEDICAL SCHOOL, WOULD BE MORE DESIRABLE FROM THE STANDPOINT OF MAXIMIZING MUTUAL ASSISTANCE THROUGH JOINT UTILIZATION OF FACILITIES AND AVOIDANCE OF DUPLICATION.

THE NEW SITE IS OWNED ENTIRELY BY THE UNIVERSITY WHICH DOES NOT DESIRE TO SELL IT TO THE GOVERNMENT. THE UNIVERSITY PROPOSES, RATHER, TO LEASE THE NEW SITE TO THE GOVERNMENT ON A LONG-TERM BASIS AT THE ****63** NOMINAL RENTAL OF $1 A YEAR. SINCE THE WHOLE CONCEPT OF ESTABLISHING VETERANS ADMINISTRATION HOSPITALS ADJACENT TO MEDICAL SCHOOLS IS BASED UPON MUTUAL ASSISTANCE AND COOPERATION, THE VA DOES NOT BELIEVE RESORT TO CONDEMNATION PROCEDURES FOR ACQUISITION OF THE DESIRED NEW SITE WOULD BE APPROPRIATE.

IT IS ANTICIPATED THAT THE COST TO THE GOVERNMENT OF BUILDING THE PROPOSED SMALLER HOSPITAL ON LEASED LAND WILL BE SOMEWHAT LESS THAN THE $24,565,000 BUDGETED FOR THE 760-BED HOSPITAL, INCLUDING SITE AND PARKING FACILITIES.

IT HAS ALSO BEEN SUGGESTED THAT THE UNIVERSITY WILL BUILD PARKING FACILITIES ON ITS LAND FOR ITS USE JOINTLY WITH THE VETERANS ADMINISTRATION AND THAT THE VA PAY A PORTION OF THE CONSTRUCTION COST IN EXCHANGE FOR THE RIGHT TO USE SPACE THEREIN. AS AN ALTERNATIVE TO THIS PLAN, THERE IS THE POSSIBILITY THAT THE UNIVERSITY WOULD BUILD A PARKING STRUCTURE FOR ITS USE UP TO ITS PROPERTY LINE AND THAT THE VA WOULD BUILD A COMPARABLE TYPE STRUCTURE, TO MEET ITS NEEDS (ABOUT 400 SPACES), ON LEASED LAND IMMEDIATELY ADJACENT TO THAT PROPOSED BY THE UNIVERSITY, WITH PARKING FLOORS AT THE SAME LEVELS, AND POSSIBLY, WITH COMMON ACCESS RAMPS. NO ESTIMATE HAS BEEN MADE OF THE COST TO THE GOVERNMENT OF PARTICIPATION IN EITHER OF THE ABOVE PLANS FOR PROVIDING PARKING FACILITIES.

AS A BASIS FOR FURTHER DISCUSSION OF THE ABOVE PROPOSALS WITH UNIVERSITY OFFICIALS, YOU REQUEST OUR ADVICE WITH RESPECT TO THE FOLLOWING SPECIFIC QUESTIONS:

'/1) COULD THE VETERANS ADMINISTRATION USE ANY FUNDS, NOW OR HEREAFTER APPROPRIATED FOR CONSTRUCTION OF A NEW HOSPITAL AND RELATED FACILITIES IN CHICAGO, TO CONSTRUCT THE CURRENTLY PROPOSED HOSPITAL STRUCTURE OR STRUCTURES ON LEASED LANDS ACQUIRED AT NOMINAL OR SMALL COST TO THE GOVERNMENT? IF SO, UNDER WHAT LIMITATIONS OR RESTRICTIONS WOULD WE BE REQUIRED TO NEGOTIATE THE TERMS OF SUCH A LEASE? OF COURSE, WE WOULD CLEAR THE QUESTION OF SUFFICIENCY OF THE TITLE WITH THE DEPARTMENT OF JUSTICE, IN VIEW OF THE ATTORNEY GENERAL'S OPINION THAT CONSTRUCTION ON LEASED LAND IS SUBJECT TO THE RESTRICTIONS IMPOSED BY 40 USC 255 (28 OP. AG 463, 464).

'/2) DO YOU BELIEVE IT WOULD BE LEGALLY APPROPRIATE FOR THE VETERANS ADMINISTRATION TO USE FUNDS, NOW OR HEREAFTER APPROPRIATED FOR CONSTRUCTION OF A NEW HOSPITAL AND RELATED FACILITIES IN CHICAGO, TO DEFRAY A PORTION OF THE COSTS, TO THE UNIVERSITY OF CHICAGO, OF CONSTRUCTING A PARKING STRUCTURE, IN RETURN FOR WHICH THE VETERANS ADMINISTRATION WOULD RECEIVE A CONTRACTUAL RIGHT TO USE, AS IT CHOOSES, A STIPULATED NUMBER OF PARKING SPACES? A SOMEWHAT RELATED QUESTION CONCERNING PARKING FACILITIES FOR THIS HOSPITAL WAS THE SUBJECT OF YOUR OPINION B-156496, DATED JULY 9, 1965, SUBSEQUENT TO WHICH SECTION 5004, TITLE 38 U.S.C. WAS AMENDED BY SECTION 201 (A), PL 89-785, NOVEMBER 7, 1966.

***3** '/3) IF THE ANSWER TO THE FOREGOING QUESTION IS NEGATIVE, AND PROVIDED CONTRACTUAL PROTECTION COULD BE OBTAINED WHEREBY THE INTERESTS OF THE GOVERNMENT WOULD BE PROTECTED FOR THE LIFE OF THE STRUCTURE, DO YOU SEE ANY REASON TO OBJECT TO THE VETERANS ADMINISTRATION'S CONSTRUCTING A PARKING FACILITY FOR ITS USE, ON LEASED LAND CONTIGUOUS TO AND JOINED WITH A SIMILAR FACILITY PROPOSED TO BE CONSTRUCTED BY THE UNIVERSITY OF CHICAGO FOR ITS USE? WE REALIZE THAT THIS IS VIRTUALLY THE SAME QUESTION AS THAT PRESENTED IN (1) ABOVE, BUT BELIEVE THE AMENDMENT OF SECTION 5004, NOTED SUPRA, MAY HAVE SOME PERTINENCE, AS WELL AS SECTIONS 5001 AND 5012 (B), 38 USC.

****64** '/4) IN YOUR OPINION, WOULD IT BE IN CONTRAVENTION OF 41 USC 254 (B) (STATUTORY LIMITATION OF ARCHITECTURAL FEES) IF WE ENTERED INTO A NEW ARCHITECT-ENGINEER CONTRACT FOR DESIGN OF THE PROPOSED NEW HOSPITAL ON A SITE DIFFERENT FROM THAT ORIGINALLY CONTEMPLATED, IF THE NEW FEE SPECIFIED ADDED TO THAT ALREADY EXPENDED, WOULD EXCEED 6 PERCENT OF THE

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

ESTIMATED COSTS OF CONSTRUCTION? IN THIS CONNECTION, THE USE OF THE NEW AND SMALLER SITE WILL REQUIRE REDESIGN OF THE HOSPITAL AND ITS REDUCTION IN SIZE AS INDICATED ABOVE, AND THE CURRENTLY PROPOSED BUILDING WOULD BEAR LITTLE SIMILARITY TO THE ONE PREVIOUSLY DESIGNED IN EITHER SCHEME OF ARRANGEMENT OR STRUCTURAL SHAPE AND SIZE. IN FACT, WE BELIEVE IT IS SUBSTANTIALLY CORRECT TO SAY THAT FROM AN ARCHITECTURAL STANDPOINT IT IS A DIFFERENT PROJECT FROM THAT HERETOFORE DESIGNED.'

THE LONG-STANDING RULE FOLLOWED BY THE ACCOUNTING OFFICERS OF THE GOVERNMENT IS THAT APPROPRIATED FUNDS MAY NOT BE USED FOR THE PERMANENT IMPROVEMENT OF PRIVATELY OWNED PROPERTY IN THE ABSENCE OF EXPRESS STATUTORY AUTHORITY. 6 COMP. DEC. 295, 19 COMP. GEN. 679. THE RULE HAS BEEN SPECIFICALLY APPLIED IN THE CASE OF PREMISES LEASED TO THE GOVERNMENT. 35 COMP. GEN. 715, 716. WHILE APPROVAL HAS BEEN GIVEN BY THIS OFFICE IN SPECIAL CIRCUMSTANCES TO THE IMPROVEMENT AT PUBLIC EXPENSE OF PRIVATE PROPERTY, IN EACH SUCH INSTANCE THERE WAS GENERALLY INVOLVED A RELATIVELY MINOR REMOVABLE IMPROVEMENT OF TEMPORARY CHARACTER THE INSTALLATION OF WHICH WAS NECESSARY TO ACCOMPLISHMENT OF THE PROGRAM OBJECTIVE FOR WHICH THE FUNDS INVOLVED WERE APPROPRIATED. SEE 6 COMP. DEC. 877, 7 ID. 712, 15 COMP. GEN. 761, 20 ID. 927, 35 ID. 715, 42 ID. 480, 43 ID. 738. CF. 18 COMP. GEN. 463, INVOLVING THE NECESSITY FOR ACQUIRING RIGHTS IN PERPETUITY FOR CONSTRUCTION AND MAINTENANCE WITH RESPECT TO CONSTRUCTION ON PRIVATE PROPERTY OF AN IMPROVEMENT NOT SUBJECT TO READY REMOVAL. CF. ALSO 39 COMP. GEN. 304 INVOLVING EXEMPTION OF THE POST OFFICE DEPARTMENT FROM THE PROVISIONS OF SECTION 278 (A), TITLE 40, UNITED STATES CODE, WHICH AUTHORIZES THE IMPROVEMENT OF LEASED PREMISES BUT LIMITS THE EXPENDITURES FOR SUCH PURPOSE WHICH MAY BE MADE.

