5.12

NOTE: APPENDIX IV, the agency response to the audit, is not included in this copy of the document. The FOIA Officer is seeking authorization to release that portion of the document from the responsible authority.

# WEATHER FORECAST OFFICE CONSTRUCTION SUPPORT CONTRACT NEEDED IMPROVED MANAGEMENT AND ADMINISTRATION

**NOA-4436-3-0001**

**AUGUST 1993**

**U.S. DEPARTMENT OF COMMERCE**
**OFFICE OF INSPECTOR GENERAL**
**OFFICE OF AUDITS**
**NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION DIVISION**

# TABLE OF CONTENTS


EXECUTIVE SUMMARY . . . . . i

INTRODUCTION . . . . . 1
Purpose and Scope of Audit . . . . . 2

FINDINGS AND RECOMMENDATIONS . . . . . 4

PROCUREMENT OFFICIALS SHOULD FOLLOW PROPER CONTRACT MANAGEMENT PRACTICES . . . . . 4

Contract Files Lack Sufficient Information . . . . . 5
Independent Government Estimate for Architectural and Engineering Effort Not Obtained . . . . . 6
Contracting Officer Circumvented Requirements and Controls . . . . . 6
Questionable Costs Included in Fee Calculation . . . . . 7
Potential Conflict of Interest Not Mitigated . . . . . 8

EFFECTIVE MANAGEMENT NEEDED OVER CONTRACTOR PERFORMANCE . . . . . 10

Statement of Work Did Not Limit Specific Work Assignments . . . . . 10
Work Priorities and Requirements Set By Contractor . . . . . 10
Change Request System Ineffective and Costly . . . . . 11
Costs for New or Redirected Work Not Negotiated or Audited . . . . . 12
Work Products Not Independently Approved or Monitored . . . . . 12
Costs Not Adequately Tracked to Tasks or Work Performed . . . . . 13
Contractor Performed Inherently Governmental Functions . . . . . 13

RECOMMENDATIONS . . . . . 16
Funds to Be Put to Better Use . . . . . 19
NOAA Comments and OIG Response . . . . . 19

CORRECTIVE ACTIONS IMPLEMENTED BY NOAA . . . . . 20

APPENDIXES
I WFO Designs
II Pictures of WFO and NEXRAD Unit
III Summary of NOAA Response and OIG Comments

Weather Forecast Office
Construction Support Contract
Needed Improved Management
and Administration

Final Audit Report
August 1993

---

## EXECUTIVE SUMMARY


The National Weather Service is constructing or modifying weather forecast offices throughout the country and in Puerto Rico. The estimated cost to acquire the land and build or modify the WFOs is $125 million (an average of about $1.1 million per site).

In 1986, the National Weather Service contracted with Fluor Daniel, Inc. to provide professional services for WFO and NEXRAD (Next Generation of Weather Radar) program management, site studies, office designs, construction bid packages, and real estate acquisition support. The contract was a cost-reimbursable type, with a negotiated fixed fee. The term was for a base period covering fiscal years 1986 and 1987 and four options extending the contract through 1991. In July 1992, a separate contract was issued to Fluor Daniel for future support services to the NEXRAD program. NOAA extended the WFO contract to October 31, 1992, then issued a letter contract to continue the WFO support services until a new contract is negotiated. The new contract would extend full WFO support services through fiscal year 1997.

Our performance audit disclosed the following problems in NOAA's administration of the contract with Fluor Daniel:

- Insufficient documentation to account for continuous contract cost growth, from an initial estimate of $9 million in 1986 to an estimate by NOAA of $79 million. Fluor Daniel's estimate was $94.2 million, $15.2 million higher than NOAA's estimate. (See page 5.)

- Lack of required independent government estimates for use in negotiating the contract and subsequent tasks. (See page 6.)

- Circumvention of requirements for competitive procurements and departmental controls by adding unrelated services to an architectural and engineering contract. (See page 6.)

- Questionable inclusion of administrative functions in direct hours to meet the contractual requirements to earn the fixed fee. (See page 7.)

- Failure to mitigate potential organizational conflicts of interest. (See page 8.)




