orders, was assigned the work they had previously planned and budgeted. Fluor Daniel also assisted the COTR and contracting officer in preparing the solicitation package and statement of work for the follow-on A&E contract that NOAA planned to award to Fluor Daniel. The FAR requires that, under the above situation, the contracting officer take the necessary actions to resolve or mitigate the conflict.

## EFFECTIVE MANAGEMENT NEEDED OVER CONTRACTOR PERFORMANCE

Part 36.609-3 of the FAR requires "oversight, supervision, direction, control, and approval" by the contracting officer of the extent and character of the work done by the contractor. During our review we found that the support center's contracting officer and the SEPO officials who acted as the contracting officer's technical representatives did not exercise these responsibilities with respect to the contractor's performance and costs. Neither did they negotiate the addition of new or redirected work, as required by Part 15 of the FAR.

### Statement of Work Did Not Limit Specific Work Assignments

The contracting officer issued a statement of work in the original contract that contained no specific work requirements; described services in broad terms such as "attend meetings" and "accomplish all necessary engineering effort;" and referred to services, such as NEXRAD program support and real estate acquisition support, that were not negotiated during the award process. By including these all-encompassing terms and casual interpretations of work requirements in the contract, the contracting officer permitted the COTR to add millions of dollars in new or redefined services through the issuance of task orders, as discussed below. These services included NEXRAD program support, real estate acquisition, cost/benefit analysis, and additional conceptual and redesign work. According to the contracting officer this was not "scope creep" but simply "the redefinition of work assignments." As a result, Fluor Daniel's level of effort increased by more than 100,000 hours per year over the original annual estimate and contract costs rose continuously.

### Work Priorities and Requirements Set by Contractor

The contracting officer allowed Fluor Daniel to establish its own estimated budget, program priorities and work requirements through the use of task orders. The contracting officer, COTR, and the facilities program manager described the procedures which were used in issuing task orders under the contract as follows:

Towards the end of each fiscal year, Fluor Daniel would provide SEPO with the budget estimate for the next fiscal year's task order. According to senior SEPO officials, this estimate was

based upon what Fluor Daniel determined it would need to complete the design and construction program schedule that Fluor Daniel produced under its program management function.

SEPO would send this estimate to the weather service, which in turn issued a requisition for that amount to the contracting officer. The contracting officer would then give Fluor Daniel the amount available for the year along with a general set of work requirements such as "Perform program management functions."

In response, Fluor Daniel generated a several-thousand-item work plan describing in great detail what it planned to do during the year. The contracting officer issued the work plan, which had been prepared on Fluor Daniel letterhead, as the annual task order. The contracting officer then sent a copy of this plan to the COTR, who gave the plan to the assistant COTRs with instructions that this would be the year's "statement of work."

Thereafter, the contracting officer failed to limit the work to that assigned in the task orders. According to documentation found in the contract file (including a memorandum from the head of the support center's Procurement Division), the contracting officer allowed Fluor Daniel to accept verbal changes in work assignments, including assignments from unauthorized personnel, without monitoring or documenting the changes.

For all practical purposes, contract work priorities and requirements were set by Fluor Daniel without effective oversight by NOAA employees. We found little evidence of critical review by NOAA employees of Fluor Daniel's cost estimates or proposed work plan during the contract.

### Change Request System Ineffective and Costly

To improve control over work assignments, the contracting officer implemented a change request system in April 1991. We found little evidence, however, that this system has actually improved NOAA's oversight or direction of Fluor Daniel's work.

The support center issued over 200 change orders from April 1991 through September 1992. These ran the gamut from preparing slides for a presentation to agreeing to reimburse Fluor Daniel $45,000 to assist NOAA in preparing for a WFO program status meeting with members of our staff. We reviewed most of the change orders and found that Fluor Daniel identified the work requirements, prepared the change orders, developed the work statements, and established

the costs. Moreover, documentation attached to these change orders indicated that support center officials rarely questioned the need for or the costs of the services. The contracting officer's approval was, in our opinion, a mere formality since only a few change orders were ever disapproved.

