JACK BROOKS, TEX., CHAIRMAN
WILLIAM S. MOORHEAD, PA.
WILLIAM J. RANDALL, MO.
DANTE B. FASCELL, FLA.

OGDEN R. REID, N.Y.
FLETCHER THOMPSON, GA.
MARGARET M. HECKLER, MASS.

CAPITOL [illegible]

NINETIETH CONGRESS

# Congress of the United States
## House of Representatives

GOVERNMENT ACTIVITIES SUBCOMMITTEE
OF THE
COMMITTEE ON GOVERNMENT OPERATIONS
RAYBURN HOUSE OFFICE BUILDING, ROOM B350-B
WASHINGTON, D.C. 20515

November 16, 1967

The Honorable Elmer B. Staats
Comptroller General of the
United States
Washington, D. C. 20548

Dear Mr. Staats:

Your April report relating to architect-engineer (A-E) fees has been referred to this Subcommittee for review. In your report you suggest that:

1. Federal agencies have misinterpreted the extent of the services covered by the 6 percent statutory limitation Congress has placed on A-E fees.

2. Federal agencies do not award A-E contracts under procedures you consider clearly in compliance with applicable statutes requiring "competitive" negotiation. You object that the amount to be paid as fee is not considered in the initial stage of the selection process when the agency ranks various A-Es according to relative capability to perform the particular project preliminary to negotiating with them in the order of their qualifications.

3. Many Federal agencies fail to consider all A-E firms that might be qualified and, therefore, "within the competitive range" as required by statute, and do not negotiate on the basis of cost (as distinguished from references to the cost of A-E services stated in terms of percentages of estimated project cost) in determining the amount of the A-E fee.

You recommend that Congress:

1. Repeal the "arbitrary" 6 percent fee limitation on A-E fees because they are unsound and unworkable, and

2. Clarify by legislation whether the negotiation of such contracts should be the subject of or an exception to what you consider to be the general intent of the law requiring "competitive" negotiation; that is, where the amount the A-E is to receive as a fee is considered in determining the relative qualifications of the A-Es during the initial stage of the selection process.

Interpretation of Statutes Relating to the 6 Percent Limitation

The conclusions in your report stem from an interpretation of five statutes. Three of these are early statutes dealing individually with the Navy, Army, and Air Force, limiting A-E fees to 6 percent. The other two statutes are the subsequently enacted Armed Services Procurement Act of 1947 and the Federal Property and Administrative Services Act of 1949, dealing with Defense and civil agencies respectively.

Congress, in 1939, imposed a limitation on fees to be paid under A-E contracts of 6 percent of the estimated construction cost for "the production and delivery of the designs, plans, drawings, and specifications required for the accomplishment of any Naval public works or utilities project" (10 U.S.C. 7212). The same limitation embodying the same description of the services to be covered was then extended to the Army (10 U.S.C. 2540) and the Air Force (10 U.S.C. 9540).

In 1947, Congress enacted the Armed Services Procurement Act providing the defense establishment with a comprehensive procedure for the procurement of goods and services. This statute forbade the use of cost-plus-a-percentage-of-cost contracts, and, among other things, set limitations on the fees to be paid under various general types of cost-plus-fixed-fee contracts:

for experimental, developmental and research work, the limitation was 15 percent of the estimated cost of the contract;

on cost-plus-fixed-fee contracts for "architectural or engineering services for a public work or utility" the 6 percent limitation expressed in the earlier statutes was maintained;

fees on other types of cost-plus-fixed-fee contracts were set at not more than 10 percent.

In 1949, Congress extended the same general procurement concepts as outlined above to the civil side of Government by enactment of Title II of the Federal Property and Administrative Services Act. As in the Procurement Act of 1947, the work subject to the 6 percent limitation was described as "architectural or engineering services" as contrasted to the "production and delivery of the designs, plans, drawings, and specifications" as contained in the earlier statutes dealing with the Army, Navy, and Air Force.

Up until the time of your report, most Federal agencies have interpreted the term "architectural or engineering services" as used in the 1947 Procurement Act and the 1949 Property Act as having comparable application as the limitation contained in the three earlier statutes. Other types of work A-Es performed not relating directly to the basic services described in detail in the earlier statutes have not been considered as coming within the 6 percent limitation. As indicated in your report, there have been numerous instances where the total amount paid to A-Es relating to some particular public work or utility exceeded 6 percent.

It is your conclusion that the term "architectural or engineering services," as used in the 1947 Procurement Act and the 1949 Property Act, has a broader meaning than the description of the limitation imposed by the earlier statutes. You suggest that this subsequent language extended the limitation to cover all A-E services performed regarding any particular public work or utility.

We cannot agree with your interpretation of these statutes. It is the Subcommittee's opinion that the present statutes relating to A-E fees are clear and unambiguous. Under our interpretation of the law, there is at present a 6 percent limitation on the fees of architect-engineers relating to the "production and delivery of plans, drawings, and specifications." Regarding the Department of Defense, the earlier statutes apply to all type contracts and the 1947 Procurement Act makes it clear that the limitation also applies to cost-plus-fixed-fee contracts, notwithstanding the other fee limitation provisions that statutes might contain.

