Dec 27 02 04:05p Legislative Archives 2025017006 p.5



Section 2 of this bill authorizes to be appropriated out of any money in the Treasury of the United States not otherwise appropriated such sums as may be necessary to effectuate the purpose of this act.

Section 3 of the proposed bill would give to the Secretary of the Navy authority to contract with or employ individuals, firms, or corporations for the production of designs, plans, drawings, and specifications of naval vessels, aircraft, public works, or utilities without reference to the Classification Act of 1923, as amended, or to section 3709 of the Revised Statutes which requires advertising and competitive bidding, whenever, in the opinion of the Secretary of the Navy, such would be advantageous to the national defense.

Expansion of the Navy both afloat and ashore in an emergency must of necessity be preceded by field investigations and the preparation of plans and specifications for the building of ships or aircraft, the erection of structures, and the provision of public utilities. Expansion of the forces afloat requires an increase of training station facilities, industrial facilities at navy yards and in all other branches of the naval shore establishment. The rapid expansion of shore facilities is a condition precendent to expansion of the forces afloat.

Past experience has shown that to achieve such expansion the Navy must avail itself of the services of private individuals and organizations. The expansion of the professional and engineering forces within the material bureaus of the Navy Department cannot be accomplished expeditiously. The current emergency shore construction program has demonstrated that neither personnel nor the space required for their work can be obtained quickly.

The obvious alternative is to engage the services of private engineering and architectural firms or individuals to supplement the work of the Navy Department. In such manner the Navy could not only expedite the preparation of plans and specifications for important shipbuilding and engineering works, but could also obtain the services of the country's outstanding specialists.

At the present time the Navy Department may engage individual engineering consultants at the rate of $20 to $25 per day. Experience has shown that this authority does not accomplish the results desired. The pay of $20 to $25 per day is too low to obtain the best talent. Further, it is usually desirable to engage the services of an engineering firm with its staff of specialists rather than the services of an individual. This cannot be done under the present arrangement.

It is desired to eliminate advertising for engineering and architectural services, as is required by section 3709 of the Revised Statutes, for two reasons: (1) Because such advertising would delay the initiation of the work and, (2) because responding to advertising for professional services of this character is considered to be unethical. The American Society of Civil Engineers have gone on record as being opposed to this practice.

Furthermore, it is as illogical to advertise for the services of a shipbuilding or other engineering specialist as it would be to advertise for the services of a medical specialist. Standard fees have been established by reputable professional societies for various kinds of engineering and architectural works, so that the question of the magnitude of



the fee does not enter into the selection of an engineering or architectural firm. The question in each case should be decided upon the special qualifications of the firms under consideration.

Enactment of the proposed legislation would result in a very material speeding up of all public works planning and shipbuilding and execution in time of emergency. The principle involved in the proposed bill is not new. A similar provision was made for the Secretary of the Treasury in the act of March 31, 1930 (46 Stat. 137). It is believed that the Navy Department which has to do with the national defense where expeditious action is of paramount importance should have the authority proposed herewith.

The difference of cost of performing the work contemplated in the proposed legislation by private contract as against performing it by the Navy Department personnel would be so small as to be completely negligible.

Section 4 of the proposed bill would authorize the Secretary of the Navy to negotiate cost-plus fixed-fee contracts for construction at places beyond the continental limits of the United States. Such authority would serve four purposes:

(a) It would permit initiating the work at the earliest practicable date, since complete plans and specifications will not be necessary under such an arrangement.

(b) It would permit the work to be carried on at a faster rate, since necessary changes in the design and construction procedures which are inevitable in work of this character will be made with a minimum of delay.

(c) It would result in lower ultimate cost to the Government.

(d) It would permit a much greater degree of secrecy as to the details of the improvements constructed, since public advertising for bids would not be necessary.

