US Army Corps
of Engineers®

EP 715-1-7
31 July 2002

# ARCHITECT-ENGINEER CONTRACTING



Approved for public release. Distribution is unlimited.

CECW-ET
CEPR-P

**DEPARTMENT OF THE ARMY**
**U.S. Army Corps of Engineers**
**Washington, DC 20314-1000**

EP 715-1-7

Pamphlet
No. 715-1-7

31 July 2002

# Procurement
# ARCHITECT-ENGINEER CONTRACTING

1. Purpose.

a. This pamphlet provides guidance and procedures for contracting for architect-engineer (A-E) services in accordance with the Brooks Architect-Engineer Act and the acquisition regulations referenced below. The guidance and procedures in this pamphlet are intended to promote fair, efficient and consistent A-E contracting practices throughout the U.S. Army Corps of Engineers (USACE).

b. Adherence to the guidance and procedures herein will ensure proper compliance with the acquisition regulations, and any variations therefrom must be documented in the contract file (provided the variations do not violate the acquisition regulations).

c. This pamphlet provides guidance and procedures for implementing certain key portions of the acquisition regulations relevant to A-E contracting. However, it is not intended to cover all aspects of the A-E contracting process and should not be used as a substitute for the current acquisition regulations (the FAR system) which provide procurement policy. If a conflict arises between this pamphlet and the acquisition regulations, the acquisition regulations govern.

2. Applicability. This pamphlet applies to all USACE commands authorized to procure A-E services, and to all USACE programs.

3. Distribution Statement. Approved for public release. Distribution is unlimited.

4. References.

a. Brooks Architect-Engineer Act; Public Law 92-582, as amended; 40 United States Code (U.S.C.) 541-544 (Appendix A).

b. Federal Acquisition Regulation (FAR) and the Defense (DFARS), Army (AFARS) and Corps of Engineers (EFARS) supplements thereto.

c. Army Regulation (AR) 25-55, The Department of the Army Freedom of Information Act Program.

d. AR 215-4, Nonappropriated Fund Contracting.

---

This pamphlet supersedes EP 715-1-7, dated 31 May 1999.

e. Engineer Regulation (ER) 5-1-11, U.S. Army Corps of Engineers Business Process.

f. ER 1105-2-100, Planning Guidance Notebook.

g. ER 1110-1-12, Engineering and Design Quality Management.

h. ER 1110-1-8152, Professional Registration.

i. ER 1180-1-9, Design-Build Contracting.

j. Engineer Pamphlet (EP) 715-1-4, Architect-Engineer Contracts: Competing for Architect-Engineer Contracts Awarded by the U.S. Army Corps of Engineers.

k. Engineer Manual (EM) 1110-1-1000, Photogrammetric Mapping.

5. Acronyms. Appendix B contains a list of acronyms used in this pamphlet.

FOR THE COMMANDER:

31 Appendices
(See Table of Contents)

JOSEPH SCHROEDEL
Colonel, Corps of Engineers
Chief of Staff

# CHAPTER 4
# NEGOTIATION AND AWARD

4-1. Principles.

a. Contract negotiation is a team effort among properly trained and well-prepared personnel in engineering, contracting, counsel, project management and other appropriate functional elements.

b. Negotiation will be based on a thorough SOW that fully conveys the customer's requirements and the pertinent technical criteria.

c. Negotiations will be conducted in a professional and sincere manner.

d. The primary objective in negotiation is to agree on a price which is fair and reasonable to the Government (not necessarily the lowest price) and gives the A-E firm sufficient financial incentive to produce quality services and products on schedule.

4-2. Responsibilities. Commanders will ensure that personnel who negotiate A-E services are properly trained.

4-3. Regulatory Basis. A-E contract negotiations will be primarily conducted in accordance with FAR 15.4, 36.605 and 36.606, and supplements thereto.

4-4. Negotiation Team.

a. Team Members.

(1) A-E contract negotiation is a team effort among engineers, architects, contracting specialists, counsel, contract auditors (provide advisory support) and other specialists, under the authority of the KO who is solely responsible for the final price agreement (FAR 15.405(a)). The negotiation team must collectively have a thorough knowledge and understanding of the A-E business community, the detailed project requirements, applicable technical criteria, and contracting policies. (In this pamphlet, negotiators means the members of the Government negotiation team.)

(2) There is no regulation that precludes a Government employee who sat on an evaluation board for an A-E contract from participating on the negotiation team for that contract. Also, there is no regulation that precludes a member of the negotiation team from participating in the administration of the contract. However, the KO may impose such restrictions if necessary to ensure the integrity of the system of checks and balances.

b. Training. Engineers, architects and surveyors who are primary participants in A-E negotiations will have the following minimum contracting training:

(1) "Architect-Engineer Contracting," PROSPECT course 004; or DAU course CON

243 (same title).

