ASBCA

Appeal of Skidmore, Owings & Marrill

Under Contract No. AF 33(600)-28303

February 28, 1961

APPEARANCES FOR THE GOVERNMENT:

Brigadier General A. W. Rigsby, USAF

Chief Trial Attorney

Captain Chester D. Taylor, Jr., USAF

Trial Attorney

APPEARANCES FOR THE APPELLANT:

Marshall G. Sampsell, Esq.

Charles A. Bane, Esq.

Arthur R. Kiefer, Esq.

Philip F. Purcell, Esq.

Isham, Lincoln & Beale

Chicago, Illinois

Of Counsel

OPINION BY MR. McCONOUGHEY

The appellant partnership has taken timely appeal from the contracting officer's decision denying any increase in compensation over the initial fee of $75,866 for rendering certain architectural engineering services. This fee was provided by the contract [FN1] for the preparation of drawings, design analyses, and specifications necessary for the construction of the chapel at the United States Air Force Academy in Colorado. Since that decision both parties have modified their respective positions. The appellant has reduced the amount of its claim for additional fee from $220,492 to $208,492, because this particular $12,000 item for presentation models and renderings was not incurred as anticipated on 2 April 1958, the date of appellant's amended claim. The Government now concedes that an additional fee of $72,733 is equitable.

The evidence shows that appellant made its amended claim of 2 April 1958 approximately nine months before the Government accepted appellant's drawings and specifications as satisfactory for use in the advertising and award of contracts. Appellant based its amended claim upon the estimated cost of $140,703 for its own technical labor. [FN1a] Its actual cost of technical labor for the chapel was $135,512.46.

Appellant sustained a substantial financial loss in the performance of design services with respect to the chapel as an individual line item under the contract. This loss on the chapel design as such tended to affect adversely appellant's position on the contract

in its entirety since there is reason to believe that the total fee for design services was closely priced. The total fee claimed, $208,492 plus the initial fee of $75,866, is $284,358 for the chapel design. The claim for $208,492 includes a claim for $15,522 profit. The amount of technical labor in the initial fee of $75,866 is not shown. However, in the appellant's cost proposal of 24 January 1956 [FN2] for Title I (design) services, technical labor accounts for approximately 42% of the total proposed price.

The Government concedes that a certain design directive and two amendments, all issued after the date of the definitive contract, are changes. The Government likewise concedes that certain fluctuations in the programed cost of the design services relating to the chapel are changes. The Government argues, and we agree, that the 'Changes' clause [FN3] authorizes an equitable adjustment only for the work that is changed.

If we lay aside the question of statutory restrictions upon the size of the architect-engineer's fee, these issues remain:

(1) What is the scope of Title I (design) services, with respect to the chapel, under the definitive contract as entered into 14 February 1956?

(2) What adjustment is equitable for design directives and programmed cost fluctuations effective after 14 February 1956?

(3) Assuming that certain activities of the Government other than the issuance of design directives and changing the programmed cost of the chapel are beyond the scope of Title I services called for by the contract, what adjustment is equitable to compensate the contractor for services rendered as a result of such activities?

On the stated issues the Government argues that the contract requires the appellant to overcome all obstacles other than the conceded changes at no increase in the fee. With respect to the conceded changes, the Government contends that its offer of $72,733 is reasonable. The foundation for appellant's position has been laid in the testimony of the partner who carried a heavy share of the design responsibility in the following words:

'A lump sum for complete architectural services must be based on a certain set of criteria, it cannot be an open-end contract where the architect is required to do anything and every thing for a fixed sum of money.'

Hesolution of these issues with mathematical precision is not practical. We must consider the contract terms that outline the scope of the work in the perspective of events. We first examine the contract.

The letter contract before us, dated and accepted 4 August 1954, did not define 'Title I--Design Services' as such. This instrument, in paragraph 1-01 of Exhibit 'A' thereto, called upon the contractor to * * * 'perform complete architectural-engineering services for the design and construction of the Air Force Academy * * *'. Amendment 5 (dated 23 June 1955) delineates the nature of Title II services as supervision and inspection of construction for compliance with plans and specifications, and details certain steps to be taken to facilitate the rendering of the supervision and inspection function. We are left to infer that the term 'Title I' covers the preceding function i.e., preparation of drawings, plans and specifications.

