No. 00-207C
(Judge Block)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FLUOR ENTERPRISES, INC.
f/k/a FLUOR DANIEL, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

DONALD E. KINNER
Assistant Director

STEVEN J. ABELSON
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tele: (202) 514-4325

Attorneys for Defendant

OF COUNSEL:

FRED KOPATICH
Attorney
Office of the
General Counsel
Department of Commerce
Washington, D.C. 20230

April 12, 2004

**TABLE OF CONTENTS**

**PAGE(S)**


DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . 1

DEFENDANT'S BRIEF . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . 2

I. Nature Of The Case . . . . . . . . . . . . . . . . . . . . 2

II. Statement Of The Facts . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I. Summary Judgment Is An Appropriate Method For The Disposition Upon The Issue As To Whether Six Percent Limitation Upon Fees Imposed By 41 U.S.C. § 254(b) Was Applicable To The Site Specific A&E Services That Fluor Provided Pursuant To The Contract . . . . . . . . . . . . . . . 5

II. The Government Is Entitled To Summary Judgment Upon The Issue That The Six Percent Limitation Upon Fees For A&E Services Imposed By 41 U.S.C. § 254(b) Was Applicable To The A&E Services That Fluor Performed Pursuant To Requirement 2.3 Of The Contract . . . . . . . . . . . 7

A. The Plain Wording Of 41 U.S.C. § 254(b) Provides That A&E Fees Are Limited To Six Percent Of The Estimated Cost Of Construction Regardless Of The Nature Of The Contract . . . . 7

B. Fluor Contemporaneously Interpreted The Contract As Being Subject To Six Percent Fee Limitation Imposed By 41 U.S.C. § 254(b) Applied To the Contract . . . . . . . . . . . . 14

C. Fluor's After-the-Fact Attempt to Limit Application of 41 U.S.C. § 254(b) Has No Basis In Law Or Fact . . . . . . . . . . . . . . 18

III. The Contracting Officer's Determination Of Fluor's Liability To The Government Is Not An Appropriate Issue For Summary Judgment . . . . . . . . . . . . . 22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF AUTHORITIES

**CASE** **PAGE(S)**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) . . . . . 5

Appeal of O'Neal Engineering, Inc., ASBCA No. 32013, 86 B.C.A. ¶ 19,114 (emphasis supplied) . . . . . 22

Big Chief Drilling Company v. United States, 15 Cl. Ct. 295, 300 (1988) . . . . . 26

Blinderman Construction Co., Inc. v. United States, 695 F.2d 552 (Fed. Cir. 1982) . . . . . 18

Burlington Northern RR. Comp. v. Oklahoma Tax Committee, et al., 481 U.S. 454 (1987) . . . . . 14

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . 5

Clary v. United States, 333 F.3d 1345 (Fed. Cir. 2003) . . . . . 10

Composite Laminates, Inc. v. United States, 27 Fed. Cl. 310 (1992) . . . . . 25

Defenders of Wildlife, Earth Island Institute v. Hogart, 330 F.3d 1358 (Fed. Cir. 2003), . . . . . 10, 14

De Matteo Construction Co. v. United States, 600 F.2d 1384, 220 Ct. (1979) . . . . . 14

Garcia v. United States, 469 U.S. 70 (1984) . . . . . 10, 21

General Engineering and Machine Works v. O'Keefe, 991 F.2d 775 (Fed. Cir. 1993) . . . . . 14

Goodman Manufacturing, L.P. v. United States, 69 F.3d 505 (Fed. Cir. 1995) . . . . . 6

H.F. Allen Orchards v. United States, 749 F.2d 1571 (Fed. Cir.1984), cert. denied, 474 U.S. 818, 106 S. Ct. 64, 88 L. Ed. 2d 52 (1985) . . . . . 25

Harrison v. PPG Industries, Inc., 446 U.S. 578 (1980) . . . . . 11

## TABLE OF AUTHORITIES (Cont.)

**CASE** **PAGE(S)**

Hartford Underwriters Insurance Co. v. Union Planters Bank, 530 U.S. 1 (2000) . . . . . . . . . . . . . . . . . . . 14

Julius Goldman's Egg City v. United States, 697 F.2d 1051 (Fed. Cir. 1983) . . . . . . . . . . . . . . 18

Litton Industrial Products, Inc. v. Solid State Systems Corp., 755 F.2d 158 (Fed. Cir.1985) . . . . . . . . . . . . . . . 25

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . . 25

Mudge v. United States, 308 F.3d 1220 (Fed. Cir. 2002) . . . . . . . . . . . . . 11, 21

Norfolk Dredging Co., Inc. v. United States, 58 Fed. Cl. 741 (2003) . . . . . . . . . . . . . . . . . 14

Perrin v. United States, 444 U.S. 37 (1979) . . . . . . . . . . . . . . . . . . . 26

Robinson v. Shell Oil Co., 519 U.S. 337 (1997) . . . . . . . . . . . . . . . . . . 10

Santa Fe Pacific Railroad Co. v. United States, 294 F.3d 1336 (Fed. Cir. 2002) . . . . . . . . . . . . . 24, 25

Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . . . . . . 5

## STATUES AND REGULATIONS

10 U.S.C. § 2306(d) . . . . . . . . . . . . . . . . . . . . . 13

10 U.S.C. § 7212 . . . . . . . . . . . . . . . . . . . . . . 20

41 U.S.C. § 254(b) . . . . . . . . . . . . . . . . . . . . PASSIM

48 C.F.R. § 15.404-4(c)(4)(i)(B) (2003) . . . . . . . . . . . 13

48 C.F.R. § 15.903(d)(1)(ii) (1997) . . . . . . . . . . . . . . 13

48 C.F.R. § 236.606 . . . . . . . . . . . . . . . . . . . . . 22

48 C.F.R. § 836.606-73 . . . . . . . . . . . . . . . . . . . 23

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FLUOR ENTERPRISES, INC. f/k/a FLUOR DANIEL, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 00-207C (Judge Block) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT’S OPPOSITION TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM
AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant respectfully submits its opposition to plaintiff's motion for summary judgment("motion") and supporting memorandum and defendant's cross-motion for summary judgment. There are no genuine issues of material fact that the site-specific architectural and engineering ("A&E") services that plaintiff, Fluor Enterprises, Inc. ("Fluor") provided the United States, pursuant to contract no. 50WCNA606099 ("the contract") were the subject to the six percent fee limitation imposed upon A&E fees by 41 U.S.C. § 254(b).

In support of our opposition to plaintiff's motion and our cross-motion, we rely upon this brief, defendant's proposed findings of uncontroverted fact, defendant's response to plaintiff's proposed findings of uncontroverted fact, defendant's appendix, plaintiff's proposed findings of uncontroverted fact, and plaintiff's appendix.[1/]

[1/] Defendant's proposed findings of uncontroverted fact, defendant's response to plaintiff's proposed findings of uncontroverted fact, and defendant's appendix have all be filed with the Court under separate cover.

DEFENDANT'S BRIEF

STATEMENT OF THE ISSUES

1. Whether the statutory six percent fee limitation imposed upon A&E services relating to the construction of public works by 41 U.S.C. § 254(b)is applicable to the site-specific A&E services that plaintiff, Fluor Enterprises, Inc. ("Fluor"), was required to provide pursuant to the contract.

2. Whether Fluor is entitled to summary judgment upon the issue of quantum.

STATEMENT OF THE CASE

I. Nature Of The Case

Congress has mandated that

> . . . in the case of a cost-plus-a-fixed-fee contract the fee shall not exceed 10 percent of the estimated cost of the contract, exclusive of the fee, as determined by the agency head at the time of entering into such contract (except that a fee not in excess of 15 percent of such estimated cost is authorized in any such contract for experimental, developmental, or research work and that a fee inclusive of the contractor's costs and not in excess of 6 percent of the estimated cost, exclusive of fees, as determined by the agency head at the time of entering into the contract, of the project to which such fee is applicable is authorized in contracts for architectural or engineering services relating to any public works or utility project).

41 U.S.C. § 254(b)(emphasis supplied). Thus, when the Federal Government awards a cost-plus-fixed-fee contract for A&E services, Congress has specifically prohibited the Government from paying the contractor more than six percent of the estimated costs of construction for that project.

Pursuant to the contract that Fluor and the Government entered into in 1986, Fluor was to provide construction cost estimates, site-specific designs, and construction supervision for over 100 WFOs to be constructed for the National Weather Service, which is an agency of the National Oceanic and Atmospheric Administration (NOAA). App. 41-53.[2/] Shortly before Fluor completed the contract, and thereafter, the Department of Commerce's ("Commerce") Inspector General ("IG"), as required by regulation, conducted an audit of incurred costs the Government paid Fluor pursuant to the contract. DPFUF 27; App. 19. In an interim and final report, the IG concluded that, among other things, Fluor had been paid fees, which included incurred costs, for A&E services that exceeded the maximum of six percent of the estimated construction costs permitted by 41 U.S.C. § 254(b). DPFUF 28-33; App. 5, 6.

Based upon these reports, the contracting officer conducted an investigation into Fluor's contract billings. App. 6. She determined that the payments made to Fluor for site-specific A&E services Fluor performed pursuant to contract requirement 2.3, exceeded the six percent fee limitation imposed by 41 U.S.C. § 254(b). App. 6, 48-51. Consequently, on or about April 13,

---

[2/] "App.___" refers to defendant's appendix. "DPFUF___" refers to defendant's proposed findings of uncontroverted fact. "PPFUF__" refers to plaintiff's proposed findings of fact. DRPPFUF___" refers to defendant's response to plaintiff's proposed findings of uncontroverted fact.
"Brief____" refers to plaintiff's motion for summary judgment and supporting memorandum. "Pl. App.___" refers to plaintiff's appendix.

1999, the contracting officer issued a contracting officer's final decision in which she demanded, among other things, that Fluor repay the Government a total of $2,560,413 for fees, which included incurred costs, that the Government paid Fluor for A&E services, and which exceeded the six percent limitation allowed by 41 U.S.C. § 254(b) upon such A&E fees.[3/] App. 10. Fluor challenged this final decision by timely filing a complaint with this Court.

II. Statement Of The Facts

The relevant, uncontroverted facts are set forth in defendant's proposed findings of uncontroverted fact and defendant's response to plaintiff's proposed findings of uncontroverted fact, which have been filed with the Court under separate cover. These facts will be mentioned in this brief to the extent that they are necessary for an understanding of the argument.

---

[3/] The contracting officer also determined that the Government had also paid at total of unallowable costs had been paid under the Contract in the amount of $213,659 in other unallowable costs. App. 10. These costs are not relevant to either plaintiff's motion for summary judgment or defendant's cross-motion for summary judgment.

## ARGUMENT

I. Summary Judgment Is An Appropriate Method For The Disposition Upon The Issue As To Whether The Six Percent Limitation Upon Fees Imposed By 41 U.S.C. § 254(b) Was Applicable To The Site Specific A&E Services That Fluor Provided Pursuant To The Contract

Summary Judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Liberty Lobby, Inc., 477 U.S. at 248; Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562 (Fed. Cir. 1987).

The Supreme Court has held that summary judgment may no longer be regarded as a disfavored procedural shortcut. Rather, summary judgment must be viewed as an "integral part of the Federal rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' Fed. R. Civ. P. 1." Celotex Corp., 477 U.S. at 327. Accord Sweats Fashions, Inc., 833 F.2d at 1562. Moreover, Rule 56 must be construed so as to preserve a party's right to demonstrate before trial that the non-moving party's claims are without foundation. Celotex Corp., 477 U.S. at 327.

To prevail upon our cross-motion for summary judgment, the Government need only demonstrate its entitlement to judgment as a

matter of law, and identify those portions of the record that demonstrate the absence of a genuine issue of material fact that the A&E service Fluor performed pursuant to contract requirement 2.3 were subject to the fee limitation mandated by 41 U.S.C. § 254(b). Celotex, 477 U.S. at 322-23. Moreover, when the parties agree upon the material facts, and request that the court interpret a statute and apply it to the agreed-upon facts, then the issue is one of law, which particularly lends itself to resolution through summary judgment. Goodman Mfg., L.P. v. United States, 69 F.3d 505, 508 (Fed. Cir. 1995)

Based upon the above, summary judgment is appropriate upon the issue of the applicability of 41 U.S.C. § 254(b) to the site-specific A&E services required by the contract. There is no dispute between the parties concerning the material facts (1) as to the nature and content of the contract; (2) that the Government issued task orders to Fluor and, in accordance with those task orders, Fluor provided the Government site-specific A&E services pursuant to contract requirement 2.3; (3) that Fluor submitted invoices to the Government that requested payment for those services; and (4) that the Government paid Fluor for those services.

The Government will establish that, as a matter of law, the site-specific A&E services that Fluor performed pursuant to the contract were subject to the six percent fee limitation imposed by 41 U.S.C. § 254(b). Consequently, the Government is entitled summary judgment that, as a matter of law, the payment of fees

for site-specific A&E services was subject to the six percent limitation imposed by 41 U.S.C. § 254(b).

## II. The Government Is Entitled To Summary Judgment Upon The Issue That The Six Percent Limitation Upon Fees For A&E Services Imposed By 41 U.S.C. § 254(b) Was Applicable To The A&E Services That Fluor Performed Pursuant To Requirement 2.3 Of The Contract

### A. The Plain Wording Of 41 U.S.C. § 254(b) Provides That A&E Fees Are Limited To Six Percent Of The Estimated Cost Of Construction Regardless Of The Nature Of The Contract

Fluor's motion for summary judgment is limited to count I of its complaint. Brief 14. In that count, Fluor, in essence alleges that the Government breached the contract by applying the 6six  percent limitation imposed by 41 U.S.C. § 254(b) to the A&E services that Fluor performed pursuant to the contract. Compl. ¶¶ 81-89. Fluor then spends considerable time and effort attempting to convince the Court that, despite the clear and unambiguous statutory language, the statute does not apply to the contract. Brief 14-18.

Fluor contends that 41 U.S.C. § 254(b) does not apply to the contract because "[the contract] was not (emphasis in original) a contract principally (emphasis supplied) for the production of plans, designs, drawings and specifications." Brief 18. Fluor contends that its contract was "far more than a contract for the delivery of plans designs, drawings, and specifications, or even for incidental services related thereto." Brief 19. Fluor then describes the process by which it performed work pursuant to the contract, Brief 19-20, and concludes by arguing that the statute does not apply to an incrementally funded, level of effort

contract. Brief 20-21. Fluor's arguments, contentions, and theories are without merit.

There is only one issue for the Court to decide by summary judgment; whether the six percent limitation upon fees for A&E services imposed by 41 U.S.C. § 254(b) applies to the contract, specifically, the site specific A&E services Fluor performed pursuant to contract requirement 2.3. Fluor concedes that one of the contract's requirements placed upon Fluor was "the production of plans, designs, drawings and specifications." Brief 18. Further, Fluor does not contend that 41 U.S.C. § 254(b) is either ambiguous or unclear upon its face. Nevertheless, Fluor attempts to minimize this fact by claiming that these A&E services were "minor" when compared to the rest of Fluor's responsibilities pursuant to the contract and, therefore, the six percent limitation did not apply to this particular requirement. Brief 18-19. Fluor attempts to use the legislative history of the statute to support its unsupportable contention.

Fluor's claim would have some validity if the Government had attempted to impose the statutory six percent limitation upon all of the work Fluor was required to perform pursuant to the contract. However, the Government only applied the limitation to Fluor's performance of contract requirement 2.3, which required Fluor to provide site-specific WFO design services. App. 48-51. Employing the rules of statutory interpretation, we establish the limitation imposed by 41 U.S.C. § 254(b) applied to the services Fluor provided pursuant to contract requirement 2.3 regardless as

to whether that requirement was a major or minor portion of the contract.

As set out above, pursuant to 41 U.S.C. § 254(b), when making payment to an A&E contractor for A&E services, pursuant to a cost-plus-fixed-fee contract, the Government is limited to paying "a fee inclusive of the contractor's costs and not in excess of six percent of the estimated cost, exclusive of fees, as determined by the agency head at the time of entering into the contract, of the project to which such fee is applicable is authorized in contracts for architectural or engineering services relating to any public works or utility project)." Id. Thus, the statute unequivocally prohibits the Government from paying a contractor for A&E services more than six percent of the estimated cost of construction of the project.

When interpreting a statute, courts first begin with the wording of the statute itself. The United States Court of Appeals for the Federal Circuit ("Federal Circuit")recently held that:

> To interpret a statute we first look to the statutory language and then to the legislative history if the statutory language is unclear. We must first "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." Robinson v. Shell Oil Co., 519 U.S. 337, 340, 117 S. Ct. 843, 136 L. Ed.2d 808 (1997). "Our inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.' " Id.

Clary v. United States, 333 F.3d 1345, 1348 (Fed. Cir. 2003) (some citations omitted) (emphasis supplied).

Pursuant to contract requirement 2.3, App. 48-51, Fluor was required, among other things, to "conduct site investigations and prepare site specific designs," App. 48, as well as "prepare a complete design and construction package for each [WFO] specified by the Government." App. 49. It is undisputed that these types of A&E services were the types of services to which the statute applied.[4/] Thus "in order to construe [the] statute contrary to the plain meaning of its text, [Fluor] must show a clear contrary intent by Congress that supports its construction." Defenders of Wildlife, Earth Island Institute v. Hogart, 330 F.3d 1358, 1367 (Fed. Cir. 2003), citing Garcia v. United States, 469 U.S. 70, 75 (1984) ('[O]nly the most extraordinary showing of contrary intentions from [the legislative history] would justify a limitation on the 'plain meaning' of the statutory language.").

Fluor attempts to circumvent the statute's clear language by directing the Court to review the legislative history of the statute, which Fluor theorizes establishes that the statutory limitation does not apply to the contract because the contract was not a contract "principally for the production of plans, designs, drawings and specifications." Brief 18. However, the statute neither states, nor even hints, that the six percent limitation is restricted to those contracts (1) pursuant to which an A&E contractor only performs A&E services or, (2) if performing other tasks, where the contract is "principally for

---

[4/] The Government agrees with Fluor that the term "A&E services means "the production of plans, designs, drawings and specifications." Brief 18.

the production of plans, designs, drawings and specifications." Brief 18. Moreover, despite Fluor's contentions to the contrary, Brief 20-21, there is nothing in the statute that even remotely suggests that an incrementally funded, level of effort contract for A&E services is exempted from the mandated six percent limitation.

The use of legislative history to limit or contradict the plain meaning of a statute is appropriate only when a party makes an "extraordinary showing" that Congress intended something other than what a statute says. Mudge v. United States, 308 F.3d 1220, 1230 (Fed. Cir. 2002). Indeed, "it would be a strange canon of statutory construction that would require Congress to state in committee reports or elsewhere in its deliberations that which is obvious on the face of a statute." Harrison v. PPG Industries, Inc., 446 U.S. 578, 592 n. 8 (1980).

Fluor has not only failed to make the required extraordinary showing, but its selected excerpts from the legislative history do not even support Fluor's theory. In fact, the legislative history supports the application of the statute to a range of differing contracts. For example, the 1967 letter from Representative Jack Brooks to the Comptroller General. Pl. App. Vol 20, 1 of 2, upon which Fluor relies, establishes that there is no need for the legislative history to be reviewed because, as Representative Brooks stated:

> It is the Subcommittee's opinion that the present statutes [containing the fee limitation] relating to A-E fees are clear and unambiguous. Under our interpretation of

> the law, there is at present a 6 percent limitation on the fees of architect-engineers relating to the "production and delivery of plans, drawings, and specifications."

Id. at 3. Consequently, there is absolutely nothing in the cited legislative history that indicates, or even suggests, that Congress intended that the six percent fee limitation imposed 41 U.S.C. § 254(b) would not apply to contracts (1) where a range of services are provided in addition to site design, such as construction estimates and supervision; (2) that are incrementally funded; and (3) that do not set out a maximum design fee. If Congress did not want the six percent limitation to apply to contracts for A&E services that were incrementally funded, level of effort of contracts, Brief 20-21, and/or to contracts that were not "principally for the production of plans, designs, drawings, and specifications," Brief 18, Congress would have put such exemptions in the statute. This Congress did not do.

The Federal Acquisition Regulations ("FAR") implementing 41 U.S.C. § 254(b)is quite enlightening. The FAR provides, in pertinent part, that:

> The contracting officer shall not negotiate a price or fee that exceeds the following statutory limitations, imposed by 10 U.S.C. § 2306(d) and 41 U.S.C. 254(b)
>
> * * * * *
>
> (B) For architect-engineer services for public works or utilities, the contract price or the estimated cost and fee for production and delivery of designs, plans, drawings, and specifications shall not exceed 6 percent of the estimated cost of construction of the

public work or utility, excluding fees.

48 C.F.R. § 15.404-4(c)(4)(i)(B) (2003).[5/] By using the terms "price" and "contract price," id., the FAR not only prohibits the contracting officer from negotiating cost-reimbursable contracts in excess of the six percent fee limitation, but goes beyond the statute by imposing the limitation upon fixed price contracts awarded for such services. However, the FAR does not exempt either cost reimbursable or fixed price contracts if (1) such services are performed in conjunction with other services; or (2) the contract is an incrementally funded, level of effort contract. "Federal regulations which are based upon a grant of statutory authority 'have the force and effect of law, and, if they are applicable, they must be deemed terms of the contract even if not specifically set out therein, knowledge of which is charged to the contractor.'" General Engineering and Machine Works v. O'Keefe, 991 F.2d 775, 780 (Fed. Cir. 1993), citing De Matteo Constr. Co. v. United States, 600 F.2d 1384, 1391, 220 Ct. Cl. 579 (1979).

For all of the reasons discussed above, Fluor has failed to establish "a clear contrary intent by Congress that supports its construction [of 41U.S.C. § 254(b)]," Defenders of Wildlife, Earth Island Institute, 330 F.3d at 1367, that, pursuant to 41 U.S.C. § 254(b), the six percent limitation imposed upon A&E

[5/] Prior to 1998, which would encompass the period of performance of the contract, this exact language was found at FAR § 15.903(d)(1)(ii). See, 48 C.F.R. § 15.903(d)(1)(ii) (1997); Compl. ¶ 56.

services was not applicable to contract requirement 2.3. Thus, because language of 41 U.S.C. § 254(b) is unambiguous, and the application of the usual meaning of the words does not lead to an absurd result, further judicial inquiry into legislative history or other interpretative guidance is not warranted and the inquiry should end by giving the statute its plain meaning. See Burlington Northern RR. Comp. v. Oklahoma Tax Comm., et al., 481 U.S. 454, 461 (1987)("Unless exceptional circumstances dictate otherwise, when we find the terms of a statute unambiguous, judicial inquiry is complete."); see also Hartford Underwriters Ins. Co. v. Union Planters Bank, 530 U.S. 1, 6 (2000); Norfolk Dredging Co., Inc. v. United States, 58 Fed. Cl. 741, 748 (2003). Consequently, Fluor's attempt to have Court construe the statute, despite the clear and unambiguous language to the contrary, as exempting from the six percent limitation those contracts where the A&E services may not be "principally for the production of plans, designs, drawings, and specifications," Brief 18, or are an incrementally funded, level of effort contract, Brief 20-21, is without merit. Accordingly, the Government is entitled to summary judgment that, as a matter of law, 41 U.S.C. § 254(b) applied to the contract.

B. Fluor Contemporaneously Interpreted The Contract As Being Subject To The Six Percent Fee Limitation Imposed By 41 U.S.C. § 254(b) Applied To the Contract

We have established that 41 U.S.C. § 254(b) was applicable to the contract. Fluor's contention to the contrary is in direct conflict with Fluor's contemporaneous interpretation of the

contract. In fact, because Fluor understood that the contract the statute limited Fluor's fee for the site-specific to six percent, Fluor took specific steps to monitor its costs in relation to that statutory limitation. In March, 1993, the Commerce Department's Inspector General issued an interim audit report covering the period through completion of Task Order 7 (April 30, 1992) in which the IG, among other items, questioned costs, i.e., fees, that the Government paid for A&E services that exceeded the six percent limitation of 41 U.S.C. § 254(b). App. 5. Fluor was provided a copy of that report and, in June 1993, Fluor submitted a detailed response to the audit findings entitled "Position Paper of Fluor Daniel, Inc." App. 66-73.[6] In that paper, Fluor emphasized its understanding that the fee limitation imposed by 41 U.S.C. § 254(b) was applicable to the contract and detailed the actions it had taken based upon that understanding. Indeed, Fluor stated that, in May 1988, Fluor had submitted proposed contract pricing information to NOAA "that reflected the basis for applying the fee limitation [of 41 U.S.C. § 254(b)]. . . ." App. 71, see also App. 53-56. In May 1988, Fluor estimated its price for WFO design services to be exactly six percent of the construction cost for the offices. App. 56.

