# INDEX FOR APPENDIX

**DOCUMENT** **PAGE(S)**

Declaration of Donita McCullough
Dated, April 7, 2004 . . . . . . . . . . . . . . . . . . . 1

Contracting Officer's Final Decision
Dated April 13, 1999 . . . . . . . . . . . . . . . . . . . 8

Excerpts From Contract No.
50WCNA606099, Dated May 30, 1987 . . . . . . . . . . . . . 41

Program Review Transmittal From
Fluor Technology, Inc.,
Dated May 13, 1988 . . . . . . . . . . . . . . . . . . . . 53

E-Mail, Ron Anielak To Fluor,
Dated May 24, 1990 . . . . . . . . . . . . . . . . . . . . 57

Minutes of June 12, 1990 Meeting . . . . . . . . . . . . . . 59

Task Order No. 6 Pricing Memorandum,
Dated October 3, 1990 . . . . . . . . . . . . . . . . . . 62

E-Mail From Terry L. Sonderup,
Dated August 15, 1991 . . . . . . . . . . . . . . . . . . 65

Position Paper Of Fluor Daniel, Inc.
In Response to OIG's Final Audit
Dated, June 21, 1993 . . . . . . . . . . . . . . . . . . . 66

DFARS § 236.606-70, Statutory
Fee Limitation . . . . . . . . . . . . . . . . . . . . . . 74

EFARS § 36.606-70, Statutory
Fee Limitation . . . . . . . . . . . . . . . . . . . . . . 75

DVA FAR Supp § 836.606-73, Application Of
6-Percent Architect-Engineer
Limitation . . . . . . . . . . . . . . . . . . . . . . . . 76

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FLUOR ENTERPRISES, INC.<br>f/k/a FLUOR DANIEL, INC.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 00-207<br>(Judge Block) |

**DECLARATION OF CONTRACTING OFFICER DONITA McCULLOUGH**

I, Donita McCullough, do hereby declare under penalty of perjury that:

1. I have personal knowledge of the facts stated herein as a result of having acted as the Contracting Officer for Contract No. 50WCNA606099, having reviewed relevant documents related to the Contract, and issuing a final decision seeking repayment of fees from the Plaintiff for architectural and engineering services that exceeded the limitation on such fees at 41 U.S.C. § 254(b).

2. I am a Contracting Officer with the National Oceanic and Atmospheric Administration at the Central Administrative Support Center in Kansas City, Missouri. I have an unlimited warrant.

3. The National Oceanic and Atmospheric Administration (NOAA) is an agency of the United States Department of Commerce. The National Weather Service operates under NOAA.

4. I became the Government's Contracting Officer for Contract No. 50WCNA606099 (the Contract) in 1990, and have continued in that capacity to the

present. The first Contracting Officer assigned to the Contract, Jesus Arredondo, is deceased.

5. In the mid-1980s, NOAA undertook a program to restructure and modernize the National Weather Service and to apply new technologies for observing atmospheric conditions and processing weather information. Among the new technologies that the Weather Service planned to utilize was the next generation weather radar (NEXRAD), with radar sites to be constructed throughout the United States.

6. As part of the modernization program, the National Weather Service began a consolidation of its existing 249 weather offices into approximately 116 Weather Forecast Offices (WFOs), to be located near the planned NEXRAD sites.

7. In 1986, NOAA initiated a procurement for architectural and engineering services in accordance with Federal Acquisition Regulation ("FAR") Part 36 to obtain a contractor to provide architectural design, project management, and construction management services for the WFO construction project.

8. NOAA's Architect-Engineer Selection Board ranked firms submitting qualifications statements, and, after price negotiations, Fluor Technology, Inc. ("Fluor") which later became Fluor Daniel, Inc., and is now Fluor Enterprises, Inc.) was selected for award. On July 29, 1986, NOAA issued a letter contract to Fluor, which allowed Fluor to commence work on the project.

9. On May 30, 1987, the letter contract was definitized with a base period to September 30, 1987, with the Government having the right to exercise options, all of which were exercised, for four subsequent years. The contract was later extended through

October 1992.

10. The Contract's Statement of Work separated the support services to be provided by Fluor into the following categories:

a. Program and project management and planning (Requirement 2.1);

b. General architectural and engineering ("A&E") services (Requirement 2.2);

c. WFO site-specific A&E services (Requirement 2.3); and

d. Construction management and inspection (Requirement 2.4).

11. Under the Contract, NOAA ordered work through the issuance of task orders. During the period of the Contract, NOAA issued Fluor a total of eight task orders, each of which identified those WFO sites for which site-specific A&E services under Contract Requirement 2.3 were to be provided during the task period, as well as the other A&E tasks to be performed for each WFO site.

12. Each task order required Fluor, in accordance with Requirement 2.1 of the contract, to initially develop construction cost estimates for each WFO site. These estimates were to be the basis for project planning, and established the estimated cost of construction for application of the six percent fee limitation of 41 U.S.C. § 254(b). Site-specific design work did not begin prior to the development of Fluor's WFO cost estimates.

13. WFO site-specific A&E services were a significant part of the Contract. Under the Contract, Fluor was paid a total of $42,531,626. Of that total amount, I determined that Fluor was paid $5,551,549 for WFO site-specific A&E services that were subject to

3

the statutory six percent limitation.

14. During the time that I was the Contracting Officer for the Contract, Fluor consistently indicated that it understood that the six percent fee limitation on site-specific A&E services applied to the Contract. In cost analysis documents submitted to NOAA, Fluor tracked A&E labor costs by WFO site, and tracked whether site-specific A&E costs were within six percent of the estimated cost of construction of the sites.

15. In 1990, I took part in discussions between NOAA and Fluor concerning work to be performed during the fourth option year of the contract (fiscal year 1991). During the discussions in which I participated, representatives of Fluor and NOAA discussed the application of the six percent fee limitation on site-specific A&E services. Fluor's representatives expressed their understanding that the six percent fee limitation applied to the Contract.

16. On June 12, 1990, I attended a meeting with Fluor's representatives where the statutory fee limitation was discussed. At that meeting, Fluor's project manager distributed a document entitled "Price & Profit Limitations," that set out Fluor's understanding that the fee limitation of 41 U.S.C. § 254(b) applied to the Contract. The document detailed those site-specific A&E design tasks that Fluor believed were subject to the six percent limitation. (No subsequent contract modification was executed that incorporated Fluor's listing of design tasks that were subject to the fee limitation.)

17. Throughout the course of the contract, NOAA accepted and paid invoices for A&E services that were submitted by Fluor.

