9

# POSITION PAPER OF FLUOR DANIEL, INC.

Submitted June 21, 1993 to NOAA In Response to
OIG's Final Audit Report No. DEN-4613-3-0001
For Contract No. 50WCNA606099

66

fee limitation, based on its audit of incurred costs, does not comport with the statute and cannot be justified. (Indeed, OIG wisely made no attempt to justify its retrospective reading in the final audit report.) FDI will demonstrate in Section V that based on a prospective application of the statute, FDI was in compliance with the six per cent fee limitation throughout the 1986 Contract.

## IV. FDI AND NOAA REACHED A CLEAR AND PROPER UNDERSTANDING OF THE ELEMENTS OF FDI'S WORK THAT WERE SUBJECT TO THE 6 PER CENT FEE LIMITATION.

### A. NOAA AGREED TO APPLY INMAN'S NARROW DEFINITION OF A/E SERVICES SUBJECT TO THE STATUTORY LIMITATION, AS ARTICULATED IN THE CORPS GUIDELINES.

In the Spring of 1990, as part of their negotiations for Option Year Four (FY91), NOAA and FDI elected to formalize their understanding and practice as to how the statutory fee limitation had been and would continue to be applied. This understanding was articulated and documented in a series of discussions, meetings, and communications in May-June and October of 1990. Under the resulting agreement, the services deemed subject to the six per cent fee limitation were narrowly restricted to substantive A/E design work, and expressly excluded the pre-design, conceptual design, studies and investigations, and other preliminary work excluded by the Corps Guidelines. As demonstrated in detail in Section V, on the basis of this agreement, FDI was in compliance with the statutory limitation throughout the 1986 Contract.

NOAA commenced these discussions in late May, 1990, as part of the negotiations for Option Year Four (FY91) under the Contract. ACO Ron Anielak informed FDI by E-Mail dated May 24, 1990 (copied to CO Donita McCullough), of guidelines that NOAA intended to impose on the negotiations, including, among others, the requirement that "[a] 6% fixed fee limitation will apply to design specific subtasks." [Tab 2.]

At about the same time, COTR D. Max Entrikin instructed FDI to review its FY91 proposal for compliance with the six per cent fee limitation. Consistent with Anielak's application of the limitation to "design specific subtasks" only, the review was to be performed for a narrow range of services comprising technical A/E design work.

On June 12, 1990, NOAA and FDI met to discuss the fee limitation and other issues relating to the FY91 negotiations. [See Tab 3.] Application of the fee limitation was addressed at the meeting, and agreement was reached as to the FDI services subject to the limitation. FDI minutes of the meeting [id.] attached a sheet dated June 15, 1990 and headed "Price and Profit Limitations" that documented the understanding reached. At Entrikin's request, FDI clarified the terms of the agreement in a second "Price & Profit Limitations" sheet to NOAA dated June 21, 1990. [Tab 4.]

The June 21 iteration was accepted by NOAA as a correct articulation of the parties' understanding of how the fee limitation applied to FDI's work under the Contract. As there reflected, services in the nature of "Pre-Design" were not subject to the limitation -- including such services as initial site visits, topographic and geo-technical investigations, studies of any sort, conceptual design work, inspection and verification of as-built conditions, reproduction of documents for NOAA design reviews, and cost estimates prepared for milestone reviews.

This meant the first 15 per cent of FDI's design effort, which consisted entirely of such Pre-Design work, was excluded from the fee limitation, as were the listed Post-Design services.[9] The parties thus agreed that the services to which the statute and FAR applied were narrowly limited, in accordance with the statutory language, to the production of designs, plans, and specifications (here, part I, sect. C of the construction contracts) comprising the "Design Phase" -- that is, the site-specific designs prepared by FDI's engineers and its architectural subcontractor. [Tab 4.]