IN A DECISION REPORTED AT 43 COMP. GEN. 705 WE DID AUTHORIZE THE CONSTRUCTION OF CURB, GUTTER, AND SIDEWALK IMPROVEMENTS ON PROPERTY LEASED TO THE GOVERNMENT FOR 99 YEARS. AND IN REACHING THE HOLDING IN THAT CASE, WE ADVERTED TO SUCH LEASED PROPERTY AS BEING IN THE 'OWNERSHIP' OF THE UNITED STATES FOR THE PURPOSE OF INTERPRETING A STATUTE WHICH SPECIFICALLY AUTHORIZED CONSTRUCTION OF SUCH ITEMS 'ALONG THE BOUNDARY OF GOVERNMENT-OWNED RESIDENTIAL OR OTHERWISE IMPROVED LOTS.' BUT THE RATIONALE APPLIED THERE CAN HAVE NO APPLICATION IN THE INSTANT SITUATION.

***4** THE CONSTRUCTION OF CURBS, GUTTERS, AND SIDEWALKS IS BUT AN INCIDENTAL ASPECT OF THE GOVERNMENT'S USE AND ENJOYMENT OF THE TOTAL LEASED PREMISES. AND SPECIFIC STATUTORY AUTHORITY HAD BEEN GRANTED TO OVERCOME THE FEDERAL SOVEREIGN IMMUNITY TO LOCAL ASSESSMENT FOR SUCH IMPROVEMENTS. IT WAS IN LIGHT OF THESE FACTORS TOGETHER WITH THE LENGTH OF THE LEASE TERM THAT WE DID NOT RAISE OBJECTION TO THE EXPENDITURES ****65** INVOLVED. CF. 29 COMP. GEN. 279 DENYING AUTHORITY TO CONSTRUCT WALKWAYS. IN THE INSTANT SITUATION, HOWEVER, THE IMPROVEMENT GOES TO THE VERY ESSENCE OF THE PURPOSE FOR WHICH THE UNIMPROVED PROPERTY WILL BE LEASED TO THE GOVERNMENT. THE IMPROVEMENT CONTEMPLATED IS A $25 MILLION BUILDING, NOT SOME MINOR ITEM INCIDENTAL TO A LARGER PURPOSE.

YOU SUGGEST THAT SUFFICIENT AUTHORITY TO OVERCOME THE RULE AGAINST THE EXPENDITURE OF APPROPRIATED FUNDS FOR THE IMPROVEMENT OF PRIVATE PROPERTY MAY BE CONTAINED IN THE PROVISIONS OF SECTIONS 5001 AND 5012 (B) OF TITLE 38, UNITED STATES CODE.

SECTION 5001 AUTHORIZES CONSTRUCTION OF VA HOSPITALS AND OTHER FACILITIES '* * * ON SITES ALREADY OWNED BY THE UNITED STATES OR OTHER SITES ACQUIRED BY PURCHASE, CONDEMNATION, GIFT, OR OTHERWISE.'

SECTION 5012 (B) AUTHORIZES PROCUREMENT OF NECESSARY SPACE '* * * FOR ADMINISTRATIVE, CLINICAL, MEDICAL, AND OUTPATIENT TREATMENT PURPOSES BY LEASE, PURCHASE, OR CONSTRUCTION OF BUILDINGS * * '

THE PERTINENT LANGUAGE OF SECTION 5001 DERIVES FROM SECTION 1 OF THE PUBLIC NO. 587, APPROVED MARCH 3, 1925, 43 STAT. 1212, AND SECTION 5012 (B) DERIVES FROM PUBLIC LAW 85-56,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

APPROVED JUNE 17, 1957, 71 STAT. 83, 143. SEE ALSO SECTION 10 OF THE WORLD WAR VETERANS' ACT, 1924, 43 STAT. 607, 610, REQUIRING THAT NEW PROPERTY OR STRUCTURES ACQUIRED BECOME PERMANENT PROPERTY OF THE GOVERNMENT.

WE FIND NOTHING IN THE LEGISLATIVE HISTORIES OF THESE SECTIONS TO SUGGEST THAT CONGRESS INTENDED TO AUTHORIZE THE CONSTRUCTION OF HOSPITALS OR ANY PERMANENT TYPE IMPROVEMENTS ON LEASED PROPERTY. SECTION 5001 SPEAKS IN TERMS OF SITES ALREADY OWNED OR ACQUIRED BY PURCHASE, CONDEMNATION OR GIFT. WE DO NOT BELIEVE THAT USE OF THE TERM 'OTHERWISE' IN THE SECTION CAN REASONABLY BE INTERPRETED TO MEAN ACQUISITION OF LESS THAN A FEE INTEREST IN LAND BUT, RATHER, THAT IT IS INTENDED TO COVER SITUATIONS, SUCH AS PERHAPS EXCHANGES OF LAND, WHICH WOULD NOT COME PRECISELY WITHIN THE SPECIFIED MEANS OF ACQUIRING LAND ENUMERATED. SEE 38 COMP. GEN. 143, 146, WHERE AUTHORITY 'TO ACQUIRE LAND' FOR CERTAIN PURPOSES WAS NOT CONSIDERED SUFFICIENT AUTHORITY TO IMPROVE LEASED PROPERTY EVEN THOUGH EXPENDITURES FOR RENT WERE AUTHORIZED.

THE FIRST QUESTION IS ANSWERED IN THE NEGATIVE.

IN OUR DECISION OF JULY 9, 1965, B-156496, WE HELD THAT VETERANS ADMINISTRATION FUNDS COULD NOT BE USED UNDER A LEASE CONSTRUCTION ARRANGEMENT FOR IMPROVEMENTS VALUED IN EXCESS OF $200,000 WITHOUT SPECIFIC APPROVAL BY APPROPRIATE COMMITTEES OF THE CONGRESS IN LIGHT OF CERTAIN APPROPRIATION RESTRICTIONS. SEE 80 STAT. 675.

***5** WE ALSO HELD IN THAT DECISION THAT FEES CHARGED EMPLOYEES AND VISITORS FOR THE USE OF VETERANS ADMINISTRATION PARKING FACILITIES WERE ****66** REQUIRED TO BE COVERED INTO THE TREASURY AS MISCELLANEOUS RECEIPTS AND COULD NOT BE USED TO DEFRAY OPERATING EXPENSES. THIS HOLDING WAS BASED IN PART OF THE PROVISIONS OF SECTION 5004, TITLE 38, UNITED STATES CODE.

SUBSEQUENT TO OUR DECISION, SECTION 5004 WAS AMENDED BY SECTION 201 OF THE VETERANS HOSPITALIZATION AND MEDICAL SERVICES MODERNIZATION AMENDMENTS OF 1966, 80 STAT. 1368. BUT WHILE THE AMENDMENTS EFFECTED BY SECTION 201 EXTENDED PROVISIONS OF LAW AUTHORIZING THE VETERANS ADMINISTRATION TO CONSTRUCT AND MAINTAIN GARAGES ON ITS HOSPITAL AND DOMICILIARY RESERVATIONS, THEY RELATED, IN TERMS OF NEW AUTHORITIES PROVIDED, MORE TO THE OPERATION OF SUCH FACILITIES THAN TO THEIR CONSTRUCTION. THESE AMENDMENTS OVERRIDE OUR DECISION OF JULY 9, 1965, SO FAR AS CONCERNS THE DISPOSITION OF PARKING FEES COLLECTED, BUT WE FIND NOTHING IN THEM THAT WOULD AFFECT OUR CONCLUSION CONCERNING THE LEASE CONSTRUCTION ASPECTS CONSIDERED.

THE ONLY CHANGE WHICH MIGHT POSSIBLY BE CONSTRUED AS AFFECTING OUR PRIOR CONCLUSION REGARDING LEASE CONSTRUCTION IS CONTAINED IN THE PROVISION THAT:

'THE ADMINISTRATOR MAY CONTRACT, BY LEASE OR OTHERWISE, WITH RESPONSIBLE PERSONS, FIRMS OR CORPORATIONS, FOR THE OPERATION OF SUCH PARKING FACILITIES, UNDER SUCH TERMS AND CONDITIONS AS HE MAY PRESCRIBE, AND WITHOUT REGARD TO THE LAWS CONCERNING ADVERTISING FOR COMPETITIVE BIDS.'