FD 000770

- Reliance upon a very general statement of work which permitted the COTR to add millions of dollars in new or redefined services. (See page 10.)

- Inappropriate reliance upon Fluor Daniel to establish its own priorities and requirements. (See page 10.)

- Use of an ineffective and costly change request system intended to control work assignments. (See page 11.)

- Failure to negotiate new or redirected work or obtain audits of incurred costs. (See page 12.)

- Lack of monitoring, reviewing, or coordinating tasks, associated costs and funding. (See page 12.)

- Inappropriate use of Fluor Daniel for personal services and inherently governmental functions. (See page 13.)

Due to the severity of the problems and the need to resolve them before awarding new contracts for such services, we informed the appropriate NOAA and Departmental officials of our audit findings and recommendations throughout the audit and in a memorandum on September 30, 1992. NOAA management officials and OIG auditors began a coordinated effort to resolve the issues identified during the audit fieldwork. On November 17, 1992, NOAA officials replied to our memorandum of September 30 and agreed to many of the recommendations in the memorandum, reiterated on page 16 of the report.

As a result, NOAA undertook a major Fluor Daniel recovery effort and actions to implement most of our recommendations are already completed or underway. Actions taken by NOAA include reassigning the new contract to a more experienced contracting office. NOAA should realize significant savings upon full implementation of the recommendations. With the new management controls and rigorous oversight, we anticipate approximately $10 million in funds put to better use.

On March 31, 1993, NOAA responded to our draft audit report. The agency reiterated that it had already agreed with most of the report's recommendations and was in the process of implementing them. A summary of NOAA's response and our comments is presented in Appendix III.

---

## INTRODUCTION

The National Oceanic and Atmospheric Administration is currently restructuring its National Weather Service to take advantage of scientific advances in understanding weather phenomena and new technologies for observing the atmosphere and processing information. These technologies include the next generation weather radar (NEXRAD), an automated surface observing system, geostationary operational environmental satellites, and an advanced weather interactive processing system.

The weather service plans to consolidate its 249 weather offices into 116 weather forecast offices, 13 river forecast centers collocated with the WFOs, and four national centers. The WFOs must be located in proximity to NEXRAD radar sites, which are placed to provide a national grid of weather radars. The WFO buildings are generally three basic sizes (4,555, 5,366, and 5,858 square feet) depending on the individual office's planned functions (see Appendix I). The offices usually are one story without basements (see Appendix II).

WFO construction management functions are divided between the Central Administrative Support Center (CASC) in Kansas City, Missouri, and various National Weather Service offices including the NEXRAD Program Office (since moved to NOAA's Systems Program Office), the Transition Program Office (TPO), the Office of Systems Operations, and the weather service regional offices. The weather service provided the WFO requirements, the project budget, and the NEXRAD equipment delivery dates to SEPO.

The modernization will involve a significant amount of construction. Sites for radar installation and weather facilities have to be acquired and existing weather offices modified or new offices built for the incoming new systems. NOAA assigned the real estate acquisition and facilities construction for the WFOs to the Special Engineering Program Office. SEPO, which is under the Central Administrative Support Center, is responsible for ensuring that the WFOs are ready for the installation of the NEXRAD equipment. SEPO's responsibilities include:

- obtaining land for NEXRAD radar sites,
- establishing schedules for meeting equipment delivery dates,
- developing prototype designs,
- preparing architectural and engineering designs,

FD 000772

- obtaining construction contractors, and
- managing and inspecting the construction of the weather facilities.

In 1986 SEPO procured a support contractor, Fluor Daniel, Inc., to provide program management, architectural and engineering services, and construction management and inspections. The contract was modified later to include support services for NEXRAD program construction efforts and real property acquisition.

The contract is a cost-reimbursable type with a negotiated fixed fee. The term was for a base period covering fiscal years 1986 and 1987 and four options extending the contract through 1991. In July 1992, NOAA awarded Fluor Daniel a new contract to separately continue the NEXRAD program support. In October 1992, NOAA issued a letter contract while it negotiates a new contract with Fluor Daniel to obtain WFO support services through fiscal year 1997.