The system also proved costly to maintain. Fluor Daniel estimates its extra cost to prepare and control the system's paperwork at over $1 million through 1996.

**Costs for New or Redirected Work Not Negotiated or Audited**

We reviewed the change orders and found that the contracting officer approved millions of dollars in new or redirected work to the existing contract without adequately negotiating either the level of effort or the costs proposed, as required by the FAR.

Part 15.8 of the FAR requires that contracting officers purchase services from responsible sources at fair and reasonable prices. Price negotiation is intended to permit the contracting officer and the contractor to agree on a fair and reasonable price. The price negotiation should be based on the contracting officer's analysis of the contractor's proposed costs and, at a minimum, a technical assessment of the labor mix and the number and kinds of labor hours proposed.

According to the support center officials, they planned to use audits of incurred costs by the Defense Contract Audit Agency upon the completion of the contract to identify any improperly charged costs. However, no audits of incurred costs had been requested as of the date of our review. Moreover, these audits are limited in scope and do not determine whether the costs incurred are fair and reasonable.

**Work Products Not Independently Approved or Monitored**

The COTR and assistant COTRs allowed Fluor Daniel to review its own technical products and identify its own mistakes. The contracting officer delegated to the COTRs the responsibility for reviewing and ensuring that Fluor Daniel performed the technical requirements in accordance with contract terms, conditions and specifications. Yet according to SEPO officials, they have no formal procedures for approving Fluor Daniel's work products. Moreover, we found little

evidence that the COTRs analyzed the contractor's level of effort to determine if it was reasonable for the work produced. For instance, although the COTRs established an engineering master plan to guide Fluor Daniel in its design work, we found no indication that they monitored Fluor Daniel's performance against the plan. As a result, the COTRs did not ensure the adequacy of Fluor Daniel's work.

**Costs Not Adequately Tracked to Tasks or Work Performed**

Support center officials did not adequately monitor Fluor Daniel's costs to ensure that they accurately reflected the work performed or stated in the task orders. Although the contractor submitted financial status reports, these reports did not provide sufficient detail for a thorough evaluation. For instance, monthly reports contained only total amounts such as total labor for the month. Thus the contracting officer was unable to readily assess the accuracy of the costs, compare the costs to progress made, or determine whether the program costs and work were on target.

**Contractor Performed Inherently Governmental Functions**

Support center personnel treated Fluor Daniel employees as if they were an extension of the SEPO staff. The contract was administered as if it were a contract for personal services which allowed the contractor to perform inherently governmental functions. According to FAR Part 37 and federal personnel laws (5 U.S.C. §3109), agencies are prohibited from using personal services contracts unless specifically authorized by statute. OMB Circular No. A-76 also prohibits contractors from performing certain types of services that are so intimately related to the public interest as to mandate performance by government employees.

Nevertheless, SEPO assigned work to Fluor Daniel that required direct government supervision of Fluor Daniel employees and resulted in a contractor making program decisions that should have been made by federal employees. For instance, the NEXRAD program is managed by a joint system program office comprised of representatives from the Departments of Commerce, Transportation, and Defense. A Fluor Daniel employee acted on behalf of the Department of Transportation as their representative to this office. In another instance, a Fluor Daniel employee acted as an integral part of NOAA's team in the negotiation of the comprehensive settlement of the NEXRAD major system contract. He coordinated the presentation of financial

information used by the government's negotiators and weather service officials in developing the government's negotiating position and policy decisions. He worked directly with the government's negotiator. SEPO also gave Fluor Daniel responsibility for obtaining and negotiating prices for the land needed to build radar sites and weather forecast offices. A subsequent audit revealed that SEPO gave Fluor Daniel responsibility for procuring many of the leases for the WFOs. Fluor Daniel conducted market surveys, prepared solicitations and leases, reviewed offers, and negotiated with offerors with little oversight from the SEPO real property officer.