The 1947 Procurement Act did not alter the nature of the services included within the limitation. Your report, starting at page 47, contains an exhaustive statement of the law in support of the premise that recodification does not alter the meaning of statutes. There is no evidence that the switch from the language describing the limitation as extending to the "production and delivery of plans, designs, drawings, and specifications" to "architectural or engineering services" was anything more than a simplification of the language of an earlier statute. Had Congress intended to alter the meaning of the limitation, some vestige of this intent would have been manifest. Certainly the earlier statutes applying to the Navy, Army, and Air Force would either have been repealed or they would have been amended so as to conform to the new description of the services Congress had in mind in the enactment of the 1947 statute.

In 1947, Congress enacted a comprehensive, detailed procedure for the negotiation of defense contracts. It was concluded that statutory fee limitations would be imposed on cost-plus-fixed-fee contracts. Having described a fee limitation for R & D contracts and having in mind a 10 percent limitation on the fees falling within the general cost-type category, there was an obvious need to make some reference to the traditional 6 percent limitation previously imposed on A-E fees. Without mention of the earlier A-E fee limitation and its applicability to cost-plus contracts, there would have been significant question whether this type of contract was subject to any fee limitation at all or whether cost-plus-fixed-fee A-E contracts would fall within the 10 percent category. It seems obvious that all Congress did, in an effort to avoid an ambiguity, was to make it clear that the traditional limitation as contained in earlier statutes (which were not repealed at that time) would also extend to cost-plus-fixed-fee contracts, notwithstanding the other limitations placed on this type of contract in the statute. To make

this so clear as to be beyond question, the House Armed Services Committee in its report (House Report 109) expressly stated, "This provision follows section 3 of the Act of April 25, 1939, above referred to * * *"; or, in other words, the Navy statute which originally described the limitation in terms of the "production and delivery of plans, designs, drawings, and specifications."

Your interpretation of the limitation is also subject to one extremely important and practical consideration. There are a number of instances which arise where Federal agencies require the services of A-Es involving "public works or utilities" and otherwise coming within the statute, when there is no facility to be constructed and, therefore, no estimated construction costs. In these cases, no fee could be paid. It is unreasonable to assume that Congress would provide for such a result.

Statutory Requirements Relating to the Need for Agency Consideration of Price in the Selection of Architect-Engineers

The second principal legal question presented in your report relates to the legality of current agency procedures relating to the selection and award of A-E contracts. Agencies in the Government have traditionally ranked A-Es, regarding a particular project, according to capability and acceptability. The agency then negotiates with the A-E determined to be the most capable and qualified at that time to design that project. And, assuming that a satisfactory fee cannot be agreed upon, then negotiates with the second A-E on the list. This procedure is continued until a contract is agreed upon.

You suggest that this procedure is not in conformance with provisions of the 1947 Procurement Act requiring that "proposals shall be solicited from the maximum number of qualified sources consistent with the nature and requirements of the supplies or services to be procured, and written or oral discussions shall be conducted with all responsible offerors who submit proposals within a competitive range, price, and other factors considered * * *."

We do not agree. First, we believe that provisions of the 1947 Procurement Act permit the type of negotiation traditionally followed by the various agencies where fee is not considered in determining the relative qualifications of A-Es to perform a particular project. Congress intended to provide broad flexibility in this statutory provision -- to permit the negotiation to be "consistent with the nature and requirements of the supplies or services to be procured." On p. 117 of your report, your Deputy General Counsel, in testimony before the House Committee on this very provision of the proposed 1947 Procurement Act confirms our interpretation of this statutory direction.

Furthermore, we believe the traditional agency approach reflects the best interest of the Government. The procurement of A-E services is not an end in itself. Nor is this phase of any project the most costly. The quality and

the cost of the facilities the A-E designs are the true test of his capability. Thus, it behooves the Government to optimize in every way the chances of selecting the A-E who will design the best possible building that can be constructed at the least possible cost.

If the amount to be paid the A-E enters into the initial stage of the selection process when the relative qualifications of A-Es are determined, the chances of achieving this optimum result are compromised. As there is no available standard of performance at the time of A-E selection, any reduction in the amount of the A-E's fee resulting from the type of "competitive negotiation" you have in mind could as easily come out of the quality of the successful A-E's subsequent performance as out of his margin of profit. Furthermore, this approach openly discourages the more painstaking, careful, and thorough A-E whose offer of higher quality services could be at the mercy of less responsible members of his profession.

You have reservations on this point, for in the General Accounting Office report (p. 32) you state:

> "We recognize that there is some basis for the argument that language of the statute which requires that competitive negotiations 'shall be consistent with the nature and requirements of the supplies or services to be procured' justifies the procedures presently being followed in the negotiation of A-E contracts and that the present methods of negotiation A-E contracts are based on well-established traditional methods of doing business with A-Es."