The experience of the Navy Department has shown that it is impracticable to obtain competitive bids from reliable and experienced contractors on work at outlying stations except at exorbitant prices. This arises from the fact that unusual hazards, the uncertainty of weather conditions, the distance from material and labor markets, and the cost of overcoming unforeseen construction difficulties all contribute to the element of uncertainty which requires that a prudent bidder include in his bid a very large item for contingencies. If these contingencies do not arise the Government will pay an excessive profit to the contractor.

The principle of noninsurance of Government property is firmly established. The procedure embodied in section 4 represents no more than an extension of that principle, in that the Government in effect carries the insurance for contingencies which, under ordinary circumstances, would be carried by the contractor and indirectly paid for by the Government.

For work within the continental limits of the United States, where it is practicable to obtain competitive bids and where the contingency item is not large, the usual procedure of competitive bidding is to be preferred. However, in the case of work at outlying stations the procedure recommended in section 4 would be more advantageous to the Government.

Dec 27 02 04:05p Legislative Archives 2025017006 p.6



In conclusion, no other nation can logically object to any nation improving the purely defensive facilities of its own land unless that other nation should have aggressive designs on the territory thus defended.

We do not seek war with anyone. We do not intend to get entangled in any alien quarrels. As a democratic people we are a peaceful people.

We respect the rights of other nations; we expect other nations to respect our rights.

We do not covet one foot of soil of any other nation. The purpose of this program is to insure that no covetous nation shall secure a foot of ours.

The views and recommendations of the Navy Department on the proposed legislation are set forth in the letter of the Acting Secretary of the Navy to the Speaker of the House of Representatives dated January 19, 1939, which is hereby made a part of this report.

NAVY DEPARTMENT,
*Washington, January 19, 1939.*

THE SPEAKER OF THE HOUSE OF REPRESENTATIVES,
*Washington, D. C.*

MY DEAR MR. SPEAKER: There is transmitted herewith a draft of a proposed bill to authorize the Secretary of the Navy to proceed with the construction of certain public works, and for other purposes.

Section 10 of the act of May 17, 1938 (52 Stat. 403; 34 U. S. C. 498i), authorized and directed the Secretary of the Navy to appoint a board of officers to investigate and report upon the need, for purposes of national defense, for the establishment of additional submarine, destroyer, mine, and naval air bases on the coasts of the United States, its Territories, and possessions.

The Secretary of the Navy was also directed to cause the report of this board to be transmitted to the Speaker of the House of Representatives during the first session of the Seventy-sixth Congress.

The board of officers convened pursuant to section 10 of the act of May 17, 1938, has completed its investigations. Its report has been transmitted to the Speaker of the House of Representatives and printed as House of Representatives Document No. 65, Seventy-sixth Congress.

Sections 1 and 2 of the proposed bill transmitted herewith would authorize the construction of certain of the aviation facilities recommended by the board and would provide authority for appropriations to effectuate the construction authorized.

The Navy Department will welcome an opportunity to explain in detail to the appropriate committees of the Congress the necessity or desirability to the national defense for construction of the facilities specified in the proposed bill.

Section 3 of the proposed bill would give to the Secretary of the Navy authority to contract with or employ individuals, firms, or corporations for the production of designs, plans, drawings, and specifications of naval vessels, aircraft, public works, or utilities without reference to the Classification Act of 1923, as amended, or to section 3709 of the Revised Statutes, which requires advertising and competitive bidding whenever, in the opinion of the Secretary of the Navy, such would be advantageous to the national defense.

Expansion of the Navy both afloat and ashore in an emergency must of necessity be preceded by field investigations and the preparation of plans and specifications for the building of ships or aircraft, the erection of structures, and the provision of public utilities. Expansion of the forces afloat requires an increase of training-station facilities, industrial facilities at navy yards, and in all other branches of the naval shore establishments. The rapid expansion of shore facilities is a condition precedent to expansion of the forces afloat.

Past experience has shown that to achieve such expansion the Navy must avail itself of the services of private individuals and organizations. The expansion of the professional and engineering forces within the material bureaus of the Navy Department cannot be accomplished expeditiously. The current emergency shore construction program has demonstrated that neither personnel nor the space required for their work can be obtained quickly.