(2) A course on basic Federal contracting, approved by the local Director/Chief of Contracting, such as DAU course 101, Basics of Contracting, or a commercial course.

(3) A course on Government contract law, approved by the local Director/Chief of Contracting, such as DAU course 210, Government Contract Law, or a commercial course.

4-5. Statement of Work. A thorough SOW is the basis for negotiating a fair and reasonable price, successful performance, and fair and effective administration of an A-E contract or task order. The SOW is included as Section C in the Uniform Contract Format (UCF; FAR 15.204-1 and EFARS 15.204(a)). A SOW will typically include the following topics:

a. General responsibilities of the A-E firm.

b. Project description, including estimated construction cost, if relevant.

c. Scope of A-E services.

d. Schedule and deliverables. Refer to the most recent guidance from the Tri-Service CADD/GIS Technology Center on sample contract language for CADD and GIS deliverables.

e. Reviews and conferences.

f. Technical criteria and standards, including Government-furnished information.

g. Administrative instructions.

h. General provisions.

Appendix V is an example statement of work for a task order.

4-6. Request for Price Proposal. A firm will be notified by the KO in writing (except for urgent situations) of its selection for negotiation of a contract action (contract, task order, or modification to a contract or task order) and requested to submit a price proposal (FAR 36.606(b)). Appendix W provides RFPP instructions.

4-7. Preproposal Conference.

a. General. When appropriate, a preproposal conference(s) may be held between the A-E firm and pertinent Government representatives to discuss and resolve questions concerning the contract requirements, SOW, and RFPP instructions. The project site may also be inspected if appropriate. An A-E firm's costs for preparing proposals and attending preproposal conferences are normal costs of doing business and are included in a firm's overhead rate. A firm is not compensated for attending a preproposal conference unless the

firm performs work of tangible benefit to the Government in connection with the conference, and the work is properly authorized in advance by the KO.

b. Contract Requirements. At the preproposal conference or at some other time early in the negotiation period, the Government will discuss the following contract requirements with the A-E firm and document these discussions in the price negotiation memorandum (PNM):

(1) Performance evaluation process (FAR 36.604, EFARS 36.604 and Chapter 6 of this pamphlet).

(2) Liability for Government costs resulting from design errors or deficiencies (FAR 36.608, 36.609-2, and 52.236-23, and Chapter 7 of this pamphlet).

(3) Design within funding limitations (FAR 36.609-1 and 52.236-22), when applicable.

(4) Registration of designers (FAR 36.609-4 and 52.236-25), when applicable.

(5) Payments (FAR 32.111(d)(1) and 52.232-10, and paragraph 5-7 of this pamphlet).

(6) Subcontractors and Outside Associates and Consultants (Architect-Engineer Services) (FAR 36.606(e), 44.204(b) and 52.244-4)[1].

(7) Subcontracting plan requirements and reporting if the A-E firm is a large business and the contract is over $500,000 (see paragraphs 4-15 and 5-8).

4-8. Partnering.

a. General. Partnering is the development and sustainment of a relationship that promotes achievement of mutually beneficial goals. See ER 1110-1-12 for additional guidance on partnering, including a sample partnering agreement. If a formal partnering agreement is desired by the Government and/or the A-E firm, it should be discussed during negotiations. However, partnering is voluntary and does not begin until after contract award.

b. Costs. Since it is voluntary, a firm is not directly compensated for partnering on its contract. Typically, the Government and the A-E firm share the costs of partnering, with the A-E firm absorbing its costs in its overhead. However, an A-E firm may be compensated for participating in partnering meetings during construction when the firm's attendance is

---

[1] The prime A-E firm must obtain the KO's consent to change any subcontractors that were identified during selection and negotiation. The KO should refer the qualifications of any new subcontractor to the original selection board (to the extent that these individuals are available) for evaluation. The KO and negotiators may and should strongly encourage contractors to use a qualification-based selection process like the Brooks A-E Act instead of bidding when selecting subcontractors for professional services.

necessary to discuss the design intent, procedures for responding to the construction contractor's questions on the drawings and specifications, scheduling considerations, or similar project issues. Partnering meetings should be scheduled concurrently with required meetings to minimize costs.

4-9. Service Contract Act (SCA). The SCA (FAR 22.10) applies to an A-E contract if the SOW involves the use of service employees (such as drilling and survey crews, clerks, CADD operators, photographers, and laboratory technicians) to a significant or substantial extent. If the SCA applies, a wage determination (WD) must be obtained from the U.S. Department of Labor (DoL) for the service employees anticipated in the contract. In most cases, the WD may be obtained electronically through the Labor Advisor in the local Office of Counsel. The WD must be provided to the firm for use in preparing its proposal. The proposed labor rates and benefits for service employees must be at least equal to the WD. For surveying and mapping contracts, the WD for the location of the performing office shall be used instead for the WD for the location of the work[2].