As we read the letter contract, its terms do not, in exact words, correspond to the reference to 'Title I--Design Services' included in the definitive contract for design services. Part I 'Statement of Work' of Schedule of the definitive contract for design services, dated 14 February 1956, which includes in Item 1(a) the reference to 'Title I', is quoted in pertinent part:

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

'Item 1. Title I--Design Services

'(a) This Contract shall cover that portion of the work included in the aforementioned Letter Contract, identified as 'Title I--Design Services.'

'(b) The Contractor shall furnish and supply to the Government all architect-engineer services in connection with projects listed in Air Force Academy Design and Construction Schedule dated 31 October 1955 and as amended by mutual consent, and necessary for the accomplishment and delivery of the following:

'1. Definitive drawings, specifications, design analyses and cost estimates.

'2. Contract bidding documents including drawings, specifications, design analyses and cost estimates for comparison with bids received.

'(c) All work under Title I shall be performed in accordance with the 'Manual for Planning and Design' dated 1 February 1955 as revised 17 November 1955, and any instructions issued under the letter contract by the Contracting Officer, prior to the date of this definitive contract.

'(d) The services shall be performed by personnel qualified professionally and otherwise for the work called for.'

The Manual for Planning and Design referred to above contemplated that the design services with respect to preparation of drawings should progress to completion through the following three stages: (1) Sketch, (2) Definitive and (3) Working. Working drawings, or contract drawings as sometimes called, are such as can be used in actual construction and hence in bidding for contracts to construct, by persons familiar with the particular segment of construction involved.

The preparation of drawings in successive stages is normal in the architect client relationship. By proceeding through several stages, with discussion between the architect and his client at each stage, the architect is better able to learn what the client wants before the architect has proceeded too far in a manner inconsistent with those wants. Equally important, the technique of preparing drawings in several stages enables the architect to adapt his drawings to the client's budget and, in many instances points the client to the necessity of conforming his wants to his budget, his budget to his wants, or compromising these alternatives.

Having described some of the means by which an architect and his client reach a result satisfying to both, we are ready to consider whether the design of the chapel made unusual demands upon the architect. In doing so we discount the fact that the chapel was part of a difficult and complex undertaking and was subject to surutiny by exacting standards. Also we discount the fact that the dient was the Government, with needs and methods peculiar to inself. The architect appellant was aware of the nature of his client and the undertaking. The contract contemplated at least this much.

The Government concedes that three design directives were not contemplated within the scope of the work outlined under the definitive contract of 14 February 1956. The Government does not concede that it should have made further design directive changes. Appellant first requested such changes by letter dated 20 August 1957, at the time sketch drawings were submitted, and again in its letter of 29 August 1958, at a time when appellant was protesting that its client the Government did not have just grounds to reject the contract or working drawings recently submitted. Likewise the Government concedes nothing for the extra effort imposed upon the architect in convincing and otherwise dealing with an unusual diversity of 'clients' that from time to time

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

represented the Government.

The architect appellant did have to satisfy an unusual number of diverse groups. This is so first because we are dealing with a religious edifice that was eventually designed to accommodate Judaism, Roman Catholicism and Protestantism in separate facilities under one roof. Also there was some provision for religious activity within the chapel by others. This is so secondly because public funds were used. There is yet another reason. The skill or genius of the design architect produced an unusual exterior form that made use of tetrahedrons. Time, effort, travel, and no small fluency on the part of both the Air Force and the appellant were used at various meetings and exhibitions to convince those who had the best right to be interested in the exterior form and who did not at first give full approval.