In the position paper, Fluor also explained that, concerning the applicability of 41 U.S.C. § 254(b) to the contract:

---

[6] Although the position paper states that it is a response to the final audit, App. 66, in actuality, it is a response to the interim audit. The final audit report was not issued until March 21, 1995, almost two years after the position paper.

> Project records do not show earlier consideration of the issue of included and excluded services [subject to the six percent statutory limitation] because substantive A/E design was not the focus of FDI's work during the first two years of the Contract. In fact, FDI's A/E design effort on this project was not fully under way until Option Year Four (FY91). . . . The fee limitation issue became a focus of attention only when program definition was relatively complete, so that substantive A/E design could start in earnest and become a substantial component of FDI's scope of work. FY91 marked this transition in the Contract. The [statutory] limitation issue was recognized and addressed prior to that time, but was not fully articulated until the Option Four negotiations in 1990 because the work did not require it.

App. 71-72. Fluor also stated that:

> In the Spring of 1990, as part of their negotiations for Option Year Four (FY91), NOAA and FDI elected to formalize their understanding and practice as to how the statutory fee limitation [of 41 U.S.C. § 254(b)] had been and would continue <u>to be applied.</u>

App. 67 (emphasis supplied).

The paper also discussed a June 1990 meeting between Fluor's and the Government's principals. Fluor noted that: "The June 21 iteration further reflected the parties' recognition and agreement that the fee limitation was to be applied <u>prospectively</u>. . . ." App. 68. In fact, Fluor even presented a chart to the Government's representatives that clearly expressed Fluor's understanding of what design tasks would be subject to the six percent fee limitation. App. 60.

There is other documentation that clearly reflects that Fluor contemporaneously interpreted the contract as being subject

to the statutory limitation upon fees for A&E services. App. 57-58, 62-64. Of particular note is an e-mail, dated August 15, 1991, that was sent by Fluor's project manager to Fluor's managers. App. 65. In this e-mail, the project manager instructed Fluor's managers how to track design work in relation to the six percent fee limitation:

> Background: By contract (the FAR's]) we are required to produce the detailed site specific design within a budget of 6% of facility construction cost. Conceptual design is not included in this "6% design". Conceptual design is charged to [labor category] 3A and this activity is completed prior to issue of the 35% package.
>
> * * * * *
>
> Area 31 is site specific (6%) design and is from completion of "3A" until 100% package issue.
>
> * * * * *
>
> Area 34 charges are outside of the 6% design. . . .

Id.

It is a familiar principle of contract law that the parties' contemporaneous construction of an agreement is entitled to great weight in its interpretation." Blinderman Construction Co., Inc. v. United States, 695 F.2d 552, 558 (Fed. Cir. 1982)(emphasis supplied); see also Julius Goldman's Egg City v. United States, 697 F.2d 1051 (Fed. Cir. 1983) (parties conduct prior to dispute indicates intent of the parties). During Fluor's performance of the contract, before a dispute arose, Fluor and the Government were in complete agreement that, for site-specific design work

performed pursuant to contract requirement 2.3, the six percent limitation of 41 U.S.C. § 254(b) was applicable. Indeed, Fluor even took steps to segregate its design costs to ensure it had complied with the statute.[7/] Therefore, it strains credulity for Fluor to now assert that, despite the clear and unambiguous language of the statute, the six percent limitation on A&E fees no longer applies to the contract.

C. Fluor's After-The-Fact Attempt To Limit Application Of 41 U.S.C. § 254(b) Has No Basis In Law Or Fact

In addition to Fluor's contentions and theories discussed above, Fluor also contends, in essence, that the statute does not apply to the contract because (1) the head of the agency did not calculate the estimated project costs prior to award of the contract and the contracting officer did not ensure compliance with the statutory limitation prior to the start of contract performance. Brief 23-28. These arguments, as with Fluor's other contentions, are without merit.

We have established that site-specific WFO design was a separate part of the statement of work (Contract Requirement 2.3). App. 48-51. Pursuant to the contract, the Government ordered work through the issuance of individual task orders, which, among other things, (1) required a site-specific WFO design; and (2) identified the individual WFO sites for which

[7/] While the evidence is clear that Fluor understood that 41 U.S.C. § 254(b) applied to the Contract, Government disagrees that Fluor adequately ensured that its invoices reflected compliance with the statutory limitation on design fees. As discussed below, there is a genuine issue of material fact as to whether payments to Fluor were within the statutory limitation.

site-specific A&E services pursuant to requirement 2.3 were to be provided during the task period. App. 3. Thus, with each task order, the Government was, in essence, contracting with Fluor to perform work that included site specific A&E services pursuant to contract requirement 2.3, the costs of which the parties knew were limited by the statutory six percent design fee limitation. Pursuant to contract requirement 2.1.3, Fluor was required to "prepare cost estimates for construction packages prepared under [the] contract. App. 44. Thus, there could be no estimated costs of construction until Fluor calculated those costs . Consequently, the calculation of the estimated costs of construction was delegated to Fluor. Finally, we have established that Fluor's own contemporaneous interpretation of the contract was that the site specific A&E services were subject to the six percent limitation. In fact, Fluor even monitored its compliance with the limitation during its performance of site-specific design work. During its performance of the contract, Fluor never raised a question as to the estimated cost of construction to be used to calculate the six percent fee for the A&E services it performed pursuant to contract requirement 2.3. Nevertheless, despite its previous, contemporaneous interpretation of the contract, Fluor, relying upon the legislative history of the statute, now asserts that, despite the clear and unambiguous statutory language, over $5 million in site-specific A&E costs was not subject to 41 U.S.C. § 254(b). The Federal Circuit has held that:

> [I]t is [Fluor] that must show clear legislative history supporting its construction because it is [Fluor] that seeks to construe the statute contrary to its plain text. [Fluor] may not discharge this burden by pointing to what the legislative history does not demonstrate. Where, as here, that history fails to make the sort of "extraordinary showing" required by Garcia, the Court must construe the statute according to its plain language.

Mudge, 308 F.3d at 1230 (emphasis supplied).

As previously discussed, the legislative history does not support the unreasonable interpretation of 41 U.S.C. § 254(b) that Fluor urges. Indeed, Fluor's interpretation would mean that A&E contracts could no longer combine design tasks and project supervision tasks because to do so would thwart the mandate of the statute that A&E services for design tasks are limited to six percent of the estimated construction costs for the project. Such an interpretation completely ignores the clear and unambiguous language of the statute.

The Armed Services Board of Contract Appeals has reviewed A&E contracts that combined design services with other services. The board found that:

> Appellant's fee for what the Government refers to as the direct design services was subject to the six percent fee limitation set forth in 10 U.S.C. § 7212. As implemented further by DAR 18-305 pertaining to negotiation of A/E contracts, appellant's fee was restricted to six percent of the estimated construction costs of the project to which the A/E's services apply; however, to the extent that the A/E's contract ". . . also covers any type services other than the preparation of designs, plans, drawings and specifications, [i.e., the so-called "direct design services]" that part of the contract

> price for such other services was not be subject to the six percent limitation. We note that the scope of work contained in Amendment No. 8 included not only direct design services subject to the six percent fee limitation but also engineering services such as field work and special studies which were not.

Appeal of O'Neal Engineering, Inc., ASBCA No. 32013, 86 BCA ¶ 19,114 (emphasis supplied).

Several Federal agencies have supplemented the FAR concerning the application of 41 U.S.C. § 254(b) to A&E contracts that include design services with other requirements.[8/] The Department of Defense's FAR Supplement states that:

> The six percent limit applies only to that portion of the contract (or modification) price attributable to the preparation of designs, plans, drawings, and specifications. If a contract or modification also includes other services, the part of the price attributable to the other services is not subject to the six percent limit.

48 C.F.R. § 236.606; App. 74.

The Army Corps of Engineers FAR supplement lists fourteen types of services that may be included in an A&E contract subject to the statute, and which "may be excluded from the A-E fee when determining compliance with [the fee limitation]." App. 75. Similarly, the Department of Veterans Affairs procurement regulation lists numerous services that may be included in an A&E contract, but which are not subject to the fee limitation. These include preparation of estimates, feasibility studies, and

---

8/ Commerce has not addressed the application of 41 U.S.C. § 254(b) in its procurement regulations.

supervision and inspection of construction. 48 C.F.R. § 836.606-73; App. 76.

Thus, there is no support for Fluor's theory that the statutory fee limitation of 41 U.S.C. § 254(b) should be limited to a narrow range of A&E contracts that are primarily or exclusively for site-specific design. However, because of the clear and unambiguous language of the statute, there is considerable support that the six percent limitation upon fees for A&E services applies to contracts that include a wide range of A&E construction-related services similar to the contract awarded to Fluor that is the subject of this dispute.

III. The Contracting Officer's Determination Of Fluor's Liability To The Government Is Not An Appropriate Issue For Summary Judgment

Fluor contends that, even if the Court determines that 41 U.S.C. § 254(b) is applicable to the contract, Fluor is entitled to summary judgment because the contracting officer's calculation of the amount Fluor allegedly owes the Government is flawed and that its fees were within the six percent limitation. Brief 28-33. Fluor argues that it is entitled to summary judgment upon the grounds that "the costs alleged by the contracting officer to be A&E costs subject to the six percent limitation are within that limitation using the full estimate of project costs set forth in the 1992 Facilities Budget." Brief 33. Obviously, the Government disagrees.

In its proposed findings of uncontroverted fact, Fluor

stated that: "The contracting officer's final decision included, in the estimated cost of the project, only a portion of the WFOs contemplated by the contract." PPFUF No. 11. In its response to that proposed finding of fact, the Government specifically stated that it disagrees "with the proposed finding upon the ground that it is inaccurate. The contracting officer's final decision addressed the costs of all Weather Forecast Offices for which plaintiff, pursuant to the contract, performed A&E services that were subject to the six percent limitation upon fees, inclusive of costs, imposed by 41 U.S.C. § 254(b). DRPPFUF No. 11.

For these reasons, a genuine issue of material fact exists as to the contracting officer's determination of quantum. The Government's cross-motion for summary judgment has been limited to the issue of whether 41 U.S.C. § 254(b) applies to the site specific design services that Fluor provided pursuant to the contract requirement. "Issues of statutory interpretation and other matters of law may be decided on motion for summary judgment. However, summary disposition of questions of contractual intent, <u>if reasonably disputed, requires that all justifiable factual inferences are drawn in favor of the non-movant</u>." <u>Santa Fe Pacific Railroad Co. v. United States</u>, 294 F.3d 1336, 1340 (Fed. Cir. 2002) (emphasis supplied). This Court has previously held:

> When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>,

> 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed.2d 538 (1986). If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. As indicated above, any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. Id.; see also Litton Industrial Products, Inc. v. Solid State Systems Corp., 755 F.2d 158, 163 (Fed. Cir.1985); H.F. Allen Orchards v. United States, 749 F.2d 1571, 1574 (Fed. Cir.1984), cert. denied, 474 U.S. 818, 106 S. Ct. 64, 88 L. Ed.2d 52 (1985).

Composite Laminates, Inc. v. United States, 27 Fed. Cl. 310, 315 (1992) (emphasis supplied).

We have established in our cross-motion that there is no genuine issue of material fact concerning the applicability of the six percent fee limitation imposed by 41 U.S.C. § 254(b) upon A&E services. The applicability of that statute is simply a question of statutory interpretation "which may be decided on motion for summary judgment." Santa Fe Pacific Railroad, 294 F.3d at 1340. However, should the Court find that 41 U.S.C. § 254(b) is applicable to the contract, taking into consideration Fluor's allegations concerning quantum, a review of the contracting officer's final decision, App. 8-40, her declaration, App 1-7., and the Government's response to plaintiff's proposed finding of uncontroverted fact no. 11, reveals a serious disagreement between the parties concerning how much Fluor was overpaid. Consequently, Fluor has failed to meet its burden of showing the Court that there is an absence of evidence that the

contracting officer miscalculated the six percent fee to which Fluor was entitled. The Government, on the other hand, as the non-moving party, has produced more than sufficient evidence of disagreement so that Fluor's motion for summary judgment upon the quantum should be denied. Big Chief Drilling Company v. United States, 15 Cl. Ct. 295, 300 (1988). As this Court has been previously stated:

> Summary judgment in the instant manner could be denied based on the existence of one of the above genuine issues of material fact. The absence of consensus on all the factual issues discussed above, bolsters this court's conclusion that summary judgment is inappropriate in this case . . . .

Id. at 304. Accordingly, summary judgment upon the issue of quantum is inappropriate at this time.[9/]

CONCLUSION

"A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." Perrin v. United States, 444 U.S. 37, 42 (1979). Taking the ordinary, contemporary, and common meaning of the words contained in 41 U.S.C. § 254(b), no genuine issue of material fact exists that the six percent limitation imposed by that statute upon fees for A&E services was applicable to the site-specific architectural

[9/] If the court deems it necessary, defendant reserves the right to produce further evidence to establish that a genuine issue of material fact exists concerning quantum.

and engineering services that Fluor provided pursuant to contract requirement 2.3. Further, we have established that a genuine issue of material fact exists as to Fluor's liability to the Government for overpayments it received for the services covered by the statute. Accordingly, defendant respectfully requests that the Court grant defendant summary judgment upon the issue of the applicability of 41 U.S.C. § 254(b), and deny Fluor's motion for summary judgment in its entirety.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Donald E. Kinner
DONALD E. KINNER
Assistant Director

s/Steven J. Abelson
STEVEN J. ABELSON
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tele: (202) 514-4325

Attorneys for Defendant

OF COUNSEL:

FRED KOPATICH
Attorney
Office of the General Counsel
Department of Commerce
14th & Constitution Ave, N.W.
Room 5893
Washington, D.C. 20230

April 12, 2004

CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2004, the foregoing "DEFENDANT'S OPPOSITION TO PLAINTIFFS MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Steven J. Abelson

# INDEX FOR APPENDIX


| DOCUMENT | PAGE(S) |
| --- | --- |
| Declaration of Donita McCullough Dated, April 7, 2004 | 1 |
| Contracting Officer's Final Decision Dated April 13, 1999 | 8 |
| Excerpts From Contract No. 50WCNA606099, Dated May 30, 1987 | 41 |
| Program Review Transmittal From Fluor Technology, Inc., Dated May 13, 1988 | 53 |
| E-Mail, Ron Anielak To Fluor, Dated May 24, 1990 | 57 |
| Minutes of June 12, 1990 Meeting | 59 |
| Task Order No. 6 Pricing Memorandum, Dated October 3, 1990 | 62 |
| E-Mail From Terry L. Sonderup, Dated August 15, 1991 | 65 |
| Position Paper Of Fluor Daniel, Inc. In Response to OIG's Final Audit Dated, June 21, 1993 | 66 |
| DFARS § 236.606-70, Statutory Fee Limitation | 74 |
| EFARS § 36.606-70, Statutory Fee Limitation | 75 |
| DVA FAR Supp § 836.606-73, Application Of 6-Percent Architect-Engineer Limitation | 76 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FLUOR ENTERPRISES, INC.<br>f/k/a FLUOR DANIEL, INC.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 00-207<br>(Judge Block) |

**DECLARATION OF CONTRACTING OFFICER DONITA McCULLOUGH**

I, Donita McCullough, do hereby declare under penalty of perjury that:

1. I have personal knowledge of the facts stated herein as a result of having acted as the Contracting Officer for Contract No. 50WCNA606099, having reviewed relevant documents related to the Contract, and issuing a final decision seeking repayment of fees from the Plaintiff for architectural and engineering services that exceeded the limitation on such fees at 41 U.S.C. § 254(b).

2. I am a Contracting Officer with the National Oceanic and Atmospheric Administration at the Central Administrative Support Center in Kansas City, Missouri. I have an unlimited warrant.

3. The National Oceanic and Atmospheric Administration (NOAA) is an agency of the United States Department of Commerce. The National Weather Service operates under NOAA.

4. I became the Government's Contracting Officer for Contract No. 50WCNA606099 (the Contract) in 1990, and have continued in that capacity to the

present. The first Contracting Officer assigned to the Contract, Jesus Arredondo, is deceased.

5. In the mid-1980s, NOAA undertook a program to restructure and modernize the National Weather Service and to apply new technologies for observing atmospheric conditions and processing weather information. Among the new technologies that the Weather Service planned to utilize was the next generation weather radar (NEXRAD), with radar sites to be constructed throughout the United States.

6. As part of the modernization program, the National Weather Service began a consolidation of its existing 249 weather offices into approximately 116 Weather Forecast Offices (WFOs), to be located near the planned NEXRAD sites.

7. In 1986, NOAA initiated a procurement for architectural and engineering services in accordance with Federal Acquisition Regulation ("FAR") Part 36 to obtain a contractor to provide architectural design, project management, and construction management services for the WFO construction project.

8. NOAA's Architect-Engineer Selection Board ranked firms submitting qualifications statements, and, after price negotiations, Fluor Technology, Inc. ("Fluor") which later became Fluor Daniel, Inc., and is now Fluor Enterprises, Inc.) was selected for award. On July 29, 1986, NOAA issued a letter contract to Fluor, which allowed Fluor to commence work on the project.

9. On May 30, 1987, the letter contract was definitized with a base period to September 30, 1987, with the Government having the right to exercise options, all of which were exercised, for four subsequent years. The contract was later extended through

October 1992.

10. The Contract's Statement of Work separated the support services to be provided by Fluor into the following categories:

a. Program and project management and planning (Requirement 2.1);

b. General architectural and engineering ("A&E") services (Requirement 2.2);

c. WFO site-specific A&E services (Requirement 2.3); and

d. Construction management and inspection (Requirement 2.4).

11. Under the Contract, NOAA ordered work through the issuance of task orders. During the period of the Contract, NOAA issued Fluor a total of eight task orders, each of which identified those WFO sites for which site-specific A&E services under Contract Requirement 2.3 were to be provided during the task period, as well as the other A&E tasks to be performed for each WFO site.

12. Each task order required Fluor, in accordance with Requirement 2.1 of the contract, to initially develop construction cost estimates for each WFO site. These estimates were to be the basis for project planning, and established the estimated cost of construction for application of the six percent fee limitation of 41 U.S.C. § 254(b). Site-specific design work did not begin prior to the development of Fluor's WFO cost estimates.

13. WFO site-specific A&E services were a significant part of the Contract. Under the Contract, Fluor was paid a total of $42,531,626. Of that total amount, I determined that Fluor was paid $5,551,549 for WFO site-specific A&E services that were subject to

3

the statutory six percent limitation.

14. During the time that I was the Contracting Officer for the Contract, Fluor consistently indicated that it understood that the six percent fee limitation on site-specific A&E services applied to the Contract. In cost analysis documents submitted to NOAA, Fluor tracked A&E labor costs by WFO site, and tracked whether site-specific A&E costs were within six percent of the estimated cost of construction of the sites.

15. In 1990, I took part in discussions between NOAA and Fluor concerning work to be performed during the fourth option year of the contract (fiscal year 1991). During the discussions in which I participated, representatives of Fluor and NOAA discussed the application of the six percent fee limitation on site-specific A&E services. Fluor's representatives expressed their understanding that the six percent fee limitation applied to the Contract.

16. On June 12, 1990, I attended a meeting with Fluor's representatives where the statutory fee limitation was discussed. At that meeting, Fluor's project manager distributed a document entitled "Price & Profit Limitations," that set out Fluor's understanding that the fee limitation of 41 U.S.C. § 254(b) applied to the Contract. The document detailed those site-specific A&E design tasks that Fluor believed were subject to the six percent limitation. (No subsequent contract modification was executed that incorporated Fluor's listing of design tasks that were subject to the fee limitation.)

17. Throughout the course of the contract, NOAA accepted and paid invoices for A&E services that were submitted by Fluor.

18. At the conclusion of the fourth option year, construction of all of the WFOs under

4

the Weather Service modernization program was not completed under the Contract No. 50WCNA606099. Therefore, NOAA awarded an interim bridge contract to Fluor that covered project work for the period November 1992 to December 31, 1993. A final contract completing the construction program was subsequently awarded to Fluor with an effective date of January 1, 1994.

19. In accordance with regulations, the Commerce Department's Inspector General (IG) commenced a cost-incurred audit of the Contract as it was nearing its conclusion. In March 1993, the IG issued an interim audit report covering all services provided under Task Orders 1 to 7 of the Contract, which were all services provided through April 30, 1992. The IG questioned a total of $7,171,743 in costs paid to Fluor of which $6,987,219 was for A&E fees the Government paid Fluor in excess of the statutory maximum allowed by 41 U.S.C. § 254(b). The interim audit also questioned payment of $184,524 in miscellaneous unallowable costs.

20. A copy of the interim audit report was furnished to Fluor. In June, 1993, Fluor's project manager submitted to me a response to the audit findings, entitled "Position Paper," in which Fluor acknowledged that the six percent statutory limitation on A&E fees established by 41 U.S.C. § 254(b) applied to the Contract. Fluor also asserted that it had tracked its compliance with the statute throughout the course of the Contract, and it believed that site-specific A&E fees had not exceeded six percent of the WFOs' estimated cost of construction.

5

21. On March 21, 1995, the IG issued his final audit report, covering the entire contract period, including Task Order 8, in which he determined that the site-specific A&E fees Fluor had been paid exceeded the statutory fee limitation of 41 U.S.C. § 254(b) in the amount of $4,581,798. In the final report, the IG made a number of adjustments to his 1993 interim audit of A&E fees, such as excluding program administration costs and site-specific conceptual design services from the definition of design costs subject to the statutory limitation. The IG also questioned miscellaneous unallowable costs in the amount of $245,062, relating to salaries, subcontract costs, travel costs and indirect costs.

22. After issuance of the final IG audit, I communicated with Fluor's contract representatives to identify the site-specific A&E costs for each WFO. I reviewed extensive amounts of documentation provided by Fluor and had a lengthy series of communications with Fluor concerning the issues raised in the IG audit report.

23. The negotiations between Fluor and the Government reached an impasse in January 1999. Consequently, on April 13, 1999, I issued my final decision in which a demand was made upon Fluor to repay the Government $2,774,072. Of the amount demanded:

a. $2,560,413 was for site-specific A&E fees that were paid to Fluor in excess of the six percent limitation that is allowed by 41 U.S.C. § 254(b) upon such fees; and

b. $213,695 was for unallowable costs that the Government paid including duplicative labor charges, excess subcontractor costs, and unallowable

6

overhead and indirect costs.

24. In my final decision asserting a Government claim against Fluor, I applied the statutory limitation on A&E fees under 41 U.S.C. § 254(b) only to Fluor's WFO site-specific A&E services (Requirement 2.3).

25. Fluor filed its Complaint in the Court of Federal Claims almost one year later, on April 11, 2000.

I, Donita McCullough, pursuant to 28 U.S.C § 1746, declare that the above statements are true and correct to the best of my knowledge.

Donita McCullough

Donita McCullough

Executed on 04/07/2004

**National Oceanic and Atmospheric Administration,**
Host Agency serving:
Economic Development Administration
International Trade Administration
Minority Business Development Agency
Office of Export Enforcement
Office of the Inspector General

**U.S. DEPARTMENT OF COMMERCE**
**Central Administrative Support Center**
Federal Building, Room 1736
601 East 12th Street
Kansas City, Missouri 64106

7

CERTIFIED - RETURN
RECEIPT REQUESTED
P119312807

April 13, 1999

Fluor Daniel, Incorporated
Attention: Marc Cisneros
3353 Michelson Drive
Irvine, California 92698

Dear Mr. Cisneros:

This letter constitutes the final decision of the Contracting Officer making demand upon Fluor Daniel, Inc. and seeking repayment of $2,774,072 under Contract No. 50WCNW606099.

Background

On July 29, 1986, Letter Contract No. 50WCNA606099 was issued by the Central Administrative Service Center of the National Oceanic and Atmospheric Administration (NOAA) to Fluor Daniel, Incorporated (FDI). The contract was subsequently definitized on May 30, 1987. Under the contract, FDI was to provide a wide range of services in support of NOAA's Weather Forecast Office (WFO) modernization program, including overall program management and planning, general and site specific architecture and engineering services, and construction management and inspection. The contract was later modified to include NEXRAD program construction and real property acquisition. In July, 1992, NOAA entered into a separate contract to continue the NEXRAD support functions. The FDI contract was a cost-plus-fixed-fee contract, with work assigned through the issuance of periodic task orders by the Contracting Officer. The base period of the contract extended through September 30, 1987, and provided for four subsequent option years, all of which were exercised. The contract was later extended through October, 1992.