18. At the conclusion of the fourth option year, construction of all of the WFOs under

4

the Weather Service modernization program was not completed under the Contract No. 50WCNA606099. Therefore, NOAA awarded an interim bridge contract to Fluor that covered project work for the period November 1992 to December 31, 1993. A final contract completing the construction program was subsequently awarded to Fluor with an effective date of January 1, 1994.

19. In accordance with regulations, the Commerce Department's Inspector General (IG) commenced a cost-incurred audit of the Contract as it was nearing its conclusion. In March 1993, the IG issued an interim audit report covering all services provided under Task Orders 1 to 7 of the Contract, which were all services provided through April 30, 1992. The IG questioned a total of $7,171,743 in costs paid to Fluor of which $6,987,219 was for A&E fees the Government paid Fluor in excess of the statutory maximum allowed by 41 U.S.C. § 254(b). The interim audit also questioned payment of $184,524 in miscellaneous unallowable costs.

20. A copy of the interim audit report was furnished to Fluor. In June, 1993, Fluor's project manager submitted to me a response to the audit findings, entitled "Position Paper," in which Fluor acknowledged that the six percent statutory limitation on A&E fees established by 41 U.S.C. § 254(b) applied to the Contract. Fluor also asserted that it had tracked its compliance with the statute throughout the course of the Contract, and it believed that site-specific A&E fees had not exceeded six percent of the WFOs' estimated cost of construction.

5

21. On March 21, 1995, the IG issued his final audit report, covering the entire contract period, including Task Order 8, in which he determined that the site-specific A&E fees Fluor had been paid exceeded the statutory fee limitation of 41 U.S.C. § 254(b) in the amount of $4,581,798. In the final report, the IG made a number of adjustments to his 1993 interim audit of A&E fees, such as excluding program administration costs and site-specific conceptual design services from the definition of design costs subject to the statutory limitation. The IG also questioned miscellaneous unallowable costs in the amount of $245,062, relating to salaries, subcontract costs, travel costs and indirect costs.

22. After issuance of the final IG audit, I communicated with Fluor's contract representatives to identify the site-specific A&E costs for each WFO. I reviewed extensive amounts of documentation provided by Fluor and had a lengthy series of communications with Fluor concerning the issues raised in the IG audit report.

23. The negotiations between Fluor and the Government reached an impasse in January 1999. Consequently, on April 13, 1999, I issued my final decision in which a demand was made upon Fluor to repay the Government $2,774,072. Of the amount demanded:

a. $2,560,413 was for site-specific A&E fees that were paid to Fluor in excess of the six percent limitation that is allowed by 41 U.S.C. § 254(b) upon such fees; and

b. $213,695 was for unallowable costs that the Government paid including duplicative labor charges, excess subcontractor costs, and unallowable

6

overhead and indirect costs.

24. In my final decision asserting a Government claim against Fluor, I applied the statutory limitation on A&E fees under 41 U.S.C. § 254(b) only to Fluor's WFO site-specific A&E services (Requirement 2.3).

25. Fluor filed its Complaint in the Court of Federal Claims almost one year later, on April 11, 2000.

I, Donita McCullough, pursuant to 28 U.S.C § 1746, declare that the above statements are true and correct to the best of my knowledge.

Donita McCullough

Donita McCullough

Executed on 04/07/2004

7

**National Oceanic and Atmospheric Administration,**
Host Agency serving:
Economic Development Administration
International Trade Administration
Minority Business Development Agency
Office of Export Enforcement
Office of the Inspector General

**U.S. DEPARTMENT OF COMMERCE**
**Central Administrative Support Center**
Federal Building, Room 1736
601 East 12th Street
Kansas City, Missouri 64106

CERTIFIED - RETURN
RECEIPT REQUESTED
P119312807

April 13, 1999

Fluor Daniel, Incorporated
Attention: Marc Cisneros
3353 Michelson Drive
Irvine, California 92698

Dear Mr. Cisneros:

This letter constitutes the final decision of the Contracting Officer making demand upon Fluor Daniel, Inc. and seeking repayment of $2,774,072 under Contract No. 50WCNW606099.

Background

On July 29, 1986, Letter Contract No. 50WCNA606099 was issued by the Central Administrative Service Center of the National Oceanic and Atmospheric Administration (NOAA) to Fluor Daniel, Incorporated (FDI). The contract was subsequently definitized on May 30, 1987. Under the contract, FDI was to provide a wide range of services in support of NOAA's Weather Forecast Office (WFO) modernization program, including overall program management and planning, general and site specific architecture and engineering services, and construction management and inspection. The contract was later modified to include NEXRAD program construction and real property acquisition. In July, 1992, NOAA entered into a separate contract to continue the NEXRAD support functions. The FDI contract was a cost-plus-fixed-fee contract, with work assigned through the issuance of periodic task orders by the Contracting Officer. The base period of the contract extended through September 30, 1987, and provided for four subsequent option years, all of which were exercised. The contract was later extended through October, 1992.

Responsibility was thereafter transferred to NOAA's Program, Grants and Administrative Service Center to negotiate and administer follow-on contracts for completion of the WFO modernization program. FDI was awarded the contracts to continue program management, design and other functions in support of the program. An interim bridge contract covered the period November, 1992 to December 31, 1993, and a follow-on contract was executed, effective January 1, 1994. This final decision relates solely to a Government claim under the first WFO contract with FDI.

Prior to entering the 1986 contract, the parties did not negotiate a separate fee for architectural and engineering design and did not address,

in the contract documents, the statutory limitation on such fees set out at 41 U.S.C. 254(b). FDI, in fact, informed the Contracting Officer that there was no statutory or regulatory limitation that specifically applied to architectural/engineering services. Throughout the term of the contract, design services were ordered through task orders without reference to the statutory limitation on the fees payable for the services. In June, 1990, FDI and NOAA representatives discussed the statutory limitation on design fees, and agreed orally concerning which design tasks would be subject to the fee limitation. This agreement was not formally incorporated into the contract, however, and NOAA did not independently determine if the statutory limit on design fees had been exceeded during the contract.

In March, 1993, the Office of the Inspector General of the Department of Commerce issued an interim cost incurred audit of the 1986 contract covering the period through completion of Task Order 7 (April 30, 1992). The IG questioned $7,171,743 in costs paid to FDI. A copy of the audit report was furnished to FDI shortly after it was issued. In June, 1993, FDI submitted its response, termed a "Position Paper," which questioned the audit report's findings.