The June 21 iteration further reflected the parties' recognition and agreement that the fee limitation was to be applied prospectively -- i.e. to the estimated construction cost at the inception of the contract period (as denominator) -- and

---

[9] It should be noted that for a period of 10 months, from January 1 through October 31, 1992, FDI treated the first 35 per cent of the design effort as conceptual and pre-design work to be excluded from the six per cent limitation. This was inadvertent. FDI's demonstration of overall compliance with the statutory limitation (Section V) does not depend on the broader 35 per cent exclusion during this period, however. All calculations on which that demonstration is based assume exclusion of the first 15 per cent, not 35 per cent, for the period in question.

not to the actual cost of construction as determined following performance.[10] [Tab 4, first bullet.]

In addition, the list of excluded services in the June 21 iteration reflected the agreement of the parties to use the practice of the U.S. Army Corps of Engineers as a model for applying the statutory limitation and defining the services subject to the limitation. That practice was formulated by the Corps in Guidelines published as part of its training manual for contracting and procurement officers. The Corps practice and the Guidelines were familiar to both FDI and NOAA contracting personnel, and were considered by both to provide an accurate account of prior practice under the Contract, as well as a workable and legally sound basis for applying the limitation going forward. (The Corps Guidelines utilized by FDI as a basis for the May-June negotiations are attached at Tab 12.) With FDI's acquiescence, NOAA thus instructed FDI to use Corps guidelines when it directed FDI to review its base engineering effort for compliance. It was thus understood between NOAA and FDI that Corps guidelines would be the basis for application of the fee limitation under the 1986 Contract.

This definition of services subject to the fee limitation, contained in the June 21 iteration and Corps guidelines, conforms to FDI's application of the statute and FAR throughout the Contract, as explained in detail in Section III. It is the basis for both the prospective and retrospective analyses FDI performed to demonstrate, in refutation of OIG's contrary allegations, that FDI's work under the 1986 Contract in fact did comply with the fee limitation. It is thus clear that NOAA, like FDI, considered most of FDI's work under the Contract to be outside the six per cent limitation -- including the elements of program development, planning and support, program and project management, and contract administration that comprised the largest part of FDI's scope.

NOAA again confirmed its acceptance of the agreed definition of subject services in the Fall of 1990, when it exercised its option for FY91 and issued Task Order No. 6 to FDI. By letter dated October 3, 1990 [Tab 6], FDI's Project Manager R.B. Campbell, transmitted FDI's analysis of cost and fees, as

---

[10]The "prospective-only" interpretation was also confirmed by the fact that NOAA, through Entrikin, asked for FDI's review of the base engineering effort in its FY91 <u>proposal</u> to determine compliance. The parties at no time contemplated that compliance would be based on actual costs/fees and actual construction costs. As explained in Section III, this understanding is in strict accordance with the language of 41 U.S.C. § 254(b).

compared with estimated construction cost, for Task Order No. 6 and FY91. The analysis showed that FDI's base engineering costs and fee would not exceed 5.4 per cent, well within the limitation. This analysis (which was FDI's finalized response to Entrikin's earlier request for such a review) reflected FDI's definition of the services subject to the fee limitation, and conformed to the June agreement between NOAA and FDI as that definition.

On the basis of this analysis and information provided to NOAA in the course of the FY91 negotiations, NOAA determined that FDI was in compliance with the statute and FAR and proceeded with the tasking of Option Year Four. NOAA's determination and award of Option Year Four constituted acceptance of FDI's method of applying the fee limitation (which was, after all, in accordance with the parties' earlier agreement and understanding).

Furthermore, FDI's October 3 analysis and NOAA's acceptance of it were based on a "prospective-only" interpretation of the fee limitation. The October 3 letter and attachments make clear that FDI used estimated construction cost and projected cost/fees, both as determined at the inception of Option Year Four, to evaluate compliance. [Tab 6.] NOAA's acceptance of FDI's analysis constituted acceptance of the prospective-only application of the statute and FAR reflected in the documentation of the parties' earlier agreement and understanding. Again, the parties at no time contemplated that compliance would be based on actual costs/fees and actual construction costs, as determined following performance.