IN EXPLAINING THIS PROVISION, THE SENATE COMMITTEE ON LABOR AND PUBLIC WELFARE STATED IN ITS REPORT NO. 1727, DATED OCTOBER 13, 1966, AT PAGE 9, THAT:

'PARAGRAPH (3) AUTHORIZES THE ADMINISTRATOR TO LEASE OR OTHERWISE CONTRACT WITH RESPONSIBLE PERSONS, FIRMS, OR CORPORATIONS FOR THE OPERATION OF SUCH PARKING FACILITIES. THIS PROVISION WOULD PERMIT SUFFICIENT FLEXIBILITY IN THE OPERATION OF THE FACILITIES SO THAT THE ADMINISTRATOR MAY ENTER INTO CONTRACTS, EITHER IN THE NATURE OF A CONCESSION AGREEMENT OR A SERVICE CONTRACT, WHICHEVER IS DEEMED APPROPRIATE UNDER THE SPECIFIC CIRCUMSTANCES. IT IS CONTEMPLATED THAT IN SOME SITUATIONS, WHERE THE USE OF THE PARKING FACILITY IS OF SUCH VOLUME AS TO PERMIT A COMMERCIALLY PROFITABLE VENTURE, A CONCESSION AGREEMENT COULD BE REACHED WHICH WOULD RESULT IN PAYMENT BY THE CONCESSIONAIRE FOR THE PRIVILEGE OF OPERATING THE FACILITY. ON THE OTHER HAND, THERE MAY BE SITUATIONS WHERE IT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

WILL BE NECESSARY TO PAY FOR THE OPERATION OF THE PARKING FACILITY BY MEANS OF A SERVICE CONTRACT.'

THE AMENDMENTS TO SECTION 5004 WERE SPECIFICALLY DESIGNED TO OVERCOME OUR DECISION OF JULY 9, 1965, AS IT RELATED TO THE DISPOSITION OF PARKING FEES COLLECTED. THE PORTIONS OF THAT DECISION WHICH RELATE TO LEASE CONSTRUCTION AUTHORITIES WERE NOT ADVERTED TO BY THE COMMITTEE IN EXPLAINING THE PURPOSES OF THE AMENDMENTS. UNDER THE CIRCUMSTANCES, IN LIGHT OF THE LANGUAGE OF THE AMENDMENTS TOGETHER WITH THE EXPLANATION THEREOF, DEALING AS THEY DO WITH THE OPERATION OF PARKING FACILITIES AND THEIR CONSTRUCTION OR LEASING BY THE VETERANS ADMINISTRATION, WE CANNOT CONSTRUE THE AMENDMENT OF SECTION 5004 AS AFFECTING IN ANY WAY OUR PRIOR CONCLUSIONS IN THE MATTER OF AUTHORITY TO OBTAIN PARKING FACILITIES, VALUED IN EXCESS OF $200,000, BY LEASE CONSTRUCTION.

***6** THE SECOND QUESTION PRESENTED IS ANSWERED IN THE NEGATIVE.

****67** IN LIGHT OF OUR CONCLUSIONS CONCERNING QUESTIONS NUMBERED 1 AND 2, THE THIRD QUESTION IS ALSO ANSWERED IN THE NEGATIVE.

WHILE, IN VIEW OF THE ANSWERS TO THE FIRST THREE QUESTIONS, ANSWER TO THE FOURTH QUESTION DOES NOT APPEAR TO BE REQUIRED, IT MAY BE STATED GENERALLY THAT THE ARCHITECT-ENGINEER FEE LIMITATION IN SECTION 254 (B) OF TITLE 41, UNITED STATES CODE, RELATES TO COMPENSATION AUTHORIZED TO BE PAID TO ARCHITECT- ENGINEERS FOR THE SERVICES THEY RENDER IN CONJUNCTION WITH THE DESIGN OF CONSTRUCTION PROJECTS. THE STATUTORY LIMITATION IS FOR THE PURPOSE OF ASSURING THAT EXCESSIVE PRICES WILL NOT BE PAID FOR SUCH SERVICES IN CONNECTION WITH ANY CONSTRUCTION PROJECT.

THE PROJECT TO WHICH AN ARCHITECT-ENGINEER FEE IS APPLICABLE IS THE PROJECT FOR WHICH THE ARCHITECT-ENGINEER UNDERTAKES IN HIS CONTRACT TO PREPARE PLANS, ETC. SEE 40 COMP. GEN. 188. WHERE THE SITE AND NATURE OF A PROJECT ARE SO CHANGED AS TO RENDER VIRTUALLY USELESS ANY ARCHITECT-ENGINEER WORK DONE PRIOR TO ADMINISTRATIVE DETERMINATION TO EFFECT SUCH CHANGE, IT WOULD BE UNREASONABLE, IN LIGHT OF THE STATUTORY PURPOSE, TO CARRY FORWARD AGAINST THE NEW PROJECT ANY CHARGES AGAINST THE FEE LIMITATION INCURRED UNDER THE ORIGINAL PROJECT. ALTHOUGH THE PURPOSE TO BE SERVED BY A BUILDING PROJECT MAY REMAIN UNCHANGED, THAT IS NOT TO SAY THAT THE CONCEPTUAL DESIGN OF THE BUILDING AND ITS LOCATION MAY BE SUBSTANTIALLY ALTERED WITHOUT AT SOME POINT GIVING RISE TO A NEW PROJECT FOR THE PURPOSE OF APPLYING THE FEE LIMITATIONS IN QUESTION.

ASSUMING CORRECTNESS OF THE STATEMENT CONTAINED IN THE QUESTION RAISED, THAT FROM AN ARCHITECTUAL STANDPOINT THE NEW PROJECT IS A DIFFERENT ONE FROM THE OLD ONE HERETOFORE DESIGNED--AND FROM THE BRIEF DESCRIPTION FURNISHED, THE STATEMENT APPEARS REASONABLE--IT IS OUR VIEW THAT THE ARCHITECT-ENGINEER FEES EXPENDED IN DESIGN OF THE FIRST PROJECT ARE NOT FOR CONSIDERATION IN CONNECTION WITH DESIGN OF THE NEW PROJECT SO FAR AS CONCERNS APPLICATION OF THE STATUTORY FEE LIMITATION.

47 Comp. Gen. 61, 1967 WL 1686 (Comp.Gen.), B- 156,496, 1967 CPD P 31

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

H
ASBCA

Appeal of Skidmore, Owings & Marrill

Under Contract No. AF 33(600)-28303

February 28, 1961

APPEARANCES FOR THE GOVERNMENT:

Brigadier General A. W. Rigsby, USAF

Chief Trial Attorney

Captain Chester D. Taylor, Jr., USAF

Trial Attorney

APPEARANCES FOR THE APPELLANT:

Marshall G. Sampsell, Esq.

Charles A. Bane, Esq.

Arthur R. Kiefer, Esq.

Philip F. Purcell, Esq.

Isham, Lincoln & Beale

Chicago, Illinois

Of Counsel

OPINION BY MR. McCONOUGHEY

The appellant partnership has taken timely appeal from the contracting officer's decision denying any increase in compensation over the initial fee of $75,866 for rendering certain architectural engineering services. This fee was provided by the contract [FN1] for the preparation of drawings, design analyses, and specifications necessary for the construction of the chapel at the United States Air Force Academy in Colorado. Since that decision both parties have modified their respective positions. The appellant has reduced the amount of its claim for additional fee from $220,492 to $208,492, because this particular $12,000 item for presentation models and renderings was not incurred as anticipated on 2 April 1958, the date of appellant's amended claim. The Government now concedes that an additional fee of $72,733 is equitable.

The evidence shows that appellant made its amended claim of 2 April 1958 approximately nine months before the Government accepted appellant's drawings and specifications as satisfactory for use in the advertising and award of contracts. Appellant based its amended claim upon the estimated cost of $140,703 for its own technical labor. [FN1a] Its actual cost of technical labor for the chapel was $135,512.46.

Appellant sustained a substantial financial loss in the performance of design services with respect to the chapel as an individual line item under the contract. This loss on the chapel design as such tended to affect adversely appellant's position on the contract

in its entirety since there is reason to believe that the total fee for design services was closely priced. The total fee claimed, $208,492 plus the initial fee of $75,866, is $284,358 for the chapel design. The claim for $208,492 includes a claim for $15,522 profit. The amount of technical labor in the initial fee of $75,866 is not shown. However, in the appellant's cost proposal of 24 January 1956 [FN2] for Title I (design) services, technical labor accounts for approximately 42% of the total proposed price.

The Government concedes that a certain design directive and two amendments, all issued after the date of the definitive contract, are changes. The Government likewise concedes that certain fluctuations in the programed cost of the design services relating to the chapel are changes. The Government argues, and we agree, that the 'Changes' clause [FN3] authorizes an equitable adjustment only for the work that is changed.

If we lay aside the question of statutory restrictions upon the size of the architect-engineer's fee, these issues remain:

(1) What is the scope of Title I (design) services, with respect to the chapel, under the definitive contract as entered into 14 February 1956?

(2) What adjustment is equitable for design directives and programmed cost fluctuations effective after 14 February 1956?

(3) Assuming that certain activities of the Government other than the issuance of design directives and changing the programmed cost of the chapel are beyond the scope of Title I services called for by the contract, what adjustment is equitable to compensate the contractor for services rendered as a result of such activities?

On the stated issues the Government argues that the contract requires the appellant to overcome all obstacles other than the conceded changes at no increase in the fee. With respect to the conceded changes, the Government contends that its offer of $72,733 is reasonable. The foundation for appellant's position has been laid in the testimony of the partner who carried a heavy share of the design responsibility in the following words:

'A lump sum for complete architectural services must be based on a certain set of criteria, it cannot be an open-end contract where the architect is required to do anything and every thing for a fixed sum of money.'

Hesolution of these issues with mathematical precision is not practical. We must consider the contract terms that outline the scope of the work in the perspective of events. We first examine the contract.