A March 1991 audit of several NOAA support contractors, "JSPO - Contracts Poorly Managed and Funds Improperly Spent," STD-0199-1-0001, identified several significant problems with NOAA's management of the Fluor Daniel and other contracts. Concerned about increasing costs for the services provided by Fluor Daniel, the Inspector General initiated performance and contract audits focused in greater detail on the Fluor Daniel contract. This report addresses the significant management issues identified during the performance audit. Our preaward audit reports of the proposed contracts with Fluor Daniel were issued on June 15, 1992 (report nos. DEN-4596-2-0001 and DEN-4598-2-0001). On March 25, 1993, we issued a separate audit report covering our detailed review of costs incurred under this contract (report no. DEN-4613-3-0001).

## Purpose and Scope of Audit

The purpose of this performance audit was to (1) evaluate the causes of the significant increase in estimated contract costs for Fluor Daniel's services to the WFO and NEXRAD projects since 1986, and (2) assess the adequacy of program and contract management in controlling costs.

We identified the elements that comprised the increase in the estimated costs, traced these elements to their origins in the contract management process, and determined whether the increases were properly supported and justified. We examined the policies, procedures, and practices used to administer the contract to determine if they (1) were sufficient to control the

contract costs, and (2) complied with applicable laws, rules, regulations and other criteria that govern these types of contracts.

The scope of our performance audit spans the entire contract period from its planning stage in fiscal year 1985 through contract completion in 1992. We also reviewed the first proposal for the follow-up contract. The results of that review were included in an earlier audit report. We began our fieldwork in September 1991 and continued through July 1992. During this period, we reviewed documentation including rules, regulations, and other criteria that govern the types of services provided by Fluor Daniel; analyzed program financial and management records; and interviewed cognizant government and nongovernment officials. We performed our performance audit at the Central Administrative Support Center in Kansas City, Missouri, and at NOAA in Silver Spring, Maryland, and Washington, D.C.

Our assessment of internal controls concentrated on the policies, procedures, practices, and controls applicable to the administration of the contract. We found significant weaknesses in administrative controls that negatively affected the work and costs associated with the Fluor Daniel contract awarded in 1986. These issues are addressed in the findings and recommendations section of the report. We did not audit the internal controls designed to ensure reliability of data generated by computers because the pertinent data we reviewed was not computer-generated.

We performed certain tests of compliance with applicable laws and regulations relevant to the audit objectives to determine compliance with applicable laws, regulations and department procedures. This included testing to determine compliance with the Federal Acquisition Regulation and Office of Management and Budget circulars and policy letters. We found instances of noncompliance, which are discussed in the report.

Our audit was conducted in accordance with generally accepted government auditing standards and was performed under the authority of the Inspector General Act of 1978, as amended, and Department Organization Order 10-13, dated May 22, 1980, as amended.

## FINDINGS AND RECOMMENDATIONS

We found that the costs for services provided by Fluor Daniel have dramatically increased over the course of the National Weather Service's modernization. Contract costs increased from NOAA's initial estimate of $9 million to an estimate of $79 million. As of the completion of audit work, Fluor Daniel's own estimates were $15.2 million higher -- $94.2 million. Yet neither NOAA nor Fluor Daniel could provide sufficient documentation on the reasons for the cost increases.

We also found other serious problems in NOAA contract management and administration and a lack of oversight of Fluor Daniel's activities. For example, no independent government estimates of the costs were prepared; advisory and assistance services and real estate acquisition services were improperly procured under an A&E contract; the contractor was allowed to establish its own priorities and requirements; work assigned to the contractor was not covered by a reasonably specific statement of work or controlled by an effective change request system; new or redirected work was not adequately negotiated with the contractor; funding and costs were inadequately monitored and coordinated; and the contractor improperly provided personal services and performed inherently governmental functions.

We informed NOAA and Departmental officials of our audit findings and recommendations throughout the audit. A coordinated effort was begun to resolve the issues and actions are underway to correct most of the problems identified. Implementation of many of the recommendations contained in the draft audit report have already resulted in important cost avoidances.