Fluor Daniel considered itself an extension of the SEPO staff. At facility program meetings, program tasks were assigned to "SEPO/FDI." Program documentation referred to "SEPO/FDI" to such an extent that we could not distinguish where SEPO's responsibilities ended and the contractor's began. Fluor Daniel employees are included in NOAA's internal electronic mail system.

The range of Fluor Daniel's activities extended to virtually every aspect of the WFO construction program. Fluor Daniel reviewed policies and developed strategies that affected the program's priorities and budget. For instance, Fluor Daniel performed the economic analyses used in determining whether to lease or build new weather forecast offices. Fluor Daniel personnel also developed WFO budget figures, including the estimated costs for its own professional services, and made budget presentations to the Department's budget officials. Fluor Daniel maintained most of the corporate knowledge concerning the WFO project status and costs and kept most of the program records and documents for SEPO. We understand that Fluor Daniel provided the responses for many of our audit inquiries during the course of our audit.

By allowing Fluor Daniel personnel to perform inherently governmental functions, NOAA and NWS officials, in effect, surrendered control of the WFO construction program to Fluor Daniel.

OMB's Office of Federal Procurement Policy recently issued new procurement guidance relating to inherent government functions. According to the new guidelines, these functions require the use of discretion or judgment in decisions or fund expenditures. Examples include (1) determining Federal program priorities or budget requests, (2) determining what property or services are to be acquired by the government, (3) approving any contractual documents to include documents that define requirements, incentive plans, and evaluation criteria, and (4) administering contracts, including the ordering of changes in contract performance and evaluating performance. Moreover, the new guidance further requires strong management

---

controls and additional oversight for functions that can approach inherent government functions because of the way the contractor performs the work or the manner in which the government administers that performance. Examples include services which involve planning activities or which relate to analyses and strategy options used by agency personnel in developing policy.

The purpose of these new policies is to provide proper accountability, ensure that final agency actions reflect the conclusions of government officials, and ensure compliance with the laws and policies of the United States. Government agencies must maintain control over decisions which commit the government to a course of action.

---

RECOMMENDATIONS

We recommend that the Director, Transition Program Office and Director, NOAA Office of Administration instruct the contracting officer and program officials with responsibility for the WFO and NEXRAD projects to take the following action:

1. Relating to the contract instruments for Fluor Daniel's services:

   a. Consider splitting out A&E work, advisory and assistance work, real estate acquisition, and other unrelated services into separate contract instruments.

   b. Specify that the direct labor hours used for determining the level of effort and fee are based on technical and not administrative functions.

   c. Include specific procedures for preparing and issuing task orders that will ensure task orders are prepared and issued by the government based on established priorities and requirements.

   d. Include specific requirements that incurred cost information be provided in sufficient detail to enable the contracting officer to match costs with the level of effort and work performed.

2. Relating to preparation for contract negotiations:

   a. Obtain the Department's approval for the advisory and assistance portion of the contracts.

   b. Mitigate any organizational conflicts of interest in the source selection process.

   c. Follow the new policies and guidance on inherently governmental functions and managing service contracts recently issued by OMB. (Circulars A-76 and A-120 have been revised.)

3. Relating to future management:

   a. Reevaluate NOAA's projected level of Fluor Daniel support services and, if possible, reduce the projected level, justify the level of proposed expenditures for Fluor Daniel before awarding and implementing the contracts and commit to limiting contract costs to approved levels.

   b. Develop independent government estimates (not based on Fluor Daniel's historical costs, level of effort, or labor mix) to use as the basis for negotiating the contracts, task orders, modifications, and change requests.

   c. Assess the status of the WFO and NEXRAD projects for use in developing future contract requirements and statements of work.

   d. Have a more precise statement of work to outline categories of tasks and limit the types of services that can be acquired.

   e. Improve the Fluor Daniel change request system to ensure that only appropriate services are acquired, requests follow established procedures, and costs are negotiated. Control the system in the appropriate program offices in NWS.