<u>The Need to Negotiate with the Highest Qualified A-E on a Cost Basis</u>

While A-Es and agency contracting officers may normally "negotiate" in terms of a percentage of estimated project construction cost, more than likely in most instances both parties think of these percentages in terms of A-E costs. In any event, we agree that Federal agencies in negotiating A-E contracts should use a cost base. It is, of course, necessary incident to negotiations that a collateral determination be made to assure the parties that the fee under discussion falls within 6 percent of the estimated cost of the project in conformance with the statutory limitation.

This leads to the final question of what legislative action, if any, is necessary based upon the findings in this report. As far as the repeal of the statutory limitation is concerned, we have serious doubts as to the advisability of this course of action -- at least at this time. Nor are we of the opinion that they are either useless or unworkable. The A-E services as described in the 1939 Navy statute relating to the production and delivery of plans, designs, drawings and specifications are the predominant services provided the Government by members of this profession. According to the various

agencies, representatives of the A-Es, as well as your staff, few Government A-E contracts violate this traditional interpretation of the limitation. Furthermore, if these limitations on A-E fees are to be repealed, arguments of equal persuasion might be levied against other fee limitation provisions in our procurement statutes which are essential to the protection of the public's interest.

Also, if we were to repeal the limitations on A-E contracts, no practical and acceptable substitute is available for the overall protection of the public against ill-advised action on the part of executive officials. The extension of "competitive negotiation" (as you use the term) to this type contract would not only be an unacceptable substitute, but could seriously compromise the quality of A-E services the Government receives.

Nor do we see any virtue in the type of legislative proposal your staff has been discussing with representatives of the various professional groups. Copies of these proposals we have seen provide for the repeal of the 6 per cent limitation and the express exception of A-E services from the statutory requirements for competitive negotiations. For reasons stated above, we believe these objectives are inadvisable and unnecessary, respectively.

But, the principal thrust of these proposals is to put into language the requirement that agencies obtain proposals from "the maximum number of qualified sources * * *" consistent with the requirement. There is no factual basis in your report to suggest that agencies have not achieved this result in the past. However, in any event, if a problem does exist, it is administrative and not legal in nature. In our opinion, present statutes require agencies to include all A-Es within the "competitive range." For this reason, additional legislation is not needed and would not solve any problems.

The 1947 Procurement Act and the 1949 Property Act are taut, beautifully drafted statutes which give the Executive effective legislative guidelines and direction throughout the entire spectrum of Federal procurement. We should avoid cluttering these statutes with language of specific applicability, and particularly when the proposed amendments are not subject to exact interpretation.

Three statutory problems remain:

First, the 1949 Federal Property and Administrative Services Act does not extend to fixed-price contracts. This was a minor, inadvertent oversight of this Committee (and the only oversight that can be levied against Congress under our interpretation of the statutes). But, this has been corrected by appropriate agency regulation. This minor deficiency could be corrected, if necessary, during consideration of other amendments to the Property Act at some future date.

Second, in discussions with agency officials, your staff, as well as representatives of the A-Es, it is apparent that a real problem exists, even under the traditional interpretation of the 6 percent limitation, regarding small projects and renovation work. It might be appropriate for Congress to consider amendatory legislation both to the 1947 Procurement Act and the 1949 Property Act to permit a larger fee for these classes of projects. This Subcommittee will give consideration to this question.

Third, there is a problem of the larger projects presenting unique, complex engineering problems where the 6 percent limitation would be unworkable. It is our opinion that there are relatively few such projects. When an agency wishes to build a structure, such as NASA's "Moon Palace" at Cape Kennedy, it would not be unreasonable for the agency to seek authorization for a larger A-E fee incident to obtaining project authorization from Congress. Under our interpretation of the statutory limitation, preliminary A-E work leading to the presentation of the project to Congress for authorization would not come within the 6 percent limitation.

We believe that the General Accounting Office should give further study to the Subcommittee's interpretation of these statutes. The meaning we give these statutes is that traditionally applied by Federal departments and agencies for almost two decades, a meaning which is clear and consistent, and does not rely or depend upon any assumed errors or omissions on the part of Congress, and which does provide reasonable protection to the taxpayers regarding a dominant portion of services A-Es render the Government. On the other hand, your interpretation is based upon a series of inadvertent errors or omissions by Congress, and could compromise the Government's ability to obtain optimum plans and specifications for the construction of public works and utilities.

If we can agree upon the interpretation of the statutes, then the General Accounting Office and the Subcommittee can coordinate efforts to see that Federal agencies discuss proposed projects with all A-Es within the competitive range and that subsequent negotiations with individual A-Es be on a cost basis.

It is deeply regretted that the Subcommittee cannot agree with you in connection with certain aspects of this report. However, we believe that under our interpretation of these statutes, with emphasis upon those aspects of this problem in which we are in accord, the extensive work that your staff has devoted to this study can accrue to the best interest of the Government.

Sincerely,

/s/ Jack Brooks

Jack Brooks
Chairman