The obvious alternative is to engage the services of private engineering and architectural firms or individuals to supplement the work of the Navy Department. In such manner the Navy could not only expedite the preparation of plans and specifications for important shipbuilding and engineering works, but could also obtain the services of the country's outstanding specialists.

At the present time the Navy Department may engage individual engineering consultants at the rate of $20 to $25 per day. Experience has shown that this authority does not accomplish the results desired. The pay of $20 to $25 per day is too low to obtain the best talent. Further, it is usually desirable to engage the services of an engineering firm with its staff of specialists rather than the services of an individual. This cannot be done under the present arrangement.

It is desired to eliminate advertising for engineering and architectural services, as is required by section 3709 of the Revised Statutes, for two reasons; first, because such advertising would delay the initiation of the work and, second, because responding to advertising for professional services of this character is considered to be unethical. The American Society of Civil Engineers and the American Society of Consulting Engineers have gone on record as being opposed to this practice.

Furthermore, it is as illogical to advertise for the services of a shipbuilding or other engineering specialist as it would be to advertise for the services of a medical specialist. Standard fees have been established by reputable professional societies for various kinds of engineering and architectural works, so that the question of the magnitude of the fee does not enter into the selection of an engineering or architectural firm. The question in each case should be decided upon the special qualifications of the firms under consideration.

Enactment of the proposed legislation would result in a very material speeding up of all public works planning and shipbuilding and execution in time of emergency. The principle involved in the proposed bill is not new. A similar provision was made for the Secretary of the Treasury in the act of March 31, 1930 (46 Stat. 137). It is believed that the Navy Department which has to do with the national defense where expeditious action is of paramount importance should have the authority proposed herewith.

The difference of cost of performing the work contemplated in the proposed legislation by private contract as against performing it by the Navy Department personnel would be so small as to be completely negligible.

Section 4 of the proposed bill would authorize the Secretary of the Navy to negotiate cost plus fixed fee contracts for construction at places beyond the continental limits of the United States. Such authority would serve three purposes.

(*a*) It would permit initiating the work at the earliest practicable date since complete plans and specifications will not be necessary under such an arrangement.

(*b*) It would permit the work to be carried on at a faster rate since necessary changes in the design and construction procedures which are inevitable in work of this character will be made with a minimum of delay.

(*c*) It would result in lower ultimate cost to the Government.

The experience of the Navy Department has shown that it is impracticable to obtain competitive bids from reliable and experienced contractors on work at outlying stations except at exorbitant prices. This arises from the fact that unusual hazards, the uncertainty of weather conditions, the distance from material and labor markets, and the cost of overcoming unforeseen construction difficulties all contribute to the element of uncertainty which requires that a prudent bidder include in his bid a very large item for contingencies. If these contingencies do not arise the Government will pay an excessive profit to the contractor.

The principle of noninsurance of Government property is firmly established. The procedure embodied in section 4 represents no more than an extension of that principle, in that the Government in effect carries the insurance for contingencies which, under ordinary circumstances, would be carried by the contractor and indirectly paid for by the Government.

For work within the continental limits of the United States, where it is practicable to obtain competitive bids and where the contingency item is not large, the usual procedure of competitive bidding is to be preferred. However, in the case of work at outlying stations the procedure recommended in section 4 would be more advantageous to the Government.

The Navy Department recommends that the proposed legislation be enacted.

Sincerely yours,

WILLIAM D. LEAHY, *Acting.*

Legislative Archives 2025017006 p.7



In compliance with clause 2a of rule XIII of the Rules of the House of Representatives, there is herewith printed in parallel columns (1) the parts of the bill making the amendment and (2) the text of provisions of existing law which it is proposed to amend:

SEC. 3. Whenever deemed by him to be advantageous to the national defense the Secretary of the Navy is hereby authorized to employ by contract or otherwise outside architectural or engineering corporations, firms, or individuals for the production and delivery of the designs, plans, drawings, and specifications required for the accomplishment of any naval public works or utilities project without reference to the Classification Act of 1923 (42 Stat. 1488), as amended (5 U. S. C., ch. 13), or to section 3709 of the Revised Statutes of the United States (41 U. S. C. 5). In no case shall the fee paid for any service authorized by this Section exceed 6 per centum for the estimated cost, as determined by the Secretary of the Navy, of the project to which such fee is applicable.