4-10. Independent Government Estimate (IGE). In accordance with FAR 36.605(a), an IGE is required for each A-E contract action expected to exceed $100,000 (total absolute value of all elements of the action, including credits). An informal or working estimate is recommended for actions of $100,000 or less. An IGE will be prepared and approved in accordance with the procedures in Appendices X and Y. Disclosure of the IGE will comply with FAR 36.605(b).

4-11. Fact-Finding Sessions. The negotiators may hold fact-finding sessions (FAR 15.406-1(a)) with a firm after receiving its price proposal and prior to negotiations. The purpose of fact-finding is to obtain information to better understand the proposal and its assumptions, and to clarify any ambiguities, omissions or uncertainties in the RFPP and SOW apparent after review of the proposal. After fact-finding, a revised proposal may be requested. Detailed proposal analysis or audit should not be performed until a conforming proposal (a proposal that properly reflects the SOW and complies with the RFPP instructions) is received. No negotiation will take place during fact-finding; that is, the Government will not state its bargaining position or objectives during fact-finding.

4-12. Proposal Analysis and Prenegotiation Objectives.

a. Proposal Analysis. An A-E proposal will be analyzed in accordance with FAR 15.404 and Appendix Z. Proposal analysis includes technical analysis, price analysis and cost analysis.

b. Audit. An audit should be considered for the cases listed in DFARS 215.404-

[2] In accordance with CIR Information Letter No. 96-3, CECC-L, 26 July 1996, subject: Service Contract Act Wage Determinations Relating to Surveying and Mapping Services.

2(a)(i)[3], and this consideration documented in the PNM. An audit is appropriate if the available information is inadequate to determine the reasonableness of the proposed price (FAR 15.404-2(a)). The Defense Contract Audit Agency (DCAA) is the cognizant audit agency for most USACE contracts.

c. Prenegotiation Objectives (PNO).

(1) PNO are developed after a proposal has been analyzed. The PNO are the pertinent negotiation issues and the cost and profit objectives (FAR 15.406-1). The numerical objectives will be shown in a tabular comparison with the corresponding elements of the proposal, IGE, and audit (if available). Keyed to the numerical objectives will be a discussion of the significant differences among the IGE, audit (if performed), PNO and proposal, and the issues to be covered during the negotiations. The PNO may be organized by phase of work, task, discipline, or other appropriate manner. The PNO are documented in a Prenegotiation Memorandum (PnM) which includes the significant details of the contracting action and the course of action the negotiators intend to pursue (AFARS 5115.406-1(b)).

(2) The review and approval of the PnM will be in accordance with local procedures and at the lowest practicable level appropriate for the complexity, risk and dollar value of the contract action. Local procedures may exempt the review and approval of PnM for small or routine actions.

4-13. Negotiation of FFP Contracts.

a. Conduct of Negotiations. Negotiations should be conducted in an atmosphere of professionalism, patience, and trust. The KO will assign appropriate responsibilities to the team members according to their expertise and maintain overall positive control of the negotiations. The negotiation team must be fully prepared and know what flexibility there is in the Government position. The negotiators must focus on the pertinent issues and be willing to adjust the Government's position when appropriate.

b. Statement of Work.

(1) General. The Government and A-E firm should have a common understanding of the SOW before discussing effort and price. The negotiators must ensure that the firm is proposing to use personnel and procedures appropriate for the required work. The negotiators must know if there is any flexibility in the SOW requirements, including the performance schedule. It might be possible to reach agreement if one or more items in the SOW are modified or deleted, or provided by the Government.

[3] Also consider an audit for an ID contract where the total contract amount, including all option periods, exceeds the pertinent threshold in DFARS 215.404-2(a)(i) for the anticipated type of task order (fixed-price or cost-reimbursement).

(2) Construction Cost. For a contract involving design, agreement must be reached on the estimated construction cost (ECC) of the project because it directly impacts compliance with the 6 percent statutory limitation (paragraph 4-13.c(3)) and the Design within Funding Limitation clause (paragraph 4-7.b(6)). The A-E firm must submit evidence of any perceived deficiencies in the Government cost estimate before the Government agrees to any adjustment to the ECC.

c. Price. Bottom-line price agreement is the primary negotiation objective. However, the negotiators should make a bottom-line price offer only as a final attempt to reach agreement after there is a common understanding of the SOW. The negotiators should not be preoccupied with any single cost item (such as labor hours, labor rates, overhead rates or profit) since agreement on every item is not required to reach overall price agreement (FAR 15.405(a) and (b)). Conversely, final agreement does not indicate agreement on all elements of the proposal. Significant items affecting price agreement must be discussed in accordance with the PNO. The negotiators should not place themselves in a position where they are defending the Government's position. Rather, a firm should be requested to explain and support its proposal and to offer appropriate revisions. Significant elements in price negotiation are discussed below.