If we grasp the design concept, it is that the design of a building of this kind should reflect the era in which it was built, in addition to being adapted functionally to the purpose and architecturally to its locality and environs. Perhaps the concept is best expressed in part of the designer's testimony as recorded:

'In selecting the idea of the enclosures we were dealing with an air force whose responsibilities go beyond every day matters and desired to develop a solution of the tetrahedron which is essentially a space frame or structural element made up of many light elements, six-inch pipe frames which reflected in essence the way modern technology works as versus the evolution of the Gothic cathedral from the stone masonry of their time to the techniques of ours and to give the same religious experience in today's techniques, this, I believe, is the responsibility of all architects practicing in their time to reflect their time, the needs, the hopes and the materials available.'

The parties have stipulated [FN4] that the definitive contract was executed by the contractor on or about 22 February 1956. Before executing the definitive contract for Title I services, contractor wrote a letter [FN5] stating that '* * * design problems and responsibilities must be more clearly defined and the procedures from the start of design to the completion of contract drawings be more definitely outlined, understood, agreed to and complied with'. The letter was addressed to Director, Air Force Academy Construction Agency [FN6], the activity that had issued the definitive contract, and the activity to which contractor was obligated to deliver the work called for Item 1 of Part I of the Schedule, for inspection and acceptance.

In this letter of 20 February 1956, appellant proposed certain procedures. One proposed procedure was that modification of design directives by Air Force Academy Construction Agency, hereafter called AFACA, may become a reimbursable extra. Another proposal was that AFACA modification of design or engineering submittals that were in accordance with design directives would constitute an effective change of design directive. All proposals within this letter assumed a course of dealing between appellant and AFACA as the Agency that represented the Government in its contracts with appellant. We do not know what response, if any, that AFACA made to the letter. We have referred to it to trace from its origins the continuing nature of the difficulty of interpreting the scope of required Title I services.

Both the legislative and the executive branches of the Government were actively interested in the chapel design. Presentations were made before more than one Congressional committee or subcommittee. The executive branch was represented by the Secretary of the Air Force who is turn had a Special assistant. The Secretary also had the benefit of the professional advice of ?? notable architects as his consultants. The Air Force was represented on the Air Force Academy Panel, one function of which was to get the Air Staff into the proceedings. The Academy itself was active in shaping the Government's eventual position. Its interest, however, tended to emphasize functional and

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

maintenance matters. AFACA concentrated on architectural and engineering matters and served as liaison between the Government and the contractor.

The role of the consultants and of the Chief of Air Force Chaplains should be discussed separately.

On 29 February 1956 the consultants held the first of a series of meetings at which the chapel was one of the items considered. These meetings, insofar as they concerned the chapel, continued at intervals through 1957 and 1958. In March 1957, the consultants were enthusiastic over the concept of the chapel as presented at Colorado Springs. In May of the same year the consultants met at Washington. The primary purpose was to get approval of the consultants of the Washington. The primary purpose year 1958 the consultants considered the design submittal. Later in the same year they considered the contract submittal in the summer, and again late in the year after the first contract submittal had been rejected by the Government and, after protest, resubmitted.

The consultants were not concerned with design directives. Only one of them appeared to be concerned with cost. As a group they appeared to be concerned with site, orientation, light, shape and aesthetics as distinguished from structure and engineering. On at least one occasion, appellant did not agree with the consultants. When and if a disagreement could not be reconciled, the matter was decided by the Secretary.

On certain occasions the advice of the consultants was accepted as the position of the Secretary but seemingly without prompt and authoritative transmission of the information to the AFACA. AFACA on such occasions would insist upon its viewpoint until the matter was clarified. It was not always represented at decision making meetings of appellant architect with the Secretary's consultants.

Appellant urges that refinement of detail is normal and not a change. However, rethinking of a demand that necessitates replanning of an area is a change that should be noted in a design directive. This is true where as in this matter two or three of the consultants suggested different directions that appellant was required to investigate. The design directive referred to is the outline of requirements as understood by AFACA and the Academy.

The Chief of Chaplains represented and correlated viewpoints that differed materially from those of any others. Prior to the definitive contract, design directives had contemplated two separate chapels and, later, a single auditorium in which all religious services would be held. In June 1956 the Chief of Chaplains met with the Secretary. Out of this meeting came the later decision [FN7] to give up the single auditorium and to try instead to get all three of the faiths earlier mentioned into separate and distinct places under one roof.