Responsibility was thereafter transferred to NOAA's Program, Grants and Administrative Service Center to negotiate and administer follow-on contracts for completion of the WFO modernization program. FDI was awarded the contracts to continue program management, design and other functions in support of the program. An interim bridge contract covered the period November, 1992 to December 31, 1993, and a follow-on contract was executed, effective January 1, 1994. This final decision relates solely to a Government claim under the first WFO contract with FDI.

Prior to entering the 1986 contract, the parties did not negotiate a separate fee for architectural and engineering design and did not address,

in the contract documents, the statutory limitation on such fees set out at 41 U.S.C. 254(b). FDI, in fact, informed the Contracting Officer that there was no statutory or regulatory limitation that specifically applied to architectural/engineering services. Throughout the term of the contract, design services were ordered through task orders without reference to the statutory limitation on the fees payable for the services. In June, 1990, FDI and NOAA representatives discussed the statutory limitation on design fees, and agreed orally concerning which design tasks would be subject to the fee limitation. This agreement was not formally incorporated into the contract, however, and NOAA did not independently determine if the statutory limit on design fees had been exceeded during the contract.

In March, 1993, the Office of the Inspector General of the Department of Commerce issued an interim cost incurred audit of the 1986 contract covering the period through completion of Task Order 7 (April 30, 1992). The IG questioned $7,171,743 in costs paid to FDI. A copy of the audit report was furnished to FDI shortly after it was issued. In June, 1993, FDI submitted its response, termed a "Position Paper," which questioned the audit report's findings.

On March 21, 1995, the Inspector General issued its final audit report. In its final report, the Inspector General questioned engineering design costs incurred in excess of the statutory fee limitation in the amount of $4,581,798; in addition, costs in the amount of $245,062 were questioned relating to salaries, subcontract costs, travel costs and indirect costs. In the final report, the Inspector General made a number of adjustments to its interim audit, including excluding program administration costs and site-specific conceptual design services from the definition of design costs subject to the statutory limitation.

Upon issuance of the final audit report, I undertook an extensive effort to work with FDI to validate the various numbers used by the Inspector General, and to address many of FDI's concerns about the numbers and methodology used by the IG.

Following my communications with FDI, I provided my analysis to FDI on October 5, 1995. In that analysis, I provided FDI with my estimate that payments for design services exceeding the fee limitation in 41 U.S.C. 254(b) totaled $3,802,078, and that additional unallowable costs were paid under the contract in the amount of $258,559. In my letter, I invited FDI to submit a settlement proposal in response to my analysis of contract overpayments.

On January 12, 1996, FDI submitted a settlement offer, in which it offered to pay $299,621 for excess design fees and $203,379 for other unallowable costs. I then undertook to review the evidence relating to the design fee overpayment in order to respond to the settlement offer. On October 2, 1996, I wrote to FDI. In the letter, I accepted FDI's offer to settle the matter of overpayment of miscellaneous costs in the amount of $203,379. I rejected FDI's offer to settle the design fee overpayment, but, for purposes of settlement, I offered to reduce my figure to $1,689,199. For purposes of settlement, I offered to eliminate certain design costs from the design fee computation. In addition, I offered to include leased sites in the computation, although a minimum amount of design work was performed for these sites, the lessor acquired and managed the construction, and inclusion of the sites heavily skewed the design fee computation in FDI's favor.

On July 8, 1998, FDI wrote to me proposing an alternate method of determining the estimated cost of construction for the lease sites. However, I have determined that if leased sites would be included in the design fee computation, my figures for the estimated cost of construction are the correct ones, and, in fact, are figures used by FDI during the course of the contract.

On January 12, 1999, counsel for the Department of Commerce and I met with FDI representatives and their counsel to discuss settlement. I inquired at the outset of the meeting whether the parties had effected settlement of the miscellaneous costs issue in the amount of $203,379. FDI's representatives responded that there was no further need to discuss the issue, and it was not discussed. FDI, however, has not yet provided payment of the settlement amount. Therefore, I reviewed the questioned costs and adjusted my calculations appropriately to reflect the approved, audited final indirect costs rates. This final decision includes my demand for $213,659 for miscellaneous unallowable costs.

At the January 12th meeting, I offered various concessions to FDI in an effort to reach settlement on the design fee issue. No settlement was reached at the meeting, however, and I informed FDI that I would then issue my final decision and demand for repayment of excess costs.

Government Claims

*Miscellaneous Unallowable Costs*

It is my determination that $213,659 in unallowable costs (apart from costs for design services) was paid to FDI under contract No. 50WCNW606099. These unallowable costs include the following:

| | |
|---|---|
| $23,385 | Unallocable and duplicative direct labor charges |
| $146,584 | Excess costs paid for subcontracts and business travel expenses |
| $29,015 | Overhead costs |
| $14,675 | Indirect costs |

A detailed summary and explanation of the unallowable costs is included in Appendix I, which is attached to and incorporated in this final decision.

*Excess Design Fees*

It is my determination that FDI was paid $2,560,413 under Contract No. 50WCNW606099 in excess of the statutory limitation on design fees in 41 U.S.C.254(b).

41 U.S.C.254(b) provides:

> **b) Barred contracts; fee limitation; determination of use; advance notification.**
>
> * * *
>
> **[A] fee inclusive of the contractor's costs and not in excess of 6 per centum of the estimated cost, exclusive of fees, as determined by the agency head at the time of entering into the contract, of the project to which such fee is applicable is authorized in contracts for architectural or engineering services relating to any public works or utility project.**

FAR 15.903, in effect at the time of the FDI contract, states, in part:

> **15.903 Contracting officer responsibilities**
>
> * * *
>
> (d)(1) The contracting officer shall not negotiate a price or fee that exceeds the following statutory limitations, imposed by 10 U.S.C. 2306(d)and 41 U.S.C. 254(b):
>
> * * *
>
> (ii) For architect-engineering services for public works or utilities, the contract price or the estimated cost and fee for production and delivery of designs, plans, drawings, and specifications shall not exceed 6 percent of the estimated cost of construction of the public work or utility, excluding fees.

The statute applies to all contracts which involve design work, whether paid on a fixed price or cost reimbursement basis. *To the Administrator, General Services Administration*, GAO No. B-152306, 46 Comp. Gen. 573 (1966). In referring to a "fee" for architectural and engineering services, the statute means the total compensation, including profit, which may be paid for such services. *To the Administrator, Veterans Administration*, GAO No. B-152306, 46 Comp. Gen. 183, 189 (1966).

FDI, as an experienced professional firm, should have known of the statutory prohibition against design costs exceeding 6% of the estimated cost of construction and should have had an accounting system in place to accurately track design costs to ensure there was no statutory violation. FDI, however, informed the Contracting Officer at the time of the execution of the contract that 41 U.S.C.254(b) did not apply. It appears that neither NOAA nor FDI fully understood how the statute would apply; however, during performance of the contract, the parties became aware of the statute and its applicability to this contract. FDI failed to take action to adequately and consistently track costs to ensure and substantiate compliance with the statute. Any discussions between the parties concerning how the statute would apply were never incorporated into a contract modification.

FDI has raised the issue whether it is proper to evaluate if 41 U.S.C. 254(b) was violated when the parties did not specifically negotiate at the outset of the contract what services would be included in the design fee calculation. The statute, however, places an absolute limitation on payment of fees to 6% of the estimated cost of construction. Relevant cases interpreting the statute and determining whether a violation have occurred have invariably looked to total design costs paid over the course of a contract, without regard to any negotiations of the parties. *See, e.g., Rosenblum & Associates Architects, Inc.*, GSBCA No. 5835, 81-1 BCA 15,131 ("Although no [A/E] fee amount was negotiated for Proposal Request #2, such fee could not legally have exceeded the statutory limit of 6% of the estimated construction award of $56,440, or $3,386.40."); *To the Administrator, Veterans Administration*, GAO No. B-152306, 1967 WL 2259 (Jan. 24, 1967).

Moreover, the Comptroller General was asked by the Department of Commerce Inspector General to provide an opinion relating to application of the design fee limitation to Contract No. 50WCNW606099. In its opinion, GAO noted that "NOAA did not include in the contract with Fluor Daniel the 6-percent design fee limitation...Instead, Fluor Daniel charged NOAA all costs it incurred in connection with the contract without regard to the...limitation." Nevertheless, GAO found that NOAA's determination, after

the close of the contract, that the statute was violated and that excess design costs should be repaid, was proper. *Department of Commerce-Determining Compliance with Statutory Limitation on Architectural and Engineering Design Services*, GAO No. B-258058, 1995 WL 274823 (May 8, 1995).

It is my determination that the total estimated cost of construction of NOAA sites to which the 6% statutory fee limitation applies is $49,852,262. The maximum allowable costs for the production and delivery of designs, plans, drawings, and specifications are therefore $2,991,136. I have determined that NOAA paid FDI $5,551,549 in design costs for services which fall under the definition of architectural or engineering services in 41 U.S.C.254(b). Therefore, NOAA paid to FDI $2,560,413 in excess of the statutory limitation on design fees, and this amount should be repaid to the Government. A detailed summary and explanation of my calculation of the estimated cost of construction and design costs is included in Appendix II, which is attached to and incorporated in this final decision.

I am demanding repayment of $2,774,072 for excess design engineering costs and unallowable and unallocable costs paid under Contract No. 50WCNW606099. Any amounts not paid within thirty (30) days from the date of this demand will bear interest from the date of the demand. The interest rate will be the rate established by the Secretary of the Treasury, for the period affected, under Public Law 92-41.

This is the final decision of the Contracting Officer. You may appeal this decision to the General Services Board of Contract Appeals. If you decide to appeal, you must, within ninety (90) days from the date you receive this decision, mail or otherwise furnish written notice to the General Services Board of Contract Appeals and provide a copy to me, the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision and identify the contract by number. With regard to appeals to the General Services Board of Contract Appeals, you may, solely at your election, proceed under the Board's small claims procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or more. Instead of appealing to the General Services Board of Contract Appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Sincerely,

Donita McCullough

Donita McCullough
Contracting Officer

# SUMMARY OF COSTS AND FEES CLAIMED
# CONTRACTING OFFICER'S CONCLUSIONS
# CONTRACT NUMBER 50WCNA606099

## AUGUST 4, 1986 THROUGH OCTOBER 31, 1992

| | Costs and Fee Claimed | Costs Questioned/ Unallowed | Costs Accepted | Notes |
|---|---|---|---|---|
| Direct Labor | $13,764,060 | $23,385 | $13,740,675 | (a)(b)(c) |
| Other Direct Costs | 10,870,058 | 146,584 | 10,723,474 | (a)(b)(c) |
| Overhead | 10,676,619 | 29,015 | 10,647,604 | (a) |
| Subtotal | $35,310,737 | $198,984 | $35,111,753 | |
| G&A | 3,627,714 | 14,535 | 3,613,179 | (b) |
| Cost of Money (O/H) | 150,128 | 174 | 149,954 | (c) |
| Cost of Money (G&A) | 24,947 | (34) | 24,981 | (c) |
| Total Costs | $39,113,526 | $213,659 | $38,899,867 | |
| Fixed Fee | 3,418,100 | | 3,418,100 | |
| Total Invoices | $42,531,626 | $213,659 | $42,317,967 | (a) |
| Compliance Adjustment | | 2,560,413 | (2,560,413) | APPENDIX II |
| Total | $42,531,626 | $2,774,072 | $39,757,554 | |

[a] The total costs and fee claimed was tabulated from the latest invoice submitted for each task. The following is a list of those invoices (Task Number/Invoice Number/Invoice Date):

| | |
|---|---|
| 1/04-00047841/Apr. 5, 1991 | 5/80-00014586/Jan. 27, 1997 |
| 2/04-00073653/Sept. 20, 1993 | 6/80-00014587/Jan. 27, 1997 |
| 2b/04-00073654/Sept. 20, 1993 | 7/80-00014848/Jan. 28, 1997 |
| 3/80-00009773/Dec. 11, 1995 | 8/80-00014589/Jan. 27, 1997 |
| 4/80-00016964/June 26, 1997 | 8/80-00016966/Jun. 26, 1997 |

NOTES TO SUMMARY OF CONTRACTING OFFICER'S CONCLUSIONS

(a) DIRECT LABOR COSTS

Direct labor costs in the amount of $23,385 for the performance of administrative services for non-NOAA activities ($18,416) and duplicative data entry charges ($4,969) have been disallowed under this contract.

**Unallocable Administrative Labor Costs for Non-NOAA Activities**

Administrative labor costs in the amount of $18,416 relating to non-NOAA activities performed at the Kansas City project office are unallocable.

FDI agreed with the audit findings as evidenced by an electronic mail message dated September 17, 1992 from Jim Wagner to Dwayne Wilson, Jack Toliver and other FDI personnel. The agreement between the OIG and FDI was confirmed in a letter dated September 18, 1994 from the OIG to Dwayne Wilson. FDI identified 1568.7 direct labor hours and $18,416 billed to the NOAA contract in error and agreed to credit the NOAA contract for these charges. To date, a credit has not been issued.

The following table summarizes the computation of unallocable administrative labor costs.

| | Non-NOAA Labor Percentage | Unallocable Labor Cost |
|---|---|---|
| Task Order 4 | 4.592% | $2,494 |
| Task Order 5 | 6.650% | 5,036 |
| Task Order 6 | 5.381% | 6,526 |
| Task Order 7 | 4.318% | 4,360 |
| Total Unallocable Labor | | $18,416 |

**Unallowable Duplicative Costs for Time-sheet Data Entry**

Direct labor costs, in the amount of $4,969, for time-sheet data entry functions that duplicate functions in the overhead cost pool are unallowable.

In its response to the OIG audit, FDI acknowledged "duplicative time-sheet data entry costs" and agreed to credit NOAA "with the questioned direct labor cost, plus appropriate burdens, G&A, and cost of capital." To date a credit has not been issued.

The following table summarizes the computation of unallowable direct labor costs for time-sheet data entry.

| | Calculated Data Entry Hours | Calculated Data Entry Costs |
|---|---|---|
| Task Order 5 | 74.0 | $ 503 |
| Task Order 6 | 370.0 | 2,612 |
| Task Order 7 | 255.0 | 1,854 |
| Total Unallowable Direct Labor | 699.0 | $4,969 |

**Human Resources Activities - Duplicative Costs**

FDI charged labor for performing human resources activities including recruitment, hiring and employee benefits administration as a direct cost to the contract.

The indirect cost (overhead) charged to direct labor includes allocations from the support cost pool and the employee benefits cost pool. The support cost "pool is comprised of costs for project support functions" including: indirect labor and expenses, standards and procedures, recruitment, training, personnel and related payroll burdens and facility costs. Insurance and other benefits administration costs are allocated from the employee benefits pool.

It appears that FDI charged human resources activities as both direct and indirect costs to the contract, thereby duplicating costs. However, FDI's explanation provided in letters to the Contracting Officer, dated March 3, 1995 and March 30, 1995, along with information provided by Howard Dameron, DCAA, Santa Ana, California, DCAA, is sufficient to forego further discussion on this issue.

(b) OTHER DIRECT COSTS

Other direct costs in the amount of $146,584 for improper indirect cost allocations ($18,614) charged by Gould Evans Architects, other subcontract costs incurred outside the performance period of this contract ($127,133) and excessive travel costs ($837) are questioned or disallowed.

**Gould Evans Architects (GEA) Subcontract**

GEA subcontract costs in the amount of $18,614 are questioned. These questioned costs involve improper indirect cost allocations ($19,465), offset by a credit ($851) for underclaimed direct labor. The computations for the questioned costs are summarized on page 9, EXHIBIT 1.

**Other Subcontracts**

The OIG identified numerous costs incurred, totaling $127,133, for subcontracted services rendered after October 31, 1992. Such services included but were not limited to, title searches, site surveys and moving and storage services.

Contract number 50WCNA606099 was a term, level of effort, cost reimbursement type contract with a definite performance period. FDI had the authority, under this contract, to incur expenditures for a specified level of effort through October 31, 1992. It did not have the authority to commit to providing services or incur charges for services beyond that date. Therefore, subcontract charges in the amount of $127,133, for services performed after October 31, 1992, are unallowable.

A complete list of subcontract costs disallowed is provided on page 10, EXHIBIT 2.

**Unallowable Travel Charges**

FDI was reimbursed for excessive travel expenses totaling $837.00. The amount claimed for lodging costs, meals, and incidental expense (per diem) on four expense reports billed on invoice number 04-00067208 are in excess of what is allowed.

On expense report number I309682, the traveler (Scott) claimed an extra day's per diem. On expense report number I309616 the traveler (Blackard) claimed an extra nights lodging. On expense report number (s) I314141 and I314112, the travelers (Pond and Baird) claimed lodging costs in excess of that stated on the travel itinerary.

The following table summarizes the questioned travel costs.

| Report Number | Traveler | Claimed Per Diem | Authorized Per Diem | Questioned Costs |
|---|---|---|---|---|
| I309682 | Scott, Tim | $ 179.60 | $ 119.60 | $ 82 |
| I309616 | Blackard, Chas | 264.20 | 252.80 | 69 |
| I314141 | Pond, Duane | 1,715.00 | 1,372.00 | 343 |
| I314112 | Baird, George | 1,715.00 | 1,372.00 | 343 |
| Total Questioned Travel Costs | | | | $837 |

## (c) INDIRECT COST CHARGES

FDI indirect costs include, overhead, general and administrative expenses (G&A) and facilities capital cost of money charges. Weighted average indirect costs rates, were used to compute allowable indirect cost charges. The weighted average indirect cost rates are provided on page 11, EXHIBIT 3.

The total indirect cost charges questioned is $43,961. This includes $29,015 for overhead; $14,535 for G&A expense; and $411 facilities capital cost of money charges.

## Overhead Costs

Overhead costs on direct labor was computed by applying the weighted average rates to labor costs. The overhead costs claimed were $29,015 more than the allowable overhead costs for the contract period.

The following table summarizes the computation of overhead costs.

| | Paid/Claimed Overhead | Direct Labor Accepted | Weighted Average | Accepted Overhead | Questioned Overhead |
|---|---|---|---|---|---|
| Task Order 1 | | | | | |
| Irvine | $76,655 | $86,226 | 0.8890 | $76,655 | $0 |
| Task Order 2 | | | | | |
| Irvine | 275,741 | 289,223 | 0.9511 | 275,080 | 661 |
| Kansas City | 186,052 | 272,284 | 0.6778 | 184,554 | 1,498 |
| Task Order 3 | | | | | |
| Irvine | 603,021 | 552,301 | 1.0730 | 592,619 | 10,402 |
| Kansas City | 695,966 | 872,467 | 0.7817 | 682,007 | 13,959 |
| Task Order 4 | | | | | |
| Irvine | 58,452 | 52,712 | 1.1088 | 58,447 | 5 |
| Kansas City | 1,598,384 | 1,951,242 | 0.8176 | 1,595,335 | 3,049 |
| Task Order 5 | | | | | |
| Irvine | 10,831 | 9,955 | 1.0860 | 10,811 | 20 |
| Kansas City | 1,959,161 | 2,319,842 | 0.8418 | 1,952,843 | 6,318 |
| Task Order 6 | | | | | |
| Irvine | 5,441 | 5,553 | 0.9573 | 5,412 | 29 |
| Kansas City | 2,315,572 | 3,100,989 | 0.7478 | 2,318,920 | (3,348) |
| Task Order 7 | | | | | |
| Irvine | 10,126 | 11,006 | 0.9200 | 10,126 | 0 |
| Kansas City | 1,593,781 | 2,176,997 | 0.7304 | 1,590,079 | 3,702 |
| Task Order 8 | | | | | |
| Irvine | 7,039 | 7,694 | Note 1 | 7,038 | 1 |
| Kansas City | 1,430,906 | 1,977,248 | Note 1 | 1,430,906 | 0 |
| San Juan | 42,931 | 54,836 | Note 1 | 50,213 | (7,282) |
| Total | $10,870,059 | $13,740,675 | | $10,841,044 | $29,015 |

### General and Administrative Expenses

G&A allocated to total direct costs (direct labor, other direct costs and overhead) were computed using the weighted average rates. The G&A expense claimed was 14,535 more than the allowable expense for the contract period.

The following table summarizes the computation of G&A expense.

| | Claimed G & A | Cost Base Accepted | Weighted Average Rate | Accepted G&A | Questioned G & A |
|---|---|---|---|---|---|
| Task Order 1 | $17,714 | $204,434 | 0.0830 | $16,968 | $746 |
| Task Order 2 | $176,254 | $1,616,478 | 0.1071 | $173,125 | $3,129 |
| Task Order 3 | $443,769 | $4,168,843 | 0.1067 | $444,816 | ($1,047) |
| Task Order 4 | $516,085 | $5,269,219 | 0.0972 | $512,168 | $3,917 |
| Task Order 5 | $676,288 | $5,731,267 | 0.1172 | $671,704 | $4,584 |
| Task Order 6 | $764,303 | $7,369,565 | 0.1045 | $770,120 | ($5,817) |
| Task Order 7 | $532,820 | $5,436,626 | 0.0982 | $533,877 | ($1,057) |
| Task Order 8 | $500,481 | $5,302,395 | Note 1 | $490,402 | $10,079 |
| Total | $3,627,714 | $35,098,827 | | $3,613,179 | $14,535 |

### Facilities Capital Cost of Money

Two separate facilities capital cost of money rates were used to compute allowable capital cost of money charges. One rate was applied to the overhead cost base (direct labor) and the other rate was applied to the G&A cost base which is the sum of total direct labor, other direct costs and overhead. The weighted average rates were used to calculate the allowable cost of money charges.

**Overhead Cost Base** - The weighted facilities capital cost of money rate was applied to the total allowed direct labor costs. As a result, the capital cost of money claimed was $174 more than the allowable charge for the contract period.

The following table summarizes the computation of the allowable facilities capital cost of money charges.

| | Claimed Cost of Money | Cost Base Accepted | Weighted Average Rate | Accepted Cost of Money | Questioned Cost of Money |
|---|---|---|---|---|---|
| Task Order 1 | $69 | $86,226 | 0.00080 | $69 | $0 |
| Task Order 2 | $6,503 | $561,507 | 0.01094 | $6,143 | $360 |
| Task Order 3 | $18,608 | $1,424,768 | 0.01289 | $18,365 | $243 |
| Task Order 4 | $23,632 | $2,003,954 | 0.01182 | $23,687 | ($55) |
| Task Order 5 | $33,648 | $2,329,880 | 0.01433 | $33,387 | $261 |
| Task Order 6 | $38,967 | $3,106,684 | 0.01257 | $39,051 | ($84) |
| Task Order 7 | $15,758 | $2,188,003 | 0.00738 | $16,147 | ($389) |
| Task Order 8 | $12,943 | $2,039,777 | | $13,104 | ($161) |
| Total | $150,128 | $13,740,799 | | $149,954 | $174 |

**G&A Cost Base** - The weighted facilities capital cost of money rate was applied to the sum of the allowed direct labor costs, other direct costs and overhead. As a result, the capital cost of money claimed was $34 below the allowable charge for the contract period.

The following table summarizes the computation of the allowable facilities capital cost of money charges.

| | Claimed Cost of Money | Cost Base Accepted | Weighted Average Rate | Accepted Cost of Money | Questioned Cost of Money |
|---|---|---|---|---|---|
| Task Order 1 | $571 | $204,434 | 0.00306 | $626 | ($55) |
| Task Order 2 | $1,852 | $1,616,478 | 0.00126 | $2,037 | ($185) |
| Task Order 3 | $5,364 | $4,168,843 | 0.00127 | $5,294 | $70 |
| Task Order 4 | $5,643 | $5,269,219 | 0.00103 | $5,427 | $216 |
| Task Order 5 | $5,629 | $5,731,267 | 0.00099 | $5,674 | ($45) |
| Task Order 6 | $3,569 | $7,369,565 | 0.00051 | $3,758 | ($189) |
| Task Order 7 | $1,365 | $5,436,626 | 0.00026 | $1,414 | ($49) |
| Task Order 8 | $1,251 | $4,556,782 | 0.00023 | $1,048 | $203 |
| Total | $25,244 | $34,353,214 | | $25,278 | ($34) |

## (d) PROFIT

Each task order had a separate fixed fee that was established at the outset of the task performance period. Payment of the entire amount of fixed fee was contingent upon the expenditure of a specified level of effort within a definite period of time. The total fixed fee is the sum of the total fee billed on each task order.