On March 21, 1995, the Inspector General issued its final audit report. In its final report, the Inspector General questioned engineering design costs incurred in excess of the statutory fee limitation in the amount of $4,581,798; in addition, costs in the amount of $245,062 were questioned relating to salaries, subcontract costs, travel costs and indirect costs. In the final report, the Inspector General made a number of adjustments to its interim audit, including excluding program administration costs and site-specific conceptual design services from the definition of design costs subject to the statutory limitation.

Upon issuance of the final audit report, I undertook an extensive effort to work with FDI to validate the various numbers used by the Inspector General, and to address many of FDI's concerns about the numbers and methodology used by the IG.

Following my communications with FDI, I provided my analysis to FDI on October 5, 1995. In that analysis, I provided FDI with my estimate that payments for design services exceeding the fee limitation in 41 U.S.C. 254(b) totaled $3,802,078, and that additional unallowable costs were paid under the contract in the amount of $258,559. In my letter, I invited FDI to submit a settlement proposal in response to my analysis of contract overpayments.

On January 12, 1996, FDI submitted a settlement offer, in which it offered to pay $299,621 for excess design fees and $203,379 for other unallowable costs. I then undertook to review the evidence relating to the design fee overpayment in order to respond to the settlement offer. On October 2, 1996, I wrote to FDI. In the letter, I accepted FDI's offer to settle the matter of overpayment of miscellaneous costs in the amount of $203,379. I rejected FDI's offer to settle the design fee overpayment, but, for purposes of settlement, I offered to reduce my figure to $1,689,199. For purposes of settlement, I offered to eliminate certain design costs from the design fee computation. In addition, I offered to include leased sites in the computation, although a minimum amount of design work was performed for these sites, the lessor acquired and managed the construction, and inclusion of the sites heavily skewed the design fee computation in FDI's favor.

On July 8, 1998, FDI wrote to me proposing an alternate method of determining the estimated cost of construction for the lease sites. However, I have determined that if leased sites would be included in the design fee computation, my figures for the estimated cost of construction are the correct ones, and, in fact, are figures used by FDI during the course of the contract.

On January 12, 1999, counsel for the Department of Commerce and I met with FDI representatives and their counsel to discuss settlement. I inquired at the outset of the meeting whether the parties had effected settlement of the miscellaneous costs issue in the amount of $203,379. FDI's representatives responded that there was no further need to discuss the issue, and it was not discussed. FDI, however, has not yet provided payment of the settlement amount. Therefore, I reviewed the questioned costs and adjusted my calculations appropriately to reflect the approved, audited final indirect costs rates. This final decision includes my demand for $213,659 for miscellaneous unallowable costs.

At the January 12th meeting, I offered various concessions to FDI in an effort to reach settlement on the design fee issue. No settlement was reached at the meeting, however, and I informed FDI that I would then issue my final decision and demand for repayment of excess costs.

<u>Government Claims</u>

*Miscellaneous Unallowable Costs*

It is my determination that $213,659 in unallowable costs (apart from costs for design services) was paid to FDI under contract No. 50WCNW606099. These unallowable costs include the following:

| | |
|---|---|
| $23,385 | Unallocable and duplicative direct labor charges |
| $146,584 | Excess costs paid for subcontracts and business travel expenses |
| $29,015 | Overhead costs |
| $14,675 | Indirect costs |

A detailed summary and explanation of the unallowable costs is included in Appendix I, which is attached to and incorporated in this final decision.

*Excess Design Fees*

It is my determination that FDI was paid $2,560,413 under Contract No. 50WCNW606099 in excess of the statutory limitation on design fees in 41 U.S.C.254(b).

41 U.S.C.254(b) provides:

> **b) Barred contracts; fee limitation; determination of use; advance notification.**
>
> * * *
>
> **[A] fee inclusive of the contractor's costs and not in excess of 6 per centum of the estimated cost, exclusive of fees, as determined by the agency head at the time of entering into the contract, of the project to which such fee is applicable is authorized in contracts for architectural or engineering services relating to any public works or utility project.**

FAR 15.903, in effect at the time of the FDI contract, states, in part:

> **15.903 Contracting officer responsibilities**
>
> * * *
>
> (d)(1) The contracting officer shall not negotiate a price or fee that exceeds the following statutory limitations, imposed by 10 U.S.C. 2306(d)and 41 U.S.C. 254(b):
>
> * * *
>
> (ii) For architect-engineering services for public works or utilities, the contract price or the estimated cost and fee for production and delivery of designs, plans, drawings, and specifications shall not exceed 6 percent of the estimated cost of construction of the public work or utility, excluding fees.

The statute applies to all contracts which involve design work, whether paid on a fixed price or cost reimbursement basis. *To the Administrator, General Services Administration*, GAO No. B-152306, 46 Comp. Gen. 573 (1966). In referring to a "fee" for architectural and engineering services, the statute means the total compensation, including profit, which may be paid for such services. *To the Administrator, Veterans Administration*, GAO No. B-152306, 46 Comp. Gen. 183, 189 (1966).

FDI, as an experienced professional firm, should have known of the statutory prohibition against design costs exceeding 6% of the estimated cost of construction and should have had an accounting system in place to accurately track design costs to ensure there was no statutory violation. FDI, however, informed the Contracting Officer at the time of the execution of the contract that 41 U.S.C.254(b) did not apply. It appears that neither NOAA nor FDI fully understood how the statute would apply; however, during performance of the contract, the parties became aware of the statute and its applicability to this contract. FDI failed to take action to adequately and consistently track costs to ensure and substantiate compliance with the statute. Any discussions between the parties concerning how the statute would apply were never incorporated into a contract modification.

FDI has raised the issue whether it is proper to evaluate if 41 U.S.C. 254(b) was violated when the parties did not specifically negotiate at the outset of the contract what services would be included in the design fee calculation. The statute, however, places an absolute limitation on payment of fees to 6% of the estimated cost of construction. Relevant cases interpreting the statute and determining whether a violation have occurred have invariably looked to total design costs paid over the course of a contract, without regard to any negotiations of the parties. *See, e.g., Rosenblum & Associates Architects, Inc.*, GSBCA No. 5835, 81-1 BCA 15,131 ("Although no [A/E] fee amount was negotiated for Proposal Request #2, such fee could not legally have exceeded the statutory limit of 6% of the estimated construction award of $56,440, or $3,386.40."); *To the Administrator, Veterans Administration*, GAO No. B-152306, 1967 WL 2259 (Jan. 24, 1967).