It should be noted that Contracting Officer Donita McCullough was aware of and participated fully in the June 12, 1990 meeting[11] and all subsequent negotiations, agreements, and representations on NOAA's part with respect to the six per cent fee limitation. Administrative Contracting Officer Anielak was similarly aware of and participated in the meeting and negotiations. The record makes it clear that NOAA's actions were carried out with the full knowledge and authority of the contracting officer and administrative contracting officer.[12]

---

[11]This fact is evidenced by the cc's on the documents referenced, and by the list of participants in the June 12, 1990 meeting [Tab 3, "Minutes of Meeting No. 1," list of attendees].

[12]The government is bound as well by the actions and representations of COTR Entrikin. Max Drill, Inc. v. U.S., 427 F.2d 1233, 1243 (Ct.Cl. 1970); accord, Pettijohn Engineering Co., IBCA No. 1346-4-80, 83-2 BCA ¶ 16,559 (1983); Urban Pathfinders, Inc., ASBCA No. 23134, 79-1 BCA ¶ 13,709 (1979).

**B. THE UNDERSTANDING BETWEEN FDI AND NOAA PREDATED THE 1990 NEGOTIATIONS FOR OPTION YEAR FOUR.**

The 1990 understanding and agreement between NOAA and FDI articulated a practice which the parties had taken for granted since at least 1988. On May 13, 1988, FDI submitted a summary review of projected program costs to NOAA that reflected the basis for applying the fee limitation that was later articulated and formalized in June of 1990 agreement. [Tab 8.] In this document, FDI clearly applied the fee limitation only to WFO "design," expressly defined to exclude "Pre-design," "Post design," and coordination and other program services, as well as "general architecture and engineering" -- all in accordance with the 1990 agreement.[13] [Id., last page, ¶ 2.0.] NOAA's acceptance thus indicated agreement with FDI's interpretation of the statute and FAR as early as 1988.

Project records do not show earlier consideration of the issue of included and excluded services because substantive A/E design was not the focus of FDI's work during the first two years of the Contract. In fact, FDI's A/E design effort on this project was not fully under way until Option Year Four (FY91). Prior to that time, FDI's work for NOAA concentrated on program definition and development, with relatively few hours allocated to substantive A/E design within the meaning of the 1990

---

This is the case even if, contrary to fact, the COTR had acted without the contracting officer's authority. The facts described make it clear that NOAA and the contracting officer were fully aware of and adopted actions and representations of the COTR and all NOAA representatives who participated in negotiation of the June, 1990 understanding. Under these circumstances, the government would be bound even if those actions had not been authorized. Reliable Disposal Co., Inc., ASBCA No. 40100, 91-2 BCA ¶ 23,895 at 119,717 (1991) (actual or constructive knowledge of representative's unauthorized act, resulting in express or implied adoption of the act, constitutes ratification of the act and binds the government); Radcliffe Construction Co., ASBCA No. 38478, 90-3 BCA ¶ 22,96 at 114,314 (1990). Moreover the government clearly accepted benefits flowing from NOAA's promises and agreements, since FDI continued to perform in reliance on NOAA's assurance that the value of pre-design and post design services (as defined in the June 21 memorandum) would not be subject to the limitation and were therefore unallowable. Parking Co. of America, Inc., GSBCA No. 7654, 87-2 BCA ¶ 19,823 at 100,296-297 (1987) (tacit government acceptance of benefits sufficient for ratification); Silverman v. U.S., 679 F.2d 865 (Ct. Cl. 1982).

[13] Also excluded are estimating and scheduling activities (¶ 2.6.5), "design review" and associated estimates (¶ 2.6.2), and program management activities, including construction management and inspection (¶¶ 2.1-2.5) -- in further accordance with the 1990 articulation. Note that design services, at an estimated $4.1 million, were at that time, as throughout the contract, projected to comprise only a small proportion of the overall FDI scope $38.5 million.

agreement. The fee limitation issue became a focus of attention only when program definition was relatively complete, so that substantive A/E design could start in earnest and become a substantial component of FDI' scope of work. FY91 marked this transition in the Contract. The limitation issue was recognized and addressed prior to that time, but was not fully articulated until the Option Year Four negotiations in 1990 because the work did not require it.