The letter contract before us, dated and accepted 4 August 1954, did not define 'Title I--Design Services' as such. This instrument, in paragraph 1-01 of Exhibit 'A' thereto, called upon the contractor to * * * 'perform complete architectural-engineering services for the design and construction of the Air Force Academy * * *'. Amendment 5 (dated 23 June 1955) delineates the nature of Title II services as supervision and inspection of construction for compliance with plans and specifications, and details certain steps to be taken to facilitate the rendering of the supervision and inspection function. We are left to infer that the term 'Title I' covers the preceding function i.e., preparation of drawings, plans and specifications.

As we read the letter contract, its terms do not, in exact words, correspond to the reference to 'Title I--Design Services' included in the definitive contract for design services. Part I 'Statement of Work' of Schedule of the definitive contract for design services, dated 14 February 1956, which includes in Item 1(a) the reference to 'Title I', is quoted in pertinent part:

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

'Item 1. Title I--Design Services

'(a) This Contract shall cover that portion of the work included in the aforementioned Letter Contract, identified as 'Title I--Design Services.'

'(b) The Contractor shall furnish and supply to the Government all architect-engineer services in connection with projects listed in Air Force Academy Design and Construction Schedule dated 31 October 1955 and as amended by mutual consent, and necessary for the accomplishment and delivery of the following:

'1. Definitive drawings, specifications, design analyses and cost estimates.

'2. Contract bidding documents including drawings, specifications, design analyses and cost estimates for comparison with bids received.

'(c) All work under Title I shall be performed in accordance with the 'Manual for Planning and Design' dated 1 February 1955 as revised 17 November 1955, and any instructions issued under the letter contract by the Contracting Officer, prior to the date of this definitive contract.

'(d) The services shall be performed by personnel qualified professionally and otherwise for the work called for.'

The Manual for Planning and Design referred to above contemplated that the design services with respect to preparation of drawings should progress to completion through the following three stages: (1) Sketch, (2) Definitive and (3) Working. Working drawings, or contract drawings as sometimes called, are such as can be used in actual construction and hence in bidding for contracts to construct, by persons familiar with the particular segment of construction involved.

The preparation of drawings in successive stages is normal in the architect client relationship. By proceeding through several stages, with discussion between the architect and his client at each stage, the architect is better able to learn what the client wants before the architect has proceeded too far in a manner inconsistent with those wants. Equally important, the technique of preparing drawings in several stages enables the architect to adapt his drawings to the client's budget and, in many instances points the client to the necessity of conforming his wants to his budget, his budget to his wants, or compromising these alternatives.

Having described some of the means by which an architect and his client reach a result satisfying to both, we are ready to consider whether the design of the chapel made unusual demands upon the architect. In doing so we discount the fact that the chapel was part of a difficult and complex undertaking and was subject toserutiny by exacting standards. Also we discount the fact that the dient was the Government, with needs and methods peculiar to inself. The architect appellant was aware of the nature of his client and the undertaking. The contract contemplated at least this much.

The Government concedes that three design directives were not contemplated within the scope of the work outlined under the definitive contract of 14 February 1956. The Government does not concede that it should have made further design directive changes. Appellant first requested such changes by letter dated 20 August 1957, at the time sketch drawings were submitted, and again in its letter of 29 August 1958, at a time when appellant was protesting that its client the Government did not have just grounds to reject the contract or working drawings recently submitted. Likewise the Government concedes nothing for the extra effort imposed upon the architect in convincing and otherwise dealing with an unusual diversity of 'clients' that from time to time

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

represented the Government.

The architect appellant did have to satisfy an unusual number of diverse groups. This is so first because we are dealing with a religious edifice that was eventually designed to accommodate Judaism, Roman Catholicism and Protestantism in separate facilities under one roof. Also there was some provision for religious activity within the chapel by others. This is so secondly because public funds were used. There is yet another reason. The skill or genius of the design architect produced an unusual exterior form that made use of tetrahedrons. Time, effort, travel, and no small fluency on the part of both the Air Force and the appellant were used at various meetings and exhibitions to convince those who had the best right to be interested in the exterior form and who did not at first give full approval.

If we grasp the design concept, it is that the design of a building of this kind should reflect the era in which it was built, in addition to being adapted functionally to the purpose and architecturally to its locality and environs. Perhaps the concept is best expressed in part of the designer's testimony as recorded:

'In selecting the idea of the enclosures we were dealing with an air force whose responsibilities go beyond every day matters and desired to develop a solution of the tetrahedron which is essentially a space frame or structural element made up of many light elements, six-inch pipe frames which reflected in essence the way modern technology works as versus the evolution of the Gothic cathedral from the stone masonry of their time to the techniques of ours and to give the same religious experience in today's techniques, this, I believe, is the responsibility of all architects practicing in their time to reflect their time, the needs, the hopes and the materials available.'

The parties have stipulated [FN4] that the definitive contract was executed by the contractor on or about 22 February 1956. Before executing the definitive contract for Title I services, contractor wrote a letter [FN5] stating that '* * * design problems and responsibilities must be more clearly defined and the procedures from the start of design to the completion of contract drawings be more definitely outlined, understood, agreed to and complied with'. The letter was addressed to Director, Air Force Academy Construction Agency [FN6], the activity that had issued the definitive contract, and the activity to which contractor was obligated to deliver the work called for Item 1 of Part I of the Schedule, for inspection and acceptance.

In this letter of 20 February 1956, appellant proposed certain procedures. One proposed procedure was that modification of design directives by Air Force Academy Construction Agency, hereafter called AFACA, may become a reimbursable extra. Another proposal was that AFACA modification of design or engineering submittals that were in accordance with design directives would constitute an effective change of design directive. All proposals within this letter assumed a course of dealing between appellant and AFACA as the Agency that represented the Government in its contracts with appellant. We do not know what response, if any, that AFACA made to the letter. We have referred to it to trace from its origins the continuing nature of the difficulty of interpreting the scope of required Title I services.

Both the legislative and the executive branches of the Government were actively interested in the chapel design. Presentations were made before more than one Congressional committee or subcommittee. The executive branch was represented by the Secretary of the Air Force who is turn had a Special assistant. The Secretary also had the benefit of the professional advice of ?? notable architects as his consultants. The Air Force was represented on the Air Force Academy Panel, one function of which was to get the Air Staff into the proceedings. The Academy itself was active in shaping the Government's eventual position. Its interest, however, tended to emphasize functional and

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

maintenance matters. AFACA concentrated on architectural and engineering matters and served as liaison between the Government and the contractor.

The role of the consultants and of the Chief of Air Force Chaplains should be discussed separately.

On 29 February 1956 the consultants held the first of a series of meetings at which the chapel was one of the items considered. These meetings, insofar as they concerned the chapel, continued at intervals through 1957 and 1958. In March 1957, the consultants were enthusiastic over the concept of the chapel as presented at Colorado Springs. In May of the same year the consultants met at Washington. The primary purpose was to get approval of the consultants of the Washington. The primary purpose year 1958 the consultants considered the design submittal. Later in the same year they considered the contract submittal in the summer, and again late in the year after the first contract submittal had been rejected by the Government and, after protest, resubmitted.

The consultants were not concerned with design directives. Only one of them appeared to be concerned with cost. As a group they appeared to be concerned with site, orientation, light, shape and aesthetics as distinguished from structure and engineering. On at least one occasion, appellant did not agree with the consultants. When and if a disagreement could not be reconciled, the matter was decided by the Secretary.

On certain occasions the advice of the consultants was accepted as the position of the Secretary but seemingly without prompt and authoritative transmission of the information to the AFACA. AFACA on such occasions would insist upon its viewpoint until the matter was clarified. It was not always represented at decision making meetings of appellant architect with the Secretary's consultants.

Appellant urges that refinement of detail is normal and not a change. However, rethinking of a demand that necessitates replanning of an area is a change that should be noted in a design directive. This is true where as in this matter two or three of the consultants suggested different directions that appellant was required to investigate. The design directive referred to is the outline of requirements as understood by AFACA and the Academy.

The Chief of Chaplains represented and correlated viewpoints that differed materially from those of any others. Prior to the definitive contract, design directives had contemplated two separate chapels and, later, a single auditorium in which all religious services would be held. In June 1956 the Chief of Chaplains met with the Secretary. Out of this meeting came the later decision [FN7] to give up the single auditorium and to try instead to get all three of the faiths earlier mentioned into separate and distinct places under one roof.

The principal interest of the Chief of Chaplains lay in the area of function. He and his staff were concerned with whether an arrangement would work ecclesiastically. Matters such as the location of the choir, the confessionals, sacristies and the three organs were of special interest. Certain plumbing was climinated or rearranged for ecclesiastical reasons. Agreement was reached with the appellant architect on all matters except the location of a stairway through the chancel in the Protestant sector. There the architect's view of fire escape requirements prevailed.

This high degree of mutual agreement was not easily or quickly reached, however. The 'final' ideas presented by the Office of the Chief of Chaplains to the appellant, and recorded in a memorandum under date of 30 April 1957, were not the last word from that office. At the meeting of 13-14 March 1958, for the purpose of reviewing appellant's definitive submittal of 21 February 1958, representatives of the Chief of Chaplains

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

proposed and achieved decision on a series of functional changes at five different levels. These decisions revised, added or eliminated twenty-four separate locations within the chapel.

Even after the meeting of 31 July-1 August 1958 at which the appellant's contract submittal was reviewed there remained approximately eleven matters of unresolved design. [FN8] At least three of these matters pertained to the domain of ecclesiastical functioning in which the opinions of the Chaplains were given great weight. These were: whether a suspended ceiling should be provided in (1) the Roman Catholic Sacristy and Vestry and (2) in the Meeting Room (for use by sects other than the three already mentioned), and (3) where the bride's Dressing Room should be located.