### PROCUREMENT OFFICIALS SHOULD FOLLOW PROPER CONTRACT MANAGEMENT PRACTICES

We found that the Central Administrative Support Center's contracting officer[1] did not comply with procurement laws and regulations or follow sound contract management practices.

---

[1] Numerous contracting officers exercised responsibility for procurement actions during the contract period. As used in our report, the term refers to each contracting officer who took the action indicated.

---

**Contract Files Lack Sufficient Information**

The contracting officer did not include sufficient information in contract files. Part 4.8 of the FAR requires that contract files must provide a complete and accurate history of the transactions. The files should contain sufficient information to enable contracting officials and program managers to make informed decisions, maintain control over the expenditure of their program's funds, and furnish essential information for reviews, investigations, litigation, or congressional inquiries.

NOAA's estimates of the total costs rose from $9 million in 1986 to $48 million in May 1988, $71 million in April 1991, and $79 million in April 1992. Fluor Daniel proposed to continue its services through the end of the project at an even higher cost to NOAA of $94.2 million, $15.2 million more than the NOAA estimate early in 1992. Yet SEPO officials were unable to satisfactorily explain to us what specific services were acquired to account for the huge contract cost increases.

Twice we requested documentation of the reasons for the increases. In September 1991, SEPO officials provided us with a list of eight factors that caused the budget increase from $48 million to $71 million between 1988 and 1991. Examples included $5.3 million for real estate acquisition and NEXRAD program support and $6.1 million defined by Fluor Daniel as stemming from "other schedule delays." When we asked for the underlying records used to support the figures, SEPO referred us to Fluor Daniel. However, Fluor Daniel officials informed us that the figures were based only on their personal knowledge; they had not used or prepared any written financial records to support the costs.

Again in November 1991, Fluor Daniel provided us with a more detailed analysis of the professional services contract cost growth. This analysis listed 11 factors in the increases, including "facility square foot" growth and "unplanned escalation," defined by Fluor Daniel as delays due to economic analysis requirements, NEXRAD's major system contract disputes, and funding deferrals.

We were still unable to obtain adequate documentation to either fully justify or explain these factors. For instance, we were unable to determine what additional engineering work was done to justify an increase in design fees in direct proportion to the increase in office size. Neither could we determine what services they received or expected to receive as a result of program delays, which Fluor Daniel estimated to cost $3.5 million. Although some of this information

may be available in change order documentation, the system was not implemented until 1991 and proved an ineffective method for monitoring contract cost growth.

NOAA estimates that total WFO construction costs for 116 weather forecast offices will be $125 million upon completion (an average of $1.1 million per site). If NOAA had accepted Fluor Daniel's proposal for future WFO support services, WFO support service costs would total about $71 million. This equates to an average of over $600,000 per site for WFO support services, over one-half of the total site costs. (Even using NOAA's lower estimate of $64 million, the WFO support service costs would average about $520,000 per site.) Considering the simplicity of weather office design, the projected costs of Fluor Daniel's services appears unwarranted.

**Independent Government Estimate for Architectural and Engineering Effort Not Obtained**

SEPO officials did not prepare independent, detailed, government estimates of the A&E effort as required by Part 36.605 of the FAR. As a result, the contracting officer did not have sufficient information for negotiating fair and reasonable prices with Fluor Daniel. The contracting officer should have requested such an estimate before negotiating and approving the contract.

The FAR requires an independent estimate for each proposed contract or modification expected to exceed $25,000. The estimate is prepared prior to receiving the A&E cost proposal, and is based on a detailed analysis of the required work as though the government were submitting a proposal. Its purpose is to ensure that all parties understand what is needed. Although Fluor Daniel's costs and work effort increased significantly over the years, we found no evidence that SEPO developed independent estimates of need for or costs of Fluor Daniel's services after fiscal year 1986. Instead, SEPO used Fluor Daniel's historical costs and level of effort to evaluate Fluor Daniel's proposed costs and effort for new work.

**Contracting Officer Circumvented Requirements and Controls**

The contracting officer circumvented legal and FAR requirements for competitive procurements and other OMB and departmental procurement procedures by improperly adding unrelated services to an A&E contract. As a result, the contracting officer failed to ensure that the unrelated services were procured from the most qualified firm at a fair and reasonable price.