   f. Have enough staff to oversee Fluor Daniel and the WFO and NEXRAD projects (Fluor Daniel could provide support).

   g. Formalize the responsibilities and duties for the various organizations involved in the two projects. This should include limiting direct involvement in design decisions to designated employees. Decisions and questions affecting the program should be directed to the appropriate program offices in NOAA and not to Fluor Daniel in accordance with revised OMB guidance on the performance of inherently governemental functions.

   h. Separate Fluor Daniel support services budget formulation from Fluor Daniel.

i. Have government employees negotiate real estate acquisition and construction contracts.

j. Maintain an adequate distance from Fluor Daniel personnel, so that Fluor Daniel is no longer perceived as an extension of the SEPO staff.

4. Relating to contract administration:

a. Issue multiple task orders that define the specific work needed, are based on known requirements, and that specify the deliverables and completion times.

b. Discontinue using Fluor Daniel's 2,800 item work plan as the basis of the task order and contract administration.

c. Obtain audits of incurred costs at specific intervals rather than waiting to the end of the contract.

d. Negotiate all modifications and changes in work, level of effort, or costs prior to issuance to Fluor Daniel.

e. Review invoices, progress reports, and financial reports.

f. Maintain complete, auditable contract files.

g. Periodically match obligations and incurred costs to work performed and level-of-effort.

h. Make NWS's own budget and program presentations to high-level officials and not use Fluor Daniel employees to present and justify program and budgetary strategies and requests.

## Funds to be Put to Better Use

The NOAA estimate to complete the WFO construction portion of the Fluor Daniel contract was approximately $33 million as of October 1992. Without the timely management changes instituted by NOAA and improvements in the new contract as a direct result of this audit, it is probable that the actual cost to complete would have exceeded $40 million, $7 million more than the October 1992 estimate. With the new management controls and rigorous oversight imposed in response to the audit, NOAA anticipates that cost avoidance of an additional 10 percent of the estimate could realistically be achieved, providing an additional savings of $3 million. Therefore, the total cost to complete is now estimated at approximately $30 million, with $10 million in funds to be put to better use because of the timely action taken by NOAA.

## NOAA Comments and OIG Response

Due to the length of NOAA's response to our draft audit report we have included a summary of NOAA's comments and our analysis as Appendix III.

---

## CORRECTIVE ACTIONS IMPLEMENTED BY NOAA

Beginning in June 1992, NOAA management officials and OIG auditors began a coordinated effort to resolve the issues identified during the audit fieldwork. As a result, NOAA officials undertook an aggressive recovery effort. Actions taken by NOAA included reassigning the award and administration of the proposed new contract for the WFO construction project to NOAA's Procurement Operations Division in Silver Spring, Maryland. By locating the contract closer to NOAA headquarters, the Department will be able to continue working with the new Fluor Daniel contract team, and provide the structured oversight and training necessary to ensure that the contract is adequately administered and managed.

NOAA awarded the new NEXRAD support service contract to Fluor Daniel with the commitment that the contract will be reviewed and revised in accordance with the conditions of the new WFO support contract. At our urging, NOAA deferred award of the WFO support contract until the contract could be better defined and administered in accordance with our recommendations. An interim letter contract was awarded to bridge the gap between the expiration of the prior contract and the award date of the new support contract.

We expressed our concerns about the Fluor Daniel contract cost growth and NOAA contract administration throughout the audit and in a memorandum to the appropriate NOAA and Departmental officials on September 30, 1992. NOAA officials replied on November 17, 1992, and agreed to address those concerns, as well as documenting substantial corrective actions already completed. This report formally documents our findings and recommendations expressed in our September 30 memorandum and allows for audit resolution and follow-up as appropriate.



FIGURE 6.12.4 - FURNITURE/EQUIPMENT PLAN--FY91I-12/2/1 - POST DUAL OPS (OPTION A)