Section 3 of the Classification Act of 1923 (42 Stat. 1489), as amended (5 U. S. C. 663):

That there is hereby established an ex officio board, to be known as the Personnel Classification Board, to consist of the Director of the Bureau of the Budget or an alternate from that Bureau designated by the Director, a member of the Civil Service Commission or an alternate from that commission designated by the Commission, and the Chief of the United States Bureau of Efficiency or an alternate from that bureau designated by the chief of the bureau. The Director of the Bureau of the Budget or his alternate shall be chairman of the board.

Subject to the approval of the President, the heads of the departments shall detail to the board, at its request, for temporary service under its direction, officers or employees possessed of special knowledge, ability, or experience required in the classification and allocation of positions. The Civil Service Commission, the Bureau of the Budget, and the Bureau of Efficiency shall render the board such cooperation and assistance as the board may require for the performance of its duties under this Act.

The board shall make all necessary rules and regulations not inconsistent with the provisions of this Act and provide such subdivisions of the grades contained in section 13 hereof and such titles and definitions as it may deem necessary according to the kind and difficulty of the work. Its regulations shall provide for ascertaining and recording the duties of positions and the qualifications required of incumbents, and it shall prepare and publish an adequate statement giving (1) the duties and responsibilities involved in the classes to be established within the several grades, illustrated where necessary by examples of typical tasks; (2) the minimum qualifications required for the satisfactory performance of such duties and tasks; and (3) the titles given to said classes. In performing the foregoing duties, the board shall follow as nearly as practicable the classification made pursuant to the Executive order of October 24, 1921. The board may from time to time designate additional classes within the several grades and may combine, divide, alter, or abolish existing classes. Department heads shall promptly report the duties and responsibilities of new positions to the board. The board shall make necessary adjustments in compensation for positions carrying maintenance and for positions requiring only part-time service.



SEC. 4. (a) To enable the Secretary of the Navy to accomplish without delay or excessive cost those public-works projects authorized by this Act to be located outside the continental limits of the United States, he is hereby authorized to enter into contracts upon a cost-plus a fixed-fee basis after such negotiations as he may authorize and approve and without advertising for proposals with reference thereto. Approval by the President shall be necessary to the validity of any contract entered into under authority of this section. The fixed fee to be paid the contractor as a result of any contract entered into under authority of this section shall be determined at or before the time such contract is made, and shall be set forth in such contract. Such fee shall not exceed 10 per centum of the estimated cost of the contract, exclusive of the fee, as determined by the Secretary of the Navy. Changes in the amount of the fee shall be made only upon material changes in the scope of the work concerned as determined by the Secretary of the Navy whose determination shall be conclusive.

(b) Negotiations under this section shall be between the Secretary of the Navy, or a duly authorized representative, and three or more reputable and qualified contracting individuals, firms, or corporations regularly engaged in work of comparable magnitude and class to that contemplated by the negotiations, as determined by the Secretary of the Navy, and contracts may be made with any such individual, firm, or corporation, or with any two or more of them jointly, upon such terms and conditions as the Secretary of the Navy may determine to be fair and equitable, and in the interests of the national defense. For each contract entered into under authority of this section, the Secretary of the Navy may detail a naval officer to duty, without additional compensation, as an executive representative of the contracting officer. The contract may provide that the officer so detailed shall have the right to attend any meetings of the board of directors or other executive or administrative board or committee of any corporation, partnership, firm, or syndicate which is or may become a

Section 3709 of the Revised Statutes (41 U. S. C. 5). All purchases and contracts for supplies or services, in any of the Departments of the Government, except for personal services, shall be made by advertising a sufficient time previously for proposals respecting the same, when the public exigencies do not require the immediate delivery of the articles, or performance of the service. When immediate delivery or performance is required by the public exigency, the articles or service required may be procured by open purchase or contract, at the places and in the manner in which such articles are usually bought and sold, or such services engaged, between individuals.