(1) Labor and Overhead Costs.

(a) Position classifications and labor hours will be evaluated in the technical analysis (Appendix Z). Labor rates will be examined by audit or review of payroll records and evaluated for reasonableness. Overhead costs will be reviewed, which may include an audit, for allowability in accordance with FAR 31.2. The review will address the allocability of overhead costs to the contract, the acceptability of specific costs according to FAR 31.205, conformance with accounting standards (FAR 30), and reasonableness.

(b) Labor and overhead rates are negotiable. The reasonableness of labor and overhead rates will be evaluated by comparison with relevant market surveys (Appendix Y) and similar recent proposals (FAR 15.404-1(c)). When assessing reasonableness, a firm's costs should be compared to efficient, competitive firms in the same class (see Appendix X, paragraph 6.a). Verification of the actuality of labor rates and overhead rates, such as by audit, does not necessarily mean that they are reasonable. Also, firms can properly allocate costs in different ways. Hence, overhead rates, labor rates and the assignment of costs as direct or overhead must be considered together to fairly evaluate reasonableness.

(c) Accordingly, the PNO for labor rates and overhead rates shall not be based upon arbitrary caps. If labor rates and/or overhead rates are so high as to make the total price unreasonable, the negotiators should first seek justifiable reductions in the judgmental elements of the proposal (such as labor hours and position classifications) before negotiating the labor rates and overhead rates.

(2) Profit. It is in the Government's interest to negotiate sufficient profit to stimulate efficient contract performance and to attract the best qualified firms (FAR 15.404-4(a)(2) and (3)). Profit must not be negotiated until all costs have been agreed to. The negotiators

should be primarily concerned with the total dollar amount of proposed profit, and not the method or rationale used by the firm to estimate profit for itself and any subcontractors (FAR 15.404-4(c)(5)). The profit method for A-E contracts in EFARS 15.404-73-101 is only used in preparing the Government estimate of a fair and reasonable price. A firm is not required to compute its profit by this method.

(3) Statutory Limitation. The portion of the contract price for A-E services for the preparation of designs, plans, drawings and specifications may not exceed 6 percent of the project's ECC (FAR 15.404-4(c)(4)(i)(B) and 36.606(a), and DFARS 236.606-70). This limitation is statutory (10 U.S.C. 4540(b)). EFARS 36.606-70(c) provides examples of services that may be excluded from the A-E contract price when determining compliance with the statutory limitation. These examples will be used as a guide in determining other types of services that may be excluded. Preparation of the construction cost estimate is not excluded.[4] The 6 percent statutory limitation does not apply to a design-build contract, but does apply to an A-E contract for developing a design-build solicitation.

d. Acceptance or Termination of Negotiations. If agreement is reached, the firm will be advised not to begin work until directed by the KO. If agreement can not be reached, the firm will be requested to submit its best and final offer in writing (FAR 36.606(f)) within a reasonable time. If the firm does not submit a final offer in the stated time, its last written proposal will be used as the final offer. No further discussions will be held with a firm if its final offer is not completely acceptable. The firm will be sent a brief letter stating that negotiations are terminated. A PNM will be prepared documenting the unsuccessful negotiations and be approved by the KO. Negotiations may then begin with the next ranked firm. To preclude complaint or protest by the unsuccessful firm, no significant changes should be made in the SOW during negotiations with the next firm.

e. Modifications. The negotiation of modifications generally follows the same procedures as the negotiation of contracts in accordance with FAR Part 43.

4-14. Negotiation of ID Contracts. The negotiation of an ID contract is similar to a FFP contract, however the negotiation of total prices pertains only to the task orders issued under an ID contract. Agreement on labor rates and overhead rates is the central issue in the negotiation of an ID contract.

a. Labor and Overhead Rates.

---

[4] Preparation of the cost estimate is an integral part of "producing and delivering designs, plans, drawings and specifications" and is therefore, subject to the 6 percent limitation. The mandatory Design within Funding Limitation Clause (FAR 52.236-22) requires an A-E firm to design a project within the construction budget. The estimate must be prepared coincident with the construction documents to guide the selection of materials, components, and systems and keep the project within budget. Hence, the estimate is a necessary and integral part of the design process, and is not excludable.