The principal interest of the Chief of Chaplains lay in the area of function. He and his staff were concerned with whether an arrangement would work ecclesiastically. Matters such as the location of the choir, the confessionals, sacristies and the three organs were of special interest. Certain plumbing was climinated or rearranged for ecclesiastical reasons. Agreement was reached with the appellant architect on all matters except the location of a stairway through the chancel in the Protestant sector. There the architect's view of fire escape requirements prevailed.

This high degree of mutual agreement was not easily or quickly reached, however. The 'final' ideas presented by the Office of the Chief of Chaplains to the appellant, and recorded in a memorandum under date of 30 April 1957, were not the last word from that office. At the meeting of 13-14 March 1958, for the purpose of reviewing appellant's definitive submittal of 21 February 1958, representatives of the Chief of Chaplains

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

proposed and achieved decision on a series of functional changes at five different levels. These decisions revised, added or eliminated twenty-four separate locations within the chapel.

Even after the meeting of 31 July-1 August 1958 at which the appellant's contract submittal was reviewed there remained approximately eleven matters of unresolved design. [FN8] At least three of these matters pertained to the domain of ecclesiastical functioning in which the opinions of the Chaplains were given great weight. These were: whether a suspended ceiling should be provided in (1) the Roman Catholic Sacristy and Vestry and (2) in the Meeting Room (for use by sects other than the three already mentioned), and (3) where the bride's Dressing Room should be located.

The preparation, submittal and approval of drawings took longer than planned and did not follow quite the usual course. Sketch design was submitted 20 August 1957. Submission had been held up until assurance of Congressional approval had been had. Appellant felt that the sketch represented departures from the existing design directive and from the budget. As previously noted, appellant requested a formal change at this time. The request was not directly answered. AFACA on 20 September 1957 instructed appellant to proceed with design.

Appellant on 11 November 1957 submitted drawings that it described as more complete than sketch but less complete than definitive drawings. AFACA, on 24 December 1957 declined to waive its right to a definitive submittal. Appellant made the definitive submittal on 21 February 1958. It was approved by AFACA letter dated 24 March 1958 subject to the appellant giving effect to numerous decisions reached at the meeting of 13-14 March 1958. The decisions affected five levels of the chapel itself and included commonts on architectural siting, and structural features, and comments on mechanical and electrical design.

Meanwhile, on 4 February 1958, AFACA directed appellant to work with a consultant not previously mentioned on the detailed design of the pipe organ in both Roman Catholic and Protestant sectors of the chapel. The use of a specially designed organ is somewhat unusual in churches. Certain cores in both narthexes had to be redesigned. The decision to engage a special consultant on the pipe organs had been in the making since May 1957.

Appellant submitted its contract drawings on 10 July 1958. These drawings were reviewed at a meeting on 31 July and 1 August 1958. As already indicated the contract submission was unacceptable. Numerous changes were agreed upon and, as to those that were unresolved, further consideration was necessary, including consideration by the Secretary's consultants. The contract drawings were resubmitted early in December and approved 31 December 1958. The drawings comprised 159 full sized sheets.

However, the task was not finished. When the bids on construction of the chapel were opened on or about 19 February 1959, it appeared that the cost to the Government would be $3,700,000. Appellant at this juncture had estimated the price to be $2,950,000. The Government's budgetary limit at the time of bidding on the chapel construction was $2,850,000. The excess of $100,000 was in part made up of items ordered by the consultants to the Secretary. These items consisted of exterior lighting, defrosting the terrace level, and more expensive glass. In addition, the excess was made up of cost increases in passing from the definitive to contract stage of drawings that the Government had accepted.

Appellant after consulting with the Government as to what reductions would be acceptable, undertook cost reduction studies at no cost to the Government. As a result a final price of $3,300,000 approximately was obtained upon rebidding. Appellant expended $16,139 for technical labor in making the restudy. Neither this figure nor overhead nor profit on the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

technical labor involved is included in appellant's claim before us.