The following table is a summary of the total fixed fee billed.

| | |
|---|---|
| Task Order # 1 | $ 23,166 |
| Task Order # 2 | 136,834 |
| Task Order # 3 | 370,900 |
| Task Order # 4 | 512,000 |
| Task Order # 5 | 550,000 |
| Task Order # 6 | 796,000 |
| Task Order # 7 | 509,200 |
| Task Order # 8 | 520,000 |
| TOTAL | $3,418,100 |

EXHIBIT 1

Gould Evans Architects
Summary of Indirect Cost Allocations

| | Labor Claimed | Labor Questioned | Labor Accepted | Overhead Claimed | Audited Rate | Overhead Accepted | Overhead Questioned | Total Questioned |
|---|---|---|---|---|---|---|---|---|
| Task Order #1 | | | | | | | | |
| 08/04/86-09/30/86 | | | | | | | | |
| | $ 10,787 | | $ 10,787 | $ 14,679 | 1.351815 | $ 14,582 | $ 97 | $ 97 |
| Task Order #2 | | | | | | | | |
| 10/01/86-12/31/86 | 35,158 | | 35,158 | 47,845 | 1.351815 | 47,527 | 318 | 318 |
| 01/01/87-09/30/87 | 74,155 | (236) | 74,391 | 91,211 | 1.196185 | 88,985 | 2,226 | 1,990 |
| TO #2 Quest. Costs | | | | | | | | $2,308 |
| Task Order #3 | | | | | | | | |
| 10/01/87-12/31/87 | 24,174 | (263) | 24,437 | 29,734 | 1.196185 | 29,231 | 503 | 240 |
| 01/01/88-09/30/88 | 131,206 | 130 | 131,076 | 182,376 | 1.364786 | 178,891 | 3,485 | 3,615 |
| TO #3 Quest.Costs | | | | | | | | $3,855 |
| Task Order #4 | | | | | | | | |
| 10/01/88-12/31/88 | 26,746 | | 26,746 | 37,177 | 1.364786 | 36,503 | 674 | 674 |
| 01/01/89-09/30/89 | 162,994 | (23) | 163,017 | 226,561 | 1.359258 | 221,582 | 4,979 | 4,956 |
| TO #4 Quest. Costs | | | | | | | | $5,630 |
| Task Order #5 | | | | | | | | |
| 10/01/89-12/31/89 | 45,220 | | 45,220 | 62,856 | 1.359258 | 61,466 | 1,390 | 1,390 |
| 01/01/90-09/30/90 | 138,558 | 62 | 138,496 | 190,064 | 1.356628 | 187,888 | 2,176 | 2,238 |
| TO #5 Quest. Costs | | | | | | | | $3,628 |
| Task Order #6 | | | | | | | | |
| 10/01/90-12/31/90 | 50,533 | | 50,533 | 69,318 | 1.356628 | 68,554 | 764 | 764 |
| 01/01/91-09/30/91 | 201,117 | (336) | 201,453 | 279,552 | 1.411459 | 284,343 | (4,791) | (5,127) |
| TO #6 Quest. Costs | | | | | | | | ($4,363) |
| Task Order #7 | | | | | | | | |
| 10/01/91-12/31/91 | 70,671 | | 70,671 | 98,233 | 1.411459 | 99,749 | (1,516) | (1,516) |
| 01/01/92-04/30/92 | 125,064 | (185) | 125,249 | 173,839 | 1.360000 | 170,339 | 3,500 | 3,315 |
| TO #7 Quest. Costs | | | | | | | | $1,799 |
| Task Order #8 | | | | | | | | |
| 05/01/92-10/31/92 | 188,668 | | 188,668 | 262,248 | 1.360000 | 256,588 | 5,660 | 5,660 |
| Totals | 1,285,051 | ($851) | $1,285,902 | $1,765,693 | | $1,746,228 | $19,465 | $18,614 |

EXHIBIT 2

Subcontracts for Services
Performed After October 31, 1992

| Invoice Number | Vendor | Questioned | Vendor Performance Period |
|---|---|---|---|
| 04-00067054 | Carter & Burgess | $ 3,200.00 | 11/01/92 through 11/30/92 |
| | Dowl Engineers | 10,367.50 | Through 11/22/92 |
| | Dowl Engineers | 6,175.00 | Through 11/22/92 |
| | Dowl Engineers | 1,320.00 | Through 11/22/92 |
| | Dowl Engineers | 12,837.50 | Through 11/22/92 |
| | Dowl Engineers | 9,307.50 | Through 11/22/92 |
| | Herbert S. Saffir | 600.00 | 11/16/92 and 12/30/92 |
| | Anthony W. Kast, Inc. | 2,730.00 | Invoice dated 12/18/92 |
| 04-00068349 | Davis Moving & Storage | 2,075.09 | 11/01/92 through 01/07/93 |
| | Dowl Engineers | 6,160.00 | 11/23/92 through 12/22/92 |
| | Herbert S. Saffir | 808.75 | 01/04/93 through 01/05/93 |
| | Hoy Transfer, Inc. | 2,080.00 | 10/06/92 through 01/06/93 |
| | Major Engineering | 1,320.00 | Invoice dated 01/11/93 |
| | Miss. Moving Systems | 91.77 | January 1993 |
| | RLDA | 4,333.50 | Invoice dated 02/02/93 |
| | Simmons Engineering, Inc. | 2,000.00 | Invoice dated 01/05/93 |
| | Twin City Testing | 4,580.00 | Invoice dated 01/14/93 |
| 04-00069142 | Aavon Moving & Storage | 149.64 | 02/01/93 through 03/01/93 |
| | Apple Transportation | 2,972.74 | 12/07/92 through 04/07/93 |
| | Derby Van & Storage | 350.00 | 02/08/93 through 02/12/93 |
| | First American Title Ins. | 2,339.50 | Invoice dated 02/18/93 |
| | Herbert S. Saffir | 1,700.00 | 02/04/93 through 02/17/93 |
| | Hunter Land Surveying | 3,402.50 | Invoice dated 02/16/93 |
| | Miss. Moving Systems | 1,073.35 | 02/03/93 |
| | Shamrock Moving & Stor. | 775.84 | 01/07/93 through 02/26/93 |
| 04-00070008 | Derby Van & Storage | 116.48 | 03/05/93 |
| | Gore Engineering, Inc. | 1,250.00 | Invoice dated 03/29/93 |
| | Jenkins & Associates | 1,897.40 | Invoice dated 03/18/93 |
| | Miss. Moving Systems | 77.41 | January 1993 |
| | Shamrock Moving & Stor. | 680.25 | March 1993 |
| | Trinity Eng. Testing Corp. | 3,042.00 | Invoice dated 01/25/93 |
| 04-00070867 | Aavon Moving & Storage | 163.88 | March 1993 |
| | Dowl Engineers | 3,190.00 | 11/23/92 through 12/22/92 |
| | Dowl Engineers | 1,900.00 | 11/23/92 through 12/22/92 |
| | Dowl Engineers | 1,425.00 | 12/23/92 through 03/25/93 |
| | Dowl Engineers | 1,320.00 | 03/26/93 through 04/25/93 |
| | Dowl Engineers | 3,950.00 | 11/23/92 through 12/22/92 |
| | Dowl Engineers | 2,962.50 | 12/23/92 through 03/25/93 |
| | Executive Relocation | 1,874.18 | 04/07/93 and 05/03/93 |
| | Herbert S. Saffir | 2,400.00 | 03/03/93 through 03/26/93 |
| | John West Engineering | 400.00 | Invoice dated 04/22/93 |
| | RLDA | 481.50 | Invoice dated 04/21/93 |
| | Shamrock Moving & Stor. | 1,417.36 | April 1993 |
| 04-00072516 | Dowl Engineers | 7,272.50 | 12/23/92 through 06/24/93 |
| | Dowl Engineers | 6,667.50 | 11/23/92 through 06/24/93 |
| | Herbert S. Saffir | 1,000.00 | 06/01/93 through 06/25/93 |
| | Rogers Trucking | 895.00 | 04/12/93 through 06/29/93 |
| | Total Questioned | $127,133.14 | |

EXHIBIT 3

Weighted Indirect Cost Rates

| | Irvine Overhead | Field Overhead | G & A | Cost of Cap. (O/H Base) | Cost of Cap. (G & A Base) | |
|---|---|---|---|---|---|---|
| Task Order #1 (a) | 0.8890 | 0.6170 | 0.0830 | 0.00080 | 0.00306 | |
| Task Order #2 (b) | 0.9511 | 0.6778 | 0.1071 | 0.01094 | 0.00126 | |
| Task Order #3 (c) | 1.0730 | 0.7817 | 0.1067 | 0.01289 | 0.00127 | |
| Task Order #4 (d) | 1.1088 | 0.8176 | 0.0972 | 0.01182 | 0.00103 | |
| Task Order #5 (e) | 1.0860 | 0.8418 | 0.1172 | 0.01433 | 0.00099 | |
| Task Order #6 (f) | 0.9573 | 0.7478 | 0.1045 | 0.01257 | 0.00051 | |
| Task Order #7 (g) | 0.9200 | 0.7304 | 0.0982 | 0.00738 | 0.00026 | |
| Task Order #8 (h) | 0.9157 | 0.7289 | 0.0974 | 0.00654 | 0.00023 | FY 1992 |
| | 0.7829 | 0.6005 | 0.0676 | 0.00360 | 0.00023 | FY 1993 |

a. Based on 2 months of FY 1986 final rates.
b. Based on 1 month of FY 1986 final rates and 11 months of FY 1987 final rates.
c. Based on 2 months of FY 1987 final rates and 10 months of FY 1988 final rates.
d. Based on 1 month of FY 1988 final rates and 11 months of FY 1989 final rates.
e. Based on 1 month of FY 1989 final rates and 11 months of FY 1990 final rates.
f. Based on 1 month of FY 1990 final rates and 11 months of FY 1991 final rates.
g. Based on 1 month of FY 1991 final rates and 6 months of FY 1992 final rates.
h. Based on actual rates for FY 1992 and FY 1993.

# SUMMARY OF INCURRED AND QUESTIONED ENGINEERING DESIGN COSTS CONTRACT NUMBER 50WCNA606099

## AUGUST 4, 1986 THROUGH OCTOBER 31, 1992

| | | |
|---|---|---|
| Total Design Cost and Fee | | $5,551,549[a] |
| Estimated Cost of Construction | $49,852,262[b] | |
| Limitation Factor | x 0.06[c] | |
| Maximum Allowable Design Cost | | $2,991,136 |
| Question Design Cost and Fee | | $2,560,413 |

[a] See Appendix II, Pages 2 through 13
[b] See Appendix II, Pages 13 through 14
[c] 41 U.S.C. 254(b) limits engineering design costs plus fee to six percent of the estimated construction costs

24

## REVISED SUMMARY OF DESIGN COSTS
## AUGUST 4, 1986 THROUGH OCTOBER 31, 1992

| | Task Order #2 | Task Order #3 | Task Order #4 | Task Order #5 | Task Order #6 | Task Order #7 | Task Order #8 | TOTALS | NOTES |
|---|---|---|---|---|---|---|---|---|---|
| Direct Design Labor | | | | | | | | | |
| Kansas City | $1,407 | $86,456 | $95,805 | $273,292 | $178,925 | $379,510 | $265,675 | $1,281,070 | (a) |
| Irvine | 11,011 | 198,981 | 0 | 0 | 0 | 0 | 0 | 209,992 | (a) |
| San Juan | 0 | 0 | 0 | 0 | 0 | 0 | 38,486 | 38,486 | (a) |
| Allocated Admin Labor | | | | | | | | | |
| Kansas City | 2,628 | 25,649 | 30,049 | 70,678 | 37,037 | 89,669 | 72,016 | 327,726 | |
| Irvine | 8954 | 48,261 | 0 | 0 | 0 | 0 | 0 | 57,215 | |
| Subtotal - Labor (DL) | $24,000 | $359,347 | $125,854 | $343,970 | $215,962 | $469,179 | $376,177 | $1,914,489 | |
| Overhead | | | | | | | | | |
| Kansas City | 2,735 | 87,632 | 102,898 | 289,554 | 161,496 | 342,688 | 265,667 | 1,252,671 | (c) |
| Irvine | 18,989 | 265,291 | 0 | 0 | 0 | 0 | 0 | 284,279 | (c) |
| San Juan | 0 | 0 | 0 | 0 | 0 | 0 | 35,242 | 35,242 | (c) |
| Gould Evans Design Cost | 3,982 | 115,976 | 69,669 | 56,311 | 101,686 | 245,213 | 290,043 | 882,880 | (d) |
| Other Subcontracts | 0 | 0 | 0 | 0 | 0 | 62,165 | 37,522 | 99,687 | (d) |
| K.C. Office Rent | 321 | 12,806 | 13,149 | 30,156 | 17,737 | 40,616 | 29,761 | 144,546 | (e) |
| Subtotal | $50,027 | $841,052 | $311,570 | $719,991 | $496,881 | $1,159,861 | $1,034,411 | $4,613,794 | |
| General & Administrative | 5,358 | 89,740 | 30,285 | 84,383 | 51,924 | 113,898 | 100,752 | 476,340 | (f) |
| Cost of Capital (OH) | 263 | 4,632 | 1,488 | 4,929 | 2,715 | 3,463 | 2,460 | 19,949 | (f) |
| Cost of Capital (G&A) | 63 | 1,068 | 321 | 713 | 253 | 302 | 238 | 2,958 | (f) |
| Subtotal | $55,710 | $936,493 | $343,663 | $810,016 | $551,774 | $1,277,524 | $1,137,861 | $5,113,040 | |
| Fixed Fee | 4,223 | 74,451 | 30,208 | 68,770 | 53,301 | 108,334 | 99,221 | 438,509 | (g) |
| TOTAL DESIGN COSTS | $59,933 | $1,010,944 | $373,871 | $878,786 | $605,075 | $1,385,858 | $1,237,082 | $5,551,549 | |

## NOTES TO SUMMARY OF DESIGN COSTS INCURRED

### 1.0 NUMERATOR

#### (a) DIRECT DESIGN LABOR

The design window concept was applied to costs tabulated for task orders 3 through 8. EXHIBIT 4, on pages 15 and 16, provides the design window dates for each site subject to the 6% fee limitation. Costs incurred prior to the design start date and after the design completion date are excluded from the computation of design cost.

Task Order #1 - August 1, 1986 through September 30, 1986 and
Task Order #2 - October 1, 1986 through September 30, 1987

The CSSR report included labor costs applicable to effort performed from the inception of the contract, August 4, 1986. The costs were not charged to site specific CLIN codes thereby precluding application of the design window methodology. Information contained in source documents demonstrates that there was no design effort performed prior to April 15, 1987. Therefore, all costs charged to area code 13 prior to April 15, 1987 are excluded from the 6% design fee computation.

In addition, some non site specific design effort such as site surveys, site programming studies, conceptual design, access road design, a foundation study and a soil study at Sterling, Virginia (CLIN BC), were performed during the period April 15, 1987 through September 30, 1987 and charged to area code 13. An adjustment was made to exclude costs for this work from the 6% design fee computation.

The following table summarizes the computation of total direct design labor incurred during the performance of task order 2.

Task Order #2 Direct Design Labor

| | Irvine Labor | | Kansas City Labor | | Total Costs |
|---|---|---|---|---|---|
| | Hours | Costs | Hours | Costs | |
| **Area Code 13** | 2868.0 | $72,773 | 638.0 | $14,649 | $87,422 |
| Exclusions | | | | | |
| Pre-Design (TO #1) | (248.0) | (5,344) | | | (5,344) |
| Pre-Design (TO #2) | (1421.0) | (37,061) | (412.0) | (9,362) | (46,423) |
| Non-Design | (763.0) | (19,357) | (169.0) | (3,880) | (23,237) |
| Task Order #2 Design | 436.0 | $11,011 | 57.0 | $ 1,407 | $12,418 |

Task Order #3 - October 1, 1987 through September 30, 1988

During task order 3, FDI began using site CLIN codes for area code 13 charges, however, usage was infrequent and inconsistent. The design window methodology was applied to area code 13 charges to site specific CLIN codes.

A substantial amount of charges were made to CLIN 00 which is not a specific site identifier. FDI contends that the work charged to CLIN 00 was primarily for conducting studies and performing non site-specific design functions. Information from source documentation supports FDI's explanation in part. Some of the charges to area code 13, CLIN 00 were for the performance of pre-design functions such as site investigations, preparing conceptual designs; utility coordination activities; and for completing other surveys and studies such as the asbestos survey at Jackson, Mississippi (CLIN FC); the fuel storage tank study; and the telecommunication study. However, the reviewed time-sheets revealed that at least some of the costs charged to CLIN 00 were for site specific design and should have been charged to a site CLIN code. Based on information provided in source documentation, a portion of costs charged to area code 13, CLIN 00, are excluded from the 6% design fee computation.

Designs for seven sites were completed in task order 3. Since cost estimating was charged to area code 13, no further adjustment was made for the preparation of cost estimates.

The following table summarizes the computation of total direct design labor incurred during the performance of task order 3.

Task Order #3 Direct Design Labor

| | Irvine Labor | | Kansas City Labor | | Total Costs |
|---|---|---|---|---|---|
| | Hours | Costs | Hours | Costs | |
| Area Code 13 | 18148.0 | $392,709 | 12918.0 | $216,190 | $608,899 |
| Exclusions | | | | | |
| Design Window | | | (1659.0) | (23,197) | (23,197) |
| Non-Design | (8952.3) | (193,728) | (6371.8) | (106,537) | (300,265) |
| Task Order #3 Design | 9195.7 | $198,981 | 4887.2 | $ 86,456 | $285,437 |

Task Order #4 - October 1, 1988 through September 30, 1989

Throughout task order 4, FDI continued to charge all site specific design costs to area code 13. Although use of site CLIN codes was more frequent and consistent than in task order 3, evidence of incorrect charging to CLIN 00 remained. With the exception of those documented exclusions, charges to CLIN 00 are included in the design costs computations.

Designs for seven sites were completed in task order 4. Since cost estimating was charged to area code 13, no further adjustment was made for the preparation of cost estimates.

The following table summarizes the computation of total direct design labor incurred during the performance of task order 4.

Task Order #4 Direct Design Labor

| | Kansas City Labor | |
|---|---|---|
| | Hours | Total Cost |
| **Area Code 13** | 31453.7 | $451,034 |
| Exclusions | | |
| Design Window | (10192.3) | (141,451) |
| Non WFO/Leases | (552.0) | (8,071) |
| Non-Design | (14355.0) | (205,707) |
| Task Order #4 Design | 6354.4 | $ 95,805 |

Task Order #5 - October 1, 1989 through September 30, 1990

Prior to the beginning of task order 5, FDI made changes to the timecard work area charge codes. Area code 13 was no longer used for design effort. New work/cost area codes were established. These new work/cost codes were separated into four major groupings coinciding with the Statement of Work. The new cost areas were labeled "Project Management," "General Design/Engineering," "Site Specific Design/Engineering/Construction," and "JSPO/NEXRAD Program." Time-sheet instructions provided directions for charging work associated with site specific design, and design package submittal coordination and review, to area code(s) 31 and 33 respectively. The instructions also provided for the continued use of the two character facility identifier, CLIN code. Charges to these two area codes were the primary focus of the Contracting Officer's analysis of task orders 5 through 8.

Although definite instructions existed for charging site specific design, engineering, and construction activities to the appropriate area code and specific CLIN codes, a significant amount of hours, were charged CLIN 00.

FDI provided a copy of a revision to the original time-sheet instructions issued September 29, 1989. The revision made significant changes in the accounting for tasks performed, particularly in the Design and Engineering area.

According to the revised instructions, the accounting for work related to "Misc. General Engineering," (area code 20) which was originally grouped under "General Design/Engineering," was changed to "General Engineering," area code 31, CLIN 00 and re-grouped under "Site Specific Design/Engineering/ Construction." It seems illogical to categorize general, non-site specific work under the "Site Specific Design" rather than under the "General Design/Engineering" group. The revision is undated and no clear explanation for the change has been provided. Consequently, there is no basis to exclude all charges to area code 31, CLIN 00, in task order 5, from the design computation. 27

Three site designs were completed in task order 5. The cost for one construction cost estimate for each of the three sites is included in the design computation. The cost is based on the average proposed costs for estimating in task order 5.

The following table summarizes the computation of total direct design labor incurred during the performance of task order 5.

Task Order #5 Direct Design Labor

| | Kansas City Labor | |
|---|---|---|
| | Hours | Total Costs |
| **Area Code 31** | 22154.8 | $378,508 |
| Exclusions | | |
| Design Window | (4430.2) | (74,324) |
| Other Exclusions | (2793.0) | (44,985) |
| **Subtotal Area Code 31** | 14,931.6 | $259,199 |
| **Area Code 33** | 1240.7 | $ 20,836 |
| Exclusions | | |
| Design Window | (602.6) | (10,457) |
| **Subtotal Area Code 33** | 638.1 | $ 10,379 |
| **Estimates** | 189.0 | 3,714 |
| Task Order #5 Design | 15758.7 | $273,292 |

Task Order #6 - October 1, 1990 through September 30, 1991

New time-sheet instructions were published at the beginning of task order 6. Site specific charges to area codes 31 and 33 continued to be the primary focus on the analysis of this task. The number of hours charged to CLIN 00 was significantly less than that in the previous task orders. Source documentation supports the exclusion of some of the CLIN 00 charges to area codes 31 and 33. Adjustments were made to exclude documented charges for prototype design changes.

The designs for three sites were completed during task order 6. The cost for one construction cost estimate for each of the three sites is included in the design computation for task order 6.

28

The following table summarizes the computation of total direct design labor incurred during the performance of task order 6.

Task Order #6 Direct Design Labor

| | Kansas City Labor | |
|---|---|---|
| | Hours | Total Costs |
| **Area Code 31** | 18076.4 | $351,672 |
| Exclusions | | |
| Design Window | (8705.8) | (168,533) |
| Other Exclusions | (1458.0) | (28,390) |
| **Subtotal Area Code 31** | 7912.6 | $154,749 |
| **Area Code 33** | 1887.9 | $ 27,084 |
| Exclusions | | |
| Design Window | (888.5) | (13,151) |
| Other Exclusions | (27.6) | (602) |
| **Subtotal Area Code 33** | 971.8 | $ 13,331 |
| **Estimates** | 219.0 | 10,845 |
| Task Order #6 Design | 9103.4 | $178,925 |

Task Order #7 - October 1, 1991 through April 30, 1992

The system for charging design costs in task order 7 was consistent with that used for task order 6. Accordingly, the same methodology used to reconstruct 6% related design costs in task order 6 was used for task order 7. The cost for four construction cost estimates is included in the computation.

As discussed in the analysis summary, at least some 6% related design costs incurred in task order 7 were incorrectly charged to area code 3A rather than area code 31. In a letter to the OIG dated January 14, 1993, FDI estimated that approximately 41% of the hours charged to area code 3A during January, 1992 through April, 1992 (task order 7) should have been charged to area code 31.

Based on the foregoing, FDI's estimated hours and costs for detailed design, that were incorrectly charged to area code 3A, are included in the computation of design incurred during task order 7.

29

The following table summarizes the computation of total direct design labor incurred during the performance of task order 7.

Task Order #7 Direct Design Labor

| | Kansas City Labor | |
|---|---|---|
| | Hours | Total Costs |
| **Area Code 31** | 15024.0 | $318,056 |
| Exclusions | | |
| Design Window | (133.4) | (2,821) |
| Other Exclusions | (10.0) | (105) |
| **Subtotal Area Code 31** | 14880.6 | $315,130 |
| **Area Code 33** | 2655.1 | $ 39,149 |
| Exclusions | | |
| Design Window | (57.7) | (1,065) |
| Other Exclusions | (4.5) | (160) |
| **Subtotal Area Code 33** | 2592.9 | $ 37,924 |
| **Area Code 3A** | 5880.8 | $124,911 |
| Exclusions | (4906.6) | (104,462) |
| **Subtotal Area Code 3A** | 974.2 | $20,449 |
| **Estimates** | 270.0 | 6,007 |
| Task Order #7 Design | 18717.7 | $379,510 |

Task Order # 8 - May 1, 1992 through October 31, 1992

The same methodology for computing design cost in task order 7 was used to compute the design cost for task order 8. The computation of direct labor for task order 8 includes the estimated hours and costs that were incorrectly charged to area code 3A.