Moreover, the Comptroller General was asked by the Department of Commerce Inspector General to provide an opinion relating to application of the design fee limitation to Contract No. 50WCNW606099. In its opinion, GAO noted that "NOAA did not include in the contract with Fluor Daniel the 6-percent design fee limitation...Instead, Fluor Daniel charged NOAA all costs it incurred in connection with the contract without regard to the...limitation." Nevertheless, GAO found that NOAA's determination, after

the close of the contract, that the statute was violated and that excess design costs should be repaid, was proper. *Department of Commerce-Determining Compliance with Statutory Limitation on Architectural and Engineering Design Services*, GAO No. B-258058, 1995 WL 274823 (May 8, 1995).

It is my determination that the total estimated cost of construction of NOAA sites to which the 6% statutory fee limitation applies is $49,852,262. The maximum allowable costs for the production and delivery of designs, plans, drawings, and specifications are therefore $2,991,136. I have determined that NOAA paid FDI $5,551,549 in design costs for services which fall under the definition of architectural or engineering services in 41 U.S.C.254(b). Therefore, NOAA paid to FDI $2,560,413 in excess of the statutory limitation on design fees, and this amount should be repaid to the Government. A detailed summary and explanation of my calculation of the estimated cost of construction and design costs is included in Appendix II, which is attached to and incorporated in this final decision.

I am demanding repayment of $2,774,072 for excess design engineering costs and unallowable and unallocable costs paid under Contract No. 50WCNW606099. Any amounts not paid within thirty (30) days from the date of this demand will bear interest from the date of the demand. The interest rate will be the rate established by the Secretary of the Treasury, for the period affected, under Public Law 92-41.

This is the final decision of the Contracting Officer. You may appeal this decision to the General Services Board of Contract Appeals. If you decide to appeal, you must, within ninety (90) days from the date you receive this decision, mail or otherwise furnish written notice to the General Services Board of Contract Appeals and provide a copy to me, the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision and identify the contract by number. With regard to appeals to the General Services Board of Contract Appeals, you may, solely at your election, proceed under the Board's small claims procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or more. Instead of appealing to the General Services Board of Contract Appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Sincerely,

Donita McCullough

Donita McCullough
Contracting Officer

# SUMMARY OF COSTS AND FEES CLAIMED
# CONTRACTING OFFICER'S CONCLUSIONS
# CONTRACT NUMBER 50WCNA606099

## AUGUST 4, 1986 THROUGH OCTOBER 31, 1992

| | Costs and Fee Claimed | Costs Questioned/ Unallowed | Costs Accepted | Notes |
|---|---|---|---|---|
| Direct Labor | $13,764,060 | $23,385 | $13,740,675 | (a)(b)(c) |
| Other Direct Costs | 10,870,058 | 146,584 | 10,723,474 | (a)(b)(c) |
| Overhead | 10,676,619 | 29,015 | 10,647,604 | (a) |
| Subtotal | $35,310,737 | $198,984 | $35,111,753 | |
| G&A | 3,627,714 | 14,535 | 3,613,179 | (b) |
| Cost of Money (O/H) | 150,128 | 174 | 149,954 | (c) |
| Cost of Money (G&A) | 24,947 | (34) | 24,981 | (c) |
| Total Costs | $39,113,526 | $213,659 | $38,899,867 | |
| Fixed Fee | 3,418,100 | | 3,418,100 | |
| Total Invoices | $42,531,626 | $213,659 | $42,317,967 | (a) |
| Compliance Adjustment | | 2,560,413 | (2,560,413) | APPENDIX II |
| Total | $42,531,626 | $2,774,072 | $39,757,554 | |

[a] The total costs and fee claimed was tabulated from the latest invoice submitted for each task. The following is a list of those invoices (Task Number/Invoice Number/Invoice Date):

| | |
|---|---|
| 1/04-00047841/Apr. 5, 1991 | 5/80-00014586/Jan. 27, 1997 |
| 2/04-00073653/Sept. 20, 1993 | 6/80-00014587/Jan. 27, 1997 |
| 2b/04-00073654/Sept. 20, 1993 | 7/80-00014848/Jan. 28, 1997 |
| 3/80-00009773/Dec. 11, 1995 | 8/80-00014589/Jan. 27, 1997 |
| 4/80-00016964/June 26, 1997 | 8/80-00016966/Jun. 26, 1997 |

NOTES TO SUMMARY OF CONTRACTING OFFICER'S CONCLUSIONS

(a) DIRECT LABOR COSTS

Direct labor costs in the amount of $23,385 for the performance of administrative services for non-NOAA activities ($18,416) and duplicative data entry charges ($4,969) have been disallowed under this contract.

**Unallocable Administrative Labor Costs for Non-NOAA Activities**

Administrative labor costs in the amount of $18,416 relating to non-NOAA activities performed at the Kansas City project office are unallocable.

FDI agreed with the audit findings as evidenced by an electronic mail message dated September 17, 1992 from Jim Wagner to Dwayne Wilson, Jack Toliver and other FDI personnel. The agreement between the OIG and FDI was confirmed in a letter dated September 18, 1994 from the OIG to Dwayne Wilson. FDI identified 1568.7 direct labor hours and $18,416 billed to the NOAA contract in error and agreed to credit the NOAA contract for these charges. To date, a credit has not been issued.

The following table summarizes the computation of unallocable administrative labor costs.

| | Non-NOAA Labor Percentage | Unallocable Labor Cost |
|---|---|---|
| Task Order 4 | 4.592% | $2,494 |
| Task Order 5 | 6.650% | 5,036 |
| Task Order 6 | 5.381% | 6,526 |
| Task Order 7 | 4.318% | 4,360 |
| Total Unallocable Labor | | $18,416 |

**Unallowable Duplicative Costs for Time-sheet Data Entry**

Direct labor costs, in the amount of $4,969, for time-sheet data entry functions that duplicate functions in the overhead cost pool are unallowable.

In its response to the OIG audit, FDI acknowledged "duplicative time-sheet data entry costs" and agreed to credit NOAA "with the questioned direct labor cost, plus appropriate burdens, G&A, and cost of capital." To date a credit has not been issued.

The following table summarizes the computation of unallowable direct labor costs for time-sheet data entry.

| | Calculated Data Entry Hours | Calculated Data Entry Costs |
|---|---|---|
| Task Order 5 | 74.0 | $ 503 |
| Task Order 6 | 370.0 | 2,612 |
| Task Order 7 | 255.0 | 1,854 |
| Total Unallowable Direct Labor | 699.0 | $4,969 |

**Human Resources Activities - Duplicative Costs**

FDI charged labor for performing human resources activities including recruitment, hiring and employee benefits administration as a direct cost to the contract.

The indirect cost (overhead) charged to direct labor includes allocations from the support cost pool and the employee benefits cost pool. The support cost "pool is comprised of costs for project support functions" including: indirect labor and expenses, standards and procedures, recruitment, training, personnel and related payroll burdens and facility costs. Insurance and other benefits administration costs are allocated from the employee benefits pool.