The relatively small role of technical A/E design activities early in the contract was documented in early (1987) negotiations for definitization of the contract. NOAA/DOC review of contract language noted the absence of express reference to the fee limitation [Tab 9]. FDI responded, based on prior negotiations with CO Jesus Arredondo, that FDI and NOAA had agreed the Contract could not yet be considered solely as an architect/engineering services contract subject to the six per cent fee limitation. [Tab 10, ¶ 7] This was because the cost of construction -- basis for calculation of the A/E fee limit -- could not be estimated at that time due to the undefined nature of NOAA's program and design requirements; and because FDI's scope of work included many services other than A/E design. [See id.] The parties had accordingly agreed that FDI's work at that time, as a "Level of Effort Professional Services Contract," would most properly fit under the 10 per cent fee limitation of Far 15.903.(d)(iii). [Id.]

NOAA clearly accepted FDI's comments and acknowledged the prior understanding, since NOAA omitted the six per cent fee limitation from the definitized 1986 Contract. The point is that neither FDI nor NOAA considered work under the Contract to come within the six per cent fee limitation during the early years, when program development, rather than A/E design, comprised virtually all of FDI's scope of work.[14] When substantive A/E design started to increase significantly in 1988 and 1989, FDI produced cost analyses [Tab 8] that reflected its restricted definition of the services subject to the limitation. NOAA acquiesced in this definition. At the point where the work shifted substantially towards A/E design, beginning with FY91, the parties addressed the issue again and, not surprisingly, agreed on a definition of included and excluded services that

---

[14] This fact is further documented by the parties' agreement, at the inception of the relationship in 1986, not to refer to FDI solely as "A/E Contractor" in the contract documents -- again because FDI's work, especially at the beginning, was focussed on program development and management rather than engineering. [Tab 11.] The definitized contract accordingly referred to designated FDI as Professional Services Contractor, or PSC.

conformed with prior practice. The 1990 agreement and understanding was the result.

### C. NOAA'S DECISION TO ADOPT THE AGREED CRITERIA FOR APPLICATION OF THE STATUTORY LIMITATION WAS WITHIN THE DISCRETION OF THE CONTRACTING OFFICER.

Neither NOAA nor the Department of Commerce had agency criteria or guidelines, at any time during the 1986 Contract (or even now), for determining the services that are subject to the statutory limitation. [Even OIG acknowledges this fact. Final Audit Report at 4.] Where the agency does not regulate a contracting officer's authority to make decisions on a discrete issue of contract interpretation, the decision is within the latter's discretion and the discretion of his or her designated representatives.

In the absence of NOAA or DOC criteria, CO McCullough and COTR Entrikin were free to develop and apply a definition of subject services that in their judgment best served the interests of NOAA and the project. Their adoption of the terms of the agreement reviewed above, their decision to adopt this agreement as a satisfactory articulation of prior FDI/NOAA practice, and their decision to use Corps Guidelines to articulate both the agreement and prior practice, were all clearly within their authority to act for the government on this project.

## V. UNDER THE AGREEMENT WITH NOAA AND A PROPER CONSTRUCTION OF THE STATUTE AND FAR, FDI COMPLIED WITH THE SIX PER CENT FEE LIMITATION.

### A. OIG'S DEFINITION OF DIRECT ENGINEERING DESIGN IS OVERBROAD AND CONTRARY TO CONTROLLING LAW AND THE AGREEMENT OF THE PARTIES.

OIG's finding that FDI's costs and fee exceeded the statutory limitation under the 1986 Contract is driven by three calculations: (1) A computation of "alleged direct engineering design labor costs" according to OIG-defined criteria for services subject to the statutory limitation (OIG value, $2,252,008); (2) an allocation of alleged "management labor" to "direct engineering design," based on OIG criteria (OIG value, $1,513,050); and (3) a computation of alleged "Gould Evans Design Cost," also based on OIG criteria for subject services (OIG value, $1,683,669). [See Final Audit Report at 4-5, 17.] The other components of OIG's "direct engineering design" (overhead, rent, G&A, cost of capital) are percentage computations driven

**236.606-70 Statutory fee limitation.**

(a) 10 U.S.C. 4540, 7212, and 9540 limit the contract price (or fee) for A-E services for the preparation of designs, plans, drawings, and specifications to six percent of the project's estimated construction cost.