The preparation, submittal and approval of drawings took longer than planned and did not follow quite the usual course. Sketch design was submitted 20 August 1957. Submission had been held up until assurance of Congressional approval had been had. Appellant felt that the sketch represented departures from the existing design directive and from the budget. As previously noted, appellant requested a formal change at this time. The request was not directly answered. AFACA on 20 September 1957 instructed appellant to proceed with design.

Appellant on 11 November 1957 submitted drawings that it described as more complete than sketch but less complete than definitive drawings. AFACA, on 24 December 1957 declined to waive its right to a definitive submittal. Appellant made the definitive submittal on 21 February 1958. It was approved by AFACA letter dated 24 March 1958 subject to the appellant giving effect to numerous decisions reached at the meeting of 13-14 March 1958. The decisions affected five levels of the chapel itself and included commonts on architectural siting, and structural features, and comments on mechanical and electrical design.

Meanwhile, on 4 February 1958, AFACA directed appellant to work with a consultant not previously mentioned on the detailed design of the pipe organ in both Roman Catholic and Protestant sectors of the chapel. The use of a specially designed organ is somewhat unusual in churches. Certain cores in both narthexes had to be redesigned. The decision to engage a special consultant on the pipe organs had been in the making since May 1957.

Appellant submitted its contract drawings on 10 July 1958. These drawings were reviewed at a meeting on 31 July and 1 August 1958. As already indicated the contract submission was unacceptable. Numerous changes were agreed upon and, as to those that were unresolved, further consideration was necessary, including consideration by the Secretary's consultants. The contract drawings were resubmitted early in December and approved 31 December 1958. The drawings comprised 159 full sized sheets.

However, the task was not finished. When the bids on construction of the chapel were opened on or about 19 February 1959, it appeared that the cost to the Government would be $3,700,000. Appellant at this juncture had estimated the price to be $2,950,000. The Government's budgetary limit at the time of bidding on the chapel construction was $2,850,000. The excess of $100,000 was in part made up of items ordered by the consultants to the Secretary. These items consisted of exterior lighting, defrosting the terrace level, and more expensive glass. In addition, the excess was made up of cost increases in passing from the definitive to contract stage of drawings that the Government had accepted.

Appellant after consulting with the Government as to what reductions would be acceptable, undertook cost reduction studies at no cost to the Government. As a result a final price of $3,300,000 approximately was obtained upon rebidding. Appellant expended $16,139 for technical labor in making the restudy. Neither this figure nor overhead nor profit on the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

technical labor involved is included in appellant's claim before us.

The increase in the Government's budgetary limits on chapel construction costs brought about by actual competitive bidding makes it appropriate to return to this subject. We have referred to budgetary limits earlier as 'programmed cost'. It is possible to show in tabular form the several Design Directives (before and after 14 February 1956), the salient feature of each, and the programmed cost for each, as follows:

| Design Directive | Feature | Programmed Cost |
|---|---|---|
| FY 1955, #42 dated 1 June 1955 | Two distinct chapels | $1,623,500 (plus 15%) |
| FY 1955, #42A dated 18 October 1955 | Single chapel for all faiths | $1,623,500 (plus 15%) |
| FY 1957, #6 dated 27 December 1956 | All faiths and three chapels within one building complex | $4,000,000 (less 15%) |
| FY 1957, #6A dated 4 January 1957 | Changes time schedule for appellant's work | Same as preceding design directive |
| FY 1957, #6B dated 1 February 1957 | No Change in criteria | $2,550,000 ($3,000,000 less 15%) |

AFACA by letter dated 20 September 1957, at the time it approved appellant's sketch stage drawings, advised appellant that under no circumstances should the construction cost of the chapel exceed $2,608,700. Appellant replied under date of 30 September 1957. AFACA thereupon, by letter dated 8 October 1957, interpreted the $2,608,700 maximun to mean (1) an estimate that (2) would be based upon the contract stage drawings. At the same time, in a letteraddressed by one of appellant's senior partners to the Secretary's Special Assistant, appellant felt encouraged because the estimated cost was below $3,000,000 but '* * * not down to the $2,650,000 [FN9] odd * * *.' that the Special Assistant had set.

In its II November 1957 letter (when appellant submitted drawings more complete than sketch but less complete than definitive), appellant advised that the changes [FN10] outlined therein resulted in a revision of appellant's estimate from $3,492,000 to $2,890,000. With careful development of the working drawings, appellant felt that the estimate could be brought down to $2,850,000. By letter dated 24 December 1957, supra, AFACA raised the requirements for a maximum construction cost from $2,608,700 to $2,850,000. The suggestions were generally acceptable [FN11] to the Government. However, in its letter of 15 August 1958, in the course of commenting upon the first contract submittal, AFACA regarded a decrease in quality in the interior finishings in order to stay within the budget as '* * * extremely unfortunate * * *'. The same letter reiterates the requirement to stay within the cost limit of $2,350,000.

With respect to design directives in which we are most interested, that is, those issued after the date of conversion of the letter contract into definitive form, the programmed cost changed twice while the formal criteria of performance of design services changed not at all. If we include the increase necessitated by bidding and rebidding on construction of the chapel, the Government made at least three changes in programmed cost without using a design directive to do so. Appellant twice requested that the Government formally recognize changes in design criteria. Appellant urges with justification that such changes actually took place at every meeting.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

If we exclude as not relevant to the issues the budgetary limits fixed before the definitive contract for design services was entered into, and the last budgetary adjustment made to accommodate budget to bidding on construction, we are faced with four budgetary adjustments. These four adjustments occurred between 27 December 1956 and 24 December 1957, with a strong directive in mid- August 1958 to hold the line on construction costs. The budgetary limit reached its high in the December 1956 adjustment. Less than two months later the Government reset the same limit at its lowest point. Appellant was at all times under firm directions to perform its design services within these fluctuating limits.

Since Design Directives 6A and 6B did not affect criteria, the Government in effect recognized no formal changes in criteria for the services to be performed by appellant subsequent to the criteria announced by Design Directive No. 6, 27 December 1956. Actually the criteria changed in a manner relevant to the issues as a result of each of the first four submittals that have been described. The fifth submittal is not relevant because at that point both parties had reached accord until the results of the first round of bidding on construction were known. Changed criteria after the first round of bidding are not relevant because appellant does not claim compensation for its restudy to lower construction costs.

We are led to believe from the facts, and from conclusions derived from the evidence, as recited above, that appellant architect found itself in a situation of greater difficulty than it had a right to anticipate. This is so for more than one reason. The number of its 'clients' was unusual. Some of these 'clients' represented high levels of two of the three main branches of our Government. Others represented religious circles. Many of the problems were sensitive. This sensitivity of itself delayed the various voices that spoke for the Government in speaking as one. The shifting budgetary limits reflect the strong probability that appellant throughout was being pressed to economize on construction costs to a degree that was not quite compatible with the wants of its client.

The course of informal changes in design criteria after the issuance of Design Directive No. 6 went well beyond the course of normal evolutionary developments of design. We have generally indicated the volume of substantial changes that added to the architect's task by referring to the number of such changes rather than detailing them as has been done in the evidence. Two changes not previously mentioned should be now, however. The requirement for a bell tower or carillon was eliminated. The requirement for a 100-man choir in the chancel area in the fore part of the nave of the Protestant chapel eventually changed into a choir in the balcony of the narthex.

The Government does not dispute appellant's evidence as to the number, extent and nature of changes. Except for the matters that it concedes with respect to formal design directive amendments and changes in programmed cost the Government argues that these changes were not changes in criteria required by contract because they were consistent with a normal architectclient relationship. But we decide that the Government in this matter asked the appellant architect to do considerably more than appellant should have anticipated. We do this without attempting to decide whether additional formal changes in design criteria should have been made by the Government.

This brings us to the question whether the claim before us under the 'Changes' clause actually includes a claim for compensation for work not changed but which nevertheless cost more than the fixed price therefor. We have found that the contractor twice requested, in August 1957 and again in August 1958, formal changes in existing design directives. The Government did not issue any formal changes responsive to those requests.

The appellant found that it was impossible in its accounting procedures to segregate technical labor, in areas that appellant regarded as changes, in the absence of any clear

cut directive from the Government changing the scope of the work. Appellant did have a flexible and standard accounting procedure for handling the majority of changes when the project was either in definitive or contract drawing stage. Nevertheless a reputable firm of outside public accountants on whom appellant relied felt that the appellant had gone as far as practicable absent the issuance of formal changes by the Government. Although it does not make our problem any easier now, we do not know what more appellant could have done to segregate costs in view of the Government's firm attitude, taken in good faith, that changes in criteria had not occurred.

The next question is of similar import. Is appellant in pricing out these changes attempting to recover a loss on a single line item under a fixed price contract into which, with respect to that single item, it improvidently entered? Appellant has demonstrated that it bargained carefully in arriving at the fixed price to be paid for the entire Title I design services and for the chapel as a single line item. This is of little help. The evidence also suggests that the Government bargained well and shrewdly to arrive at the fixed prices of the various line items. There is no real evidence that would indicate affirmatively whether the fee for design services for the chapel, as distinguished from the fee for design services for the over-all project, was adequate to prevent a loss on design services for the chapel.