---

The Competition in Contracting Act and its implementing regulations in the FAR prescribe policies and procedures to promote full and open competition in the procurement process. Part 6.1 of the FAR requires, with certain limited exceptions, that contracting officers promote and provide for full and open competition in soliciting offers and awarding government contracts. Full and open competition means that all responsible sources are permitted to compete on an equitable basis. Competitive procurements are more likely to result in acquisitions from qualified firms, at fair and reasonable prices, than are noncompetitive procurements.

However, the procedures used for procuring A&E services, which are set forth in Part 36 of the FAR, do not promote or provide for full and open competition with respect to price. Instead, the government determines a fair and reasonable price for the needed services by establishing an independent government estimate and limiting fees paid to 6 percent of the estimated construction costs.[2] The contracting officer who awarded the contract used those procedures to originally award the contract to Fluor Daniel.

The contracting officer repeatedly approved modifications to the existing contract to procure unrelated services of advisory and assistance support and real estate acquisition assistance from Fluor Daniel. The contracting officer did not establish a competitive bidding procurement process in which other firms that may have provided the services were invited to submit bids.

By modifying the contract to obtain advisory and assistance services from Fluor Daniel, the contracting officer also failed to comply with required procedures for procuring advisory and assistance support under OMB Circular A-120 and Department Administrative Order 216-13. These procedures require acquisition of such services in compliance with the Competition in Contracting Act and departmental approval of agency procurements of such services above a dollar threshold ($25,000 for the Department). By applying the procedures applicable to A&E contracts, the contracting officer also bypassed this departmental control.

**Questionable Costs Included in Fee Calculation**

The contracting officer allowed Fluor Daniel to include hours worked by nontechnical personnel such as secretaries, bookkeepers, and other administrative employees, in calculating the direct

---

[2] The limit is set by section 304(b) of the Federal Property and Administrative Services Act of 1949, 41 U.S.C. §254(b).

productive hours billed by Fluor Daniel. According to Part 16.306 of the FAR, in level-of-effort contracts such as the Fluor Daniel contract, the payment of the negotiated fixed fee is contingent upon the contractor providing a specified level of direct productive hours. If the contractor does not provide the specified level, the fee is reduced proportionately.

We found that Fluor Daniel considered *all* labor hours performed at its Kansas City office, including nontechnical personnel, to be "productive" for purposes of calculating the direct productive hours billed to NOAA. We believe this could result in an overpayment of fixed fees. The contracting officer responsible for negotiating the contract and approving contractual payments exercised poor judgment by not limiting the direct productive hours to *only* those hours provided for support services. This happened because the contracting officer relied on the Defense Contract Audit Agency to identify any problems. However, DCAA's preaward audit did not take exception to the manner in which Fluor Daniel allocated, segregated, accumulated and reported costs. The contracting officer also believed that any questionable or unallowable costs paid over the course of the contract would be identified by DCAA and resolved upon completion of the contract. However, the contracting officer failed to request an audit by DCAA of incurred costs, which might have identified and questioned this practice.

**Potential Conflict of Interest Not Mitigated**

The contracting officer did not mitigate a potential organizational conflict of interest created by Fluor Daniel's management involvement in the program. According to Part 9.5 of the FAR, an organizational conflict of interest exists when the nature of the work performed may, without some restriction on future activities, (a) result in an unfair competitive advantage for the contractor or (b) impair the contractor's objectivity in performing the contract work. In our opinion, allowing the same contractor to perform both program planning and support work, as well as the subsequent A&E work, is not in the best interest of the government because the contractor's objectivity may become impaired when performing the contract work.

Nevertheless, as part of their program management functions, Fluor Daniel assisted SEPO and the weather service in defining and planning the facilities program's future work and budget requirements. Fluor Daniel worked with NOAA in developing program priorities and then provided the future contract requirements, estimated level of effort, and estimated costs for accomplishing those priorities. Fluor Daniel developed design and construction schedules used by the weather service's program manager and the SEPO's engineers to ensure that the offices were completed on time. In turn, Fluor Daniel through task orders, modifications, and change