Section 3710 of the Revised Statutes (41 U. S. C. 8). Whenever proposals for supplies have been solicited, the parties responding to such solicitation shall be duly notified of the time and place of opening the bids, and be permitted to be present either in person or by attorney, and a record of each bid shall then and there be made.

Dec 27 02 04:07p Legislative Archives 2025017006 p.8



party thereto for the purpose of submitting propositions, propounding questions and receiving information relative to any matter within the purview of the contract with the intent and for the purpose of safeguarding the interests of the United States, coordinating efforts, and promoting mutually beneficial relationships, and making decisions within the scope of his delegated authority and not in conflict with any provision of the contract.

SEC. 5. Amend the Act of June 14, 1934 (48 Stat. 957), after the enacting clause to read as follows: "That the Secretary of the Navy be, and he is hereby, authorized to acquire, by purchase or condemnation, additional lands adjacent to the Hampton Roads Naval Operating Base, Norfolk, Virginia, such lands lying north of the Virginian Railway and west of Granby Street. The sum of $500,000 authorized by Section 1 of the bill (H. R. 4278), as enacted, for the acquisition of land at or in the vicinity of Norfolk, Virginia, shall be available for the purposes of this Act."

The Act of June 14, 1934 (48 Stat. 957):

That the Secretary of the Navy be, and he hereby is, authorized and directed to acquire, by purchase or condemnation, additional tracts of land adjacent to and lying southeastwardly from the Hampton Roads Naval Operating Base, Norfolk, Virginia, said land being generally known as "East Camp", together with such additional land adjoining same as is necessary for the development and expansion of naval air activities at said station, and comprising approximately five hundred and forty acres and being bounded by Mason Creek on the north and east, Bowl Creek on the west, and the Virginian Railway on the south; and there is hereby authorized to be appropriated for the purchase of this entire tract the sum of $400,000.

## MINORITY VIEWS—GUAM

After 1946, when the present program for the political independence of the Philippine Islands will have been made complete, the Island of Guam will be the most westerly insular possession of the United States. It is 5,400 miles west of San Francisco, 3,337 miles west of Hawaii, 1,309 miles west of Wake Island and within 1,500 miles of Yokohama, Japan. Inhabited by approximately 20,000 persons, it is 30 miles in length and 6 miles in width. Like Midway, Johnston, Palmyra, and Wake Islands, Guam is under the supervision of the Navy Department.

We recognize the right of the United States to establish military facilities at Guam. We recognize and approve of the necessity of harbor improvement provided by this measure for the purpose of aiding commercial trans-Pacific aviation. Were this work to be done by the United States as a regular river and harbor improvement by the Army Engineers, as is the case of the improvements being made at Midway Island which are similar to those now proposed for Guam, we would have no objection. To do this work by the Navy Department as a part of its program to increase and improve the air facilities and bases for the purposes of military preparedness is involved with implications of such grave importance as to justify its omission from a naval defense measure.

Although the work is of a minor military nature and the Navy Department has definitely declared that there is no present intention to seek further naval improvement at Guam, it is obvious that this work is the first and essential step to the ultimate fortification of the island. The hazards involved in taking a step such as this, minor though it is in itself, when done by the military establishment of the country are, to our minds, too great a price to pay for the benefits that might inure either to commercial aviation or to the naval air service. Divorce these improvements from any military implication, make them as a civil improvement and there can be no objection from any source.

JOSEPH B. SHANNON.
RALPH E. CHURCH.
W. STERLING COLE.
GEORGE J. BATES.
WILLIAM E. HESS.
ARTHUR B. JENKS.



O