The increase in the Government's budgetary limits on chapel construction costs brought about by actual competitive bidding makes it appropriate to return to this subject. We have referred to budgetary limits earlier as 'programmed cost'. It is possible to show in tabular form the several Design Directives (before and after 14 February 1956), the salient feature of each, and the programmed cost for each, as follows:

| Design Directive | Feature | Programmed Cost |
|---|---|---|
| FY 1955, #42 dated 1 June 1955 | Two distinct chapels | $1,623,500 (plus 15%) |
| FY 1955, #42A dated 18 October 1955 | Single chapel for all faiths | $1,623,500 (plus 15%) |
| FY 1957, #6 dated 27 December 1956 | All faiths and three chapels within one building complex | $4,000,000 (less 15%) |
| FY 1957, #6A dated 4 January 1957 | Changes time schedule for appellant's work | Same as preceding design directive |
| FY 1957, #6B dated 1 February 1957 | No Change in criteria | $2,550,000 ($3,000,000 less 15%) |

AFACA by letter dated 20 September 1957, at the time it approved appellant's sketch stage drawings, advised appellant that under no circumstances should the construction cost of the chapel exceed $2,608,700. Appellant replied under date of 30 September 1957. AFACA thereupon, by letter dated 8 October 1957, interpreted the $2,608,700 maximun to mean (1) an estimate that (2) would be based upon the contract stage drawings. At the same time, in a letteraddressed by one of appellant's senior partners to the Secretary's Special Assistant, appellant felt encouraged because the estimated cost was below $3,000,000 but '* * * not down to the $2,650,000 [FN9] odd * * *.' that the Special Assistant had set.

In its II November 1957 letter (when appellant submitted drawings more complete than sketch but less complete than definitive), appellant advised that the changes [FN10] outlined therein resulted in a revision of appellant's estimate from $3,492,000 to $2,890,000. With careful development of the working drawings, appellant felt that the estimate could be brought down to $2,850,000. By letter dated 24 December 1957, supra, AFACA raised the requirements for a maximum construction cost from $2,608,700 to $2,850,000. The suggestions were generally acceptable [FN11] to the Government. However, in its letter of 15 August 1958, in the course of commenting upon the first contract submittal, AFACA regarded a decrease in quality in the interior finishings in order to stay within the budget as '* * * extremely unfortunate * * *'. The same letter reiterates the requirement to stay within the cost limit of $2,350,000.

With respect to design directives in which we are most interested, that is, those issued after the date of conversion of the letter contract into definitive form, the programmed cost changed twice while the formal criteria of performance of design services changed not at all. If we include the increase necessitated by bidding and rebidding on construction of the chapel, the Government made at least three changes in programmed cost without using a design directive to do so. Appellant twice requested that the Government formally recognize changes in design criteria. Appellant urges with justification that such changes actually took place at every meeting.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

If we exclude as not relevant to the issues the budgetary limits fixed before the definitive contract for design services was entered into, and the last budgetary adjustment made to accommodate budget to bidding on construction, we are faced with four budgetary adjustments. These four adjustments occurred between 27 December 1956 and 24 December 1957, with a strong directive in mid- August 1958 to hold the line on construction costs. The budgetary limit reached its high in the December 1956 adjustment. Less than two months later the Government reset the same limit at its lowest point. Appellant was at all times under firm directions to perform its design services within these fluctuating limits.

Since Design Directives 6A and 6B did not affect criteria, the Government in effect recognized no formal changes in criteria for the services to be performed by appellant subsequent to the criteria announced by Design Directive No. 6, 27 December 1956. Actually the criteria changed in a manner relevant to the issues as a result of each of the first four submittals that have been described. The fifth submittal is not relevant because at that point both parties had reached accord until the results of the first round of bidding on construction were known. Changed criteria after the first round of bidding are not relevant because appellant does not claim compensation for its restudy to lower construction costs.