The following table summarizes the computation of total direct design labor incurred during the performance of task order 8.

Task Order #8 Direct Design Labor

| | Kansas City Labor | |
|---|---|---|
| | Hours | Total Costs |
| **Area Code 31** | 7280.8 | $148,117 |
| Exclusions | | |
| Design Window | (155.1) | (3,159) |
| **Subtotal Area Code 31** | 7125.7 | $144,958 |
| **Area Code 33** | 2301.1 | $35,188 |
| Exclusions | | |
| Design Window | (373.1) | (6,599) |
| **Subtotal Area Code 33** | 1928.0 | $28,589 |
| **Area Code 3A** | 8084.9 | $170,160 |
| Exclusions | (5059.8) | (106,560) |
| **Subtotal Area Code 3A** | 3025.1 | 63,600 |
| **Estimates** | 1330.0 | 28,528 |
| **San Juan** | 2340.0 | 38,486 |
| Task Order #8 Design | 15748.8 | $304,161 |

(b) ALLOCATIONS OF ADMINISTRATIVE LABOR

The methodology used by the OIG to compute the administrative labor costs to be apportioned to costs for design services was used in this analysis. The distribution of administrative labor to design costs is based on the relative ratio (administrative ratio) of proposed administrative labor hours to proposed "productive labor" hours for each contract task order. The grouping of proposed hours as administrative or productive is based on information provided to the OIG as a result of its discussions with FDI personnel. "Productive labor" is defined as the difference between total proposed direct labor hours and proposed administrative labor hours. The hourly rate is the average rate for administrative labor based on a composite of the departmental salary rates in the proposals.

31

The following tables illustrate the calculation of administrative labor costs. The first table establishes the administrative ratio by dividing proposed administrative hours by proposed "productive hours." The second table illustrates the calculation of total administrative labor cost applicable to design services. The sum of the design labor hours for the Irvine office and Kansas City office multiplied by the administrative ratio equals the administrative labor hours apportioned to design. Administrative labor hours multiplied by the hourly rate equals the total administrative labor costs included in the 6% design calculation.

| | Total Proposed Direct Labor | Proposed Administrative Hours | Proposed Productive Hours | Administrative Ratio | Hourly Rate |
|---|---|---|---|---|---|
| Task Order #2 | | | | | |
| Kansas City | 11040.0 | 7360.0 | 3680.0 | 2.0000 | $23.05 |
| Irvine | 7075.0 | 3440.0 | 3635.0 | 0.9464 | $21.70 |
| Task Order #3 | 88853.4* | 19063.6* | 69789.8* | 0.2732* | $19.21* |
| Task Order #4 | 118200.0 | 25100.0 | 93100.0 | 0.2696 | $17.54 |
| Task Order #5 | 118590.0 | 23720.0 | 94870.0 | 0.2500 | $17.94 |
| Task Order #6 | 170250.0 | 30450.0 | 139800.0 | 0.2178 | $18.68 |
| Task Order #7 | 111420.0 | 23025.0 | 88395.0 | 0.2605 | $18.39 |
| Task Order #8 | 85399.0 | 20350.0 | 65049.0 | 0.3128 | $17.17 |

* Hours for task order 3 are based on the weighted average ratios from task order 2 and 4 through 8.

| | Design Labor Hours | Total Administrative Ratio | Total Administrative Hours | Hourly Rate | Administrative Labor Cost |
|---|---|---|---|---|---|
| Task Order #2 | | | | | |
| Kansas City | 57.0 | 2.0000 | 114.0 | $23.05 | $ 2,628 |
| Irvine | 436.0 | 0.9464 | 412.6 | $21.70 | 8,954 |
| Task Order #3 | | | | | |
| Kansas City | 4887.2 | 0.2732 | 1335.2 | $19.21 | 25,649 |
| Irvine | 9195.7 | 0.2732 | 2512.3 | $19.21 | 48,261 |
| Task Order #4 | 6354.4 | 0.2696 | 1713.1 | $17.54 | 30,049 |
| Task Order #5 | 15758.7 | 0.2500 | 3939.7 | $17.94 | 70,678 |
| Task Order #6 | 9103.4 | 0.2178 | 1982.7 | $18.68 | 37,037 |
| Task Order #7 | 18717.7 | 0.2605 | 4876.0 | $18.39 | 89,669 |
| Task Order #8 | 13408.8 | 0.3128 | 4194.3 | $17.17 | 72,016 |
| TOTAL | | | | | $384,939 |

32

(c) OVERHEAD ALLOCATED TO DIRECT LABOR

The OIG used weighted average overhead rates. Using the same methodology, the Contracting Officer recalculated the rates using the final audited and approved rates. The following weighted average overhead rates were applied to the sum of direct design labor costs and allocated administrative labor for each task order. (Reference APPENDIX I, page 11, EXHIBIT 3). Rates for the Irvine office were applied to direct labor incurred at the FDI office in San Juan.

| | Irvine Overhead | Field Overhead |
|---|---|---|
| Task Order #2 | 0.9511 | 0.6778 |
| Task Order #3 | 1.0730 | 0.7817 |
| Task Order #4 | 1.1088 | 0.8176 |
| Task Order #5 | 1.0860 | 0.8418 |
| Task Order #6 | 0.9573 | 0.7478 |
| Task Order #7 | 0.9200 | 0.7304 |
| Task Order #8 | 0.91570 | 0.7289 |

(d) SUBCONTRACTS

Design costs for subcontracts were tabulated from documentation included in FDI billings. GEA provided substantial design and engineering support to FDI throughout the entire contract period. A complete analysis of GEA costs was conducted using the timesheets that accompanied most of the GEA invoices and information provided by FDI and GEA.

The total GEA design cost is based on the relative percentage of GEA 6% direct design labor hours plus CADD hours to total GEA direct labor hours plus CADD hours charged to FDI. The total GEA costs billed are adjusted for questioned indirect cost allocations (Reference: APPENDIX I, Note (b), page 3). The total GEA design cost is the result of multiplying the adjusted billed amount by the ratio of design hours to total hours.

As with some FDI design costs in task order(s) 7 and 8, GEA incurred and charged costs for detailed design to a pre-design account as well. Again, referring to FDI's January 14, 1993 letter addressing this issue, FDI estimated GEA design costs that were incorrectly charged to a pre-design account. These costs are included in the GEA direct labor design cost computation.

The following table summarizes GEA design costs included in the 6% design fee calculation.

| | Total Design Labor & CADD Hours | Total Direct Labor Hours | Design Ratio | Adjusted Total Billings | Total GEA Design Cost |
|---|---|---|---|---|---|
| Task Order #2 | 89.5 | 2444.5 | 0.0366 | $108,789 | $ 3,983 |
| Task Order #3 | 3047.9 | 11318.0 | 0.2693 | $430,659 | 115,976 |
| Task Order #4 | 2039.0 | 15639.6 | 0.1304 | $534,271 | 69,669 |
| Task Order #5 | 1572.2 | 13739.0 | 0.1144 | $492,229 | 56,311 |
| Task Order #6 | 2561.9 | 17527.5 | 0.1462 | $695,524 | 101,686 |
| Task Order #7 | 6544.0 | 13653.6 | 0.4793 | $511,606 | 245,213 |
| Task Order #8 | 7708.1 | 13063.5 | 0.5900 | $491,599 | 290,043 |
| TOTAL | | | | | $ 882,880 |

33

A.C. Kirkwood provided design services during task order(s) 7 and 8. The costs included in the 6% design computation for these services was taken from invoices included in the FDI billings.

## (e) ALLOCATIONS OF KANSAS CITY OFFICE RENTAL

Design costs include a portion of Kansas City Office rental. The ratio of total Kansas City direct design labor hours plus allocated administrative labor to the total FDI Kansas City direct labor hours is applied to the total office rent invoiced for each task order. The total office rent multiplied by the design labor percentage yields the appropriate Kansas City office rent applicable to design.

The following table illustrates the computation for the allocation of Kansas City office costs.

| | KC Direct Design Hours | Admin Hours | Total Design Hours | Total Labor Hours | Design Rental Ratio | Total Office Rent | Total Design Rent |
|---|---|---|---|---|---|---|---|
| Task Order #2 | 57.0 | 114.0 | 171.0 | 11029.0 | 0.0155 | $ 20,700 | $ 321 |
| Task Order #3 | 4887.2 | 1335.2 | 6222.4 | 41770.0 | 0.1490 | 85,967 | 12,806 |
| Task Order #4 | 6354.4 | 1713.1 | 8067.5 | 103752.8 | 0.0778 | 169,108 | 13,149 |
| Task Order #5 | 15758.7 | 3939.7 | 19698.4 | 118701.4 | 0.1659 | 181,719 | 30,156 |
| Task Order #6 | 9103.4 | 1982.7 | 11086.1 | 147804.1 | 0.0750 | 236,476 | 17,737 |
| Task Order #7 | 18717.7 | 4876.0 | 23593.7 | 101976.7 | 0.2314 | 175,551 | 40,616 |
| Task Order #8 | 13408.8 | 4194.3 | 17603.1 | 94495.0 | 0.1863 | 159,762 | 29,761 |
| TOTAL | | | | | | | $144,547[d] |

## (f) GENERAL AND ADMINISTRATIVE (G&A)/ CAPITAL COST OF MONEY

The OIG used weighted average G&A and Cost of Capital rates. Using the same methodology, The Contracting Officer recalculated the rates using the final audited and approved rates. The weighted average G&A rate and Cost of Capital/G&A Base rate was applied to the sum of labor, overhead, subcontract and office rental costs. The weighted average rate for Cost of Capital/Overhead Base was applied to labor costs.

The following rates were used to calculate the total design cost. (Reference APPENDIX I, page 11, EXHIBIT 3)

| | G&A | Cost of Capital Overhead Base | Cost of Capital G&A Base |
|---|---|---|---|
| Task Order #2 | 0.1071 | 0.01094 | 0.00126 |
| Task Order #3 | 0.1067 | 0.01289 | 0.00127 |
| Task Order #4 | 0.0972 | 0.01182 | 0.00103 |
| Task Order #5 | 0.1172 | 0.01433 | 0.00099 |
| Task Order #6 | 0.1045 | 0.01257 | 0.00051 |
| Task Order #7 | 0.0982 | 0.00738 | 0.00026 |
| Task Order #8 | 0.0974 | 0.00654 | 0.00023 |

[d] Columns may not sum exactly due to rounding

34

(g) ALLOCATIONS OF FIXED FEES

Using the methodology employed by the OIG, fixed fee is allocated in the same ratios as FDI's fixed fee to total costs billed for each task order. The following table summarizes the calculation of fixed fee allocated to design costs.

| | Total Invoice | Fixed Fee Billed | Total Costs Billed | Fee Ratio | Design Costs | Design Fee |
|---|---|---|---|---|---|---|
| Task Order #2 | $1,942,387 | $136,834 | $1,805,552 | 0.0758 | $ 55,710 | $ 4,223 |
| Task Order #3 | 5,035,705 | 370,900 | 4,664,805 | 0.0795 | 936,493 | 74,451 |
| Task Order #4 | 6,338,322 | 512,000 | 5,826,322 | 0.0879 | 343,663 | 30,208 |
| Task Order #5 | 7,027,171 | 550,000 | 6,477,171 | 0.0849 | 810,016 | 68,770 |
| Task Order #6 | 9,032,834 | 796,000 | 8,236,834 | 0.0966 | 551,774 | 53,301 |
| Task Order #7 | 6,511,807 | 509,200 | 6,002,607 | 0.0848 | 1,277,524 | 108,334 |
| Task Order #8 | 6,481,653 | 520,000 | 5,961,653 | 0.0872 | 1,137,861 | 99,221 |
| TOTAL | | | | | | $438,509[e] |

2.0 DENOMINATOR

Only those sites incurring six percent charges in the numerator are included in the denominator of the 6% fraction. The denominator is the sum of the estimated cost of construction (ECC) of all sites included in the numerator.

The ECC for designs completed in task order(s) 2 through 8 are based on the March 1992 WFO Facilities Budget (exclusive of furniture), provided by FDI and budget estimates relevant to the time the design effort was actually performed. A pro-rated construction estimate was included in the denominator for those designs which started in task order 8 but were completed under the letter contract awarded by the NOAA, PGAS office.

The designs for the following twelve (12) sites were started in task order 8 but were completed under the letter contract.

| CLIN | LOCATION | CLIN | LOCATION |
|---|---|---|---|
| CA | Aberdeen, SD | GS | Midland/Odessa, TX |
| GB | Miami, FL | GW | Paducah, KY |
| GG | Missoula, MT | HE | Pueblo, CO |
| GH | Mobile, AL | HI | Reno, NV |
| GM | Nashville, TN | HY | Springfield, MO |
| GO | San Juan, PR | IQ | Wilmington, NC |

[e] Columns may not sum exactly due to rounding

A weighted facility cost was used to identify the extent of site design effort to be completed under the letter contract. The ratio of the weighted facility cost to the total facility cost less furniture provides the percentage of total design scheduled to be completed under the letter contract. The balance of the design effort is presumed to have been completed under contract 50WCNA606099. The ECC for these twelve sites was determined by multiplying the percentage of design completed by the ECC.

The following tables illustrate the computation of the portion of the ECC included in the denominator of the 6% fraction, for the above twelve sites.

| LOCATION | PGAS WEIGHTED FACILITY COST | ECC | PERCENTAGE OF DESIGN PGAS | TASK ORDER 8 |
|---|---|---|---|---|
| CA-Aberdeen | $ 867,423 | $1,029,400 | 0.8426 | 0.1574 |
| GB-Miami | $3,341,188 | $4,761,500 | 0.7017 | 0.2983 |
| GG-Missoula | $ 790,609 | $1,055,900 | 0.7488 | 0.2512 |
| GH-Mobile | $ 366,114 | $ 964,900 | 0.3794 | 0.6206 |
| GM-Nashville | $ 645,277 | $1,035,700 | 0.6230 | 0.3770 |
| GO-San Juan | $ 565,122 | $1,090,200 | 0.5184 | 0.4816 |
| GS-Midland | $ 772,507 | $ 909,800 | 0.8491 | 0.1509 |
| GW-Paducah | $ 699,989 | $ 974,000 | 0.7187 | 0.2813 |
| HE-Pueblo | $ 373,315 | $1,004,500 | 0.3716 | 0.6284 |
| HI-Reno | $1,570,532 | $1,624,900 | 0.9665 | 0.0335 |
| HY-Springfield | $ 563,324 | $1,121,000 | 0.5025 | 0.4975 |
| IQ-Wilmington | $ 863,743 | $ 916,700 | 0.9422 | 0.0578 |

| LOCATION | ECC | PERCENTAGE OF DESIGN TASK ORDER 8 | TASK ORDER 8 DENOMINATOR |
|---|---|---|---|
| CA-Aberdeen | $1,029,400 | 0.1574 | $ 162,028 |
| GB-Miami | $4,761,500 | 0.2983 | $1,420,355 |
| GG-Missoula | $1,055,900 | 0.2512 | $ 265,242 |
| GH-Mobile | $ 964,900 | 0.6206 | $ 598,817 |
| GM-Nashville | $1,035,700 | 0.3770 | $ 390,459 |
| GO-San Juan | $1,090,200 | 0.4816 | $ 525,040 |
| GS-Midland | $ 909,800 | 0.1509 | $ 137,289 |
| GW-Paducah | $ 974,000 | 0.2813 | $ 273,986 |
| HE-Pueblo | $1,004,500 | 0.6284 | $ 631,429 |
| HI-Reno | $1,624,900 | 0.0335 | $ 54,434 |
| HY-Springfield | $1,121,000 | 0.4975 | $ 557,698 |
| IQ-Wilmington | $ 916,700 | 0.0578 | $ 52,985 |

A list of the sites included in the denominator and the ECC for each site is provided in EXHIBIT 5, pages 17 and 18. Summing the fifty-four (54) whole and partial ECC's yields a denominator of $49,852,262.

**EXHIBIT 4**
Page 2 of 2

Site Specific Design Windows
Task Orders 1 through 8
Contract Number 50WCNA606099

| CLIN | SITE | CONTRACTING OFFICER'S DESIGN WINDOW | SOURCE | SEPTEMBER, 1994 • MASTER SCHEDULE | |
|---|---|---|---|---|---|
| GG | Missoula, MT | 06/29/92 - 10/31/92 | (3) (5) | 10/06/92 - 02/26/93 | ** |
| GH | Mobile, AL | 08/13/92 - 10/31/92 | (2) (3) (5) | 08/24/92 - 12/09/92 | ** |
| GM | Nashville, TN | 09/24/91 - 10/31/92 | (3) (5) | 10/26/92 - 03/05/92 | ** |
| GO | San Juan, PR | 07/24/92 - 10/31/92 | (1) (5) | 07/24/92 - 01/14/93 | ** |
| GP | New York (Brookhaven) | 09/03/91 - 05/29/92 | (1) (3) (4) | 09/03/91 - 04/02/92 | |
| GQ | Norfolk, VA | 01/22/91 - 10/31/92 | (3) (5) | 02/06/92 - 07/30/92 | |
| GS | Midland/Odessa, TX | 09/14/92 - 10/31/92 | (3) (5) | 09/28/92 - 02/05/93 | ** |
| GW | Paducah, KY | 08/27/92 - 10/31/92 | (2) (3) (5) | 09/14/92 - 02/01/93 | ** |
| GY | Philadelphia, PA | 01/23/92 - 09/04/92 | (1) (2) (4) | 01/24/92 - 04/22/92 | |
| HB | Pittsburgh, PA | 11/15/91 - 06/17/92 | (2) (4) | 12/09/91 - 04/24/92 | |
| HD | Portland, ME | 03/02/92 - 10/31/92 | (1) (2) (3) (5) | 03/02/92 - 06/12/92 | |
| HE | Pueblo, CO | 07/27/92 - 10/31/92 | (2) (3) (5) | 08/10/92 - 12/14/92 | ** |
| HI | Reno, NV | 10/08/92 - 10/31/92 | (3) (5) | 10/16/92 - 03/17/93 | ** |
| HO | Austin/San Antonio, TX | 08/19/91 - 10/23/92 | (1) (4) | 08/19/91 - 03/30/92 | |
| HQ | Monterey, CA | 09/23/91 - 09/15/92 | (1) (3) (4) | 09/23/91 - 05/17/92 | |
| HU | Sioux Falls, SD | 09/19/91 - 06/04/92 | (1) (3) (4) | 09/20/91 - 04/15/92 | |
| HV | New Orleans, LA | 03/02/92 - 10/31/92 | (2) (3) (4) | 03/02/92 - 08/18/92 | |
| HY | Springfield, MO | 08/03/92 - 10/31/92 | (2) (3) (5) | 08/17/92 - 01/06/93 | ** |
| IE | Topeka, KS | 07/18/88 - 07/28/89 | (1) (3) (4) | 07/18/88 - 05/18/89 | |
| IP | Wichita, KS | 08/18/89 - 08/29/90 | (3) (4) | 09/12/89 - 06/27/90 | |
| IQ | Wilmington, NC | 09/28/92 - 10/31/92 | (2) (3) (5) | 10/12/92 - 03/01/93 | ** |
| TA | WSTTC | 03/16/89 - 09/07/89 | (3) | Not Listed | |

* Converted to Leased Sites ** Design completed under follow-on contract

SOURCE KEY: (1) - Master Schedule
(2) - Date of Kick-off Letter or Site Requirements Letter
(3) - Monthly Progress Report
(4) - Solicitation Closing Date
(5) - Contract 50WCNA606099 Completion Date

**EXHIBIT 4**
Page 1 of 2

Site Specific Design Windows
Task Orders 1 through 8
Contract Number 50WCNA606099

| CLIN | SITE | CONTRACTING OFFICER'S DESIGN WINDOW | SOURCE | SEPTEMBER, 1994 MASTER SCHEDULE | |
|---|---|---|---|---|---|
| BB | Melbourne, FL | 02/12/88 - 09/13/88 | (1)(3)(4) | 02/12/88 - 07/11/88 | |
| BC | Sterling, VA | 04/14/87 - 08/24/88 | (1)(3)(4) | 05/15/87 - 05/26/88 | |
| BJ | St. Louis, MO | 01/25/88 - 09/28/88 | (1)(3)(4) | 01/25/88 - 07/25/88 | |
| CA | Aberdeen, SD | 08/27/92 - 10/31/92 | (3)(5) | 09/28/92 - 02/24/93 | ** |
| CE | Amarillo, TX | 02/27/88 - 09/15/88 | (3)(4) | 04/13/88 - 07/13/88 | |
| CK | Atlanta, GA | 07/01/92 - 11/05/92 | (1)(3) | 07/01/92 - 11/05/92 | |
| CN | Binghamton, NY | 08/22/89 - 07/26/91 | (3)(4) | 09/13/89 - 05/13/91 | |
| CO | Birmingham, AL | 07/01/91 - 05/15/92 | (2)(4) | 07/15/91 - 12/03/91 | |
| CQ | Boise, ID | 07/15/91 - 03/31/92 | (1)(3)(4) | 07/15/91 - 02/16/92 | |
| CR | Boston, MA | 09/16/91 - 02/24/92 | (1)(3) | 09/18/91 - 02/24/92 | * |
| DD | Cheyenne, WY | 10/23/91 - 05/26/92 | (1)(3)(4) | 10/23/91 - 03/26/92 | |
| DF | Chicago, IL | 04/11/90 - 09/22/90 | (3)(4) | 03/01/89 - 08/08/90 | |
| DG | Cincinnati, OH | 03/11/92 - 09/22/92 | (1)(2)(4) | 03/11/92 - 08/13/92 | |
| DI | Cleveland, OH | 02/21/92 - 09/01/92 | (2)(4) | 02/24/92 - 06/29/92 | |
| DK | Columbia, SC | 04/13/92 - 12/15/92 | (1)(2)(4) | 04/13/92 - 10/16/92 | |
| DR | Des Moines, IA | 05/08/91 - 03/24/92 | (2)(4) | 05/06/91 - 10/08/91 | |
| DS | Detroit, MI | 04/11/90 - 04/08/91 | (1)(3)(4) | 03/16/89 - 09/19/90 | |
| DT | Dodge City, KS | 02/15/88 - 09/19/88 | (1)(3)(4) | 02/15/88 - 06/27/88 | |
| EL | Goodland, KS | 02/28/88 - 09/14/88 | (3)(4) | 03/15/88 - 07/01/88 | |
| EM | Grand Island, NE | 02/17/89 - 08/23/89 | (3)(4) | 02/27/89 - 07/13/89 | |
| EQ | Great Falls MT | 10/14/91 - 04/10/92 | (1)(3) | 10/14/91 - 04/10/92 | * |
| ER | Green Bay, WI | 05/18/92 - 10/31/92 | (1)(2)(3)(5) | 05/18/92 - 10/07/92 | |
| EV | Morehead City, NC | 07/30/90 - 07/28/92 | (1)(3)(4) | 07/30/90 - 08/13/91 | |
| EY | Houston, TX | 01/30/89 - 08/29/89 | (1)(4) | 01/30/89 - 07/08/89 | |
| FB | Indianapolis, IN | 02/17/92 - 06/30/92 | (1)(3)(4) | 02/17/92 - 05/29/92 | |
| FC | Jackson, MS | 11/15/91 - 06/08/92 | (2)(3)(4) | 12/09/91 - 04/02/92 | |
| FH | Kansas City, RFC | 02/28/89 - 12/01/89 | (3)(4) | 03/06/89 - 08/01/89 | |
| FL | Knoxville, TN | 05/04/92 - 09/09/92 | (1)(3) | 05/04/92 - 09/09/92 | |
| FU | Los Angeles, CA | 09/23/91 - 06/25/92 | (1)(3)(4) | 09/23/91 - 03/25/92 | |
| FV | Louisville, KY | 10/02/90 - 04/04/91 | (1)(3)(4) | 10/02/89 - 02/08/91 | |
| GB | Miami, FL | 09/21/92 - 10/31/92 | (2)(5) | 09/21/92 - 01/19/94 | ** |
| GC | Milwaukee, WI | 03/18/88 - 09/16/88 | (1)(3)(4) | 03/18/88 - 07/15/88 | |