It appears that FDI charged human resources activities as both direct and indirect costs to the contract, thereby duplicating costs. However, FDI's explanation provided in letters to the Contracting Officer, dated March 3, 1995 and March 30, 1995, along with information provided by Howard Dameron, DCAA, Santa Ana, California, DCAA, is sufficient to forego further discussion on this issue.

(b) OTHER DIRECT COSTS

Other direct costs in the amount of $146,584 for improper indirect cost allocations ($18,614) charged by Gould Evans Architects, other subcontract costs incurred outside the performance period of this contract ($127,133) and excessive travel costs ($837) are questioned or disallowed.

**Gould Evans Architects (GEA) Subcontract**

GEA subcontract costs in the amount of $18,614 are questioned. These questioned costs involve improper indirect cost allocations ($19,465), offset by a credit ($851) for underclaimed direct labor. The computations for the questioned costs are summarized on page 9, EXHIBIT 1.

**Other Subcontracts**

The OIG identified numerous costs incurred, totaling $127,133, for subcontracted services rendered after October 31, 1992. Such services included but were not limited to, title searches, site surveys and moving and storage services.

Contract number 50WCNA606099 was a term, level of effort, cost reimbursement type contract with a definite performance period. FDI had the authority, under this contract, to incur expenditures for a specified level of effort through October 31, 1992. It did not have the authority to commit to providing services or incur charges for services beyond that date. Therefore, subcontract charges in the amount of $127,133, for services performed after October 31, 1992, are unallowable.

A complete list of subcontract costs disallowed is provided on page 10, EXHIBIT 2.

**Unallowable Travel Charges**

FDI was reimbursed for excessive travel expenses totaling $837.00. The amount claimed for lodging costs, meals, and incidental expense (per diem) on four expense reports billed on invoice number 04-00067208 are in excess of what is allowed.

On expense report number I309682, the traveler (Scott) claimed an extra day's per diem. On expense report number I309616 the traveler (Blackard) claimed an extra nights lodging. On expense report number (s) I314141 and I314112, the travelers (Pond and Baird) claimed lodging costs in excess of that stated on the travel itinerary.

The following table summarizes the questioned travel costs.

| Report Number | Traveler | Claimed Per Diem | Authorized Per Diem | Questioned Costs |
|---|---|---|---|---|
| I309682 | Scott, Tim | $ 179.60 | $ 119.60 | $ 82 |
| I309616 | Blackard, Chas | 264.20 | 252.80 | 69 |
| I314141 | Pond, Duane | 1,715.00 | 1,372.00 | 343 |
| I314112 | Baird, George | 1,715.00 | 1,372.00 | 343 |
| Total Questioned Travel Costs | | | | $837 |

(c) INDIRECT COST CHARGES

FDI indirect costs include, overhead, general and administrative expenses (G&A) and facilities capital cost of money charges. Weighted average indirect costs rates, were used to compute allowable indirect cost charges. The weighted average indirect cost rates are provided on page 11, EXHIBIT 3.

The total indirect cost charges questioned is $43,961. This includes $29,015 for overhead; $14,535 for G&A expense; and $411 facilities capital cost of money charges.

## Overhead Costs

Overhead costs on direct labor was computed by applying the weighted average rates to labor costs. The overhead costs claimed were $29,015 more than the allowable overhead costs for the contract period.

The following table summarizes the computation of overhead costs.

| | Paid/Claimed Overhead | Direct Labor Accepted | Weighted Average | Accepted Overhead | Questioned Overhead |
|---|---|---|---|---|---|
| Task Order 1 | | | | | |
| Irvine | $76,655 | $86,226 | 0.8890 | $76,655 | $0 |
| Task Order 2 | | | | | |
| Irvine | 275,741 | 289,223 | 0.9511 | 275,080 | 661 |
| Kansas City | 186,052 | 272,284 | 0.6778 | 184,554 | 1,498 |
| Task Order 3 | | | | | |
| Irvine | 603,021 | 552,301 | 1.0730 | 592,619 | 10,402 |
| Kansas City | 695,966 | 872,467 | 0.7817 | 682,007 | 13,959 |
| Task Order 4 | | | | | |
| Irvine | 58,452 | 52,712 | 1.1088 | 58,447 | 5 |
| Kansas City | 1,598,384 | 1,951,242 | 0.8176 | 1,595,335 | 3,049 |
| Task Order 5 | | | | | |
| Irvine | 10,831 | 9,955 | 1.0860 | 10,811 | 20 |
| Kansas City | 1,959,161 | 2,319,842 | 0.8418 | 1,952,843 | 6,318 |
| Task Order 6 | | | | | |
| Irvine | 5,441 | 5,553 | 0.9573 | 5,412 | 29 |
| Kansas City | 2,315,572 | 3,100,989 | 0.7478 | 2,318,920 | (3,348) |
| Task Order 7 | | | | | |
| Irvine | 10,126 | 11,006 | 0.9200 | 10,126 | 0 |
| Kansas City | 1,593,781 | 2,176,997 | 0.7304 | 1,590,079 | 3,702 |
| Task Order 8 | | | | | |
| Irvine | 7,039 | 7,694 | Note 1 | 7,038 | 1 |
| Kansas City | 1,430,906 | 1,977,248 | Note 1 | 1,430,906 | 0 |
| San Juan | 42,931 | 54,836 | Note 1 | 50,213 | (7,282) |
| Total | $10,870,059 | $13,740,675 | | $10,841,044 | $29,015 |

## General and Administrative Expenses

G&A allocated to total direct costs (direct labor, other direct costs and overhead) were computed using the weighted average rates. The G&A expense claimed was 14,535 more than the allowable expense for the contract period.

The following table summarizes the computation of G&A expense.

| | Claimed G & A | Cost Base Accepted | Weighted Average Rate | Accepted G&A | Questioned G & A |
|---|---|---|---|---|---|
| Task Order 1 | $17,714 | $204,434 | 0.0830 | $16,968 | $746 |
| Task Order 2 | $176,254 | $1,616,478 | 0.1071 | $173,125 | $3,129 |
| Task Order 3 | $443,769 | $4,168,843 | 0.1067 | $444,816 | ($1,047) |
| Task Order 4 | $516,085 | $5,269,219 | 0.0972 | $512,168 | $3,917 |
| Task Order 5 | $676,288 | $5,731,267 | 0.1172 | $671,704 | $4,584 |
| Task Order 6 | $764,303 | $7,369,565 | 0.1045 | $770,120 | ($5,817) |
| Task Order 7 | $532,820 | $5,436,626 | 0.0982 | $533,877 | ($1,057) |
| Task Order 8 | $500,481 | $5,302,395 | Note 1 | $490,402 | $10,079 |
| Total | $3,627,714 | $35,098,827 | | $3,613,179 | $14,535 |

## Facilities Capital Cost of Money

Two separate facilities capital cost of money rates were used to compute allowable capital cost of money charges. One rate was applied to the overhead cost base (direct labor) and the other rate was applied to the G&A cost base which is the sum of total direct labor, other direct costs and overhead. The weighted average rates were used to calculate the allowable cost of money charges.