(b) The six percent limit also applies to contract modifications, including modifications involving—

(1) Work not initially included in the contract. Apply the six percent limit to the revised total estimated construction cost.

(2) *Redesign.* Apply the six percent limit as follows—

(i) Add the estimated construction cost of the redesign features to the original estimated construction cost;

(ii) Add the contract cost for the original design to the contract cost for redesign; and

(iii) Divide the total contract design cost by the total estimated construction cost. The resulting percentage may not exceed the six percent statutory limitation.

(c) The six percent limit applies only to that portion of the contract (or modification) price attributable to the preparation of designs, plans, drawings, and specifications. If a contract or modification also includes other services, the part of the price attributable to the other services is not subject to the six percent limit.

**36.606-70 Statutory fee limitation.**

(c) The following are examples of services that, for the purpose of this section only, are not considered an integral part of the preparation of designs, plans, drawings, and specifications, and may be excluded from the A-E fee when determining compliance with the statute.

(i) Initial site visits.

(ii) Field, topographic, property, boundary, utility, and right-of-way surveys.

(iii) Subsurface explorations and borings; soils and materials testing and resultant reports.

(iv) Feasibility, functional, and economic studies.

(v) Flow gaugings, model testing.

(vi) Preparation or verification of as-built drawings.

(vii) Preparation of general and development criteria.

(viii) Preparation of general and feature design memoranda.

(ix) The services of consultants, where not specifically applied to the preparation of designs, plans, drawings or specifications.

(x) Preparation of environmental impact assessments, statements, and supporting data.
(xi) Construction phase services.

(xii) Models, renderings, or photographs.

(xiii) Reproduction of designs for review purposes.

(xiv) Travel and per diem allowances in connection with services that are not directly related to the preparation of designs, plans, drawings, or specifications.

[Code of Federal Regulations]
[Title 48, Volume 5]
[Revised as of October 1, 2003]
From the U.S. Government Printing Office via GPO Access
[CITE: 48CFR836.606-73]

[Page 213-214]

TITLE 48--FEDERAL ACQUISITION REGULATIONS SYSTEM

CHAPTER 8--DEPARTMENT OF VETERANS AFFAIRS

PART 836_CONSTRUCTION AND ARCHITECT-ENGINEER CONTRACTS--Table of Contents

Subpart 836.6_Architect-Engineer Services

Sec. 836.606-73 Application of 6-percent architect-engineer fee limitation.

(a) The 6-percent fee limitation does not apply to the following architect or engineer services:

(1) Investigative services including but not limited to:

(i) Determination of program requirements including schematic or preliminary plans and estimates.

(ii) Determination of feasibility of proposed project.

(iii) Preparation of measured drawings of existing facility.

(iv) Subsurface investigation.

(v) Structural, electrical, and mechanical investigation of existing facility.

(vi) Surveys: Topographic, boundary, utilities, etc.

(2) Special consultant services not normally available in organizations of architects or engineers not specifically applied to the actual preparation of working drawings or specifications of the project for which the services are required.

(3) Other:

(i) Reproduction of approved designs through models, color renderings, photographs, or other presentation media.

(ii) Travel and per diem allowances other than those required for the development and review of working drawings and specifications.

(iii) Supervision or inspection of construction, review of shop drawings or samples, and other services performed during the construction phase.

(iv) All other services that are not integrally a part of the production and delivery of plans, designs, and specifications.

(4) The cost of reproducing drawings and specifications for bidding and their distribution to prospective bidders and plan file rooms.

(b) The total cost of the architect or engineer services contracted for may not exceed 6 percent of the estimated cost of the construction project plus the estimated cost of related services and activities such as those shown in paragraph (a) of this section. To support project submissions, VA Form 10-1193, Application for Health Care Facility Project, and VA Form 10-6238,

[[Page 214]]

EMIS Construction Program-Estimate Worksheet, will be used and the proposed technical services shown where necessary and applicable.

[49 FR 12618, Mar. 29, 1984, as amended at 61 FR 20493, May 7, 1996; 67 FR 49260, July 30, 2002]