All that we really have in the way of help on both questions is the Government's own interpretation of the over-all problem. By letter of 16 July 1958, shortly after contract stage drawings had been submitted for the first time, the contracting officer requested information as to whether appellant would accept an additional fee of $65,740 as an equitable adjustment. Next, in its amended answer of 4 January 1960, shortly before the hearing, the Government conceded that appellant was entitled to an equitable adjustment increasing the contract price by $72,733 by reason of formal amendments to Design Directives and by reason of four distinct changes in the total directed construction cost of the chapel. There is much that we do not know about the means used to arrive at these offered adjustments. If the Government computed and deducted a portion of cost on the ground that it was allocable to unchanged work, it has not said how such an allocation could have been made. Likewise, with respect to the inference that the fixed price for designing the chapel was unprofitable to the appellant, the Government has not said how it would compute the amount of such a loss or, having computed it, whether it debited such a loss against appellant's costs in arriving at its version of an equitable adjustment.

The budgetary limits imposed did more than to press appellant toward economies in construction costs that could not quite be realized. The fixed price was negotiated on the basis of Design Directive FY 1955, No. 42A, supra. This directive contemplated a chapel with a single auditorium for all faiths. The budget limit was $1,623,500 plus 15% for contingencies. The next change, that of Design Directive FY 1957, No. 6, supra, some ten months after the definitive contract was entered into, established the concept that prevailed thenceforth. This was the concept of three faiths under one roof, but with separate and separated facilities for each, and with still additional space set aside for those of still other faiths. The budget limit imposed was $4,000,000, less 15%, or almost twice the budget limit for the work was conceived under the definitive contract.

This fiscal action bespeaks a change of no small magnitude. The Government in its amended answer indicates that $11,776 of the additional fee of $72,733 that it proposed is for work made obscelete or useless by changes ordered by the Government. $11,776 represents the entire amount paid for design services performed to date of issuance of Design Directive No. 6, supra. This is a feature of the Government's approach to the problem that appellant does not seemingly dispute.

We decide that this $11,776 is due the appellant. Further, we think this amount of cost of obsolescent design services should be considered and allowed separately, because it

points to Design Directive FY 1957, No. 6, supra, as formal recognition of the dominant and prevailing concept for the chapel design. After what amounted to two preliminary starts, this dominant concept of three faiths in separated sectors yet under one roof should be regarded as the true starting point and the true framework with which the quantum and range of services rendered can be seen in perspective.

The claim before us, which was made before performance was completed, includes an item of $7,150 for consultants (Bolt, Beranek and Newman) in the field of acoustical engineering. The Government appears to have requested consultations as a result of the concern with acoustics expressed by the Secretary himself. However testimony that has not been contradicted is to the effect that actual costs of consultants to appellant were $6,924.52. Also, this amount includes cost of the consultants in acoustics, but also costs to appellant for soil tests with a deep boring rig on the site by Soil Testing Company, Inc. Appellant in providing soil investigation services at the Academy was not able to provide the soil tests mentioned but regarded such tests as necessary. The sum of $6,924.52 should be allowed as a separate item for necessary deep boring soil tests and for acoustical consultation.

Appellant's claim includes an item for $16,863 for previous criteria presentations. This item should not be allowed separately. It was part of the responsibility for public relations that were inherent in acceptance by appellant architect of the commission to design this chapel for this particular client. To the extent that it is due, it is included in the fee we allow below.

We have attempted without exhaustive detail to outline the features that made appellant's commission more difficult and more expensive to perform than it had a right to expect under the contract. For reasons already stated, we use Design Directive No. 6, supra, as the framework for measuring performance. Subsequent acts of the Government as the client indeed made the job more difficult but did so without disturbing either the ultimate objective of a suitable chapel for the Academy or the concept adopted as best to meet that object. Since the concept was not the concept contemplated by the contract, an adjustment under the 'Changes' clause is proper.

For design services rendered after the issuance of Design Directive No. 6, supra, we consider and decide that a fee of $204,000 is equitable. This is 6% of $3,400,000 which in turn is $4,000,000 less 15%, the Government's budgetary limit set at the time the prevailing concept was established.

In summary, we have allowed:

| | |
|---|---|
| For services rendered obsolescent by changes.... | $11,776.00 |
| For deep boring soil tests and for acoustical consultants.................................. | 6,924.52 |
| For A-E fee based upon prevailing concept....... | 204,000.00 |
| Total | 222,700.52 |
| Less initial fee provided by contract........... | 75,866.00 |
| For additional fee allowed...................... | $146,834.52 |

The appeal is thus sustained to the extent of $146,834.52.

It is our understanding that the above decision conforms with the limitation of 10 USC 9540(b), that the fee paid for outside architect engineering services shall not be more

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

than 6% of the estimated cost of the project to which it applies. It can be argued on several grounds that this statutory limitation does not apply. We rely upon the ground that the statutory limitation, if applicable, applies to the fee for the over-all project and not the individual line items. Appellant has stated in its reply brief that the over-all contract price for design services was less than 4% of construction cost. Presumably this does not take into account later adjustments in the fixed price (fee) by reason of earlier decisions of this Board, which decisions should not, however, cause the 6% limit to be reached.

We also understand that the parties to this appeal are facing an exhausted appropriation. Our decision under such circumstances amounts to a recommendation that the deficiency be filled.

WILLIAM D. McCONOUGHEY

Member of Division No. 1,

Air Force Contract Appeals Panel

I concur

GEORGE W. CRAWFORD

Chairman of the Air Force Contract

Appeals Panel and Member of

Division No. 1

I concur

HUGH B. ARCHER

Member of Division No. 1,

Air Force Contract Appeals Panel

I certify that the foregoing is a true copy of the findings of fact, decision and views of the Air Force Contract Appeals Panel of the Armed Services Board of Contract Appeals in ASBCA No. 5593, appeal of Skidmore, Owings & Merrill, under Contract No. AF 33(600)-28303. I further certify that there has been filed with the Recorder a statement by the Chairmen of the respective Panels of the Board that they have reviewed on behalf of their respective Services the above-captioned decision of the Air Force Contract Appeals Panel and that in their opinion further, formal and exclusive decision by the three Panel Chairmen is not required.

GEORGE L. HAWKES, Recorder

Armed Services Board of

Contract Appeals

FN1 The chapel was only one of many line items of the design services which were called for. Appellant was called upon to render design services for substantially the entire Academy. These services were first rendered under a letter contract dated 4 August 1954. The letter contract was eventually converted into five definitive contracts. The

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

definitive contract that called for design services recited that it was entered into as of 14 February 1956, and called for a fee of $4,926,038 plus an allowance of not to exceed $163,000 for travel. Subsequent amendments thereto, insofar as we are advised, are not determinative of the so-called 'Chapel' dispute. A more complete history of negotiations leading to the definitive contract for design services is set forth in our decision of this appellant's earlier appeal designated ASBCA No. 4199, dated 22 June 1960, 6C-2 BCA par. ___.

FN1a 'Technical labor' includes the time of architects, engineers, estimators, specification writers, and specification typists that participated in design and contract work. The time of general partners is not included.

FN2 Submitted as a part of the file pertaining to ASBCA No. 4199. See footnote 1, supra.

FN3 The first sentence of the 'Changes' clause, which defines the extent of permissible action, reads as follows:

'The Contracting Officer may, at any time, by a written order, and without notice to the sureties, if any, make changes in or additions to drawings and specifications, issue additional instructions, require modified or additional work or services within the general scope of the contract change the place of delivery or method of shipment, or the amount of Government furnished property.'

FN4 Stipulation dated 2 June 1959 and filed in ASBCA No. 4199. See footnote 1, supra.

FN5 Dated 20 February 1956, reference CS-AF-1089 File 11.1, and also filed in ASBCA No. 4199. See footnote 1, supra.

FN6 Under date of 17 September 1955, appellant had been directed to channel through the Director, Air Force Academy Construction Agency, all matters pertaining to the design and construction of the Academy.

FN7 See Design Directive FY 1957 No. 6, dated 27 December 1956.

FN8 See inclosure 2, Appellant's Exhibit No. 11, being a letter dated 15 August 1958 from AFACA to appellant, 'Re: Contract Submittal--Academy Chapel'.

FN9 But not within the revised program cost of $3,000,000 less 15% fixed in Item 26 of attachment to AFACA letter of 18 October 1957 (Appellant's Exhibit 1). This figure (as do the other budgetary limits cited herein) excluded utilities and walkway paving that had been programmed at an additional $215,000.

FN10 In order to get the cost down, appellant suggested a number of major revisions of design such as: (1) Reduction of total structure by two bays. This was a 10% decrease in volume. The nineteen double spires were reduced to seventeen. (2) Simplification of the structural floor slab. (3) Substitution of colored glass for stained glass in all areas as tetrabedron dividers. (4) Elimination of marble memorial panels. (5) Elimination of air conditioning. (6) Elimination of elevators. Simplification of stair construction. (7) Substitution of less expensive floor finishes.

FN11 Some of the suggestions made by appellant in its 11 November 1957 letter in order to save dollars remained controversial. These reappear, along with several others as matters of 'Unresolved Design--Academy Chapel', in an inclosure dated 14 August 1958. See footnote 8, supra.