We are led to believe from the facts, and from conclusions derived from the evidence, as recited above, that appellant architect found itself in a situation of greater difficulty than it had a right to anticipate. This is so for more than one reason. The number of its 'clients' was unusual. Some of these 'clients' represented high levels of two of the three main branches of our Government. Others represented religious circles. Many of the problems were sensitive. This sensitivity of itself delayed the various voices that spoke for the Government in speaking as one. The shifting budgetary limits reflect the strong probability that appellant throughout was being pressed to economize on construction costs to a degree that was not quite compatible with the wants of its client.

The course of informal changes in design criteria after the issuance of Design Directive No. 6 went well beyond the course of normal evolutionary developments of design. We have generally indicated the volume of substantial changes that added to the architect's task by referring to the number of such changes rather than detailing them as has been done in the evidence. Two changes not previously mentioned should be now, however. The requirement for a bell tower or carillon was eliminated. The requirement for a 100-man choir in the chancel area in the fore part of the nave of the Protestant chapel eventually changed into a choir in the balcony of the narthex.

The Government does not dispute appellant's evidence as to the number, extent and nature of changes. Except for the matters that it concedes with respect to formal design directive amendments and changes in programmed cost the Government argues that these changes were not changes in criteria required by contract because they were consistent with a normal architectclient relationship. But we decide that the Government in this matter asked the appellant architect to do considerably more than appellant should have anticipated. We do this without attempting to decide whether additional formal changes in design criteria should have been made by the Government.

This brings us to the question whether the claim before us under the 'Changes' clause actually includes a claim for compensation for work not changed but which nevertheless cost more than the fixed price therefor. We have found that the contractor twice requested, in August 1957 and again in August 1958, formal changes in existing design directives. The Government did not issue any formal changes responsive to those requests.

The appellant found that it was impossible in its accounting procedures to segregate technical labor, in areas that appellant regarded as changes, in the absence of any clear

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

cut directive from the Government changing the scope of the work. Appellant did have a flexible and standard accounting procedure for handling the majority of changes when the project was either in definitive or contract drawing stage. Nevertheless a reputable firm of outside public accountants on whom appellant relied felt that the appellant had gone as far as practicable absent the issuance of formal changes by the Government. Although it does not make our problem any easier now, we do not know what more appellant could have done to segregate costs in view of the Government's firm attitude, taken in good faith, that changes in criteria had not occurred.

The next question is of similar import. Is appellant in pricing out these changes attempting to recover a loss on a single line item under a fixed price contract into which, with respect to that single item, it improvidently entered? Appellant has demonstrated that it bargained carefully in arriving at the fixed price to be paid for the entire Title I design services and for the chapel as a single line item. This is of little help. The evidence also suggests that the Government bargained well and shrewdly to arrive at the fixed prices of the various line items. There is no real evidence that would indicate affirmatively whether the fee for design services for the chapel, as distinguished from the fee for design services for the over-all project, was adequate to prevent a loss on design services for the chapel.

All that we really have in the way of help on both questions is the Government's own interpretation of the over-all problem. By letter of 16 July 1958, shortly after contract stage drawings had been submitted for the first time, the contracting officer requested information as to whether appellant would accept an additional fee of $65,740 as an equitable adjustment. Next, in its amended answer of 4 January 1960, shortly before the hearing, the Government conceded that appellant was entitled to an equitable adjustment increasing the contract price by $72,733 by reason of formal amendments to Design Directives and by reason of four distinct changes in the total directed construction cost of the chapel. There is much that we do not know about the means used to arrive at these offered adjustments. If the Government computed and deducted a portion of cost on the ground that it was allocable to unchanged work, it has not said how such an allocation could have been made. Likewise, with respect to the inference that the fixed price for designing the chapel was unprofitable to the appellant, the Government has not said how it would compute the amount of such a loss or, having computed it, whether it debited such a loss against appellant's costs in arriving at its version of an equitable adjustment.

The budgetary limits imposed did more than to press appellant toward economies in construction costs that could not quite be realized. The fixed price was negotiated on the basis of Design Directive FY 1955, No. 42A, supra. This directive contemplated a chapel with a single auditorium for all faiths. The budget limit was $1,623,500 plus 15% for contingencies. The next change, that of Design Directive FY 1957, No. 6, supra, some ten months after the definitive contract was entered into, established the concept that prevailed thenceforth. This was the concept of three faiths under one roof, but with separate and separated facilities for each, and with still additional space set aside for those of still other faiths. The budget limit imposed was $4,000,000, less 15%, or almost twice the budget limit for the work was conceived under the definitive contract.