EXHIBIT 5
Page 1 of 2

ESTIMATED COST OF CONSTRUCTION (EEC)
DENOMINATOR

| CLIN | LOCATION | PERCENTAGE OF DESIGN COMPLETE | ESTIMATED COST OF CONSTRUCTION | DENOMINATOR |
|---|---|---|---|---|
| BB | Melbourne, FL | 100.00% | $839,200 | $839,200 |
| BC | Sterling, VA | 100.00% | $1,281,400 | $1,281,400 |
| BJ | St. Louis, MO | 100.00% | $909,400 | $909,400 |
| CA | Aberdeen, SD | 15.74% | $1,029,400 | $162,028 |
| CE | Amarillo, TX | 100.00% | $791,900 | $791,900 |
| CK | Atlanta, GA | 100.00% | $2,172,700 | $2,172,700 |
| CN | Binghamton, NY | 100.00% | $802,700 | $802,700 |
| CO | Birmingham, AL | 100.00% | $1,291,000 | $1,291,000 |
| CQ | Boise, ID | 100.00% | $1,076,600 | $1,076,600 |
| CR | Boston, MA | 100.00% | $1,843,000 | $1,843,000 |
| DD | Cheyenne, WY | 100.00% | $1,085,800 | $1,085,800 |
| DF | Chicago, IL | 100.00% | $991,600 | $991,600 |
| DG | Cincinnati, OH | 100.00% | $1,723,600 | $1,723,600 |
| DI | Cleveland, OH | 100.00% | $708,000 | $708,000 |
| DK | Columbia, SC | 100.00% | $486,800 | $486,800 |
| DR | Des Moines, IA | 100.00% | $1,125,600 | $1,125,600 |
| DS | Detroit, MI | 100.00% | $1,158,600 | $1,158,600 |
| DT | Dodge, City, KS | 100.00% | $778,200 | $778,200 |
| EL | Goodland, KS | 100.00% | $823,400 | $823,400 |
| EM | Grand Island, NE | 100.00% | $790,600 | $790,600 |
| EQ | Great Falls, MT | 100 00% | $1,235,000 | $1,235,000 |
| ER | Green Bay, WI | 100.00% | $1,228,300 | $1,228,300 |
| EV | Morehead City, NC | 100.00% | $1,074,200 | $1,074,200 |
| EY | Houston, TX | 100.00% | $681,000 | $681,000 |
| FB | Indianapolis, IN | 100 00% | $1,211,800 | $1,211,800 |
| FC | Jackson, MS | 100.00% | $709,300 | $709,300 |
| FH | Kansas City, RFC, MO | 100.00% | $1,080,900 | $1,080,900 |
| FL | Knoxville, TN | 100.00% | $936,100 | $936,100 |
| FU | Los Angeles, CA | 100.00% | $1,276,100 | $1,276,100 |
| FV | Louisville, KY | 100.00% | $871,100 | $871,100 |
| GB | Miami, FL | 29 83% | $4,761,500 | $1,420,355 |
| GC | Milwaukee, WI | 100 00% | $904,900 | $904,900 |
| GG | Missoula, MT | 25.12% | $1,055,900 | $265,242 |
| GH | Mobile, AL | 62.06% | $964,900 | $598,817 |
| GM | Nashville, TN | 37.70% | $1,035,700 | $390,459 |
| GO | San Juan, PR | 48 16% | $1,090,200 | $525,040 |
| GP | Brookhaven MY | 100.00% | $1,902,000 | $1,902,000 |

39

EXHIBIT 5
Page 2 of 2

ESTIMATED COST OF CONSTRUCTION (EEC)
DENOMINATOR

| CLIN | LOCATION | PERCENTAGE OF DESIGN COMPLETE | ESTIMATED COST OF CONSTRUCTION | DENOMINATOR |
|---|---|---|---|---|
| GQ | Norfolk, VA | 100.00% | $1,013,100 | $1,013,100 |
| GS | Midland, TX | 15.09% | $909,800 | $137,289 |
| GW | Paducah, KY | 28.13% | $974,000 | $273,986 |
| GY | Philadelphia, PA | 100.00% | $1,352,500 | $1,352,500 |
| HB | Pittsburgh, PA | 100.00% | $810,200 | $810,200 |
| HD | Portland, ME | 100.00% | $1,207,000 | $1,207,000 |
| HE | Pueblo, CO | 62.86% | $1,004,500 | $631,429 |
| HI | Reno, NV | 3.35% | $1,624,900 | $54,434 |
| HO | Austin/San Antonio, TX | 100.00% | $1,045,700 | $1,045,700 |
| HQ | Monterey, CA | 100.00% | $1,672,200 | $1,672,200 |
| HU | Sioux Falls, SD | 100.00% | $985,500 | $985,500 |
| HV | New Orleans, LA | 100.00% | $1,681,300 | $1,681,300 |
| HY | Springfield, MO | 49.75% | $1,121,000 | $557,698 |
| IE | Topeka, KS | 100.00% | $316,600 | $316,600 |
| IP | Wichita, KS | 100.00% | $655,400 | $655,400 |
| IQ | Wilmington, NC | 5.78% | $916,700 | $52,985 |
| TA | WSTC, Kansas City, MO | 100.00% | $252,200 | $252,200 |
| | TOTAL | | $61,271,000 | $49,852,262 |

40

# AWARD/CONTRACT

THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 350) — RATING — PAGE OF PAGES

2. CONTRACT (Proc. Inst. Ident.) NO.: 50WCNA606099

3. EFFECTIVE DATE: *See Below

4. REQUISITION/PURCHASE REQUEST/PROJECT NO.: NAAW6400-700040

5. ISSUED BY — CODE CC32:JA

U.S. Department of Commerce, NOAA
Central Administrative Support Center
601 East 12th Street, Room 1758, CC32:JA
Kansas City, Missouri 64106

6. ADMINISTERED BY (If other than Item 5) — CODE

Same as Block No. 5

7. NAME AND ADDRESS OF CONTRACTOR (No., street, city, county, State and ZIP Code)

Fluor Technology, Inc.
3333 Michelson Drive
Irvine, California 92730

CODE — FACILITY CODE

8. DELIVERY: [ ] FOB ORIGIN [X] OTHER (See below)

9. DISCOUNT FOR PROMPT PAYMENT: Not Applicable

10. SUBMIT INVOICES (4 copies unless otherwise specified) TO THE ADDRESS SHOWN IN: ITEM 11

11. SHIP TO/MARK FOR — CODE

DOC, NOAA, CASC
Special Engineering Program Office, Room 1836
601 E. 12th Street, Kansas City, MO 64106

12. PAYMENT WILL BE MADE BY — CODE CC1

DOC, NOAA, CASC
Finance Office, Room 1760, CC1
601 E. 12th Street, Kansas City, MO 64106

13. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION:
[ ] 10 U.S.C. 2304(c)( ) [X] 41 U.S.C. 253(c)( 5 )

14. ACCOUNTING AND APPROPRIATION DATA: WA0700 8M1G31FL 2517

| 15A. ITEM NO. | 15B. SUPPLIES/SERVICES | 15C. QUANTITY | 15D. UNIT | 15E. UNIT PRICE | 15F. AMOUNT |
|---|---|---|---|---|---|
| | Provide Project and Program Management, Architect-Engineer Design, and Construction Management and Inspection Services in support of the installation phase of the NEXRAD Program and NWSFO Design and Construction Program. Base Period is from 8/4/86 to 9/30/87. | 27141 | DPMH* | | 1,750,476.00 |
| | | | Fixed | Fee | 145,000.00 |
| | | (*Direct Productive Manhours) | | | |

15G. TOTAL AMOUNT OF CONTRACT ▶ $1,895,476.00

## 16. TABLE OF CONTENTS

| (✓) | SEC. | DESCRIPTION | PAGE(S) | (✓) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I — THE SCHEDULE | | | | PART II — CONTRACT CLAUSES | |
| | A | SOLICITATION/CONTRACT FORM | | | I | CONTRACT CLAUSES | |
| | B | SUPPLIES OR SERVICES AND PRICES/COSTS | | | | PART III — LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH. | |
| | C | DESCRIPTION/SPECS./WORK STATEMENT | | | J | LIST OF ATTACHMENTS | |
| | D | PACKAGING AND MARKING | | | | PART IV — REPRESENTATIONS AND INSTRUCTIONS | |
| | E | INSPECTION AND ACCEPTANCE | | | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | |
| | F | DELIVERIES OR PERFORMANCE | | | | | |
| | G | CONTRACT ADMINISTRATION DATA | | | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | |
| | H | SPECIAL CONTRACT REQUIREMENTS | | | M | EVALUATION FACTORS FOR AWARD | |

**CONTRACTING OFFICER WILL COMPLETE ITEM 17 OR 18 AS APPLICABLE**

17. [X] CONTRACTOR'S NEGOTIATED AGREEMENT (Contractor is required to sign this document and return 4 copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.)

18. [ ] AWARD (Contractor is not required to sign this document.) Your offer on Solicitation Number ______ including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary.

APPROVED — LAW DEPT — CONTRACTS APPROVED

19A. NAME AND TITLE OF SIGNER (Type or print)
Sacker, Vice President
Fluor Technology, Inc.

20A. NAME OF CONTRACTING OFFICER
James J. Jiovenale

19B. NAME OF CONTRACTOR
BY [signature] (Signature of person authorized to sign)

19C. DATE SIGNED: 12 FEB, 1987

20B. UNITED STATES OF AMERICA
BY [signature] (Signature of Contracting Officer)

20C. DATE SIGNED: *May 30, 1987

41

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE |
|---|---|---|
| | — | |

NAME OF OFFEROR OR CONTRACTOR

FLUOR TECHNOLGOY, INC., 3333 Michaelson Drive, Irvine, CA 92730

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | SF-26 BLOCK 15B (continued) | | | | |
| | The following items are incorporated as part of the contract --- | | | | |
| 1. | RFP NWWR07000600001, dated July 11, 1986, including Amendments One and Two. | | | | |
| 2. | Fluor Proposal GA-5621, dated, July 24, 1986, including SF1411 for Base Year, Representations and Certifications, Small and Disadvantaged Business Subcontracting Plan. | | | | |
| 3. | Department of Commerce, Office of Small and Disadvantaged Business Utilization approval of Fluor Technology, Inc. Subcontracting plan. | | | | |
| 4. | Letter Contract (CAR 1352.216-76)<br>This contract replaces Letter Contract 50WCNA606099, dated July 29, 1986 and time extensions listed below:<br>(a) First Extension<br>(b) Second Extension<br>(c) Third Extension<br>(d) Fourth Extension<br>(e) Fifth Extension<br>(f) Sixth Extension<br>(g) Seventh Extension<br>(h) Eighth Extension<br>(i) Ninth Extension | | | | |
| 5. | In accordance with OSDBU approval requirement for Quarterly Sub-Contracting Report SF-295 is deleted; Semi-annual SubContracting Report SF-294 requirement remains in effect. | | | | |
| 6. | Utilization of Women-Owned Business subcontracting is deleted but purchases will be noted on Semi-Annual SubContracting Report. | | | | |
| 7. | In Part I, Section H, paragraph H.16(a) substitute CASC Contracting Officer in lieu of Dept of Energy Administrative Contracting Officer where the Dept. of Commerce is the cognizant audit agency. | | | | |
| 8. | Change effective date Amendment No. 2 to read 8/4/86. | | | | |
| 9. | ADD - FAR Clause 52.203-6 Restrictions on Subcontracter Sales To The Government (JUL 1985) | | | | |
| 10. | ADD - FAR 52.233-3 Protest After Award, Alternate I (JUNE 1985) | | | | |
| 11. | ADD - FAR 52-251-1 Government Supply Sources (APR 1984) | | | | |

42

Offices and will be required for approximately one hundred seventy-two (172) RDA facilities and for approximately forty (40) microwave facilities (some of which will be collocated at RDA and WFO sites.) Additional professional service project related work may also be required of the PSC.

References to "The Government" in this SOW shall be interpreted to mean the Government or its representative as designated in writing by the Contracting Officer (CO.)

2. REQUIREMENTS

2.1 Program and Project Management and Planning

The PSC shall establish and maintain a project management organization which effectively tracks and manages the tasks required by the Architecture and Engineering and the Construction Management and Inspection sections of this SOW. The PSC shall provide program management and planning support to assure that Architect and Engineering tasks are properly time coordinated with the Government-approved NEXRAD prime contractor, RDA and microwave site development, construction and equipment delivery, and installation schedules. The program management and planning functions shall also assure that PSC provided construction inspection services are available at the appropriate times during NEXRAD prime contractor RDA and microwave site preparation, construction, and equipment installations. Program management and planning efforts by this PSC shall further assure the availability of PSC provided construction management and construction inspection services in support of construction, modification, or expansion (by other contractors) of NWS Offices. The PSC shall provide the above program management services in a manner that will fully orchestrate the availability of WFO's at a time compatible with, and in consonance with, the NEXRAD prime contractor's delivery and installation of RDA, microwave, and NEXRAD user equipment at WFO's.

The PSC shall provide program management and planning support for all Architect and Engineering tasks and for all construction management and construction inspection tasks. The PSC shall be responsible for preparing accurate and timely assessments for the Government on program status and progress. The PSC shall develop program planning, tracking systems, and cost estimating systems that will allow the Government to evaluate the effect (in time and dollars) of changes to site acquisition, design, delivery, equipment installation, site preparation, utilities extension, access road construction, WFO construction, and all other project associated tasks. The program management and planning effort must consider the effects of seasonal variations that will affect construction and installation and must develop a management and planning system that can be responsive to measure, evaluate, and report on the impact of changes requested by or required by the Government.

2.1.1 A Work Breakdown Structure (WBS) shall be prepared and used to reflect all program elements for the Architect/Engineer and

construction management and inspection phases. The WBS shall be the primary framework for integrating program planning, scheduling, and for reporting and tracking costs. A PERT/CPM Program Network (Program Network, Schedule and Graphs) or PSC proposed Government approved alternate program shall be prepared to reflect the program tasks, task duration and task interdependencies. The PSC shall establish program milestones and schedules as required to report program progress and measure PSC and program performance. Time-phased milestones and schedules shall be established for all elements of the WBS and program tasks to provide a baseline program plan. Milestones included in the program plan shall be readily verifiable with minimum requirements for subjective judgement and shall be in sufficient number to provide a number of measurable milestones during each month of contract performance.

2.1.2 The PSC shall submit for approval a Cost Allocation Report (CAR) format for services under this contract. The CAR shall be broken down by tasks, one page per task, and be in chart format composed of rows and columns. As a minimum, the costs shall include original approved funds, revised approved funds, funds expended, estimated cost to complete, and estimated cost at completion.

2.1.3 The PSC shall prepare cost estimates for construction contract packages prepared under this contract. Initial estimates shall be prepared during the early stages of the program management and planning effort. Estimates shall be prepared in such level of detail as is practical at the time the estimates are made, and shall be refined and updated as the program progresses. At no time, however, will the original estimates be allowed to lose their visibility. The original estimates will be kept visible for two reasons. The first reason is to focus attention on the original estimating task in order to assure that the estimates are as refined as possible at the time they are made. The second reason is to assure that changes in estimates will be properly justified and supported by appropriate engineering analysis. The cost estimates will be included in the management reports and will be compared to actual costs accrued throughout the life of this contract.

2.1.4 The program plan shall be prepared in such a manner that the PSC can produce progress reports in various levels of detail for use by various levels of PSC and Government management. The top level progress report will be prepared so it conveys on one page (8½" x 11") the overall project status, including real costs vs. estimated costs, real times vs. estimated times, major actions, and persons or organizations (by name) responsible for completing the actions. The lowest level reports will show levels of detail down to each individual site status (RDA, WFO, or microwave) and for each site show the major milestones and times necessary to meet overall program completion goals. The PSC shall provide copies of the progress reports to the

Contracting Officer's Technical Representative (COTR) at least monthly and at such other times as may be requested. The report format and content will be subject to approval of the COTR.

2.1.5 An initial review meeting shall be held no later than one month after award of this contract. At this meeting the PSC shall review the methods and approach for developing the plans and schedules for conduct of the work to be performed and methods of tracking each of the tasks to be managed and completed under this contract.

2.1.6 Formal Program Management Review meetings shall be conducted bimonthly. At least five (5) working days prior to each meeting, the Agenda for the meetings shall be provided by the PSC. Time-phased flows of tasks and subtasks to be performed, logical relationships among those tasks, major schedule milestones, and discussions of areas of responsibility and accomplishments of the key people assigned to the contract shall be included.

2.1.7 Program Management Reviews shall include information on contract status, with primary emphasis on schedule status and information on key events, significant accomplishments, near-term milestones, cost, problem identification and analysis, and a personal assessment of program status by the PSC's Program Manager. The PSC shall prepare the Minutes, including presentation material, of each review and shall record and track all action items.

2.1.8 A Planning Workshop shall be conducted by the PSC approximately one month after contract award. Among other things, the purpose of the workshop will be: to establish lines of communication; to resolve division of responsibilities; to fully understand the scope of work; to discuss priorities; to educate the Government concerning "lessons learned" on previous work of a similar nature; and to discuss procedures in the conduct of the contract.

2.1.9 <u>Program Technical Review Meetings</u>

Program technical review meetings shall be initially conducted at least every month and more often as required by the COTR. Technical reviews shall include a detailed review of progress against previously developed objective measures and the established master schedule. Problems shall be described, options developed for their resolution shall be identified, and proposed solutions shall be described. Other items of a technical nature shall be discussed and necessary action determined at each program technical review meeting.

The PSC shall provide a chairperson for each technical review meeting and ensure that action items assigned to the PSC during the meeting are implemented. The PSC shall distribute the

agenda at least five (5) working days prior to each meeting. The PSC shall ensure attendance of appropriate PSC personnel, shall provide all necessary clerical support (when the reviews take place at the PSC's facility,) and shall make available copies of documentation and presentation materials to conduct efficient and effective reviews. Upon request, key reports and specific supplementary materials used during formal reviews shall be provided. At each meeting appropriate PSC personnel shall be available to respond to any Government questions related to agenda subjects covered during the meeting. The PSC shall prepare the Minutes, including presentation material, of each review and shall record and track all action items.

2.1.10 <u>Participation in Government Meetings</u>

The PSC shall make available key program and technical personnel when requested. These personnel will attend and participate in Government required reviews, planning meetings, and similar meetings. The PSC will be required to meet and interface with the NEXRAD Joint Systems Program Office (JSPO) and the NEXRAD prime contractor in order to develop planning information and schedules.

2.1.11 <u>Other Miscellaneous Management and Planning Matters</u>

The PSC shall:

a) Establish methods of rapid message transmittal (letter and drawings) between the PSC, JSPO, NWS Headquarters, the NEXRAD prime contractor, and the Special Engineering Project Office (SEPO.)

b) Provide conference rooms and temporary or occasional office space for meetings and for use by the COTR or other Government employees.

c) Prepare briefing reports and visual aids (viewgraphs/slides, etc.) for use by Government Program Managers during progress reviews.

2.1.12 If required by the Government, the PSC shall assist the Government in developing plans, procedures, and schedules for decommissioning, deactivation, and removal of existing radar equipment. These plans will be developed in a manner that will be time-phased with the staffing of the WFO's and the activation and commissioning of the NEXRAD systems and equipment.

## 2.2 General Architecture and Engineering

The PSC shall provide the full range of professional services required for design and construction of new WFO's, design and construction of existing NWS Office expansions, and design and construction of existing NWS Office modifications. The design effort shall be carried out within guidelines which will be provided by the Government. The Government guidelines will include a building schematic for a base-line new WFO and will include such engineering information (drawings, etc.) as exists in the Government's files for existing offices that require expansion or modification. Government furnished guidelines will also include basic information for space requirements and relationships for various WFO operations and support functions. Using this Government furnished engineering information, base-line WFO designs and space guidelines, the PSC shall develop design drawings, construction specifications, and cost estimates for new, expanded, or modified NWS Offices. The PSC shall produce construction documents (design drawings, construction specifications, and cost estimates) at a rate and against a time schedule that will be consistent with the project management and planning developed in Section 2.1. The PSC shall provide the following services applicable to NWS Office design and construction methodology. These efforts shall be accomplished by the PSC in order to provide additional design guidance and criteria throughout the life of this contract.

2.2.1 The PSC shall accomplish market research that will consider the cost effectiveness of various construction techniques including, but not limited to, such alternatives as on-site conventional construction, modular construction using off-site fabrication, or other methods.

2.2.2 The Government will need to make decisions as to the life cycle cost of Government ownership vs. leasing of new WFO's. Accordingly, the PSC shall develop guidelines to be used on a site specific basis to aid the Government in making these decisions. The guidelines shall consider all aspects of ownership vs. leasing for an assumed life span of 20 years. When these guidelines are developed and approved, the PSC shall apply them for each new WFO and shall recommend to the Government whether it is in the Government's best interest to build and own the facility or to lease a facility built to meet the Government's needs, but owned and maintained by others.

2.2.3 The PSC shall conduct a study to determine whether economies of scale could be realized by the Government through grouping multiple construction sites under one construction contract. The possible economic advantages, as well as the possible loss of flexibility in rescheduling construction efforts or delays in procurement efforts, shall be addressed. The priority of construction efforts must necessarily be decided by the Government; thus the installation priorities may not allow construction to proceed during optimum weather conditions.

2.2.4 The PSC shall investigate and develop a projection of total telecommunications requirements (both local and long-line) for each NWS Office (new, expanded, or modified.) This projected telecommunications requirements document shall be developed by the PSC following consultation with various Government program offices whose individual needs must be considered in developing the projections. It is expected that this investigation will culminate in a set of minimum requirements for a base-line WFO with additional telecommunications needs for special programs.

2.2.5 The PSC shall investigate the various NWS office design parameters and incorporate the findings into a comprehensive design manual. This document will serve as the Government's design criteria manual for follow-up design and modification of NWS offices made necessary by future WFO's, systems installations, or programs. The outline of the manual shall be submitted to the Government early in the contract for Government comment. A draft of the manual shall be prepared shortly thereafter. Revisions to the draft shall be made yearly incorporating "lessons learned." A final edition shall be submitted to the Government near the end of the contract.

2.2.6 The PSC shall provide site development consultation services for selected NEXRAD RDA and microwave line of sight (MLOS) sites. Civil, electrical, and telecommunications engineering advice will be used by the Government to make fundamental decisions regarding the feasibility of certain sites.

2.2.7 The PSC shall prepare a Facilities Maintenance Plan based upon the common facilities characteristics of the PSC designed WFO's. The Facilities Maintenance Plan shall include, but not be limited to, engine-generator cycling and maintenance requirements, heat, ventilation and air-conditioning (HVAC) maintenance requirements, utilities maintenance needs, uninterruptible power system (UPS) maintenance needs, and similar matters.

## 2.3 Site Specific Architecture and Engineering

For each NWS Office (new, expanded, or modified) the PSC shall provide professional and technical services necessary to assure a complete and habitable WFO at least six (6) months prior to the NEXRAD prime contractor's hardware delivery and installation schedule. In addition, the Government may require earlier availability of selected WFO's in order to avoid multiple office relocations or for other reasons. The level of effort required of the PSC for each WFO shall include, but not be limited to, the following activities.

2.3.1 The PSC shall conduct site investigations and prepare site specific designs that will accommodate local environmental concerns, aesthetics, local building codes, zoning regulations, and local climate for new, expanded, or modified NWS Offices. This site specific planning and design effort shall include, but not be limited to, foundation design, building orientation, passive

solar considerations, design of facade including material and color, utilities, grading, parking, and landscaping.

The PSC shall prepare a complete design and construction package for each NWS Office specified by the Government. All of the construction documents, cost estimates, design calculations, studies, and reports shall be approved and certified by a registered architect, registered professional engineer, or certified cost engineer, as applicable, and shall be in compliance with all local, regional, state and federal regulations, standards, codes and ordinances. All topographic surveys and construction site survey control shall be performed and certified by a surveyor licensed in the state where the WFO is located.

2.3.2 The PSC shall prepare, reproduce, and distribute, record drawings and documents for each NWS Office assigned. The PSC shall file and hold these drawings and documents during this contract and shall make them available to the Government as required.