**Overhead Cost Base** - The weighted facilities capital cost of money rate was applied to the total allowed direct labor costs. As a result, the capital cost of money claimed was $174 more than the allowable charge for the contract period.

The following table summarizes the computation of the allowable facilities capital cost of money charges.

| | Claimed Cost of Money | Cost Base Accepted | Weighted Average Rate | Accepted Cost of Money | Questioned Cost of Money |
|---|---|---|---|---|---|
| Task Order 1 | $69 | $86,226 | 0.00080 | $69 | $0 |
| Task Order 2 | $6,503 | $561,507 | 0.01094 | $6,143 | $360 |
| Task Order 3 | $18,608 | $1,424,768 | 0.01289 | $18,365 | $243 |
| Task Order 4 | $23,632 | $2,003,954 | 0.01182 | $23,687 | ($55) |
| Task Order 5 | $33,648 | $2,329,880 | 0.01433 | $33,387 | $261 |
| Task Order 6 | $38,967 | $3,106,684 | 0.01257 | $39,051 | ($84) |
| Task Order 7 | $15,758 | $2,188,003 | 0.00738 | $16,147 | ($389) |
| Task Order 8 | $12,943 | $2,039,777 | | $13,104 | ($161) |
| Total | $150,128 | $13,740,799 | | $149,954 | $174 |

**G&A Cost Base** - The weighted facilities capital cost of money rate was applied to the sum of the allowed direct labor costs, other direct costs and overhead. As a result, the capital cost of money claimed was $34 below the allowable charge for the contract period.

The following table summarizes the computation of the allowable facilities capital cost of money charges.

| | Claimed Cost of Money | Cost Base Accepted | Weighted Average Rate | Accepted Cost of Money | Questioned Cost of Money |
|---|---|---|---|---|---|
| Task Order 1 | $571 | $204,434 | 0.00306 | $626 | ($55) |
| Task Order 2 | $1,852 | $1,616,478 | 0.00126 | $2,037 | ($185) |
| Task Order 3 | $5,364 | $4,168,843 | 0.00127 | $5,294 | $70 |
| Task Order 4 | $5,643 | $5,269,219 | 0.00103 | $5,427 | $216 |
| Task Order 5 | $5,629 | $5,731,267 | 0.00099 | $5,674 | ($45) |
| Task Order 6 | $3,569 | $7,369,565 | 0.00051 | $3,758 | ($189) |
| Task Order 7 | $1,365 | $5,436,626 | 0.00026 | $1,414 | ($49) |
| Task Order 8 | $1,251 | $4,556,782 | 0.00023 | $1,048 | $203 |
| Total | $25,244 | $34,353,214 | | $25,278 | ($34) |

(d) PROFIT

Each task order had a separate fixed fee that was established at the outset of the task performance period. Payment of the entire amount of fixed fee was contingent upon the expenditure of a specified level of effort within a definite period of time. The total fixed fee is the sum of the total fee billed on each task order.

The following table is a summary of the total fixed fee billed.

| | |
|---|---|
| Task Order # 1 | $ 23,166 |
| Task Order # 2 | 136,834 |
| Task Order # 3 | 370,900 |
| Task Order # 4 | 512,000 |
| Task Order # 5 | 550,000 |
| Task Order # 6 | 796,000 |
| Task Order # 7 | 509,200 |
| Task Order # 8 | 520,000 |
| TOTAL | $3,418,100 |

19

EXHIBIT 1

Gould Evans Architects
Summary of Indirect Cost Allocations

| | Labor Claimed | Labor Questioned | Labor Accepted | Overhead Claimed | Audited Rate | Overhead Accepted | Overhead Questioned | Total Questioned |
|---|---|---|---|---|---|---|---|---|
| Task Order #1 | | | | | | | | |
| 08/04/86-09/30/86 | | | | | | | | |
| | $ 10,787 | | $ 10,787 | $ 14,679 | 1.351815 | $ 14,582 | $ 97 | $ 97 |
| Task Order #2 | | | | | | | | |
| 10/01/86-12/31/86 | 35,158 | | 35,158 | 47,845 | 1.351815 | 47,527 | 318 | 318 |
| 01/01/87-09/30/87 | 74,155 | (236) | 74,391 | 91,211 | 1.196185 | 88,985 | 2,226 | 1,990 |
| TO #2 Quest. Costs | | | | | | | | $2,308 |
| Task Order #3 | | | | | | | | |
| 10/01/87-12/31/87 | 24,174 | (263) | 24,437 | 29,734 | 1.196185 | 29,231 | 503 | 240 |
| 01/01/88-09/30/88 | 131,206 | 130 | 131,076 | 182,376 | 1.364786 | 178,891 | 3,485 | 3,615 |
| TO #3 Quest.Costs | | | | | | | | $3,855 |
| Task Order #4 | | | | | | | | |
| 10/01/88-12/31/88 | 26,746 | | 26,746 | 37,177 | 1.364786 | 36,503 | 674 | 674 |
| 01/01/89-09/30/89 | 162,994 | (23) | 163,017 | 226,561 | 1.359258 | 221,582 | 4,979 | 4,956 |
| TO #4 Quest. Costs | | | | | | | | $5,630 |
| Task Order #5 | | | | | | | | |
| 10/01/89-12/31/89 | 45,220 | | 45,220 | 62,856 | 1.359258 | 61,466 | 1,390 | 1,390 |
| 01/01/90-09/30/90 | 138,558 | 62 | 138,496 | 190,064 | 1.356628 | 187,888 | 2,176 | 2,238 |
| TO #5 Quest. Costs | | | | | | | | $3,628 |
| Task Order #6 | | | | | | | | |
| 10/01/90-12/31/90 | 50,533 | | 50,533 | 69,318 | 1.356628 | 68,554 | 764 | 764 |
| 01/01/91-09/30/91 | 201,117 | (336) | 201,453 | 279,552 | 1.411459 | 284,343 | (4,791) | (5,127) |
| TO #6 Quest. Costs | | | | | | | | ($4,363) |
| Task Order #7 | | | | | | | | |
| 10/01/91-12/31/91 | 70,671 | | 70,671 | 98,233 | 1.411459 | 99,749 | (1,516) | (1,516) |
| 01/01/92-04/30/92 | 125,064 | (185) | 125,249 | 173,839 | 1.360000 | 170,339 | 3,500 | 3,315 |
| TO #7 Quest. Costs | | | | | | | | $1,799 |
| Task Order #8 | | | | | | | | |
| 05/01/92-10/31/92 | 188,668 | | 188,668 | 262,248 | 1.360000 | 256,588 | 5,660 | 5,660 |
| Totals | 1,285,051 | ($851) | $1,285,902 | $1,765,693 | | $1,746,228 | $19,465 | $18,614 |