1961 WL 304 (A.S.B.C.A.), 61-1 BCA P 2974, ASBCA No. 5593

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

NOAA CONTRACT 50WCNA606099/52WCNA206003

# MAR '92 WFO FACILITIES BUDGET (EXCL FURNITURE)

| CLIN | SYSTEM NAME | ST | INSIDE GROSS SF | DES APP | NEX PRI | 23/8/91 EDD | TOTAL FACILITY COST |
|---|---|---|---|---|---|---|---|
| AA | Norman | OK | | | -1 | | |
| DQ | Denver Phase I | CO | N/A | M | 27 | Apr-93 | 165.8 |
| DT | Dodge City | KS | 4750 | B8 | 8 | Dec-91 | 778.2 |
| AB | Melbourne | FL | 6210 | B8 | 3 | Jul-91 | 839.2 |
| EL | Goodland | KS | 4750 | B8 | 13 | Sep-92 | 823.4 |
| CB | Amarillo | TX | 4750 | B8 | 18 | Dec-92 | 791.9 |
| GC | Milwaukee | WI | 4750 | B8 | 43 | Aug-93 | 904.9 |
| AC | Sterling | VA | 5350 | B8 | 4 | Jul-91 | 1,281.4 |
| AJ | St Louis | MO | 5350 | B8 | 7 | Nov-91 | 909.4 |
| IB | Topeka | KS | 4550 | M | 28 | Apr-93 | 316.6 |
| AC+ | Sterling Sewer Ext | VA | N/A | B8 | 4 | | 122.7 |
| BY | Houston/Galveston | TX | 4630 | B9 | 10 | Jan-92 | 681.0 |
| TA | NWS Trng (I&II) | MO | 7500 | M | 1 | | 229.5 |
| EM | Grand Island | NE | 4630 | B9 | 32 | May-93 | 786.7 |
| FH | Kansas City | MO | 9110 | BR | 14 | Oct-92 | 1,055.7 |
| IP | Wichita | KS | 4630 | B9 | 12 | Aug-92 | 655.4 |
| | PRIOR YEARs: | | | | 14 | | 10,341.8 |
| EU | State College | PA | 11000 | LAO | 36 | Jul-93 | 181.1 |
| DF | Chicago (Joliet) | IL | 4800 | B9 | 30 | May-93 | 991.6 |
| GZ | Phoenix | AZ | 6000 | L | 56 | Dec-93 | 74.3 |
| JB | NRC (BANNISTER) | MO | 13670 | M | 11 | Jul-92 | 60.4 |
| DS | Detroit | MI | 4630 | B9 | 29 | Apr-93 | 1,158.6 |
| IH | Tulsa (RFC) | OK | 9300 | LAO | 25 | Mar-93 | 176.4 |
| FV | Louisville | KY | 4630 | B9 | 42 | Aug-93 | 738.8 |
| CN | Binghamton | NY | 4630 | B9 | 39 | Jul-93 | 802.7 |
| | FISCAL YEAR '91: | | | | 8 | | 4,183.9 |

Highlighted 10,341,800

lease-assignment option (State College)

lease (Phoenix) — Highlighted 3,691,700

lease-assignment option (Tulsa)

Total highlighted $ 14,033,500*

* - Per Tracey Lambert, Project Controls, FDI/KC, highlighted locations reflect actual construction costs. Remaining locations reflect estimated construction costs.

‡ - Use actual amounts in computing estimated design costs. These locations have separate costs listed above -- part actual (⊕) and part estimated.



G 000028

6-64

NOAA CONTRACT 50WCNA606099/52WCNA206003

MAR '92 WFO FACILITIES BUDGET (EXCL FURNITURE)

| CLIN | SYSTEM NAME | ST | INSIDE GROSS SF | DES APP | NEX PRI | 23/8/91 EDD | TOTAL FACILITY COST | |
|---|---|---|---|---|---|---|---|---|
| FT | Little Rock | AR | 5370 | LM | 21 | Jan-93 | 246.7 | lease-mod |
| FC | Jackson | MS | 5370 | M | 22 | Feb-93 | 709.3 | |
| ZQ | Denver (ERL) | CO | 5960 | n/a | 27 | Apr-93 | 93.0 | |
| DQ | Denver (PHASE II) | CO | 0 | n/a | 27 | Apr-93 | 20.0 | |
| HB | Pittsburgh | PA | 4570 | M | 33 | Jun-93 | 810.2 | |
| DI | Cleveland | OH | 5640 | LM | 34 | Jun-93 | 708.0 ✓ | lease mod |
| FB | Indianapolis | IN | 5640 | B18 | 35 | Jun-93 | 1,211.8 | |
| GY | Philadelphia | PA | 5370 | B14 | 40 | Aug-93 | 1,352.5 | |
| GP | New York | NY | 5640 | B18 | 41 | Aug-93 | 1,902.0 | |
| FZ | Memphis | TN | 5370 | M | 44 | Sep-93 | 591.8 | lease |
| CB | Albany | NY | 5200 | L | 45 | Sep-93 | 151.5 | lease — TFC 276.5 - GFE Furn 125.0K = 151.5 |
| CR | Boston | MS | 10880 | LAO | 47 | Sep-93 | 1,843.0 ✓ | lease - assignment option |
| HD | Portland | ME | 5640 | B18 | 49 | Oct-93 | 1,207.0 | |
| CQ | Boise | ID | 5370 | BU6 | 50 | Oct-93 | 1,076.6 ✓ | |
| DR | Des Moines | IA | 5370 | B14 | 51 | Oct-93 | 1,125.6 ✓ | |
| HU | Sioux Falls | SD | 4570 | B12 | 52 | Nov-93 | 985.5 | |
| EV | Morehead City | NC | 4570 | B0 | 54 | Nov-93 | 1,074.2 | |
| DO | Dallas | TX | 10880 | L | 58 | Dec-93 | 499.4 | lease |
| FW | Lubbock | TX | 5640 | L | 59 | Dec-93 | 176.7 | lease |
| DD | Cheyenne | WY | 5370 | B14 | 90 | Aug-94 | 1,085.8 ✓ | |
| FU | Los Angeles | CA | 5640 | BU4 | 60 | Jan-94 | 1,246.5 | |
| HQ | Monterey/San Fran | CA | 6340 | BU3 | 65 | Feb-94 | 1,672.0 | |
| CO | Birmingham | AL | 5370 | B14 | 74 | Apr-94 | 1,291.0 ✓ | |
| | FISCAL YEAR '92: | | | 21 | | | 21,080.2 | |

G 000029

NOAA CONTRACT 50WCNA606099/52WCNA206003

## MAR '92 WFO FACILITIES BUDGET (EXCL FURNITURE)

| CLIN | SYSTEM NAME | ST | INSIDE GROSS SF | DES APP | NEX PRI | 23/8/91 EDD | TOTAL FACILITY COST | |
|---|---|---|---|---|---|---|---|---|
| DK | Columbia | SC | 4570 | LM | 55 | Nov-93 | 486.8 ✓ | lease/Mod |
| HL | Sacramento | CA | 9600 | L | 61 | Jan-94 | 190.3 | lease |
| HG | Raleigh (N.C.St.) | NC | 5300 | L | 64 | Feb-94 | 141.3 | lease |
| HS | Seattle (by WASC) | WA | 5990 | M | 67 | Feb-94 | 538.3 | ← |
| HV | New Orleans | LA | 10880 | BR | 68 | Mar-94 | 1,681.3 | |
| GB | Miami (NHC) | FL | 25000 | BU5 | 69 | Mar-94 | 3,426.1 | |
| FP | Lake Charles | LA | 5370 | LM | 71 | Mar-94 | 735.5 | lease/Mod |
| DG | Cincinnati | OH | 10880 | BR | 72 | Apr-94 | 1,723.6 ✓ | |
| CK | Atlanta | GA | 10880 | BR | 75 | Apr-94 | 1,613.7 | |
| CC | Albuquerque | NM | 5370 | L | 77 | May-94 | 302.5 | lease |
| HO | Austin | TX | 5370 | B14 | 78 | May-94 | 1,045.7 | |
| GU | Omaha | NE | 5640 | LAO | 79 | May-94 | 1,227.2 | lease Assignation Opt [illegible] |
| CT | Buffalo | NY | 5370 | B14 | 80 | Jun-94 | 1,373.9 | |
| EQ | Great Falls | MT | 5370 | LAO | 81 | Jun-94 | 1,235.0 | lease Assignation Opt [illegible] |
| GO | San Juan | PR | 5370 | B14 | 83 | Jun-94 | 1,216.7 | |
| DC | Charleston | WV | 5370 | LAO | 84 | Jul-94 | 1,209.1 | lease Assignation Opt [illegible] |
| GE | Minneapolis | MN | 13200 | LAO | 85 | Jul-94 | 2,105.4 | ✓ ✓ ✓ |
| FL | Knoxville | TN | 4570 | B12 | 86 | Jul-94 | 936.1 ✓ | |
| HI | Reno | NV | 5640 | B18 | 88 | Aug-94 | 1,610.0 | |
| HM | Salt Lake City | UT | 12700 | L | 91 | Aug-94 | 317.7 | lease |
| GG | Missoula | MT | 5370 | B14 | 92 | Aug-94 | 859.4 | |
| GQ | Norfolk | VA | 5370 | B14 | 94 | Sep-94 | 1,013.1 | |
| ER | Green Bay | WI | 4570 | B12 | 95 | Sep-94 | 1,154.6 | |
| IQ | Wilmington | NC | 4570 | B12 | 96 | Sep-94 | 907.7 | |
| GM | Nashville | TN | 5370 | B14 | 97 | Oct-94 | 1,025.3 | |
| HE | Pueblo | CO | 4570 | B12 | 98 | Oct-94 | 1,009.5 | |
| HJ | Roanoke | VA | 4570 | L | 99 | Oct-94 | 136.0 | lease |
| CA | Aberdeen | SD | 4570 | B12 | 100 | Oct-94 | 1,030.2 | |
| HY | Springfield | MO | 4570 | B12 | 101 | Nov-94 | 1,099.7 | |
| HC | Portland | OR | 10875 | L | 102 | Nov-94 | 400.7 | lease |
| EC | Eureka | CA | 5170 | BU7 | 103 | Nov-94 | 1,274.9 | |
| HF | Quad Cities | IA | 4570 | L | 104 | Nov-94 | 317.2 | lease |
| HZ | Central Illinois | IL | 4570 | B12 | 105 | Dec-94 | 1,163.0 | |
| GH | Mobile | AL | 4570 | B12 | 106 | Dec-94 | 955.4 | |
| FD | Jacksonville | FL | 5370 | B14 | 107 | Dec-94 | 1,167.9 | |
| IB | Tallahassee | FL | 5920 | BU1 | 108 | Dec-94 | 1,198.6 | |
| DB | Charleston | SC | 5370 | B14 | 109 | Jan-95 | 1,106.7 | |
| | FISCAL YEAR '93: | | | | 37 | | 38,936.1 | |