This fiscal action bespeaks a change of no small magnitude. The Government in its amended answer indicates that $11,776 of the additional fee of $72,733 that it proposed is for work made obsclete or useless by changes ordered by the Government. $11,776 represents the entire amount paid for design services performed to date of issuance of Design Directive No. 6, supra. This is a feature of the Government's approach to the problem that appellant does not seemingly dispute.

We decide that this $11,776 is due the appellant. Further, we think this amount of cost of obsolescent design services should be considered and allowed separately, because it

points to Design Directive FY 1957, No. 6, supra, as formal recognition of the dominant and prevailing concept for the chapel design. After what amounted to two preliminary starts, this dominant concept of three faiths in separated sectors yet under one roof should be regarded as the true starting point and the true framework with which the quantum and range of services rendered can be seen in perspective.

The claim before us, which was made before performance was completed, includes an item of $7,150 for consultants (Bolt, Beranek and Newman) in the field of acoustical engineering. The Government appears to have requested consultations as a result of the concern with acoustics expressed by the Secretary himself. However testimony that has not been contradicted is to the effect that actual costs of consultants to appellant were $6,924.52. Also, this amount includes cost of the consultants in acoustics, but also costs to appellant for soil tests with a deep boring rig on the site by Soil Testing Company, Inc. Appellant in providing soil investigation services at the Academy was not able to provide the soil tests mentioned but regarded such tests as necessary. The sum of $6,924.52 should be allowed as a separate item for necessary deep boring soil tests and for acoustical consultation.

Appellant's claim includes an item for $16,863 for previous criteria presentations. This item should not be allowed separately. It was part of the responsibility for public relations that were inherent in acceptance by appellant architect of the commission to design this chapel for this particular client. To the extent that it is due, it is included in the fee we allow below.

We have attempted without exhaustive detail to outline the features that made appellant's commission more difficult and more expensive to perform than it had a right to expect under the contract. For reasons already stated, we use Design Directive No. 6, supra, as the framework for measuring performance. Subsequent acts of the Government as the client indeed made the job more difficult but did so without disturbing either the ultimate objective of a suitable chapel for the Academy or the concept adopted as best to meet that object. Since the concept was not the concept contemplated by the contract, an adjustment under the 'Changes' clause is proper.

For design services rendered after the issuance of Design Directive No. 6, supra, we consider and decide that a fee of $204,000 is equitable. This is 6% of $3,400,000 which in turn is $4,000,000 less 15%, the Government's budgetary limit set at the time the prevailing concept was established.

In summary, we have allowed:

| | |
|---|---|
| For services rendered obsolescent by changes.... | $11,776.00 |
| For deep boring soil tests and for acoustical consultants................................. | 6,924.52 |
| For A-E fee based upon prevailing concept....... | 204,000.00 |
| Total | 222,700.52 |
| Less initial fee provided by contract........... | 75,866.00 |
| For additional fee allowed...................... | $146,834.52 |

The appeal is thus sustained to the extent of $146,834.52.

It is our understanding that the above decision conforms with the limitation of 10 USC 9540(b), that the fee paid for outside architect engineering services shall not be more

than 6% of the estimated cost of the project to which it applies. It can be argued on several grounds that this statutory limitation does not apply. We rely upon the ground that the statutory limitation, if applicable, applies to the fee for the over-all project and not the individual line items. Appellant has stated in its reply brief that the over-all contract price for design services was less than 4% of construction cost. Presumably this does not take into account later adjustments in the fixed price (fee) by reason of earlier decisions of this Board, which decisions should not, however, cause the 6% limit to be reached.

We also understand that the parties to this appeal are facing an exhausted appropriation. Our decision under such circumstances amounts to a recommendation that the deficiency be filled.