2.3.3 The PSC shall support the Government in conducting design reviews for each WFO site. The PSC shall coordinate, schedule, conduct, record, and distribute the design review minutes and incorporate the actions resulting from site specific design reviews for each NWS Office at the conceptual review meeting (15%,) preliminary (35%,) and pre-final (90%) design completion stages. The PSC shall conduct these design reviews at the SEPO office in Kansas City, Missouri, or, at the Government's option, at the PSC's offices in the Kansas City area. The preliminary (35%) and pre-final (90%) design review packages shall be provided to the Government a minimum of thirty (30) days prior to such reviews. The final (100%) design packages, with responses to all Government review comments, shall be provided to the Government for Government approval at least sixty (60) days prior to the time that the planning schedule developed in Section 2.1 requires the design package to be available for inclusion in Government prepared construction procurement bid documents. The PSC shall assist the Government in preparing construction procurement bid documents. The PSC shall provide advance notice information concerning design and construction packages for the Government's use in scheduling and coordinating release of contract bid packages.

2.3.4 The PSC shall accomplish all necessary engineering effort for completing site surveys for new, expanded, or modified NWS Offices. These site surveys shall generate the required site specific engineering information to allow design effort to proceed unimpeded. Site specific engineering surveys shall include, but not be limited to, geotechnical investigations, environmental investigations, earth resistivity information, photographic documentation, safety considerations, handicapped access information, information on local ordinances and codes,

HVAC evaluations, electrical system evaluations, plumbing system evaluations, structural integrity, roofing system evaluations, lead times necessary to allow construction contractors to obtain local construction and building permits, and all necessary information concerning extension of utilities and similar matters. At existing NWS Offices, the PSC shall verify existing record drawings furnished by the Government and update them as required to complete follow-on design.

2.3.5 The PSC shall provide professional services to support the Government throughout the design and construction phases of WFO preparation. These professional services shall include, but not be limited to, coordination of requirements of the National Oceanic and Atmospheric Administration (NOAA,) National Weather Service (NWS,) Federal Aviation Administration (FAA,) Department of Defense (DoD,) Joint Systems Program Office (JSPO,) local airport and city authorities, and others.

2.3.6 The PSC shall prepare documents, accomplish land surveys, and obtain other information including appraisals of property values, legal descriptions, names of owners, recorded easements, site maps, and such other information as may be necessary to allow the Government to obtain specified building sites through fee simple absolute purchase or such other means as will satisfy the Government's real property site acquisitions.

2.3.7 The PSC shall also assist the Government by preparing applications for securing clearances from FAA and owners for construction on or near airports and in other locations, and by providing the necessary professional investigations documentation, and preparation of applications to allow the Government to obtain easements for power, telephones, and communication cables, access roads, gas, water and sewer extensions, and similar matters.

2.3.8 The PSC shall provide assistance to the Government during the contract bid phase in such matters as advertising, pre-bid meetings, site visits, pre-qualification of bidders, and shall assist the Government in evaluating construction contract bid responses and making award recommendations prior to Government approval. Following award of a construction contract, the PSC shall assist the Government by participating in pre-construction meetings, in negotiating and processing variances as required, and by preparing change orders (including cost estimates) when necessary. The PSC shall assist the Government in negotiating change orders and resolving disputes and claims, as required. The PSC shall also (with 10-day turnaround) review, make recommendations, and prepare letters for Government approval or disapproval of all construction contractor submitted shop drawings, catalog cuts, and other required construction contractor submittals. The PSC shall also establish and maintain a file of all such submittals. The PSC shall provide procurement and logistics support service as required to coordinate

obtaining, shipping, storage, and issue of Government and construction contractor supplied material and equipment.

2.3.9 The PSC shall provide construction management and inspection services for WFO's at approved times as necessary to assure that construction is being carried out in accordance with the terms of the construction documents. The PSC shall document the results of these inspections and shall make timely recommendations to the Government of the need to issue stop orders to the Contractor for non-compliance. The PSC shall assist the Government during final inspection and in developing final inspection punch-lists. The PSC shall also assist the Government in reviewing construction contractor's requests for partial and final payments, and shall prepare letters for the COTR's signature to the contracting officer conveying information pertaining to the construction contract and payment requests.

2.3.10 The PSC shall prepare necessary applications for the Government to use in ordering the telecommunications services and shall assure that power and other utility services for the WFO's are applied for by the construction contractors. During site inspections the PSC shall assure that utility development is being carried out in a timely manner. The PSC shall identify those areas where utility installation lead-time is excessively long and shall advise the Government concerning schedule impacts.

2.4 Construction Management and Inspection

In addition to the construction management and inspection efforts discussed in Section 2.3, the PSC shall provide the same level of professional services during the NEXRAD prime contractor's RDA and microwave site construction and installation effort and for the NEXRAD prime contractor's installation of equipment at WFO's. The PSC shall assist the Government by providing review of the NEXRAD prime contractor's RDA site and microwave site construction documents, and of the NEXRAD prime contractor's equipment installation documents for installations at WFO's. The PSC shall review and comment on the above documents at the 35%, 90%, and 100% completion points and shall make necessary recommendations for changes, approvals, or disapprovals, and shall prepare letters of transmittal for the Government to forward to the NEXRAD prime contractor. In addition, the PSC shall review and comment on each submittal of the NEXRAD prime contractor's CPM/PERT schedules.

2.4.1 The PSC shall provide technical participation at pre-construction meetings, and at such other meetings as may be required.

2.4.2 The PSC shall collect information and prepare submittals to assist the Government in obtaining zoning variances and easements, when required; the PSC shall participate in zoning board

meetings as required. The PSC shall advise on and prepare change orders and cost estimates, when required.

2.4.3 The PSC shall prepare for each WFO, a package of information that will be transferred by the Government to the NEXRAD prime contractor. This package shall include information to allow the NEXRAD prime contractor to prepare WFO site specific NEXRAD equipment installation documents. The package will include, as a minimum, space layouts, air-conditioning provisions, power distribution provisions, cable routing, ground bus locations, and location of the telephone company demarcation point for leased communication lines.

2.4.4 The PSC shall provide RDA site and microwave site construction inspection in support of the Government's overall construction management effort. The PSC shall prepare an inspection schedule for Government approval that will assure timely inspection of NEXRAD prime contractor construction efforts. The schedule will identify the critical points of construction that will require inspection and approval to proceed, and will include as a minimum, pre-final and final inspections, as well as those instances where excavation work is open and where footers, re-bar, buried cable, and similar items must be inspected on site. The PSC will also assure during on-site inspections that the NEXRAD prime contractor is adhering to local, state, and federal regulations concerning personnel safety and wage rates.

2.4.5 The PSC shall provide the Government with RDA site, MLOS site(s), and User site construction cost estimates for each NEXRAD site. The cost estimates will be used as Government Cost Estimates to validate the NEXRAD prime contractor's construction costs. The estimates will also be used to negotiate change orders as actual site conditions may require. An estimate based on RDA/MLOS/User site specific Government assumptions shall be required early in the contract. An update to the estimate shall be required based on information contained in the RDA site Government furnished, "In-Depth Site Survey" reports. Revised estimates shall be prepared based on the NEXRAD prime contractor's 35%, 90%, and 100% construction documents. The original estimates, as well as the updates, shall be kept visible throughout all stages of refinement.

## 3. DELIVERABLES

### 3.1 General Information

The PSC shall provide deliverables as specified in the table on the following page.

FLUOR TECHNOLOGY, INC.
3333 MICHELSON DRIVE
IRVINE, CALIFORNIA 92730
TELEPHONE: (714) 975-2000
TELEX: 18-1625
ITT: 4720147

May 13, 1988

4600 Madison Avenue - Suite 900
Kansas City, Missouri 64112

SEPO-NEXRAD and NWS Office
Development
NOAA Contract 50WCNA606099
FTI Contract 449438

Letter No. FK/NK/0287

U. S. Department of Commerce, NOAA
Central Administrative Support Center
Special Engineering Program Office
601 East 12th Street, Room 1836
Kansas City, Missouri 64106

Attention: D. M. Entrikin, COTR

Gentlemen:

TRANSMITTAL PROGRAM DOCUMENTS

Reference: Program Review, May 4-5, 1988, Kansas City, Mo.

Attached are five sets of the programmimg documents which were discussed at referenced program review and have been revised to reflect changes from the models used as the basis for those discussions.

The conference notes containing the minutes of this review will be distributed separately.

Each set of documents contains the following:

- Cost summary by fiscal year 1989 - 1994 (6 sheets)
- Cost summary FY89-94
- Summary schedule (4 bar charts)
- Engineering manpower, 28 MYR LOE
- Construction contract award schedule (3 sheets)
- Construction program by fiscal year (6 sheets)
- PSC cost estimate FY89 (3 sheets)
- PSC cost estimate FY90 (3 sheets)

Very truly yours,

K. T. Sawyer
Project Manager

KTS:sds
KTS099
Attachments (5 copies)

53

FD 004160

SD-977

5.0 Discussion:

| | | | | |
|---|---|---|---|---|
| o | 1.3 | RDA/MLOS/access | | $ 47,750,000 |
| | | MLOS 40x$75,000 | | ($ 3,000,000) |
| | | RDA 175x$250,000 | | ($ 43,750,000) |
| | | 10 unique accesses | | ($ 1,000,000) |
| o | 1.4 | PUPs | 429 | $ 7,875,000 |
| | | WFO sites | (114) | |
| | | Other sites | 315 x $25,000 | |

o 2.1 Program Management $ 5,602,000

Includes:
- Program Management
- Discipline Management
  . Cost
  . Schedule
  . Estimating
  . Construction
  . Real Estate
  . Contracting
  . Purchasing
  . Engineering

o 2.2 Real Property $ 1,193,000

Supports 4 ASCs with total of 3 manyears/year for 4 years

o 2.3 JSPO Project Management $ 5,506,000

- Costs about 10% in excess of norm
- Higher costs reflect:
  . Low constructed cost of PUPs
  . High travel
  . FAA coordination role extends beyond facilities
- Costs include: UNISYS Contract management support, PUPs coordination, FAA coordination, interface coordination JSPO, FAA, DOD, UNISYS, SEPO, ASC, NWSR, NWSH.

o 2.4 Construction Management and Inspection $ 10,454,000

- Costs higher than the customary 5% reflect:
  . travel, use of graduate engineers as inspectors (quality, ethics) and support of CASC contract administration
  . five RDA inspections at 60 sites adjacent to WFOs - follow after nine WFO inspections

54

5.0 Discussion (cont'd)

o 2.5 General Engineering $ 2,780,000

- Forecast based on FY88 experience activity consumed 9.4 percent of total DPMH preparing studies, evaluations, presentation materials, etc.

o 2.6 Specific Engineering $ 13,800,000

- Design cost experience in FY88 is less than forecast in reference
- Pre-design work includes: site investigation and report, design narrative, topographic and geo-technical surveys and reports, and utility and telephone connection.
- Post-design work includes: vendor data control, review, approval; manual preparation; record drawings; contract closeout
- Coordination includes: documentation of interfaces with ASCs, Regions, NWSH, JSPO, SRI, UNISYS, SEPO, utilities, telecom companies.

Reference: LETTER FK/NK/0287 DATED MAY 13, 1988 TRANSMITTING PROGRAM DOCUMENTS DEVELOPED FOR THE MAY 4-5, 1988 WORKSHOP HELD IN KANSAS CITY.

1.0 Facilities Construction Costs ($ FY88):

| | | |
|---|---|---|
| 1.1 | WFO-UA (117-34) | $ 68,361,000 |
| 1.2 | Land (223) | $ 3,331,000 |
| 1.3 | RDA/MLOS/Site Access (175) | $ 47,750,000 |
| 1.4 | PUPs (315) (@ 25,000 EA) | $ 7,875,000 |
| 1.5 | Subtotal | $ 127,317,000 |

Estimated facilities costs do not include existing UA facilities, utilities, tie-ins, PUPs at WFOs.

2.0 PSC Costs:

| | | | |
|---|---|---|---|
| 2.1 | Program Management<br>$127,317,000 x .044 = | | $ 5,501,948 |
| 2.2 | Real Property Management | | $ 1,193,000 |
| 2.3 | JSPO Project Management Support<br>$55,625,000 x .099 = | | $ 5,506,875 |
| 2.4 | Construction Management and Inspection<br>$127,317,000 x .082 = | | $ 10,439,994 |
| 2.5 | General Architecture and Engineering<br>$127,317,000 x .022 = | | $ 2,800,974 |
| 2.6 | Specific Architecture and Engineering | | |
| | 2.6.1 WFO-UA | | |
| | Pre-design .02x$68,361,000 = | $ 1,367,220 | |
| | Design .06x$68,361,000 = | $ 4,101,660 | |
| | Post design .03x$68,361,000 = | $ 2,050,830 | |
| | Coordination .02x68,361,000 = | $ 1,367,220 | |
| | 2.6.2 RDA/MLOS/PUPs<br>Design review, estimates, coordination .02x55,625,000 = | $ 1,112,500 | |
| | 2.6.3 Contract documents .01x127,317,000 = | $ 1,273,170 | |
| | 2.6.4 Construction engineering .005x127,317,000 = | $ 636,585 | |
| | 2.6.5 Cost/Schedule/Estimating engineering .01x127,317,000 = | $ 1,273,170 | |
| | 2.6.6 Subtotal | $ 13,182,355 | 13,182,355 |
| 2.7 | Subtotal PSC | | $ 38,625,000 |
| 3.0 | SEPO Costs | | $ 720,000 |
| 4.0 | Program Costs | | $ 166,662,000 |

6

23MAY90.02
To: JACKT@MAIL@FDI KCMO
Cc: DONITAM@PROC@CASC,EdM@SEPO@CASC
Bcc:
From: Ronald F. Anielak@PROC@CASC
Subject: FY91 PSC Modification - Task Orders
Date: Thursday, May 24, 1990 at 1:26:21 pm CDT
Attach:
Certify: N
Forwarded by:

---

SUBJECT: PSC CONTRACT MODIFICATION,
LEVEL OF EFFORT NO. 06 (FY91) PREPARATION GUIDELINES

The proposed FY91 level of effort cost plus fixed fee term contract will be divided into eight (8) specific task orders within one contract mod.

These Task Orders will include:

1. Program Management - Labor
2. Program Management - Expenses
3. JSPO Support
4. Real Estate
5. Site Selection
6. Construction Services
7. General Engineering
8. Site Development and Engineering

Task Orders No's. 3, 4, 5, 6, and 8 will include specific sites per task or will be "site specific". That is, each Task Order will specify the sites associated with that specific task.
If 20 sites are selected for construction of WFOs as an example, each site would be listed under Site Development and Engineering and again under Construction Services.Task Orders No's 1, 2, and 7 will NOT include specific sites.

Supporting documentation for individual task orders will be similar to the current documentation prepared for annual task orders and revisions.

Milestones will be established for each task order based on a schedule provided by the Government. FDI will submit monthly progress reports using the established milestone schedules. The Government will monitor progress using the established milestone schedules. The Government will conduct monthly meetings on the second Tuesday of each month to discuss progress.

FDI may continue to submit bi-monthly invoices. However costs for each task order must be segregated on the invoice into the eight task orders and will include:

1. Direct Productive Manhours per task order, except task order no. 2.
2. Costs per task order.
3. Fee per task order, except task order no. 2.

A fixed fee will be negotiated across the board for all task orders within the modification. The fee will be subdivided among the specific task orders.

A 6% fixed fee limitation will apply to design specific sub-tasks.

A contract modification will be issued on a quarterly basis and new milestones established if the milestones change regardless of what or who caused the change.

ONFK - 155

FLUOR DANIEL, INC.
4600 Madison, Suite 900
Kansas City, MO 64112
(816) 561-5757

# MINUTES OF MEETING No. 1
## Tuesday, June 12, 1990 10:00

Project: NEXRAD/WFO Job: NOAA

Location: CASC Bid Room
Subject : Task Order 5&6 Review

| Here Y/N | Initials | Attendee Name | Representing Name |
|---|---|---|---|
| Y | RFA | R. F. Anielak | U.S. DOC, NOAA, CASC |
| Y | DSM | D. S. Mc Cullough | U.S. DOC, NOAA, CASC |
| Y | RAR | R. A. Rusch | U.S. DOC, NOAA, SEPO |
| Y | EHM | E. H. Mische | U.S. DOC, NOAA, SEPO |
| Y | JMT | J. M. Toliver | Fluor Daniel, Inc. |
| Y | JAW | J. A. Wagner | Fluor Daniel, Inc. |
| Y | TRL | T. R. Lambert | Fluor Daniel, Inc. |
| Y | LLS | L. L. Sutton | Fluor Daniel, Inc. |

| Item | Description | Status | Initial | Due | BIC |
|---|---|---|---|---|---|
| 0001 | It was reported that negotiations with the St. Louis contractor, Wayne Roberts, had gone well. All but 2 changes were negotiated. A claim is still expected from the contractor. FDI is reviewing the statutory requirements for the claim to see if the contractor is complying. Also, we expect to pave soon at Sterling. | NEW | 12JUN90 | | LLS |
| 0002 | RFA reviewed an article from that mornings K.C. Star newspaper about the Kansas City contractor, Oppenheimer, moving to Calif. and closing their Kansas City operations. The Pleasant Hill WFO was specifically mentioned noting that it would not be complete until December 1990. The contractor will be reminded of continuing contract obligations. | NEW | 12JUN90 | | LLS |
| 0003 | JMT presented discussion papers regarding Price and Profit Limitations and Ways to Reduce "Design" Cost. Smooth copies of the papers are attached hereto. This discussion ensued in response to RFA E-mail of May 24, 1990. | NEW | 12JUN90 | | JMT |
| 0004 | JAW discussed status of the Draft Annual Work Plan for next fiscal year. On 29 Jun 90 FDI will deliver the Draft Plan including 1) Work Statement 2) Work Plan 3) Cost Estimate and a listing of personnel to perform the work. This preliminary submittal will not be broken down into 8 task orders. The breakdown will be accomplished after JSPO approves overall plan on about Aug 24, 1990. | NEW | 12JUN90 | 29JUN90 | TRL |

Prepared by: FLUOR DANIEL, INC.

Signed: [signature]
By:
Date: 15 June 1990

59

# PRICE & PROFIT LIMITATIONS

- **ARCHITECTURAL & ENGINEERING SERVICES**

  FAR 15.903 (d) (1) (ii)

  Price (Cost + Fee) for Designs, Plans, Drawings and Specs
  ≦ 6% Estimated Cost of Construction.

- **CPFF CONTRACTS**

  FAR 15.903 (d) (1) (iii)

  Fee (Profit) ≦ 10% Contract's Estimated Cost

---

*Example of (ii):*

WFO = $700,000
GFE = <u>$100,000</u>
$800,000 x 0.06 = $48,000 maximum for:

## DESIGNS, PLANS, SPECS, (PART 1/SECTION C)

↓

| 0 | 15% | 100% | ACCEPT |
|---|---|---|---|

0------------♦■■■■■■■■■■■■■■■■■♦------------0

↑ ↑

- INITIAL SITE VISITS
- TOPO/GEOTECH
- STUDIES
- STANDARDS/CRITERIA
- CONCEPTUAL WORK
- VERIFICATION OF AS-BUILT CONDITIONS
- REPRODUCTION FOR REVIEW
- MILESTONE ESTIMATES

- QA/QC
- SHOP DRAWINGS
- SUBMITTALS
- MANUALS
- AS-BUILTS

# WAYS TO REDUCE "DESIGN" COST

## CLIENT

- REDUCE NO. OF REVIEWS ON STANDARD DESIGNS
- REDUCE NO. OF REVIEWERS
- CONSOLIDATE & LIMIT COMMENTS
- STANDARDIZE FORMAT OF REVIEW PACKAGE
- REDUCE (ELIMINATE) "WHAT-IFS"

## FDI

- REVIEW & "HARDEN" MANHOUR BUDGET FOR DESIGNS
- CLEAN-UP THE MANHOUR BUDGET FOR UNIQUE DESIGNS
- HIP SHOOT ON COSTS OF REDESIGN - ie, PUT-UP OR SHUT-UP
- SEGREGATE (INSULATE) PRODUCTION DESIGNERS, ie,:
  PRODUCTION = X people
  OTHER = Y people

FLUOR DANIEL

October 3, 1990

SEPO-NEXRAD and NWS Office Development
NOAA Contract 50WCNA606099
FDI Contract 449458

Letter No: FK/NK/1057

U.S. Department of Commerce, NOAA
Central Administrative Support Center
Special Engineering Program Office
601 East 12th Street, Room 1836
Kansas City, Missouri 64106

Attention: Mr. Max Entrikin

Dear Max:

TASK ORDER NO. 6

Since the requirement for 6% design (A/E) is a continuing question associated with the NWS modernization, we've prepared the attached calculation which demonstrates the budgeted A/E effort associated with Task Order No. 6. You will note the forecast (all-in) A/E cost including estimated fee is 5.40% (less than 6%).

Also attached is the fully priced personnel summary for Task Order No. 6. Please note the TOWP Hourly Rate includes a 6.15% TOWP benefit adjustment over the base monthly rate. This reflects a change in FDI accounting practices. The accounting change along with new lower overhead rates have been submitted to the DOE-RL ACO for approval and a "before and after" case is attached for your information. You will note that the TOWP adjustment along with the new overhead rates are revenue neutral and have no cost impact.

Best regards,

R.B. Campbell
Project Manager

RBC:mg

Attachments

6 % DESIGN TEST - T.O. #6 (FY91)
BASIS: STATEMENT OF WORK SUBMITTAL, DATED 12 SEP 90, AND
1 AUG 90 EDD SCHEDULE.

DESIGN PROGRESS BASIS

| DESIGN PKGS | CONCEPTUAL | DETAIL DESIGN & SPECS | | | |
|---|---|---|---|---|---|
| | 0 15% | 15-35% | 35-90% | 90-100% | |
| | | 23% + | 65% + | 12% | = 100% |

SITES IN DESIGN DURING FY91

| CLIN | SYSTEM | PR | CCE | % DES | WTD CCE $ |
|---|---|---|---|---|---|
| CN | BINGHAMTON | 19 | 895,100 | 77% | 689,000 |
| GY | PHILADELPHIA | 20 | 923,200 | 12% | 111,000 |
| FV | MOREHEAD CITY | 21 | 901,200 | 77% | 694,000 |
| FV | LOUISVILLE | 22 | 862,800 | 35% | 302,000 |
| FB | INDIANAPOLIS | 23 | 1,001,700 | 100% | 1,002,000 |
| GO | SAN JUAN | 24 | $1,093,000 | 100% | 1,093,000 |
| HB | PITTSBURGH | 25 | 386,300 | 100% | 386,000 |
| FZ | MEMPHIS | 28 | 332,100 | 100% | 332,000 |
| DK | COLUMBIA SC | 29 | 320,500 | 100% | 321,000 |
| FC | JACKSON MS. | 30 | 324,600 | 100% | 325,000 |
| HU | SIOUX FALLS SD | 31 | 324,600 | 100% | 325,000 |
| DI | CLEVELAND | 33 | 437,300 | 94% | 411,000 |
| CT | BUFFALO | 34 | 1,132,400 | 100% | 1,132,000 |
| CR | BOSTON | 36 | 1,654,700 | 100% | 1,655,000 |
| HD | PORTLAND ME | 37 | 904,400 | 100% | 904,000 |
| GU | OMAHA | 38 | 1,007,800 | 95% | 957,000 |
| DR | DES MOINES | 39 | 903,700 | 100% | 904,000 |
| HV | NEW ORLEANS | 41 | 1,432,500 | 94% | 1,347,000 |
| DO | DALLAS | 42 | 1,467,800 | 88% | 1,292,000 |
| FW | LUBBOCK | 43 | 877,900 | 100% | 878,000 |
| GB | MIAMI | 44 | 328,000 | 72% | 236,000 |
| FT | LITTLE ROCK | 45 | 276,100 | 56% | 155,000 |
| HQ | SAN FRAN/MONTEREY | 47 | 1,350,700 | 100% | 1,351,000 |
| HS | SEATTLE | 48 | 366,900 | 39% | 143,000 |
| CQ | BOISE ID | 49 | 931,600 | 88% | 820,000 |
| FU | LOS ANGELES | 50 | 1,060,500 | 94% | 997,000 |
| DG | CINCINNATI | 51 | 1,579,600 | 56% | 885,000 |
| FP | LAKE CHARLES | 52 | 807,800 | 56% | 452,000 |
| EQ | GREAT FALLS MT | 53 | 936,300 | 23% | 215,000 |
| CO | BIRMINGHAM AL | 54 | 965,600 | 39% | 377,000 |
| HO | AUSTIN | 55 | 890,500 | 23% | 205,000 |
| CK | ATLANTA | 56 | 1,469,200 | 39% | 573,000 |
| CC | ALBUQUERQUE | 57 | 1,050,800 | 23% | 242,000 |
| DC | CHARLESTON WV | 58 | 828,300 | 17% | 141,000 |
| GE | MINNEAPOLIS | 59 | 2,188,600 | 30% | 657,000 |

02-Oct-90 RUN DATE

SIX%.WK1

| | | | | | |
|---|---|---|---|---|---|
| DN | ANCHORAGE | 60 | 1,024,000 | 88% | 901,000 |
| FL | KNOXVILLE | 61 | 873,600 | 13% | 114,000 |
| HA | FAIRBANKS | 63 | 1,795,000 | 88% | 1,580,000 |
| DD | CHEYENNE | 64 | 879,200 | 17% | 149,000 |
| GG | MISSOULA | 65 | 348,500 | 3% | 10,000 |

AVG PER SITE (40 SITES) $928,000 TOTAL $25,263,000

NOT TO EXCEED A&E COST @ $25,263,000 x 6% $1,516,000

FORECAST A&E COST FROM 1.0.6.3 PLAN = 5.40% $1,363,000

PRIORITY RECONCILIATION

| | | |
|---|---|---|
| DETROIT | 26 | DESIGN COMPLETE IN FY90 |
| PHOENIX | 27 | LEASE |
| SACRAMENTO | 32 | LEASE |
| ALBANY | 35 | LEASE |
| MILWAUKEE | 40 | DESIGN & CONSTRUCTION COMPLETE |
| RALEIGH/DURHAM | 46 | LEASE |
| RENO | 62 | CONCEPTUAL DESIGN COMPLETE IN FY91 |

64

03-Oct-90 RUN DATE

SIXZ.WK1

8

:      *@ENGR,*@CADD,*@ARCH
:      HBS@PROC,TRL@PROC
c:
om:      Terry L. Sonderup@ENGR@FDI KCMO
ubject:      TIMECHARGES
ate:      Thursday, August 15, 1991 10:34:32 CDT
tach:
rtify:      N
rwarded by:

---

IERE IS QUITE A BIT OF CONFUSION REGARDING THE SCOPE DEFINITION OF AREAS 3A, , AND 34.