20

EXHIBIT 2

Subcontracts for Services
Performed After October 31, 1992

| Invoice Number | Vendor | Questioned | Vendor Performance Period |
|---|---|---|---|
| 04-00067054 | Carter & Burgess | $ 3,200.00 | 11/01/92 through 11/30/92 |
| | Dowl Engineers | 10,367.50 | Through 11/22/92 |
| | Dowl Engineers | 6,175.00 | Through 11/22/92 |
| | Dowl Engineers | 1,320.00 | Through 11/22/92 |
| | Dowl Engineers | 12,837.50 | Through 11/22/92 |
| | Dowl Engineers | 9,307.50 | Through 11/22/92 |
| | Herbert S. Saffir | 600.00 | 11/16/92 and 12/30/92 |
| | Anthony W. Kast, Inc. | 2,730.00 | Invoice dated 12/18/92 |
| 04-00068349 | Davis Moving & Storage | 2,075.09 | 11/01/92 through 01/07/93 |
| | Dowl Engineers | 6,160.00 | 11/23/92 through 12/22/92 |
| | Herbert S. Saffir | 808.75 | 01/04/93 through 01/05/93 |
| | Hoy Transfer, Inc. | 2,080.00 | 10/06/92 through 01/06/93 |
| | Major Engineering | 1,320.00 | Invoice dated 01/11/93 |
| | Miss. Moving Systems | 91.77 | January 1993 |
| | RLDA | 4,333.50 | Invoice dated 02/02/93 |
| | Simmons Engineering, Inc. | 2,000.00 | Invoice dated 01/05/93 |
| | Twin City Testing | 4,580.00 | Invoice dated 01/14/93 |
| 04-00069142 | Aavon Moving & Storage | 149.64 | 02/01/93 through 03/01/93 |
| | Apple Transportation | 2,972.74 | 12/07/92 through 04/07/93 |
| | Derby Van & Storage | 350.00 | 02/08/93 through 02/12/93 |
| | First American Title Ins. | 2,339.50 | Invoice dated 02/18/93 |
| | Herbert S. Saffir | 1,700.00 | 02/04/93 through 02/17/93 |
| | Hunter Land Surveying | 3,402.50 | Invoice dated 02/16/93 |
| | Miss. Moving Systems | 1,073.35 | 02/03/93 |
| | Shamrock Moving & Stor. | 775.84 | 01/07/93 through 02/26/93 |
| 04-00070008 | Derby Van & Storage | 116.48 | 03/05/93 |
| | Gore Engineering, Inc. | 1,250.00 | Invoice dated 03/29/93 |
| | Jenkins & Associates | 1,897.40 | Invoice dated 03/18/93 |
| | Miss. Moving Systems | 77.41 | January 1993 |
| | Shamrock Moving & Stor. | 680.25 | March 1993 |
| | Trinity Eng. Testing Corp. | 3,042.00 | Invoice dated 01/25/93 |
| 04-00070867 | Aavon Moving & Storage | 163.88 | March 1993 |
| | Dowl Engineers | 3,190.00 | 11/23/92 through 12/22/92 |
| | Dowl Engineers | 1,900.00 | 11/23/92 through 12/22/92 |
| | Dowl Engineers | 1,425.00 | 12/23/92 through 03/25/93 |
| | Dowl Engineers | 1,320.00 | 03/26/93 through 04/25/93 |
| | Dowl Engineers | 3,950.00 | 11/23/92 through 12/22/92 |
| | Dowl Engineers | 2,962.50 | 12/23/92 through 03/25/93 |
| | Executive Relocation | 1,874.18 | 04/07/93 and 05/03/93 |
| | Herbert S. Saffir | 2,400.00 | 03/03/93 through 03/26/93 |
| | John West Engineering | 400.00 | Invoice dated 04/22/93 |
| | RLDA | 481.50 | Invoice dated 04/21/93 |
| | Shamrock Moving & Stor. | 1,417.36 | April 1993 |
| 04-00072516 | Dowl Engineers | 7,272.50 | 12/23/92 through 06/24/93 |
| | Dowl Engineers | 6,667.50 | 11/23/92 through 06/24/93 |
| | Herbert S. Saffir | 1,000.00 | 06/01/93 through 06/25/93 |
| | Rogers Trucking | 895.00 | 04/12/93 through 06/29/93 |
| | Total Questioned | $127,133.14 | |

21

EXHIBIT 3

Weighted Indirect Cost Rates

| | Irvine Overhead | Field Overhead | G & A | Cost of Cap. (O/H Base) | Cost of Cap. (G & A Base) | |
|---|---|---|---|---|---|---|
| Task Order #1 (a) | 0.8890 | 0.6170 | 0.0830 | 0.00080 | 0.00306 | |
| Task Order #2 (b) | 0.9511 | 0.6778 | 0.1071 | 0.01094 | 0.00126 | |
| Task Order #3 (c) | 1.0730 | 0.7817 | 0.1067 | 0.01289 | 0.00127 | |
| Task Order #4 (d) | 1.1088 | 0.8176 | 0.0972 | 0.01182 | 0.00103 | |
| Task Order #5 (e) | 1.0860 | 0.8418 | 0.1172 | 0.01433 | 0.00099 | |
| Task Order #6 (f) | 0.9573 | 0.7478 | 0.1045 | 0.01257 | 0.00051 | |
| Task Order #7 (g) | 0.9200 | 0.7304 | 0.0982 | 0.00738 | 0.00026 | |
| Task Order #8 (h) | 0.9157 | 0.7289 | 0.0974 | 0.00654 | 0.00023 | FY 1992 |
| | 0.7829 | 0.6005 | 0.0676 | 0.00360 | 0.00023 | FY 1993 |

a. Based on 2 months of FY 1986 final rates.
b. Based on 1 month of FY 1986 final rates and 11 months of FY 1987 final rates.
c. Based on 2 months of FY 1987 final rates and 10 months of FY 1988 final rates.
d. Based on 1 month of FY 1988 final rates and 11 months of FY 1989 final rates.
e. Based on 1 month of FY 1989 final rates and 11 months of FY 1990 final rates.
f. Based on 1 month of FY 1990 final rates and 11 months of FY 1991 final rates.
g. Based on 1 month of FY 1991 final rates and 6 months of FY 1992 final rates.
h. Based on actual rates for FY 1992 and FY 1993.