G 000030

NOAA CONTRACT 50WCNA606099/52WCNA206003

MAR '92 WFO FACILITIES BUDGET (EXCL FURNITURE)

| CLIN | SYSTEM NAME | ST | INSIDE GROSS SF | DES APP | NEX PRI | 23/8/91 EDD | TOTAL FACILITY COST | |
|---|---|---|---|---|---|---|---|---|
| CP | Bismarck | ND | 5370 | M | 93 | Sep-94 | 474.1 | |
| GW | Paducah | KY | 4570 | B12 | 110 | Jan-95 | 972.9 | |
| GS | Midland/Odessa | TX | 4570 | B12 | 111 | Jan-95 | 898.7 | |
| IC | Tampa Bay Area | FL | 5370 | M | 113 | Feb-95 | 735.3 | |
| CS | Brownsville | TX | 4570 | B12 | 114 | Feb-95 | 1,059.3 | |
| EH | San Joaquin Valley | CA | 5370 | B14 | 115 | Feb-95 | 1,285.8 | |
| HT | Shreveport | LA | 4570 | B12 | 116 | Feb-95 | 1,061.4 | |
| IG | Tucson | AZ | 5640 | L | 119 | Mar-95 | 307.5 | lease |
| EX | Honolulu | HI | 7000 | L | 120 | Mar-95 | 1,091.8 | lease |
| FR | Las Vegas | NV | 5370 | B14 | 123 | Apr-95 | 1,237.3 | |
| FX | Marquette | MI | 4570 | B12 | 124 | Apr-95 | 1,006.6 | |
| EO | Grand Rapids | MI | 4570 | B12 | 125 | May-95 | 1,089.4 | |
| CD | Alpena | MI | 4570 | B12 | 128 | May-95 | 1,162.8 | |
| DN | Anchorage | AK | 10880 | BR | 129 | Jun-95 | 2,117.6 | |
| DV | Duluth | MN | 4570 | B12 | 130 | Jun-95 | 1,036.2 | |
| HP | San Diego | CA | 5370 | B14 | 131 | Jun-95 | 1,308.7 | |
| GR | North Platte | NE | 4570 | B12 | 132 | Jun-95 | 1,067.2 | |
| IR | Elko | NV | 4570 | B12 | 135 | Jul-95 | 1,487.7 | |
| HW | Pocatello | ID | 4570 | B12 | 136 | Jul-95 | 1,052.2 | |
| CU | Burlington | VT | 4570 | LM | 137 | Aug-95 | 682.6 | lease mod |
| ID | Juneau | AK | 5370 | B14 | 138 | Aug-95 | 1,528.4 | |
| FY | Medford | OR | 5370 | M | 139 | Aug-95 | 641.7 | |
| EF | Flagstaff | AZ | 4570 | B12 | 140 | Aug-95 | 1,206.8 | |
| EN | Grand Junction | CO | 5370 | B14 | 141 | Sep-95 | 1,144.1 | |
| HA | Fairbanks | AK | 5640 | B18 | 142 | Sep-95 | 1,668.7 | |
| HH | Rapid City | SD | 5640 | B18 | 143 | Sep-95 | 1,198.6 | |
| FQ | Riverton (Lander) | WY | 4570 | B12 | 144 | Sep-95 | 1,130.8 | |
| GX | Pendleton | OR | 4570 | B12 | 145 | Oct-95 | 1,065.8 | |
| FN | La Crosse | WI | 4570 | B12 | 146 | Oct-95 | 1,029.9 | |
| HX | Spokane | WA | 4570 | B12 | 149 | Nov-95 | 1,276.1 | |
| EE | Fargo | ND | 4570 | B12 | 150 | Nov-95 | 1,004.1 | |
| CM | Billings | MT | 4570 | B12 | 151 | Nov-95 | 1,076.5 | |
| EK | Glasgow | MT | 4570 | B12 | 154 | Dec-95 | 1,171.1 | |
| EA | El Paso | TX | 5370 | B14 | 155 | Dec-95 | 1,139.1 | |
| DM | Corpus Christi | TX | 4570 | B12 | 156 | Dec-95 | 1,085.1 | |
| HN | San Angelo | TX | 4570 | B12 | 160 | Jan-96 | 934.0 | |
| | FISCAL YEAR '94: | | | | 36 | | 39,435.8 | |

G 000031

NOAA CONTRACT 50WCNA606099/52WCNA206003

# MAR '92 WFO FACILITIES BUDGET (EXCL FURNITURE)

| CLIN | SYSTEM NAME | ST | INSIDE GROSS SF | DES APP | NEX PRI | 23/8/91 EDD | TOTAL FACILITY COST |
|---|---|---|---|---|---|---|---|
| CY | Cedar City | UT | n/a | RO | 133 | Jul-95 | 0.0 |
| IT | Yuma | AZ | n/a | RO | 148 | Oct-95 | 0.0 |
| FJ | Key West | FL | n/a | RO | 153 | Dec-95 | 0.0 |
| | FISCAL YEAR '95: | | | 3 | | | 0.0 |
| | TOTAL | | | | | | 114,000.0 |
| | | | 700.0 SF x 1000 | | | | |



G 000032

Appendix

1. Contracting Officer's Price and Cost Analysis ........ 5,11,12,18

2. Contracting Officer's Memorandum for the Record ........ 4,11,18

3. Defendant's Supplemental Response to Plaintiff's Requests for Admission ........ 5,12,13,26,30, n.27

4. 2/13/87 Memorandum of Negotiation ........ 5,12

5. Contracting Officer's Negotiation Plan ........ 5

6. 5/30/87 Memorandum of Understanding between Jesse Arredondo, Contracting Officer, NOAA and K Sawyer, Project Manager, FDI ........ 6

7. 10/21/86 Memorandum from W. Becker, Contracting Officer, Central Administrative Support Center, to Janet Stine, Audit Manager, Systems Acquisition Division, OIG ..... 6

8. Audit Report No. 4181-7D210225, dated 12/2/86, from DCAA to OIG ........ 6

9. 1/8/87 Memorandum from Janet Stine to William Becker ........ 6

10. Summary of Contracting Officer's Analysis of Incurred Costs ........ 6,10,12,13,30, n.21

11. Defendant's Response to Plaintiff's First Set of Interrogatories ........ 6,12,27

12. 4/8/87 Letter from Jack Toliver FDI to Jesse Arredondo CO NOAA ........ 7

13. 10/6/90 Draft OIG Audit Report ........ 7

14. 6/11/90 e-mail from Edward Mische SEPO to Jack Tolliver FDI ........ 7

15. 6/25/90 facsimile from FDI illustrating agreement from 6/12/90 meeting between FDI and NOAA ........ 8

16. Agency's 10/5/90 Internal Letter from Max Entrikin SEPO ........ , n.15

17. Defendant's Response to Plaintiff's Request for Admissions ........ ,12

18. OIG Audit Report No. NOA-4436-3-001 "Weather Forecast Office Construction Support Contract Needed Improved Management and Administration" (1993) ........ 8,18,19,26

19. H.R. 670, 1949 U.S.C.C.A.N. 1475, 1499 ........ 16,24

20. Letter from Rep. Jack Brooks, Chairman of the Government Activities Subcommittee of the House Committee on Government Operations to the Comptroller General of the United States (November 16, 1967) .................. 16,n.12,n.15

21. Affidavit of Kenneth W. Forsyth .................................................................. 18,21,26

22. 10/6/86 NOAA Program Work Breakdown Structure .................................................. 18

23. H.R. 4278, 72d Congress (1939) ........................................................................ 20

24. FAR §§ 15.903(d)(1) and 16.306(c) (1986) ........................................................... 24,25

25. EP 715-1-7 US Army Corps of Engineers "Architect-Engineer Contracting" ............... 26

26. Comptroller General Warren to the Secretary of War, B-18,126, 21 Comp. Gen. 580, 191 WL 925 (December 18, 1941) ................................................................ 29

27. To the Administrator, Veteran Administration, B-156,469, 1967 CPD ¶ 31, 1967 WL 1686 (July 21, 1967) ........................................................................ 31

28. Skidmore, Owings & Marrill, ASBCA No. 5593, 61-1 BCA ¶ 2974 (February 28, 1961) ........................................................................................ 31

29. 1992 WFO Facilities Budget ........................................................................ 2