WILLIAM D. McCONOUGHEY

Member of Division No. 1,

Air Force Contract Appeals Panel

I concur

GEORGE W. CRAWFORD

Chairman of the Air Force Contract

Appeals Panel and Member of

Division No. 1

I concur

HUGH B. ARCHER

Member of Division No. 1,

Air Force Contract Appeals Panel

I certify that the foregoing is a true copy of the findings of fact, decision and views of the Air Force Contract Appeals Panel of the Armed Services Board of Contract Appeals in ASBCA No. 5593, appeal of Skidmore, Owings & Merrill, under Contract No. AF 33(600)-28303. I further certify that there has been filed with the Recorder a statement by the Chairmen of the respective Panels of the Board that they have reviewed on behalf of their respective Services the above-captioned decision of the Air Force Contract Appeals Panel and that in their opinion further, formal and exclusive decision by the three Panel Chairmen is not required.

GEORGE L. HAWKES, Recorder

Armed Services Board of

Contract Appeals

FN1 The chapel was only one of many line items of the design services which were called for. Appellant was called upon to render design services for substantially the entire Academy. These services were first rendered under a letter contract dated 4 August 1954. The letter contract was eventually converted into five definitive contracts. The

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

definitive contract that called for design services recited that it was entered into as of 14 February 1956, and called for a fee of $4,926,038 plus an allowance of not to exceed $163,000 for travel. Subsequent amendments thereto, insofar as we are advised, are not determinative of the so-called 'Chapel' dispute. A more complete history of negotiations leading to the definitive contract for design services is set forth in our decision of this appellant's earlier appeal designated ASBCA No. 4199, dated 22 June 1960, 6C-2 BCA par. ___.

FN1a 'Technical labor' includes the time of architects, engineers, estimators, specification writers, and specification typists that participated in design and contract work. The time of general partners is not included.

FN2 Submitted as a part of the file pertaining to ASBCA No. 4199. See footnote 1, supra.

FN3 The first sentence of the 'Changes' clause, which defines the extent of permissible action, reads as follows:

'The Contracting Officer may, at any time, by a written order, and without notice to the sureties, if any, make changes in or additions to drawings and specifications, issue additional instructions, require modified or additional work or services within the general scope of the contract change the place of delivery or method of shipment, or the amount of Government furnished property.'

FN4 Stipulation dated 2 June 1959 and filed in ASBCA No. 4199. See footnote 1, supra.

FN5 Dated 20 February 1956, reference CS-AF-1089 File 11.1, and also filed in ASBCA No. 4199. See footnote 1, supra.

FN6 Under date of 17 September 1955, appellant had been directed to channel through the Director, Air Force Academy Construction Agency, all matters pertaining to the design and construction of the Academy.

FN7 See Design Directive FY 1957 No. 6, dated 27 December 1956.

FN8 See inclosure 2, Appellant's Exhibit No. 11, being a letter dated 15 August 1958 from AFACA to appellant, 'Re: Contract Submittal--Academy Chapel'.

FN9 But not within the revised program cost of $3,000,000 less 15% fixed in Item 26 of attachment to AFACA letter of 18 October 1957 (Appellant's Exhibit 1). This figure (as do the other budgetary limits cited herein) excluded utilities and walkway paving that had been programmed at an additional $215,000.

FN10 In order to get the cost down, appellant suggested a number of major revisions of design such as: (1) Reduction of total structure by two bays. This was a 10% decrease in volume. The nineteen double spires were reduced to seventeen. (2) Simplification of the structural floor slab. (3) Substitution of colored glass for stained glass in all areas as tetrabedron dividers. (4) Elimination of marble memorial panels. (5) Elimination of air conditioning. (6) Elimination of elevators. Simplification of stair construction. (7) Substitution of less expensive floor finishes.

FN11 Some of the suggestions made by appellant in its 11 November 1957 letter in order to save dollars remained controversial. These reappear, along with several others as matters of 'Unresolved Design--Academy Chapel', in an inclosure dated 14 August 1958. See footnote 8, supra.

1961 WL 304 (A.S.B.C.A.), 61-1 BCA P 2974, ASBCA No. 5593

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works