CKGROUND: BY CONTRACT (THE FAR'S) WE ARE REQUIRED TO PRODUCE THE DETAILED TE SPECIFIC DESIGN WITHIN A BUDGET OF 6% OF FACILITY CONSTRUCTION COST. NCEPTUAL DESIGN IS NOT INCLUDED IN THIS "6% DESIGN"; CONCEPTUAL DESIGN IS IARGED TO AREA 3A AND THIS ACTIVITY IS COMPLETED SOMETIME PRIOR TO ISSUE OF IE 35% PACKAGE. AREA 3A CHARGES INCLUDE (BUT ARE NOT LIMITED TO) ACTIVITIES JCH AS:

FLOOR PLAN DEVELOPMENT
BUILDING ELEVATIONS
PLUMBING LAYOUT
HVAC DUCTWORK LAYOUT
ELECTRICAL ONE LINE
PRELIMINARY GRADING PLANS
STRUCTURAL FRAMING PLAN

WILL BE WORKING WITH THE PROJECT ENGINEERS AND LEAD DISCIPLINE ENGINEERS TO TTER DEFINE THE BREAK POINT. UNTIL THAT TASK IS COMPLETED THE LEAD GINEERS SHOULD DIRECT THEIR TROOPS REGARDING CHARGES TO "3A".

EA 31 IS SITE SPECIFIC (6%) DESIGN AND IS FROM COMPLETION OF "3A" UNTIL 100% CKAGE ISSUE.

EA 34 IS FOR PRELIMINARY SITE SPECIFIC WORK SUCH AS SITE INVESTIGATIONS, O/TOPOS, AND ENGINEERING COORDINATION. ENGINEERING COORDINATION RELATES TO RLY COORDINATION ACTIVITIES SUCH AS:

INVESTIGATE UTILITY REQUIREMENTS
INVESTIGATE PERMITTING REQUIREMENTS
INVESTIGATE ZONING REQUIREMENTS

EA 34 CHARGES ARE OUTSIDE OF THE 6% DESIGN, SO ENGINEERING COORDINATION DOES T REFER TO COORDINATION OF WORK THAT OCCURS AS PART OF YOUR DETAIL DESIGN TIVITIES (SQUAD CHECK, DESIGN REVIEWS, CLIENT COMMENTS, ETC.). THIS TOPIC LL BE DISCUSSED IN MORE DETAIL DURING THE NEXT MANHOUR REVIEW MEETING.

65

9

# POSITION PAPER OF FLUOR DANIEL, INC.

Submitted June 21, 1993 to NOAA In Response to
OIG's Final Audit Report No. DEN-4613-3-0001
For Contract No. 50WCNA606099

fee limitation, based on its audit of incurred costs, does not comport with the statute and cannot be justified. (Indeed, OIG wisely made no attempt to justify its retrospective reading in the final audit report.) FDI will demonstrate in Section V that based on a prospective application of the statute, FDI was in compliance with the six per cent fee limitation throughout the 1986 Contract.

## IV. FDI AND NOAA REACHED A CLEAR AND PROPER UNDERSTANDING OF THE ELEMENTS OF FDI'S WORK THAT WERE SUBJECT TO THE 6 PER CENT FEE LIMITATION.

### A. NOAA AGREED TO APPLY INMAN'S NARROW DEFINITION OF A/E SERVICES SUBJECT TO THE STATUTORY LIMITATION, AS ARTICULATED IN THE CORPS GUIDELINES.

In the Spring of 1990, as part of their negotiations for Option Year Four (FY91), NOAA and FDI elected to formalize their understanding and practice as to how the statutory fee limitation had been and would continue to be applied. This understanding was articulated and documented in a series of discussions, meetings, and communications in May-June and October of 1990. Under the resulting agreement, the services deemed subject to the six per cent fee limitation were narrowly restricted to substantive A/E design work, and expressly excluded the pre-design, conceptual design, studies and investigations, and other preliminary work excluded by the Corps Guidelines. As demonstrated in detail in Section V, on the basis of this agreement, FDI was in compliance with the statutory limitation throughout the 1986 Contract.

NOAA commenced these discussions in late May, 1990, as part of the negotiations for Option Year Four (FY91) under the Contract. ACO Ron Anielak informed FDI by E-Mail dated May 24, 1990 (copied to CO Donita McCullough), of guidelines that NOAA intended to impose on the negotiations, including, among others, the requirement that "[a] 6% fixed fee limitation will apply to design specific subtasks." [Tab 2.]

At about the same time, COTR D. Max Entrikin instructed FDI to review its FY91 proposal for compliance with the six per cent fee limitation. Consistent with Anielak's application of the limitation to "design specific subtasks" only, the review was to be performed for a narrow range of services comprising technical A/E design work.

On June 12, 1990, NOAA and FDI met to discuss the fee limitation and other issues relating to the FY91 negotiations. [See Tab 3.] Application of the fee limitation was addressed at the meeting, and agreement was reached as to the FDI services subject to the limitation. FDI minutes of the meeting [id.] attached a sheet dated June 15, 1990 and headed "Price and Profit Limitations" that documented the understanding reached. At Entrikin's request, FDI clarified the terms of the agreement in a second "Price & Profit Limitations" sheet to NOAA dated June 21, 1990. [Tab 4.]

The June 21 iteration was accepted by NOAA as a correct articulation of the parties' understanding of how the fee limitation applied to FDI's work under the Contract. As there reflected, services in the nature of "Pre-Design" were not subject to the limitation -- including such services as initial site visits, topographic and geo-technical investigations, studies of any sort, conceptual design work, inspection and verification of as-built conditions, reproduction of documents for NOAA design reviews, and cost estimates prepared for milestone reviews.

This meant the first 15 per cent of FDI's design effort, which consisted entirely of such Pre-Design work, was excluded from the fee limitation, as were the listed Post-Design services.[9] The parties thus agreed that the services to which the statute and FAR applied were narrowly limited, in accordance with the statutory language, to the production of designs, plans, and specifications (here, part I, sect. C of the construction contracts) comprising the "Design Phase" -- that is, the site-specific designs prepared by FDI's engineers and its architectural subcontractor. [Tab 4.]

The June 21 iteration further reflected the parties' recognition and agreement that the fee limitation was to be applied <u>prospectively</u> -- i.e. to the <u>estimated</u> construction cost at the inception of the contract period (as denominator) -- and

[9] It should be noted that for a period of 10 months, from January 1 through October 31, 1992, FDI treated the first <u>35</u> per cent of the design effort as conceptual and pre-design work to be excluded from the six per cent limitation. This was inadvertent. FDI's demonstration of overall compliance with the statutory limitation (Section V) does not depend on the broader 35 per cent exclusion during this period, however. All calculations on which that demonstration is based assume exclusion of the first 15 per cent, not 35 per cent, for the period in question.

not to the actual cost of construction as determined following performance.[10] [Tab 4, first bullet.]

In addition, the list of excluded services in the June 21 iteration reflected the agreement of the parties to use the practice of the U.S. Army Corps of Engineers as a model for applying the statutory limitation and defining the services subject to the limitation. That practice was formulated by the Corps in Guidelines published as part of its training manual for contracting and procurement officers. The Corps practice and the Guidelines were familiar to both FDI and NOAA contracting personnel, and were considered by both to provide an accurate account of prior practice under the Contract, as well as a workable and legally sound basis for applying the limitation going forward. (The Corps Guidelines utilized by FDI as a basis for the May-June negotiations are attached at Tab 12.) With FDI's acquiescence, NOAA thus instructed FDI to use Corps guidelines when it directed FDI to review its base engineering effort for compliance. It was thus understood between NOAA and FDI that Corps guidelines would be the basis for application of the fee limitation under the 1986 Contract.

This definition of services subject to the fee limitation, contained in the June 21 iteration and Corps guidelines, conforms to FDI's application of the statute and FAR throughout the Contract, as explained in detail in Section III. It is the basis for both the prospective and retrospective analyses FDI performed to demonstrate, in refutation of OIG's contrary allegations, that FDI's work under the 1986 Contract in fact did comply with the fee limitation. It is thus clear that NOAA, like FDI, considered most of FDI's work under the Contract to be outside the six per cent limitation -- including the elements of program development, planning and support, program and project management, and contract administration that comprised the largest part of FDI's scope.

NOAA again confirmed its acceptance of the agreed definition of subject services in the Fall of 1990, when it exercised its option for FY91 and issued Task Order No. 6 to FDI. By letter dated October 3, 1990 [Tab 6], FDI's Project Manager R.B. Campbell, transmitted FDI's analysis of cost and fees, as

---

[10]The "prospective-only" interpretation was also confirmed by the fact that NOAA, through Entrikin, asked for FDI's review of the base engineering effort in its FY91 <u>proposal</u> to determine compliance. The parties at no time contemplated that compliance would be based on actual costs/fees and actual construction costs. As explained in Section III, this understanding is in strict accordance with the language of 41 U.S.C. § 254(b).

compared with estimated construction cost, for Task Order No. 6 and FY91. The analysis showed that FDI's base engineering costs and fee would not exceed 5.4 per cent, well within the limitation. This analysis (which was FDI's finalized response to Entrikin's earlier request for such a review) reflected FDI's definition of the services subject to the fee limitation, and conformed to the June agreement between NOAA and FDI as that definition.

On the basis of this analysis and information provided to NOAA in the course of the FY91 negotiations, NOAA determined that FDI was in compliance with the statute and FAR and proceeded with the tasking of Option Year Four. NOAA's determination and award of Option Year Four constituted acceptance of FDI's method of applying the fee limitation (which was, after all, in accordance with the parties' earlier agreement and understanding).

Furthermore, FDI's October 3 analysis and NOAA's acceptance of it were based on a "prospective-only" interpretation of the fee limitation. The October 3 letter and attachments make clear that FDI used estimated construction cost and projected cost/fees, both as determined at the inception of Option Year Four, to evaluate compliance. [Tab 6.] NOAA's acceptance of FDI's analysis constituted acceptance of the prospective-only application of the statute and FAR reflected in the documentation of the parties' earlier agreement and understanding. Again, the parties at no time contemplated that compliance would be based on actual costs/fees and actual construction costs, as determined following performance.

It should be noted that Contracting Officer Donita McCullough was aware of and participated fully in the June 12, 1990 meeting[11] and all subsequent negotiations, agreements, and representations on NOAA's part with respect to the six per cent fee limitation. Administrative Contracting Officer Anielak was similarly aware of and participated in the meeting and negotiations. The record makes it clear that NOAA's actions were carried out with the full knowledge and authority of the contracting officer and administrative contracting officer.[12]

---

[11]This fact is evidenced by the cc's on the documents referenced, and by the list of participants in the June 12, 1990 meeting [Tab 3, "Minutes of Meeting No. 1," list of attendees].

[12]The government is bound as well by the actions and representations of COTR Entrikin. Max Drill, Inc. v. U.S., 427 F.2d 1233, 1243 (Ct.Cl. 1970); accord, Pettijohn Engineering Co., IBCA No. 1346-4-80, 83-2 BCA ¶ 16,559 (1983); Urban Pathfinders, Inc., ASBCA No. 23134, 79-1 BCA ¶ 13,709 (1979).

## B. THE UNDERSTANDING BETWEEN FDI AND NOAA PREDATED THE 1990 NEGOTIATIONS FOR OPTION YEAR FOUR.

The 1990 understanding and agreement between NOAA and FDI articulated a practice which the parties had taken for granted since at least 1988. On May 13, 1988, FDI submitted a summary review of projected program costs to NOAA that reflected the basis for applying the fee limitation that was later articulated and formalized in June of 1990 agreement. [Tab 8.] In this document, FDI clearly applied the fee limitation only to WFO "design," expressly defined to exclude "Pre-design," "Post design," and coordination and other program services, as well as "general architecture and engineering" -- all in accordance with the 1990 agreement.[13] [Id., last page, ¶ 2.0.] NOAA's acceptance thus indicated agreement with FDI's interpretation of the statute and FAR as early as 1988.

Project records do not show earlier consideration of the issue of included and excluded services because substantive A/E design was not the focus of FDI's work during the first two years of the Contract. In fact, FDI's A/E design effort on this project was not fully under way until Option Year Four (FY91). Prior to that time, FDI's work for NOAA concentrated on program definition and development, with relatively few hours allocated to substantive A/E design within the meaning of the 1990

---

This is the case even if, contrary to fact, the COTR had acted without the contracting officer's authority. The facts described make it clear that NOAA and the contracting officer were fully aware of and adopted actions and representations of the COTR and all NOAA representatives who participated in negotiation of the June, 1990 understanding. Under these circumstances, the government would be bound even if those actions had not been authorized. Reliable Disposal Co., Inc., ASBCA No. 40100, 91-2 BCA ¶ 23,895 at 119,717 (1991) (actual or constructive knowledge of representative's unauthorized act, resulting in express or implied adoption of the act, constitutes ratification of the act and binds the government); Radcliffe Construction Co., ASBCA No. 38478, 90-3 BCA ¶ 22,96 at 114,314 (1990). Moreover the government clearly accepted benefits flowing from NOAA's promises and agreements, since FDI continued to perform in reliance on NOAA's assurance that the value of pre-design and post design services (as defined in the June 21 memorandum) would not be subject to the limitation and were therefore unallowable. Parking Co. of America, Inc., GSBCA No. 7654, 87-2 BCA ¶ 19,823 at 100,296-297 (1987) (tacit government acceptance of benefits sufficient for ratification); Silverman v. U.S., 679 F.2d 865 (Ct. Cl. 1982).

[13] Also excluded are estimating and scheduling activities (¶ 2.6.5), "design review" and associated estimates (¶ 2.6.2), and program management activities, including construction management and inspection (¶¶ 2.1-2.5) -- in further accordance with the 1990 articulation. Note that design services, at an estimated $4.1 million, were at that time, as throughout the contract, projected to comprise only a small proportion of the overall FDI scope $38.5 million.

agreement. The fee limitation issue became a focus of attention only when program definition was relatively complete, so that substantive A/E design could start in earnest and become a substantial component of FDI' scope of work. FY91 marked this transition in the Contract. The limitation issue was recognized and addressed prior to that time, but was not fully articulated until the Option Year Four negotiations in 1990 because the work did not require it.

The relatively small role of technical A/E design activities early in the contract was documented in early (1987) negotiations for definitization of the contract. NOAA/DOC review of contract language noted the absence of express reference to the fee limitation [Tab 9]. FDI responded, based on prior negotiations with CO Jesus Arredondo, that FDI and NOAA had agreed the Contract could not yet be considered solely as an architect/engineering services contract subject to the six per cent fee limitation. [Tab 10, ¶ 7] This was because the cost of construction -- basis for calculation of the A/E fee limit -- could not be estimated at that time due to the undefined nature of NOAA's program and design requirements; and because FDI's scope of work included many services other than A/E design. [See id.] The parties had accordingly agreed that FDI's work at that time, as a "Level of Effort Professional Services Contract," would most properly fit under the 10 per cent fee limitation of Far 15.903.(d)(iii). [Id.]

NOAA clearly accepted FDI's comments and acknowledged the prior understanding, since NOAA omitted the six per cent fee limitation from the definitized 1986 Contract. The point is that neither FDI nor NOAA considered work under the Contract to come within the six per cent fee limitation during the early years, when program development, rather than A/E design, comprised virtually all of FDI's scope of work.[14] When substantive A/E design started to increase significantly in 1988 and 1989, FDI produced cost analyses [Tab 8] that reflected its restricted definition of the services subject to the limitation. NOAA acquiesced in this definition. At the point where the work shifted substantially towards A/E design, beginning with FY91, the parties addressed the issue again and, not surprisingly, agreed on a definition of included and excluded services that

---

[14] This fact is further documented by the parties' agreement, at the inception of the relationship in 1986, not to refer to FDI solely as "A/E Contractor" in the contract documents -- again because FDI's work, especially at the beginning, was focussed on program development and management rather than engineering. [Tab 11.] The definitized contract accordingly referred to designated FDI as Professional Services Contractor, or PSC.

conformed with prior practice. The 1990 agreement and understanding was the result.

**C. NOAA'S DECISION TO ADOPT THE AGREED CRITERIA FOR APPLICATION OF THE STATUTORY LIMITATION WAS WITHIN THE DISCRETION OF THE CONTRACTING OFFICER.**

Neither NOAA nor the Department of Commerce had agency criteria or guidelines, at any time during the 1986 Contract (or even now), for determining the services that are subject to the statutory limitation. [Even OIG acknowledges this fact. Final Audit Report at 4.] Where the agency does not regulate a contracting officer's authority to make decisions on a discrete issue of contract interpretation, the decision is within the latter's discretion and the discretion of his or her designated representatives.

In the absence of NOAA or DOC criteria, CO McCullough and COTR Entrikin were free to develop and apply a definition of subject services that in their judgment best served the interests of NOAA and the project. Their adoption of the terms of the agreement reviewed above, their decision to adopt this agreement as a satisfactory articulation of prior FDI/NOAA practice, and their decision to use Corps Guidelines to articulate both the agreement and prior practice, were all clearly within their authority to act for the government on this project.

**V. UNDER THE AGREEMENT WITH NOAA AND A PROPER CONSTRUCTION OF THE STATUTE AND FAR, FDI COMPLIED WITH THE SIX PER CENT FEE LIMITATION.**

**A. OIG'S DEFINITION OF DIRECT ENGINEERING DESIGN IS OVERBROAD AND CONTRARY TO CONTROLLING LAW AND THE AGREEMENT OF THE PARTIES.**

OIG's finding that FDI's costs and fee exceeded the statutory limitation under the 1986 Contract is driven by three calculations: (1) A computation of "alleged direct engineering design labor costs" according to OIG-defined criteria for services subject to the statutory limitation (OIG value, $2,252,008); (2) an allocation of alleged "management labor" to "direct engineering design," based on OIG criteria (OIG value, $1,513,050); and (3) a computation of alleged "Gould Evans Design Cost," also based on OIG criteria for subject services (OIG value, $1,683,669). [<u>See</u> Final Audit Report at 4-5, 17.] The other components of OIG's "direct engineering design" (overhead, rent, G&A, cost of capital) are percentage computations driven

**236.606-70 Statutory fee limitation.**

(a) 10 U.S.C. 4540, 7212, and 9540 limit the contract price (or fee) for A-E services for the preparation of designs, plans, drawings, and specifications to six percent of the project's estimated construction cost.

(b) The six percent limit also applies to contract modifications, including modifications involving—

(1) Work not initially included in the contract. Apply the six percent limit to the revised total estimated construction cost.

(2) *Redesign.* Apply the six percent limit as follows—

(i) Add the estimated construction cost of the redesign features to the original estimated construction cost;

(ii) Add the contract cost for the original design to the contract cost for redesign; and

(iii) Divide the total contract design cost by the total estimated construction cost. The resulting percentage may not exceed the six percent statutory limitation.

(c) The six percent limit applies only to that portion of the contract (or modification) price attributable to the preparation of designs, plans, drawings, and specifications. If a contract or modification also includes other services, the part of the price attributable to the other services is not subject to the six percent limit.

**36.606-70 Statutory fee limitation.**

(c) The following are examples of services that, for the purpose of this section only, are not considered an integral part of the preparation of designs, plans, drawings, and specifications, and may be excluded from the A-E fee when determining compliance with the statute.

(i) Initial site visits.

(ii) Field, topographic, property, boundary, utility, and right-of-way surveys.

(iii) Subsurface explorations and borings; soils and materials testing and resultant reports.

(iv) Feasibility, functional, and economic studies.

(v) Flow gaugings, model testing.

(vi) Preparation or verification of as-built drawings.

(vii) Preparation of general and development criteria.

(viii) Preparation of general and feature design memoranda.

(ix) The services of consultants, where not specifically applied to the preparation of designs, plans, drawings or specifications.

(x) Preparation of environmental impact assessments, statements, and supporting data.

(xi) Construction phase services.

(xii) Models, renderings, or photographs.

(xiii) Reproduction of designs for review purposes.

(xiv) Travel and per diem allowances in connection with services that are not directly related to the preparation of designs, plans, drawings, or specifications.

[Code of Federal Regulations]
[Title 48, Volume 5]
[Revised as of October 1, 2003]
From the U.S. Government Printing Office via GPO Access
[CITE: 48CFR836.606-73]

[Page 213-214]

TITLE 48--FEDERAL ACQUISITION REGULATIONS SYSTEM

CHAPTER 8--DEPARTMENT OF VETERANS AFFAIRS

PART 836_CONSTRUCTION AND ARCHITECT-ENGINEER CONTRACTS--Table of Contents

Subpart 836.6_Architect-Engineer Services

Sec. 836.606-73 Application of 6-percent architect-engineer fee limitation.

(a) The 6-percent fee limitation does not apply to the following architect or engineer services:

(1) Investigative services including but not limited to:

(i) Determination of program requirements including schematic or preliminary plans and estimates.

(ii) Determination of feasibility of proposed project.

(iii) Preparation of measured drawings of existing facility.

(iv) Subsurface investigation.

(v) Structural, electrical, and mechanical investigation of existing facility.

(vi) Surveys: Topographic, boundary, utilities, etc.

(2) Special consultant services not normally available in organizations of architects or engineers not specifically applied to the actual preparation of working drawings or specifications of the project for which the services are required.

(3) Other:

(i) Reproduction of approved designs through models, color renderings, photographs, or other presentation media.

(ii) Travel and per diem allowances other than those required for the development and review of working drawings and specifications.

(iii) Supervision or inspection of construction, review of shop drawings or samples, and other services performed during the construction phase.

(iv) All other services that are not integrally a part of the production and delivery of plans, designs, and specifications.

(4) The cost of reproducing drawings and specifications for bidding and their distribution to prospective bidders and plan file rooms.

(b) The total cost of the architect or engineer services contracted for may not exceed 6 percent of the estimated cost of the construction project plus the estimated cost of related services and activities such as those shown in paragraph (a) of this section. To support project submissions, VA Form 10-1193, Application for Health Care Facility Project, and VA Form 10-6238,

[[Page 214]]

EMIS Construction Program-Estimate Worksheet, will be used and the proposed technical services shown where necessary and applicable.

[49 FR 12618, Mar. 29, 1984, as amended at 61 FR 20493, May 7, 1996; 67 FR 49260, July 30, 2002]