# SUMMARY OF INCURRED AND QUESTIONED ENGINEERING DESIGN COSTS CONTRACT NUMBER 50WCNA606099

## AUGUST 4, 1986 THROUGH OCTOBER 31, 1992

| | | |
|---|---|---|
| Total Design Cost and Fee | | $5,551,549[a] |
| Estimated Cost of Construction | $49,852,262[b] | |
| Limitation Factor | x 0.06[c] | |
| Maximum Allowable Design Cost | | $2,991,136 |
| Question Design Cost and Fee | | $2,560,413 |

(a) See Appendix II, Pages 2 through 13
(b) See Appendix II, Pages 13 through 14
(c) 41 U.S.C. 254(b) limits engineering design costs plus fee to six percent of the estimated construction costs

# REVISED SUMMARY OF DESIGN COSTS
## AUGUST 4, 1986 THROUGH OCTOBER 31, 1992

| | Task Order #2 | Task Order #3 | Task Order #4 | Task Order #5 | Task Order #6 | Task Order #7 | Task Order #8 | TOTALS | NOTES |
|---|---|---|---|---|---|---|---|---|---|
| Direct Design Labor | | | | | | | | | |
| Kansas City | $1,407 | $86,456 | $95,805 | $273,292 | $178,925 | $379,510 | $265,675 | $1,281,070 | (a) |
| Irvine | 11,011 | 198,981 | 0 | 0 | 0 | 0 | 0 | 209,992 | (a) |
| San Juan | 0 | 0 | 0 | 0 | 0 | 0 | 38,486 | 38,486 | (a) |
| Allocated Admin Labor | | | | | | | | | |
| Kansas City | 2,628 | 25,649 | 30,049 | 70,678 | 37,037 | 89,669 | 72,016 | 327,726 | |
| Irvine | 8954 | 48,261 | 0 | 0 | 0 | 0 | 0 | 57,215 | |
| Subtotal - Labor (DL) | $24,000 | $359,347 | $125,854 | $343,970 | $215,962 | $469,179 | $376,177 | $1,914,489 | |
| Overhead | | | | | | | | | |
| Kansas City | 2,735 | 87,632 | 102,898 | 289,554 | 161,496 | 342,688 | 265,667 | 1,252,671 | (c) |
| Irvine | 18,989 | 265,291 | 0 | 0 | 0 | 0 | 0 | 284,279 | (c) |
| San Juan | 0 | 0 | 0 | 0 | 0 | 0 | 35,242 | 35,242 | (c) |
| Gould Evans Design Cost | 3,982 | 115,976 | 69,669 | 56,311 | 101,686 | 245,213 | 290,043 | 882,880 | (d) |
| Other Subcontracts | 0 | 0 | 0 | 0 | 0 | 62,165 | 37,522 | 99,687 | (d) |
| K.C. Office Rent | 321 | 12,806 | 13,149 | 30,156 | 17,737 | 40,616 | 29,761 | 144,546 | (e) |
| Subtotal | $50,027 | $841,052 | $311,570 | $719,991 | $496,881 | $1,159,861 | $1,034,411 | $4,613,794 | |
| General and Administrative | 5,358 | 89,740 | 30,285 | 84,383 | 51,924 | 113,898 | 100,752 | 476,340 | (f) |
| Cost of Capital (OH) | 263 | 4,632 | 1,488 | 4,929 | 2,715 | 3,463 | 2,460 | 19,949 | (f) |
| Cost of Capital (G&A) | 63 | 1,068 | 321 | 713 | 253 | 302 | 238 | 2,958 | (f) |
| Subtotal | $55,710 | $936,493 | $343,663 | $810,016 | $551,774 | $1,277,524 | $1,137,861 | $5,113,040 | |
| Fixed Fee | 4,223 | 74,451 | 30,208 | 68,770 | 53,301 | 108,334 | 99,221 | 438,509 | (g) |
| TOTAL DESIGN COSTS | $59,933 | $1,010,944 | $373,871 | $878,786 | $605,075 | $1,385,858 | $1,237,082 | $5,551,549 | |

## NOTES TO SUMMARY OF DESIGN COSTS INCURRED

### 1.0 NUMERATOR

#### (a) DIRECT DESIGN LABOR

The design window concept was applied to costs tabulated for task orders 3 through 8. EXHIBIT 4, on pages 15 and 16, provides the design window dates for each site subject to the 6% fee limitation. Costs incurred prior to the design start date and after the design completion date are excluded from the computation of design cost.

Task Order #1 - August 1, 1986 through September 30, 1986 and
Task Order #2 - October 1, 1986 through September 30, 1987

The CSSR report included labor costs applicable to effort performed from the inception of the contract, August 4, 1986. The costs were not charged to site specific CLIN codes thereby precluding application of the design window methodology. Information contained in source documents demonstrates that there was no design effort performed prior to April 15, 1987. Therefore, all costs charged to area code 13 prior to April 15, 1987 are excluded from the 6% design fee computation.

In addition, some non site specific design effort such as site surveys, site programming studies, conceptual design, access road design, a foundation study and a soil study at Sterling, Virginia (CLIN BC), were performed during the period April 15, 1987 through September 30, 1987 and charged to area code 13. An adjustment was made to exclude costs for this work from the 6% design fee computation.

The following table summarizes the computation of total direct design labor incurred during the performance of task order 2.

Task Order #2 Direct Design Labor

| | Irvine Labor | | Kansas City Labor | | Total Costs |
|---|---|---|---|---|---|
| | Hours | Costs | Hours | Costs | |
| **Area Code 13** | 2868.0 | $72,773 | 638.0 | $14,649 | $87,422 |
| Exclusions | | | | | |
| Pre-Design (TO #1) | (248.0) | (5,344) | | | (5,344) |
| Pre-Design (TO #2) | (1421.0) | (37,061) | (412.0) | (9,362) | (46,423) |
| Non-Design | (763.0) | (19,357) | (169.0) | (3,880) | (23,237) |
| Task Order #2 Design | 436.0 | $11,011 | 57.0 | $ 1,407 | $12,418 |