IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FLUOR ENTERPRISES, INC.<br>f/k/a FLUOR DANIEL, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 00-207C<br>(Judge Block) |

**PLAINTIFF'S SUPPLEMENTAL BRIEFING IN RESPONSE TO THE COURT'S ORDER OF OCTOBER 29, 2004**

FRANK M. RAPOPORT
STEPHEN E. RUSCUS
McKENNA LONG & ALDRIDGE LLP
1900 K Street, N.W.
Washington, DC 20006

Attorneys for Plaintiff
Fluor Enterprises, Inc.

January 14, 2005

# TABLE OF AUTHORITIES

**Cases** **Page**

American Tel. & Tel., Co. v. United States, 177 F.3d 1368, 1374 (Fed. Cir. 1999) .................. 19

Beta Sys., Inc. v. United States, 838 F.2d 1179 (Fed. Cir. 1988) ............................................. 19

Bowen v. Am. Hosp. Ass'n., 476 U.S. 610, 643 n.30 (1986) .................................................... 14

Bowen v. Georgetown Univ. Hosp. Assn., 488 U.S. 204, 212 (1986)....................................... 13

Clark v. United States, 95 U.S. 539 (1877) ................................................................................ 20

In Re New York Times Sec. Servs., 371 F.3d 68, 82-83 (2nd Cir. 2004).................................. 14

John Reiner & Co. v. United States, 325 F.2d 438, 440 (Ct. Cl. 1963) .................................... 20

LaBarge Prods. v. West, 46 F.3d 1547 (Fed. Cir. 1995) ............................................................ 19

Norfolk Dredging Co. v. United States, 58 Fed. Cl. 741 (2003) .................................................. 7

Ross Constr. Co. v. United States, 392 F.2d 984, 986 (Ct. Cl. 1968).................................. 22, 23

Skidmore v. Swift & Co., 323 U.S. 134 (1944) ……………………………………….....13,14

Trilon Educ. Corp. v. United States, 578 F.2d 1356 (Ct. Cl. 1978).......................................... 19

United States v. Amdahl, 786 F.2d 387, 393 (Fed. Cir. 1986) ........................................... 20, 23

United States v. Mead Corp., 533 U.S. 218 (2001)..................................................................... 13

United States v. Turkette, 452 U.S. 576, 580 (1981) .................................................................... 7

Urban Data Sys., Inc. v. United States, 699 F.2d 1147 (Fed. Cir. 1983) .................................. 19

Yosemite Park & Curry Co. v. United States, 582 F.2d 552 (Ct. Cl. 1978)......... 19, 20, 21, 22, 23

**Rules**

41 U.S.C. § 254 ............................................................................................................................ 2

41 U.S.C. § 254(b)............................................................................................................ passim

FAR 9.505 .................................................................................................................................... 3

FAR 16.306(c)............................................................................................................................... 5

FAR 36.605 ........ 12

FAR 404-4(c)(4)(i) ........ 5

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FLUOR ENTERPRISES, INC.<br>f/k/a FLUOR DANIEL, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 00-207C<br>(Judge Block) |

**PLAINTIFF'S SUPPLEMENTAL BRIEFING IN RESPONSE TO THE COURT'S ORDER OF OCTOBER 29, 2004**

Pursuant to the Court's Order of October 29, 2004, Plaintiff Fluor Enterprises, Inc. ("Plaintiff") hereby submits this supplemental briefing.

**QUESTION NO. 1**

Defendant alleges that, pursuant to contract provision 2.1.3 (see Compl. App. 9 at 10), plaintiff was obligated to "prepare cost estimates for construction contract packages prepared under this contract." Is there any evidence in the record of specific estimates conducted by plaintiff under this contract provision? If so, on what dates were these estimates provided by plaintiff, to which specific facilities were they addressed, and what were the actual estimates? Which individuals at the Department of Commerce and/or the National Oceanic and Atmospheric Administration received, reviewed and approved these estimates? Is there evidence in the record to support these conclusions?

**ANSWER**

There is no evidence in the record that Plaintiff performed the estimate of project cost required of the head of the agency by statute. Specifically, there is no evidence in the record that *any* estimate of project cost was performed prior to entering the Contract as required by the statute. To the contrary, Defendant has indicated that such estimate could not be done by the

agency and that Plaintiff was required to perform construction contract package estimates only after entering the Contract. Def.'s Br. at 19 ("there could be no estimated costs of construction until Fluor calculated those costs"); see also Def.'s Resp. to Pl.'s Proposed Finding No. 5 (admitting that "[t]he agency head did not perform an estimate of costs of the project by the agency head prior to award of the contract"); 10/28/04 Hearing Transcript at 69 ("There's no denying that, at the time this contract was awarded, there was no cost estimate. As a matter of fact, that was Fluor's job under the contract") (comments of government counsel). Second, there is no evidence in the record that the agency performed any estimate of project costs after entering into the Contract. Third, there is no evidence in the record that the head of the agency, even after contract award, reviewed and adopted any estimate performed by Plaintiff, and Defendant does not allege that this was so.[1]

Plaintiff clearly did prepare construction estimates for construction contract packages. However, to confuse these estimates with the statutory project estimate required of the agency head by 41 U.S.C. § 254 would be to ignore the plain language of the statute, ignore a long history of implementation of the statute by government and industry for true contracts for A&E services, and to create an unworkable, nonsensical interpretation of the statute.

Companies performing an element of design work in the course of contract performance nearly always prepare construction package estimates as part of, and during, the design process, i.e., at the same time design work is being performed. Wagner Pl.'s Br. App. 36, 1/4/05 Declaration at Para. 4; see, e.g., Complaint App. 9, Contract, § C.3 - Deliverables, at 19 of 105

[1] Even if the head of the agency did adopt an estimate Plaintiff prepared after entering the Contract, it is Plaintiff's view that, such estimate could not be used as a basis for limiting Plaintiff's recovery of reasonable, allowable and allocable costs because it was prepared after entering the Contract. See § 41 U.S.C. 254(b); Pl.'s Br. at 23-27; Pl.'s Reply to Def.'s Resp. to Pl.'s Br. at 9-10.

("2.1.3 Cost Estimate: Construction Packages (15/35/90%")). However, these estimates never qualify as the statutory estimate prepared by the head of the agency at the time the A&E enters the contract to do both the designs and related estimates in the first instance.[2] See Pl.'s Br. App. 36, 1/4/05 Decl. of James Wagner at Para. 4; Complaint App. 2, Briefing Papers, Architect-Engineer Contracts, at 41 (prepared by Deputy General Counsel, USACE ) (explaining seemingly "incongruous" requirement that the government limit payment using the estimate of the agency head prior to awarding the very contract under which the contractor will produce plans and designs and estimate construction costs for construction packages). Plaintiff was not required to and did not prepare the statutory estimate required of the agency head at the time of entering the Contract.

In the instant case, evidence in the record establishes that the Contract required Plaintiff to deliver construction package estimates relating to the 15%, 35% and 90% construction packages (estimates as the design itself reached each of these stages of completion) throughout the contract period, "as required." Complaint App. 9, Contract, § C.3 - Deliverables.

Only one task order is in the record -- Task Order No. 3, Revision A -- and none have been entered into the record by Defendant. See Complaint App. 9, Contract, Mod. 6, Att. B.[3]

---

[2] The contractor's construction package estimates, if used for purposes of the statute (which they are not and cannot be), would constitute impermissible conflicts of interest under FAR Part 9 because the contractor's construction estimate would directly affect its ability to recover costs and profit. See FAR 9.505 (indicating intent to prevent "the existence of conflicting roles that might bias a contractor's judgment"). Moreover, use of such estimates would implicate the performance of inherently governmental functions by private parties and would violate the plain language of the statute. In addition, use of estimates developed by the contractor after the government already has contractually induced the contractor to perform the related design work and promised to pay for this work would, in a level of effort contract, place the contracting officer in potential violations of the Anti-Deficiency Act, the prohibition on the receipt of voluntary services and the prohibition on supplementation of Congressional appropriations. Finally, use of such estimates retroactively to limit payment to the contractor makes no sense and cannot have been within the contemplation of Congress, as the contractor would in effect be required to promise to perform work without knowing whether ever it would be paid.

[3] Task Order No. 3 covered the period 10/1/87-9/30/88.

On information and belief, this is because, under the program as implemented, Defendant understood that the government's design requirement was a moving target and only statements of construction project cost prepared at the very end of the Contract, like the 1992 WFO Facilities Budget, actually were representative of the WFO's as actually designed and constructed. See Pl.'s Br. App. 36, 1/4/05 Decl. of James Wagner at Para 7 (government design concept revisited continually through entire period of contract; ultimate configuration bore little resemblance to concept at contract inception).[4]

Nevertheless, Task Order No. 3 is instructive because it shows that Plaintiff was required to prepare the initial site-specific construction estimate and three other construction estimates for each of several specified WFO facilities including Dodge City (DT), Melbourne (BB), Goodland (EL) and Kansas City and was required to perform 100% of the design work for these same sites, during the performance of that same task order. Complaint App. 9, Contract, Mod. 6, Att. B. There is no evidence in the record regarding the dates these particular estimates were provided by Plaintiff or the amount of the actual estimates themselves, only that the contracting officer provided Plaintiff the direction to proceed with the design work prior to the creation of the related construction efforts.

Regarding approval of estimates by the government, the record reflects that acceptance and inspection of the deliverable estimates "shall be accomplished at destination by the Contracting Officer's Technical Representative (COTR)" (not even at the level of contracting officer). Complaint App. 9, Contract, Part I, § E.2, Acceptance and Inspection. There is no evidence in the record that Congress authorized the head of the agency to delegate authority to

[4] These statement of construction project cost were in some respects not really estimates at all because they were done after the Contract was almost entirely complete, when Defendant had decided what it wanted, and contained many actual costs.

perform the statutory estimate. There is no documentation nor other evidence in the record that the head of the agency in fact did delegate such authority, much less permit sub-delegation to the level of the Contracting Officer's Technical Representative. There is no evidence in the record that anyone other than the Contracting Officer's Technical Representative ever reviewed, much less approved, such estimates. And there certainly is no evidence in the record that any such approval occurred at the time of entering the Contract (nor for that matter at the time of issuance of any task order). Accordingly, use of construction package estimates prepared by Plaintiff for purposes of the statutory estimate would violate the plain language of the statute, even if the statute were applicable to the Contract.

Finally, the question of the head of the agency's authority to delegate and the question of his actual delegation of the statutory estimate, if any, have nothing to do with whether the contracting officer possessed a warrant to contract with Plaintiff. No issue has been raised in this case concerning the warrant of the contracting officer. Assuming he possessed the proper warrant, it is clear that, in contracts for A&E services covered by the statute (which this is not), the regulations require the contracting officer to use the statutory estimate of the agency head to insure that the agency does not promise to pay in excess of the statutory limitation and to ensure that the agency does not require, accept and pay for work in excess of the statutory limit during contract performance. 41 U.S.C. § 254(b); FAR 404-4(c)(4)(i) ("contracting officer shall not negotiate a price or fee that exceeds the . . . statutory limitations [including 41 U.S.C. § 254(b)]"); FAR 16.306(c) ("No cost-plus-fixed fee contract shall be awarded unless the contracting officer complies with all limitations in 15.404-4(c)(4)(i)").

There was substantial discussion at the October 28, 2004 hearing regarding the role of the "Secretary" in performing estimates for contracts for A&E services, as that term is used in the

statute, with counsel for Defendant opining that it was "hard to believe" that the Secretary would perform estimates for each and every agency construction project. 10/28/04 Hearing Transcript at 79. Counterintuitive as it may appear, however, agencies experienced in the implementation of the statute routinely approve these estimates to the highest command levels as required by the statute. Pl.'s Br. App. 33, Army Regulation 415-15, Army Military Construction Program Development and Execution.[5] This is because creation of an A&E contract, as that term is used in the statute, can only occur after certain steps relating to project development and funding have been achieved so that an estimate by the agency head is possible. As set forth in Army Regulation 415-15, for example, the "user" (typically the military installation with the construction requirement) establishes the project concept sufficient to permit the required estimate and then establishes the project cost estimate on DD Form 1391-EF, FY __ Military Construction Project Data, which communicates user facility needs through the chain of command to the Deputy Assistant Secretary of the Army to obtain approval and funds to satisfy the requirement as follows:

- The DD Form 1391-EF is reviewed and approved by the U.S. Army Corps of Engineers (USACE). The USACE is required to certify to the major army command (MACOM) that sufficient information exists to start project design.
- The MACOM reviews the project documentation and is required to certify to Headquarters, Department of the Army (HQDA) that the USACE possesses sufficient information to begin design and submits the project documentation for approval.
- Only after approval of the DD Form 1391-EF by the Deputy Assistant Secretary of the Army (DASA) does the DASA release to Headquarters, USACE (HQUSACE), the authority to award the design contract to the AE and commence preparation of concept or parametric design.
- The HQUSACE in turn releases this authority down to the USACE district responsible for the design.

[5] For simplicity, Plaintiff has continued the numbering of its appendices from its moving brief, such that the appendices to this supplemental briefing begin with No. 33.

- Concept design in turn is limited to the HQDA approved scope as shown on the DD Form 1391-EF.
- The USACE is responsible for assuring that the authorized scope on the DD Form 1391-EF is not exceeded during design.

Again, no evidence in the record establishes that, in the instant case, the head of the agency performed any estimate of project construction cost prior to award of the Contract.[6]

**QUESTION NO. 2**

The Contracting Officer's final decision was calculated using an estimated cost of construction (ECC) based on the "March 1992 WFO Facilities Budget" (see Compl. App. 1 at 28). The March 1992 WFO Facilities Budget itself indicates that the report included both estimated costs for some facilities and actual construction costs for others. Explain in detail the figures included in this report, including which individual facility figures were based on actual construction costs. For those figures that represent forward-looking construction estimates (and not actual costs), when were specific estimates conducted, and at what time were those estimates reviewed by the defendant?

**ANSWER**

---

[6] It is the process set forth in AR 415-15 for "contracts for architecture and engineering services" as that term is used in the statute which permits rational application of a 6 percent limitation. This process insures that the AE is required to begin incurrence of costs against a statutory monetary cap only after the agency formally has certified that "sufficient information exists to start project design" and that the approval of the monetary cap (the project construction estimate) is tied to the sufficiency of information available in contracts of that type. Prior to the instant contract for the development of virtually every aspect of the WFO Modernization Program, no such information was or could be available. Pl.'s Br. App. 36, 1/4/05 Decl. of James Wagner at Para 7 (government requirement not fully established prior to Contract; design concept revisited through entire period of contract); see Pl.'s Br. App. 18, OIG Audit Report No. NOA-4436-3-001 at 11 (1993) (statement of work not adequately defined; Plaintiff required to implement WFO modernization program from start to finish including establishment of program priorities). Accordingly, to interpret 41 U.S.C. § 254(b) also to limit to 6 percent design costs in a contract like the instant contract that is not a contract for A&E services as that term is used in the statute would be to produce an absurd result. United States v. Turkette, 452 U.S. 576, 580 (1981) (statutory language should not be read to lead to absurd result); Norfolk Dredging Co. v. United States, 58 Fed. Cl. 741 (2003), rev'd on other grounds, 375 F.3d 1106 (Fed. Cir. 2004) (same).

The 1992 WFO Facilities Budget used by the contracting officer in place of the statutory estimate to limit Plaintiff's costs was prepared after December, 1991, and thus was prepared after Plaintiff had performed virtually all work under the Contract (including design work). As such there is no question as to whether the document was prepared or approved by the head of the agency at the time of entering into the Contract.

As set forth in Plaintiff's Motion for Summary Judgment, App. 29, the statement of project cost contained in the 1992 WFO Facilities Budget included actual (non-estimated, non-forward looking) construction costs for the following construction activities: Dodge City; Melbourne; Goodland; Amarillo; Milwaukee; Sterling; St. Louis; Topeka; Sterling Sewer Ext; Houston; NWS Trng; Grand Island; Kansas City; Wichita; State College; Chicago; Phoenix; NRC (Bannister); Detroit; Tulsa; Louisville; and Binghamton. Obviously, these figures were derived after all design work on these sites already was complete. For this reason, alone, the project cost reflected in the 1992 WFO Facilities Budget cannot be used as the statutory estimate of project cost.

The "forward-looking" construction cost estimate components of the 1992 WFO Facilities Budget render that statement of project cost similarly deficient. Each of these separate components, like the rest of that facilities budget, were developed after December, 1991, and were calculated using the estimated construction delivery dates which were current at that time. While they were forward-looking in relation to construction that had not taken place, they largely were not forward-looking in relation to the contracting officer's direction to commence the related design work under the Contract. At a minimum, in Task Order No. 6 (Pl.'s Br. App. 34), for example, issued for the fiscal year beginning October 1, 1990 and ending September 30, 1991 (prior to creation of the 1992 WFO Facilities Budget), the contracting officer required Plaintiff to

perform actual design work on Missoula, Philadelphia, Pittsburgh, Portland, Monterey, Sioux Falls, New Orleans, Atlanta, Birmingham, Boise, Cheyenne, Cincinnati, Cleveland, Columbia, Des Moines, Great Falls, Morehead City, Indianapolis, Jackson, Knoxville, Los Angeles, and Miami. Pl.'s App. 34, Task Order No. 6. In addition, Task Order No. 7 (Pl.'s Br. App. 35), issued for the fiscal year beginning October 1, 1991 (also prior to creation of the 1992 WFO Facilities Budget) required actual design work on Boston, New York, and Austin. Pl.'s App. 35, Task Order No. 7. To the extent the 1992 WFO Facilities Budget was reviewed by any government official, such review occurred after December 1991, i.e. after work on Task Order Nos. 1-6 was complete and after significant work on the seventh of the eight task orders already had been performed. Accordingly, even if the statute permitted the use of estimates prepared after entering the Contract, the project estimate contained in the 1992 WFO facilities budget could not be used as the statutory estimate of project cost.

**QUESTION NO. 3**

Defendant contends that the estimates upon which the six-percent limitation was calculated were actually conducted by plaintiff on an ongoing basis and later adopted by defendant. Where in the record do the facts of this case support that contention? Does this contention fit with the law, particularly the provisions in 41 U.S.C. § 254(b) that prohibit cost-plus-percentage-of-cost contracts and require an estimate for A&E contracts to be established "by the agency head"?

**ANSWER**

The record does not support Defendant's contention that the estimate upon which the statutory six-percent limitation could be calculated actually was conducted by plaintiff on an ongoing basis and later adopted by defendant.

First, the *statutory* six-percent limitation was not calculated. At the time the parties entered into the Contract, they believed the statutory limitation did not apply to the contract type at issue here. See Pl.'s Br. App. 12, 4/8/87 Letter from Jack Toliver Plaintiff to Jesse Arredondo CO NOAA, G004447-48 (objecting to suggestion that 6 percent statute applied and confirming parties' agreement not to apply statute in light of impossibility of creating required estimate); Complaint App. 1, CO's Final Decision at 4 (stating "It appears that neither NOAA nor Plaintiff fully understood how the statute would apply"). Because the required estimate was not done by the head of the agency at time of entering into the Contract, no statutory limitation was or could be applied. However, with the OIG seeking to control program costs and insisting that some limitation be applied, the parties, mid-contract, attempted to monitor A&E costs against a non-statutory estimate to ensure that no dispute regarding recovery of costs could arise even if the statute were applicable and could be applied without the statutory estimate.[7]

Second, as set forth in response to Question No. 1, above, while Plaintiff was required to and did produce ongoing construction package estimates after the parties entered into the Contract, these site specific construction package estimates for individual sites were required by the same task orders that required the design work on these sites, i.e., these estimates occurred after Plaintiff was ordered to commence the related design work.

Third, there is no evidence in the record that these construction package estimates were adopted by the head of the agency as the statutory estimate, and Defendant has made no such allegation at any time in this litigation. To the contrary, the Contract specifies only that these

[7] The basis of Plaintiff's estoppel count is that the government has now not only applied the statute but reneged on the parties agreement as to how the limitation would be applied. Plaintiff's relied on the government's representation that even if the statute applied, the Company still would recover its costs because the parties agreed that Plaintiff's costs would fall within the hypothetical 6% limitation.

estimates would be accepted and inspected by the Contracting Officer's Technical Representative. Indeed, it would have made no sense for the head of the agency to review and approve these estimates as they were merely interim figures created during an evolving design process leading up to creation of each final construction package and estimate after completion of each design.[8]

Fourth, the contracting officer calculated no purported "statutory" limitation until contract performance was complete, and then used 1992 WFO Facilities Budget retroactively and improperly as set forth above. See Complaint App. 1, CO's Final Decision at 2-3.

Regarding the prohibition on cost-plus-percentage-of-cost contracts, this prohibition prevents a contractor's profit from being negotiated as a percentage of actual costs incurred under the contract. The reason for this prohibition is that, otherwise, contractors would have incentive to incur unnecessary costs if their profits were increased based on these costs. This prohibition does not apply directly to the cost plus fixed fee (profit) in contracts for A&E services because those contracts are limited in relation to the estimated project construction costs (not estimated A&E costs). However, a related policy/prohibition applies. Part 36 of the FAR required the contracting officer to perform an independent Government estimate prior to commencing negotiations on the Contract to insure fairness of the contract price to the

[8] There were multiple such estimates for each site as a matter of course, and none was designated the statutory estimate even were this permissible. The statute does not permit the contracting officer to limit reasonable, allowable and allocable costs of a contractor based on the contracting officer's election from among a continuing stream of estimate iterations produced by the contractor during the design process. Rather, it clearly permits limitation of costs only against a single, complete estimate of project cost, prepared by the head of the agency at the time of entering into the contract. 41 U.S.C. § 254(b); see also Complaint App. 2, Briefing Papers, Architect-Engineer Contracts, at 41, 42 n. 3 (prepared by Deputy General Counsel, USACE ) ("[t]he estimate which the Govt is required to follow, in determining the maximum fee it can pay you, must be made by the Govt, prior to the time it awards you the very contract which will produce the proposed project's plans and specifications upon the basis of which *you* [the contractor] are required to make an intelligent project cost estimate"; if project consists of several structures "the fee limitation applies to the overall project, not to each separable item"); Pl.'s Br. App. 36, 1/4/05 Decl. of James Wagner at Para. 4 (construction package estimates not used).

government. FAR 36.605. As implemented by the USACE, this estimate may not be based on any cost or pricing information provided by the contractor, but must carefully consider the 6 percent limitation based on the estimate prepared by the head of the agency prior to entering into the contract. See Pl.'s Br. App. 25, EP 715-1-7, US Army Corps of Engineers "Architect-Engineer Contracting," App. X, dated 7/31/02. In the instant case, Defendant did prepare an independent estimate prior to entering into the Contract, but did not consider the 6 percent limitation because it did not prepare the statutory estimate. Defendant did not prepare independent government estimates before each task order. Pl.'s Br. App. 17, Def.'s Resp. to Pl.'s Req. for Adm. No. 37.[9]

Regarding the requirement for an estimate by the agency head, the estimate upon which the contracting officer's post-contract limitation calculation was based satisfy none of the requirements of the statute: it was not performed by the head of the agency; it was not performed at the time of entering into the Contract; it was not even an estimate as it included actual costs of construction for design work already accomplished; and it was not a project estimate but rather only reflected construction costs of 54 of the 116 sites constituting the project under this level of effort contract. There is no evidence in the record that the head of the agency

[9] In this regard, it is important to note the difference between an indefinite quantity contract for A&E services (in which task orders under the contract constitute separate projects that may or may not be known when the contract is executed) and the instant level of effort contract for a single, integrated project (in which Plaintiff's proposal specifically reflected the cost of the entire project (including base year and options), based on Defendant's express definition of the project to include 116 WFO sites prior to entering the Contract) requiring a single project estimate. Moreover, Plaintiff's Motion for Summary Judgment argues that even if the statute were applicable and the 1992 WFO Facilities Budget were the statutory estimate, the "estimated" cost of the entire construction project in the 1992 Budget Facilities used by the contracting officer in her final decision was approximately $114M; the total covered A&E costs under the level of effort contract identified by the contracting officer in that final decision equaled $5,551,549; and, accepting her numbers for this purpose only, the resulting ratio of 4.9% would be well within the 6 percent limitation. See Pl.'s Br. at 28-33; Pl.'s Reply to Def.'s Resp. to Pl.'s Br. at 13-15. This result moots both the parties' arguments on the applicability of the statute and arguments regarding whether Defendant performed a proper statutory estimate.

properly delegated the responsibility to prepare the statutory estimate prior to entering the Contract to any individual in the agency nor that the head of the agency performed such an estimate himself. To the contrary, the parties at time of entering the Contract did not think the statute applied. When, after the Contract, the contracting officer attempted to limit recovery of the contractor's properly incurred costs, she ignored the statutory requirement for an estimate by the agency head. Accordingly, the estimates used by her cannot be used as the statutory estimate.

**QUESTION NO. 4**

Both parties have submitted interpretations regarding A/E contracts rendered by federal agencies other than the Department of Commerce and the National Oceanic and Atmospheric Administration. Should the court give deference to these interpretations? See Skidmore v. Swift & Co., 323 U.S. 134 (1944); United States v. Mead Corp., 533 U.S. 218 (2001). If so, to what extent?

**ANSWER**

Chevron deference in this case is inappropriate as neither NOAA nor the Department of Commerce has promulgated any formal interpretation of the statute. Moreover, the position of the government in this case completely contradicts the position taken by the parties at the time of contract award. Defendant's litigation position in this case is thus entitled to no deference. Bowen v. Georgetown Univ. Hosp. Ass'n, 488 U.S. 204, 212 (1986) (no deference to agency litigating positions unsupported by regulations, rulings, or administrative practice).

Even if agencies with experience implementing this statute were party to the case, Chevron deference to their interpretations would be inappropriate. United States Code, Title 41, § 254 is applicable to all agencies entering into contracts for A&E services. As a result, the

interpretation of any single agency is not entitled to Chevron deference. See Bowen v. Am. Hosp. Ass'n, 476 U.S. 610, 643 n.30 (1986). No greater likelihood of achieving a unified view through the agency than through review in multiple courts since multiple agencies interpret the statute, and, for the same reason, singularly specialized agency expertise does not exist.

Under the Supreme Court's decision in Skidmore, 323 U.S. at 140, if an agency's statutory interpretations are "not controlling upon the courts," the weight accorded an agency interpretation "[i]n a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade. . ." See also, In Re New York Times Sec. Servs., 371 F.3d 68, 82-83 (2nd Cir. 2004) (granting Skidmore deference agency interpretation filed in an amicus brief). While the agencies referenced by the parties have not made offered interpretations as parties or amici and none of referenced interpretations directly govern the parties to this litigation, several of the referenced documents, in particular AR 415-15 and USACE EP 715-1-7 offer insight as to the manner and extent to which other agencies have implemented the statute.

The issue, however, in this case is that none of the FAR supplements referenced by Defendant actually reflect “agency interpretations” regarding what constitutes a contract for A&E services. Instead, these regulations deal only with implementation of the statute when it already is established that there is a contract for A&E services, but that contract contains both A&E services subject to the limitation and A&E services that are not. There is no dispute that when a contract for A&E services includes some A&E services covered by the 6 percent limitation (generally Title I services) and some A&E services that are not (generally Title II services), then the limitation is in fact applied only to the covered services.

The instant contract, however, is altogether not "a contract for A&E services" as that term is understood by industry and agencies with experience implementing the statute. Rather, the Contract is for comprehensive development and management of Defendant's WFO Modernization Program in which, in the contracting officer's own words, only a minor portion of the work related to A&E services. See Pl.'s Br. App. 1, CO's Price and Cost Analysis, G004709; Pl.'s App. 2, CO's Memorandum for the Record, G004708; see also 1/8/04 Aff. of Kenneth Forsyth at Para. 3-8; Pl.'s Br. App. 36, 1/4/05 Decl. of James Wagner at Para. 9; 5/6/04 Decl. of James Wagner at Para. 3; Pl.'s Br. App. 22, 10/6/86 NOAA Program Work Breakdown Structure.

It is important to note what evidence is in the record regarding the actual types of contracts to which agencies apply the statute. First, the record reflects that, Plaintiff, an experienced contractor, believed that the statute did not apply to the Contract since is was not a contract for architecture and engineering services as that term is used in the statute and the program as implemented by NOAA was one to which is was impossible to apply the statute. Complaint App 1, CO's Final Decision at 1-2; D's Resp. to Pl.'s Br., App. at 8-9; Pl.'s Br. App. 36, 1/4/05 Decl. of James Wagner at Para. 7-9; Pl.'s Br. App. 12, 4/8/87 Letter from Jack Toliver, Plaintiff, to Jesse Arredondo, CO, NOAA; Pl.'s Br. App. 31, 5/6/04 Decl. of James Wagner.

Second, the affidavit of Plaintiff's expert, former USACE official Ken Forsyth, indicates that the Contract did not resemble any contract for A&E services he had ever encountered and to which the statute would be applied. Pl.'s Br. App. 21, Aff. of Kenneth Forsyth at Para. 3-8. See also Pl.'s Br. App. 36, 1/4/05 Decl. of James Wagner, at Para. 8.

Third, agency guidance confirms that agencies do not apply the statute to every contract that contains any design services. For example, the USACE doesn't apply the 6 percent limitation to design-build contracts which are for many agencies the *majority* of all contracts for design and construction services and which clearly involve design services. Pl.'s Br., App. 25, EP 715-1-7 US Army Corps of Engineers "Architect-Engineer Contracting," at § 4-13(c)(3) ("The 6 percent limitation statutory limitation does not apply to a design-build contract"); Id. at § 2.3 ( "AE services are a minor part of a design-build contract"); GAO/GGD-00-172R, Study on Facility Design Reviews at 21 (design-build procurement strategy is now favored contracting strategy); Pl.'s Br. App. 36, 1/4/05 Decl. of James Wagner, at Para. 9.[10] Plaintiff respectfully submits that while the definition of a "contract for A&E services" may appear to be purely a legal issue, the institutional knowledge industry and agencies with decades of experience implementing the statute in this area offers considerable insight.

**QUESTION NO. 5**

Assume, for the purposes of this response only, that the court concludes that the plain meaning of § 254(b) requires a project estimate to be in place "at the time of entering into the contract: (*see* 41 U.S.C. § 254(b)), i.e., that a project estimate was required of defendant when this contract was initially entered into in 1986.

---

[10] Defendant obscures the issue by its references to DFARS § 236.606-70 and EFARS § 36.606-70. These regulations have nothing to do with the issue at bar and merely codify what every experienced contractor and agency implementing the statute already knows: there are two types of A&E services (included and excluded) and while both may be found in a contract for A&E services as that term is used in the statute, only the included A&E services are subject to the act. See Complaint App. 2, Briefing Papers, Architect-Engineer Contracts, at 41 (prepared by Deputy General Counsel, USACE ) (distinguishing between Title I A&E services (included in the 6% limitation) and Title II A&E services (not included in the 6% limitation) in contracts for A&E services.) In the instant case, there is no contract for A&E services as that term is used in the statute. As a result, the statute does not apply to the Contract in whole or in part. No evidence to the contrary exists in the record of this case.

(a) What are the implications for this contract, vis-à-vis the § 254(b) six-percent limitation, of the apparent fact that no such estimate was performed by either party in a timely fashion?

(b) Is the six-percent limitation therefore not applicable to this particular contract?

(c) Alternatively, is this contract *ultra vires*?

(d) Alternatively, should the court overlook this requirement and impose the six-percent limitation based on some other estimate that was established after "the time of entering into the contract"?

**ANSWER**

(a) Because the statutory limitation does not and was not intended to apply to the contract at bar (it is not a "contract for architecture and engineering services" as that term is understood by industry and agencies with experience implementing the statute), no impact results from the absence of an estimate of the agency head at the time of entering into the Contract. In fact, there is no estimate because the statute did not apply and could not be applied, as both parties agreed at the time of entering into the Contract.

(b) Correct. The 6 percent limitation is not applicable to this particular contract. First, this is not a situation in which any dollar limitation is specified by statute so that retroactive application of the 6 percent limitation might be possible. The factual predicate for the calculation of the statutory limitation is the head of the agency's timely and proper estimate.

Second, the particular contract at issue in this case is a broad services contract for development and management of the entire WFO Modernization Program ultimately requiring a small amount of design incident to its performance. As such, Defendant obviously *could not* perform the required estimate prior to entering the Contract. See Pl.'s Br. App. 17, Def.'s Resp.

to Pl.'s Req. for Adm. No. 19; Pl.'s Br. App. 3, Def.'s Supp. Resp. to Pl.'s Req. for Adm. No. 19. Nothing in the statute or its legislative history suggests that, in such a case, Congress intended to prohibit procurement of services, even including a small amount of design, where, because of the preliminary or comprehensive nature of those services, Defendant cannot predict in advance of the contract the ultimate design concept and other results of its program development effort. Rather than prohibiting procurement of such services, Congress, in enacting 41 U.S.C. § 254(b), sought to limit payments for procurements that actually are contracts for A&E services and therefore susceptible to pre-contract estimation of project construction costs. Cf. Pl.'s Br. App. 33, Army Regulation 415-15, Army Military Construction Program Development and Execution (describing point in military construction program development and execution at which a contract for A&E services first may arise).

(c) If and only if the Court were to find that the statute does apply, the head of the agency's failure to perform the required estimate would render the Contract illegal although Defendant clearly was authorized to enter into contracts for A&E services. The consequences of the hypothesized illegality are discussed in response to Question No. 6, below.

(d) The Court should not impose a non-statutory limitation on Plaintiff's recovery of reasonable, allowable and allocable costs. There is no basis in law or equity for any limitation of such costs. To the contrary, the Contract between the parties required that Defendant pay (and Defendant did pay) Plaintiff its costs and fixed profit for work accepted under the Contract.

**QUESTION NO. 6**

Assume, for the purpose of this response only, that the court concludes the portion of the contract dealing with A/E services is *ultra vires*. What would be the consequences with respect to this contract? How can the court calculate recovery given that project estimates were not in

place "at the time of entering into the contract" (*see* 41 U.S.C.§ 254(b))? See Yosemite Park & Curry Co. v. United States, 582 F.2d 552 (Ct. Cl. 1978).

**ANSWER**

If the Court were to conclude that the portions of the Contract relating to A&E services that would be subject to the 6% limitation in a contract for A&E services were illegal, Plaintiff still should be permitted to recover under the Contract. Not every illegal contract must be treated as void. American Tel. & Tel., Co. v. United States, 177 F.3d 1368, 1374 (Fed. Cir. 1999) aff'd, 307 F.3d 1374 (Fed. Cir. 2002) ("[i]nvalidation of the contract is not a necessary consequence when a statute or a regulation has been contravened"). Rather, courts will consider the illegality "in light of the statutory and regulatory purpose, with recognition of the strong policy of supporting the integrity of contracts made by and with the United States." Id. In the instant case, nothing in the statute or the legislative history of 41 U.S.C. § 254(b) suggests that Congress intended to prohibit procurement of A&E services particularly where, as here, the government because of the nature of the program at issue *could not* perform the required estimate of project construction cost prior to entering the Contract. Section 254(b) provides no prohibition on the procurement of any product or service. Instead, the statute simply limits the amount the government may pay based on an estimate, the responsibility for which it imposes squarely and solely on government -- specifically, the agency head.

Moreover, courts have been reluctant to void contracts after they have been fully performed and have variously sustained or reformed such contracts or permitted recovery on an implied in fact basis. Id. at 1375. See, e.g., LaBarge Prods. v. West, 46 F.3d 1547 (Fed. Cir. 1995); Beta Sys., Inc. v. United States, 838 F.2d 1179 (Fed. Cir. 1988); Urban Data Sys., Inc. v. United States, 699 F.2d 1147 (Fed. Cir. 1983); Trilon Educ. Corp. v. United States, 578 F.2d

1356 (Ct. Cl. 1978); Clark v. United States, 95 U.S. 539 (1877). In the instant case, the parties fully completed contract performance over 11 years ago.

Finally, courts have been particularly reluctant to annul contracts where the illegality is not plain. John Reiner & Co. v. United States, 325 F.2d 438, 440 (Ct. Cl. 1963). In the instant case, the illegality of the contract (presumed by Question No. 6) clearly is not plain. No evidence in the record indicates that, to this day, either party ever has viewed the Contract as illegal. Moreover, as evidenced in the submissions to the Court in this proceeding, even the fundamental applicability of the statute is unclear (see Pl.'s Br. App. 21, Aff. of Kenneth Forsyth at Para. 3-8 (contract does not resemble contract for A&E services); Pl.'s Br. App. 36, 1/4/05 Decl. of James Wagner, at Para. 8-9 (same)), as is, if applicable, how the statute should be applied. See, generally, Complaint App. 1, CO's Final Decision (use of retroactive estimate by contracting officer legal); Def.'s Opp. to Pl.'s Br. (same); Pl.'s Br. (if statute were applicable, use of retroactive estimate would be improper).

Even if the Court were to decide not to sustain the Contract (under the scenario of illegality assumed in Question No. 6), Plaintiff still would be entitled to *quantum meruit* recovery on an implied-in- fact contract. See United States v. Amdahl, 786 F.2d 387, 393 (Fed. Cir. 1986) ("[e]ven though a contract be unenforceable against the Government, because not properly advertised, not authorized, or for some other reason, it is only fair and just that the Government pay for goods delivered or services rendered and accepted under it"); Yosemite Park, 582 F.2d at 560-61 (because government bargained for, agreed to pay for, and received benefit of contractor's services, contractor was entitled to recover reasonable value of those services). Plaintiff asserts that, since its costs incurred otherwise were allowable, allocable and reasonable (with certain minor exceptions not relevant here), and the profit negotiated by the

contracting officer was reasonable, Plaintiff, under an implied in fact contract, would be entitled to an amount approximately equal to the full amount received during performance of the Contract.

Moreover, calculation of Plaintiff's recovery under this hypothetical would not necessitate a "project estimate." The Yosemite case referenced in Question No. 6 stands for the proposition that, when the government acts illegally, the contractor is entitled to the full, reasonable value of its services. In Yosemite, while the court did limit the reasonable *profit* to 10 percent of estimated costs because to do otherwise would have been "patently illegal," no such limitation applies to Plaintiff's recovery of costs or its total fee in this case for four primary reasons:

First, there is, and can be, no limitation in the instant case without an estimate prepared by the agency head at the time of entering the contract. No dollar limitation is specified by statute. The factual predicate for the calculation of the statutory limitation is the head of the agency's timely and proper estimate. If this estimate does not exist, no specified Congressional limitation exists on Plaintiff's recovery of costs. Accordingly, Plaintiff's recovery of *quantum meruit* would be the full reasonable value of the services provided including profit.[11]

Second, unlike in Yosemite, there is no patent illegality in the instant case: the contracting officer did not put Plaintiff on notice of the amount of any cap on payments relating to A&E services; nor did the contracting officer provide the agency head's estimate to Plaintiff so as to permit Plaintiff itself to calculate any cap on payment for A&E services (there was not

---

[11] Section 254(b) would limit Plaintiff's recovery of *profit* to 10 percent of its costs. However, Plaintiff represents and, at trial on quantum, the facts would show that Plaintiff's profit was significantly less than 10 percent.

such estimate); neither party believed the statute applied; nor is it clear, even now, that the statute applied.

Third, the holding in Yosemite regarding limitation of profit should be viewed in light of circumstances present in this case and this Court's holding in Ross. Although the Court previously has questioned the applicability of Ross to this case, Plaintiff respectfully draws the Court's attention to that portion of Ross instructing that "absent the most explicit of statutory language, a Congressional limitation on expenditures should not be read as excluding recovery for circumstances over which the contractor could have no control and which were not its fault." Ross Constr. Co. v. United States, 392 F.2d 984, 986 (Ct. Cl. 1968). In other words, Congressional limitations on payment are not absolute. The Executive Branch is not permitted to induce private parties to perform work with promises to pay for such work if such payment would violate a statutory limitation, is not permitted to require private parties to perform such work and is not permitted to accept such work without paying for it where the contractor does not control or possess the information relating to the dollar limitation and thus is not at fault. Where the contractor's incurrence of costs in excess of the statutory limit is the fault of the government, Ross establishes that the statutory provision limiting payment will be read to permit the contractor to be paid what the agency promised.

The fact that Ross involved the contractor's request for payment for "additional work" performed does not distinguish that case from this one. Both the contract in Ross and the instant contract were government contracts; in both instances, the contractors were *required* by contract to perform the work requested by the government; and, in both cases, only the government knew (or should have known) whether the cost of the required work exceeded the statutory limitation.

Nor does Ross's reference to exhaustion of appropriation cases involving appropriations used to pay multiple contractors instead of a single contractor create a distinction. The Ross doctrine focuses on the absence of fault of the contractor. In the exhaustion of appropriation cases involving a general appropriation used for multiple contractors, the finding of "no fault" rests on the inability of the contractor to ascertain what portion of the appropriation remains available because multiple contractors are being paid from the same appropriation. In the instant case, were the statute applicable, the finding of "no fault" would rest on the failure of the agency head to perform the required estimate, the failure of the contracting officer to follow the FAR in negotiating the Contract to insure that the price negotiate is not in excess of the statutory limit, the failure of the contracting officer to monitor contract payments or provide Plaintiff with the statutory estimate (there was none) so that Plaintiff itself could monitor costs incurred, and the fact that neither party thought the statute applied. Although both the case in Ross and the instant case have a different set of reasons why the contractor is not at fault, both cases are governed by the Ross doctrine.

Fourth, fundamental to the doctrine of quantum meruit is the principle that the contractor is entitled to receive the fair value of its services even when the contract pursuant to which the work is done is illegal. See Amdahl, 786 F.2d at 393; Yosemite Park, 582 F.2d at 560-61. Yosemite limited the *profit* the contractor was entitled to receive to 10 percent. The contractor thus recovered all costs and some profit, *i.e.*, fair market value for its services. In the instant case, application of the 6 percent limitation to Plaintiff's recovery of costs (as well as profit) would result in Plaintiff's having produced thousands of hours of designs for no money.[12] No

---

[12] In this regard, it is important to remember that Defendant was purchasing incremental hours of effort. Under a level of effort contract, the finished product of the contract is whatever is produced following the expenditure of the contract hours which the government lawfully can order. Any further hours ordered result in

court has held, in a contract such as this, that the fair market value of concededly valuable services, ordered, accepted and paid for by the government is zero. The doctrine of quantum meruit requires otherwise.

**QUESTION NO. 7**

Are there other federal agencies that employ the level-of-effort cost plus-fixed-fee procurement for A/E services? Assuming for the purpose of this response only, that the contract fails in whole or in part under § 254(b) because it is *ultra vires*, what would be the implications for other federal agencies' A/E procurements?

**ANSWER**

Plaintiff is unaware of any level of effort cost plus fixed fee contract for A&E services and thus cannot gauge the implications of any ruling by the Court that the instant contract fails in whole or in part under § 254(b). However, a ruling by the Court that any contract requiring any amount of design work to perfect its performance is a "contract for A&E services" and thus covered by the statute would have a profound impact on other agencies' procurement of A&E services. The traditional design-bid-build procurement strategy necessitating "contracts for A&E services" as that term is used in the Act is fast becoming a thing of the past. As agencies have significantly downsized their facility engineering and design organizations, they increasingly are using different contract forms to shift more of the planning, management, design and engineering responsibilities to private contractors. 7/11/2000 GAO/GGD-00-172R, Study on Facility Design Reviews at 21. At least by July 2000, for example, NAVFAC, which at that time had an annual construction budget of approximately $2.5 billion, was reporting that the design-build

---

separate charges. The government's theory would characterize the fair market value of these additional hours ordered, accepted and paid by the NOAA as $0.

procurement strategy[13] was the favored contracting strategy used by that organization and that the traditional design-bid-build strategy had become the least favored. Id. at 22. The US Army Corps of Engineers, which has decades of experience implementing the statutory limitation set forth in 41 U.S.C. § 254(b), *does not apply the 6 percent limitation to design-build contracts*! Pl.'s Br., App. 25, EP 715-1-7 US Army Corps of Engineers "Architect-Engineer Contracting," at § 4-13(c)(3) ("The 6 percent limitation statutory limitation does not apply to a design-build contract"). To render illegal all such modern era contracts, performed without application of the statute, would create upheaval in the government facilities procurement world.

## CONCLUSION

Based on the undisputed material facts, Plaintiff respectfully requests that the Court grant it summary judgment on Count I of Plaintiff's Complaint and deny Defendant's motion.

Respectfully submitted,

s/*Frank M. Rapoport*

FRANK M. RAPOPORT
STEPHEN E. RUSCUS
McKENNA LONG & ALDRIDGE LLP
1900 K Street, N.W.
Washington, DC 20006
(202) 496-7500

Attorneys for Plaintiff,
Fluor Enterprises, Inc.

Date: January 14, 2005

[13] Under this approach, the agency prepares a project scope definition and then engages a single entity that will provide all services necessary for design and construction of the facility.

**CERTIFICATE OF SERVICE**

**I hereby certify that on January 14, 2005, the foregoing "PLAINTIFF'S SUPPLEMENTAL BRIEFING IN RESPONSE TO THE COURT'S ORDER OF OCTOBER 29, 2004" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.**

s/*Frank M. Rapoport*

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FLUOR ENTERPRISES, INC.<br>f/k/a FLUOR DANIEL, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 00-207C<br>(Judge Block) |

**PLAINTIFF'S SUPPLEMENTAL BRIEFING IN RESPONSE TO THE COURT'S ORDER OF OCTOBER 29, 2004**

**<u>APPENDIX</u>**

| | |
|---|---|
| Pl.'s App. 33 | Army Regulation 415-15, Army Military Construction Program Development and Execution |
| Pl.'s App. 34 | Task Order No. 6 |
| Pl.'s App. 35 | Task Order No. 7 |
| Pl.'s App. 36 | 1/4/05 Declaration of James Wagner |

January 14, 2005

Army Regulation 415–15

Construction

# Army Military Construction Program Development and Execution

Headquarters
Department of the Army
Washington, DC
4 September 1998

**UNCLASSIFIED**

# SUMMARY of CHANGE

AR 415–15
Army Military Construction Program Development and Execution

This new regulation--

o Clarifies policy for minor construction projects costing $500,000 or less as given in AR 420-10 (para 1-1a).

o Establishes Unspecified Minor Military Construction, Army, funding limits for military construction projects intended solely to correct a deficiency that is life, health, or safety threatening (para 1-6b).

o Provides additional funding policy for the Energy Conservation Investment Program (para 1-6b).

o Identifies funding limits for Operation and Maintenance, Army, funds (para 1-6c).

o Provides guidance on the use of Other Procurement, Army, funds for time-sensitive installation of communications-electronics equipment and systems (para 1-6c).

o Clarifies certification authority for DD Forms 1391-EF (para 3-5a).

o Clarifies U.S. Army Information Systems Engineering Command review policy for user developed information systems cost estimates (para 3-7).

o Updates design directives policy and introduces parametric design (para 5-4).

o Introduces systems commissioning policy (para 5-14).

o Establishes procedures for an execution review by Headquarters, U.S. Army Corps of Engineers with Headquarters, Department of the Army and major Army Commands (para 5-15).

o Clarifies policy as related to the Unspecified Minor MCA Program (app B).

o Provides specific policy for operation and maintenance funded projects (app B).

o Clarifies waiver procedures for deviations from standard designs (app G).

o Updates DD Forms 1391-EF certification procedures for combating terrorism and physical security measures (app K).

o Clarifies policy on barrier-free design for new construction, additions, or alterations (app K).

- Incorporates procedures for use of fiber optic cable for military construction (app K).

- Establishes policy eliminating construction of shelters or other facilities for smoking (app K).

- Provides additional guidance on the Facilities Reduction Program (app K).

- Updates policy on obligation rates for foreign currency transactions (app K).

- Incorporates additional information on the funding for information systems (app L).

- Adds policy for changes associated with Army Family Housing , Military Construction, Army, and Unspecified Minor Military Construction, Army, projects (app M).

**Headquarters**
**Department of the Army**
**Washington, DC**
**4 September 1998**

***Army Regulation 415–15**

**Effective 4 October 1998**

**Construction**

# Army Military Construction Program Development and Execution

Robert M. Walker
*Acting Secretary of the Army*

**History.** This printing publishes a revision of this regulation. Because the publication has been extensively revised, the changed portions have not been highlighted.

**Summary.** This regulation has been revised, and prescribes new policies, responsibilities, and procedures for Army military construction, including major military construction; unspecified minor military construction and Army family housing construction programs; and the acquisition of facilities with military construction funds. It describes planning, programming, budgeting, and execution of military construction projects, annual and biennial programs, and related activities. It implements Department of Defense Directives 4270.5 and 4270.34 and Department of Defense (DOD) Instructions 7040.4 and 7040.5.

**Applicability.** This regulation applies to the Active Army and tenants on Active Army installations. It also applies to the Army National Guard and the U.S. Army Reserve when they are tenants on Active Army installations.

**Proponent and exception authority.** The proponent for this regulation is the Assistant Chief of Staff for Installation Management. The proponent has the authority to approve exceptions to this regulation that are consistent with controlling law and regulation. Proponents may delegate this approval authority, in writing, to a division chief under their supervision within the proponent agency, in the grade of Colonel or the civilian equivalent.

**Army management control process.** This regulation contains management control provisions but does not identify key management controls that must be evaluated.

**Supplementation.** Supplementation of this regulation and establishment of command or local forms are prohibited without prior approval from the proponent. Address requests to HQDA, Assistant Chief of Staff for Installation Management (DAIM-FD), 600 Army Pentagon, Washington, DC 20310-0600.

**Suggested Improvements.** Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to HQDA (DAIM-FD), 600 Army Pentagon, WASH DC 20310-0600.

**Distribution.** Distribution of this publication is made in accordance with initial distribution number 093463, intended for command levels C, D, and E for the Active Army, the Army National Guard, and the U. S. Army Reserve.

**Contents** (Listed by paragraph and page number)

**Chapter 1**
**Introduction,** *page 1*

*Section I*
*General, page 1*
Purpose • 1–1, *page 1*
References • 1–2, *page 1*
Explanation of abbreviations and terms • 1–3, *page 1*
Army Planning, Programming, Budgeting, and Execution System • 1–4, *page 1*
Military construction programming process • 1–5, *page 1*
Appropriations and programs that provide for construction • 1–6, *page 2*
Army Family Housing construction program • 1–7, *page 3*
Defense medical facilities construction program • 1–8, *page 3*
Army and Air Force Exchange Service facilities construction program • 1–9, *page 3*
Army Environmental Compliance Achievement Program • 1–10, *page 3*
Host nation funded construction program • 1–11, *page 3*
Utilities privatization program • 1–12, *page 3*

*Section II*
*Responsibilities, page 3*
The Assistant Secretary of Defense, Health Affairs • 1–13, *page 3*
The Assistant Secretary of the Army (Installations, Logistics, and Environment) • 1–14, *page 3*
The Assistant Secretary of the Army (Financial Management and Comptroller) • 1–15, *page 3*
The Director of Information Systems for Command, Control, Communications, and Computers • 1–16, *page 3*
Deputy Chief of Staff for Operations and Plans • 1–17, *page 3*
The Assistant Chief of Staff for Installation Management • 1–18, *page 4*
Principal officials of other HQDA staff agencies • 1–19, *page 4*
The Surgeon General • 1–20, *page 4*
The Commander, U.S. Army Corps of Engineers • 1–21, *page 5*
Commanders of major Army commands and other operating agencies • 1–22, *page 5*
Commander, Training and Doctrine Command • 1–23, *page 6*
Chief, U.S. Army Reserve • 1–24, *page 6*
The Chief, National Guard Bureau • 1–25, *page 6*
Commanders of installations • 1–26, *page 6*
The Commander, U.S. Army Medical Command • 1–27, *page 7*
The Commander, Military Traffic Management Command • 1–28, *page 7*

*The regulation supersedes AR 415-15, 30 August 1994



**UNCLASSIFIED**

**Contents—Continued**


The Commander, U.S. Army Information Systems Engineering Command (USAISEC) • 1–29, *page 7*
Commanders of tenant activities • 1–30, *page 7*

*Section III*
*Authorities, page 7*
Authorization and funding • 1–31, *page 7*
Environmental compliance • 1–32, *page 7*

**Chapter 2**
**Planning Overview,** *page 10*
Real property master planning • 2–1, *page 10*
Site approval • 2–2, *page 10*
Project definition • 2–3, *page 10*
Project programming documentation • 2–4, *page 10*
Funding for planning activities • 2–5, *page 10*

**Chapter 3**
**Programming,** *page 10*
Army programming • 3–1, *page 10*
Major Army command Program Objective Memorandum submission • 3–2, *page 11*
Major Army command project review • 3–3, *page 11*
Major Army command military construction project selection • 3–4, *page 11*
U.S. Army Corps of Engineers review and certification (MCA and AFH projects only) • 3–5, *page 12*
Major Army command project certification (MCA and AFH only) • 3–6, *page 12*
U.S. Army Information Systems Engineering Command certification (MCA and AFH only) • 3–7, *page 12*
Project submission for design authorization • 3–8, *page 12*
Army military construction design authorization • 3–9, *page 12*
Army program development and review • 3–10, *page 12*
Office of the Secretary of Defense program review • 3–11, *page 13*

**Chapter 4**
**Budgeting,** *page 13*
Army budget estimates • 4–1, *page 13*
Final revisions to project programming documentation • 4–2, *page 13*
DD Form 1390-EF, FY__ Military Construction Program • 4–3, *page 13*
Army approval of the Budget Estimate Submission • 4–4, *page 13*
Office of the Secretary of Defense and Office of Management and Budget review • 4–5, *page 13*
President's Budget • 4–6, *page 14*
Authorization and appropriation • 4–7, *page 14*

**Chapter 5**
**Execution,** *page 14*
Supervision of military construction projects • 5–1, *page 14*
Coordination • 5–2, *page 14*
Design management • 5–3, *page 14*
Design directives • 5–4, *page 14*
Architect-Engineer contracts • 5–5, *page 15*
Pre-design activities and AEI design criteria • 5–6, *page 15*
Concept design • 5–7, *page 15*
Parametric design • 5–8, *page 16*
Final design • 5–9, *page 16*
Cost estimate • 5–10, *page 17*
Additive bid items • 5–11, *page 17*
Advertising, award, and obligation • 5–12, *page 17*
Project construction • 5–13, *page 17*
Systems commissioning • 5–14, *page 17*
Semi-annual review • 5–15, *page 17*
Cost increases (MCA and AFH) • 5–16, *page 17*
Scope variation (MCA and AFH) • 5–17, *page 18*
Project completion • 5–18, *page 18*
Emergency construction • 5–19, *page 18*

**Appendixes**

**A.** References, *page 19*

**B.** Unspecified Minor MCA (UMMCA) Program, *page 20*

**C.** Emergency Construction, *page 21*

**D.** Restoration or Replacement of Damaged or Destroyed Facilities and Construction Authority in the Event of Declaration of War or National Emergency, *page 21*

**E.** Army Medical Facilities, *page 24*

**F.** Environmental Protection, *page 24*

**G.** Facilities Standardization and Repetitive Designs, *page 26*

**H.** Equipment Installation, *page 27*

**I.** DD Form 1391-EF, FY Military Construction Project Data, *page 29*

**J.** DD Form 1390-EF, FY Military Construction Program, *page 29*

**K.** Specific Facility Policy, *page 29*

**L.** Information Systems Support, *page 35*

**M.** Authority for Approval of Changes to MILCON Projects Funded by MCA, UMMCA, and AFH Appropriations, *page 38*

**Glossary**

**Index**

# Chapter 1 Introduction

## Section I General

### 1–1. Purpose

*a.* This regulation prescribes policies, procedures, and responsibilities for Department of the Army (DA) military construction (MILCON). It —

(1) Establishes Army policies, responsibilities (listed in section II of chapter 1), and procedures for the development and execution of Military Construction, Army, (MCA) and Unspecified Minor Military Construction, Army, (UMMCA) programs during peacetime and mobilization. The scope includes planning, programming, designing, budgeting, construction of MCA and UMMCA projects, acquisition of real estate related to MILCON construction, demolition requirements associated with MILCON construction, and other supporting activities. Policy for minor construction projects costing $500,000 or less is given in AR 420-10.

(2) Prescribes procedures for planning, programming, budgeting, and executing the design and construction portion of the AFH program. AFH policy is contained in AR 210-50.

(3) Includes procedures pertaining to the Army portion of the Medical Military Construction (MED MILCON) program.

*b.* The term MILCON as used in this regulation is limited to MCA, UMMCA, AFH, and MED MILCON. See the glossary for the definition.

*c.* This regulation sets forth policies and procedures for integrating the planning, programming, and execution phases of the Army MILCON process, with primary emphasis on the programming and execution phases. The planning (project identification) phase is explained in AR 210-20. Intergovernmental coordination for Army MILCON for installations located in the National Capital Region (NCR) will be accomplished in accordance with AR 210-70 and the published submittal requirements of the National Capital Planning Commission (NCPC) and the Commission of Fine Arts (CFA). The procedure is explained in the Architectural and Engineering Instructions (AEI) Design Criteria.

*d.* Although this regulation does not govern construction programming funded under Base Realignment and Closure (BRAC), many of the principles and guidelines associated with sound planning, design, and construction apply.

*e.* This regulation prescribes the goal for achieving high quality, cost effective military construction for the Army within schedules that meet the needs of the facility users and attain and maintain compliance with Federal, State, local, and host nation environmental laws and regulations.

### 1–2. References

Required and related publications and prescribed and referenced forms are listed in appendix A.

### 1–3. Explanation of abbreviations and terms

Abbreviations and terms used in this regulation are explained in the glossary.

### 1–4. Army Planning, Programming, Budgeting, and Execution System

*a.* The Army Planning, Programming, Budgeting, and Execution System (PPBES) is the management process employed by the Army to ensure effective use of resources to establish and maintain the Army's capabilities to accomplish its roles and missions. Guided by policy and direction from the Secretary of Defense (SECDEF), the Army PPBES responds to both the DOD Planning, Programming, and Budget System and the Joint Strategic Planning System. The PPBES is the Army's primary management system that ties strategy, program, and budget together. It builds a comprehensive plan in which budget flows from programs, programs from requirements, requirements from missions, and missions from national security objectives.

*b.* The PPBES identifies and accounts for all resources programmed by the Army. It allocates resources by fiscal year totals for manpower and dollars. It covers total obligation authority (TOA) and manpower totals four years beyond the end (second year) of the biennial budget (a total of six years).

*c.* Documents produced within the PPBES support defense decision making. The review and discussions that are part of its development help to shape the outcome.

(1) The Army participates in preparing the Defense Planning Guidance and documents produced by the Joint Strategic Planning System. This participation influences policy, strategy, and force objectives considered by the Secretary of Defense and the Joint Chiefs of Staff, including policies for development, acquisition, and other resource allocations.

(2) Commanders of MACOMs and the commanders-in-chief (CINCs) similarly influence positions and decisions made by the Secretary of the Army (SA) and the Chief of Staff, Army (CSA).

*(a)* On behalf of the CINC of a unified command, MACOM commanders serving as Army Component Commanders integrate the CINCs' operational requirements into their Program Objective Memorandums (POMs) and forward the requirements to HQDA.

*(b)* MACOM commanders make their views known through periodic commander's conferences held by the CSA on the proposed plan, program, and budget.

*(c)* MACOM commanders develop and submit force structure, procurement and construction requirements, command programs, and budget estimates annually.

*(d)* The PPBES is described in AR 1-1.

### 1–5. Military construction programming process

*a.* The MILCON program involves a sequence of reviews by the Office of the Secretary of the Army, the Office of the Secretary of Defense (OSD), Office of Management and Budget (OMB), and the Congress. Program changes continue throughout the review until the MILCON program becomes law. The DOD Financial Management Regulation (DOD 7000.14-R) requires the design of all construction projects be at least 35 percent complete (5-15 percent in the case of parametric design), when submitted to the Congress. This allows for submission of an accurate budget estimate based on the project design. There is a deliberate one year lag between the Army's normal biennial programming and budgeting system and the MILCON process. MILCON programming, unlike other Army programming, requires an additional year for the design effort. MACOMs must identify projects for the first year of their POM a year before it is submitted to HQDA.

*b.* The MILCON programming process consists of four phases. (See fig 1-1.)

(1) Guidance year (GY). In the GY, HQDA publishes The Army Plan (TAP) and the Army Planning and Programming Guidance Memorandum that incorporate general instructions, current policy, and resource guidance for facilities from the latest Program Budget Guidance (PBG). MACOMs respond by submitting their POMs containing updated construction programs for the POM period. A MACOM's first year projects are reviewed, validated, and recommended for design by the HQDA Construction Requirements Review Committee (CRRC) at the annual Project Review Board (PRB). These reviews are scheduled before the MACOM POM submission to ensure projects programmed for the first year of the biennial budget will be 35 percent (5-15 percent in the case of parametric design) designed and cost estimates completed by 1 July of the following (design) year.

(2) Design year (DY). During the DY, as the Army builds its POM for submission to OSD, first year project designs proceed toward 35 percent completion (5-15 percent in the case of parametric design). Around midyear, the CRRC at the PRB will review, validate, and authorize design of MACOM second year projects programmed for the second year of the biennial budget. Following the OSD Program Decision Memorandum (PDM), both

first and second year projects will be included in the Army's Budget Estimate Submission (BES) to OSD in September.

(3) Budget Year (BY). During the BY, the Army presents each project in the MILCON program before OSD, OMB, and the Congress. OSD reviews the construction projects contained in the Army's BES early in the budget year through the Program Budget Decision (PBD) process. OSD directed revisions to the program are made by the Army before submission of the President's Budget (PB) to the Congress in January. During this year, the final design of the first year projects, is completed.

(4) Program Year (PY). The program year, or execution year, is the year funds are made available for construction of first year projects. During this year, final design of the second year projects is completed.

*c.* Amended and abbreviated budget review. During the even years, HQDA, DOD, and the President submit a two-year MILCON budget to the Congress. Typically, the Congress will authorize and appropriate funds for only the first year of that budget. To update and adjust the second year budget, as necessary, an amended budget review is conducted in the odd year.

*d.* NCPC requires Army installations located in the NCR to provide an annual submittal in July of each year of the five-year (short range) MILCON for incorporation into the five-year Federal Capital Improvement Program (FCIP). Any land acquisition or development proposal being considered for funding in the next five years is to be submitted to NCPC prior to the Program Year.

**1–6. Appropriations and programs that provide for construction**

*a.* Construction in the Army may be programmed or accomplished under a number of regulations, and may be authorized and appropriated by separate acts of the Congress. Construction on military installations may also be supported by non-appropriated or private funds. (See AR 415-19.)

*b.* In addition to the programming process described above, construction may also be accomplished through the following:

(1) UMMCA. Part of the annual MCA authorization and appropriation is funding for unforeseen requirements that cannot be delayed until the next MCA or MED MILCON cycle. Under section 2805, title 10, United States Code (USC) (10 USC 2805), the Army may perform MILCON projects costing $1.5 million, or less, using this UMMCA account. If the military construction project is intended solely to correct a deficiency that is life, health, or safety threatening, 10 USC 2805 specifies that a minor military construction project may have an approved cost equal to, or less than $3 million. Policies and procedures governing the UMMCA program are contained in appendix B.

(2) Emergency Construction. Under section 2803, title 10, United States Code (USC) 10 USC 2803), SA may approve MILCON projects, not otherwise authorized by law, that are vital to national security or the protection of health, safety, or quality of the environment, and cannot be delayed until the next MCA Authorization Act. Funding must be available from unobligated MILCON funds previously appropriated. Policies and procedures governing emergency construction are contained in chapter 5. Refer to appendix C for statutory authority.

(3) Restoration or Replacement of Damaged or Destroyed Facilities. Under section 2854, title 10, United States code (USC) (10 USC 2854), the SA may authorize use of available MCA funds to restore or replace damaged or destroyed facilities. Funding must be available from unobligated MILCON funds previously appropriated. Policies and procedures for restoring or replacing damaged or destroyed facilities are contained in appendix D.

(4) Energy Conservation Investment Program (ECIP). ECIP is designed to achieve DOD directed energy conservation goals. Through the ECIP, DOD provides additional MILCON funds to accomplish major retrofit projects (greater than $500,000) for existing Army energy systems and facilities. Under this program, installations can compete for energy conservation funds. Evaluation is based on economic analysis and investment return ratios of the candidate projects.

(5) Defense Access Road Program (DARP). DARP allows the Army to participate in the funding of public highway improvements when such improvements are necessary because of sudden or unusual defense generated actions. DARP guidance is contained in AR 55-80. DARP projects are prepared when major expansions or changes to installations are planned and major public highway impacts will result.

(6) Contingency construction. The Secretary of Defense is authorized under section 2804, title 10, United States Code (USC) (10 USC 2804) to execute MILCON projects if deferral of the projects until the next budget request is "inconsistent with national security or national interest." This authority is generally reserved for projects that support multi-service requirements. Urgent projects that support only one service should be authorized by the respective service secretary as emergency projects under 10 USC 2803. Accordingly, requests for 10 USC 2804 projects are generally submitted by the Unified Commands. The 10 USC 2804 authority is similar to the 10 USC 2803 authority except the Congress provides an annual appropriation for 10 USC 2804 projects.

(7) Construction Authority in the Event of a Declaration of War or National Emergency. Under section 2808, title 10, United States Code (USC) (10 USC 2808), in the event of a declaration of war or the declaration by the President of a national emergency under section 1601, title 50, United States Code (USC) (50 USC 1601), the Secretary of Defense may undertake MILCON projects that are necessary to support such use of the armed forces. Funding must be available from unobligated MILCON project funds already appropriated.

(8) National Foreign Intelligence Program (NFIP). Under provisions of Executive Order 12333, facilities for intelligence activities can be programmed in the NFIP. Funds programmed in this manner are additive to Army MILCON following approval by the Deputy Secretary of Defense and the Director of Central Intelligence. Such funds can only be used for specifically approved projects unless changes are jointly approved by the Deputy Secretary of Defense and the Director of Central Intelligence.

*c.* Acquisition or construction of facilities may also be accomplished with other appropriations under special circumstances.

(1) Operation and Maintenance, Army (OMA) funds may be used for minor construction costing $500,000 or less, the statutory limitation. (See AR 420-10.) If the project is solely to correct a life, health, or safety deficiency, the limitation is $1 million.

(2) Government-Owned, Contractor-Operated facilities may be funded by OPA when located on a military installation, and shall be funded by OPA if located on Government land other than a military installation, or, if the facility is an ammunition plant.

(3) Research, Development, Test, and Evaluation (RDTE) funds may be used for minor construction costing $500,000 or less, the statutory limitation. (See AR 420-10.) At Government-owned installations, construction projects over $500,000 are normally MCA funded; however, RDTE may fund construction supporting unique items in research, development, test, or evaluation if facilities are contractor operated and maintained. Congressional notification is required prior to obligation of funds. Using RDTE for construction or improvements having general utility is not authorized for projects over $500,000.

(4) Efforts to execute construction costing more than $500,000 with OPA or RDTE funds normally require congressional notification, and should not be pursued without prior specific project funding approval at the programming MACOM level.

(5) Other Procurement, Army (OPA) funds may be used, in lieu of MILCON, RDTE, or OMA, under special circumstances, for time-sensitive installation of communications-electronics equipment and systems to include site preparation and construction required to support this equipment. The OPA-funded equipment shelters and support facilities or systems are classified as real property and maintained by the Directors of Public Works (DPWs). All of the following special circumstances must also apply:

*(a)* Requirement must support HQDA-directed milestones (usually 18 months or less) for installation of the equipment and systems.

*(b)* The requirement cannot be met through the normal MCA or UMMCA process.

*(c)* Work classification must be approved in advance by HQDA (DAIM-FD).

*(d)* The construction shall be necessary for the installation of communications-electronic equipment or systems, and may not be designed or used to meet space requirements for personnel. If required, this latter construction must be provided by a separate project (OMA or MILCON funded).

*(e)* Master planning will be performed, and site approval obtained through the servicing DPW.

*(f)* Final design approval will be obtained from the servicing DPW before awarding a construction contract.

*(g)* Transfer of construction to the real property books of the DPW will be accomplished in accordance with established Army procedures.

*(h)* The purchase, installation, maintenance, and repair of communications equipment (personal property) continues to be the responsibility of the tenant, and where DPW services are required and available, must be accomplished on a reimbursable basis.

(6) The Transportation Working Capital Fund (TWCF) may be used for minor construction of less than $500,000.

### 1–7. Army Family Housing construction program

*a.* Family housing construction is funded by the AFH appropriation. AFH is authorized and appropriated under the same MILCON laws as MCA; however, it is a separate appropriation with unique controls and requirements. AFH construction consists of two broad programs, new construction and post-acquisition construction that includes improvements and whole neighborhood revitalization.

*b.* Procedures for AFH new construction are contained in this regulation and AR 210-50. Criteria and standards for new and renovated housing are contained in Architectural and Engineering Instructions, Army Family Housing, and programming and related facility information is contained in Military Handbook 1035.

### 1–8. Defense medical facilities construction program

The Office of the Surgeon General (OTSG) (MCMR-FP) programs all medical projects for the Army. The medical program is funded by the Assistant Secretary of Defense, Health Affairs (ASD(HA)). The process begins one year earlier than MCA projects for the same program year. Refer to appendix E for additional information.

### 1–9. Army and Air Force Exchange Service facilities construction program

Programming for and construction of Army and Air Force Exchange Service (AAFES) facilities are governed by AR 60-31.

### 1–10. Army Environmental Compliance Achievement Program

Army Environmental Compliance Achievement Program (ECAP) projects are in a special category since they are initiated because deficiencies have been identified and Notices of Violation or Administrative Orders have been issued to an installation by regulatory officials. These requirements cannot be ignored and must be addressed in the appropriate time frame. (See AR 200-1.) OMB has identified special procedures for planning, programming, and budgeting for environmental and pollution projects. These procedures are contained in OMB Circulars A-11 and A-106, and in appendix F.

### 1–11. Host nation funded construction program

Specific guidance for planning, programming, budgeting, developing technical criteria, and executing host nation funded construction program projects is provided by DOD. (Refer to the summary statement of this regulation for the DOD implementing instruction.)

### 1–12. Utilities privatization program

Army policy is to obtain utility services from local, municipal, or regional (public or private) authorities, or private existing installation systems rather than build, expand, upgrade, or renovate Army-owned exterior utility systems. Installations shall use local, municipal, or regional (public or private) utility systems, or privatized Army-owned systems where it is life cycle cost effective.

## Section II
## Responsibilities

### 1–13. The Assistant Secretary of Defense, Health Affairs

The Assistant Secretary of Defense, Health Affairs (ASD(HA)) provides central management for the MED MILCON program. Procedures for planning and executing the MED MILCON program are contained in appendix E.

### 1–14. The Assistant Secretary of the Army (Installations, Logistics, and Environment)

The Assistant Secretary of the Army (Installations, Logistics, and Environment) (ASA (IL&E)) provides overall policy and program direction for Army construction programs. Refer to Table 1-1 for project controls.

**Table 1–1**
**Project Controls**

| Appropriation Program | POM/Budget Project Review | Design Release[1] Construction Advertisement Construction Award |
|---|---|---|
| Military Construction, Army | ASA (IL&E) | DASA(IH)* |
| Army Family Housing | ASA(IL&E) | DASA(IH)* |
| *(DASA (IH), Deputy Assistant Secretary of the Army (Installations and Housing)) | | |

Notes:
[1] At the time of design release, projects may be flagged by ASA(IL&E) that will require further review before award of design contract, construction advertisement, or construction award.

### 1–15. The Assistant Secretary of the Army (Financial Management and Comptroller)

The Assistant Secretary of the Army (Financial Management and Comptroller (ASA(FM&C)) controls military construction appropriation funds and manages the budget as provided in AR 1-1.

### 1–16. The Director of Information Systems for Command, Control, Communications, and Computers

The Director of Information Systems for Command, Control, Communications, and Computers (DISC4) provides overall policy and program management for Army Information Management per AR 25-1.

### 1–17. Deputy Chief of Staff for Operations and Plans

The Deputy Chief of Staff for Operations and Plans (DCSOPS) will—

*a.* Prioritize the Army MILCON Program.

*b.* Establish and promulgate for HQDA review and approval, MILCON funded range and training land projects and non-MCA (OMA) funded range projects. Establish policy and guidance for planning, programming, and resourcing major training land acquisition proposals (1000 acres of more, or $1 million acquisition costs or more). Convene, chair, and serve as a principal (voting) member of the Range and Training Land Program (RTLP) Requirements Review and Prioritization Board (RRPB) and the RTLP Configuration Control Board (CCB).

**1–18. The Assistant Chief of Staff for Installation Management**

The Assistant Chief of Staff for Installation Management (ACSIM) executes day-to-day MILCON PPBES responsibilities. The ACSIM, as program manager for MILCON, will—

*a.* Prepare MILCON guidance for inclusion in TAP.

*b.* Review and evaluate program submissions for compliance with DA policy.

*c.* Serve as chairman of the CRRC.

*d.* Provide release authority to the U.S. Army Corps of Engineers (USACE) for design of MILCON (other than MED MILCON) projects, after ASA(IL&E) approval.

*e.* Provide MILCON programming guidance based on prioritized projects contained in the Army Master Range Program (AMRP) per DA DCSOPS (DAMO-TR) and the DA Program Coordinator for Army Training Facilities.

*f.* Prepare MCA and AFH programs and budget estimates for OSD, OMB, and the Congress, as Army program manager.

*g.* Ensure MACOMs and U.S. Army Communications Electronics Command (USACECOM) representatives are kept informed on the status of MILCON programming and budgeting activities and that they participate in program development.

*h.* Ensure MACOMs have submitted projects that comply with environmental laws and regulations.

*i.* Participate in the Department of the Army (DA) Facilities Standardization Program as co-chairman of the DA Facilities Standardization Committee.

*j.* Obtain approvals for reprogrammings and cost variations.

**1–19. Principal officials of other HQDA staff agencies**

Principal officials of other HQDA staff agencies will—

*a.* Review and provide comments on construction issues.

*b.* When designated the functional proponent for a facilities type—

(1) Provide a representative to serve as a member of the CRRC to analyze MACOM construction requirements to determine if requests meet objectives, policies, and priorities established in the current program guidance. DCSOPS prioritizes projects for submittal to Army leadership for approval.

(2) Present valid requirements through the programming and budgeting process within Army, OSD, and OMB, as required.

(3) Provide policy and guidance to HQUSACE regarding standards for facilities.

(4) Participate in the development, implementation, and revision of standard designs for repetitive facilities under the DA Facilities Standardization Program.

*c.* Proponents for the various categories of MILCON projects are as follows:

(1) Deputy Chief of Staff for Operations and Plans.

*(a)* Airfield and aviation support facilities (except maintenance facilities).

*(b)* Air traffic control facilities.

*(c)* Training facilities.

*(d)* Chemical and nuclear storage facilities.

*(e)* Land acquisition for unit training.

*(f)* Individual training facilities.

*(g)* Physical security and law enforcement facilities.

*(h)* Force protection and terrorism counteraction facilities.

(2) Deputy Chief of Staff for Logistics.

*(a)* Maintenance facilities.

*(b)* Supply facilities (other than chemical and nuclear storage facilities).

*(c)* Dining facilities.

*(d)* Ammunition storage facilities.

*(e)* Transportation and deployment out loading facilities.

(3) Assistant Secretary of the Army for Financial Management and Comptroller. Finance and accounting facilities.

(4) Deputy Chief of Staff for Personnel.

*(a)* Unaccompanied personnel housing.

*(b)* Educational facilities.

*(c)* Postal facilities.

*(d)* Publications facilities.

*(e)* Band facilities.

*(f)* Community facilities.

*(g)* Physical fitness facilities.

*(h)* Child development facilities.

(5) Assistant Secretary of the Army for Research, Development, and Acquisition.

*(a)* Army ammunition plants.

*(b)* RDTE facilities, excluding medical research.

*(c)* Production facilities.

(6) The Surgeon General.

*(a)* Health care facilities.

*(b)* Medical research facilities.

*(c)* Medical training facilities.

*(d)* War Reserve Medical Warehouses.

(7) Deputy Chief of Staff for Intelligence. Intelligence related projects.

(8) Director of Information Systems for Command, Control, Communications and Computers.

*(a)* Communications facilities.

*(b)* Automatic Data Processing Facilities.

*(c)* Information Systems provided in support of all MILCON projects.

(9) Assistant Chief of Staff for Installation Management.

*(a)* Environmental projects.

*(b)* Utilities projects.

*(c)* Energy conservation projects.

*(d)* Roads, bridges, fire stations, and other infrastructure.

*(e)* Army family housing.

(10) Chief of Chaplains.

*(a)* Chapels.

*(b)* Other religious facilities.

(11) Chief, Army Reserve. Army Reserve projects.

(12) Chief, National Guard Bureau. Army National Guard projects.

**1–20. The Surgeon General**

The Surgeon General (TSG) will—

*a.* Provide MACOMs, Major Medical Subcommands (MMSCs) and installations with annual programming guidance and criteria for development of medical facility projects and programs.

*b.* Review, coordinate, and rank, in coordination with host MACOMs, all construction and major alterations of health care facilities (Facility Class 500, Medical Facilities); Medical Research Laboratories under Category Code 310 60; and Category Codes 171 and 179 (AR 415-28), facilities associated with medical training), for planning, programming, and budgeting consideration by the Defense Medical Facilities Office.

*c.* Ensure MACOM approval for siting of all medical facilities.

*d.* Develop and maintain the Army Future Year Defense Program for MED MILCON, the medical Long Range Construction Program, and the medical mobilization plan.

*e.* Perform user reviews of Army medical facility designs for medical functionality.

*f.* Review Army medical facility designs, together with HQUSACE (CEMP-E), for compliance with Military Handbook 1191 and AEI Design Criteria.

*g.* Present the Army medical facility program to the CRRC, Program Budget Committee (PBC), CSA, and Secretary of the Army for approval.

*h.* Submit the proposed Army medical facility program to the ASD(HA) Defense Medical Facilities Office (DMFO) for review, approval, and submission to the Congress. Assist DMFO in presenting projects before the Congress, when requested by OSD.

*i.* Ensure that USACECOM and its subordinate commands formulate information systems requirements for, and participate in, the design of all medical facilities.

*j.* Monitor and analyze medical construction program execution.

*k.* Ensure medical facilities located in the NCR accomplish intergovernmental coordination of the Army MILCON, master plans,

and construction project design in accordance with AR 210-70 and the published submittal requirements of NCPC and CFA.

### 1–21. The Commander, U.S. Army Corps of Engineers

*a.* The Commander, USACE will—

(1) Serve as DOD Construction Agent responsible for the design and construction of MILCON facilities.

(2) Manage design, construction, and real estate activities associated with the MILCON program. Approve cost and technical aspects of those design, construction, and real estate activities.

(3) Undertake design and construction projects for the organizations listed below (including their authorized representatives), per directives of the Secretary of Defense and agreements with concerned agencies.

*(a)* Department of the Air Force.

*(b)* DOD.

*(c)* Other Government agencies.

*(d)* Foreign governments.

*(e)* Nonappropriated funded agencies, such as the Army and Air Force Exchange Service.

(4) Ensure DD Forms 1391-EF (FY__ Military Construction Project Data) for MILCON projects submitted by MACOMs comply with prescribed standards, criteria, and cost engineering requirements. Review project sitings, (i.e., for environmental impacts, floodplain, and wetland concerns). Certify to the MACOMs that there is sufficient information to start MILCON project design.

*b.* HQUSACE will—

(1) Develop, maintain, and distribute policy and criteria for the architectural and engineering design of MILCON projects.

(2) Develop and implement mandatory DA standard designs for repetitive facilities under the DA Facilities Standardization Program in coordination with the Army Staff (ARSTAF) facility proponent. Review construction programs for projects suitable for standard designs, site adaptations, and similar re-use of design. Ensure that standard designs incorporate anti-terrorism force protection elements as appropriate.

(3) Manage concept designs for health care facilities (Facility Class 500, Medical Facilities; Medical Research Laboratories under Category Code 310 60; and Category Codes 171 and 179 (AR 415-28), facilities associated with medical training) in cooperation with the OTSG, ensuring compliance with Military Handbook 1191 and conforming to design procedures prescribed by the ASD(HA) DMFO.

(4) Provide automation support for MILCON programming activities on a reimbursable basis, as required.

(5) Provide guidance and training for preparation of electronically generated DD Forms 1390-EF (FY__ Military Construction Program) and 1391-EF (FY__ Military Construction Project Data).

(6) Develop, maintain, and distribute policy and criteria for MILCON project management.

(7) Regularly schedule conferences with OACSIM and MACOMs to discuss projects in design and construction.

(8) Establish and maintain a Force XXI/Army Force Modernization Program Office (FXX/AFM PO), Combat Readiness Support Team (CRST), and the Mandatory Center of Expertise (RTLP MCX) for standardization, modernization, and centralized program execution management or functional manager in support of the RTLP.

(9) Review, validate, and approve current working estimates (CWE) for budget purposes.

*c.* USACE major subordinate command (MSC) commanders and major subordinate commands with operating missions similar to those of USACE districts will—

(1) Develop and maintain expertise on the policy and criteria for architectural and engineering design of Army facilities, per guidance and direction from HQUSACE. Review construction programs for projects suitable for standard designs, site adaptations, and similar re-use of design.

(2) Manage assigned portion of Army design, construction, and related real estate activities. Ensure MACOMs, installations, using services, and other agencies are kept informed on the status of design and construction activities.

(3) Appoint a MSC representative to the USACE committee of the DA Facilities Standardization Program and participate in the program.

(4) Participate in HQUSACE scheduled conferences with ACSIM and the MACOMs to discuss projects in design and construction.

*d.* USACE district commanders will—

(1) Execute assigned portion of MILCON design, real estate, and construction programs.

(2) Ensure projects are designed and constructed to current standards and criteria, and the approved scope and cost of the project as defined on DD Form 1391-EF.

(3) Provide value engineering studies on all projects with an estimated construction cost of $2 million or greater.

(4) Ensure that anti-terrorism force protection and physical security are considered as part of standard design practice.

(5) When requested, provide support to installations for real property master planning activities and project documentation preparation, construction contracting, and other activities on a reimbursable basis.

### 1–22. Commanders of major Army commands and other operating agencies

Commanders of major Army commands and other operating agencies will—

*a.* Provide guidance and assistance to their installations and activities in MILCON program development, per Army Long Range Planning Guidance (ALRPG), PBG, and TAP.

*b.* Direct preparation of project documentation for the budget years, following review and approval of the installation Real Property Master Plan (RPMP).

*c.* Program and prioritize MILCON requirements in the MACOM POM submission. Ensure POM Management Decision Packages (MDEPs) have all related facility requirements identified and resourced. Present requirements to HQDA and assist in presentation to OSD and the Congress.

*d.* Review project documentation to ensure that requirements are valid and conform to current objectives, policies, and procedures; that approved project sitings are consistent with the approved installation RPMP; and that suitable standard designs developed under the DA Facilities Standardization Program are used when appropriate. MACOMs will certify that all planning and related coordination have been accomplished on all budget year projects and that USACE has sufficient information to begin concept or parametric design before submission to HQDA.

*Note.*

Projects which fall under the purview of the Range and Training Land Program and the Integrated Training Area Management Program will be concurrently reviewed and approved. (See AR 210-21 and AR 350-XX for more information.)

*e.* Obtain USACE certification that sufficient information is available to begin concept or parametric design before submission to HQDA.

*f.* Promptly advise HQDA (DAIM-FD, 600 Army Pentagon, Washington, DC 20310-0600), and the USACE MSC of any circumstances that either cancel the requirement or would cause a change in the scope or siting of a proposed MILCON project.

*g.* Appoint a representative to the DA Facilities Standardization Program, and participate in the program. Refer to appendix G for additional information.

*h.* Review and approve scope and compliance of MILCON project concept or parametric designs with MACOM programming objectives.

*i.* Approve the siting of tenant projects and ensure tenant facility requests are in accordance with the host tenant support agreement.

*j.* When a MACOM activity is a tenant, ensure the activity coordinates its facility needs with its host and that requirements are incorporated into the supporting installation's RPMP.

*k.* Review, validate, and submit to HQDA (DAIM-FD) unforeseen requirements that cannot wait for programming. UMMCA policies and procedures are addressed in appendix B.

*l.* Review, approve, and forward DARP need reports to the Military Traffic Management Command.

*m.* Ensure that privatization of an exterior utility system is thoroughly evaluated and documented prior to the submission of a project to build, expand, upgrade, or renovate an Army-owned system.

*n.* Establish MACOM policy for range and training land requirements per AR 220-10.

*o.* Ensure military installations located in the NCR accomplish intergovernmental coordination of the Army MILCON, master plans, and construction project design in accordance with AR 210-70 and the published submittal requirements of NCPC and CFA.

### 1–23. Commander, Training and Doctrine Command

The Commander, Training and Doctrine Command (TRADOC) will—

*a.* Designate a DA Range and Training Land Program Coordinator.

*b.* Assist HQDA (DCSOPs) (DAMO-TR) in the development of Army training investment strategies and program objectives in coordination with the DA Program Coordinator of Army Training Facilities.

*c.* Coordinate targetry installation and range construction completion schedules with the RTLP MCX and the Army Materiel Command (AMC) commodity manager.

*d.* Participate in meetings and review designs for range projects to ensure training standards and requirements are satisfactorily met per the RTLP MCX.

*e.* Schedule and conduct Construction Compliance Reviews (CCR), Targetry Interface Inspections (TII), and coordinate facility acceptance for range projects.

*f.* Consolidate MACOM updated submissions on Army range assets, utilization/throughput, and operation and maintenance (O&M) for inclusion into appropriate DOD and HQDA decision support systems, as required.

### 1–24. Chief, U.S. Army Reserve

For U.S. Army Reserve installations, the Chief, U.S. Army Reserve (USAR) will—

*a.* Establish RTLP Development Plans (RDP) for training land requirements.

*b.* Establish and implement procedures to validate the adequacy and accuracy of range and training land plans.

*c.* Identify range and training land requirements to support Army Reserve training, per AR 5-9.

*d.* Advise DA Program Coordinators of program implications resulting from force structure and stationing changes, initiatives, or congressional actions (e.g., Military Construction (MILCON) or non-MCA additions).

### 1–25. The Chief, National Guard Bureau

The Chief, National Guard Bureau (CNGB) will—

*a.* Coordinate applicable MILCON, National Guard (MCNG), and non-MCNG range and training land requirements with the DA Range and Training Land Program Coordinator.

*b.* Advise DA Program Coordinators of program implications resulting from force structure and stationing changes, BRAC initiatives, or congressional actions (e.g., MILCON or non-MCA additions).

### 1–26. Commanders of installations

Commanders of installations will—

*a.* Prepare and submit completed project documentation on designated projects per MACOM instructions. Ensure all non-construction funded requirements related to the project have been identified and properly programmed.

*b.* Review and approve functional, operability, and maintainability characteristics of all MILCON project concept or parametric designs for their installations. Review projects for compliance with exterior appearance standards articulated in the Installation Design Guide.

*c.* Participate in the development, justification, and execution of all MILCON projects in design and construction for their installation. If required, present all aspects of project planning through the programming and budgeting phases.

*d.* Advise the MACOM of any circumstances that may cancel the requirement. Request MACOM approval to change the scope or siting of a MILCON project that is under design or construction.

*e.* Assist tenants in project formulation and documentation per their support agreements, when required. Request parent MACOM certification of tenant projects to ensure projects are fully planned and coordinated.

*f.* Ensure proposed sitings are reflected in the RPMP and submit to the MACOM for approval.

*g.* Participate in pre-design and design conferences.

*h.* Include privatization as the first alternative evaluated when building, expanding, upgrading, or renovating Army-owned exterior utility systems. Provide complete analysis including market survey and documentation in the project submission.

*i.* Through the Director of Information Management (DOIM) and in coordination with U.S. Army Information Systems Engineering Command (USAISEC):

(1) Obtain and submit user information systems requirements, in functional terms, along with an information systems cost estimate for each proposed project.

(2) If USAISEC is responsible for the design of information systems, provide the USACE district with a current information systems cost estimate as part of the first project design review. Final cost estimate must be submitted not later than 1 July of the design year.

(3) Witness operational tests and advise installation on acceptance of the information system portion of the MILCON project.

(4) Review, mark-up, and approve design documents for information systems.

*j.* Ensure proper review of all programming, pre-design, concept (or parametric) design, and final design documents for projects that have physical security and antiterrorism requirements. Ensure that all force protection (physical security and anti-terrorism) requirements beyond those required by physical security and force protection regulations, or those not included in a standard design for the type of facility being programmed, are based on a threat analysis in a form consistent with the threat analysis procedure in Technical Manual (TM) TM 5-853-1.

*k.* Determine the number and type of ranges needed to accomplish individual and collective training to support per Field Manual (FM) FM 25-100, and Reserve Component training needs per AR 5-9 and AR 210-20.

*l.* For Army installations located in the NCR, submit the five-year (short range) MILCON to NCPC each year for the FCIP. Any land acquisition or development proposal being considered for funding in the next five years is to be submitted to NCPC prior to the Program Year. Submit to NCPC for the FCIP, any change in project scope or funds increase or decrease in the amount of at least 10 percent of the original cost estimate. Provide NCPC the project documentation for new projects.

*m.* For Army installations located in the NCR, projects are to be programmed in accordance with a NCPC approved installation master plan. For Army installations located in the District of Columbia, to include Arlington National Cemetery and Fort Myer, Virginia, projects will be programmed in accordance with both a NCPC and CFA approved installation master plan.

*n.* For Army installations located in the NCR, accomplish intergovernmental coordination of the MILCON, master plans, and construction project design in accordance with AR 210-70 and the published submittal requirements of both NCPC and CFA.

### 1–27. The Commander, U.S. Army Medical Command

The commander, U.S. Army Medical Command (MEDCOM) will—

*a.* Provide subordinate installations, regional medical centers, and medical department activities with annual programming guidance and criteria for development of medical facility projects and programs. Provide periodic status reports to HQDA (OTSG), as appropriate.

*b.* Review, coordinate, and prioritize, in coordination with medical commanders and host MACOMs, all construction and major alterations of health care facilities, (Facility Class 500, Medical Facilities; Medical Research Laboratories under Category Code 310 60; and Category Codes 171 and 179 (AR 415-28), for planning, programming and budgeting consideration by TSG Health Facility Planning Agency (HFPA).

*c.* Ensure medical facilities located in the NCR accomplish intergovernmental coordination of the Army MILCON, master plans, and construction project design in accordance with AR 210-70 and the published submittal requirements of both NCPC and CFA.

### 1–28. The Commander, Military Traffic Management Command

The Commander, Military Traffic Management Command (MTMC) will determine DARP eligibility and program MILCON funds for DARP requirements.

### 1–29. The Commander, U.S. Army Information Systems Engineering Command (USAISEC)

The Commander, USAISEC, functioning under the U.S. Army Materiel Command (AMC),will—

*a.* Plan, program, and budget for procurement of information systems end instruments and switching equipment from funds other than MILCON in support of information systems in MILCON funded construction.

*b.* Review user information systems, in functional terms, and review the user developed Information Systems Cost Estimate (ISCE) for each proposed MILCON project submitted and provide certification to DAIM-FD prior to PRB.

*c.* Provide the installation and the USACE district with current information systems cost estimates, including associated cost and other appropriations based on the design documents. Final estimate must be submitted prior to PRB.

*d.* Participate in updating technical specifications for information systems.

*e.* Monitor quality of information systems during design and construction processes.

*f.* Participate in HQDA CRRC annual project review boards for all MACOMs.

*g.* Provide information systems expertise to USACE design and construction reviews for MACOMs.

*h.* Prepare information systems requirements in support of MED MILCON projects, including the ISCE.

### 1–30. Commanders of tenant activities

At Army installations with tenant activities, the installation commander will meet, when possible, tenant activity requirements from available facilities. When not possible, the tenant and its parent command will program new facilities to meet the tenant's mission. However, projects will be carefully coordinated with the installation commander and host MACOM, and will be included on the approved RPMP and have project site approval before design begins. The installation commander programs common support projects, such as housing and community facilities.

## Section III
## Authorities

### 1–31. Authorization and funding

*a.* MILCON is governed by public law. Every MCA, AFH, and MED MILCON construction undertaking must be specifically authorized and funded in MILCON legislation or performed under special statutory authority (for example, 10 USC 2803 or 10 USC 2854). UMMCA is authorized and appropriated as a single undertaking. Specific UMMCA projects are not separately authorized and appropriated.

*b.* The Military Construction Codification Act, Public Law 97-214 (PL 97-214), unified and codified the statutory constraints and limitations for the MILCON process (see section 2801, title 10, United States Code (USC) (10 USC 2801) et seq.).

*c.* In accordance with chapter 949, Public Act No. 592, NCPC is the central planning agency for Federal agencies in the NCR. NCPC fulfills its mission through three principal functions of comprehensive planning, oversight of the Federal capital improvements, and review of Federal construction projects. NCPC sets long-range policies and goals for future Federal development, historic preservation, environmental protection, and economic development of the NCR. Intergovernmental coordination of the Army MILCON for installations in the NCR will be accomplished in accordance with AR 210-70 and the NCPC published submittal requirements. NCPC reviews the Federal construction investment for the NCR through the five-year FCIP. NCPC requires an annual submittal in July of each year of the five-year (short range) Army MILCON for incorporation into the five-year FCIP. The FCIP is submitted to OMB for the President's Annual Budget message to Congress concerning total Federal investment in the NCR. NCPC reviews all Federal development projects in the NCR and approves or denies the location and design of all Federal buildings, museums, memorials, and monuments in the District of Columbia or Arlington National Cemetery. Projects are reviewed for compliance with the Comprehensive Plan for the National Capital, as well as Federal environmental and historic preservation laws. NCPC requires the review and approval of master plans and review and approval of MILCON project designs for Army installations located in the NCR.

*d.* In accordance with Chapter 243, Public Act No. 181; Public Law 99-652; Executive Order (EO) 1259; EO 1862; and EO 3524, CFA is responsible for the design of all public and other proposed developments to be paid in whole or in part from Federal or District of Columbia funds. CFA regulates the design quality, public interests, and reasonable control of statues, fountains, and monuments in the District of Columbia and Arlington National Cemetery. CFA reviews and approves master plans and MILCON project designs for installations in the District of Columbia; Arlington National Cemetery; and Fort Myer, Virginia. CFA regulates the exterior architecture of buildings and grounds.

### 1–32. Environmental compliance

The Congress has largely provided the States with authority to enforce these laws and regulations. To avoid fines and penalties, authorization and funding for environmental projects must be accomplished in a timely manner. Commanders of military installations and activities are required to fund programs and projects in order to achieve and maintain compliance with Federal, host nation, state, and local environmental regulations. Requirements for planning, programming, and budgeting of environmental compliance programs and projects are outlined in Executive Order 12056, Executive Order 12088, OMB Circular A-11, and section 2706b, title 10, United States Code (USC) (10 USC 2706(b)).

## MCA/AFH Program Flow Chart Activities

A. Authorization and Appropriation, PY Program

1. Army Guidance and/or Engineer MILCON Program guidance to MACOMs.

2. MACOM guidance to installations.

3. Installations prepare prioritized construction lists and submit to MACOM.

4. Using agencies provide general functional requirements to installations for projects in the program.

5. MACOMs submit prioritized construction lists concurrent MACOM Field POM.

6. HQUSACE transfers MACOM programs to DA CAPCES data base.

7. Installations submit completed DD Forms 1391-EF to MACOM and information copy to USACE and USAISEC.

8. USACE reviews DD Forms 1391-EF and provides certification and comments to MACOMs.

9. MACOMs review USACE, certification/comments and transmits completed DD Forms 1391-EF to DAIM with MACOM certification.

10. CRRC reviews Army program in preparation of PRBs - USAISEC certification provided to DAIM.

11. HQUSACE prepares DD Form 1391-EF books for use during the PRBs.

12. USACE district may initiate pre-design (Code 1) activities only if directed by HQUSACE based on DA guidance.

13. Biennial POM lock and submit (even years only).

14. PRB (CRRC) reviews projects and provides recommendation to DASA (IH). DASA (IH) releases Code 2 or 3 to DAIM. DAIM releases Code 2 or 3 to HQUSACE. 10 USC 2807 Congressional Notification is prepared by DAIM for DASA (IH) signature and transmittal to Congress.

15. HQUSACE releases Code 2 or 3 directive to USACE district.

16. MACOMs participate in concept or parametric design reviews.

17. Installations participate in concept or parametric design reviews.

18. Code 2 or 3 designs. Submit concept or parametric level cost data to HQUSACE not later than 1 July of Design Year.

19. Adjust project costs and submit to DAIM for approval.

20. DAIM conducts final review of program and submits to SA.

21. Issues papers. Defense Resources Board (DRB) adjusts and approves Army resources. Program Decision Memorandum (PDM) issued.

22. Army Secretariat biennial budget review and approval (BES) for two years of the biennial budget cycle.

23. SA reviews/approves amended budget submission (ABS) for second year of biennial budget cycle.

24. HQUSACE compiles OSD budget books in accordance with DAIM guidance.

25. OSD/OMB reviews, adjusts, and approves BY program.

26. DAIM responds to OSD issues and provides execution guidance to HQUSACE.

27. HQUSACE compiles Congressional budget books in accordance with DAIM guidance. DA forwards books thru OSD and OMB to Congress. DAIM provides guidance to HQUSACE on release of final design authority. HQUSACE then issues a Code 6 design directive.

28. USACE districts initiate final design of PY projects when directed.

29. Installations monitor project progress and participate in final design review in coordination with MACOMs.

30. Congress reviews budget submission. Hearings conducted.

31. Authorization and Appropriation Bills enacted.

32. Apportionment by OMB on or after 1 October.

33. OSD releases program.

34. ASA(FM&C) allocates funds.

35. Construction directives and funds issued to USACE districts.

36. USACE districts begin construction process.

**Notes: - - - -→ Indicates program impacts resulting from decisions on preceding programs.**

**Items 1,2,3 and 4 begin or occur in GY-1.**

**Figure 1-1. MCA/AFH Program Development Flow Chart**




Figure 1-1. MCA/AFH Program Development Flow Chart-Continued

## Chapter 2
## Planning Overview

### 2–1. Real property master planning

*a.* Installation planners develop RPMPs following planning and funding guidance provided by HQDA, MACOMs, and local commanders. The success of a MILCON project in programming and budgeting is directly related to the RPMP process. Documentation must demonstrate that planning was completed and the proposed project is the most logical and most cost effective alternative. Installations must ensure costs associated with each alternative are carefully and correctly estimated. The Army RPMP process and its role in support of the PPBES is described in AR 210-20.

*b.* Army installations in the NCR will develop master plans in accordance with the requirements of AR 210-20 and the published NCPC submittal requirements. For installations in the District of Columbia, to include Arlington National Cemetery and Fort Myer, Virginia, CFA requires the review and approval of master plans and Army MILCON project designs.

### 2–2. Site approval

*a.* All proposed construction projects in the approved RPMP Short Range Component (SRC) will identify site locations in accordance with the installation RPMP and receive MACOM approval per AR 210-20. Site approval denotes that a project's location conforms to land planning principles, the planned development of the installation, and that any special criteria (such as safety or environmental) have been considered and deficiencies have been or will be rectified or a waiver will be obtained.

*b.* Organizations responsible for selecting MILCON sites will conduct an environmental survey and categorization before site selection.

*c.* A valid site approval will be maintained on all projects under design.

*d.* Construction not complying with DOD ammunition and explosives safety standards, must be certified by the Service Secretary as necessary due to strategic or other compelling reasons.

*e.* For Army installations in the NCR, Army MILCON will be shown on an NCPC approved installation master plan. Projects not shown on an approved installation master plan will be delayed until the plan is updated and approved as required by the published NCPC submittal requirements. For installations in the District of Columbia, to include Arlington National Cemetery and Fort Myer, Virginia, projects not be shown on both an NCPC and CFA approved master plan will be delayed until the plan is updated and approved as required by the published NCPC and CFA submittal requirements.

### 2–3. Project definition

The RPMP includes both construction and major repair projects.

*a.* A military construction project is a single undertaking that produces a complete and usable facility or a complete and usable improvement to an existing facility. Construction includes:

(1) The erection, installation, or assembly of a new facility.

(2) The addition, expansion, extension, alteration, relocation, or replacement of an existing facility.

(3) Site preparation, excavation, filling, landscaping, land improvements, utility connections, and installed equipment (see app H).

(4) Related real property requirements.

*b.* Repair means to restore a real property facility, system or component to such a condition that it may effectively be used for its designated functional purpose.

(1) When repairing a facility, the components of the facility may be repaired by replacement, and the replacement may be up to current standards or codes. For example, heating, ventilation, and air conditioning (HVAC) equipment can be repaired by replacement, can be state-of-the-art, and can provide for more capacity than the original unit due to increased demands and standards.

(2) Additions, new facilities, and functional conversions must be done as construction. Construction projects may be done concurrent with repair projects as long as the facilities are complete and usable even if the repair projects would not be accomplished.

### 2–4. Project programming documentation

*a.* After the MACOM designates specific MILCON projects for programming in the first two years of the POM, the project proponent prepares project programming documentation. The DD Form 1391-EF is the MILCON programming form prescribed by DOD. (See app I and DA PAM 415-15 for additional information.) It includes the following documentation:

(1) Justification.

(2) Analysis of deficiency.

(3) Alternatives considered with related economics.

(4) Functional requirements.

(5) Criteria to be used.

(6) Related acquisitions.

(7) Utility impacts.

(8) Environmental documentation.

(9) Completed and required coordination actions.

*b.* In addition, family housing projects require a current DD Form 1523, (Military Family Housing Justification) and unaccompanied personnel housing (UPH) projects require submission through the Army Housing Requirements Program (AHRP). Supporting documentation is not required for MED MILCON projects.

*c.* Range and Training Land projects require submission for review, validation, and prioritization by the HQDA Range and Training Land Program Requirements Review and Prioritization Board prior to submission by the MACOM per AR 210-21.

*d.* The 1391 Processor, a module of the Programming, Administration, and Execution (PAX) System, will be used for project documentation. Classified information will not be entered in the 1391 Processor System; an unclassified version of the DD Form 1391-EF will be entered in the 1391 Processor System and submitted. A hard-copy classified version, if required, will be prepared and submitted through channels to HQDA (DAIM-FD).

### 2–5. Funding for planning activities

*a.* Planning tasks related to project identification and formulation will be programmed and funded from other than MILCON appropriations. Real property master planning is addressed in AR 210-20.

*b.* Criteria package preparation, design oversight, and construction surveillance for host nation sponsored projects will be funded with MILCON planning and design funds.

## Chapter 3
## Programming

### 3–1. Army programming

*a.* Programming translates planning decisions, OSD guidance, and congressional guidance into a comprehensive and detailed allocation of manpower and funds. In the process, the PPBES integrates and balances centrally managed programs for manpower; operations, research, development, and acquisition; stationing; and construction. Concurrently, the PPBES incorporates MACOM requirements for manpower, operation and maintenance, housing, and construction. The Army POM results from programming.

*b.* The POM presents the Army's proposal for a balanced allocation of resources within specified constraints. OSD reviews the POM and issues a PDM to reflect Secretary of Defense program decisions. As approved by the Secretary of Defense, the POM forms the basis for preparing the Army Budget Estimate.

*c.* Resources identified for specific MILCON projects, planning and design activities, and unforeseen construction requirements are contained in the Army POM.

**3–2. Major Army command Program Objective Memorandum submission**

*a.* MILCON projects submitted in the MACOM's POM will be identified in an MDEP. MDEPs are resource management tools that indicate program and budget resources by appropriation and program element. Individually, an MDEP describes a particular organization, program, or function and indicates the resources connected with the intended purpose.

*b.* Specific MILCON projects will be identified in the Army POM. For each project, the MACOM must provide HQDA (DAIM-FD) with the fiscal year (FY), MDEP, OSD Decision Unit, Form Number, Project Description, and Funded Amount.

*c.* MACOM facility proponents will verify the appropriate MDEP for each MILCON project. Care should be taken to establish a strong relationship between the MILCON project and the MDEP. As the Army builds its POM, MDEPs are used to assess program worth, confirm compliance with policy and plans, and rank resourcing.

*d.* The POM represents specific programming requirements of the MACOM commander. MILCON projects or programs submitted to HQDA in the Construction Appropriation Programming Control, and Execution System (CAPCES) will be updated to reflect the construction program in the MACOM POM. Revisions to the MACOM's MILCON program subsequent to its POM must be approved by the MACOM commander. It is essential to the credibility of the MACOM MILCON program that changes and revisions to requirements be minimal and necessary.

*e.* Costs associated with MILCON projects contained in the MACOM POM will be the program year costs.

*f.* When submitted to the Congress, incrementally funded construction projects will be based on sound overall scope and cost estimates and include a request for full authorization of all increments. All other projects will be funded in a single year appropriation.

(1) Each increment need not result in a complete and usable facility. In general, an exception to the complete and usable criteria exists only where cost-effective contracting would permit obligations in successive fiscal years.

(2) Incremental funding will not be construed as permitting construction of a facility which, after incremental funding is complete, would not be complete and usable. The total requirement must be identified in order for an implied congressional commitment to the entire project to be obtained when the first increment is appropriated.

(3) If mission dictates incremental construction, the request must be identified as "incremental" in the project justification. The requirement will detail the scope, cost, and timing of all other increments. This procedure does not apply to utility projects on major installations where roads, electrical, gas and water distribution, and sewage and storm water collection can successfully be constructed as portions of a system.

(4) Execution of incrementally funded projects requires an exception to OMB Circular A-11 which requires full funding of the entire cost for construction. Full written justification must be submitted by ASA(FM&C) to the Deputy Undersecretary of Defense (DUSD) (Comptroller) by 1 July of the design year.

*g.* A conjunctively funded construction project is one that requires funding from multiple sources to complete a usable facility.

(1) Use of non-appropriated funds, private funds, defense funds, operation and maintenance (O&M) funds, civil works funds, BRAC funds, or other funds in conjunction with MCA funding in a single project is permitted, but requires separate accountability for each type of fund appropriated to a conjunctively funded project. The combination of funding sources will not be used to expand projects or to circumvent statutory limitations. If conjunctive funding is required, this must be stated on the front page of the DD Form 1391-EF. A separate DD Form 1391-EF is required for each funding source. All DD Forms 1391-EF needed to provide for the complete and usable facility will be cross referenced as related projects on the face of each DD Form 1391-EF. The total project cost and the amount required from each source will be provided on DD Form 1391-EF, along with a statement that a complete and usable facility will not be produced by the funds requested from any one source. Conjunctively funded projects normally should be funded in the same fiscal year.

(2) Not all construction projects that include funds from multiple sources are classified as conjunctively funded projects. A project that includes MILCON funds for a real property facility; O&M funds to procure furnishings; OPA funds to procure information systems, computer equipment, or flight simulators; and RDTE funds to procure testing equipment is not a conjunctively funded project because construction of the facility is being funded with only one appropriation (i.e., MILCON). The MILCON funded portion of these examples must provide a complete and usable facility.

**3–3. Major Army command project review**

*a.* MACOMs must review the documentation of each MILCON project before submitting the project to HQDA (DAIM-FD) for design authorization or for programming the requirement in the POM to ensure:

(1) The requirement is valid.

(2) It conforms to current objectives, policies, and procedures.

(3) Project sitings are consistent with the MACOM approved RPMP.

(4) A survey of the site has been conducted and available records have been reviewed.

(5) Appropriate environmental inventories, consultations, and analyses have been performed to adequately address impacts of site selection on endangered species habitats, historic sites, archaeologically significant areas, wetlands, or floodplain.

(6) The site is free from pollutants, contaminants, and ordnance and explosive waste that would impact start of construction.

(7) Suitable standard designs developed under the DA Facilities Standardization Program are used when appropriate.

(8) The privatization of an exterior utility system has been thoroughly evaluated and documented.

(9) Force protection considerations have been addressed as appropriate and documented.

*b.* The MACOM must certify that planning and coordination have been accomplished on all budget year MILCON projects. Further, the MACOM must also certify that, where appropriate, USACE certifications have been obtained as described in paragraph 3-5 below.

*c.* MACOM facilities proponents must be prepared to justify all aspects of the projects throughout the programming and budgeting process.

**3–4. Major Army command military construction project selection**

*a.* Following the latest Army guidance, MACOMs should select MILCON projects for inclusion in the first and second year of their POM. Due to congressional requirement to have MILCON projects at concept or parametric design when submitted to the Congress, first year projects must be submitted to HQDA eight months before the MACOM POM.

*b.* For those projects selected, MACOMs will—

(1) Direct installations to complete and submit DD Forms 1391-EF and all supporting documentation for review. Information copies will be provided to the appropriate USACE district MSC and USAISEC. All project documentation, supporting documentation, cost estimates, and DD Forms 1391-EF will be prepared, submitted, and reviewed through the 1391 Processor module of the PAX system.

(2) Inform HQDA (DAIM-FD) with information copies of the project list to HQDA facilities proponent which projects were selected. HQDA will revise CAPCES to reflect the MACOM proposed construction program. For each project the following information must be provided:

*(a)* MACOM priority.

*(b)* Fiscal year.

*(c)* MDEP.

*(d)* Name of installation.

*(e)* DD Form 1391-EF number.

*(f)* Project description.

*(g)* Facility category code.

*(h)* Funded amount in dollars.

(3) Include new mission requirements in the appropriate MDEP and prioritize projects.

### 3–5. U.S. Army Corps of Engineers review and certification (MCA and AFH projects only)

*a.* USACE will review project documentation submitted by MACOMs for compliance with prescribed technical standards, criteria, and cost engineering requirements. These reviews should include site visits. MILCON documentation reviews will be funded from O&M appropriations.

*b.* Once the review has been completed and comments made, USACE will forward a statement to the MACOM, via the DD Form 1391-EF, that the project scope complies with Army standards, criteria, and cost estimating requirements; that deviations indicated are justified; and that sufficient information is available to commence concept or parametric design. In addition, this statement will list those issues that must be resolved before budget submission to prevent project delay or loss.

*c.* Issues listed in the certification should be of such magnitude that they would preclude or delay execution of the project. Issues must be resolved prior to issuance of concept or parametric design authority.

*d.* If the design or construction of a project is to be performed by another DOD agent, USACE is responsible for certification.

*e.* Deferred projects will be recertified by USACE upon reentry of the project into the program if there are significant changes in cost or scope or if the original certification is more than one year old.

### 3–6. Major Army command project certification (MCA and AFH only)

MACOMs will certify projects by selecting and including a statement in the DD Form 1391-EF that all planning and coordination with appropriate agencies has been accomplished and project documentation is available. Further, the statement will indicate that the project is valid, requirements and scope are in accordance with HQDA guidance, and siting is in accordance with the MACOM approved installation RPMP. Lastly, the statement will reflect that no major problems exist that should defer the project from programming, and that the project documentation has been reviewed by the appropriate USACE organization and was found to be adequate to begin design. If the design or construction of a project is performed by another DOD agent, MACOMs will still obtain the necessary certifications from USACE. Deferred projects will be recertified by the MACOM upon reentry of the project into the program if there are significant changes in cost or scope or if the original certification is more than one year old.

### 3–7. U.S. Army Information Systems Engineering Command certification (MCA and AFH only)

USAISEC will review the user provided information systems requirement and cost estimate for technical adequacy and certify projects directly to HQDA (DAIM-FD) prior to PRB.

### 3–8. Project submission for design authorization

*a.* After a project's planning and documentation are completed and certified, the MACOM will submit the project to HQDA (DAIM-FD) for review and design authorization, as provided in annual submittal guidance. DD Form 1391-EF will be submitted through the 1391 Processor of the PAX system.

*b.* MACOMs will submit certified project documentation for the first budget year prior to 1 May of the GY. Certified project documentation for the second budget year must be submitted prior to 1 May of the DY.

*c.* All comments generated during the USACE and USAISEC certifications must be resolved.

*d.* After the MACOM identifies a MILCON program, HQDA (DAIM-FD) will annotate CAPCES and provide the CRRC a project listing by staff proponency. The CRRC will review requirements as individual project documentation is submitted by the MACOM. The staff proponent for the facility will determine if the requirement meets objectives, policies, and priorities established in current program guidance. This initial review will take place before the annual HQDA PRB and will normally involve staff proponent counterparts from the MACOM.

### 3–9. Army military construction design authorization

*a.* The MACOM will make a formal presentation of its program to the DA CRRC at the HQDA PRB after requirements for a given program year are submitted. This PRB is held annually in the June through July time frame. The MACOM will brief individual MILCON projects. Facility use data contained in the Headquarters Real Property Planning and Analysis System (an automated real property planning system) is a basis for the CRRC to evaluate a project.

*b.* The PRB will consider each project presented by the MACOM. The PRB will either recognize the project requirement in the given program year, or defer consideration of the project to a later POM year. DAIM-FD will consolidate projects considered in the given program year for a General Officer Steering Committee (GOSC). Projects approved by the GOSC are consolidated in the Army's program submittal.

*c.* At the PRB, HQDA may recommend authorizing code 2 (concept design) or code 3 (parametric design). This design authorization will be prescribed by the scope and cost (programmed amount) specified on the DD Form 1391-EF. Following DASA(IH) approval, projects are referred to HQDA (DAIM-FD) for program budget execution. For projects with a design cost of $300,000 or less, a design directive will normally be issued by HQUSACE (CEMP-M) within 10 working days of the design authorization by HQDA (DAIM-FD). For projects with a design cost greater than $300,000 a design directive will be issued by HQUSACE (CEMP-M) at the expiration of the 21-day notification period mandated by section 2807, title 10, United States Code (USC) (10 USC 2807) and after design authorization by HQDA (DAIM-FD). Design funds for Architect-Engineer (A-E) contracts must be requested approximately than 3 days before the obligation date.

*d.* Projects submitted by the MACOM at the PRB that are not certified will not be authorized for design.

*e.* HQDA may also initially defer design authorization on a project until a particular concern or issue is resolved. HQDA will defer design authorization indefinitely unless resolution is attained by 1 August of the GY following the HQDA PRB.

*f.* Projects not authorized or deferred indefinitely for design by HQDA will be returned to the MACOM for reconsideration in another program year. If required, MCA funds will be reallocated by HQDA.

### 3–10. Army program development and review

*a.* Using the MDEP as a building block, formal program development applies information contained in the Army Programming Guidance (APG) and refines and extends the program of the previous PPBES cycle. The resource position shown in the President's Budget and related PBG serve as the baseline for MACOMs and other operating agencies for developing their POMs.

*b.* HQDA agencies, guided by the APG, collect and analyze program information. They review the existing program in light of new requirements, determine program needs, and begin preparing functional programs. Revised estimates for planning and design and UMMCA are included for this review. The agencies incorporate program inputs in the Army POM, consider alternatives directed by the APG, and construct a balanced program. In addition to MACOM POMs, the agencies consider Defense Planning Guidance, CINC Integrated Priority Lists, and Army Component Commander developed requirements for supporting the CINCs.

*c.* Proponent agency program evaluation groups (PEGs), directed

and guided by Director, Program Analysis and Evaluation, build the Army program. See AR 1-1 for additional information on PEGs. Each PEG evaluates specific MDEPs based largely on the MDEPs main fiscal appropriation. Both DAIM-FD and ARSTAF facility proponents are represented in each PEG. The role of each PEG is to support and follow MILCON projects in the PEG review and evaluation process. A MACOM may be required to present its programs to a PEG. PEGs will rank order resourced and unresourced programs submitted by MACOMs and other operating agencies' POMs. MILCON projects not demonstrating a strong relationship to an MDEP, or that are prioritized too low for execution, may be dropped from the Army program during the PEG review.

*d.* The assembled Army program is reviewed by senior leadership during the second quarter of even years. The Army Commanders' Conference scheduled during this period provides field commanders an opportunity to review and influence program alternatives. Essential MILCON requirements, unresourced by a PEG, should be highlighted by the commander at the conference. Next, the Army Resource Board (ARB), HQDA's senior committee, reviews program alternatives, incorporating the views expressed at the Army Commanders' Conference, and makes its recommendations on alternatives to the Secretary of the Army and Chief of Staff, Army. Finally, through a series of in-process reviews, the Secretary of the Army and the Chief of Staff, Army decide on the Army program.

*e.* In April of even years, the Army submits the POM approved by the Secretary of the Army and the Chief of Staff, Army to OSD for review. HQDA (DAIM-FD) will again revise CAPCES to reflect the construction program in the Army POM.

### 3–11. Office of the Secretary of Defense program review

*a.* From April through late July of even years, OSD conducts a program review of the services' POMs. This review includes Program Review Proposals that recommend alternatives to services POMs. Program Review Proposals may be developed by members of the Defense Resources Board (DRB), ASD program managers, or CINCs. Each Program Review Proposal recommends program additions and reductions that sum to zero. Major issues are deliberated in the DRB or with the Deputy Secretary of Defense (DEPSECDEF). Budget issues may be identified for later review by the DOD Comptroller. The Director, Program Analysis and Evaluation, is the executive agent for the OSD program review.

*b.* In mid to late July, after the DRB has resolved all outstanding issues, the DEPSECDEF signs the PDM. The PDM approves the Army POM as adjusted by the program review process. This becomes the program basis for the Army budget estimate to OSD.

## Chapter 4
## Budgeting

### 4–1. Army budget estimates

Budget formulation converts the first 2 years of the MILCON program, approved by the DEPSECDEF in the PDM, into the Army BES. After Secretary of the Army and Chief of Staff, Army approval, the BES undergoes an OSD and OMB review before it is incorporated into the President's Budget. The MILCON portion of the BES and the President's Budget consists primarily of DD Forms 1390-EF, FY__ Military Construction Program and DD Forms 1391-EF.

### 4–2. Final revisions to project programming documentation

*a.* In the months just before the BES, code 2 or code 3 designs of projects in the first year of the MILCON program must be completed. Following concept or parametric design review and approval by the using agency, installation, and MACOM, the CWE for budget purposes must be prepared, coordinated with the programming MACOM, and electronically transmitted by the USACE district to HQUSACE (CEMP-E, Washington, DC 20314-1000) not later than 1 July of DY. After the CWE for budget purposes is reviewed and approved by HQUSACE, the project cost will be annotated on the DD Form 1391-EF for the BES requirement. Revisions to the previously approved description of work on the DD Form 1391-EF may also be made at this time.

*b.* Prior to submission to OSD, each DD Form 1391-EF project justification is reviewed to ensure the information presented is correct and current, including the analysis concerning privatization, and that narratives justify the project in compelling and unequivocal terms.

### 4–3. DD Form 1390-EF, FY__ Military Construction Program

*a.* HQDA will prepare DD Forms 1390-EF for each installation having projects proposed for inclusion in the MILCON program. Information for this form will be drawn from the Army Stationing and Installation Plan, Headquarters Integrated Facilities System, CAPCES, the Installation Status Report, and the 1391 Processor.

*b.* Appendix J provides additional information on content and instructions for preparing DD Form 1390-EF.

### 4–4. Army approval of the Budget Estimate Submission

*a.* Upon receipt of the PDM, the MILCON program submitted in the POM will be adjusted to reflect changes documented in the PDM. With assistance from the Director of the Army Budget, HQDA (DAIM-FD) will develop the MCA budget estimate. Using the latest project cost estimates, minor adjustments in pricing may be made to the program provided costs remain within the total PDM allowance for MILCON. HQDA (DAIM-FD) may also identify additional unfunded requirements (UFRs) that need to be added to the program.

*b.* HQDA (DAIM-FD) and the Assistant Secretary of the Army (Financial Management and Comptroller) (ASA (FM&C) will then present proposed revisions, UFRs, and adjustments to the MILCON program to the PBC and ARB for review and recommendations.

*c.* After the ARB review, the Director of the Army Budget will present the budget to the Secretary of the Army and Chief of Staff, Army for approval. Once the proposed estimates are approved, the Secretary of the Army will send the Army Budget to the Secretary of Defense. Separately, the Director of the Army Budget will submit a MILCON justification book to OSD. This book contains a DD Form 1391-EF for each requirement in the MILCON program. The requirements are organized by decision units (DUs) as follows:

(1) DU 301.1 Operation Facilities.
(2) DU 301.2 Training Facilities.
(3) DU 302.1 Maintenance Facilities.
(4) DU 302.2 Production Facilities.
(5) DU 303.0 Research and Development Facilities.
(6) DU 304.0 Supply Facilities.
(7) DU 306.0 Administrative Facilities.
(8) DU 307.0 Unaccompanied Personnel Housing and Dining Facilities.
(9) DU 308.0 Community Facilities.
(10) DU 309.0 Utilities and Real Estate
(11) DU 314.0 Planning and Design Program.
(12) DU 315.0 Unspecified Minor Military Construction Program.
(13) DU 316.0 Environmental Compliance Program.

### 4–5. Office of the Secretary of Defense and Office of Management and Budget review

*a.* Members of OSD and OMB will jointly review the Army Budget Estimate, focusing on proper pricing, reasonableness, ability to execute, and validity of requirements.

*b.* When reviewing the MILCON program, the OSD Comptroller may develop recommendations that include alternative courses of action such as deferral of projects for more study or to a later year, reduction in cost or scope or deletion (loss of TOA). Before a PBD is signed by the DEPSECDEF, the Army is given the opportunity to

review a coordinating PBD and, contest OSD-OMB proposed alternatives to the OSD Comptroller. If the Army opposes the alternative, a compelling argument must be developed and presented to the OSD Comptroller in order for the alternative to be deleted from the proposed PBD. Earlier emphasis on the importance of sound planning in project development and the Army's heavy reliance on strong justifications in documentation is now apparent. Alternatives to funding MILCON requirements usually result from weaknesses discovered in the project's documentation. OSD Comptroller alternatives unsuccessfully contested by the Army will be presented to the DEPSECDEF with the proposed PBD.

*c.* The DEPSECDEF will review the recommended adjustments and forward the approved alternatives to the Army as signed PBDs. The Director of the Army Budget will incorporate the approved PBD changes into the budget estimate.

*d.* During the PBD cycle, the Army may identify pending decrements as major budget issues (MBIs). MBIs center on decrements to specific initiatives that would significantly impair the Army's ability to achieve a program's intentions and emphasize the adverse impact should the decrement occur. An MBI that affects a unified command will be coordinated with the CINC to gain support. At the end of the PBD process, the Secretary of the Army and the Chief of Staff, Army will meet with the Secretary of Defense and DEPSECDEF on major unresolved issues. The Secretary of Defense will make the final decisions in the DRB.

*e.* At the end of the Program Budget Decision cycle, OSD will issue a PBD incorporating all changes resulting from major budget issues deliberations.

*f.* For Army installations in the NCR, OMB compares the Army MILCON in the NCR with the FCIP.

### 4–6. President's Budget

*a.* Following the review phase, the Army will submit the required budget information in the form of the President's Budget. The MILCON portion of the budget covers prior year outlays and estimates for the current year, plus estimates of TOA for the BY and the BY plus one (only in even years, not in the amended budget submission year). HQDA (DAIM-FD) will also prepare a justification book for the Congress (known as the "Green Book" ). This book contains a DD Form 1391-EF for each requirement in the President's Budget (BY and BY plus one). Requirements are grouped by Continental United States (CONUS) or Outside of the Continental United States (OCONUS) and indexed by State and installation, and by current or new mission.

*b.* The above process is basically the same for both the biennial and the amended budget. The amended budget will show only the second year of the original biennial budget.

### 4–7. Authorization and appropriation

*a.* Authorization is required to use funds. The two steps in the authorization process are:

(1) Passage of an authorization bill by both Houses of the Congress.

(2) Signature of the President of the United States on the bill which becomes the Authorization Act.

*b.* Line item appropriation of funds is required on each project in MCA, MED MILCON, and AFH programs. The two steps in the appropriation process are:

(1) Passage of an appropriation bill by both houses of Congress.

(2) Signature of the President of the United States on the bill which becomes the Appropriation Act.

## Chapter 5
## Execution

### 5–1. Supervision of military construction projects

*a.* Each contract entered into by the United States in connection with a military construction project or a military family housing project shall be carried out under the direction and supervision of the Secretary of the Army (acting through the Chief of Engineers), or such other department or Government agency as the Secretary of Defense approves to assure the most efficient, expeditious, and cost-effective completion of the project.

*b.* A military construction project for an activity or agency of the Department of Defense (other than a military department) financed from appropriations for military functions of the Department of Defense shall be accomplished by, or through, a military department designated by the Secretary of Defense.

### 5–2. Coordination

*a.* Effective project development, design management, and cost engineering require close coordination among the using agency, installation, MACOM, USACE, and HQDA.

*b.* The HQUSACE Commander will delegate authority to USACE MSC commanders to execute MILCON projects. This authority is then typically delegated to appropriate USACE district commanders. The MSC and districts will administer direct management of the design and construction of MILCON projects.

*c.* MILCON program funds should be obligated as early in the program year as is practical.

*d.* Guidance on design of specific facilities is provided in appendix K.

### 5–3. Design management

*a.* The cost to complete engineering and design of a project will be in accordance with HQUSACE guidance.

*b.* DA standard designs will be used for design development, if available. Standard designs may be tailored to the site-specific requirements of the project and adapted to the Installation Design Guide (IDG).

(1) DD Forms 1391-EF will indicate if standard designs are being used. If an available DA standard design is not to be used, the DD Form 1391-EF will include justification in the supporting paragraphs and make reference to an approved waiver.

(2) When using a DA standard design, deviations from mandatory design elements require a waiver. Requests for such waivers will be addressed to HQDA (DAIM-FD).

*c.* Concept or parametric designs are governed first by the scope and then by the cost of the project, as defined in the DD Form 1391-EF. Final designs are governed principally by the cost of the project as reflected in DEPSECDEF program approvals during the PBD cycle. Congressional changes will be incorporated by the USACE district and coordinated with the MACOM per instructions issued by HQDA (DAIM-FD) through HQUSACE (CEMP-M).

*d.* Reviews of project documentation on concept, parametric, and final designs will be conducted by authorized representatives from MACOMs, installations, using agencies, and USACE.

*e.* Any deviation in primary facility scope must be within standards or criteria, and must be approved by HQDA (DAIM-FD) in coordination with the DA staff proponent.

*f.* A value engineering study will be made on each project with a programmed amount exceeding $2 million.

*g.* A project management plan will be developed by the USACE district for each project. The project management plan will establish scope, schedule, budgets, interface with the user, and technical performance requirements for the management and control of the project. The plan will provide performance measurement criteria including major milestones. In addition, the plan will document the USACE and user commitments required for project execution.

### 5–4. Design directives

*a.* Design directives authorize various stages of project design, indicate project scope and cost, and provide special instructions for the design of the project. The design execution process is managed, in part, by using design codes. Since design funds are centrally managed, only HQUSACE (CEMP-M) has the authority to issue a design code to the appropriate USACE MSC or district.

*b.* Design codes are defined as follows:

(1) Code 1. The project is authorized for accomplishment of site

investigation work, preparation of pre-design cost estimate, and other pre-design work to the extent defined by special instructions of individual directives. Selection and negotiation (not award) of an architect-engineer (A-E) contract for design is authorized.

(2) Code 2. Preparation of concept design is authorized. Award of design contract is authorized, if appropriate. Approved concept design is considered to be 35 percent of the total design effort.

(3) Code 3. Preparation of parametric design is authorized. Award of a design contract is authorized, if appropriate. Approved parametric design is considered to be 5-15 percent of the total design effort.

(4) Code 4. The project design is on hold, pending a supplemental design directive.

(5) Code 5. The project is deferred from the program. Do not start design. If design of the project by USACE district in-house personnel has begun, it will be terminated. If design is being accomplished by A-E contract, it will be concluded per paragraph 5-5d.

(6) Code 6. The project is authorized for final design.

(7) Code 7. Not used.

(8) Code 8. The project is canceled and if design is being accomplished by A-E contract, it will be concluded per paragraph 5-5d.

(9) Code 9. A construction contract (or design-construct contract) is authorized for award.

## 5–5. Architect-Engineer contracts

*a.* The contracting officer may contract for A-E services for execution of the design.

*b.* The fee under any A-E contract for services contract for developing plans and specifications will not exceed 6 percent of the estimated cost of construction. The 6 percent statutory limitation applies only to production and delivery of designs, plans, drawings, and specifications for construction. The costs of non-design services, including the following, are exempt from 6 percent limitations:

(1) Project development.

(2) Engineering feasibility.

(3) Deficiency studies.

(4) Site investigations.

(5) Subsurface explorations.

(6) Surveys.

(7) Shop drawing review.

(8) Construction inspection.

(9) Preparation of operating manuals and similar activities.

(10) Furniture-related interior design.

(11) Construction cost estimates.

(12) Economic analyses.

(13) National pollution discharge elimination system and other environmental permits.

(14) Hazardous, toxic, and radioactive waste surveys.

*c.* If design costs are estimated to exceed $300,000 (the amount specified in 10 USC 2807, as amended), award of A-E contract or initiation of in-house design will not be accomplished until HQDA fulfills Section 2807 congressional notification requirements.

*d.* A deferred or canceled project may require termination of the A-E contract. Work must cease or be completed through the next logical stopping point. If an A-E contract is not terminated, HQUSACE will immediately notify HQDA (DAIM-FD) who, in turn, will notify DASA(IH).

*e.* For Army installations in the NCR, Army MILCON designs require approval by NCPC. For installations in the District of Columbia, to include Arlington National Cemetery and Fort Myer, Virginia, Army MILCON designs require approval by CFA. Project submittals shall be in accordance with the published NCPC and CFA submittal requirements. Provisions will be made to A-E contracts to allow for the milestone requirements to receive NCPC and CFA project design approval.

## 5–6. Pre-design activities and AEI design criteria

*a.* Pre-design activities and AEI design criteria will begin when a Code 1 design directive is received from HQUSACE. Unless otherwise directed, pre-design activities and AEI design criteria require the following documentation before beginning:

(1) MACOM approved DD Form 1391-EF.

(2) Architectural and engineering instructions, or special instructions issued by HQUSACE, if required.

(3) Host MACOM approved site plan to include a MACOM statement that a hazardous and toxic materials survey has been accomplished, indicating the site is suitable for construction.

(4) IDG.

(5) Risk analysis provided by the installation (Provost Marshal or Security Officer) for assets to be associated with the project.

*b.* Pre-design preparation will include the following:

(1) Site surveys.

(2) Site plans.

(3) Preliminary subsurface investigation and analysis.

(4) Preliminary utility investigation and analysis.

(5) Narrative description of structural, electrical, mechanical, power, fire protection, and HVAC systems, and alternative energy systems to be considered.

(6) CWE for budget purposes will be prepared for HQUSACE (CEMP-E) approval if cost differs from that shown on the approved DD Form 1391-EF.

(7) A threat analysis and the results of a security engineering survey, where applicable.

(8) Environmental documentation.

(9) Selection and negotiation of an A-E contract.

(10) Development of project management plan.

(11) Preliminary hazard analysis outlining expected operational hazards as prescribed by AR 385-16.

*c.* For Army installations in the NCR, the NCPC is to be contacted to obtain the milestones and submittal requirements for the Army MILCON design approval. For installations in the District of Columbia, to include Arlington National Cemetery and Fort Myer, Virginia, CFA will be contacted to obtain the milestones and submittal requirements for the Army MILCON design approval. Project submittal shall be in accordance with the published NCPC and CFA submittal requirements. As soon as the Code 1 design release is issued, NCPC and CFA will be contacted to establish the submittal requirements.

## 5–7. Concept design

*a.* Concept design will begin when a Code 2 design directive is received from HQUSACE and will be based upon the pre-design activities and the AEI design criteria. Where no pre-design activities and the AEI design criteria were accomplished, concept design will include all the requirements of pre-design. Concept design for MED MILCON projects will comply with the requirements of Military Handbook 1191 and the AEI Design Criteria.

*b.* Concept design will be limited to the HQDA approved scope as shown on the DD Form 1391-EF. USACE is responsible for assuring that the authorized scope on the DD Form 1391-EF is not exceeded during design. The design will establish all basic features, materials, construction methods, facility systems, fire plans, and related costs of the facility. The USACE district will prepare studies that permit necessary design decisions to be made and justified.

*c.* MACOMs will immediately notify the design agent and HQDA (DAIM-FD) of any mission changes that may alter the design before concept design completion. Revisions to programming, budgeting, and execution will be evaluated and appropriate guidance provided to the MACOM and HQUSACE by HQDA.

*d.* Concept design will be prepared according to the AEI Design Criteria. MED MILCON project concept design will also be prepared per Military Handbook 1191. Concept design will consist of, but not be limited to the following:

(1) Thirty-five percent design drawings, which include:

*(a)* Project site plan.

*(b)* Area site plan.

*(c)* Complete subsurface investigation and analysis.

*(d)* Architectural floor plans that consider functional relationships, work area use, physical security requirements, anti-terrorism force protection requirements, and traffic flow patterns.

*(e)* Building sections.

*(f)* General interior finish selections.

*(g)* Exterior elevation drawings showing principal exterior finishes.

*(h)* General preliminary mechanical, electrical, and information systems layouts, including equipment capacities and sizes.

*(i)* Fire protection plan.

*(j)* Exterior utility plans.

(2) Outline specifications.

(3) CWE for budget purposes.

(4) Basis of design, which include the following:

*(a)* Design assumptions.

*(b)* Design analysis and calculations.

*(c)* Economic analysis.

*(d)* List of materials and methods of construction to be used.

*(e)* Information systems requirements

*(f)* Discussion of types and capacities of HVAC systems, including a description of the selected system.

*(g)* Discussion of types and capacities of primary electrical power, conduit, information systems, lighting, and other systems considered, including a description of the selected systems.

*(h)* Descriptions of the foundation, including any special requirements such as drilled piers, pilings, and support facilities.

*(i)* Site analysis that discusses the opportunities and constraints of the site and includes the recommendations from the IDG.

*(j)* Operability studies.

*(k)* Department of Defense Explosives Safety Board (DDESB) site approval, if required by AR 385-60.

*(l)* Hazard analyses, if required.

*(m)* Preliminary erosion control analyses.

*(n)* Preliminary landscaping planting plan and a plant material analysis that reflects the selection of plant material native to the project area.

*(o)* Life-cycle cost analyses.

*(p)* Building energy simulations, energy conservation studies, and design energy use calculations.

*(q)* Narrative description of the approach to and basis for physical security, and anti-terrorism force protection measures, and a narrative description of those measures.

*(r)* Fire protection analyses.

*(s)* Corrosion mitigation plan.

*e.* The USACE district will finalize and submit a concept design cost estimate (CWE for Budget Purposes), based on the concept design approved by the using agency, installation, and MACOM, to HQUSACE (CEMP-E). The USACE district will ensure compliance with the DASA(IH) approved DD Form 1391-EF. MACOMs will request approval from HQDA (DAIM-FD) for any scope or cost changes. MACOMs will identify program revisions to accommodate cost changes. HQDA (DAIM-FD) will advise HQUSACE (CEMP-M and CEMP-E) of scope or cost changes.

*f.* The USACE MSC will ensure concept designs comply with technical requirements of the DD Form 1391-EF and design criteria. The USACE MSC will employ quality verification principles including staff visits, review of district quality control procedures, and technical consultations to accomplish this objective. The USACE MSC will ensure the district processes support delivery of quality products, on time, and within budget.

*g.* In addition to the previously described reviews by the installation and MACOM, the using agency, when a tenant, will also review and comment on the functional aspects of the project during concept design.

*h.* The USACE district will forward the drawings, basis of design, outline specifications, and cost estimate data to the using agency, the installation, the MACOM, and parent MSC for comment and appropriate approvals. (See para 1-22.h and 1-26.b.) Any functional design related conflicts between the installation and using agency will be resolved by the respective MACOMs.

*i.* The USACE district will incorporate valid comments made by review agencies, if practical, provide written rationale to reviewers for comments not incorporated, and obtain final approvals of concept design.

*j.* Concept design is not complete until it incorporates all valid comments and is approved by the using agency, installation, USAISEC, and MACOM. This must be completed by 1 July of the design year. The cost estimate, reported by the current working estimate, is reviewed, validated, and approved by HQUSACE (CEMP-E) prior to its submission to HQDA (DAIM-FD).

## 5–8. Parametric design

Parametric design begins when a Code 3 directive and appropriate funding is issued by HQUSACE. It incorporates the following elements:

*a.* Prepare preliminary sketches of a site plan and area plan showing project features. Examples include proposed buildings, roads, and parking areas.

*b.* Prepare pre-design level functional relationship diagram showing functional space arrangements.

*c.* Review existing geo-technical data to determine possible impact on cost. If existing data is not available or is insufficient, limited geo-technical investigation should be conducted as required.

*d.* Identify probable utility connection points.

*e.* Provide a summary of environmental issues identifying required waivers and permits.

*f.* Prepare pre-design level descriptive narrative for mechanical , electrical, structural, and information systems.

*g.* Identify unusual requirements (i.e., special foundations, physical security, anti-terrorism force protection, asbestos, and lead-based paint abatement, special considerations, etc.) that will significantly influence the cost.

*h.* Prepare a report on the basis of design including estimate assumptions and economic analysis considerations.

*i.* Prepare parametric cost estimate and submit a CWE for budget purposes to HQUSACE by 1 July of the DY.

*j.* Thoroughly involve the user and obtain input and approval throughout all steps of this process.

*k.* Parametric design is not complete until it incorporates all valid comments and is approved by the using agency, installation, and MACOM. This must be completed by 1 July of the DY. The cost estimate, reported by the CWE for budget purposes, is reviewed, validated, and approved by HQUSACE (CEMP-E) prior to its submission to HQDA (DAIM-FD).

## 5–9. Final design

*a.* Final design begins when a code 6 design directive and appropriate funding is issued by HQUSACE.

*b.* Final design is based on approved concept or parametric design (in some instances, a concept or parametric design may not have been done, for example, UMMCA). Final designs will be functional, cost effective, and reflect the scope of the DASA(IH) approved DD Form 1391-EF. Final designs for MED MILCON projects will comply with Military Handbook 1191 and the AEI Design Criteria. Using agency originated changes made subsequent to budget submission, including those occurring during construction, will be incorporated only if approved during the user requested change review and approval process according to HQDA (DAIM-FD) guidance. (Refer to app M.)

*c.* USACE will request that the using agency, installation, USAISEC, and MACOM review design documents that are nearing final design to assure the project conforms to the approved concept requirements for functionality, operability, and maintainability. The USACE MSC will assist in resolving any design related conflicts among the installation, using agency, MACOM, and the USACE district. The HQUSACE Director of Military Programs, (CEMP-ZA), will resolve remaining conflicts between the USACE MSC and the MACOM. Copies of completed final design documents will be provided to the using agency, the installation, and the MACOM.

## 5–10. Cost estimate

*a.* Cost estimates supporting MILCON projects will be prepared in accordance with TM 5-800-4 guidance. Appendix L provides guidance for the information systems portion of the cost estimate. Design and cost estimates will include life-cycle costs analyses. After HQDA (DAIM-FD) approval, cost data from the CWE for budget purposes will replace cost data on the DD Form 1391-EF.

*b.* Cost estimates prepared before issuance of a Code 1, 2, or 3 design directive, whether prepared by the installation or USACE district, will be funded by the using agency. Where renewable energy sources are deemed feasible, costs are not to be included on the DD Form 1391-EF prior to completion of the concept or parametric cost estimate.

## 5–11. Additive bid items

*a.* Cost limitations can necessitate identifying non-essential additive items that could be deferred if bids are not favorable. Under no circumstances will features essential for a complete and usable facility be included in additive bid items.

*b.* During advertising, bidding, awarding, and construction of a MILCON project, it may be impossible to award all additive bid items related to a project. This occurs when statutory limitations are reached, when items are prohibitively costly, when the appropriation is critically short of contingency funds, or for other reasons. OMA, AFH (O&M), or other funds available to the installation or tenant may not normally be applied to construction work that was unawardable with MILCON construction appropriated funds or unawardable within MILCON authorization ceilings. To do so may constitute evasion of statutory limitations. This policy does not apply to in-place personal property equipment, furnishings, or work items that may be classified as maintenance and repair.

*c.* MACOM, installation, and user approval of additive bid lists must be obtained by the USACE district.

## 5–12. Advertising, award, and obligation

*a.* Appropriate interest in the real property will be obtained before bids are advertised or construction contracts are awarded. (See AR 405-10.)

*b.* Advertisement will not occur until the USACE district has, satisfactorily resolved MACOM and user review comments and the project has been through the National Capital Planning Commission review process (for projects in the National Capital Region).

*c.* Award will not occur until the USACE district has satisfactorily addressed all using agency changes approved during the user requested change review and approval process established by HQDA (DAIM-FD).

*d.* The USACE district will forward copies of all bidding documents, a notice of intent to advertise for bids, and the proposed date of advertisement to the using agency, the installation, and the MACOM.

*e.* The contracting officer will not normally open bids or award a contract with known material changes required.

*f.* Funds sufficient to cover the cost of the contract, contingencies, engineering during construction, as-built drawings, and supervision and administration must be available at time of award.

*g.* Savings realized from favorable bids (for example, lower than expected bids, quantity underruns, invalid claims) will be used at the discretion of HQDA (DAIM-FD) to fund shortfalls in the MILCON program.

## 5–13. Project construction

The USACE district commander will do the following.

*a.* Establish and maintain a safe construction site.

*b.* Provide appropriate Quality Assurance during execution of the project.

*c.* Provide all necessary contract administration to manage the project.

*d.* Ensure the construction complies with the project drawings and specifications and with Federal, state, and host nation regulations to yield a quality product.

*e.* Manage project costs and assess impacts of changes.

*f.* Negotiate and issue modifications to the contract when necessary.

*g.* Resolve claims and contract disputes with the contractor.

*h.* Maintain detailed construction schedules.

*i.* Monitor contractor execution and process progress payments.

*j.* Advise the using agency of project status.

*k.* Evaluate the performance of the contractor and the architect-engineer at the completion of the project.

*l.* Keep HQUSACE and the USACE MSC apprised of the project status.

## 5–14. Systems commissioning

Individual operating systems testing to insure that contractual requirements have been met is not always an adequate process to guarantee overall performance. For projects which include various large, complex, or interactive utility systems, where significant operational degradation may occur in critical facility processes or in life, health, or safety features of the project if systems do not function as required, it may be necessary to insure that design intent has been accomplished through the use of the systems commissioning process. Installations will identify and justify all such requirements and program all funds necessary to implement this process, including any MILCON funds required for same in the project DD Form 1391-EF, to insure that appropriate resources are available when needed for each such project selected. MACOMs will be prepared to support such requirements on a per project basis at HQDA PRB meetings.

## 5–15. Semi-annual review

HQUSACE (CEMP-ZA) will meet with HQDA (DAIM-FD) and MACOMs on a periodic basis to review projects under design and construction, and related execution issues.

## 5–16. Cost increases (MCA and AFH)

*a.* Since MILCON cost estimates provided in the Congressional Justification Books are based on less than 100 percent design, the Congress allows the Services certain flexibility to approve cost increases. Per section 2853, title 10, United States Code (USC) (10 USC 2853), the Services can approve a cost increase provided it “could not have reasonably been anticipated at the time the project was approved originally by Congress” ; and provided that it is “required for the sole purpose of meeting unusual variations in cost.” In other words, the cost increase must not be the result of an increase in the authorized scope. The flexibility to increase the cost of a project is generally contingent on the availability of savings from other projects such as, bid savings or cancellations.

*b.* Every MILCON project is treated as if it had a separate authorization and appropriation. For practically all projects, these two amounts are the same. Most MCA and AFH new construction projects have a line item authorization and appropriation in a particular MILCON budget. Other MCA projects have a special authorization with the appropriation provided either by congressionally approved reprogramming (for example, emergency construction) or from a lump-sum appropriation (for example, UMMCA). Although Army Housing Requirements Program (AHRP) projects are authorized and appropriated as a lump sum, for the purpose of cost increases, the authorized and appropriated amounts are considered to be the costs shown in the Congressional Justification Books.

*c.* Increases to the authorized amounts are within the purview of the Authorization MILCON Subcommittees; whereas increases to the appropriated amounts are strictly within the purview of the Appropriations MILCON Subcommittees. The separate rules for increasing the project authorization and appropriation are discussed in the following paragraphs. If the approval thresholds are different for the authorized and appropriated amounts, the smaller one controls.

*d.* Per 10 USC 2853, the Service Secretaries can approve a “cost variation” (increase of the project authorization) up to 25 percent of the amount appropriated, or 200 percent of the UMMCA threshold (currently $3 million, that is, 2 x $1.5 million), whichever is less. The specific cost variation approval thresholds are as follows:

(1) HQUSACE (CEMP-M) can approve up to 15 percent over the amount appropriated, or $1.5 million, whichever is less.

(2) HQDA (DASA(IH)) can approve up to 25 percent over the amount appropriated, or $3 million, whichever is less, with certain exceptions. Since some cost increases need to be funded promptly to avoid interest or impact costs, 10 USC 2853 provides the Services (DASA(IH) for the Army) with unlimited authority to approve payment of within-scope modifications and meritorious claims provided the Congress is notified promptly of the facts relating to the cost increase.

(3) The Authorization MILCON Subcommittees approve authorization increases for initial awards greater than 25 percent over the appropriated amount, or $3 million, whichever is less. The award cannot occur until at least 21 calendar days after the Congress is notified or if there are objections.

*e.* Per FY 94 MILCON Appropriation Conference Report No. 103-278, the Services can approve a “reprogramming” (increase of the project appropriation) up to 25 percent, or $2 million, whichever is less. This criteria is more restrictive than 10 USC 2853. The specific reprogramming approval thresholds are as follows:

(1) HQUSACE (CEMP-M) can approve up to 15 percent over the amount appropriated, or $1.5 million, whichever is less, except as noted in paragraph 5-16e(3)(b).

(2) HQDA (DASA(IH)) can approve:

*(a)* Up to 25 percent over the amount appropriated, or $2 million, whichever is less, except as noted in paragraph 5-16 e(3)(b), and except for claims and certain AHRP projects.

*(b)* Because claim settlements need to be paid promptly to avoid additional interest costs, Senate Report 100-200 provided the Services (DASA(IH) for the Army) with unlimited reprogramming authority to approve payment of meritorious claims.

*(c)* For out-of-cycle AHRP projects added by the Army, the DASA(IH) can approve cost increases, regardless of the percentage, provided the total project CWE is less than $1.5 million.

(3) Senate and House Appropriation MILCON Subcommittees can approve:

*(a)* Any increase greater than 25 percent, or $2 million, whichever is less, except for claims and certain AHRP projects (see para 5-16e(2)(b) and 5-16e(2)(c)).

*(b)* Any increase, regardless of percentage or dollar amount, to a project whose programmed amount has been either increased or decreased (as a funding source) by a previously approved congressional reprogramming action. This limitation does not apply to new projects authorized pursuant to 10 USC 2803 and 10 USC 2854. For the latter projects, the DASA(IH) can approve cost increases up to 25 percent or $2 million, whichever is less.

(4) Reprogramming limits do not apply to individual UMMCA projects. Cost increases for UMMCA projects are handled by reapproving the project at a higher amount pursuant to 10 USC 2805.

### 5–17. Scope variation (MCA and AFH)

*a.* Per 10 USC 2853, the Congress must be notified when the project scope is reduced below 75 percent of the scope originally approved by the Congress. The award cannot occur until at least 21 calendar days after the Congress is notified or if there are objections.

*b.* Per Senate Report 97-474 on the MILCON Codification Act, cost variations will not be used as a basis to increase the scope of any MILCON project. However, certain limited scope adjustments are permissible if required for technical reasons, and if approved by HQDA. Coordination with the MILCON Subcommittees may also be required. Requested adjustments are handled on a case-by-case basis.

### 5–18. Project completion

*a.* Physically complete MILCON projects will be transferred to the installation by DD Form 1354, (Transfer and Acceptance of Military Real Property).

*b.* As-built drawings will be provided to the installation within 60 days of the final transfer of the facility.

*c.* USACE fiscal closeout of the project should occur within 60 days after physical completion. However, fiscal closeout may be delayed by pending changes and claims.

### 5–19. Emergency construction

Requests for emergency construction will be executed per procedures listed below. (See app C for statutory authorizations and limitations.)

*a.* Emergency construction requests will be submitted by MACOMs (signed by a General Officer or equivalent Senior Executive Service (SES) civilian) to HQDA (DAIM-FD), with copies to the Chief of Staff, Army and ASA (IL&E). Each request must explicitly state why the project is vital to national security or protection of health, safety or environmental quality, and why it can not be included in the next MILCON budget request. Requests should also include a DD Form 1391-EF and proposed completion date.

*b.* HQDA (DAIM-FD) will request approval of an emergency project from the Army Secretariat after it is validated by the HQDA proponent and provided funding is available. If approved by the Army Secretariat, HQDA (DAIM-FD) will issue a design release to HQUSACE (CEMP-M). The appropriate congressional correspondence will be submitted after a reliable cost estimate is prepared and the DD Form 1391-EF is revised, as necessary. Note that ultimate approval of the project is contingent on the following:

(1) Agreement by OSD to forward the reprogramming request to the House and Senate Appropriations Committees.

(2) Written approval of the reprogramming by the House and Senate Appropriations Committees.

(3) No objections from the House or Senate Armed Services Authorization Committees within 21 calendar days after they receive the 10 USC 2803 notification letters from the Army Secretariat.

*c.* Advertising authority will not generally be provided until an emergency project is approved by the Authorization and Appropriations Committees. If justified, authority to advertise and open bids (subject to the availability of funds) may be provided before congressional approval.

*d.* The project dollar amount shown on a 10 USC 2803 congressional notification and reprogramming request will be treated as a normally authorized and appropriated project. Consequently, the Army has reprogramming flexibility up to 25 percent or $2 million, whichever is less, provided additional funding is available.

## Appendix A
## References

### Section I
### Required Publications

**AR 25–1**
The Army Information Resources Management Program (Cited in para K-2b.)

**AR 200–1**
Environmental Quality: Environmental Protection and Enhancement (Cited in paras 1-10, F-2b, and F-2j.)

**AR 210–20**
Master Planning for Army Installations (Cited in paras 1-1c, 1-26k, 2-1a, 2-1b, 2-5a, F-1c, and I-1.)

**AR 210–50**
Housing Management (Cited in paras 1-7b and D-1c.)

**AR 210–70**
Intergovernmental Coordination of DOD Federal Development Programs and Activities (Cited in paras 1-1c, 1-21o, 1-25n, 1-26c, and 1-30c.)

**AR 415–19**
Nonappropriated-Funded Construction Project Development and Approval (Cited in paras 1-6a and K-5g.)

**AR 415–28**
Real Property Category Codes (Cited in paras 1-20b, 1-21b, and Glossary.)

**AR 420–10**
Management of Installation Directorates of Public Works (Cited in paras 1-1a and 1-6c, B-4b, and D-1f.)

**TM 5–853–1**
Security Engineering Project Development (Cited in para 1-26j.)

### Section II
### Related Publications

**AR 1–1**
Planning, Programming, Budgeting, and Execution System

**AR 5–9**
Intraservice Support Installation Area Coordination

**AR 11–18**
The Cost and Economic Analysis Program

**AR 15–6**
Procedures for Investigating Officers and Boards of Officers

**AR 50–5**
Nuclear and Chemical Weapons and Materiel - Nuclear Surety

**AR 55–80**
Highways for National Defense

**AR 60–31**
Equipment and Facilities

**AR 190–13**
The Army Physical Security Program

**AR 200–2**
Environmental Effects of Army Actions

**AR 200–3**
National Resources -Land, Forest, and Wildlife Management

**AR 210–21**
Army Ranges and Training Land Program

**AR 210–25**
Vending Facility Program for the Blind on Federal Property

**AR 210–70**
Intergovernmental Coordination of DOD Federal Development Program and Activities

**AR 210–135**
Banks and Credit Unions on Army Installations

**AR 215–1**
Nonappropriated Fund Instrumentalities and Morale, Welfare and Recreation Activities

**AR 220–10**
Preparation for Overseas Movement of Units

**AR 385–10**
The Army Safety Program

**AR 385–16**
System Safety Engineering and Management

**AR 385–64**
U.S. Army Explosives Safety Program

**AR 405–10**
Acquisition of Real Property and Interests Therein

**AR 415–32**
Engineer Troop Unit Construction in Connection With Training Activities

**AR 420–17**
Real Property and Resource Management

**AR 420–18**
Facilities Engineering Materials, Equipment, and Relocatable Building Management

**AR 420–49**
Utility Services

**AR 525–13**
The Army Combatting Terrorism Program

**AR 740–1**
Storage and Supply Activity Operations

**DA PAM 415–3**
Economic Analysis: Description and Methods

**DA PAM 415–15**
Army Military Construction Program Development and Execution

**DA PAM 415–28**
Guide to Army Real Property Category Codes

**DA PAM 420–11**
Facilities Engineering Project Definition and Work Classification

**EO 12056**
Federal Compliance with Pollution Prevention and Emergency Planning-Community Right to Know Acts

**EO 12088**
Federal Compliance with Pollution Control Standards

**TM 5–800–4**
Programming Cost Estimates for Military Programs

**TM 5–809–10**
Seismic Design for Buildings

**TM 5–809–10–1**
Seismic Design Guidelines for Essential Buildings

**MIL–STD–1691D**
Construction and Material Schedule for Military Medical and Dental Facilities

**Military Handbook 1191**
Medical and Dental Treatment Facilities Design and Construction Facilities

**OMB Circular A–11**
Preparation and Submission of Budget Estimates

**OMB Circular A–11**
Environmental Requirements in Connection with Prevention, Control, and Abatement of Environmental Pollution at Existing Federal Facilities

### Section III
### Prescribed Forms

**DD Form 1390–EF**
FY __ Military Construction Program (Prescribed in para J-1)

**DD Form 1391–EF**
FY __ Military Construction Project Data (Prescribed in para I-1)

### Section IV
### Referenced Forms

**DD Form 1354**
Transfer and Acceptance of Military Real Property

**DD Form 1523**
Military Family Housing Justification

## Appendix B
## Unspecified Minor MCA (UMMCA) Program

### B–1. Authorization

*a.* Under 10 USC 2805, the Army may execute a UMMCA project costing more than $500,000 but not in excess of $1.5 million (up to no more than $3 million to correct health, life, or safety deficiencies).

*b.* Projects costing more than $500,000, may be programmed in the annual MCA program. Unforeseen urgent requirements that cannot wait for normal program procedures, may be funded from the UMMCA account by HQDA.

*c.* Installations will submit UMMCA projects, through their MACOMs, to HQDA as soon as they are identified and documented (DD Form 1391-EF). All projects will be submitted through the 1391 Processor. MACOMs will review the documentation to ensure compliance with this regulation.

*d.* UMMCA projects require a congressional notification period of 21 days subsequent to approval by DASA (IH) but prior to award.

*e.* Medical unspecified minor military construction requirements must be submitted to OTSG (MRMC-FP) for coordination and submission to ASD(HA).

### B–2. Procedures

*a.* UMMCA projects may be submitted at any time. Installations will prepare DD Form 1391-EF, along with the best available cost estimate and submit the request to the MACOM. MACOMs will review and approve the DD Form 1391-EF, to include the scope, technical requirements, site approval, consideration of alternatives, and staff proponency endorsement of the validity and urgency of the requirement.

*b.* When HQDA (DAIM-FD) receives the requirement, project programming documentation will be screened to determine if the requirement appears in the current MCA program. If the project is contained in the MCA program, it will be removed if appropriate. A project cannot be included in both the MCA and UMMCA program simultaneously. If conditions dictate, the project may be returned to the MCA program (and removed from UMMCA).

*c.* The DD Form 1391-EF will be staffed with the CRRC and the appropriate ARSTAF proponent for comments. The ARSTAF proponent is required to provide the following information:

(1) Project number, title, and location.

(2) Proponent point of contact.

(3) A statement that the project is a valid requirement.

(4) A statement indicating the scope is correct.

(5) Why the project must be started on time.

(6) Any recent, concurrent, or future projects related to this project (if so, give the title, FY and project number).

(7) Whether related furnishings and equipment are currently available (if not, are they on order?).

(8) Any congressional history, economics, or other information not stated on the DD Form 1391-EF which supports the requirement.

*d.* Concurrent with CRRC review of the requirement, HQUSACE (CEMP-E) will perform both technical and cost reviews. HQUSACE (CEMP-E) will determine if a project is complete and usable, conforms to appropriate technical standards for construction, and if other reviews or approvals are required (such as DDESB, real estate actions, information systems support, and related O&M projects). HQUSACE (CEMP-E) will review the cost estimate to establish the Programmed Amount (PA).

*e.* After the CRRC review, UMMCA projects are submitted to the DCSOPS for prioritization and to DASA(IH) for approval. If approved, DASA(IH) will authorize final design. HQDA (DAIM-FD) will then notify HQUSACE (CEMP-M). Final design authority (code 6) will be issued at this time because of the urgency and, usually, simplicity of the requirement. HQUSACE (CEMP-M) will notify the MACOM, the USACE MSC, and installation commander of the design authorization by directive. The USACE district will move as quickly as possible to a final design. To prevent delays, design reviews will be held while design continues. HQUSACE will monitor design progress and inform HQDA (DAIM-FD) of problems, costs, and schedules. After completion of final design, the cost estimate (CWE for Budget Purposes) will be electronically prepared, coordinated with the installation and programming MACOM, and transmitted by the USACE district to HQUSACE (CEMP-E) for approval. The DD Form 1391-EF will then be annotated to reflect this cost. This becomes the programmed amount.

*f.* Before a UMMCA project can be awarded, it must have a CWE of $1.5 million or less, ($3 million if project is intended to correct a deficiency that is health, life, or safety threatening), and be approved by the appropriate authority. In addition, the Congress must be notified, by DASA(IH), followed by a 21-day waiting period.

### B–3. Selection process

The UMMCA program will be reviewed several times a year to list the most urgent requirements to be funded against the funding level

in the program at that time. If necessary, project lists will be assembled and presented to the CRRC for review, to DCSOPS for reprioritization, and DASA-IH for approval.

### B–4. Exceeding military construction limit on O&M funded projects

*a.* Monetary ceilings on minor military construction (10 USC 2805c(1)) represent a statutory limit, and any obligation or expenditure in excess of the ceiling violates section 1341, title 31, United States Code (USC) (31 USC 1341a(1)) of the Antideficiency Act and is prohibited.

*b.* When a project, executed under this authority, exceeds or is expected to exceed the current statutory limit:

(1) All work on the project is to be halted immediately.

(2) Review the scope of the project to validate work classification and that only necessary work is included.

(3) Consider deleting any unnecessary work, avoiding project splitting and incrementation. If the deletion would take the project below the limit, you may delete it and continue the project after MACOM concurrence. The remaining work should be completed under strict cost controls and project oversight. Only truly unnecessary work is to be deleted, because adding the deleted work as a separate project(s) at a later date could be considered project splitting or incrementing and thus a statutory violation.

(4) If at this point it is still apparent that the projected total funded cost will exceed the statutory limit, then the procedures of AR 420-10 and Defense Finance and Accounting System (DFAS-IN) Manual 37-1 are to be followed.

(5) The installation DPW will immediately notify the installation Director of Resource Management (DRM) or the person holding the equivalent position. The DRM will immediately notify the installation commander, who will follow the directions of DFAS-IN Manual 37-1 (e.g., send a "flash report" to ASA (FM&C) and appoint an investigating officer in accordance with AR 15-6).

(6) The installation DPW will notify the MACOM engineer of the project and expedite action to submit the project in accordance with this regulation.

(7) The responsible MACOM engineer will notify HQDA (DAIM-FD) of the project and the requirement for funding the project as UMMCA.

## Appendix C
## Emergency Construction

### C–1. Statutory authorization

10 USC 2803, Emergency Construction, is reprinted as follows:
“(a) Subject to subsections (b) and (c), the Secretary concerned may carry out a military construction project not otherwise authorized by law if the Secretary determines (1) that the project is vital to national security or to the protection of health, safety or the quality of the environment, and (2) that the requirement for the project is so urgent that deferral of the project for inclusion in the next Military Construction Authorization Act would be inconsistent with national security or the protection of health, safety or environmental quality, as the case may be.
(b) When a decision is made to carry out a military construction project under this section, the Secretary concerned shall submit a report in writing to the appropriate committees of Congress on that decision. Each such report shall include (1) the justification for the project and the current estimate of the cost of the project, (2) the justification for carrying out the project under this section, and (3) a statement of the source of funds to be used to carry out the project. The project may then be carried out only after the end of the 21-day period beginning on the date the notification is received by such committees.
(c)(1) The maximum amount that the Secretary concerned may obligate in any fiscal year under this section is $30,000,000.
(c)(2) A project carried out under this section shall be carried out within the total amount of funds appropriated for military construction that have not been obligated.”

### C–2. Congressional guidance

*a.* In Senate Report 97-474, 17 June 1982, page 14, the Senate Armed Services Authorization Committee provided the following guidance: “This authority would not be used for projects denied authorization in a prior military construction authorization Act. No authorization of appropriations would be provided in an annual military construction authorization Act for the use of the authority of this section. Therefore, the use of this authority is dependent upon the availability of savings of appropriations from other military construction projects or through funding obtained by deferring or canceling other military construction projects.”

*b.* House Report 99-275, 18 September 1985, page 23 states: The House Appropriations Committee provided the following guidance: “This authority was provided to give the Department and the Congress flexibility in dire situations. A true emergency project should be confined to facilities without which a critical weapon system or mission could not function. The Committee expects the Secretary of Defense to more closely scrutinize emergency reprogramming requests and only submit those which meet the definition outlined above.”

### C–3. Military construction, Army program

Although 10 USC 2803 is written broadly to cover all MILCON programs, the Army has used it only for the MCA program because other authorities are available to handle emergency family housing projects. Additionally, emergency construction projects costing $1.5 million (up to $3 million for life, health, or safety) or less, should be executed under the UMMCA program.

### C–4. Funding

Senate Report 97-474 states that no funding is appropriated for emergency construction. Therefore, funds to finance the authorization must be reprogrammed (with Congressional approval) from unobligated MILCON funds. Note that the Congress would be reluctant to approve cancellation or deferment of a required project to fund an emergency construction project unless there were a truly dire need.

### C–5. Limitation

There is no individual project limitation. However, 10 USC 2803 states that the Secretary of the Army may obligate a maximum of $30 million per fiscal year for emergency construction projects. Also, the additional emergency authorization cannot cause an annual MCA program authorization to be exceeded. Furthermore, since there is no separate emergency construction appropriation, projects carried out under 10 USC 2803 will be completed within the total amount of appropriated MCA funds that have not been obligated.

## Appendix D
## Restoration or Replacement of Damaged or Destroyed Facilities and Construction Authority in the Event of Declaration of War or National Emergency

### D–1. Damaged or destroyed facilities

*a. Statutory Authorization.* 10 USC 2854, Restoration or Replacement of Damaged or Destroyed Facilities, is reprinted as follows:
“(1) Subject to subsections (a), the Secretary concerned may repair, restore, or replace a facility under his jurisdiction, including a family housing facility, that has been damaged or destroyed.
(2) When a decision is made to carry out construction under this section and the cost of the repair, restoration, or replacement is greater than the amount for a minor construction project, the Secretary concerned shall notify in writing the appropriate committees of Congress of that decision, of the justification for the project, of the current estimate of the cost of the project, of the source of funds for

the project, and of the justification for carrying out the project under this section. The project may then be carried out only after the end of the 21-day period beginning on the date the notification is received by such committees."

*b. Congressional Guidance.* Senate Report 97-474, 17 June 1982, page 24: The Senate Armed Services Authorization Committee provided the following guidance: "Subsection (a) permits military departments and defense agencies to respond to natural disasters and acts of arson or terrorism promptly. The committee expects prompt responses to restore mission effectiveness and to preclude further deterioration of damaged facilities. To assure timely responses, operation and maintenance appropriations may be used to temporarily repair or restore damaged facilities. If an economic analysis of life-cycle costs shows that the most cost effective alternative is facility replacement, military construction appropriations may be used to construct the replacement facility. The committee would expect that any replacement facility would use current design and material criteria and may be increased in size to meet current mission and functional requirements."

*c. Authorized projects.*

(1) This authority may be used for MCA restoration or replacement projects which exceed the minor construction cost limitation.

(2) Family housing units may also be restored or replaced under this authority. However, it is Army policy that 10 USC 2854 be used only for AFH replacement projects (new construction) that are urgent and cannot be delayed until the next AFH budget cycle. Refer to AR 210-50 for further guidance.

(3) O&M funds may be used to repair temporarily or restore facilities while funding approval for a permanent solution is being obtained if there is a compelling urgency. Examples of compelling urgency might be prevention of additional significant deterioration of the facility, mitigation of a serious life safety hazard, or avoidance of severe degradation of a critical mission.

(4) A damaged facility or family housing unit may be replaced under this authority, in lieu of being restored, if supported by a life-cycle economic analysis. A replacement facility or family housing unit should use current design and material criteria and may be increased to statutory size limits by pay grade to meet current mission and functional requirements.

(5) Note that the legislative history of 10 USC 2854 (Authorization Committee Report 97-474) asserts that the authority was provided for "natural disasters and acts of arson or terrorism."Therefore, it is clear that the authority was not intended for the restoration or replacement of facilities in a serious state of disrepair due to gradual deterioration or lack of maintenance.

*d.* Funding. No additional funding will be appropriated for projects constructed under 10 USC 2854. Therefore, construction funds necessary to finance the authorization must be reprogrammed (with congressional approval) from unobligated MILCON funds. Note that the Congress would be reluctant to approve cancellation or deferment of a required project to fund a restoration or replacement project unless there were a truly dire need.

*e.* Limitation. 10 USC 2854 does not contain any limitation on the cost of an individual project, or total value of projects authorized per FY. However, this does not exempt the restoration or replacement of family housing units from compliance with other statutes that limit per-unit costs (that is, $50,000 times area cost factor). Authorization of restoration or replacement projects cannot cause an annual MCA or AFH program authorization to be exceeded. Furthermore, since there is no separate appropriation for projects carried out under 10 USC 2854, projects must be completed within the total dollar amount of appropriated unobligated MCA or AFH funds.

*f.* Project submission. Proposed projects will be submitted by MACOMs (signed by a General Officer or equivalent SES) to HQDA (DAIM-FD), with copies to the Chief of Staff, Army and ASA (IL&E). A request must state explicitly why the project is needed and why it cannot be included in the next MCA or AFH budget request. A request should also include a DD Form 1391-EF, proposed completion date, economic analysis (if a replacement facility is proposed), and housing deficit verification (for AFH projects). Repair projects will be submitted as required by AR 420-10.

*g.* Project approval. HQDA (DAIM-FD) will request approval from the Army Secretariat for a restoration or replacement project after it is validated by HQDA proponent staff, and provided funding is available. If approved by the Army Secretariat, HQDA (DAIM-FD) will issue a design release. The appropriate congressional correspondence will be submitted after a reliable cost estimate is prepared and the DD Form 1391-EF is reviewed and validated, as necessary. Note that ultimate approval of the project is contingent on the following: agreement by OSD to forward the reprogramming request to the Appropriations Committees, written approval of the reprogramming by the House and Senate Appropriations Committees, and no objections from the House National Security or Senate Authorization Committees within 21 calendar days after receipt of the 10 USC 2854 notification letters from the Army Secretariat.

*h.* Project execution. Advertising authority will generally not be provided until a restoration or replacement project is approved by the Authorization and Appropriations Committees. However, if justified, authority to advertise and open bids (subject to the availability of funds) may be provided before congressional approval.

*i.* Cost variation. The project amount shown on a 10 USC 2854 congressional notification and reprogramming request will be treated as a normally authorized and appropriated project. Consequently, the Army has reprogramming flexibility up to 25 percent or $2 million, whichever is less, provided additional funding is available.

### D–2. Declaration of war or national emergency

10 USC 2808 provides that in the event of a declaration of war or a declaration by the President of a national emergency under 50 USC 1601, the Secretary of Defense may undertake MILCON projects necessary to support use of the armed forces. Funding for all projects must be available from unobligated MILCON funds previously appropriated. Specific guidance will be issued HQDA upon activation of this authority.




**Figure D-1. Damaged Facility Repair, Restoration, Replacement Logic Diagram**

# Appendix E
# Army Medical Facilities

## E–1. Background
The Defense Medical Military Construction (MED MILCON) program is centrally managed by the ASD(HA). The DMFO plans, develops, and executes the MED MILCON Future Years Defense Program for ASD(HA). The programming and design cycle for all medical projects, determined by the DMFO, begins 2 years earlier than MCA projects for the same program year. The Army proponent for MED MILCON programming is the OTSG (SGFP-ZA).

## E–2. Program planning and execution
Defense medical facility construction planning and execution proceeds as follows:

*a.* The DMFO provides annual programming guidance, performs defense-wide health care facility planning and project programming, and reviews and adjusts projects for scope and cost. The DMFO then prioritizes Defense Department-wide Medical Programs, presents OSD and congressional budget books for submission, and presents medical programs to OSD and the Congress. After approval by OSD and the Congress, the DMFO releases projects with funding for design and construction to USACE. The DMFO also maintains program status information in CAPCES, interprets DOD medical space planning criteria, determines official scope of all MED MILCON projects, and develops economic analyses, when required.

*b.* HQUSACE (CEMP) performs programming reviews of DD Forms 1391-EF for cost accuracy and quality of documentation; adjusts, corrects, and incorporates DMFO requirements; and prepares engineering instructions for design. HQUSACE (CEMP) coordinates technical and cost reviews of projects; performs technical reviews of medical projects; and ensures adherence to Military Handbook 1191 and the AEI Design Criteria. HQUSACE (CEMP) also maintains cost control data, design, and construction status in CAPCES, and directs design and construction through the USACE MSC to districts.

*c.* The OTSG, HFPA submits and presents the Army MED MILCON program before OSD and the Congress as requested, develops and prioritizes the DA MED MILCON program, and provides MED MILCON program guidance. HFPA maintains the Army MED MILCON Future Year Defense Program and Mobilization MILCON programs. During design and construction phases of the program HFPA functions as the user, performs functional design reviews of medical projects, and participates in user requested change reviews and processes. HFPA directs MED MILCON program performance and analysis. HFPA also performs technical reviews on DD Forms 1391-EF before submission to DMFO and assures participation in development of information systems requirements for medical facilities. HFPA organizes the MEDCOM Program Budget Committee project approval board.

*d.* Major Medical Subcommands (MMSCs) perform the following program planning and execution procedures:

(1) Develop regional (major medical subcommand) MED MILCON programs.

(2) Assure technical compliance with regulatory and statutory requirements. Examples include installation master plan siting approval, host MSC and MACOM support, environmental considerations, historical preservation, archaeological investigations, and all other pertinent data.

(3) MEDCOM coordinates MED MILCON priorities for MEDCOM subordinate units with host MSC and MACOM.

(4) The Medical Research and Materiel Command (MRMC) consolidates all MED R&D projects world-wide into a single OTSG priority list. MRMC coordinates with host MSC and MACOM for MRMC subordinate units.

(5) Brief projects and installation MED RPMP as required by TSG Program Budget Committee.

(6) Other medical organizations not listed above develop MED MILCON priorities for their facilities and submit to TSG/HFPA.

*e.* The senior installation medical representative coordinates development of medical DD Form 1391-EF and project information and integration of the MED RPMP with the installation RPMP, and submits installation medical project priorities through medical command channels.

*f.* Host MSCs and MACOMs direct installation planning, siting approval, and project review.

*g.* Installations coordinate with the medical activity to develop DD Form 1391-EF and provide all supporting documentation for medical requirements at the installation, and assist medical activities in obtaining project validations. Installations also coordinate with USAISEC and the MACOM to provide information systems requirements and cost estimates and integrate the information systems portion of the Medical RPMP with the overall installation RPMP.

*h.* UMMC projects are coordinated through OTSG/HFPA for funding by the Office of the Secretary of Defense, Health Affairs (OSD(HA)).

## E–3. Programming
*a.* The OTSG is the Army proponent for all military construction projects classified in Category Code Facility Class 500 (Health Care Delivery Medical Facilities), Category Code 310.60 (Medical Research Laboratories), and Category Codes 171 and 179 (facilities associated with medical training).

*b.* Facility five-digit code designations will be assigned per AR 415-28. When a Category Code Facility Class 500 series facility includes functions in addition to those in the Category Code Class 500 series, the facility will be classified in the 500 series if one of the following conditions is met:

(1) Over 50 percent of the space is in the 500 series.

(2) Over 50 percent of the cost is for 500 series functions.

(3) There is a mutual written agreement between the Army OTSG and the DMFO.

*c.* Programming for the Army MED MILCON program will begin 2 years earlier than MCA projects for the same program year.

*d.* Project submission will follow medical command lines to the OTSG. Individual medical units will submit project requirements to the senior installation medical representative, who will coordinate the requirement into the Medical RPMP and Medical Capital Investment Strategy (MED CIS). These projects will then be submitted to their respective medical commands. Each Medical Command will submit a prioritized list to OTSG. OCONUS MEDCOMs will submit to OTSG through their MACOM.

# Appendix F
# Environmental Protection

## F–1. Background
*a.* Commanders of Army installations and activities have been entrusted with the stewardship of the land, water, and natural and cultural resources associated with performing the Army mission. These resources must be expertly managed in order to properly balance the short- and long-term needs of both the Army and our nation. In so doing, Army Commanders insure that properties and facilities under their care are capable of sustaining current needs as well as the future needs of our national defense.

*b.* AR 210-70 requires Federal agencies to cooperate with State and local governments in the evaluation, review, and coordination of projects. In developing MILCON projects and programs, procedures contained in AR 210-70 will be followed. Some projects must be reviewed by environmental regulatory agencies.

*c.* As part of the RPMP, the installation should identify environmentally sensitive areas. This information will be reflected in the installation environmental overlays as required by AR 210-20.

## F–2. Environmental considerations
*a.* *Environmental quality.* The National Environmental Policy Act

(NEPA), Public Law 91-190 (PL 91-190), established general Federal policy to protect and enhance the quality of the human environment. NEPA requires a process that results in formal documentation and consideration of the environmental impacts of projects. AR 200-2 implements NEPA in the Army. A number of environmental laws and regulations also govern Army activities. These typically focus on specific media (air, water, solid waste, and so forth). Some laws and regulations govern environmental issues such as protection of endangered plant and animal species.

*b. Pollution control.* Federal law, as implemented by AR 200-1, requires Army facilities to comply with applicable Federal, State and local pollution abatement standards. Pollution standards cover control of pollutants in the air, water, and terrain. Pollutants are produced by liquids, gases, solid and hazardous waste, noise, radiation, and hazardous and toxic materials, including pesticides and herbicides.

*c. Procedural requirements.* Federal facilities will comply with both procedural and substantive pollution abatement regulations for air and water pollution control and for solid and hazardous waste management.

*d. Pre-construction site selection.* The installation commander is responsible for the environmental survey of a proposed site before site selection. The MACOM is responsible for certifying the site categorization.

*e. Site categorization.* Sites are classified into the three following categories.

(1) Category I - There is no reason to suspect contamination will be encountered during construction.

(2) Category II - There is no known contamination, there remains some potential that contamination may be encountered during construction.

(3) Category III - The site is known to be contaminated or there is a strong suspicion contamination will be encountered during construction.

*f. Ordnance and explosive waste.* If historical research of a prospective site indicates the possibility of the presence of ordnance and explosive waste, the site will be classified as a Category III site. Even though the site is classified as Category III, it may still be a feasible construction site because of the nature of the unexploded ordnance contamination (for example, inert) or the capability to clear the construction site.

*g. Documentation.* Detailed instructions for compliance with environmental documentation requirements are contained AR 200-2. All projects require preparation of environmental documentation. The USACE district may be requested to support installation environmental documentation efforts.

*h. Funding.* In accordance with the Military Construction Codification Act (PL 97-214), preparation of environmental documentation and investigations associated with their development, are considered advanced planning for projects and will be funded from other than MILCON funds. The installation bears the cost of these site surveys. Non-Army tenants will fund the site survey for MILCON projects where they are the user. Costs of design and construction mitigation measures required as a direct result of MILCON projects will be paid from MILCON funds if included in the cost estimate and description of work on DD Form 1391-EF. These costs will also be included in the environmental documentation of the project. If the condition is known before project approval by HQDA, but not included on DD Form 1391-EF, O&M funds will be used. The MACOM must certify (MACOM certification) that the site is ready for construction before concept or parametric design will be authorized.

*i. Funding exceptions.* Procurement of Ammunition, Army funds will be identified for pollution abatement construction required to build or modernize Army ammunition plants. Minor construction projects within O&M limitations will be financed with O&M funds. Other funding exceptions may be granted by OSD.

*j. OCONUS environmental protection and enhancement requirements.* Army agencies and activities that construct or operate Federal facilities outside the United States will ensure that the "final governing standards"approved by the appropriate unified command and issued by the DOD appointed executive agent for the host nation are followed, and requests for new facilities or for changes to existing facilities (DD Forms 1391-EF) will provide for such compliance. Pollution abatement construction projects in excess of the O&M limitations on minor construction projects will be proposed for funding with MCA appropriations. Status of Forces Agreements (SOFAs), treaties, or other international agreements that permit or require applicability of standards more stringent than those issued by the executive agent will be considered part of the environmental pollution control standards of general applicability in the host nation or jurisdiction. When appropriate, AR 200-1 will be used to supplement these environmental protection requirements in OCONUS.

### F–3. Construction in floodplains or on wetlands

*a.* EO 11988, 33 CFR 1977 and EO 11990, 33 CFR 1977 restrict Federal activities in floodplains and wetlands.

*b.* During initial project planning, the responsible using Service will determine whether the project is sited in a floodplain or wetland. Guidance may be obtained from the supporting USACE district. If the proposed site is in a floodplain or wetland, the project may be started only if there is no practical alternative and a section 404 (Clean Water Act) permit is obtained per section 1344, title 33, United States Code (USC) (33 USC 1344).

*c.* The Coastal Zone Management (CZM) Act, Public Law 92-583 (PL 92-583), requires Federal agencies with activities or development projects directly affecting the coastal zone to conform to approved State CZM programs to the maximum extent practicable. (See AR 210-20 and AR 420-74.)

*d.* Construction in foreign countries will be governed by SOFAs. However, EO 12114, 3 CFR 1979 requires all Federal agencies, taking major Federal actions having significant effects on the environment outside the United States, to comply with its procedures unless exempted under the terms of the Executive Order.

### F–4. Preservation of historic properties and archaeological sites

*a.* National Historic Preservation Act requirements

(1) The National Historic Preservation Act of 1966, Public Law 89-665 (PL 89-665), as amended, establishes:

*(a)* The national policy for preservation of historic properties.

*(b)* A National Register of Historic Places (NRHP) maintained by the Secretary of the Interior.

*(c)* Procedures for consideration and protection of properties included in or eligible for inclusion in the NRHP.

(2) Detailed instructions for compliance with the historic preservation requirements are contained in AR 200-4.

*b.* Archaeological sites within MILCON project site areas.

(1) Advance planning. Preparation of archaeological surveys and investigations associated with development are considered advance planning for projects and will be funded from other than MILCON funds.

(2) Preservation, recovery, and mitigation. Protection or preservation of known or suspected archaeological objects or findings, gathering data, reporting, and similar tasks, will be accomplished before award of military construction contracts, when feasible. Public Law 93-291 permits the use of up to one percent of the MILCON project program amount to protect, preserve, and mitigate damage to previously unknown archaeological objects or findings discovered during construction. This temporary protection will continue until such time as appropriate investigations and site clearances can be conducted by the installation using other than MILCON funds. This one percent of the project amount is also intended to be used for compensating the construction contractor for contractual impacts and delays resulting from discovery of previously unknown archaeological objects or findings during construction. Military construction projects will not be proposed for sites that contain known or suspected archaeological findings until those sites have been properly cleared of such objects or findings.

### F–5. Endangered species protection

With respect to the Endangered Species Act of 1973, section 1531, title 16, United States Code (16 USC 1531), the goal of the Army is to ensure that actions are not likely to jeopardize the continuing existence of threatened or endangered species, or result in adverse modification of the critical habitat of such species. AR 420-74 provides guidance.

## Appendix G
## Facilities Standardization and Repetitive Designs

### G–1. Standardization

The term "standardization" is often understood to mean complete duplication of a facility design site adapted from site to site. However, standardization of a facility design may be accomplished through several methods as follows:

*a.* Full standard designs include drawings and specifications that are sufficient in detail to serve as construction documents after modifications are made for site-specific requirements.

*b.* Definitive designs include drawings and information that delineate space allocations, functional layouts, and basic configuration of the facility, and serve as guides in developing specific design and construction drawings.

*c.* Design guides normally contain a combination of written and graphic material for a specific facility type, accompanied by several example designs.

### G–2. Department of the Army Facilities Standardization Program

*a.* The Department of the Army Facilities Standardization Program is a formal process for developing requirements and designs for facilities which will be used as DA standards for construction.

*b.* The overall objective of the DA facilities standardization program is to achieve savings and benefits in planning, programming, design, and construction and maintenance of Army facilities. Specifically, this objective includes, but is not limited to, the following:

(1) Increased credibility with the Congress through more consistent construction program development.

(2) Consistency in facility types with equal treatment among MACOMs, installations, and users.

(3) Improved early planning and simplified construction programming activities, including the preparation of DD Forms 1391-EF.

(4) Improved site planning.

(5) Improved design quality and the promotion of design excellence.

(6) Consistent local architectural themes at Army installations.

(7) Simplified design project management.

(8) Reduced design costs and time.

(9) Consistent application of local construction materials and methods.

(10) Reduced construction costs and time.

(11) Reduced change orders during construction.

(12) Improved maintenance and repair activities.

(13) Increased customer satisfaction through better and more consistent functional and operational requirements.

*c.* DA standard designs have been developed for various facility types to a level of design that is similar to definitive designs in order to provide the flexibility to meet the varying needs of the Army and implemented through the DA Facilities Standardization Program. Use of DA Standard Designs is required where they exist. Exceptions will only be addressed during the DD Form 1391-EF approval process. Deviations from mandatory design elements of a standard design will not be made unless a waiver is granted.

*d.* Implementation instructions on the use of standard designs developed under the DA Facilities Standardization Program will be accomplished through the design directive process, the 1391 Processor. Requests for waivers will be approved or disapproved by the ACSIM as the DA staff proponent for facilities policy. HQDA (DAIM-FD) will coordinate waivers with HQUSACE, as the executor for military construction, and with other proponents and members of the ARSTAF, as appropriate.

(1) Installations will initiate requests for waivers to standard designs or space planning criteria and forward waiver requests to the installation? MACOM, carefully laying out both the rationale that supports a departure from the DA standard and the specific elements of the standard design or criteria for which a waiver is requested. Installations will coordinate with the supporting USACE district and the appropriate USACE Center of Standardization (COS) to fully understand the rationale behind a standard design before initiating a waiver request. Waiver requests should be submitted before design begins in order to allow for the extensive coordination required and still not cause design or construction problems.

(2) MACOMs will review waiver requests from subordinate installations. The MACOM is a disapproval authority for waiver requests. Waiver requests that have MACOM support will be forwarded with a recommendation to HQDA, ACSIM, ATTN: DAIM-FD, 600 Army Pentagon, Washington, DC 20310-0600.

(3) HQUSACE will provide architectural and engineering technical and execution advice for all waiver requests and ensure USACE districts are assisting users to coordinate with COS and fully understand rationale behind standard designs before submitting waiver requests.

(4) HQDA (DAIM-FD) will staff and coordinate all waiver requests. As a minimum, each waiver will be coordinated with HQUSACE (CEMP-E). Most waiver requests will also be coordinated with the appropriate DA staff proponent (such as Deputy Chief of Staff for Personnel (DCSPER) for barracks) as well as appropriate elements within the Army Secretariat.

*e.* Implementation instructions on the use of standard designs developed under the DA Facilities Standardization Program will be accomplished through the design directive process, the "Special Design Instructions" form in the 1391 Processor.

### G–3. Repetitive designs

Standard, definitive, or existing designs, as well as other existing guidance will be used to the maximum extent to shorten the time and lower the cost for design. The following apply:

*a.* Standard or definitive designs, if available, will be used for design development.

*b.* Existing designs for similar projects will be considered for site adaptation if a DA Standard Design does not exist. This consideration will include designs prepared in other USACE MSCs and districts. This information will be provided in the “Special Design Instructions.”

*c.* If a standard or definitive design does not exist, suitable existing designs for similar projects will be considered for site adaptation. This consideration will not be limited to local designs. Designs prepared in, or for, other USACE districts or divisions will be considered. Factors to be evaluated when considering an existing design will include:

(1) Operational and functional requirements of users.

(2) Compliance with the current version of AEI Design Criteria, and other applicable criteria.

(3) Environmental factors, including architectural appearance, theme, and character.

(4) Ease of site adapting the existing project design to the specifics of the current project.

### G–4. Management

HQUSACE (CEMP-E) will coordinate and manage day-to-day operation of the DA Facilities Standardization Program.

*a. DA Facilities Standardization Committee.* This committee is co-chaired by the ACSIM and the Director of Military Programs, HQUSACE, and consists of one voting General Officer who is supported by one non-voting point of contact from each DA Staff office and MACOM with facility proponent responsibility.

*b. Subcommittees for Specific Facility Types.* Only one worldwide subcommittee is established for each facility type or group of

facility types to be standardized. Specific working teams may be established as necessary within each subcommittee to address specific elements, or geographical and regional variations of the facility type. Each subcommittee will consist of representatives from the ARSTAF and MACOM that are facility proponents. In addition, members may represent subordinate commands, Army installation using organizations, and other activities involved with the type of facility. For the purpose of decision making, the subcommittees are chaired by representatives from the ARSTAF or MACOM that are the proponents for the facility types, or by Army functional and operational experts designated by the ARSTAF or MACOM.

*c. USACE Facilities Standardization Committee.* This committee consists of one representative from each USACE MSC having military construction responsibilities. This committee coordinates among USACE districts and provides them the opportunity to participate in development and use of Army standard facility designs. Specifically, this committee represents the architectural, engineering, and construction perspective in the development and use of standard facility designs. The committee coordinates proposed standard facility designs with other USACE districts to ensure applicability and constructibility throughout the intended geographical area where the standard will be used. The committee also coordinates architectural, engineering, and technical feedback, and resolves technical conflicts.

*d. Centers of Standardization.* Centers of Standardization consist of USACE MSC or district organizations that support the subcommittees on specific facility types to develop DA standard design packages for specific Army facility types. Once a DA standard is established, a Center of Standardization tracks and monitors the use of the standard, evaluates the standard for technical sufficiency and responsiveness to user requirements, and provides technical support to other design agencies for assigned facility types, as required.

## Appendix H
## Equipment Installation

### H–1. Installed building equipment

Installed building equipment (IBE) includes items of real property affixed to or built into a facility which are an integral part of the facility. IBE is normally provided as part of construction and costs are included in the construction cost estimate. Primary facility costs that include items of IBE are financed with MILCON funds. Examples of supporting IBE are listed below.

*a.* Antenna (master antennas for non-paid-subscriber entertainment television systems).

*b.* Bedside headwall units.

*c.* Bleachers (built-in).

*d.* Benches (built-in).

*e.* Boilers.

*f.* Bookcases (built-in).

*g.* Cabinets (built-in).

*h.* Carpet (wall to wall).

*i.* Chapel seating, baptisteries, altars, pulpits, communion rails and tables, and raised platforms (built-in).

*j.* Closets.

*k.* Correctional facility equipment.

*l.* Desks and tables (built-in).

*m.* Dishwasher equipment (built-in).

*n.* Drinking water coolers (built-in).

*o.* Electrical components (built-in electric lighting fixtures and power utilization, and distribution equipment).

*p.* Elevators and elevator doors.

*q.* Escalators.

*r.* Exhaust systems.

*s.* Fire alarm and detection systems.

*t.* Food service equipment (built-in).

*u.* Gas fittings.

*v.* Hardware and fixtures for handicapped access.

*w.* Heating, ventilating, and air conditioning equipment, and control systems.

*x.* Hoists (crane and crane rails).

*y.* Incinerators.

*z.* Key control systems.

*aa.* Laboratory sinks, tables, and benches (built-in).

*bb.* Lockers (built-in).

*cc.* Meat cutting equipment.

*dd.* Medical gas systems.

*ee.* Medical automated box conveyors.

*ff.* Medical material handling systems.

*gg.* Nurse call systems.

*hh.* Paging systems.

*ii.* Panel boards.

*jj.* Plumbing.

*kk.* Pneumatic tube systems.

*ll.* Pot and pan washing equipment.

*mm.* Protective construction features.

*nn.* Refrigeration equipment (built-in).

*oo.* Storm sash and doors.

*pp.* Screens.

*qq.* Shelving and racks (built-in).

*rr.* Signage.

*ss.* Sprinklers.

*tt.* Sterilizers (built-in).

*uu.* Storage bins (built-in).

*vv.* Telecommunication systems (major construction projects).

*ww.* Theater and auditorium railings.

*xx.* Theater stage and fire curtain.

*yy.* Traffic railings.

*zz.* Utility monitoring and control systems.

*aaa.* Vaults.

*bbb.* Vehicle and pedestrian traffic control, and direction signs.

*ccc.* Venetian blinds and window shades.

*ddd.* Wardrobes (fixed).

*eee.* Waste disposers.

*fff.* Other similar non-severable items.

### H–2. Personal property (fixed)

Personal property (fixed) (normally not MILCON funded) consists of capital equipment and other equipment of a movable nature that has been fixed in place or attached to real property, but may be severed or removed from buildings without destroying the usefulness of the facilities. Acquisition and installation of personal property is an unfunded project cost and should be funded from other than MILCON appropriations. However, under special circumstances, this equipment may be financed from construction funds. In such cases a proposal to fund personal property from MILCON funds must be fully justified. The equipment items will be clearly identified and costed separately. This includes an itemized listing of equipment, quantity, unit of measure, and cost. When this type of equipment is proposed for MILCON funding and will not be a part of the construction contract, commanders will take appropriate programming actions. Examples of personal property for primary facilities normally not financed by MILCON funds are listed below.

*a.* Antennas and antenna towers for point-to-point communication.

*b.* Banking equipment.

*c.* Blast furnaces.

*d.* Blasters and roto-blasters.

*e.* Bleachers (portable).

*f.* Chain and tractor equipment.

*g.* Conveyor systems.

*h.* Dies.

*i.* Drills.

*j.* Dryers.

*k.* Electronic repair laboratory and shop equipment.

*l.* Electronic security equipment.

*m.* Fixed navigational aids.

*n.* Fixed facilities for radio and meteorological stations.

*o.* Fixed target range systems.

*p.* Forges.
*q.* Frequency converters.
*r.* Grinders.
*s.* Heat treating machines.
*t.* Jigs.
*u.* Lathes.
*v.* Laundry equipment.
*w.* Medical and dental equipment.
*x.* Metal plating equipment.
*y.* Microscopes (fixed).
*z.* Molders.
*aa.* Organs.
*bb.* Ovens and furnaces.
*cc.* Paint sprayers.
*dd.* Photographic equipment.
*ee.* Planners.
*ff.* Power conditioning equipment and power filters.
*gg.* Presses.
*hh.* Printing presses and related equipment.
*ii.* Punches.
*jj.* Riveters.
*kk.* Scientific measuring instruments.
*ll.* Sewing machines.
*mm.* Sheet metal equipment.
*nn.* Stamping and cleaning equipment.
*oo.* Steam cleaning equipment.
*pp.* Stills.
*qq.* Stitchers.
*rr.* Telescopes.
*ss.* Testing equipment.
*tt.* Training equipment and simulators.
*uu.* Vats.
*vv.* Wash tanks.
*ww.* Welding machines.
*xx.* Woodworking equipment.

## H–3. Personal property (movable)

Equipment that is movable and not affixed as an integral part of the facility is generally accounted for as personal property rather than real property. Normally, these items should not be financed from MILCON funds. This does not apply to telecommunications systems and equipment items that are MILCON funded for major military construction projects. Information systems, including telecommunication systems are addressed in appendix L. Examples of items not financed with MILCON funds are listed below.

*a.* Automated data processing equipment.
*b.* Dental chairs and pedestal units.
*c.* Filing cabinets and portable safes.
*d.* Food service equipment (portable).
*e.* Furnishings, including rugs.
*f.* Furniture (such as chairs, tables, beds, desks, and partitions).
*g.* Office machines.
*h.* Photographic equipment (portable).
*i.* Pre-wired workstations (see definition in Glossary).
*j.* Shop equipment.
*k.* Training aids and equipment, including simulators.
*l.* Wall clocks.

## H–4. Commissary equipment

Commissary projects specifically included in the MILCON program by the Defense Commissary Agency (DeCA) and commissary store equipment, both movable and fixed or built in as an integral part of a facility, will normally not be financed from MILCON funds, or included in the project cost.

## H–5. Medical and dental equipment

Procedures for planning and budgeting for medical and dental supporting equipment are contained in MIL-STD-1691D. Guidance on construction funded equipment for medical projects is contained in MIL-STD-1691D.

## H–6. Equipment installation

*a.* Equipment affixed and built into a facility (real property) as an integral part of the facility is “construction”and will be funded as a construction cost.

*b.* Costs associated with installing movable equipment not affixed as an integral part of existing real property facilities is “non-construction”and will not be funded as a construction cost. The cost of this equipment and the costs related to its procurement (including transportation, packing, unpacking, assembly, attachment, and so forth) are not construction and are funded from the owning property book holder with the same appropriation that bought the equipment when the installation is in an existing building or facility. Some typical examples are as follows:

(1) Installation and relocation of prefabricated interior screens, partitions, and dividers mainly unattached. Movable screens or detachable panels that are temporarily held in place by light braces and screws and are readily removable without impairing or defacing either the panels or the floors, walls, or ceilings of the structure.

(2) Installation of false floors and platforms required solely to allow operating equipment to be installed.

(3) Installation of required shielding for electromagnetic radiating devices. Structural changes, including new partitions related to installing shielding, are construction.

(4) Temporary removal and reinstallation of items such as portions of walls, roof, and utility systems to permit installation of equipment. Reinstallation may involve rerouting or relocation of some items.

(5) Installation of special foundations, pads on slab-on-grade or pits in facilities. Installation of floors other than slab-on-grade are limited to bases needed to spread load and to secure equipment in place. Increase in load bearing capacity of these floors by additional or larger structural components is construction.

(6) Installation of secondary utility work to connect equipment to utility services within a facility. This work lies between the utilities primary entry or source within the structure and the equipment to be served; for example, utility work from the existing main electrical service panel or for equipment requiring primary voltage from the building primary bus.

(7) Installation of air conditioning under the following circumstances:

*(a)* To meet manufacturer’s specifications for equipment temperature, humidity, particulate matter, and air circulation.

*(b)* In clean rooms installed in non-air conditioned spaces or when the building central system cannot meet the temperature and humidity requirements of the clean room operations.

*(c)* For operator occupied areas where installed equipment will increase the temperature or humidity beyond safety levels in the immediate area of equipment. Under this policy, air conditioning may be provided only in bona fide equipment spaces related directly to the equipment and not in administrative or other working spaces.

(8) Installation of mechanical ventilation and separate exhaust systems when needed for personnel safety or for proper functioning of the equipment as required by the manufacturer.

(9) Installation of specialty fire extinguishing systems for rooms that contain substantial amounts of automatic data processing (ADP) equipment.

*c.* When installed in new facilities, items listed in paragraphs b(2), (3), (6), (7), (8), and (9) above are construction. Related costs are properly chargeable to a construction project as a funded cost.

## H–7. Automatic box conveyor system

Automatic box conveyor (ABC) systems are transportation systems designed to move or convey small items from one area to another within a facility. ABC systems consist of two parts:

*a.* An installed track system, including switches and controls, normally designed to fit a particular facility and integrated into the building’s fire protection and mechanical systems. If removed, the

system will require major modification before it can be reused. This installed track system is IBE.

*b.* Conveyor carts and containers that can be removed from the conveyor track system. These items are personal property.

### H–8. Prefabricated indoor offices
Users may purchase and install indoor prefabricated offices with equipment funds (as personal property) provided the equipment is:

*a.* Owned and accounted for by the user.

*b.* Maintained and repaired with user's operating funds.

*c.* Made for and used indoors.

*d.* Movable and attached to the real property and capable of being severed or removed without destroying the usefulness of the building.

### H–9. High Altitude Electromagnetic Pulse and TEMPEST shielding
High altitude electromagnetic pulse (HEMP) and TEMPEST shielding may protect all or part of a facility. The following differentiation holds for both new facilities and the renovation of existing facilities.

*a.* Global shielding (to include the actual shield, the filters, and the waveguides) installed as an overall shield to encompass the entire facility shall be procured and installed with construction funds when part of a MILCON project. See Military Handbook 423, High Altitude Electromagnetic Pulse (HEMP) Protection for Fixed and Transportable Ground Based C4I Facilities.

*b.* Sub-global or component-level shielding and hardening shall be procured with the same funds used to buy the equipment being protected.

### H–10. Auxiliary generators
Auxiliary generators shall be installed to support only those facilities or activities noted in AR 420-49. Generators affixed as a permanent part of a facility that provide power to facility electrical loads are considered to be installed building equipment (real property) and should be funded with MILCON funds. Generators that solely support personal property shall not be MILCON funded.

## Appendix I
## DD Form 1391-EF, FY Military Construction Project Data

### I–1. Background
DD Form 1391-EF, FY__ Military Construction Project Data, is the principal DOD (and Army) construction project justification document. It expresses user facility needs and communicates these needs through the command channel to obtain funds to satisfy requirements. Construction needs are first identified and documented in the RPMP (see AR 210-20). Housing requirements are established by the Army Housing Justification Process. Both processes are conducted by the installation. The DD Form 1391-EF is prepared by the user and reviewed by USACE, the MACOM, and HQDA. The form is then submitted to OSD, OMB, and the Congress. The document must be clear, concise, logical, and complete, and must effectively describe, justify, and price the project.

### I–2. Justification
The user must provide detailed project justification. The installation normally develops project programming documentation based upon the justification provided by the user. If the project is directed by higher authorities, the user must still justify the project on the DD Form 1391-EF.

### I–3. Content
DD Form 1391-EF contains four primary categories of information: (1) description of the project, (2) construction cost, (3) justification, and (4) back-up data. The form has been automated (1391 Processor) with write, read, comment, permit, certification, and submit options depending on organizational level and point of time in the submission cycle. Detailed guidance for preparation and submission of DD Form 1391-EF is contained in DA PAM 415-15.

### I–4. Review Responsibility
After the user completes DD Form 1391-EF, it is submitted to the MACOM. Both the MACOM and USACE review the documentation. For DD Form 1391-EF review responsibility for MED MILCON, see appendix E.

### I–5. Certification and Submission
*a.* MACOMs, USACE, and USAISEC will review and certify projects according to guidance provided in chapter 4. MACOMs will submit the project to HQDA (DAIM-FD) per annual submittal guidance for validation and design authorization. DD Forms 1391-EF will be submitted through the 1391 Processor of the PAX system. HQDA will use DD Forms 1391-EF for project review and validation. For certification, validation, and submission of MED MILCON projects, see appendix E.

*b.* MACOMs will submit certified DD Forms 1391-EF for the first year of the SRC not later than (NLT) 1 May of the GY. Certified DD Forms 1391-EF for the second year of the SRC must be submitted NLT 1 May of the following year.

*c.* After the MACOM identifies an MCA program, HQDA (DAIM-FD) will revise CAPCES and provide the CRRC a project listing by staff proponency and appropriate segments of the affected installation's RPMP. The CRRC will review and validate requirements as individual DD Forms 1391-EF are submitted by the MACOM to HQDA. The staff proponent for each project will determine the project's validity and if the requirement meets objectives, policies, and priorities established in current program guidance. This initial review will take place before the annual HQDA Project Review Board (normally in June and July) and will normally involve staff proponent counterparts from the MACOM. The purpose of this review is to establish a project's necessity and validity, develop a DA staff sponsor, and obtain answers to planning concerns. HQUSACE review elements may also review projects to determine if a project is in compliance with standards, criteria, and cost guidance.

## Appendix J
## DD Form 1390-EF, FY Military Construction Program

### J–1. Background
DD Form 1390-EF, FY__ Military Construction Program is used to record each installation's MCA program in relation to personnel strengths, real property improvements, and mission and functions. DD Form 1390-EF accompanies DD Form 1391-EF, FY__ Military Construction Project Data for each installation in the Army's MILCON submission to OSD, OMB, and the Congress.

### J–2. Creation of DD Form 1390-EF
DD Form 1390-EF is prepared and submitted electronically, using the DD 1390-EF module of the 1391 Processor. In preparation for the HQDA submission of the MCA program to OSD, HQUSACE (CEMP-M) initiates DD Form 1390-EF. Installations and MACOMs are then given an opportunity to review the form. Installations update population data, mission statement, outstanding pollution and safety deficiencies, and remarks blocks. MACOMs ensure consistency of DD Forms 1390-EF for MCA and AFH.

## Appendix K
## Specific Facility Policy

### K–1. U.S. Army Reserve and Army National Guard facilities on Army installations

*a.* At active, semi-active and inactive installations, capital improvements needed to meet mobilization requirements are programmed, budgeted, and funded by the active Army when it is the proponent. At installations where facilities are jointly used by the active Army, USAR components, or Army National Guard (ARNG) components, capital improvements to meet training requirements are normally funded by MCA or other active Army sources. USAR or ARNG components will fund construction of facilities for which they are the sole user.

*b.* If active military forces must displace or relocate permanently housed units or activities of USAR or ARNG components that are not mobilized, the active military forces will provide replacement facilities equal to those from which the units or activities are removed.

### K–2. Information Processing Centers (IPCs) and Information Systems Facilities (ISFs)

*a.* Collocation will be considered for projects to house IPCs and ISFs. Collocating emergency operations centers with IPCs and ISFs will be evaluated.

*b.* Construction of IPCs and ISFs will be programmed only after HQDA approves the requirement per AR 25-3.

### K–3. Explosives, toxic chemicals, and ammunition facilities

*a.* DDESB must review and approve site layout and design of new facilities or major alterations to existing facilities for manufacturing, handling, transporting, storing, maintaining, or testing military explosives, toxic chemicals, or ammunition. Site layout and design of other facilities exposed to risks from hazardous material must also be approved by DDESB. Exemptions to DDESB standards may be authorized per AR 385-60. Normally, exemptions will be granted only under the following conditions:

(1) When immediate corrective measures are impractical

(2) Where impairment of the overall defense posture would result

(3) When positive programs for eventual elimination of the exemption's need are being pursued.

*b.* The using agency will forward site plans, through command channels, to DDESB. Data specified in AR 385-60 will be included in the submittal. DDESB will provide preliminary siting approval based on this submission. The designing agency, with the assistance of the using agency, will prepare all data required and provide it to the installation commander for submission through command channels to DDESB for approval before the concept design review (35 percent design) or the parametric design review (10-15 percent design). Before final design can begin, DDESB final approval must be forwarded by the installation commander to the design agent, with copies to HQUSACE (CEMP-E), the appropriate MACOM, and the using agency.

### K–4. Hazardous waste storage facilities

The construction of hazardous waste storage facilities on Army installations is discouraged unless no other feasible option exists. (See AR 200-1.)

### K–5. Unaccompanied personnel housing and guest housing

*a.* The UPH program provides for new construction and revitalization of existing substandard UPH (upgradable) facilities to adequate UPH facilities.

*b.* UPH may be modernized to approach new construction criteria when justified by long-range manpower strengths, adequacy standards, and the physical condition of facilities. Decisions between renovation and new construction in the MILCON program will be based on the results of a life-cycle cost economic analysis per AR 11-18.

*c.* Modernization projects at installations whose UPH utilization rate is below 90 percent will be intensively reviewed before being accepted for inclusion in a budget request.

*d.* Projects to restore to UPH facilities diverted from UPH use to other uses will identify the number of enlisted living spaces and the amount of square footage recovered as well as other uses the recovered space was put to during its diversion.

*e.* Legislative policy contained in section 2856, title 10, United States Code (10 USC 2856) requires the Secretary of Defense to establish maximum allowable net square feet per occupant for new permanent barracks. Instructions are provided in AEI Design Criteria.

*f.* UPH projects will be supported by current AHRP procedure documentation.

*g.* New guest housing facilities and improvements to existing facilities will normally be constructed with non-appropriated funds. AR 210-50, AR 215-1, and AR 415-19 provide additional information.

### K–6. Community facilities

*a.* Army policy on morale, welfare, and recreational (MWR) facilities is contained in AR 215-1.

*b.* Public schools on Army installations in the fifty states, the District of Columbia, Puerto Rico, Guam, American Samoa, and Virgin Islands will normally be programmed from other than MCA appropriated funds. DOD will program dependent school facilities overseas under the Defense Agencies Title of the Military Construction Acts.

*c.* Community facilities, such as youth centers, pools, and community centers integral to a family housing area and serve only these residents and their guests will be programmed within the AFH appropriation.

*d.* Commissary, exchange, and certain MWR facility construction will normally be funded from revenue generated by these operations. Use of MCA funds will require special justification based on activation of a new installation or loss of an existing facility, as a result of transfer to active Army use for other purposes.

*e.* The U.S. Postal Service will provide CONUS postal service facilities in accordance with an agreement with the DOD. OCONUS postal service facilities may be funded with MCA funds.

*f.* Banks and credit unions are privately funded. Project development procedures are contained in AR 210-135.

*g.* Community facilities, such as child development centers funded from MCA appropriations, require commercial market research and analysis and needs analysis as specified in AR 215-1 and AR 415-19, in addition to the requirements for MCA projects.

*h.* Religious facilities will be funded from MCA appropriations. The needs analysis will be based on the AEI Design Criteria, population served, and commander's master religious program.

### K–7. Aviation, operational, and training facilities

*a.* Army aviation facilities will be planned for in coordination with the Federal Aviation Administration and the U.S. Army Aeronautical Services Agency, MOAS-AI, included in the MACOM approved RPMP.

*b.* OCONUS U.S. Army Intelligence and Security Command operational facilities will be collocated with other DOD security facilities when practical.

*c.* Training ranges and outdoor maneuver areas will be planned according to AR 210-21 and FM 25 series guidance.

### K–8. Research, development, test, and evaluation facilities

RDTE facilities (Category Code Facility Class 300 series) can be constructed with MCA or RDTE funds following procedures in this regulation. Medical RDTE (Category Code Facility Class 31060) may be constructed with MED MILCON funds following procedures in this regulation.

### K–9. Supply and storage facilities

*a.* Supply facilities. Programming for facilities to receive, store, preserve, and issue materials in the Army supply system will be

justified per AR 740-1 and this regulation. Hazardous materiel facilities will be justified per AR 740-1.

*b.* Special weapons storage facilities. Special weapons storage facilities will be planned as follows:

(1) Consider modification of conventional storage and maintenance facilities.

(2) Locate facilities on or next to existing military installations. Ensure locations are consistent with operational requirements and economic and engineering considerations. Avoid undue target buildups.

*c.* Nuclear weapons storage.

(1) Facilities intended mainly to store and maintain nuclear weapons will conform to the criteria in the following publications:

*(a)* AR 50-5.

*(b)* AR 190-13.

*(c)* AR 385-60.

*(d)* TM 39-series.

(2) Facilities in areas not under U.S. control will conform to any restrictive understandings or agreements with the host nations.

### K–10. Maintenance and hardstand facilities

*a.* Maintenance facilities. Maintenance facilities for tracked and wheeled vehicles (Basic Category Code 214) will be planned according to information contained in the Facility Planning System (FPS).

*b.* Hardstand facilities. Space allowances for shop hardstands (Shop Category Codes 123, 214, and 442) will be planned in accordance with the FPS.

### K–11. Defense Access Road Program

DARP actions will be initiated as soon as new facility requirements or installation mission changes are identified, if the changes are likely to cause a significant impact that requires public highway construction improvements.

### K–12. Utilities, roads, parking areas, and site improvements

Utilities, roads, parking areas, and site improvements to include landscape plant material, turf and erosion control requirements will be programmed as MILCON at the same time as construction of primary facilities.

*a.* Supporting utilities, as well as roads and parking areas, will be programmed as MILCON at the same time as construction of primary facilities to prevent shortages when new facilities are completed.

*b.* The cost of site improvements to include landscape development, planting and screening, erosion control, and seeding will be included in the MILCON funding of the facility.

### K–13. Utilities in phased construction projects

When planning and programming a phased construction project, the first phase will include all utility work related to those utilities where fragmentation of utility replacement could cause hazards to health and life safety. Funds will be programmed to:

*a.* Perform complete utility construction (for example, electrical, gas, water, and so forth) for each utility in the first phase of a phased construction project.

*b.* Remove a section of all such utility lines that are to be abandoned in place at a location adjacent to the cutoff point, to ensure complete disconnection from all sources of supply.

*c.* Remove portions of such utilities that would otherwise be abandoned in place beneath new structures, to preclude accidental entry of hazardous materials into those structures.

### K–14. Coordination of Army developments with other government organizations

*a.* AR 210-70 requires Federal agencies to cooperate with State and local governments in the evaluation, review, and coordination of Federal programs and projects. In developing MILCON projects and programs, follow procedures contained in AR 210-70.

*b.* Per the National Capital Planning Act of 1952, as amended, the RPMP and designs for proposed construction projects in the NCR must be submitted to the National Capital Planning Commission for appropriate reviews and approvals. Per Public Law 61-181 (PL 61-181), as amended; EO 1259, 25 October 1910; and EO 1862, 28 November 1913, similar submissions must be made to the Commission of Fine Arts for comment and advice. Specific guidance for submissions to these organizations is contained in the AEI Design Criteria.

### K–15. Energy conservation measures

Managers in the project development and acquisition process will ensure that energy efficiency of buildings, building components, and utilities systems is considered at all phases of project development. The most energy efficient design, based on least life cycle cost and operational requirements, will be used. All energy conservation measures determined to be life cycle cost effective, per 10 CFR 436, will be implemented in all new facilities and modernizations of permanent existing facilities.

### K–16. Renewable energy cost provisions

Solar (active, passive, and photovoltaic) and other renewable forms of energy will be considered for all MILCON projects. If life cycle cost effective, solar or other renewable forms of energy considerations will be included in program documents and in the construction. (Cost of including renewable energy provisions in construction contracts will be shown on DD Form 1391-EF and in the concept design (35 percent) or parametric design (5-15 percent), and later, cost estimates when feasibility has been ascertained.)

### K–17. Mitigation of seismic risks

*a.* New facilities and additions or extensions of existing facilities will be designed to provide the level of seismic protection required by TM 5-809-10 and TM 5-809-10-1.

*b.* Alteration, renovation, or improvement of existing facilities must include a seismic screening and evaluation when:

(1) A change in facility use causes a change in the seismic occupancy category, as defined in TM 5-809-10, to a category of greater importance (lower category number).

(2) The capacity of the structural system or components are reduced to 90 percent, or less, of its original stability and strength.

(3) A project significantly extends the useful life or value of the building and the cost of construction exceeds 50 percent of the current replacement value.

*c.* When alterations, renovations, or improvements of existing facilities meet any of the conditions given above, seismic screening and, if necessary, evaluation must be done. Screening and evaluation will be done according to EI 01S103, “Seismic Screening and Evaluation Procedures for Existing Military Buildings” dated March 1997. If this screening/evaluation process indicates the earthquake resistance of the structure or the site does not meet life safety or higher performance standard established for the facility, appropriate mitigation of the risk must be done. The mitigation method will be selected by the MACOM and installation commander. Mitigation alternatives are the rehabilitation of structural, nonstructural, and geologic hazards, the abandonment of the facility, or the reduction in occupancy category of the facility. If structural and nonstructural rehabilitations are the chosen mitigation, design and detailing will be done in accordance with TM 5-809-10 and TM 5-809-10-1 when appropriate for the occupancy category of the facility.

*d.* Existing buildings may be exempted from the seismic evaluation requirements given above if:

(1) The original design was done according to the provisions of the 1982 or later edition of TM 5-809-10, or the 1988 edition of TM 5-809-10-1 and the design for the alteration does not reduce the strength or increase the earthquake loading of any existing structural component by more than ten percent.

(2) Replacement is scheduled within 5 years.

(3) Classified for agriculture use, or intended only for minimal human occupancy, and occupied by persons for a total of less than two hours a day.

(4) Detached one- and two-family dwellings that are located in areas having a governing acceleration coefficient less than 0.15.

(5) One-story building of light steel frame or wood construction with an area is less than 280m2 (3,000 square feet).

*e.* If the seismic evaluation indicates the resistance of the structure does not meet the established Life Safety or higher performance standard, a structural rehabilitation must be done. Guidance for the rehabilitation design is contained in TM 5-809-10.

### K–18. Occupational safety and health

AR 385-10 requires following Occupational Safety and Health Act (OSHA) criteria during planning and development of new facilities or upgrading of existing facilities. When workplaces must be safe in industrial, commercial, maintenance, and other facilities to comply with OSHA requirements, the cost to upgrade or modernize will be included in the cost of any construction project.

### K–19. Physical security and anti-terrorism force protection measures

*a.* Physical security and anti-terrorism force protection other than those required by AR 525-13 or those included as part of a standard design will be provided as standard design practice, when required by the existing or potential threat and current vulnerabilities, to deter terrorists from attacking personnel, facilities, and equipment, and minimize loss or damage in the event of such an attack.

*b.* To ensure that physical security and anti-terrorism force protection construction requirements are identified, the installation Director of Plans and Training (DPT), or equivalent, and the installation Provost Marshal or Security Officer, will be fully involved in the facility planning, programming, budgeting, and review process.

*c.* Anti-terrorism requirements for MCA and AFH projects designated as Mission Essential and Vulnerable Areas, identified as high probability risk targets, or frequented by personnel designated as High Risk Personnel, will be coordinated with the installation DPT, and reviewed by the installation Force Protection Committee (FPC).

*d.* Measures incorporated to address force protection requirements will not be deleted during the design process without coordination with the installation DPW and Provost Marshal.

*e.* All DD Forms 1391-EF must include certification by the installation Provost Marshal or Security Officer that security and anti-terrorism measures have been addressed.

### K–20. Barrier-free design

*a.* Facilities will be barrier-free, with as few obstacles (for example, doors, elevation, grade changes) as possible. The Architectural Barriers Act of 1968, Public Law 90-480 (PL 90-480), requires certain Army facilities be accessible to and usable by Americans with disabilities. These provisions will be part of the project cost. Only facilities operated and used solely by able-bodied military or civilian personnel, or where great hazards exist, may be exempt from this requirement.

*b.* The Secretary of Defense memorandum dated 20 October 1993 requires that, in addition to meeting the Uniform Federal Accessibility Standards (UFAS) requirements, the Americans with Disabilities Act Accessibility Guidelines (ADAAG) requirements that provide equal or greater accessibility than those of the UFAS must also be met in the facilities subject to UFAS.

*c.* Army buildings and facilities involving new construction, additions, or alterations worldwide, which are open to the public, or which may be visited by the public will be accessible to physically disabled persons. This includes MWR facilities; other NAF facilities; or any facilities where civilian workers may be employed. Every building and facility should be designed to ensure accessibility unless the facility is restricted to use by able-bodied military and civilian personnel, or classified as a facility housing hazardous occupations.

*d.* At least 5 percent of the total military family housing inventory and guest housing inventory constructed since 7 August 1984 (no less than one unit of each) of an installation will be designed and built to be either accessible, or readily and easily modifiable to be accessible, to the physically disabled.

*e.* The AEI Design Criteria provides implementing instructions for UFAS and ADAAG. If a waiver to the UFAS or ADAAG criteria is needed, a waiver request including sufficient data to analyze the request will be submitted to HQDA (DAIM-FD). Waivers will be granted only in extraordinary circumstances.

### K–21. Permanent signs

The cost of interior and exterior permanent signs to identify new facilities or areas having constant or fixed use will be included in the project. Traffic signs and markings required due to alterations, extensions, and additions to road networks or paved areas will be included in the project cost.

### K–22. Radon mitigation

Radon mitigation techniques will be incorporated in construction plans to prevent excessive radon migration into new structures. See AR 200-1 for additional information.

### K–23. Fire protection

Fire protection will be provided for facilities per the AEI Design Criteria and MIL-HDBK 1008. Special fire protection features provided solely to protect user-provided equipment housed or stored in a facility (that is, flight simulators, computer equipment, and similar items), and not required to provide fire protection for the facility itself, will be funded by the user.

### K–24. Use of fiber optic cable for MILCON construction

For new cable runs, excluding AFH projects, optical fiber and twisted pair cable for both the outside plant and building premises will be installed. This includes cable from the main distribution frame, through intermediate distribution frames, to the communications distribution room. Fiber optic cable will be installed to the outlet during construction if the user, or proponent, has a validated current requirement for fiber optic connectivity.

### K–25. Host Nation-Funded Construction Program

*a.* It is DOD policy to actively seek host nation support for DOD construction requirements in the Facilities Improvement Program in Japan (JFIP), the Combined Defense Improvement Program (CDIP) in Korea, Republic of Korea Funded Construction, and Payment-In-Kind (PIK) in Germany, or like programs before MILCON funds are requested. If host nation funding is denied or will not satisfy U.S. requirements soon enough, or if there are other compelling reasons to proceed, the U.S. MILCON program will be the acceptable funding source. (Refer to AR 415-32 for additional guidance.)

*b.* A project funded by the host nation may not be included in the MILCON budget. (If necessary, a project to be funded by a host nation may be included in programs submitted to the Congress for the purpose of obtaining authorization.) Programming of projects in both MILCON programs and Host Nation-Funded Construction Programs (HNFCPs) is only authorized beyond the first 2 years of the current POM.

*c.* HNFCP projects will normally be designed and constructed to meet U.S. MILCON program criteria and standards for reliability, maintainability, functionality, personnel health, safety, and environment. Pollution abatement procedures at Federal facilities outside the U.S. will be implemented per AR 200-1, and the final governing standards developed by the DOD-appointed executive agent for the host nation.

*d.* U.S. MILCON projects will be programmed to complement host nation funded projects, as required, to provide for total usable facilities.

*e.* DOD components and military departments will submit plans for host nation funded projects or modification of fixed or movable ammunition and explosives facilities to the DDESB for review and approval. Projects that may be affected by proximity to such explosive and ammunition operations are also subject to this approval process.

**K–26. Burden sharing contributions by other nations**

The Secretary of Defense may accept cash contributions from other nations for military construction projects of the DOD under provision of section 1045, Public Law 102-190.

*a.* Authorization for military construction. Contributions credited to an appropriation account of the DOD may be used:

(1) By the Secretary of Defense to carry out a military construction project that is consistent with the purposes for which the contributions were made and is not otherwise authorized by law; or

(2) By the Secretary of a military department, with the approval of the Secretary of Defense, to carry out such a project.

*b.* Notice and wait requirements. When a decision is made to carry out a military construction project under this provision, the Secretary of Defense shall submit a report to the congressional defense committees explaining the need for the project, the then-current estimate of the cost of the project, and a justification for carrying out the project under this provision.

*c.* The Secretary of Defense or the Secretary of a military department may not commence a military construction project under this provision until the end of the 21-day period beginning on the date on which the Secretary of Defense submits the report to the Congress regarding the project.

**K–27. Vending facility program for the blind on Federal property**

AR 210-25 implements the Randolph Sheppard Act, Public Law 74-732 (PL 74-732) and presents Army policy for the blind vending facility program. If there is construction, substantial alteration, or renovation of Army facilities, satisfactory sites will be provided for the blind to operate vending facilities. Based on negotiations between the installation and the State licensing agency, the installation will define the functions or requirement. This includes space, locations, and other aspects. The cost of these provisions will be part of the project cost.

**K–28. Relocation of an operation incident to MILCON construction**

*a.* Permanent or temporary relocation. When MILCON projects require operations to be relocated permanently or temporarily, the cost of relocation and of providing austere but adequate accommodations may be funded by MILCON appropriations as follows:

(1) Permanent relocation of an operation from a facility to be altered, renovated, or demolished.

(2) Temporary relocation of an operation from a facility to be altered, renovated or demolished for construction site clearance, with later return to the facility.

*b.* MILCON funding limitations for relocation

(1) Under the condition described in a(1) above, only the costs of initial transfer and relocation of operations will be chargeable to the project.

(2) Relocation costs will be included on DD Form 1391-EF as a separate line item under Primary Facilities. Relocation items will be described and a justification and explanation included.

(3) The relocation will not interfere with execution of the approved installation RPMP.

(4) Only minimum provisions may be made for a displaced operation in a temporary location. The following costs are authorized:

*(a)* Cost for removing and returning the operation to its permanent location and placing it in an operating condition.

*(b)* Cost for restoring the interim facility to its original condition.

(5) Recurring costs of operating at a temporary location are not chargeable to the project but to the appropriate O&M accounts.

(6) When an operation is relocated, only existing equipment (or its equivalent) will be relocated and installed in the interim facility, and returned and reinstalled in its permanent location.

**K–29. Manufactured or pre-engineered buildings**

Many types of facilities can readily be constructed using totally manufactured or pre-engineered components and systems. These alternatives offer potential savings by reducing labor requirements at the construction site. However, an important factor in determining the degree of economy gained is the number of competing manufacturers and their proximity to the construction site. The economic analysis for this type of construction will not differ from that for permanent type construction.

**K–30. Relocatable buildings**

*a.* Relocatable buildings may be included in an MCA project when:

(1) Projected need for the facility is less than 5 years after the program year. Overseas missions have an undetermined lifespan.

(2) Total cost of construction exceeds authorized limits for O&M funded construction.

*b.* Classification of relocatable buildings as equipment rather than real property is described in AR 420-18.

*c.* An economic analysis comparing the total life cycle cost of an austere permanent facility with the total life cycle cost of the proposed relocatable facility will be completed. The following conditions will apply to the life cycle cost analysis:

(1) Assume the functional life of the permanent building or the expected life of the installation to be 25 years, whichever is shorter. If the life of the installation is unknown, use 15 years for overseas installations and 25 years for CONUS installations.

(2) Assume the functional life of a relocatable building to be 15 years.

(3) Total life cycle cost of the relocatable building will include a move to the nearest operational installation of the MACOM at the end of 5 years. Include the total cost for disassembly, transportation, and reassembly.

(4) Compare the total cost for each alternative at the end of 15 years or when the installation is expected to be terminated, whichever is sooner. A relocatable building will be programmed if, at that point, its total cost is equal to or less than that of an equivalent permanent building.

**K–31. Construction of field offices**

*a.* It is Army Policy that field office facilities be funded by the sponsor of the construction work. Waivers or exceptions to this policy must be approved by DASA(IH).

*b.* On military installations, the USACE district commander, or his or her agent will request, in writing, suitable facilities (specifying what facilities are needed) from the installation commander. The installation commander will provide such facilities for the conduct of USACE operations, if available. If suitable facilities are not available, acceptable alternatives for providing them are as follows:

(1) When facilities are available that can be made suitable, necessary improvements may be provided for in one of two ways: (1) the installation commander may initiate a minor O&M project to upgrade the facilities; or (2) the upgrade may be included in a DD Form 1391-EF for the project to be supported.

(2) If the installation commander cannot provide facilities, temporary facilities may be identified as a requirement in the DD Forms 1391-EF in one of two ways: (1) temporary office space (for example, trailers, and other facilities) may be provided under the construction contract on-post, under conditions and siting mutually approved by the installation and the USACE district commander; or (2) when no on-post accommodations can be made available, temporary facilities may be provided in the construction contract by off-post rentals.

(3) In cases where the construction mission at or near the installation has sufficient economic justification, the construction of a suitable, permanent facility on the installation is permitted. Provisions for constructing such a facility on the installation may be included in the DD Form 1391-EF by mutual agreement between the installation commander and the USACE district commander, or HQUSACE may program a separate MCA or UMMCA project.

**K–32. Shelters or other facilities for smoking**

Use of MILCON funds for construction of shelters or other facilities for smoking is not authorized.

### K–33. Transfer of completed work to installation commander

*a.* After a construction project is completed, the USACE district will prepare a DD Form1354, per AR 420-17, to formally transfer the completed work to the installation commander and provide the installation a DD Form 1354 on the day the user beneficially occupies the premises. The USACE district will provide the installation as-built drawings, warranties, and operational manuals not later than 60 days following the occupancy date.

*b.* Transfer to the installation commander will be accomplished as follows:

(1) Joint inspection of completed work. Upon receipt of written notice from the USACE district that a project is ready for use, the installation commander, using service (tenant), and USACE district representatives will jointly inspect the facility or portion of the completed facility. All known major construction deficiencies will be corrected before this inspection. This inspection will also include a concurrent review of as-built drawings, project cost data, and data for real property records. Written notice of the joint inspection will be forwarded to the MACOM, the operating agency commander of the using service or tenant agency commander, or both so they might take part in the inspection. Minor construction deficiencies will not delay the transfer. These deficiencies will be listed on the reverse side of the transfer forms for correction by the USACE district. The date for correction of minor deficiencies will be agreed upon by the using service and the USACE district before final acceptance by the using service.

(2) Acceptance by the installation commander. The installation commander will accept the completed work when the USACE district certifies that it is complete and usable for its designed purpose, except for noted minor deficiencies, in accordance with the terms of the contract documents. The installation commander will report such acceptance to the MACOM commander of the Army using service and include comments on the work.

(3) Transfer. Transfer of completed work to other departments and agencies will be as agreed upon by DA and the department or agency for which the work was accomplished.

### K–34. Execution of construction projects after completion of a MILCON project

Once a MILCON project is complete and usable, execution of construction projects using other appropriations such as OMA, OPA, or RDTE may proceed without a waiting period. However, the required project must address a newly identified requirement and cannot be construed as project splitting.

### K–35. Real estate acquisition

*a.* AR 405-10 governs land acquisition.

*b.* Land costing no more than $500,000 (exclusive of administrative cost and deficiency judgements) can be purchased at the discretion of the installation, and funded with appropriations available for maintenance or construction. (See section 2672, title 10, United States Code (USC) (10 USC 2672) and section 2673, title 10, United States Code (USC) (10 USC 2673.))

*c.* Land costing more than $500,000 can be funded with a Congressional MCA reprogramming provided it is authorized pursuant to 10 USC 2672a. By this statute, the Secretary of the Army is authorized to acquire any land provided:

(1) It is needed in the interest of national defense

(2) It is needed to maintain the operational integrity of an installation

(3) It is so urgent, it can not wait for the next annual MCA budget request

(4) Congress is notified 30 days before the acquisition.

*d.* For a land acquisition which meets the above criteria and costs no more than $1.5 million, UMMCA funds can be used in lieu of a congressional MCA reprogramming. This could save several months.

*e.* For land costing more than $500,000, and which does not meet the stringent criteria of 10 USC 2672a, authorization and funding must be obtained through the annual MILCON Authorization and Appropriations Acts. Although section 3801, title 10 United States Code (USC) (10 USC 3801) does not define military construction to include land acquisitions, there is ample statutory precedent to show that MILCON funds should be used for such a capital investment as land. Accordingly, programming and execution of land acquisitions should be in accordance with this regulation.

*f.* Real property access required for construction purposes will be cleared before access is gained. The concerned USACE district will obtain title, right of entry for construction, or right of possession to real estate upon request of the installation commander or his or her authorized representative and receipt of appropriate funding. Land acquisition OCONUS, however, is processed through the MACOM under SOFA procedures. (See AR 405-10.)

*g.* MILCON of a permanent nature will be placed only on land that meets the requirements outlined in AR 405-10.

*h.* When UMMCA funds are used for land acquisition, section 2672A(a), title 10, United States Code (10 USC 2672A(a)) will be cited as the authority.

### K–36. Facilities Reduction Program

*a.* The Facility Reduction Program (FRP) requires the Army to dispose of one square foot of facilities to offset each square foot of new construction added to the inventory. Facilities demolished may come from the inventory of the host MACOM on whose installation the construction will occur or from the inventory of a tenant MACOM. This requirement will not reduce the Army facility inventory, but will preclude the growth of existing inventories.

(1) Disposal square footage needed to meet the one-for-one offset requirements will be added to the programming MACOM FRP 2 years after the project's appropriation year. Additional square footage to meet offset requirements for non-landholding tenant construction will be added to the host MACOM's FRP inventory 2 years after the appropriation year of the project.

(2) Temporary, semi-permanent, or permanent facilities may be demolished under the FRP. MACOMs should select these facilities based on condition.

(3) Disposal of square footage to meet the one-for-one offset requirement may be MILCON funded if construction is for a replacement project. Demolition associated with a replacement project must be on the same installation as the new construction and must be explained on the DD Form 1391-EF. MILCON funded disposal is not limited to footprint demolition. MACOMs and installations will not approve changes that involve deletion or revision to facilities scheduled for demolition in the project. These changes and any associated with square footage identified for demolition in the DD Form 1391-EF will be submitted to HQDA (DAIM-FD).

*b.* Changes in project scope or completion date (delay in appropriation) will result in adjusted size and schedule of offset reductions required.

*c.* Buildings identified for demolition against one construction project may not be identified for demolition against another construction project, unless an exception to demolish has been approved.

(1) Changes in project scope, project cancellations, or project resiting will be the only acceptable reasons for requests for substitution or exception to demolition.

(2) Approval of requests for exception will not reduce the FRP requirement to demolish one square foot of existing facilities for each square foot of new construction.

(3) Demolition identified on DD Forms 1391-EF is considered a formal commitment by the Army to the Congress. Requests for substitution or exception to demolition policy will be submitted to HQDA (DAIM-FD).

*d.* New construction for AFH, Defense Logistics Agency depots, production plants, sewage treatment facilities, transformer stations, and similar infrastructure facilities and chemical demilitarization facilities (when the facility is intended to be demolished at the conclusion of its use) are exempt from the offset disposal requirement. However, disposal associated with construction of these types of facilities is encouraged. Tenant construction requires demolition

of an equivalent amount of square footage to be constructed. This demolition must be identified by the MACOM on whose installation the construction will occur. However, actual facilities nominated for reduction may be negotiated among MACOMs and may actually come from the tenant MACOM inventory.

*e.* Demolition associated with AFH will be funded and accomplished in accordance with that appropriation's guidance and not the FRP guidance above.

### K–37. Obligation rates for foreign currency transactions

Funding of Army MILCON projects executed by foreign currency contracts should be limited to the year of appropriation. If it is necessary to fund such a project from other than its year of appropriation, prior approval in writing must be obtained from HQDA (DAIM-FD). As a general rule:

*a.* The budgeted currency exchange rate in effect when funds are appropriated by the Congress will be uniformly applied to foreign currency obligations made throughout the life of that appropriation, regardless of the year in which the obligations, including in-scope adjustments, are actually recorded.

*b.* Split-funded foreign currency projects will be obligated using the budget exchange rates associated with each cited fiscal year's appropriation.

*c.* Obligations which have been partially or fully liquidated will not be revalued.

*d.* Previously recorded disbursement transactions should not be adjusted to change obligation values.

## Appendix L
## Information Systems Support

### L–1. Funding Sources

Funding sources for information systems and associated equipment and systems supporting construction-funded projects are listed in table L-1.

### L–2. Funding of information systems components

Table L-1 applies to funding for information systems where those systems are associated with MILCON projects. Costs related to such functions as repair, replacement, expansion, operation, and maintenance unassociated with MILCON projects are not to be construction funded.

### L–3. Explanation of table columns

*a.* Column one, System Component, lists the information system component of both information and associated equipment systems supporting construction-funded projects.

*b.* Column two, ISCE, identifies if the system component is included in the Information System Cost Estimate.

*c.* Columns three and four identify under the heading "Funding Source"specific funding sources for procurement and installation of information systems cabling or components. This does not necessarily reflect that maintenance, operation, repair, or replacement of such items is funded by the DPW. (For those items of information systems for which maintenance, operation, repair, or replacement costs or activities are funded by the DPW, see AR 420-49.)

*d.* The letter "Y"indicates that the cost estimate for each item in column one that is included in Section 17 of the DD Form 1391-EF (ISCE), is developed by USAISEC, the agency which provides the standards, criteria, and design for that item. The aggregate costs of "Y"items represent the ISCE total cost estimate. The letter "N"indicates the cost estimate for each item in column one is included as part of the per-square-foot cost, is developed by USACE, the agency which provides the standards, criteria, and design for that item. The aggregate cost appears in the per-square-foot cost of the primary facility. Where "N"items include cabling or equipment installed beyond the facility 5 foot line, a separate line item entry, in addition to that entitled "Information Systems," will be made in Block 9B, the Supporting Facilities section of DD Form 1391-EF for those items. One example of this condition would be entertainment television cabling run between buildings in a UPH complex.

*e.* Abbreviations used in Table L-1 are defined in the Legend at the end of the table.

**Table L–1**
**Funding of Information Systems Support Components**

| System Component | ISCE | Funding Sources Procure | Funding Sources Install |
|---|---|---|---|
| **1. Telephone, administrative, all MILCON projects excluding UMMCA.** | | | |
| Cabling.[1] | Y | CONF | CONF |
| POTS (plain old telephone system)dual tone multi-frequency (DTMF),explosion proof, weatherproof, and multi-line telephone sets.[2] | Y | ISEC | ISEC |
| Telephone instruments other than those cited immediately above (e.g., call directors, key systems, integrated voice/digital terminals, and secure systems), directors, key systems, integrated voice/digital terminals, etc.).[2] | Y | PROP | PROP |
| Modems. | Y | PROP | PROP |
| Voice/data switching equipment including line and trunk cards.[2] & [3] | Y | ISEC | ISEC |
| Line equipment[1]. | | | |
| Fiber optic line drivers, fiber optics multiplexer (MUX), interface devices, etc., wired-in. | Y | CONF | CONF |
| Fiber optic line drivers, fiber optic MUX, interface devices, etc., (personal property). | Y | PROP | PROP |
| **2. Telephone, administrative, unspecified UMMCA.** | | | |
| Cabling. | Y | PROP | PROP |
| POTS, DTMF, explosion proof, weatherproof, and multi-line telephone sets. | Y | PROP | PROP |
| Instruments other than those cited immediately above (e.g., call directors, key systems, integrated voice/digital terminals, and secure systems). | Y | PROP | PROP |
| Modems. | Y | PROP | PROP |
| Voice data switching equipment including line and trunk cards. | Y | PROP | PROP |
| Line equipment. | | | |
| Fiber optic line drivers, fiber optic MUX, interface devices, etc. (real property). | Y | PROP | PROP |
| Fiber optic line drivers, fiber optic MUX, interface devices, etc. (personal property). | Y | PROP | PROP |
| **3. Telephone, non-administrative (individual subscriber).** | | | |
| Cabling, BEQ/BOQ/troop billets/family housing.[1,9] | Y | CONF | CONF |
| Telephone instruments and other equipment. | N | SUB | SUB |
| Outside cable plant, equipment and equipment shelter. | N | SUB | SUB |
| **4. Intercommunication systems, complete.** | A | CONF | CONF |
| **5. Administrative outside cable plant (outside five-foot line).[1]** | | | |

**Table L–1**
**Funding of Information Systems Support Components—Continued**

| System Component | ISCE | Funding Sources Procure | Install |
|---|---|---|---|
| Expansion as a direct result of new construction (includes fiber optics cable and associated electronics as indicated in 1, above). | Y | CONF | CONF |
| Upgrade/replacement of existing outside cable plant not associated with new construction. | N | ISEC | ISEC |
| Ducting, conduit, manholes, poles, etc.[4] | Y | CONF | CONF |
| **6. Telephone central office equipment.** | | | |
| Upgrade/expansion as a direct result of new construction.[2] | Y | ISEC | ISEC |
| Modernization/replacement not associated with new construction. | N | ISEC | ISEC |
| **7. Conduit, raceway, ductwork, riser system, etc., associated with new construction.[4]** | Y | CONF | CONF |
| **8. AM-FM radio and public address, complete.** | N | CONF | CONF |
| **9. Entertainment Television Systems.** | | | |
| **9.1. Government-owned master antenna.[9]** | | | |
| Television (MATV) systems.[5] | Y | CONF | CONF5 |
| Cabling.[1] | N | CONF | CONF |
| Antennas, dipole and loop, fixed. | N | CONF | CONF |
| Antennas, dish.[2] | N | PROP | PROP |
| Amplifiers, splitters, couplers, etc. | N | CONF | CONF |
| Receivers.[2] | N | PROP | PROP |
| **9.2. Commercially-Owned Cable Company.[9]** | | | |
| Entertainment Television Systems. | | | |
| Cable access systems (including device plates, jacks, raceways, boxes, etc.) (see note 4). | N | CONF | CONF |
| Cabling, interior (see note1). | N | CONF | CONF |
| All other external components. (All exterior cabling, plus equipment such as converters, receivers, amplifiers, and splitters not part of the cable path, etc.) (see note 2). | N | SUB | SUB |
| All monthly or other periodic fees and charges. | N | SUB | SUB |
| **10. Nurse call, complete.** | N | CONF | CONF |
| **11. Radio paging systems, complete.[6]** | N | CONF | CONF |
| **12. Utility/Energy monitoring and control system (UMCS/EMCS)** | | | |
| UMCS/EMCS, non-energy conservation investment program (ECIP), with maintenance management subsystem. | N | CONF | CONF |
| UMCS/EMCS, ECIP, without maintenance management subsystem. | N | CONF | CONF |
| UMCS/EMCS maintenance management subsystem in conjunction with ECIP-funded UMCS/EMCS. | N | PROP | PROP |
| **13. Local area networks (LANs), all MILCON projects excluding UMMCA.** | | | |
| Cabling.[1] | Y | CONF | CONF |
| Information and data processors. | | | |
| Common user. | Y | ISEC | ISEC |
| User specific. | Y | PROP | PROP |
| Terminals, printers, key-boards and other peripheral equipment. | Y | PROP | PROP |
| Tapes, disks, etc. | | | |
| Common user. | Y | ISEC | ISEC |
| User specific. | Y | PROP | PROP |
| Line equipment.[1] | | | |
| Fiber optic line drivers, fiber optic MUX,interface devices, etc., (real property). | Y | CONF | CONF |
| Fiber optic drivers, fiber optic MUX, interface devices, etc., (personal property). | | | |
| Common user. | Y | ISEC | ISEC |
| User specific. | Y | PROP | PROP |
| **14. LANs UMMCA.[10]** | | | |
| Cabling. | Y | PROP | PROP |
| Information and data processors. | Y | PROP | PROP |
| Tapes, disks, etc. | Y | PROP | PROP |
| Line equipment. | | | |
| Fiber optic line drivers, fiber optic MUX, interface devices, etc. (real property). | Y | PROP | PROP |
| Fiber optic line drivers, fiber optic MUX, interface devices, etc. (personal property). | Y | PROP | PROP |
| **15. Reproduction, photographic, printing and similar hard-copy developing and processing equipment.** | N | PROP | PROP |
| **16. Intrusion detection, all MILCON projects excluding UMMCA.** | | | |
| Cabling.[1] | B | CONF | CONF |
| Sensors. | N | PROP | CONF |
| Operating consoles and other head-end equipment. | N | PROP | CONF |
| Amplifiers, splitters, couplers, etc. | N | CONF | CONF |
| Assessment cameras and monitors. | N | PROP | CONF |
| Line equipment (fiber optic signal line conditioners (SLCs), MUX, etc.).[1] | | | |
| Fiber optic line drivers, fiber optic MUX interface devices, etc. (real property). | N | CONF | CONF |
| Fiber optic line drivers, fiber optic MUX, interface devices, etc. (personal property). | N | PROP | PROP |
| **17. Intrusion detection, UMMCA.[8]** | | | |
| Cabling. | N | PROP | PROP |
| Sensors. | N | PROP | PROP |
| Operating consoles and other head-end equipment. | N | PROP | PROP |
| Amplifiers, splitters, couplers, etc. | N | PROP | PROP |
| Assessment cameras and monitors. | N | PROP | PROP |
| Line equipment (fiber optic SLCs, MUX, etc.). | | | |
| Fiber optic line drivers, fiber optic MUX, interfacedevices, etc. (real property). | N | PROP | PROP |
| Fiber optic line drivers, fiber optic MUX, interfacedevices, etc. (personal property). | N | PROP | PROP |
| **18. Pneumatic tube, complete.** | N | CONF | CONF |

**Table L–1**
**Funding of Information Systems Support Components—Continued**

| System Component | ISCE | Funding Sources Procure | Install |
|---|---|---|---|
| **19. Central clock, complete.** | N | CONF | CONF |
| **20. Portable clock (battery or plug-in).** | N | PROP | PROP |
| **21. Real-time clock.** | | | |
| EMCS. | N | CONF | CONF |
| Non-EMCS. | N | PROP | PROP |
| **22. Fire alarm and detection, complete.** | N | CONF | CONF |
| **23. Operating and malfunction alarms associated with CONF equipment.** | N | CONF | CONF |
| **24. Central dictation, complete.** | | | |
| Cabling. | N | CONF | CONF |
| Dictation equipment. | N | PROP | PROP |
| **25. Antennas and antenna towers for point-to-point communication.** | N | PROP | PROP |
| **26. Electronic navigational aids terminal VHF omnidirectional range (TVOR), tactical airnavigation (TACAN), etc.).** | N | PROP | PROP |
| **27. Fixed and portable facility equipment for radio and meteorological stations.**[6] | N | PROP | PROP |
| **28. Organs and other musical instruments.** | N | PROP | PROP |
| **29. Closed-circuit television (CCTV) for training and surveillance purposes unassociated with intrusion detection system assessment purposes or medical facilities.** | | | |
| Cabling.[1] | N | CONF | CONF |
| Amplifiers, splitters, couplers, line drivers, etc. | Y | CONF | CONF |
| Monitors and cameras. | Y | PROP | CONF |
| Antennas. | Y | PROP | CONF |
| Operating consoles and other head-end equipment. | Y | PROP | CONF |
| Line equipment. | | | |
| Fiber optic line drivers, fiber optic MUX, interface devices, etc. (real property).[1] | Y | CONF | CONF |
| Fiber optic line drivers, fiber optic MUX, interfacedevices, etc. (personal property). | Y | PROP | PROP |
| **30. CCTV for medical facilities.** | | | |
| Cabling.[1] | N | CONF | CONF |
| Amplifiers, splitters, couplers, etc. | N | CONF | CONF |
| Monitors and cameras. | N | PROP | PROP |
| Antennas. | N | PROP | PROP |
| Operating consoles and other head-end equipment. | N | PROP | PROP |
| **31. Mission orientated visual information systems for stand-alone briefing rooms, auditoriums command and control facilities, conference rooms, and other applications nor addressed elsewhere in this table.** | | | |
| Cabling.[1] | Y | CONF | CONF |
| Amplifiers, splitters, couplers, etc. | Y | CONF | CONF |
| Monitors, cameras, video projectors, camera record, and playback facilities, etc. | Y | PROP | PROP |
| Antennas. | Y | PROP | PROP |
| Operating consoles and other head-end equipment. | Y | PROP | PROP |
| Line equipment. | | | |
| Fiber optic line drivers, fiber optic MUX, interface devices, etc. (real property).[1] | Y | CONF | CONF |
| Fiber optic line drivers, fiber optic MUX, interfacedevices, etc. (personal property). | Y | PROP | PROP |
| Sound subsystems. | Y | PROP | PROP |
| **32. Video Information Projection Systems.** | | | |
| Cabling. | Y | CONF | CONF |
| Amplifiers, splitters, couplers, etc. | Y | CONF | CONF |
| Monitors, cameras, VCRs, video projectors, etc. | Y | PROP | PROP |
| Computer workstations. | Y | PROP | PROP |
| Antennas (all). | Y | PROP | PROP |
| **33. Teleconferencing.** | | | |
| Cabling. | Y | CONF | CONF |
| Amplifiers, splitters, couplers, etc. | Y | CONF | CONF |
| Monitors, cameras, VCRs, video projectors, etc. | Y | PROP | PROP |
| Screens. | Y | PROP | PROP |
| Coding and decoding equipment. | Y | PROP | PROP |
| Audio subsystems. | Y | PROP | PROP |
| Computer subsystems. | Y | PROP | PROP |
| **34. Educational Television Systems.** | | | |
| Cabling. | Y | CONF | CONF |
| Amplifiers, splitters, couplers, etc. | Y | CONF | CONF |
| Monitors, cameras, VCRs, video projectors, etc. | Y | PROP | PROP |
| Audio subsystems. | Y | PROP | PROP |
| Head-end transmitters. | Y | PROP | PROP |
| **35. Computer-Aided Instruction Systems.** | | | |
| Cabling. | Y | CONF | CONF |
| Amplifiers, splitters, couplers, etc. | Y | CONF | CONF |
| Learning station equipment. | Y | PROP | PROP |
| Computer subsystems. | Y | PROP | PROP |
| **36. Composite medical information system.** | | | |
| Cabling.[1] | N | CONF | CONF |
| Monitors and cameras. | N | PROP | PROP |
| Antennas. | N | PROP | PROP |
| Operating consoles and other head-end equipment. | N | PROP | PROP |

**Table L–1**
**Funding of Information Systems Support Components—Continued**

| System Component | ISCE | Funding Sources Procure | Install |
|---|---|---|---|
| **37. Testing, diagnostic equipment (TMDE), and special tools.** | | | |
| TMDE and special tools dedicated to fixed CONF-procured and installed systems and components.[7] | N | CONF | CONF |
| TMDE and special tools dedicated to fixed USACECOM-procured and -installed systems and components.[7] | Y | ISEC | ISEC |
| Other TMDE. | N | PROP | PROP |
| **38. Official record traffic equipment (teletype, facsimile, computers, etc.).** | | | |
| Common user. | Y | ISEC | ISEC |
| Dedicated/special purpose. | Y | PROP | PROP |
| **39. Signal line filters.** | | | |
| Installed on signal lines procured with project funds. | Y | CONF | CONF |
| Installed on signal lines procured with other than CONF project funds. | Y | PROP | PROP |
| **40. Uninterruptible power supplies.** | | | |
| Used in support of equipment procured with CONF project funds. | N | CONF | CONF |
| Used in support of equipment procured with USACECOM funds. | Y | ISEC | ISEC |
| Used in support of equipment procured with other than CONF project or USACECOM funds. | N | PROP | PROP |
| Used in support of a combination of equipment, some of which is procured with CONF project funds and some with other than CONF project funds. | N | CONF | CONF |

Legend for Table:
Abbreviation Definition
CONF Construction-funded
UMMCA Unspecified Minor Military Construction, Army
ISEC Information Systems Engineering Command NON-CONF (MDEP MU1U) funds
PROP Proponent of CONF project NON-CONF (MDEP MS4Z) funds
SUB Subscriber NON-CONF funds
Y Shall be included in DD Form 1391-EF, Section 17 (ISCE) (See footnote)
N Not to be included in the ISCE. (See para L-3.)
A Where intercommunication capability is provided integrally with the administrative telephone system, that capability will be funded integrally with the telephone system and included in the ISCE. When this capability is a separate system, it will not be in the ISCE.
B When cabling is common user, it will be included in the ISCE, otherwise it will not be included.

Notes:
[1] Cabling includes cable and the fittings, connectors, terminal strips, and similar devices needed to install cable. Cabling also includes wired-in equipment such as multiplexers and interface devices built into the system up to the outlet device plate when required to complete the transmission path to the user outlet. Cabling does not include servers, routers, brouters, gateways, and other user-specific equipment associated with LANs and WANs. Plug-in and other devices and wiring external to the user outlet are personal property, equipment-in-place, not CONF.
[2] For Defense Medical Facility (DMF) projects, the funding categories for "procure" and "install" will be CONF in lieu of that shown, in both columns.
[3] Voice or data switching equipment including line and trunk cards will not be included in the CONF cost of the facility in which they are located. Costs for such equipment will be listed as a separate line item entry under Section 17 of DD Form 1391-EF as USACECOM or proponent funded equipment as indicated.
[4] Conduit and tubing, junction and outlet boxes, under-floor duct systems, manholes, and so forth, comprising access systems for Information Systems are considered an integral part of a CONF facility, and are both procured and installed using construction funds.
[5] Funding sources shown apply to Government-owned, -operated, and -maintained entertainment television systems. Cable television systems, whose services would be procured on a subscriber basis, including all components and connection charges, are not CONF.
[6] For Army hospitals, fixed and portable radio paging equipment covered under SYSTEM/COMPONENT Item No. 11, paging systems, are authorized to be procured and installed with CONF funds, as an exception to the funding guidance shown for other radio systems.
[7] Testing and diagnostic equipment and special tools, necessary to operate and maintain systems and equipment that are both procured and installed with construction funds, and remain within the facility in which the construction funded systems and equipment are fixed, may be funded with construction funds. For example, diagnostic equipment for EMCS hardware or special wrenches required for a specific make and model diesel engine, for which no generic equipment or tool exists for use with other makes and models of systems or equipment.
[8] Costs associated with intrusion detection systems (IDS), although not included in Section 17 of DD Form 1391-EF cost displays, are to be included in Section 13 of DD Form 1391-EF for “other appropriations” cost display.
[9] Telephone outlets will be provided in the kitchen/dining/family area, living room, and all bedrooms. CAT 5 wiring will be utilized for the telephone wiring. In addition, cable TV outlets will be installed in the living room, family room and all bedrooms. No conduit is required in family housing unless the project involves multi-family or apartment units. In those cases, conduit would be installed from the building utility entrance point to each unit/apartment, but not throughout the unit (i.e., a minimal amount of conduit).
[10] Common-user line equipment for LANs (personal property) is considered to be only the router or other device providing connectivity to the installation backbone.

## Appendix M
## Authority for Approval of Changes to MILCON Projects Funded by MCA, UMMCA, and AFH Appropriations

### M–1. Changes associated with Military Construction, Army and Army Family Housing projects after budget lock

There are two types of changes associated with MCA, UMMCA and AFH projects:

*a. Mandatory changes.* Unavoidable changes required to provide a complete and useable facility. Such changes are caused by unforeseen factors discovered during design or construction (e.g. design oversights and errors, mandatory criteria changes, construction site conditions, or unavailability of materials). These changes include those absolutely necessary for completion of the project; but not those justified by improved efficiency of operation, maintainability, function or appearance.

*b. Discretionary changes.* Changes not absolutely required to provide a complete and useable facility which meets operational requirements. This would include any criteria changes that are not mandatory for ongoing projects and changes that would improve the

efficiency, maintainability, functionality, or appearance of the facility. Basically, any change that is not absolutely necessary is considered discretionary. Table M-1 summarizes the approval authorities for changes to MCA, UMMCA, and AFH projects.

**M–2. Approval of mandatory changes**
Approval follows USACE command lines to HQDA and the Congress, as appropriate for the funding authority required for mandatory changes.

**M–3. Approval of discretionary changes prior to budget lock**
MACOMs may normally approve changes during concept design (35 percent) or parametric design (5-15 percent) to incorporate user requirements prior to budget lock as long as the project meets the intent and general scope approved by the CRRC.

**M–4. Approval of discretionary changes after budget lock and prior to construction contract award**
MACOMs may approve discretionary changes, after budget lock and before construction contract award (but preferably before project advertisement), provided all conditions below are met. If any condition is not met, the change must be approved by HQDA (DAIM-FD).

*a.* The change is in accordance with technical criteria (normally published in USACE technical publications or Army technical manuals) and Army standards (standard designs, etc.).

*b.* The change does not cause the CWE to exceed the PA.

*c.* The change is within the scope of the DD Form 1391-EF presented to the Congress with the Budget Justification and does not cause a change in the scope of the project.

*d.* Incorporation of the change does not cause the scheduled award date to slip.

*e.* The total of discretionary changes does not cause any increase in the original design cost budget for the project.

**M–5. Approval of discretionary changes after construction contract award**
MACOMs may approve discretionary changes after construction contract award provided all of the conditions below are met. If any condition is not met, then the change must be approved by HQDA (DAIM-FD).

*a.* The cumulative amount of discretionary changes on the project does not exceed one percent of the initial contract amount (this is in addition to the USACE district's authority for mandatory changes).

*b.* The cost of a change includes design and delay costs, as well as, the direct cost of the change.

*c.* The change is in accordance with technical criteria and Army standards.

*d.* The change is within the scope of the DD Form 1391-EF presented to the Congress with the Budget Justification.

**M–6. USACE involvement in discretionary changes**
MACOMs and installations are required to obtain USACE district evaluation of proposed changes to include cost and time estimates and impacts. The USACE district evaluation and estimates must be included as supporting documentation for any approval request. HQDA may require HQUSACE to provide additional technical review on requests for approval. HQUSACE will ensure that funds are available in USACE districts to implement MACOM and installation approved changes. Funds for HQDA approved changes will be issued by HQUSACE to USACE districts at the time of approval.

**M–7. Relationship to Army approved standard designs**
Any changes that would cause a deviation from a standard design must also be approved in accordance with the procedures of the Army Standard Design Program.

**M–8. HQDA approval**
Requests for approval of changes that exceed the programming MACOM authority will be forwarded to HQDA (DAIM-FD).

**Table M–1**
**Approval Authority for MILCON Change Management - MCA, UMMCA, and AFH**

| | Design Changes (After Budget Lock) | | Construction Changes | |
|---|---|---|---|---|
| Approval Authority | Mandatory | Discretionary | Mandatory | Discretionary |
| USACE District | All changes IAW technical criteria, and within approved PA and scope. | No Approval Authority(Provides analysis to installations) | All changes within approved scope; and with a cumulative cost not to exceed 2 percent of the contract amount. | No Approval Authority(Provides analysis to installations) |
| USACE Division | Evaluates and forwards to HQUSACE. | No Approval Authority | Evaluates and forwards to HQUSACE. | No Approval Authority |
| HQUSACE | Approves changes either not IAW technical criteria; or cause the project CWE to exceed PA by no more than 15 percent or $1.5M, whichever is less. * | No Approval Authority | Approves changes either not IAW technical criteria; or cause the project CWE to exceed PA by no more than 15 percent or $1.5M, whichever is less. | No Approval Authority |
| Customer or Installation | No Approval Authority | Initiates request through Installation to MACOM | No Approval Authority | Initiates request through Installation to MACOM. |
| MACOM | No Approval Authority | Approves changes IAW technical criteria, and within approved PA and scope. | No Approval Authority | Approves changes IAW technical criteria; within approved scope; and with a cumulative cost not to exceed 1 percent of the initial contract amount. |
| HQDA and/or DASA-IH | Approves changes which are not within the approved scope, or which cause the project CWE to exceed PA by more than 15 percent or $1.5M, whichever is less. | Approves changes which are not IAW technical criteria, not within the approved scope, or which cause the project CWE to exceed the PA. | Approves changes which are not within the approved scope, or which cause the project CWE to exceed PA by no more than 25 percent or $2M, whichever is less. | Approves changes which are not IAW technical criteria, not within the approved scope, or have a cumulative cost exceeding 1 percent of the initial contract amount. |

**Table M–1**
**Approval Authority for MILCON Change Management - MCA, UMMCA, and AFH —Continued**

| | Design Changes (After Budget Lock) | | Construction Changes | |
|---|---|---|---|---|
| Approval Authority | Mandatory | Discretionary | Mandatory | Discretionary |
| Congress | Not Applicable | Not Applicable | Approves changes that cause CWE to exceed PA by 25 percent or $2M, whichever is less. | Approves changes that cause CWE to exceed PA by 25 Percent or $2M, whichever is less. |

Notes:

* Coordinate with DAIM-FD regarding scope and cost adjustment during budget markup to Congress. If the project CWE is more than 15 percent or $15 million over the PA (whichever is less), then all further user requested changes must be approved by ACSIM (DAIM-FD) even if the full one percent allotment has not been used.

# Glossary

## Section I
## Abbreviations

**AAFES**
Army and Air Force Exchange Service

**ABC**
automatic box conveyor

**ACSIM**
The Assistant Chief of Staff for Installation Management

**ADP**
automatic data processing

**AEI**
Architectural and Engineering Instructions

**A-E**
architect-engineer

**AFH**
Army family housing

**AHRP**
Army Housing Requirements Program

**ALRPG**
Army long-range planning guidance

**AMC**
Army Materiel Command

**AR**
Army Regulation

**ARB**
Army Resource Board

**ARNG**
Army National Guard

**ARSTAF**
Army staff

**ASA (FM&C)**
Assistant Secretary of the Army (Financial Management and Comptroller)

**ASA (IL&E)**
Assistant Secretary of the Army (Installations, Logistics, and Environment)

**ASD(HA)**
Assistant Secretary of Defense, Health Affairs

**BES**
budget estimate submission

**BRAC**
base realignment and closure

**BY**
budget year

**CAPCES**
Construction Appropriation, Programming, Control, and Execution System

**CCTV**
closed circuit television

**CDIP**
Combined Defense Improvement Program

**CFA**
Commission of Fine Arts

**CFR**
Code of Federal Regulations

**CINC**
commander-in-chief

**CIS**
capital investment strategy

**CONUS**
continental United States

**CRRC**
Construction Requirements Review Committee

**CSA**
Chief of Staff, Army

**CWE**
Current working estimate

**CZM**
Coastal zone management

**DA**
Department of the Army

**DARP**
Defense Access Road Program

**DASA**
Deputy Assistant Secretary of the Army

**DCSOPS**
Deputy Chief of Staff for Operations and Plans

**DDESB**
Department of Defense Explosive Safety Board

**DeCA**
Defense Commissary Agency

**DEPSECDEF**
Deputy Secretary of Defense

**DFAS**
Defense Finance and Accounting System

**DISC4**
Director of Information Systems for Command, Control, Communications, and Computers

**DMFO**
Defense Medical Facilities Office

**DOD**
Department of Defense

**DOIM**
Director of Information Management

**DPT**
Director of Plans and Training

**DPW**
Director of Public Works

**DRB**
Defense Resources Board

**DU**
decision unit

**DY**
design year

**ECAP**
Environmental Compliance Achievement Program

**ECIP**
Energy Conservation Investment Program

**EMCS**
Energy monitoring and control system

**EO**
Executive Order

**FCIP**
Federal Capital Improvements Program

**FM**
Field Manual

**FPC**
Force Protection Committee

**FPS**
Facility Planning System

**FRP**
Facilities Reduction Program

**FY**
fiscal year

**GOSC**
General Officer Steering Committee

**GY**
guidance year

**HEMP**
high altitude electromagnetic pulse

**HFPA**
Health Facility Planning Agency

**HNFCP**
Host Nation-Funded Construction Program

**HQDA**
Headquarters, Department of the Army

**HQUSACE**
Headquarters, U.S. Army Corps of Engineers

**HVAC**
heating, ventilating, and air conditioning

**IBE**
Installed building equipment

**IDG**
installation design guide

**IPC**
Information Processing Center

**ISCE**
information systems cost estimate

**ISEC**
Information Systems Engineering Command

**ISF**
information systems facility

**JFIP**
Facilities Improvement Program in Japan

**MACOM(s)**
major Army command(s)

**MBI**
major budget issue

**MCA**
Military Construction, Army

**MDEP(s)**
management decision package(s)

**MEDCOM(s)**
Medical Command(s)

**MED MILCON**
Medical military construction

**MILCON**
military construction

**MMSC(s)**
Major Medical Subcommand(s)

**MPI**
master planning instructions

**MSC**
major subordinate command

**MTMC**
Military Traffic Management Command

**MWR**
morale, welfare, and recreation

**NCPC**
National Capital Planning Commission

**NCR**
National Capital Region

**NEPA**
National Environmental Policy Act

**NLT**
not later than

**NRHP**
National Register of Historic Places

**OCONUS**
outside of the continental United States

**O&M**
operations and maintenance

**OMA**
Operations and Maintenance, Army

**OMB**
Office of Management and Budget

**OPA**
Other Procurement, Army

**OSD**
Office of the Secretary of Defense

**OSHA**
Occupational Safety and Health Act

**OTSG**
Office of the Surgeon General

**PA**
programmed amount

**PAX**
programming, administration, and execution

**PB**
President's Budget

**PBC**
Program Budget Committee

**PBD**
Program Budget Decision

**PBG**
Program Budget Guidance

**PDM**
Program Decision Memorandum

**PEG(s)**
program evaluation group(s)

**POM(s)**
Program Objective Memorandum(s)

**PPBES**
Planning, Programming, Budgeting, and Execution System

**PRB**
Project Review Board

**PY**
program year

**RDTE**
research, development, test, and evaluation

**RPMP**
Real Property Master Plan

**RTLP**
range and training land program

**SA**
Secretary of the Army

**SECDEF**
Secretary of Defense

**SES**
senior executive service

**SOFA(s)**
Status of Forces Agreement(s)

**SRC**
short range component

**TAP**
The Army Plan

**TM**
technical manual

**TOA**
total obligation authority

**TSG**
The Surgeon General

**UFAS**
Uniformed Federal Accessibility Standards

**UFR**
unfunded requirement

**UMCS**
utility monitoring and control system

**UMMCA**
Unspecified Minor Military Construction, Army

**UPH**
unaccompanied personnel housing

**USACE**
U.S. Army Corps of Engineers

**USACECOM**
U.S. Army Communications-Electronics Command

**USAISEC**
U.S. Army Information Systems Engineering Command

**USAR**
U.S. Army Reserve

**USC**
United States Code

## Section II
## Terms

**Army installation**
An aggregation of contiguous or near contiguous, common mission supporting real property holdings under the jurisdiction of the DOD or a State, the District of Columbia, territory, commonwealth, or possession, controlled by and at which an Army unit or

activity (active, USAR, or ARNG) is permanently assigned.

**Army Stationing and Installation Plan (ASIP)**
The official document and database that reflects the authorized planning populations for Army installations.

**Construction**
*a.* The erection, installation or assembly of a new facility.
*b.* The acquisition, expansion, extension, alteration, conversion or replacement of an existing facility.
*c.* The relocation of a facility from one installation to another.
*d.* Installed equipment made a part of the facility, related site preparation, excavation, filling, landscaping or other land improvements.

**Discretionary Changes**
These are changes that are not absolutely required to provide a complete and useable facility which meets operational requirements. This would include: any criteria changes that are not mandatory for ongoing projects; changes that would improve the efficiency, maintainability, function, or appearance of the facility. Basically, any change that is not absolutely necessary is considered elective or discretionary.

**Environmental compliance**
Any activity designed to correct deficiencies in order to comply with existing environmental standards and costs to meet new standards, and other environmental compliance, prevention and conservation costs.

**Environmental Restoration**
Any activity designed to investigate and remediate pollution from past operations, primarily at sites on the National Priorities List.

**Facility**
Any interest in land, structure, or complex of structures together with any supporting road and utility improvements necessary to support the functions of an Army activity or mission. A facility includes the occupiable space it contains. The class of facility is identified by a five digit construction category code. (Refer to AR 415-28.)

**Installation commander**
Commanding officer of an installation. The commander of a military table of organization and equipment or table of distribution and allowance unit or activity who does not otherwise have responsibility for land, buildings, and fixed improvements is not an installation commander.

**Installation Design Guide (IDG)**
A document prepared by an installation that provides specific guidance on the exterior and interior design parameters for the installation. All installation improvements, renovation projects, and new construction must comply with the IDG. It may be as simple or as comprehensive as desired to achieve aesthetically pleasing working and living environments.

**Integrated Facilities System (IFS)**
An automated information evaluation system that encompasses life cycle management of real property resources. It is also the source of the installation real property inventory.

**Mandatory Changes**
These are unavoidable changes that are required to provide a complete and usable facility. Such changes are caused by unforeseen factors discovered during design (e.g. design oversights/errors or mandatory criteria changes) or construction (e.g. changed site conditions or unavailability of materials). These changes do not include enhancements or improvements that are not absolutely necessary for completion of the project; even those justified by improved efficiency of operation, maintainability, function or appearance.

**Master Planning Instructions (MPI)**
Master planning implementing information published by USACE that prescribes supplemental guidance and procedures for the development of RPMPs.

**Military Construction (MILCON)**
Any construction, development, conversion, or extension of any kind carried out with respect to a military installation. (See 10 USC 2801.)

**Military Construction, Army (MCA)**
The program by which Army facilities are planned, programmed, designed, budgeted, constructed, and disposed of during peacetime and under mobilization conditions. The program also includes the acquisition of real estate and other supporting activities.

**Military construction project**
All military construction work, or any contribution authorized by this regulation, necessary to produce a complete and usable facility or a complete and usable improvement to an existing facility.

**National Capital Region**
The National Capital Region is defined as the District of Columbia; Montgomery and Prince George's Counties in Maryland; Arlington, Fairfax, Loudoun, and Prince William Counties in Virginia; and all cities and towns within the geographic area bounded by the outer boundaries of these counties.

**Phasing of Construction**
The process of breaking a complete project into sequential tasks, such as foundation, superstructure, exterior and interior finish work, and site improvement. One "phase" without companion "phases" will not produce a complete and usable project. This is not to be confused with incremental construction.

**Planning, Programming, Budgeting, and Execution System (PPBES)**
The Army's primary resource management system that is now in a biennial cycle. It constitutes a major decision making process. It ties planning, programming, and budgeting together. It forms the basis for building a comprehensive plan in which budgets flow from programs, programs flow from requirements, requirements from missions, and missions from national security objectives. The patterned flow, from end purpose to resource cost, defines requirements in progressively greater detail. The system integrates centrally managed programs for manpower; research, development, and acquisition; and stationing and construction. The system also integrates the O&M budgets of the MACOMs and operating agencies, and MACOM needs for manpower, housing, and construction. It supports budget preparation from installation to departmental level. It reviews execution of the approved program budget by both headquarters and field organizations. During execution, it provides feedback to the planning, programming, and budgeting process.

**Pre-Wired Workstations**
A workstation which should include posts, panels, partitions, wiring for electricity and communications, task lighting, and partition-hung components to support individual and group efforts. Both panel-to-panel and post-to-panel systems are acceptable. Additional system components are ambient lighting and partition supported files. A pre-wired workstation should, at a minimum, provide for the following functions: (1) An acoustically treated enclosure defining the limits of an individual or a shared use workstation. (2) Adequate work surfaces to accommodate the individual's equipment, writing, and work layout needs. (3) Storage space for individual files and supplies. (4) Task lighting and electrical and communications outlets to support the individual's equipment. Pre-wired workstations do not include movable furniture and furnishings such as chairs, stand alone file cabinets, coat hooks or racks, name tags, in and out file trays, and other similar accouterments.

**Program and Budget Guidance**
Resource guidance for MACOMs, program executive offices, and other operating agencies. The guidance covers force structure and associated manpower, appropriations of immediate interest, such as OMA, MCA, and AFH, procurement appropriations, and construction using trust funds and non-appropriated funds. It is published five or six times during the biennial PPBES cycle; in January soon after the PB goes to the Congress, in the spring following publication of TAP, and in the fall to record results of resource management updates and probable fiscal guidance. In the second year of the PPBES cycle, the President may submit an amended budget, and if so, HQDA will issue a PBG with updates. A PBG reflecting the new program follows submission of the POM in the spring,

and a fall PBG reflects Army budget estimates.

**Real Property Master Plan (RPMP)**
The installation commander's plan for management and development of the installation's real property resources. It analyzes and integrates the plans prepared by the installation and other garrison and tenant activities, higher headquarters, and neighboring communities to provide for orderly development of real property resources. A complete RPMP forms the foundation for the development for all peacetime facility management and construction development activities on the installation.

**Tenant unit, agency, or activity**
A unit, agency, or activity of one command that occupies facilities on an installation of another command and receives support services from that installation.

**The Army Plan**
A plan that documents Army policy and provides resource guidance. It outlines national military strategy and security policy for the Army, states the Army's priorities within expected resource levels and guides development of the total Army program and budget. It records the Army objective force and provides additional guidance for bridging the gap between the planning force and the programmed force.

## Section III
## Special Abbreviations and Terms

**ABS**
amended (or abbreviated) budget submission

**ASA(FM&C)**
Assistant Secretary of the Army (Financial Management & Comptroller)

**CEMP**
Corps of Engineers Directorate of Military Programs

**HQIFS**
Headquarters Integrated Facilities System

## Index

This index is organized by topic and subtopic. Topics and subtopics are identified by paragraph number.

**Additive bid items, 1-6, 5-11**
**Advertising for bids, 5-11, 5-12, 5-19, D-1**
**Amended/abbreviated budget review, 1-5, 4-6**
**Ammunition**
and Explosive Safety Standards, 2-2
facilities, K-3
movable, K-25
operations, K-25
procurement of, F-2
responsibilities for facilities, 1-19
storage facilities, 1-19
using funds for construction, 1-6
**Appropriation**
and authorization, 4-7
annual, 1-6
AFH, 1-7, K-6
authority for approval, appendix M
Congressional guidance, C-2
contributions, K-26
critically short, 5-11
for construction, 1-6, 1-15, 3-2, C-5
for military functions, 5-1
House and Senate, 5-16, 5-19
lump sum, 5-16
maintenance, D-1, K-36
MCA, F-2, H-2, K-6, K-28
MDEPs, 3-2, 3-10
MILCON, 2-5, 5-16, 5-16, D-1,
MILCON Subcommittees, 5-16
other, 1-6c, K-34, K-34
O&M, 3-5
project controls, 1-14
single year, 3-2, K-37
UMMCA, 1-6
**Approval authority for UMMCA, 1-6, 1-31**
**Archaeologically significant area, 3-3**
**Architect-Engineer (A-E), contracts, 3-9, 5-4, 5-5**
**Architectural and Engineering Instructions (AEI)**
construction procedures, 1-1
pre-design activities and AEI Design Criteria, 5-7
**Army and Air Force Exchange Service, 1-9, 1-21**
**Army Commanders' Conference, 3-10**
**Army Environmental Compliance Achievement Program, 1-10**
**Army facilities standardization, 1-19, 1-21**
**Army Family Housing (AFH)**
additive bid items for (O&M), 5-11
authorization and appropriation, 4-7
budget estimate, 1-18
construction program, 1-7
cost increases, 5-16
design and construction, 1-1
MACOM certification, 3-6, 3-7
review and certification, 5-6
responsibilities for, 1-18
scope variation, 5-16
statutory constraints, 1-31
**Army Master Range Program (AMRP), 1-17**
**Army National Guard (ARNG),**
proponency for MILCON, 1-19
**Army staff (ARSTAF)**
Commander USACE relation to, 1-21
facility proponents represented in PEGs, 3-10
**Army Stationing and Installation Plan (ASIP), information for DD Form 1390-EF, 4-3**
**Assistant Chief of Staff, Installation Management**
MILCON PPBES execution and responsibilities, 1-18
projects responsible for, 1-18
**Assistant Secretary of the Army (ASA)**
**ASA (IL&E), 1-14**
**Assistant Secretary of Defense (Health Affairs) (ASD(HA))**
Defense Medical Facilities Office (DMFO), 1-20, 1-21
medical program funding, 1-8
**Authority**
advertising, 5-19, D-1
approval to changes to MILCON, appendix M
construction, 1-6, appendix D
delegation of, 5-2
design, 3-5, 5-4, B-2
obligation, 1-4
release, 1-18
statutory, 1-6, 1-31
unlimited, 5-16
**Authorization, design, 3-3, 3-8, 3-9**
**Automatic data processing facilities, 1-19**

**Base Realignment and Closure (BRAC), funds for, 1-1**
**Basis of design, 5-7**
**Bid**
advertising, award, and obligation, 5-12
items, additive, 5-11
savings, 5-16
**Budget**
DAIM involvement with, 1-18
Commander, USAISEC, responsibilities, 1-29
Estimate, Army, 1-4, 1-5
estimates, Army approval of, 4-4
Guidance Manual, 1-5
MACOM POM submission, 1-22
overview, 1-5
review by OSD-OMB, 4-5
year, 1-5
**Budget Estimate Submission (BES)**
approval, 4-5
part of MILCON process, 1-5
**BY (Budget Year)**
MILCON presentation during, 1-5
PPBES resource accounting, 1-4
TOA estimates for President's Budget, 1-4, 4-6

**Capital Investment Strategy (CIS), 2-1**
**Certification**
USACE, 1-22, 3-3, 3-5
MACOM, 3-6
**Change, scope or 1-22, 1-26, 3-8, 5-7**
**Chapel, churches, and religious facilities**
furnishings, 1-19
responsibility of CCH for, 1-19
**Chemicals**
storage facilities, 5-2
toxic, 5-5, 5-6
**Chief, Army Reserve responsibility for MILCON categories, 1-24**
**Chief of Chaplains responsibility for MILCON categories, 1-19**
**Chief National Guard Bureau, projects responsible for, 1-25**
**Codes, design, 5-4**
**Commander In Chief (CINC)**
influence in PPBES, 1-4
integrated priority list, 3-10
MBI support of, 4-5
OSD program review, 3-11
program review proposals, 3-11
**Commission of Fine Arts (CFA)**
requirements applicable to, 1-1
review of NCR projects by, 5-5
**Community facilities**
Army approval of BES, 4-4
Deputy Chief of Staff for Personnel responsibilities, 1-19
Installation commanders responsibilities, 1-30
**Completion of project, 5-18**
**Comptroller, DOD, budget review, 3-11**
**Concept design**
authorization by MILCON, 3-9
final design based on, 5-9
general requirements, 5-7
governed by scope and cost, 5-3
health care facilities, 1-20
review and approval, 4-2
Congress, Senate
acts of, for Army construction, 1-6, 3-1
authorization to use funds, 4-7
budget estimates presented to, approved by, 1-18
cost increases, 5-16
guidance, 1-6
incrementally funded projects submitted to, 3-2
MACOM commander justification to, 1-22
medical facility program submitted to, 1-20
President's Budget, justification book for, 4-6
reviews by, 1-5
scope variation notification, 5-17
States, authority from, 1-32
**Conjunctive funding, 3-2**
**Conservation, energy, 1-6, 1-19, 5-7**
**Consideration of alternatives, 1-6, 1-22**
**Construction**
additive bid items, 5-11
agent, 1-21
appropriation funds control, 1-15
Army and Air Force Exchange Service (AAFES) facilities, 1-9
Army family housing, 1-7
conjunctively funded, 3-2
contingency, 1-6
cost estimates, 5-10
cost increases, 5-16
defense medical facilities, 1-8
definition of, 2-3
emergency, 1-6, 5-19
final design, 5-9
funds, availability of, 1-6
health care facilities, 1-21
host nation funded, 1-11
incrementally funded, 3-2
information systems requirements, 1-30
policy and program direction, 1-15

pre-design activities and AEI Design Criteria, 5-6
project, 5-13
site approval, 2-2
**Construction Appropriation, Programming, Control, and Execution System (CAPCES)**

**HQDA (DAIM-FD) provisions, 3-10**
revision by HQDA during project selection, 3-4, 3-10
review of MACOM projects, 1-5
updating, 3-2

**Contaminants and pollutants, 3-3**
**Cost**
additive bid items, 5-11
adjustments by OSD comptroller, 4-5
A-E contracts, 5-5
BES cost approval, 4-4
DAIM-FD justification book by, 4-6
DD Form 1391-EF specified, 3-2, 3-9, 5-6, 5-9
design authorization, 3-8, 3-9, 5-4
effective alternative, 2-1
engineering, 3-5, 5-2, 5-3
estimates, 1-5, 1-28, 4-2, 5-10
information systems, 1-26
HQUSACE guidance on, 5-3
HQUSACE responsibility, 1-21
increases, 5-16
incremental funding cost estimates, 3-2
limitations, additive bid items, 5-11
life-cycle cost analysis, 5-7
MACOM POM quoted, 3-2
overruns or scope variations, 1-19, 5-7, 5-17
pre-design, 5-4
project construction, 5-13
project greater/less than $300,000, 1-1, 1-6, 3-9, 5-5
project greater/less than $1.5 million, 1-6
project greater than $2 million, 1-21, 5-3
reduction, 5-5
revised, 3-8
value engineering, 1-21
**Construction Requirements Review Committee (CRRC)**
approval for HQUSACE to issue design code, 1-5
ARSTAF Agency as member of, 1-18
HQDA (DAIM-FD) provisions, 3-8
MACOM presentation to, 3-9
review of MACOM projects, 1-5
TSG presents program to, 1-20
**Current Mission Revitalization Investment Streams, 3-2**
**Current Working Estimate (CWE), 1-21, 5-6, 5-7, 5-10, 5-16**
**Current Year (CY)**
defined, 1-4
PB estimates for, 4-6

**DA Standard Designs**
ARSTAF role in development, 1-21
deviations from, 1-22
use of, 5-3
**DD Form 1390-EF**
BES and PB, part of, 4-1
preparation of by HQDA and information sources, 4-3
DD Form 1391-EF
BES and PB, part of, 4-2
cost estimate information for, revision of, 5-10
CRRC review of, 3-8
conjunctive funding information inclusion on multiple forms, 3-2
defined, 2-4
justification block reviewed prior to submission to OSD, 4-2
MACOM directive to installations to complete, 3-3
nonstandard design statement, 5-3
OSD justification book by, 4-4
pre-concept design document item, 5-6
revision to, 5-7
scope and cost specified on/compliance with, 3-9, 5-9
submission of, 3-2, 3-8
USACE guidance, 5-3
USACE Commander, review by, 1-21
USACE district commanders review of project scope based on, 1-21
USACE review of, 5-7
USACE district ensures compliance with, 5-7
**DD Form 1523**
required for family housing projects, 2-4
**Damaged or destroyed facilities, MCA fund used for, 1-6**
**Deputy Chief of Staff for Intelligence, responsibilities, 1-19**
**Deputy Chief of Staff for Logistics (DCSLOG), responsibilities, 1-19**
**Deputy Chief of Staff for Operations and Plans (DCSOPS), responsibilities, 1-19**
**Deputy Chief of Staff for Personnel (DCSPER), responsibilities, 1-19**
**Defense Commissary Agency (DeCA), H-4**
**Declaration of War, 1-6**
**Defense Access Road Program (DARP)**
eligibility, 1-28
MTMC responsibilities, 1-28
overview, 1-6
**Defense Medical Facilities Office (DMFO), 1-20, 1-21**
**Defense Resources Board (DRB)**
PRP development, 3-11
SECDEF final budget decisions, 4-5
**Deferrals, project, 1-6**
**Demolition, 1-1, 5-2**
**Department of Defense Explosives Safety Board (DDESB), 5-6**
**Deputy Secretary of Defense (DEPSECDEF)**
budget approval, 3-11, 4-1
budget revision approval, 4-5, 5-3
OSD program review, 3-11
**Description of proposed construction**
environmental considerations, 1-10
pre-design activities and AEI Design Criteria, 5-6
project selection process, 3-3
**Design**
Army family housing, 1-1
authorization, 3-8, 3-9
codes, 5-4
concept, (See Concept Design)
conferences, 1-21, 1-26
costs, (See Cost)
criteria, 1-1
directives, code numbers, 5-4
drawings, plans, 5-7, 5-13, 5-18
final, 1-5, 1-26, 3-5, 5-3, 5-4, 5-9
HQDA approval, 1-5
interior, 5-5
management, 5-3
pre-concept, 5-6
programming process, 1-5
repetitive facilities, 1-19, 1-21
scope, 1-1
standards, (See Standards)
year (DY), 1-5, 3-8, 4-2
**Design Year (DY)**
documentation submission schedule, 3-8
MILCON process phase, 1-5
**Director of the Army Budget (DAB), BES assistance on, 4-4, 4-5**
**Director of Information Systems for Command, Control, Communications, and Computers, 1-19**
**Director, Program Analysis and Evaluation (DPAE), 3-10**
**Disposal of structures, 5-2**
**Documentation**
Commander USACE review, 3-5, 4-6
concept design, 5-7
final revisions, 4-2
Installation commanders submission, 1-26
MACOM commanders preparation, review, submission, 1-22, 3-3, 3-4, 3-6, 3-8
OSD budget review, 4-5
pre-concept design, 5-6
pre-design activities and AEI Design Criteria, 5-6
project programming, 2-4
real property master planning, 2-1
USACE district commanders preparation and review, 1-21
**DOD Comptroller, budget review by, 3-11, 4-5**

**Economic factors**
A-E contract limitations, 5-5
concept design, part of, 5-7
documentation of, 2-4
energy conservation, 1-6
**Emergency, construction, 1-6, 5-16, 5-19**
**Endangered species, 3-3**
**Energy**
alternative, 5-6
concept design studies, 5-7
conservation, 1-6
DISC4 responsibilities for conservation, 1-19
sources, renewable, 5-10
**Energy Conservation Investment Program (ECIP)**

**general, 1-6**

**Environmental**
Assistant Chief of Staff, Installation Management responsibilities, 1-19
documentation on, 2-4, 5-6
laws, regulations, 1-18
MACOM project review, 3-3
permits, 5-5
site approval, 2-2
statutory constraints, 1-32
USACE commanders responsibilities, 1-21
**Environmental Compliance Achievement Program (ECAP), 1-10**

**Equipment**
computer, 3-2
conjunctive funds for computer, 3-2
fund switching, 1-29
installed, 2-3
in-place, 5-11
test, 1-6
**Estimates**
Army budget, 4-1
budget, Army approval of, 4-4
cost, 1-5, 1-18, 3-2, 4-4, 5-10, 5-16
information systems, 1-29
revised, 3-10
**Exchange facilities, 1-9**
**Execution phase of MILCON, 1-1**
**Explosives**
safety standards, 2-2
waste, 3-3

**Facilities**
AAFES facilities construction program, 1-9
community, 1-30
defense medical facilities construction program, 1-8
health care, 1-20, 1-27
incrementally funded, 3-2
MILCON, 1-21
repetitive, 1-19
restoration or replacement of damaged or destroyed, 1-6
Standardization Program, 1-19, 1-22, 3-3
test, 1-6
types of 1-19
**Family housing, 1-1, 1-14, 1-19, 1-31, 2-4**
**Federal Capital Improvement Program (FCIP), requirements for submission, 1-1**
**Final design, 1-5, 1-26, 3-5, 5-3, 5-4, 5-9**
**Fire**
plans, in concept design, 5-7
stations, 1-19
**Floodplains and wetlands, 3-3**
**Force protection, 1-19, 1-21, 1-26, 3-3, 5-7, 5-8, K-19**
**Funding**

**ECIP projects, 1-6**
emergency construction, 1-6, 5-19
guidance on, 2-1
incremental, 3-2
multiple source (conjunctive), 3-2
planning activities, 2-5
public highway improvements, 1-6
restoration of damaged or destroyed facilities, 1-6

**Guidance Year (GY)**
general, 1-5
MACOM documentation due date, 3-8
resolution date for authorization issues, 3-9

**Hazardous wastes, 5-5**
**Headquarters Integrated Facilities System (HQIFS), 4-3**
**Health care facilities**
Commander MEDCOM responsibilities, 1-27
Commander USACE responsibilities, 1-21
TSG proponency for, 1-19, 1-20
**Health Facility Planning Agency (HFPA), 1-27**
**Heating, ventilation, air conditioning (HVAC)**
concept design, description in, 5-7
pre-concept design, description in, 5-6
**High Altitude Electromagnetic Pulse (HEMP) shielding, 2-3**
**Highways, public, 1-6**
**Hospitals (See Health care facilities, Medical facilities)**
**Host Nation-Funded Construction Program (HNFCP), 5-2**
**Housing**
documentation, 2-4
family, 1-7, 1-15
project programming, 1-14
unaccompanied personnel, 4-4
statutory authority, 1-30

**In-process review (IPR), SA and CSA led, 3-10**
**Incremental funding, 3-2**
**Information Systems (IS)**
Assistant Chief of Staff, Installation Management responsibilities, 1-18
Cost Estimate, 5-10
DISC4 responsibilities, 1-16
USAISEC responsibilities, 1-29
installation commanders responsibilities, 1-26
MACOM POM submission, 3-2
**Installation Commanders, 1-26**
**Installation Design Guide, 1-26, 5-3, 5-6, 5-7**
**Installation master plan, 1-22**
**Installed building equipment (IBE), 2-3**
**Interior design, 5-5**
**Inspection, A-E fees for construction, 5-5**
**Integrated Priority Lists (IPL), 3-10**
**Interior Design, 5-5**

**Joint Strategic Planning System (JSPS), 1-4**

**Land acquisitions, training purposes, 1-19**
**Landscaping, land improvements**
concept design, 5-7
project definition includes, 2-3
**Long Range Construction Program**
TSG responsibility, 1-20

**Major Army Command (MACOM)**
commanders responsibilities, 1-22
engineer project certification, 3-6
POM submission, 3-2
project submission, 3-8
project selection, 3-4
project review, 3-3
**Major budget issue (MBI), 4-5**
**Management Decision Package (MDEP), 1-22, 3-2, 3-3, 3-4, 3-10**
**Medical mobilization construction plan (MEDCOM-MP), 1-20, 1-27**
**Military construction (MILCON)**
ARSTAF officials responsibilities for, 1-19
budget estimates, 4-1, 5-10, 5-16
budget, President's, 4-6
budget review, 4-4, 4-5
definition, 1-1
design authorization, 3-9
funds for projects, 1-6
installation commanders responsibilities, 1-26
limitations, 1-1
MACOM responsibilities, 1-22
POM submission, 3-1, 3-2
programming process, 1-5
project completion, 5-19
project execution, 5-2
project review by MACOM, 3-3
project selection by MACOM, 3-3
RPMP process, 2-1
statutory authority, 1-30
USACE responsibilities, 1-21, 3-5
**Military Construction, Army (MCA)**
authorization, 1-6, 1-31
cost increases, 5-16
funding, 1-31, 3-9
general, 1-1
review and certification, 3-5, 3-6
**Military Traffic Management Command (MTMC), 1-28**
**Mobilization**
Groups, 5-10
medical, 1-20, 1-21, 1-27
**Modification of facility, 5-16**

**National Capital Planning Commission (NCPC), 1-1, 1-31, 5-5, 5-12**
**National Capital Region (NCR), 1-1, 1-31, 2-1, 5-5, 5-12**
**Nonappropriated Funds (NAF), 1-6**

**Operation and Maintenance, Army (OMA), 1-6**
**Operation and maintenance (O&M), funds used for minor construction, 1-6**
**Ordnance and Explosive Waste, 3-3**
**Other Procurement Army (OPA), 3-2**
**Outline specifications**
required in concept design, 5-7

**Personal property**
additive bid items, 5-11
project definition, 2-3
**Physical security**
concept design discussion of, 5-7
DCSOPS responsibilities for, 1-19
Installation commanders responsibilities, 1-26
**Planning, Programming, Budgeting, and Execution System (PPBES)**
Army programming, 3-1
DAIM responsibilities, 1-18
explanation of, 1-4
review, Army, 3-10
RPMP support for, 2-1
**Pollution**
A-E contracts, 5-5
environmental compliance program, 1-10
**Postal facilities, 1-19**
**President's Budget (PB)**
BES as part of, 4-1
general, 4-6
OSD revisions prior to submission of, 1-5
resource position as POM baseline, 3-10
**Program**
appropriations that provide for construction, 1-6
Army and Air Force Exchange Service (AAFES) facilities construction, 1-1, 1-9
Army Environmental Compliance Achievement Program, 1-10
Army family housing construction, 1-1, 1-7
Budget Committee, 1-6
DA facilities standardization, 1-19, 1-21, 1-22, 3-3

defense access road, 1-20
defense medical facilities construction, 1-1, 1-8, 1-20
development, 3-10
host nation funded construction, 1-11
long range construction, 1-20, 1-27 phase of MILCON, 1-5
review, OSD, 3-11
unspecified minor MCA, 1-6, 1-31
**Program Budget Committee (PBC), 1-6, 1-22**
**Program Budget Decisions (PBD)**
budget reviews, 1-5, 4-5
cycle, 5-3
OSD review, 4-6
**Program Budget Guidance (PBG)**
as POM baseline, 3-10
guidance from, 1-5, 1-22
**Program Decision Memorandum (PDM)**
BES, relation with, 1-5
OSD review results, 3-1
signing of as POM approval, 3-11
**Program Evaluation Group (PEG), 3-10**
**Program Objective Memorandum (POM)**
Army programming, 3-1, 3-10
CINC operational requirements integrated into, 1-4
HQDA agencies consideration of, 4-4
MACOM commanders' responsibilities for, 1-22, 2-4, 3-2, 3-3, 3-4
review by OSD, 3-11
ASA (IL&E) project controls, 1-14
schedule of submitting, 1-5
**Program Review Proposal (PRP), OSD program review alternatives, 3-11**
**Program year (PY), 1-5**
**Programmed Amount (PA)**
increases/decreases, 5-16
scope and cost, 3-9
UMMCA programs, 1-6, 1-22
value engineering, 5-3
**Programming, Administration, and Execution (PAX) System, 2-4, 3-4, 3-8**
**Project**
certification, 3-6
completion, 5-18
construction, 5-13
deferrals, 1-6, 4-5
definition, 2-3
programming documentation, 2-4
review, MACOM, 3-3
revisions, 4-2
selection of, 3-4
submission schedule, 3-8
USACE review, 3-5
**Project Review Board (PRB), 1-5, 3-8**
**Proposed construction, description of**
project selection process, 3-4
site approval, 2-2
**Provost Marshal/Security Officer, 5-6**
**Public**
highways, 1-5, 1-6
law, 1-31

**Radon mitigation, 5-2**
**Range and training land**
Army Master Range Program, 1-17d
assets, 1-23f
plans, 1-24b
projects, 1-17b, 1-22d, 1-25a, 2-4c
program, 1-17b, 1-22d, 1-25a, 2-4c
program coordinator, 1-23a
range construction, 1-23c
ranges, types of, 1-26k
requirements, 1-22n, 1-24c, 1-25a
systems, H-2
**Real estate**
acquisition of, 1-1, 5-9
decision unit, 4-4
management of, 1-21
**Real Property Master Plans (RPMP)**
defining projects, 2-3
documentation developed from, 1-21, 1-22
Installation commanders' responsibilities, 1-30, 2-1
major medical subcommands responsibilities, 1-8
mobilization component, 1-21
site approval, 1-26, 2-2, 3-3, 3-6
**Recreational facilities, 5-2**
**Related projects**
cross referencing, 3-2
documentation, 2-4
**Religious facilities, 1-19**
**Renewable energy sources, 5-10**
**Repair/restoration/replacement projects, 2-3**
**Repetitive designs**
DA staff agencies responsibilities, 1-19
development of, 1-21
**Research, development, test, and evaluation (RDTE) facilities, 1-6**
**Review**
amended/abbreviated budget, 1-5 and Approval Process, 3-3
Army program development, 3-10
certification, 3-5
construction issues, 1-19, 1-21
DAIM program, 1-18
MACOM project, 3-3
National Capital Planning Commission/ Commission of Fine Arts, 5-5
OSD program, 1-5, 3-2, 3-11
OSD/OMB budget, 4-1, 4-5
process, 1-5
project, 1-14
project sitings, 1-21
T.G. responsibilities, 1-20
USACE responsibilities, 3-5
**Revitalization**
investment streams/accounts, 3-2
whole-neighborhood projects, 1-7
**Risk analysis, 5-6**

**Scope variations, guidance for, 5-17**
**Secretary of the Army (SA)**
approval of emergency construction, 1-6, 5-19
approval of medical facility projects, 1-20
approval of the Army program, 3-10
approval of MILCON projects, 4-4
authorizing funds for repairs, 1-6
budget review by, 4-1
meet with CSA and SECDEF at end of PBD cycle, 4-4
**Secretary of Defense (SECDEF)**
approval authority, 1-6
approval of POM, 3-1
DRB decisions, 4-5
guidance on PPBES, 1-4
MILCON program reviews, 1-5
**Security, physical**
concept design discussion of, 5-7
DCSOPS responsibilities for, 1-19
Installation commanders' responsibilities, 1-26
**Short Range Component (SRC)**
certification and submission, 2-4
site location contained in, 2-2
**Site approval, 1-30, 2-2, 5-7**
**Six Year Plan, Army Medical, 1-8**
**Standards/Standard Designs**
Army family housing, 1-7
ARSTAF role in development, 1-19
design management, 5-3
deviations from, 5-7
MACOM commanders ensure usage, 3-3
USACE Commander role in development/ implementation, 1-21, 5-3
**Status of MILCON programming, DAIM reports to CECOM, 1-18**
**Statutory**
authority, 1-31
limitations, 1-6, 1-19, 3-2, 5-5, 5-11
**Storage and supply facilities, 1-19**
**Surgeon General, The (TSG)**
medical projects programming, 1-8
responsibilities, 1-19, 1-20

**The Army Plan (TAP)**
guidance on by DAIM, 1-18
guidance on by MACOM commanders, 1-22
publishing, 1-5
**Tenant projects**
commanders of tenant activities responsibilities, 1-30
concept design, 5-7
installation commanders responsibilities, 1-26
MACOM commanders responsibilities, 1-22
**Total Obligation Authority (TOA)**
budget estimates for PB, 4-6
loss of, 4-5
MACOM commanders responsibilities, 3-4
PPBES coverage, 1-4
**Toxic chemicals, 5-2**
**Traffic, concept design, 5-7**
**Training**
budget for, 4-4
facilities, 1-19, 1-20, 1-21, 1-27
land acquisition for, 1-19
preparation of DD Forms 1390-EF and 1391-EF, 1-21
**Transfer of completed work, to installation commander, 5-18**

**Unaccompanied personnel housing and guest housing**
budget justification, 4-4
DCSPER responsibility for, 1-19
**Unawardable additive bid items, 5-11**
**Urgent/unforeseen construction requirements, 1-6, 1-22**
**Unspecified Minor Military Construction Army (UMMCA)**
appropriations for, 1-1, 1-6
cost variation, 5-16
HQDA review, 3-10
MACOM commanders responsibilities, 1-22
statutory authority, 1-31

**User Requested Change Review and Approval Process, 5-9**
**Utilities**
budget estimate justification, 4-4
projects, 1-19

**Value Engineering, study for projects over $2 million, 1-21, 5-3**

**War, declaration of, 1-6**
**Waste (See Hazardous wastes)**
**Wetlands and floodplains, 3-3**

# USAPA

ELECTRONIC PUBLISHING SYSTEM
TEXT FORMATTER ... Version 2.56

| | |
|---|---|
| PIN: | 003261–000 |
| DATE: | 10-15-98 |
| TIME: | 08:16:06 |
| PAGES SET: | 54 |
| DATA FILE: | ar415-15.fil |
| DOCUMENT: | AR 415–15 |
| DOC STATUS: | REVISION |

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE | PAGE 1 OF PAGES 2

2. AMENDMENT/MODIFICATION NO.: 56WCNA100006 Task Order

3. EFFECTIVE DATE: 10/01/90

4. REQUISITION/PURCHASE REQ. NO.: NAAW6600100015

5. PROJECT NO. (If applicable)

6. ISSUED BY — CODE: CC31:RFA

U.S. Department of Commerce, NOAA
Central Administrative Support Center
601 East 12th Street, Room 1756
Kansas City, MO 64106

7. ADMINISTERED BY (If other than Item 6) — CODE

8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code)

Fluor Daniel, Inc.
4600 Madison Avenue, Suite 900
Kansas City, MO 64112

CODE | FACILITY CODE

9A. AMENDMENT OF SOLICITATION NO.

9B. DATED (SEE ITEM 11)

X 10A. MODIFICATION OF CONTRACT/ORDER NO.: 50-WCNA-6-06099

10B. DATED (SEE ITEM 13): May 30, 1987

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning ______ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

1WA70008M2L34PS 2517 $545,400.00

13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| (✓) | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| X | D. OTHER (Specify type of modification and authority) Task Order Number Six (0006) in accordance with Task Order Clause B.7 of the contract. |

E. IMPORTANT: Contractor ☒ is not, ☐ is required to sign this document and return ______ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

This task order is issued in order to cover the interim period of October 1, 1990 through December 15, 1990, or until task order 7 through 13 can be issued.

The work to be performed during this period is a continuation of the previous task orders of the contract. The scope of work by paragraph is included as an attachment.

Estimated labor hours for this task order number 0006 is 37,500 and estimated total amount is $2,000,000.00.

This document represents partial tasking of option year four (0004) October 1, 1990, through September 30, 1991. Full tasking of the option year will occur upon completion of the DCAA audit. Estimated total amount as proposed is subject to negotiation upon completion of the

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER (Type or print)

16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)
Donita S. McCullough
Chief, Contracts Branch A

15B. CONTRACTOR/OFFEROR
(Signature of person authorized to sign)

15C. DATE SIGNED

16B. UNITED STATES OF AMERICA
BY Donita McCullough
(Signature of Contracting Officer)

16C. DATE SIGNED: 10/01/90

NSN 7540-01-152-8070
PREVIOUS EDITION UNUSABLE

30-105

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

INSTRUCTIONS

Instructio... ...ns other than those that are self-ex... ...are ...s follows:

(a) Item 1 (Contract ID Code). Insert the contract type identification code that appears in the title block of the contract being modified.

(b) Item 3 (Effective date).

(1) For a solicitation amendment, change order, or administrative change, the effective date shall be the issue date of the amendment, change order, or administrative change.

(2) For a supplemental agreement, the effective date shall be the date agreed to by the contracting parties.

(3) For a modification issued as an initial or confirming notice of termination for the convenience of the Government, the effective date and the modification number of the confirming notice shall be the same as the effective date and modification number of the initial notice.

(4) For a modification converting a termination for default to a termination for the convenience of the Government, the effective date shall be the same as the effective date of the termination for default.

(5) For a modification confirming the contracting officer's determination of the amount due in settlement of a contract termination, the effective date shall be the same as the effective date of the initial decision.

(c) Item 6 (Issued By). Insert the name and address of the issuing office. If applicable, insert the appropriate issuing office code in the code block.

(d) Item 8 (Name and Address of Contractor). For modifications to a contract or order, enter the contractor's name, address, and code as shown in the original contract or order, unless changed by this or a previous modification.

(e) Items 9, (Amendment of Solicitation No.–Dated), and 10, (Modification of Contract/Order No.–Dated). Check the appropriate box and in the corresponding blanks insert the number and date of the original solicitation, contract, or order.

(f) Item 12 (Accounting and Appropriation Data). When appropriate, indicate the impact of the modification on each affected accounting classification by inserting one of the following entries:

(1) Accounting classification ..............................
Net increase $ ..............................

(2) Accounting classification ..............................
Net decrease $ ..............................

NOTE: If there are changes to multiple accounting classifications that cannot be placed in block 12, insert an asterisk and the words "See continuation sheet".

(g) Item 13. Check the appropriate box to indicate the type of modification. Insert in the corresponding blank the authority under which the modification is issued. Check whether or not contractor must sign this document. (See FAR 43.103.)

(h) Item 14 (Description of Amendment/Modification).

(1) Organize amendments or modifications under the appropriate Uniform Contract Format (UCF) section headings from the applicable solicitation or contract. The UCF table of contents, however, shall not be set forth in this document.

(2) Indicate the impact of the modification on the overall total contract price by inserting one of the following entries:

(i) Total contract price increased by $ ..........

(ii) Total contract price decreased by $ ..........

(iii) Total contract price unchanged.

(3) State reason for modification.

(4) When removing, reinstating, or adding funds, identify the contract items and accounting classifications.

(5) When the SF 30 is used to reflect a determination by the contracting officer of the amount due in settlement of a contract terminated for the convenience of the Government, the entry in Item 14 of the modification may be limited to —

(i) A reference to the letter determination; and

(ii) A statement of the net amount determined to be due in settlement of the contract.

(6) Include subject matter or short title of solicitation/contract where feasible.

(i) Item 16B. The contracting officer's signature is not required on solicitation amendments. The contracting officer's signature is normally affixed last on supplemental agreements.

☆U.S. Government Printing Office: 1989-262-081/90223

Block 14, Description of Amendment/Modification (Continued)

audit. Any decrease in costs or fee as a result of the negotiations shall be made retroactive to October 1, 1990.

Reference is made to FAR Clause 52.232-18 entitled, "Availability of Funds" referenced at Part II, Section I.1. Funds have not been appropriated by Congress for the Department of Commerce, NOAA, for FY91 (October 1, 1990 through September 30, 1991). For the purpose of this task order, funds in the amount of $545,400.00 are available for performance through October 19, 1990.

End of Modification

**National Oceanic and Atmospheric Administration,**
Host Agency serving:
Bureau of the Census
Economic Development Administration
International Trade Administration
Minority Business Development Agency
Office of Export Enforcement
Office of the Inspector General
U.S. Travel and Tourism Administration

**U.S. DEPARTMENT OF COMMERCE**
**Central Administrative Support Center**
Federal Building, Room 1736
601 East 12th Street
Kansas City, Missouri 64106

TASK ORDER NO. 6
WORK PLAN AND AUTHORIZATION

Contract No.: 50-WCNA-6-06099
Task Order No.: 06
Work Plan date: October 1, 1990
Authorization Date: October 1, 1990

I. <u>TASK ORDER SUMMARY</u>

A. TASK DESCRIPTION: Within the limits of the Statement of Work, Part I, Section C of the contract, Fluor Daniel, Inc., (FDI) shall perform all work during FY91 as detailed in the Work Performance Description, dated October 1, 1989.

B. PERFORMANCE PERIOD AND SCHEDULE: The work described herein shall be accomplished from October 1, 1990 through December 15, 1990.

C. DELIVERABLES: The work products and scheduled delivery dates are set forth in the Work Plan.

II. <u>WORK PLAN SUMMARY</u>

A. Except as noted in the Work Plan, all work will be performed by FDI in its Kansas City, Missouri office. The technical approach to perform the work is described in Attachment A.

B. The following milestone dates apply to this task order:

Begin work . . . . . . . . . . . . . October 1, 1990

Complete Task Order . . . . . . . . December 15, 1990

C. The estimated costs to accomplish the work described herein are detailed in Attachment A. The total estimated DPMH requirement and price are:

Estimated Cost: $2,000,000.00

Estimated Direct Productive Manhours: 135,000

III. <u>AUTHORIZATION</u>

This task order and related attachments and exhibits thereto are issued pursuant to the provisions of clause B.7 of contract 50WCNA606099.

Effective October 1, 1990, you are authorized to proceed with the work set forth in this task order number 6. FDI is not authorized to proceed beyond the performance period of this order nor will FDI be paid for any costs incurred beyond that period unless the task order is modified by the Contracting Officer to authorize additional performance and payment.

Attachment A -
Work Performance Description 6.1 to 6.7

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.1**

TASK ORDER - NO. 06.1 PROGRAM MANAGEMENT & PLANNING - LABOR
PERFORMANCE PERIOD: OCTOBER 1, 1990 - SEPTEMBER 30, 1991

SCOPE: WORK TO BE PERFORMED UNDER CONTRACT 50WCNA606099 DURING FY 1991...

STATEMENT OF WORK:

**TASK 2.1 - PROGRAM AND PROJECT MANAGEMENT AND PLANNING (REFERENCE ARTICLE 2.1 OF THE CONTRACT).**

2.1.01 General Program Management, PSC and S/C Administration.

2.1.1.1 Quarterly status and update of PROGRAM MASTER schedule, and PROJECT LEVEL schedule. (TOTAL 4)

2.1.1.2 Twice monthly update of TASK ORDER SUMMARY schedule. (or weekly when required) (TOTAL 26)

2.1.1.3 Monthly status and update of TASK ORDER CONTROL LEVEL schedule. (TOTAL 12)

2.1.1.4 Specialty schedules - none allowed.

2.1.1.5 Draft Quarterly Task Order revisions. (TOTAL 32)

2.1.1.6 Draft Task Order No. 7. (TOTAL 1)

2.1.1.7 Maintain overall PROGRAM PLAN documents.

2.1.1.8 Monthly Program Cost Report. (TOTAL 12)

2.1.1.9 Participate in NEXRAD Outreach Committee. Attendance at six meetings allowed. TRIPS REQUIRED: 6

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.1**

2.1.1.10 Participate in FOC meetings as required. Attendance at six meetings allowed. TRIPS REQUIRED: 6

2.1.1.11 Administer Gould Evans Architects subcontract.

2.1.1.12 Administer Fluor Daniel, Inc, PSC.

2.1.02 Prepare and submit Cost Allocation Reports (CAR) Financial Progress Reports and Progress Reports. (TOTAL 12)

2.1.03 THRU 2.1.5 NOT USED...

2.1.06 Schedule and implement Program Management Review meetings. (TOTAL 6)

2.1.07 THRU 2.1.8 NOT USED...

2.1.09 Schedule and implement Program Technical Review meetings. (TOTAL 30)

2.1.10 Schedule and implement Task Order Review meetings. (TOTAL 12)

2.1.11 Miscellaneous management and planning matters.

2.1.11.01 Maintain an office in Kansas City with office space, furnishings, equipment and personnel suitable for efficient performance of the work.

2.1.11.02 Acquire supplies and equipment.

2.1.11.03 Maintain O & A Manual. (No work allowed)

2.1.11.04 Prepare briefing reports and visual aids for use by Government Program Managers during progress reviews.

2.1.12 NOT USED...

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.2**

TASK ORDER - NO. 06.2 GENERAL ARCHITECTURE & ENGINEERING
PERFORMANCE PERIOD: OCTOBER 1, 1990 - SEPTEMBER 30, 1991

SCOPE: WORK TO BE PERFORMED UNDER CONTRACT 50WCNA606099 DURING FY 1991...

STATEMENT OF WORK:

**TASK 2.2 - GENERAL ARCHITECTURE AND ENGINEERING (REFERENCE ARTICLE 2.2 OF THE CONTRACT)**

2.2.1 Perform specific general architectural and engineering tasks as may be required by the Contracting Officer.

2.2.1.1 FY90 Standard WFO design (4,550 SF).
2.2.1.2 DDG/EES Maintenance Specifications
2.2.1.3 Standard Small WFO design (3,995 SF).

2.2.2 THRU 2.2.4 NOT USED...

2.2.5 Maintain design manual (No work allowed)

2.2.6 NOT USED...

2.2.7 Develop Operations and Maintenance Manuals for completed sites (TOTAL 4).

2.2.7.1 NRC (JB)
2.2.7.2 Kansas City (FH)
2.2.7.3 Wichita (IP)
2.2.7.4 Grand Island (EM)

2.2.8 THRU 2.4.8 NOT USED...

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.3**

TASK ORDER - NO. 06.3 SITE SPECIFIC ARCHITECTURE & ENGINEERING
PERFORMANCE PERIOD: OCTOBER 1, 1990 - SEPTEMBER 30, 1991

SCOPE: WORK TO BE PERFORMED UNDER CONTRACT 50WCNA606099 DURING FY 1991...

STATEMENT OF WORK:

**TASK 2.1 - PROGRAM AND PROJECT MANAGEMENT AND PLANNING (REFERENCE ARTICLE 2.1 OF THE CONTRACT)**

2.1.1 THRU 2.1.2 NOT USED...

2.1.3 Prepare Construction Cost Estimates (CCE) for WFO facilities, UAIB's, and roads in conjuntion with section 2.3.1. Includes maintenance of estimating data base/data retrieval system, and computer systems for estimating.

- 2.1.3.1 15% DESIGN ESTIMATES (CONCEPTUAL) (Deleted from scope).
- 2.1.3.2 35% DESIGN ESTIMATES (TOTAL 30).
- 2.1.3.3 90% DESIGN ESTIMATES (TOTAL 22).
- 2.1.3.4 100% DESIGN ESTIMATES (Deleted from scope).

2.1.4 Prepare construction schedules in conjunction with Section 2.1.3.4.

2.1.5 THRU 2.1.12 NOT USED...

**TASK 2.3 - SITE SPECIFIC ARCHITECTURE AND ENGINEERING (REFERENCE ARTICLE 2.3 OF THE CONTRACT)**

2.3.1 (a) Accomplish site specific CONCEPTUAL design and issue 15% design packages where required. Conduct ongoing review of design criteria. Participate in JSPO/SEPO/NWS review of same. Respond to requirements for technical evaluation of alternative criteria. It is not anticipated 15% design packages will be issued for standard designs.

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.3**

| 2.3.1(a) | CONT. | CONCEPT. DESIGN | 15% DESIGN PACKAGE |
|---|---|---|---|
| 2.3.1.1 | Los Angeles CA (FU) (Standard) | 100% | |
| 2.3.1.2 | Memphis TN (FZ) (Modification) | 100% | Required |
| 2.3.1.3 | Cleveland OH (DI) (Modification) | 100% | Required |
| 2.3.1.4 | Portland ME (HD) (Standard) | 100% | |
| 2.3.1.5 | Omaha NE (GU) (Standard) | 100% | |
| 2.3.1.6 | Des Moines IA (DR) (Standard) | 100% | - |
| 2.3.1.7 | Sioux Falls SD (HU)(Modification) | 100% | Required |
| 2.3.1.8 | Birmingham AL (CO)(Standard) | 100% | |
| 2.3.1.9 | Atlanta GA (CK)(Unique RFC) | 100% | Required |
| 2.3.1.10 | Miami FL (GB)(Modification) | 100% | Required |
| 2.3.1.11 | Columbia SC (DK)(Modification) | 100% | Required |
| 2.3.1.12 | Buffalo NY (CT) (Standard) | 100% | |
| 2.3.1.13 | Seattle WA (HS) (Modification) | 100% | Required |
| 2.3.1.14 | Boise ID (CQ) (Standard) | 100% | |
| 2.3.1.15 | Minneapolis MN (GE)(Unique RFC) | 100% | Required |
| 2.3.1.16 | Bismarck ND (CP)(Modification) | 75% | Required |
| 2.3.1.17 | Great Falls MT (EQ)(Standard) | 100% | |
| 2.3.1.18 | Dallas TX (DO)(Unique RFC) | 100% | Required |
| 2.3.1.19 | Austin TX (HO)(Standard) | 100% | |
| 2.3.1.20 | Lubbock TX (FW)(Standard) | 100% | |
| 2.3.1.21 | Albuquerque NM (CC)(Standard) | 100% | |
| 2.3.1.22 | Reno NV (HI)(Standard) | 100% | |
| 2.3.1.23 | Cincinnati OH (DG) (Unique RFC) | 100% | Required |
| 2.3.1.24 | Missoula MT (GG) (Modification) | 100% | Required |
| 2.3.1.25 | Knoxville TN (FL) (Standard) | 100% | |
| 2.3.1.26 | Lake Charles LA (FP)(Standard) | 100% | |
| 2.3.1.27 | New Orleans LA (HV) (Unique RFC) | 100% | Required |
| 2.3.1.28 | Little Rock AR (FT) (Modification) | 100% | Required |
| 2.3.1.29 | Monterey CA (HQ) (Standard) | 100% | |
| 2.3.1.30 | Charleston WV (DC) (Standard) | 100% | |
| 2.3.1.31 | Cheyenne WY (DD) (Standard) | 100% | |
| 2.3.1.32 | Green Bay WI (ER) (3,995 SF) | 75% | |

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.3**

2.3.1(a) CONT.

| | | CONCEPT. DESIGN | 15% DESIGN PACKAGE |
|---|---|---|---|
| 2.3.1.33 | Pueblo CO (HE) (3,995 SF) | 50% | |
| 2.3.1.34 | Aberdeen SD (CA) (3,995 SF) | 25% | |
| 2.3.1.35 | New York City NY (GP) (Standard) | 50% | |
| 2.3.1.36 | Fairbanks AK (HA) (As req'd) | 100% | Required |
| 2.3.1.37 | Anchorage AK (DN) (As req'd) | 100% | Required |

2.3.1 (b) Accomplish site specific PRELIMINARY design, FINAL design and SIGNATURE documents (35%,90% and 100% packages).

| | | DESIGN PACKAGES | | |
|---|---|---|---|---|
| | | 35% | 90% | 100% |
| 2.3.1.38 | Pittsburgh PA (HB)(Rst Mod) | 100% | 100% | 100% |
| 2.3.1.39 | Jackson MS (FC) (Rst Mod) | 100% | 100% | 100% |
| 2.3.1.40 | Morehead City NC (EV) (Std) | | 100% | 100% |
| 2.3.1.41 | Buffalo NY (CT) (Std) | 100% | 100% | 100% |
| 2.3.1.42 | Philadelphia PA(GY)(Rst 89R) | | | 100% |
| 2.3.1.43 | Binghamton NY (CN)(89R) | | 100% | 100% |
| 2.3.1.44 | Cleveland OH (DI)(Mod) | 100% | 100% | 50% |
| 2.3.1.45 | Indianapolis IN (FB) (89R) | 100% | 100% | 100% |
| 2.3.1.46 | Louisville KY (FV) (89R) | | 35% | 100% |
| 2.3.1.47 | Charleston WV (DC) (Std) | 75% | | |
| 2.3.1.48 | Memphis TN (FZ) (Mod) | 100% | 100% | 100% |
| 2.3.1.49 | Little Rock AR (FT) (Mod) | 100% | 50% | |
| 2.3.1.50 | New Orleans LA (HV) (Uniq RFC) | 100% | 100% | 50% |
| 2.3.1.51 | Los Angeles CA (FU) (Std) | 100% | 100% | 50% |
| 2.3.1.52 | Monterey CA (HQ)(Std) | 100% | 100% | 100% |
| 2.3.1.53 | Portland ME (HD) (Std) | 100% | 100% | 100% |
| 2.3.1.54 | Omaha NE (GU)(Std) | 100% | 100% | 60% |
| 2.3.1.55 | Des Moines IA (DR) (Std) | 100% | 100% | 40% |
| 2.3.1.56 | Cheyenne WY (DD) (Std) | 50% | | |
| 2.3.1.57 | Sioux Falls SD (HU) (Mod) | 100% | 100% | 100% |
| 2.3.1.58 | Birmingham AL (CO) (Std) | 100% | 25% | |
| 2.3.1.59 | Atlanta GA (CK)(Uniq RFC) | 100% | 25% | |

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.3**

2.3.1 (b) CONT.

| | | DESIGN PACKAGES | | |
|---|---|---|---|---|
| | | 35% | 90% | 100% |
| 2.3.1.60 | Miami FL (GB) (Mod) | 100% | 75% | |
| 2.3.1.61 | Columbia SC (DK) (Mod) | 100% | 100% | 100% |
| 2.3.1.62 | Seattle WA (HS) (Mod) | 100% | 25% | |
| 2.3.1.63 | Boise ID (CQ) (Std) | 100% | 100% | |
| 2.3.1.64 | Minneapolis MN (GE) (Uniq RFC) | 100% | 10% | |
| 2.3.1.65 | Great Falls MT (EQ)(Std) | 100% | | |
| 2.3.1.66 | Dallas TX (DO) (Uniq RFC) | 100% | 100% | |
| 2.3.1.67 | Austin TX (HO) (Std) | 100% | | |
| 2.3.1.68 | Lubbock TX (FW) (Std) | 100% | 100% | 100% |
| 2.3.1.69 | Albuquerque NM (CC) (Std) | 100% | | |
| 2.3.1.70 | Cincinnati OH (DG) (Uniq RFC) | 100% | 50% | |
| 2.3.1.71 | Missoula MT (GG) (Mod) | 10% | | |
| 2.3.1.72 | Knoxville TN (FL) (Std) | 50% | | |
| 2.3.1.73 | Lake Charles LA (FP) (Std) | 100% | 50% | |
| 2.3.1.74 | Fairbanks AK (HA)(As req'd) | 100% | 100% | |
| 2.3.1.75 | Anchorage AK (DN)(As req'd) | 100% | 100% | |

2.3.2 Produce As-Built drawings for completed sites (5 sites).

2.3.2.1 NRC (JB)
2.3.2.2 Kansas City MO (FH)
2.3.2.3 Wichita KS (IP)
2.3.2.4 Grand Island NE (EM)
2.3.2.5 Houston TX (EY)

2.3.3 Design package submittals and reviews for WFO's to support Section 2.3.1 above.

2.3.4 Accomplish site investigations and complete site investigation packages in support of A/E design: (TOTAL 35). Prepare, issue, administer subcontracts for and accomplish TOPO surveys (TOTAL 24), geotechnical surveys (TOTAL 29), laboratory testing and engineering coordination to support 2.3.1 (a) above. TRIPS REQUIRED: 55

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.3**

2.3.4 CONT.

| | | INVESTIGATE | TOPO | GEOTECH |
|---|---|---|---|---|
| 2.3.4.1 | Aberdeen SD (CA) | x | | x |
| 2.3.4.2 | Albuquerque NM (CC) | x | x | x |
| 2.3.4.3 | Atlanta GA (CK) | x | x | x |
| 2.3.4.4 | Austin TX (HO) | x | x | x |
| 2.3.4.5 | Birmingham AL (CO) | x | x | x |
| 2.3.4.6 | Bismarck ND (CP) | x | | |
| 2.3.4.7 | Boise ID (CQ) | | | x |
| 2.3.4.8 | Brownsville TX (CS) | | x | x |
| 2.3.4.9 | Buffalo NY (CT) | x | x | x |
| 2.3.4.10 | Charleston WV (DC) | x | x | x |
| 2.3.4.11 | Cincinnati OH (DG) | x | | x |
| 2.3.4.12 | Cleveland OH (DI) | x | | |
| 2.3.4.13 | Columbia SC (DK) | x | | |
| 2.3.4.14 | Dallas TX (DO) | x | x | x |
| 2.3.4.15 | Des Moines IA (DR) | | | x |
| 2.3.4.16 | Glasgow MT (EK) | | x | |
| 2.3.4.17 | Great Falls MT (EQ) | x | x | x |
| 2.3.4.18 | Green Bay WI (ER) | x | | x |
| 2.3.4.19 | Jackson MS (FC) | x | | |
| 2.3.4.20 | Knoxville TN (FL) | x | x | x |
| 2.3.4.21 | Lake Charles LA (FP) | x | x | x |
| 2.3.4.22 | Little Rock AR (FT) | x | | |
| 2.3.4.23 | Lubbock TX (FW) | x | x | x |
| 2.3.4.24 | Miami FL (GB) | x | | |
| 2.3.4.25 | Minneapolis MN (GE) | x | x | x |
| 2.3.4.26 | Missoula MT (GG) | x | | |
| 2.3.4.27 | Monterey CA (HQ) | x | x | x |
| 2.3.4.28 | Nashville TN (GM) | x | x | x |
| 2.3.4.29 | New Orleans (HG) | x | x | x |
| 2.3.4.30 | New York NY (GP) | x | x | x |
| 2.3.4.31 | Norfolk VA (GQ) | x | | x |
| 2.3.4.32 | Omaha NB (GU) | | | x |
| 2.3.4.33 | Paducah KY (GW) | | x | |

FLUOR DANIEL
CONTRACT NO. 50WCNA606099
FLUOR CONTRACTS 449466/68

WORK PERFORMANCE DESCRIPTION
TASK ORDER 06.3

2.3.4 CONT.

| | | INVESTIGATE | TOPO | GEOTECH |
|---|---|---|---|---|
| 2.3.4.34 | Pittsburgh PA (HB) | x | | |
| 2.3.4.35 | Portland ME (HD) | x | x | x |
| 2.3.4.36 | Pueblo CO (HE) | x | x | x |
| 2.3.4.37 | Reno NV (HI) | x | x | x |
| 2.3.4.38 | Riverton WY (FQ) | | x | |
| 2.3.4.39 | Seattle WA (HS) | x | | |
| 2.3.4.40 | Sioux Falls SD (HU) | x | | |
| 2.3.4.41 | Springfield MO (HY) | x | x | x |
| 2.3.4.42 | Wilmington NC (IQ) | x | | x |

2.3.5 THRU 2.4.8 NOT USED...

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.4**

TASK ORDER - NO. 06.4 ECONOMIC ANALYSIS
PERFORMANCE PERIOD: OCTOBER 1, 1990 - SEPTEMBER 30, 1991

SCOPE: WORK TO BE PERFORMED UNDER CONTRACT 50WCNA606099 DURING FY 1991...

STATEMENT OF WORK:

**TASK 2.2 - GENERAL ARCHITECTURE AND ENGINEERING (REFERENCE ARTICLE 2.2 OF THE CONTRACT)**

2.2.1 NOT USED...

2.2.2 Prepare economic analysis packages as necessary to satisfy the NWS/IG Memorandum of Understanding for the following sites (TOTAL 62). Assumes requirements letters will be available from NWS to support scheduled real estate acquisition and site design. TRIPS REQUIRED: 15

| | | SITE SURVEY | |
|---|---|---|---|
| | | Required | Not Required |
| 2.2.2.1 | Lake Charles LA (FP) | x | |
| 2.2.2.2 | Roanoke VA (HJ) | x | |
| 2.2.2.3 | Quad Cities IA (HF) | | x |
| 2.2.2.4 | Central Illinois IL (HZ) | x | |
| 2.2.2.5 | Alpena MI (CD) | | x |
| 2.2.2.6 | Shreveport LA (HT) | x | |
| 2.2.2.7 | Nashville TN (GM) | x | |
| 2.2.2.8 | Sacramento CA (HL) | | x |
| 2.2.2.9 | Eureka CA (EC) | | x |
| 2.2.2.10 | San Diego CA (HP) | x | |
| 2.2.2.11 | Aberdeen SD (CA) | | x |
| 2.2.2.12 | Rapid City SD (HH) | x | |
| 2.2.2.13 | Tampa Bay FL (IC) | x | |
| 2.2.2.14 | Mobile AL (GH) | x | |
| 2.2.2.15 | Jacksonville FL (FD) | x | |
| 2.2.2.16 | Tallahassee FL (IB) | x | |
| 2.2.2.17 | Charleston SC (DB) | x | |

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.4**

2.2.2 CONT.

| | | Required | Not Required |
|---|---|---|---|
| 2.2.2.18 | Pocatello ID (HW) | | X |
| 2.2.2.19 | Spokane WA (HX) | X | |
| 2.2.2.20 | Medford OR (FY) | X | |
| 2.2.2.21 | Duluth MN (DV) | X | |
| 2.2.2.22 | Fargo ND (EE) | X | |
| 2.2.2.23 | El Paso TX (EA) | X | |
| 2.2.2.24 | Glasgow MT (EK) | | X |
| 2.2.2.25 | Corpus Christi TX (DM) | X | |
| 2.2.2.26 | San Angelo TX (HN) | | X |
| 2.2.2.27 | Midland TX (GS) | X | |
| 2.2.2.28 | Las Vegas NV (FR) | | X |
| 2.2.2.29 | Tuscon AZ (IG) | X | |
| 2.2.2.30 | Flagstaff AZ (EF) | | X |
| 2.2.2.31 | Elko NV (IR) | | X |
| 2.2.2.32 | Memphis TN (FZ) | X | |
| 2.2.2.33 | Jackson MS (FC) | | X |
| 2.2.2.34 | Sioux Falls SD (HU) | X | |
| 2.2.2.35 | Albany NY (CB) | X | |
| 2.2.2.36 | Portland ME (HD) | X | |
| 2.2.2.37 | Omaha NE (GU) | X | |
| 2.2.2.38 | Des Moines IA (DR) | X | |
| 2.2.2.39 | New Orleans LA (HV) | X | |
| 2.2.2.40 | Dallas/Ft.Worth TX (DO) | | X |
| 2.2.2.41 | Lubbock TX (FW) | X | |
| 2.2.2.42 | Miami FL (GB) | X | |
| 2.2.2.43 | Raleigh NC (HG) | X | |
| 2.2.2.44 | Seattle WA (HS) | X | |
| 2.2.2.45 | Boise ID (CQ) | X | |
| 2.2.2.46 | Cincinnati OH (DG) | | X |
| 2.2.2.47 | Great Falls MT (EQ) | X | |
| 2.2.2.48 | San Antonio TX (HO) | X | |
| 2.2.2.49 | Albuquerque NM (CC) | | X |
| 2.2.2.50 | Minneapolis MN (GE) | X | |
| 2.2.2.51 | Knoxville TN (FL) | | X |
| 2.2.2.52 | Reno NV (HI) | X | |

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.4**

2.2.2 CONT.

| | | Required | Not Required |
|---|---|---|---|
| 2.2.2.53 | Cheyenne WY (DD) | | x |
| 2.2.2.54 | Salt Lake City UT (HM) | x | |
| 2.2.2.55 | Bismarck ND (CP) | x | |
| 2.2.2.56 | New York City NY (GP) | x | |
| 2.2.2.57 | Portland OR (HC) | x | |
| 2.2.2.58 | Puerto Rico (GO) | x | |
| 2.2.2.59 | Anchorage AK (DN) | x | |
| 2.2.2.60 | Fairbanks AK (HA) | x | |
| 2.2.2.61 | Honolulu HI | x | |
| 2.2.2.62 | Sitka (Juneau)AK (ID) | x | |

2.2.3 THRU 2.4.8 NOT USED.. .

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.5**

TASK ORDER - NO. 06.5 CONTRACTING, CONSTRUCTION MANAGEMENT & INSPECTION

PERFORMANCE PERIOD: OCTOBER 1, 1990 - SEPTEMBER 30, 1991

SCOPE: WORK TO BE PERFORMED UNDER CONTRACT 50WCNA606099 DURING FY 1991...

STATEMENT OF WORK:

**TASK 2.3 - SITE SPECIFIC ARCHITECTURE AND ENGINEERING (REFERENCE ARTICLE 2.3 OF THE CONTRACT)**

2.3.1 THRU 2.3.7 NOT USED...

2.3.8 Provide assistance to the government in contracting matters.

2.3.8.1 Assist the government in administering Government Furnished Equipment (GFE) requirements contracts. Prepare and source GFE contract for fuel tanks.

2.3.8.1.1 Furniture GFE
2.3.8.1.2 DDG GFE
2.3.8.1.3 EES GFE
2.3.8.1.4 HVAC GFE
2.3.8.1.5 Signs GFE
2.3.8.1.6 Source Fuel Tank GFE

2.3.8.2 Prepare and issue construction contracts in conjunction with Task Order No. 06.3 Section 2.3.1 (TOTAL 16). TRIPS REQUIRED: 12

2.3.8.2.1 Detroit (8A) (DS)
2.3.8.2.2 Chicago (DF)
2.3.8.2.3 Morehead City (EV)

FLUOR DANIEL
CONTRACT NO. 50WCNA606099
FLUOR CONTRACTS 449466/68

WORK PERFORMANCE DESCRIPTION
TASK ORDER 06.5

2.3.8.2 CONT.

2.3.8.2.4 Buffalo (CT)
2.3.8.2.5 Binghamton (CN)
2.3.8.2.6 Indianapolis (FB)
2.3.8.2.7 Jackson (Partial) (FC)
2.3.8.2.8 Omaha (GU)
2.3.8.2.9 Des Moines (DR)
2.3.8.2.10 Louisville (FV)
2.3.8.2.11 Memphis (Partial) (FZ)
2.3.8.2.12 Lubbock (Partial) (FW)
2.3.8.2.13 NRC (JB)
2.3.8.2.14 Pittsburgh (Partial) (HB)
2.3.8.2.15 Philadelphia (GY)
2.3.8.2.16 Portland ME (HD)

2.3.8.3 Provide construction management, review of vendor submittals, review of lessor submittals and contract administration services as required for 19 projects.

2.3.8.3.1 Binghamton (CN)
2.3.8.3.2 Buffalo (CT)
2.3.8.3.3 Chicago (DF)
2.3.8.3.4 Detroit 8A (DS)
2.3.8.3.5 Grand Island (EM)
2.3.8.3.6 Indianapolis (FB)
2.3.8.3.7 Kansas City (FH)
2.3.8.3.8 Louisville (FV)
2.3.8.3.9 Morehead City (EV)
2.3.8.3.10 NRC (JB)
2.3.8.3.11 Philadelphia (GY)
2.3.8.3.12 Wichita (IP)
2.3.8.3.13 Tulsa (LEASE) (IH)
2.3.8.3.14 State College (LEASE) (EU)
2.3.8.3.15 Phoenix (LEASE) (GZ)
2.3.8.3.16 Sacramento (LEASE) (HL)
2.3.8.3.17 Albany (LEASE) (CB)
2.3.8.3.18 Boston (LEASE) (CR)

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.5**

2.3.8.3 CONT.
2.3.8.3.19 Raleigh/Durham (LEASE) (HG)

2.3.8.4 Validate contractor payment requests and construction progress.

2.3.8.5 Maintain cost report for recording and reporting contractors cost status (TOTAL 12).

2.3.8.6 Assist in the prevention and resolution of disputes and claims.

2.3.8.7 Assist in negotiating change orders.

2.3.8.8 Review contractors schedules for compliance to contract requirements.

2.3.8.9 Provide Contract Administration Services.

2.3.8.10 Prepare and administer furniture storage, delivery and installation contracts (TOTAL 5).

2.3.8.10.1 Kansas City (FH)
2.3.8.10.2 Wichita (IP)
2.3.8.10.3 Grand Island (EM)
2.3.8.10.4 Tulsa (IH)
2.3.8.10.5 Chicago (DF)

2.3.8.11 <u>LEASE ADMINISTRATION</u>(Competitive Sites)-Administer the lease contracts for leases at competitive locations. This will include discussions with lessor, building contractor, and architect to clarify lease terms on requirements; and review of schedules and progress (TOTAL 8) TRIPS REQUIRED: 16

2.3.8.11.1 Albany NY (CB)
2.3.8.11.2 Boston MA (CR)
2.3.8.11.3 Norman Training OK (AA)
2.3.8.11.4 Phoenix AZ (GZ)
2.3.8.11.5 Raleigh NC (HG)

FLUOR DANIEL
CONTRACT NO. 50WCNA606099
FLUOR CONTRACTS 449466/68

WORK PERFORMANCE DESCRIPTION
TASK ORDER 06.5

2.3.8.11 CONT.

- 2.3.8.11.6 Roanoke VA (HJ)
- 2.3.8.11.7 State College PA (EU)
- 2.3.8.11.8 Sacramento CA (HL)

2.3.8.12 Conduct post construction conference (6 TOTAL). TRIPS REQUIRED:12

- 2.3.8.12.1 NRC
- 2.3.8.12.2 Kansas City MO
- 2.3.8.12.3 Wichita KS
- 2.3.8.12.4 Grand Island NE
- 2.3.8.12.5 Houston TX
- 2.3.8.12.6 Chicago IL

2.3.9 Provide construction management and inspection services.

2.3.9.1 Provide construction management and inspection services for 18 projects. TOTAL 76 inspections, 59 contractor invoices. TRIPS REQUIRED: 84

- 2.3.9.1.1 Kansas City (FH)
- 2.3.9.1.2 Wichita (IP)
- 2.3.9.1.3 Tulsa (LEASE) (IH)
- 2.3.9.1.4 Grand Island (EM)
- 2.3.9.1.5 State College (LEASE)(EU)
- 2.3.9.1.6 Binghamton (CN)
- 2.3.9.1.7 Philadelphia (GY)
- 2.3.9.1.8 Morehead City (EV)
- 2.3.9.1.9 Louisville (FV)
- 2.3.9.1.10 Indianapolis (FB)
- 2.3.9.1.11 Chicago (DF)
- 2.3.9.1.12 Detroit (DS)
- 2.3.9.1.13 Buffalo (CT)
- 2.3.9.1.14 Boston (LEASE) (CR)
- 2.3.9.1.15 Albany (LEASE)(CB)
- 2.3.9.1.16 Raleigh (LEASE)(HG)

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.5**

2.3.9.1 CONT.

2.3.9.1.17 Phoenix (LEASE)(GZ)
2.3.9.1.18 Sacramento (LEASE)(HL)

2.3.9.2 Compliance inspection and coordinations.

2.3.9.3 Final inspection and acceptance.

2.3.9.4 Validate contractor payment requests and construction progress.

2.3.9.5 Review contractors schedules for compliance to program requirements.

2.3.9.6 Coordinate construction contract interfaces.

2.3.9.7 Construction project administration.

2.3.10 THRU 2.4.8 NOT USED...

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.6**

TASK ORDER - NO. 06.6 REAL PROPERTY ACQUISITION
PERFORMANCE PERIOD: OCTOBER 1, 1990 - SEPTEMBER 30, 1991

SCOPE: WORK TO BE PERFORMED UNDER CONTRACT 50WCNA606099 DURING FY 1991...

STATEMENT OF WORK:

**TASK 2.3 - SITE SPECIFIC ARCHITECTURE AND ENGINEERING (REFERENCE ARTICLE 2.3 OF THE CONTRACT)**

2.3.6 Perform market surveys, prepare documents, negotiate terms, accomplish land surveys, and obtain other information including appraisals of property values, legal descriptions, names of owners, recorded easements, site maps, zoning clearances, and other information necessary to allow the Government to obtain specified building sites.

2.3.6.1 Assist the government in selection of sites to be acquired.

2.3.6.2 Assist SEPO in preparation of Congressional responses.

2.3.6.3 Assist ASC's on drafting deeds.

2.3.6.4 Assist ASC's on title restrictions resolution.

2.3.6.5 Assist SEPO on interpreting utility tie-in fees and permits.

2.3.6.6 Assist SEPO in the preparation of courtesy review permit package submissions.

2.3.6.7 Assist SEPO in coordinating real estate environmental issues with SRI.

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.6**

2.3.6.8 FEE SIMPLE PURCHASE - Purchase land from private sources for construction by the Government of WFO facilities (TOTAL 4). TRIPS REQUIRED: 10

- 2.3.6.8.1 Eureka CA WFO (EC)
- 2.3.6.8.2 Los Angeles CA WFO (FU)
- 2.3.6.8.3 Minneapolis MN WFO/RFC (GE)
- 2.3.6.8.4 Yuma AZ WFO (Partial) (IT)

2.3.6.9 LEASES- Develop new leases for special purpose facility space (WFO) (TOTAL 7). TRIPS REQUIRED: 17

- 2.3.6.9.1 Albany NY WFO (CB)
- 2.3.6.9.2 Phoenix AZ WFO (GZ)
- 2.3.6.9.3 Raleigh NC WFO (HG)
- 2.3.6.9.4 Roanoke VA WFO (HJ)
- 2.3.6.9.5 State College PA WFO/RFC (EU)
- 2.3.6.9.6 Tulsa OK WFO/RFC (IH)
- 2.3.6.9.7 Boston MA WFO/RFC (CR)

2.3.6.10 AAIA LEASES- Obtain no-cost leases for use of airport property under the Airport and Airways Improvement Act (AAIA) (TOTAL 5). TRIPS REQUIRED: 12

- 2.3.6.10.1 Charleston SC WFO (DB)
- 2.3.6.10.2 Cheyenne WY WFO (DD)
- 2.3.6.10.3 Dallas TX WFO/RFC/UA/RDA (DO)
- 2.3.6.10.4 Portland OR WFO/RFC (HC)
- 2.3.6.10.5 Pueblo CO WFO (HE)

2.3.6.11 MEMORANDUM OF AGREEMENT- Develop agreements for use of public domain under the control of another Government Agency (TOTAL 3). TRIPS REQUIRED: 7

- 2.3.6.11.1 Elko NV WFO (IR)
- 2.3.6.11.2 Missoula MT WFO (Partial) (GG)

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.6**

2.3.6.11 CONT.

2.3.6.11.3 Medford OR WFO (Partial) (FY)

2.3.6.12 Prepare, issue and administer subcontracts for plats of survey (TOTAL 17), appraisals (TOTAL 20), title insurance (TOTAL 10) and tower analysis (TOTAL 5) as required to support real estate actions.

2.3.6.13 Develop monthly NEXRAD Real Estate Report (TOTAL 12)

2.3.6.14 Provide real estate administration and coordination support. TRIPS REQUIRED: 9

FLUOR DANIEL
CONTRACT NO. 50WCNA606099
FLUOR CONTRACTS 449466/68

WORK PERFORMANCE DESCRIPTION
TASK ORDER 06.7

TASK ORDER - NO. 06.7 JSPO SUPPORT
PERFORMANCE PERIOD: OCTOBER 1, 1990 - SEPTEMBER 30, 1991

SCOPE: WORK TO BE PERFORMED UNDER CONTRACT 50WCNA606099 DURING FY 1991...

STATEMENT OF WORK:

**TASK 2.2 - GENERAL ARCHITECTURE AND ENGINEERING (REFERENCE ARTICLE 2.2 OF THE CONTRACT)**

2.1.1 THRU 2.2.5 NOT USED...

2.2.6 Assist the JSPO with the preparation, review, and coordination with UNISYS of PUP survey packages (TOTAL 65). TRIPS REQUIRED: 65

| | |
|---|---|
| 2.2.6.1 | Eglin AFB (Partial) (BH) |
| 2.2.6.2 | JAX (Jacksonville) ARTCC (Partial) (BH) |
| 2.2.6.3 | Kansas City ARTCC (Partial) (BJ) |
| 2.2.6.4 | San Angelo WFO SUP #1 (DW) |
| 2.2.6.5 | Navpol/Andrews (Partial) (ASS) |
| 2.2.6.6 | FAA Flow Control (Partial) (NONA) |
| 2.2.6.7 | Denver ARTCC (DQ) |
| 2.2.6.8 | Denver WFO (RPGOP) (DQ) |
| 2.2.6.9 | Keesler AFB OPS Training (Partial) (TB) |
| 2.2.6.10 | Andersen AFB GUAM (Partial) (CG) |
| 2.2.6.11 | Navocan/JTWC/AGANA (Partial) (CG) |
| 2.2.6.12 | Agana (Partial) (CG) |
| 2.2.6.13 | San Juan PR (GO) |
| 2.2.6.14 | Kansas City RFC (FH) |
| 2.2.6.15 | Whiteman AFB (Partial) (FH) |
| 2.2.6.16 | Kansas City WFO (RPGOP) (FH) |
| 2.2.6.17 | McConnell AFB (Partial) (IP) |
| 2.2.6.18 | Wichita WFO (IP) |
| 2.2.6.19 | Fort Riley (Partial) (IE) |

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.7**

2.2.6 CONT.

2.2.6.20 Topeka WFO (IE)
2.2.6.21 Tulsa WFO (IH)
2.2.6.22 Memphis ARTCC (IH)
2.2.6.23 Goodland WFO (EL)
2.2.6.24 Clark AB PI (Partial) (DH)
2.2.6.25 Nas Cubi PT (Partial) (DH)
2.2.6.26 Grand Island NE (EM)
2.2.6.27 Minneapolis ARTCC (EM)
2.2.6.28 Offutt AFGWC (NONA)
2.2.6.29 Amarillo WFO (CE)
2.2.6.30 Albuquerque ARTCC (CE)
2.2.6.31 Harrisburg RFC (EU)
2.2.6.32 State College (EU)
2.2.6.33 Binghamton WFO (CN)
2.2.6.34 Philadelphia WFO (GY)
2.2.6.35 NAS Willow Grove (Partial) (GY)
2.2.6.36 McGuire AFB (Partial) (GY)
2.2.6.37 National Met Center #2 (Partial) (NONA)
2.2.6.38 Kunsan AB KOREA (Partial) (FM)
2.2.6.39 Dover AFB (Partial) (DU)
2.2.6.40 Charleston WV WFO (DC)
2.2.6.41 Cincinnati RFC (DC)
2.2.6.42 Louisville WFO (FV)
2.2.6.43 Indianapolis WFO (FB)
2.2.6.44 Indianapolis RFC (FB)
2.2.6.45 Chicago WFO (DF)
2.2.6.46 Chicago ARTCC (DF)
2.2.6.47 Pittsburgh WFO (HB)
2.2.6.48 Cleveland ARTCC (HB)
2.2.6.49 Detroit WFO (DS)
2.2.6.50 Selfridge ANGB (Partial) (DS)
2.2.6.51 Camp Humphreys ROK (Partial) (CV)
2.2.6.52 Osan AB (Partial) (CV)
2.2.6.53 Yongsan (Partial) (CV)
2.2.6.54 Suwon (Partial) (CV)

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.7**

2.2.6 CONT.

2.2.6.55 CP Casey (Partial) (CV)
2.2.6.56 Cleveland WFO (DI)
2.2.6.57 Memphis WFO (FZ)
2.2.6.58 Eaker AFB (Partial) (FZ)
2.2.6.59 NAS Memphis (FZ)
2.2.6.60 Birmingham WFO (DX)
2.2.6.61 Fort Benning (Partial) (DX)
2.2.6.62 Maxwell AFB (Partial) (DX)
2.2.6.63 Atlanta ARTCC (DX)
2.2.6.64 Little Rock WFO (FT)
2.2.6.65 Little Rock AFB (Partial) (FT)

2.2.7 NOT USED...

2.2.8 Provide NEXRAD Engineering support. TRIPS REQUIRED: 12 domestic plus 2 overseas

2.2.8.1 NRC Maintenance Facility Tech Requirements
2.2.8.2 RDA Preliminary Conceptual Design - Remote Mountains
2.2.8.3 RDA Preliminary Conceptual Design - Europe DOD Sites
2.2.8.4 RDA Preliminary Conceptual Design - Vance AFB Demolition
2.2.8.5 RDA Preliminary Conceptual Design - General
2.2.8.6 RDA Preliminary Conceptual Design - Pacific DOD Sites
2.2.8.7 FAA Project Management and Engineering Support
2.2.8.8 General Nexrad Engineering CAD Support

**TASK 2.3 - SITE SPECIFIC ARCHITECTURE AND ENGINEERING (REFERENCE ARTICLE 2.3 OF THE CONTRACT)**

2.3.1 THRU 2.3.4 NOT USED...

2.3.5 Provide general support to JSPO for the NEXRAD program. TRIPS REQUIRED: 40

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.7**

2.3.5.1 Maintain NEXRAD schedules, prepare and monitor Government contract deliverables and monitor UNISYS Contract Deliverables.

2.3.5.2 Provide JSPO assistance with contract management meetings.

2.3.5.3 Attend UNISYS management meetings.

2.3.6 NOT USED...

2.3.7 Utility coordination for RDA and user sites(TOTAL 41).

2.3.7.1 Bannister MNTC Depot (JB)
2.3.7.2 Denver (DQ)
2.3.7.3 Keesler AFB (IB)
2.3.7.4 Andersen AFB (CG)
2.3.7.5 San Juan PR (GO)
2.3.7.6 Kansas City (FH)
2.3.7.7 Wichita (IP)
2.3.7.8 Topeka (IE)
2.3.7.9 Tulsa (IH)
2.3.7.10 Goodland (EL)
2.3.7.11 Kadena AB OKI (FF)
2.3.7.12 Grand Island (EM)
2.3.7.13 Amarillo (CE)
2.3.7.14 State College (EU)
2.3.7.15 Binghamton (CN)
2.3.7.16 Philadelphia (GY)
2.3.7.17 Clark AFB PHI (DH)
2.3.7.18 Dover AFB (DU)
2.3.7.19 Charleston WV (DC)
2.3.7.20 Louisville (FV)
2.3.7.21 Indianapolis (FB)
2.3.7.22 Chicago (DF)
2.3.7.23 Pittsburgh (HB)
2.3.7.24 Detroit (DS)
2.3.7.25 Kunsan AB ROK (FM)
2.3.7.26 Cleveland (DI)

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.7**

2.3.7 CONT.

| | |
|---|---|
| 2.3.7.27 | Buffalo (CT) |
| 2.3.7.28 | Memphis (FZ) |
| 2.3.7.29 | East Alabama (DX) |
| 2.3.7.30 | Little Rock (FT) |
| 2.3.7.31 | Camp Humphreys (CV) |
| 2.3.7.32 | Jackson (FC) |
| 2.3.7.33 | Slidell (HV) |
| 2.3.7.34 | Central Texas (DA) |
| 2.3.7.35 | San Francisco (HQ) |
| 2.3.7.36 | Los Angeles (FU) |
| 2.3.7.37 | Vandenberg AFB (IK) |
| 2.3.7.38 | Morehead City (EV) |
| 2.3.7.39 | Yokota AB JAP (IS) |
| 2.3.7.40 | Albany (CB) |
| 2.3.7.41 | Dyess AFB TX (DW) |

2.3.8 THRU 2.3.10 NOT USED...

**TASK 2.4 CONSTRUCTION MANAGEMENT AND INSPECTION (REFERENCE ARTICLE 2.4 IN THE CONTRACT)**

2.4.1 Assist the JSPO/NEXRAD Program in reviewing NEXRAD Contractor design and NEXRAD Program materials. (46-35% Reviews, 32-90% Design Reviews, 19-100% Design Reviews).

| | | RDA | DESIGN | REVIEWS |
|---|---|---|---|---|
| | | 35% | 90% | 100% |
| 2.4.1.1 | NW Florida (SUP) (BH) | | | X |
| 2.4.1.2 | Keesler AFB (MTC DPT)(TE) | | X | X |
| 2.4.1.3 | St. Louis (BJ) | | | X |
| 2.4.1.4 | Dodge City (DT) | X | X | X |
| 2.4.1.5 | Houston/Galveston(EY) | X | X | X |
| 2.4.1.6 | KC Bannister (JB) | | X | X |
| 2.4.1.7 | Denver (DQ) | X | X | X |
| 2.4.1.8 | Keesler AFB (DOD TRNG)(TB) | X | X | X |
| 2.4.1.9 | Andersen AFB (CG) | X | X | X |

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.7**

2.4.1 CONT.

| | | RDA 35% | DESIGN 90% | REVIEWS 100% |
|---|---|---|---|---|
| 2.4.1.10 | San Juan PR (GO) | X | X | X |
| 2.4.1.11 | Kansas City (FH) | X | X | X |
| 2.4.1.12 | Wichita (IP) | X | X | X |
| 2.4.1.13 | Topeka (IE) | X | X | X |
| 2.4.1.14 | Tulsa (IH) | X | X | X |
| 2.4.1.15 | Goodland (EL) | X | X | X |
| 2.4.1.16 | Kadena OKI (FF) | X | X | X |
| 2.4.1.17 | Grand Island (EM) | X | X | X |
| 2.4.1.18 | Amarillo (CE) | X | X | X |
| 2.4.1.19 | St. College (EU) | X | X | X |
| 2.4.1.20 | Binghamton (CN) | X | X | |
| 2.4.1.21 | Philadelphia (GY) | X | X | |
| 2.4.1.22 | Clark AFB (DH) | X | X | |
| 2.4.1.23 | Dover AFB (DU) | X | X | |
| 2.4.1.24 | Charleston WV (DC) | X | X | |
| 2.4.1.25 | Louisville (FV) | X | X | |
| 2.4.1.26 | Indianapolis (FB) | X | X | |
| 2.4.1.27 | Chicago (DF) | X | X | |
| 2.4.1.28 | Pittsburgh (HB) | X | X | |
| 2.4.1.29 | Detroit (DS) | X | X | |
| 2.4.1.30 | Kunsan AB ROK (FM) | X | X | |
| 2.4.1.31 | Cleveland (DI) | X | X | |
| 2.4.1.32 | Buffalo (CT) | X | X | |
| 2.4.1.33 | Memphis (FZ) | X | X | |
| 2.4.1.34 | East Alabama (DX) | X | X | |
| 2.4.1.35 | Little Rock (FT) | X | | |
| 2.4.1.36 | Camp Humphreys (CV) | X | | |
| 2.4.1.37 | Jackson (FC) | X | | |
| 2.4.1.38 | Slidell (HV) | X | | |
| 2.4.1.39 | Central Texas (DA) | X | | |
| 2.4.1.40 | San Francisco (HQ) | X | | |
| 2.4.1.41 | Los Angeles (FU) | X | | |
| 2.4.1.42 | Vandenberg AFB (IK) | X | | |
| 2.4.1.43 | Morehead City (EV) | X | | |

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.7**

| 2.4.1 CONT. | | RDA 35% | DESIGN 90% | REVIEWS 100% |
|---|---|---|---|---|
| 2.4.1.44 | Yokota (IS) | X | | |
| 2.4.1.45 | Albany (CB) | X | | |
| 2.4.1.46 | Dyess AFB (DW) | X | | |
| 2.4.1.47 | Boston (CR) | X | | |
| 2.4.1.48 | Salt Lake City (HM) | X | | |
| 2.4.1.49 | Fort Rucker (EG) | X | | |
| 2.4.1.50 | Portland ME (FM) | X | | |

2.4.2 THRU 2.4.3 NOT USED...

2.4.4 Assist the JSPO with construction inspection of building modifications (TOTAL 46) and NEXRAD RDA sites (TOTAL 14). TRIPS REQUIRED: 48

BUILDING SITES

| | |
|---|---|
| 2.4.4.1 | Tulsa RFC (BA) |
| 2.4.4.2 | Tinker AFB (BA) |
| 2.4.4.3 | Dallas/Ft. Worth ARTCC (BA) |
| 2.4.4.4 | Oklahoma City (Norman) WFO (RPGOP) (BA) |
| 2.4.4.5 | Cape Canaveral (BB) |
| 2.4.4.6 | Melbourne WFO (RPGOP) (BB) |
| 2.4.4.7 | Patrick AFB (BB) |
| 2.4.4.8 | Miami ARTCC (BB) |
| 2.4.4.9 | National Meteorlogical Center #1 (NONA) |
| 2.4.4.10 | National Hurricane Center #1 (NONA) |
| 2.4.4.11 | National Severe Storm Center #1 (NONA) |
| 2.4.4.12 | MCAF Quantico (NONA) |
| 2.4.4.13 | Pax River (NONA) |
| 2.4.4.14 | Sterling (Washington DC) (RPGOP) (BC) |
| 2.4.4.15 | Andrews AFB (BC) |
| 2.4.4.16 | DCA (Washington) ARTCC (BC) |
| 2.4.4.17 | Kansas City (RPGOP) (TA) |
| 2.4.4.18 | Altus AFB (BF) |
| 2.4.4.19 | Sheppard AFB (BF) |
| 2.4.4.20 | Ft. Sill (BF) |

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.7**

2.4.4 CONT. BUILDING SITES

2.4.4.21 AF GLOBAL WX CTR #1 (OFFUT AFB) (NONA)
2.4.4.22 Eglin AFB (BH)
2.4.4.23 JAX (Jacksonville) ARTCC (BH)
2.4.4.24 Tyndall AFB (BH)
2.4.4.25 Hurlburt FLD (AFB) (BH)
2.4.4.26 KC ARTCC (BJ)
2.4.4.27 Scott AFB (BJ)
2.4.4.28 St. Louis WFO (BJ)
2.4.4.29 Dodge City WFO (DT)
2.4.4.30 Houston/Galveston WFO (EY)
2.4.4.31 Kansas City Bannister (CJ)
2.4.4.32 Denver WFO (DQ)
2.4.4.33 Denver ARTCC (DQ)
2.4.4.34 MAC/WSU Scott AFB (NONA)
2.4.4.35 Keesler AFB (MTC TRAINING) (JA)
2.4.4.36 Southern Region HQ (NONA)
2.4.4.37 Eastern Region HQ (NONA)
2.4.4.38 Central Region HQ (NONA)
2.4.4.39 NWS HQ (Washington DC) (NONA)
2.4.4.40 NSSFC #2 (NONA)
2.4.4.41 National Data Center (NONA)
2.4.4.42 Tallahassee WFO (NONA)
2.4.4.43 OSF2 (NONA)
2.4.4.44 FAA Flow Control (NONA)
2.4.4.45 Navpol Andrews (NONA)
2.4.4.46 Navpol Suitland (NONA)

RDA SITES

2.4.4.47 OSF/RADAR Upgrade (BA)
2.4.4.48 Oklahoma City (Twin Lakes) (BA)
2.4.4.49 Melbourne (BB)
2.4.4.50 Washington (Sterling) (BC)
2.4.4.51 Frederick (SUP) (BF)
2.4.4.52 NW Florida (SUP) (BH)

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.7**

2.4.4 CONT. <u>RDA SITES</u>

2.4.4.53 Keesler AFB (MNTC DEPOT) (TE)
2.4.4.54 St. Louis (BJ)
2.4.4.55 NRC (JB)
2.4.4.56 Dodge City (DT)
2.4.4.57 Houston/Galveston (EY)
2.4.4.58 Denver (DQ)
2.4.4.59 Keesler AFB (TB)
2.4.4.60 Andersen AFB GUAM (CG)

2.4.5 Provide RDA/MLOS site and user site construction cost estimates (35% and 90%) and schedules in conjunction with 2.4.1 above (TOTAL 78).

| | | COST ESTIMATES 35% | 90% |
|---|---|---|---|
| 2.4.5.1 | Keesler AFB (MTC DPT) (TE) | | X |
| 2.4.5.2 | Dodge City (DT) | X | X |
| 2.4.5.3 | Houston/Galveston (EY) | X | X |
| 2.4.5.4 | Bannister (JB) | | X |
| 2.4.5.5 | Denver (DQ) | X | X |
| 2.4.5.6 | Keesler AFB (TB) | X | X |
| 2.4.5.7 | Andersen GUAM (CG) | X | X |
| 2.4.5.8 | San Juan PR (GO) | X | X |
| 2.4.5.9 | Kansas City (FH) | X | X |
| 2.4.5.10 | Wichita (IP) | X | X |
| 2.4.5.11 | Topeka (IE) | X | X |
| 2.4.5.12 | Tulsa (IH) | X | X |
| 2.4.5.13 | Goodland (EL) | X | X |
| 2.4.5.14 | Kadena OKI (FF) | X | X |
| 2.4.5.15 | Grand Island (EM) | X | X |
| 2.4.5.16 | Amarillo (CE) | X | X |
| 2.4.5.17 | State College (EU) | X | X |
| 2.4.5.18 | Binghamton (CN) | X | X |
| 2.4.5.19 | Philadelphia (GY) | X | X |
| 2.4.5.20 | Clark AFB (DH) | X | X |

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.7**

| | | | COST ESTIMATES 35% | 90% |
|---|---|---|---|---|
| 2.4.5 | CONT. | | | |
| | 2.4.5.21 | Dover AFB (DU) | X | X |
| | 2.4.5.22 | Charleston WV AFB (DC) | X | X |
| | 2.4.5.23 | Louisville (FV) | X | X |
| | 2.4.5.24 | Indianapolis (FB) | X | X |
| | 2.4.5.25 | Chicago (DF) | X | X |
| | 2.4.5.26 | Pittsburgh (HB) | X | X |
| | 2.4.5.27 | Detroit (DS) | X | X |
| | 2.4.5.28 | Kunsan AB ROK (FM) | X | X |
| | 2.4.5.29 | Cleveland (DI) | X | X |
| | 2.4.5.30 | Buffalo (CT) | X | X |
| | 2.4.5.31 | Memphis (FZ) | X | X |
| | 2.4.5.32 | East Alabama (DX) | X | X |
| | 2.4.5.33 | Little Rock (FT) | X | |
| | 2.4.5.34 | Camp Humphreys (CV) | X | |
| | 2.4.5.35 | Jackson (FC) | X | |
| | 2.4.5.36 | Slidell (HV) | X | |
| | 2.4.5.37 | Central Texas (DA) | X | |
| | 2.4.5.38 | San Francisco (HQ) | X | |
| | 2.4.5.39 | Los Angeles (FU) | X | |
| | 2.4.5.40 | Vandenberg AFB (IK) | X | |
| | 2.4.5.41 | Morehead City (EV) | X | |
| | 2.4.5.42 | Yokota (IS) | X | |
| | 2.4.5.43 | Albany (CB) | X | |
| | 2.4.5.44 | Dyess (DW) | X | |
| | 2.4.5.45 | Boston (CR) | X | |
| | 2.4.5.46 | Salt Lake City (HM) | X | |
| | 2.4.5.47 | Fort Rucker (EG) | X | |
| | 2.4.5.48 | Portland ME (HD) | X | |

2.4.6 Develop a NEXRAD System Test Plan and Acceptance Procedure and assist in the establishment of an Acceptance Working Group. Support the Government in the inspection and acceptance effort at each site and for each system and PUP installation and provide necessary project management services (TOTAL 12). TRIPS REQUIRED: 24

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.7**

2.4.6 CONT.

2.4.6.1 OSF/Radar Upgrade
2.4.6.2 NWS/NWSTC
2.4.6.3 Maintenance
2.4.6.4 OSF-2
2.4.6.5 Oklahoma City (Twin Lakes) OK (BA)
2.4.6.6 Melbourne FL (BB)
2.4.6.7 Washington (Sterling) VA (BC)
2.4.6.8 Frederick OK (BF)
2.4.6.9 NW Florida (BH)
2.4.6.10 DOD/Maintenance Training Equipment
2.4.6.11 St.Louis MO (BJ)
2.4.6.12 Kansas City (Bannister) MO (JB)

2.4.7 Provide miscellaneous project management and contract administration services on the NEXRAD prime contract and the Site Surveying and Facility and Support Planning contract.

2.4.7.1 Perform MLOS versus Commercial T-1 analyses (TOTAL 41).

2.4.7.1.1 MLOS - San Joaquin Valley (EH)
2.4.7.1.2 MLOS - Elko (IR)
2.4.7.1.3 MLOS - Boise (CQ)
2.4.7.1.4 MLOS - Missoula (GG)
2.4.7.1.5 MLOS - Billings (CM)
2.4.7.1.6 MLOS - Pocatello (HW)
2.4.7.1.7 MLOS - Grand Junction (EN)
2.4.7.1.8 MLOS - Pueblo (HE)
2.4.7.1.9 MLOS - North Platte (GR)
2.4.7.1.10 MLOS - Oklahoma City (BA)
2.4.7.1.11 MLOS - Springfield IL (HZ)
2.4.7.1.12 MLOS - Medford (FY)
2.4.7.1.13 COMMERCIAL T-1 - Seattle (HS)
2.4.7.1.14 COMMERCIAL T-1 - Portland OR (HC)
2.4.7.1.15 COMMERCIAL T-1 - Eureka (EC)
2.4.7.1.16 COMMERCIAL T-1 - Sacramento Valley (HL)
2.4.7.1.17 COMMERCIAL T-1 - San Francisco (HQ)

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.7**

2.4.7.1 CONT.

2.4.7.1.18 COMMERCIAL T-1 - Los Angeles (FU)
2.4.7.1.19 COMMERCIAL T-1 - Yuma (IT)
2.4.7.1.20 COMMERCIAL T-1 - Tucson (IG)
2.4.7.1.21 COMMERCIAL T-1 - Phoenix (GZ)
2.4.7.1.22 COMMERCIAL T-1 - Flagstaff (EF)
2.4.7.1.23 COMMERCIAL T-1 - Las Vegas (FR)
2.4.7.1.24 COMMERCIAL T-1 - Reno (HI)
2.4.7.1.25 COMMERCIAL T-1 - Charleston WV (DC)
2.4.7.1.26 COMMERCIAL T-1 - Wilmington (IQ)
2.4.7.1.27 COMMERCIAL T-1 - Roanoke (HJ)
2.4.7.1.28 COMMERCIAL T-1 - Cedar City (CY)
2.4.7.1.29 COMMERCIAL T-1 - Salt Lake City (HM)
2.4.7.1.30 COMMERCIAL T-1 - Denver (DQ)
2.4.7.1.31 COMMERCIAL T-1 - Albuquerque (CC)
2.4.7.1.32 COMMERCIAL T-1 - Topeka (IE)
2.4.7.1.33 COMMERCIAL T-1 - Tulsa (IH)
2.4.7.1.34 COMMERCIAL T-1 - Memphis (FZ)
2.4.7.1.35 COMMERCIAL T-1 - Louisville (FV)
2.4.7.1.36 COMMERCIAL T-1 - Portland ME (HD)
2.4.7.1.37 COMMERCIAL T-1 - Albany (CB)
2.4.7.1.38 COMMERCIAL T-1 - State College (EU)
2.4.7.1.39 COMMERCIAL T-1 - Philadelphia (GY)
2.4.7.1.40 COMMERCIAL T-1 - Raleigh/Durham (HG)
2.4.7.1.41 COMMERCIAL T-1 - Charleston SC (DB)

2.4.8 Provide the same services in support of real estate acquisition of MLOS and RDA sites, as provided for WFO sites in Subsection 2.3.6.

2.4.8.1 <u>FEE SIMPLE PURCHASE</u> - Purchase land from private sources for the construction by the Government of RDA and MLOS facilities (TOTAL 5). TRIPS REQUIRED: 12

2.4.8.1.1 Albany NY REPEATER (CB)
2.4.8.1.2 Charleston SC RDA (DB)
2.4.8.1.3 Charleston SC REPEATER (DB)

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 449466/68**

**WORK PERFORMANCE DESCRIPTION**
**TASK ORDER 06.7**

2.4.8.1 CONT.

2.4.8.1.4 Louisville KY REPEATER (FV)
2.4.8.1.5 Raleigh NC RDA (HG)

2.4.8.2 LEASES - Develop new leases for unimproved parcels (RDA/MLOS) (TOTAL 11). TRIPS REQUIRED: 25

2.4.8.2.1 Elko NV MLOS (Partial) (IR)
2.4.8.2.2 Elko NV RDA ACCESS (Partial)(IR)
2.4.8.2.3 North Platte NE REPEATER (GR)
2.4.8.2.4 Philadelphia PA REPEATER (GY)
2.4.8.2.5 Phoenix AZ MLOS (GZ)
2.4.8.2.6 Raleigh NC MLOS (HG)
2.4.8.2.7 Sacramento CA RDA (HL)
2.4.8.2.8 San Joaquin CA MLOS (EH)
2.4.8.2.9 Yuma AZ RDA (IT)
2.4.8.2.10 Wilmington NC MLOS (IQ)
2.4.8.2.11 Tulsa OK MLOS (IH)

2.4.8.3 MEMORANDA OF AGREEMENT - Development agreements for use of public domain under control of another Government Agency (TOTAL 5). TRIPS REQUIRED: 12

2.4.8.3.1 Elko NV RDA (IR)
2.4.8.3.2 Elko NV MLOS (IR)
2.4.8.3.3 Elko NV MLOS (IR)
2.4.8.3.4 Miami FL RDA/UA (GB)
2.4.8.3.5 Portland OR MLOS (HC)

2.4.8.4 Assist with acquisition of Norman Computer Training Facilities.



G 002643

AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

PAGE OF PAGES

2. AMENDMENT/MODIFICATION NO. 56WCNA200007

3. EFFECTIVE DATE October 1, 1991

4. REQUISITION/PURCHASE REQ. NO. NAAW66002

5. PROJECT NO. (If applicable)

6. ISSUED BY CODE CC31:RFA

U.S. Department of Commerce, NOAA
Central Administrative Support Center
Procurement Division, Room 1656
601 East 12th Street
Kansas City, Missouri 64106

7. ADMINISTERED BY (If other than Item 6) CODE

8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code)

Fluor Daniel, Inc.
4600 Madison, Suite 900
Kansas City, Missouri 64112

(✓) 9A. AMENDMENT OF SOLICITATION NO.

9B. DATED (SEE ITEM 11)

X 10A. MODIFICATION OF CONTRACT/ORDER NO. 50WCNA606099

10B. DATED (SEE ITEM 13) May 30, 1987

CODE FACILITY CODE

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning ______ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)
2AA1110BM2134PS (NWS) 2517 Increase $2,904,480.00 2AA1110BM2L41PS (DOD) 2517 Increase $161,360.00
2AA1110BM2L40PS (FAA) 2517 Increase $161,360.00

13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

(✓) A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b).

C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:

D. OTHER (Specify type of modification and authority)
X Task Order Number Seven (0007) in accordance with Task Order Clause B.7 of the Contract.

E. IMPORTANT: Contractor ☒ is not, ☐ is required to sign this document and return ______ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

This task order is issued to cover the period of October 1, 1991 through December 31, 1991. The work to be performed during this period is a continuation of the previous task orders of the Contract. The work is described in the attached statement of work entitled "Work Performance Description, Revision 1," dated September 24, 1991. Fluor Daniel Inc's proposal dated September 24, 1991 is incorporated by reference.

| Labor Hours | Cost | Fixed Fee | Total Cost |
|---|---|---|---|
| 55,375 | $2,986,500.00 | $240,700.00 | $3,227,200.00 |

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER (Type or print)

16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)
Donita S. McCullough
Contracting Officer

15B. CONTRACTOR/OFFEROR
(Signature of person authorized to sign)

15C. DATE SIGNED

16B. UNITED STATES OF AMERICA
BY Donita McCullough
(Signature of Contracting Officer)

16C. DATE SIGNED 10-9-91

NSN 7540-01-152-8070
PREVIOUS EDITION UNUSABLE

30-105

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

G 001048

## INSTRUCTIONS

Instructions for items other than those that are self-explanatory, are as follows:

(a) Item 1 (Contract ID Code). Insert the contract type identification code that appears in the title block of the contract being modified.

(b) Item 3 (Effective date).

(1) For a solicitation amendment, change order, or administrative change, the effective date shall be the issue date of the amendment, change order, or administrative change.

(2) For a supplemental agreement, the effective date shall be the date agreed to by the contracting parties.

(3) For a modification issued as an initial or confirming notice of termination for the convenience of the Government, the effective date and the modification number of the confirming notice shall be the same as the effective date and modification number of the initial notice.

(4) For a modification converting a termination for default to a termination for the convenience of the Government, the effective date shall be the same as the effective date of the termination for default.

(5) For a modification confirming the contracting officer's determination of the amount due in settlement of a contract termination, the effective date shall be the same as the effective date of the initial decision.

(c) Item 6 (Issued By). Insert the name and address of the issuing office. If applicable, insert the appropriate issuing office code in the code block.

(d) Item 8 (Name and Address of Contractor). For modifications to a contract or order, enter the contractor's name, address, and code as shown in the original contract or order, unless changed by this or a previous modification.

(e) Items 9, (Amendment of Solicitation No.–Dated), and 10, (Modification of Contract/Order No.–Dated). Check the appropriate box and in the corresponding blanks insert the number and date of the original solicitation, contract, or order.

(f) Item 12 (Accounting and Appropriation Data). When appropriate, indicate the impact of the modification on each affected accounting classification by inserting one of the following entries:

(1) Accounting classification ..............................
Net increase $ ..............................

(2) Accounting classification ..............................
Net decrease $ ..............................

NOTE: If there are changes to multiple accounting classifications that cannot be placed in block 12, insert an asterisk and the words "See continuation sheet".

(g) Item 13. Check the appropriate box to indicate the type of modification. Insert in the corresponding blank the authority under which the modification is issued. Check whether or not contractor must sign this document. (See FAR 43.103.)

(h) Item 14 (Description of Amendment/Modification).

(1) Organize amendments or modifications under the appropriate Uniform Contract Format (UCF) section headings from the applicable solicitation or contract. The UCF table of contents, however, shall not be set forth in this document.

(2) Indicate the impact of the modification on the overall total contract price by inserting one of the following entries:

(i) Total contract price increased by $ ...........

(ii) Total contract price decreased by $ ...........

(iii) Total contract price unchanged.

(3) State reason for modification.

(4) When removing, reinstating, or adding funds, identify the contract items and accounting classifications.

(5) When the SF 30 is used to reflect a determination by the contracting officer of the amount due in settlement of a contract terminated for the convenience of the Government, the entry in Item 14 of the modification may be limited to –

(i) A reference to the letter determination; and

(ii) A statement of the net amount determined to be due in settlement of the contract.

(6) Include subject matter or short title of solicitation/contract where feasible.

(i) Item 16B. The contracting officer's signature is not required on solicitation amendments. The contracting officer's signature is normally affixed last on supplemental agreements.

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 597176/78**

**WORK PERFORMANCE DESCRIPTION**
**FY92 FIRST QUARTER WORK PLAN REV.1**

TASK ORDER - PROGRAM MANAGEMENT & PLANNING - LABOR
PERFORMANCE PERIOD: OCTOBER 1, 1991 - DECEMBER 31, 1991

SCOPE: WORK TO BE PERFORMED UNDER CONTRACT 50WCNA606099 DURING FY 1992...

STATEMENT OF WORK:

**TASK 2.1 – PROGRAM AND PROJECT MANAGEMENT AND PLANNING (REFERENCE ARTICLE 2.1 OF THE CONTRACT).**

2.1.1 Perform Program Management, PSC and S/C Administration.

2.1.1.1 Project Management - Program Management Activities

2.1.1.1.1 Program Planning
2.1.1.1.2 Overview of Departmental Work
2.1.1.1.3 Client Activity Coordination
2.1.1.1.4 Travel Coordination
2.1.1.1.5 Filing
2.1.1.1.6 Prepare, issue, copy and distribute correspondence and E-Mail.
2.1.1.1.7 Prepare and issue Meeting Notes
2.1.1.1.8 Prepare and issue Monthly Reports
2.1.1.1.9 Prepare and update Work Plans
2.1.1.1.10 SEPO and FDI Alignment

2.1.1.2 Project Controls - Program Management Activities

2.1.1.2.1 TPO Coordination
2.1.1.2.2 Prepare Budget & Schedule Studies
2.1.1.2.3 Quarterly Status & Update of Program Master Schedule & Project Level Schedule (TOTAL 1)
2.1.1.2.4 Twice Monthly Update of Summary Work Plan Schedule (TOTAL 7)
2.1.1.2.5 Monthly Status & Update of Task Order Control Level Schedule (TOTAL 3)
2.1.1.2.6 Draft Quarterly Task Order Revisions (TOTAL 7 Task Orders)

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 597176/78**

**WORK PERFORMANCE DESCRIPTION**
**FY92 FIRST QUARTER WORK PLAN REV.1**

2.1.1.2.7 Maintain and issue Monthly Program Cost Report (TOTAL 3)
2.1.1.2.8 Prepare site specific engineering manhour reports (TOTAL 5)
2.1.1.2.9 Prepare and issue Task Order Change Requests.
2.1.1.2.10 Issue weekly Change Request Index (TOTAL 13)

2.1.1.3 WFO Project Management - Program Management Activities

2.1.1.3.1 Monitor and Manage Quality Program
2.1.1.3.2 Develop and review Project Execution Plans
2.1.1.3.3 Monitor and Manage Project Costs
2.1.1.3.4 Monitor and Manage Project Scope
2.1.1.3.5 Monitor and Manage Task Order Schedule
2.1.1.3.6 Implement Plans and Changes to Plans

2.1.1.4 Construction - Program Management Activities

2.1.1.5 Engineering - Program Management Activities

2.1.1.5.1 Engineering Administration
2.1.1.5.2 Scheduling and Planning
2.1.1.5.3 Engineering Supervision
2.1.1.5.4 Engineering Staff Meetings
2.1.1.5.5 Review Project Documents and Criteria

2.1.1.6 Participate in NEXRAD Outreach Committee. Attendance at two meetings allowed. TRIPS REQUIRED: 2

2.1.1.7 Participate in FOC meetings as required. Attendance at two meetings allowed. TRIPS REQUIRED: 2

2.1.1.8 Administer Gould Evans Architects subcontract

2.1.1.9 Administer other A/E subcontractors

2.1.1.10 Administer temporary personnel subcontracts

2.1.2 Cost Allocation and Progress Reporting

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 597176/78**

**WORK PERFORMANCE DESCRIPTION**
**FY92 FIRST QUARTER WORK PLAN REV.1**

2.1.2.1 Prepare and submit Cost Allocation Report (CAR) Financial Progress Reports and Progress Reports (TOTAL 3)

2.1.2.2 Maintain Expense Worksheet Database

2.1.2.3 Maintain CAPS Labor Report

2.1.2.4 Maintain Agency Labor Data

2.1.2.5 Research Commitments

2.1.3 THRU 2.1.5 NOT USED...

2.1.6 Schedule and implement Program Mangement Review Meetings (TOTAL 2)

2.1.7 THRU 2.1.8 NOT USED...

2.1.9 Schedule and implement Program Technical Review Meetings (TOTAL 6)

2.1.10 Schedule and implement Task Order Review Meetings (TOTAL 3)

2.1.11 Miscellaneous management and planning matters

2.1.11.1 Maintain an O & A Manual (No work allowed)

2.1.11.2 Purchasing and Procurement - Project Support

2.1.11.3 Cost Accounting Activities

2.1.11.3.1 Payroll Timesheets
2.1.11.3.2 NOAA Invoice
2.1.11.3.3 Expense Reports
2.1.11.3.4 Accounts Payable
2.1.11.3.5 Project Cost Analysis
2.1.11.3.6 Supervision Overview

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 597176/78**

**WORK PERFORMANCE DESCRIPTION**
**FY92 FIRST QUARTER WORK PLAN REV.1**

2.1.11.3.7 Telephone Expense Tracking and Bill Reconciliation
2.1.11.3.8 Petty Cast Administration
2.1.11.3.9 Manual Checks
2.1.11.3.10 KCPO Banking

2.1.11.4 Irvine Organization Support

2.1.11.5 Project Administration - Human Resources

2.1.11.5.1 Salary Administration
2.1.11.5.2 Employee Records
2.1.11.5.3 Performance Evaluations
2.1.11.5.4 Benefit Administration
2.1.11.5.5 EEO/AAP

2.1.11.6 Project Administration - Office Operations

2.1.11.6.1 Clerical Support
2.1.11.6.2 Reception
2.1.11.6.3 Office Supplies
2.1.11.6.4 Telephone/correspondence/couriers
2.1.11.6.5 Facilities and equipment
2.1.11.6.6 Travel coordination and log

2.1.11.7 Project Administration-LAN and Computer System

2.1.11.7.1 Support
2.1.11.7.2 Administration
2.1.11.7.3 Network maintenance
2.1.11.7.4 Hardware support
2.1.11.7.5 Software support
2.1.11.7.6 Network procedure word processing
2.1.11.7.7 Programming

2.1.12 NOT USED...

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 597176/78**

**WORK PERFORMANCE DESCRIPTION**
**FY92 FIRST QUARTER WORK PLAN REV.1**

TASK ORDER - GENERAL ARCHITECTURE & ENGINEERING
PERFORMANCE PERIOD: OCTOBER 1, 1991 - DECEMBER 31, 1991

SCOPE: WORK TO BE PERFORMED UNDER CONTRACT 50WCNA606099 DURING FY 1992...

STATEMENT OF WORK:

**TASK 2.2 - GENERAL ARCHITECTURE AND ENGINEERING (REFERENCE ARTICLE 2.2 OF THE CONTRACT)**

2.2.1 Perform specific general architectural and engineering tasks as may be required by the Contracting Officer.

2.2.1.1 Update Standard Designs
2.2.1.2 Prepare special studies as required
2.2.1.3 DDG/EES maintenance specifications

2.2.2 THRU 2.2.4 NOT USED...

2.2.5 Maintain Design Criteria Manual

2.2.5.1 Update Design Manual including Furniture Book & color schemes to FY92 Criteria

2.2.6 NOT USED...

2.2.7 Develop Operations and Maintenance Manuals for completed sites (TOTAL 2).

2.2.7.1 Chicago IL (DF)
2.2.7.2 Wichita KS (IP)

2.2.8 THRU 2.4.8 NOT USED...

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 597176/78**

**WORK PERFORMANCE DESCRIPTION**
**FY92 FIRST QUARTER WORK PLAN REV.1**

TASK ORDER - SITE SPECIFIC ARCHITECTURE & ENGINEERING
PERFORMANCE PERIOD: OCTOBER 1, 1991 - DECEMBER 31, 1991

SCOPE: WORK TO BE PERFORMED UNDER CONTRACT 50WCNA606099 DURING FY 1992...

STATEMENT OF WORK:

**TASK 2.1 - PROGRAM AND PROJECT MANAGEMENT AND PLANNING (REFERENCE ARTICLE 2.1 OF THE CONTRACT)**

2.1.1 THRU 2.1.2 NOT USED...

2.1.3 Prepare Construction Cost Estimates (CCE) for WFO facilities, UAIB's, and roads in conjuntion with section 2.3.1. Includes maintenance of estimating data base/data retrieval system, and computer systems for estimating.

2.1.3.1 15% DESIGN ESTS.(CONCEPTUAL)
2.1.3.2 35% DESIGN ESTS.(TOTAL 9)
2.1.3.3 90% DESIGN ESTS.(TOTAL 6)
2.1.3.4 100% DESIGN ESTIMATES
2.1.3.5 LESSOR MOD ESTIMATES (TOTAL 3)

2.1.4 Prepare construction schedules in conjunction with Section 2.1.3.4.

2.1.5 THRU 2.1.12 NOT USED...

**TASK 2.3 - SITE SPECIFIC ARCHITECTURE AND ENGINEERING (REFERENCE ARTICLE 2.3 OF THE CONTRACT)**

2.3.1 (a) Accomplish site specific CONCEPTUAL design and issue 15% design packages where required. Conduct ongoing review of design criteria. Participate in SPO/SEPO/NWS review of same. Respond to requirements for technical evaluation of alternative criteria. It is not anticipated 15% design packages will be issued for standard designs.

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 597176/78**

**WORK PERFORMANCE DESCRIPTION**
**FY92 FIRST QUARTER WORK PLAN REV.1**

2.3.1(a)CONT.

| | | CONCEPT. DESIGN | 15% DESIGN PACKAGE |
|---|---|---|---|
| 2.3.1.1 | Charleston WV (DC) (WFO I-14) | 100% | |
| 2.3.1.2 | Dallas TX (DO) (RFC) | 60% | |
| 2.3.1.3 | Los Angeles CA (FU)(Unique WFO) | 100% | Required |
| 2.3.1.4 | S.Francisco Bay Area(HQ)(Uniq.WFO) | 100% | |
| 2.3.1.5 | Portland ME (HD) (WFO I-14) | 60% | |
| 2.3.1.6 | Great Falls MT (EQ) (WFO I-14) | 100% | |
| 2.3.1.7 | Philadelphia PA (GY)(WFO I-14) | 100% | |
| 2.3.1.8 | Sioux Falls SD (HU)(WFO I-12) | 100% | |

2.3.1 (b) Accomplish site specific PRELIMINARY design, FINAL design and SIGNATURE documents (35%,90% and 100% packages).

| | | DESIGN PACKAGES 35% | 90% | 100% |
|---|---|---|---|---|
| 2.3.1.9 | Jackson MS (FC) (Modification) | | 100% | 50% |
| 2.3.1.10 | Des Moines IA (DR) (WFO I-14) | | | 100% |
| 2.3.1.11 | Boise ID (CG) (Unique WFO) | | 100% | 40% |
| 2.3.1.12 | Indianapolis IN (FB)(WFO I-18) | | 100% | 100% |
| 2.3.1.13 | Boston MA (CR) (RFC) | 100% | 100% | |
| 2.3.1.14 | Birmingham AL (CO) (WFO I-14) | | 100% | |
| 2.3.1.15 | New York NY (GP) (WFO I-18) | 100% | 60% | |
| 2.3.1.16 | Philadelphia PA (GY) (WFO I-14) | 100% | 25% | |
| 2.3.1.17 | Los Angeles CA (FU)(Uniq.WFO) | 100% | | |
| 2.3.1.18 | S.Fran.Bay Area(HQ)(Uniq.WFO) | 100% | 25% | |
| 2.3.1.19 | Austin/S.Ant. TX(HO)(WFO I-14)- | 100% | 90% | |
| 2.3.1.20 | Great Falls MT (EQ)(WFO I-14) | 100% | | |
| 2.3.1.21 | Sioux Falls SD (HU)(WFO I-12) | 100% | 75% | |
| 2.3.1.22 | Pittsburgh PA (HB)(Modification) | | 100% | |
| 2.3.1.23 | Charleston WV (DC)(WFO I-14) | 100% | | |

2.3.2 Produce As-Built drawings for completed sites (2 sites).

2.3.2.1 Chicago IL (DF)
2.3.2.2 Wichita KS (IP)

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 597176/78**

**WORK PERFORMANCE DESCRIPTION**
**FY92 FIRST QUARTER WORK PLAN REV.1**

2.3.3 Design package submittals and reviews for WFO's to support Section 2.3.1 above.

2.3.4 Accomplish site investigations (TOTAL 7) and complete site investigation packages in support of A/E design. Prepare, issue, administer subcontracts for and accomplish TOPO surveys (TOTAL 10), geotechnical surveys (TOTAL 7), tree surveys (ALLOW 2) laboratory testing and engineering coordination to support 2.3.1 (a) above. TRIPS REQUIRED: 7

| | | INVESTI. | TOPO | GEOTECH |
|---|---|---|---|---|
| 2.3.4.1 | Green Bay WI (ER) | x | | |
| 2.3.4.2 | Missoula MT (GG) | x | x | |
| 2.3.4.3 | Norfolk VA (CQ) | x | | |
| 2.3.4.4 | Reno NV (HI) | x | x | |
| 2.3.4.5 | San Juan PR (GO) | x | | |
| 2.3.4.6 | Tallahassee FL (IB) | x | | |
| 2.3.4.7 | Wilmington NC (IQ) | x | | |
| 2.3.4.8 | Albuquerque NM (CC) | | | x |
| 2.3.4.9 | Atlanta GA (CK) | | | x |
| 2.3.4.10 | Charleston WV (DC) | | | x |
| 2.3.4.11 | Duluth MN (DV) | | x | x |
| 2.3.4.12 | Knoxville TN (FL) | | | x |
| 2.3.4.13 | Lubbock TX (FW) | | | x |
| 2.3.4.14 | Nashville TN (GM) | | | x |
| 2.3.4.15 | Burlington VT (CU) | | x | |
| 2.3.4.16 | Buffalo NY (CY) | | x | |
| 2.3.4.17 | Jacksonville FL (FD) | | x | |
| 2.3.4.18 | Lake Charles LA (FP) | | x | |
| 2.3.4.19 | Lake Charles LA (Cable Easmt.) | | x | |
| 2.3.4.20 | Little Rock AR (FT) | | x | |
| 2.3.4.21 | Shreveport LA (HT) | | x | |

2.3.5 THRU 2.4.8 NOT USED...

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 597176/78**

**WORK PERFORMANCE DESCRIPTION**
**FY92 FIRST QUARTER WORK PLAN REV.1**

TASK ORDER - CONTRACTING, CONSTRUCTION
MANAGEMENT & INSPECTION

PERFORMANCE PERIOD: OCTOBER 1, 1991 - DECEMBER 31, 1991

SCOPE: WORK TO BE PERFORMED UNDER CONTRACT 50WCNA606099 DURING FY 1992...

STATEMENT OF WORK:

**TASK 2.3 - SITE SPECIFIC ARCHITECTURE AND ENGINEERING (REFERENCE ARTICLE 2.3 OF THE CONTRACT)**

2.3.1 THRU 2.3.7 NOT USED...

2.3.8 Provide assistance to the government in contracting matters.

2.3.8.1 Assist the government in administering Government Furnished Equipment (GFE) requirements contracts. Prepare and resource as sole source contract the DDG GFE contract.

2.3.8.1.1 Furniture GFE
2.3.8.1.2 DDG GFE
2.3.8.1.3 EES GFE
2.3.8.1.4 HVAC GFE
2.3.8.1.5 Signs GFE
2.3.8.1.6 Source Fuel Tank GFE

2.3.8.2 Assist the government in preparation of CBD Notices (TOTAL 3)

2.3.8.3 Provide contract administration support

2.3.8.3.1 Clerical Support
2.3.8.3.2 Staff Meetings and Preparation
2.3.8.3.3 Writing Procedures
2.3.8.3.4 Scheduling Tasks

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 597176/78**

**WORK PERFORMANCE DESCRIPTION**
**FY92 FIRST QUARTER WORK PLAN REV.1**

2.3.8.3 CONT.

2.3.8.3.5 Database Management
2.3.8.3.6 Administer Socio-Economic Programs

2.3.8.4 Prepare and issue construction contracts in conjunction with Task Order No. 06.3 Section 2.3.1 (TOTAL 3)

2.3.8.4.1 Des Moines IA (DR) (Partial 50%)
2.3.8.4.2 Morehead City NC (Partial 25%)
2.3.8.4.3 Indianapolis IN (Partial 20%)

2.3.8.5 Conduct Pre-Construction Conferences (NONE) TRIPS REQUIRED: 0.

2.3.8.6 Provide construction management, review of vendor submittals, review of lessor submittals and contract administration services as required for 8 projects.

2.3.8.6.1 Chicago IL (DF)
2.3.8.6.2 Louisville KY (FV)
2.3.8.6.3 Detroit MI (DS)
2.3.8.6.4 Binghamton NY (CB)
2.3.8.6.5 Jackson MS Roof (FC)
2.3.8.6.6 Tulsa OK (Lease)(IH)
2.3.8.6.7 Central Pennsylvania (Lease)(EU)
2.3.8.6.8 Kansas City MO (FH)

2.3.8.7 Validate contractor payment requests and construction progress.

2.3.8.8 Maintain cost report for recording and reporting contractors cost status (TOTAL 3).

2.3.8.9 Assist in the prevention and resolution of disputes and claims.

2.3.8.10 Assist in negotiating change orders.

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 597176/78**

**WORK PERFORMANCE DESCRIPTION**
**FY92 FIRST QUARTER WORK PLAN REV.1**

2.3.8.11 Review contractors schedules for compliance to contract requirements.

2.3.8.12 Provide Contract Administration Services.

2.3.8.13 Prepare and administer furniture storage, delivery and installation contracts (TOTAL 5).

2.3.8.13.1 Chicago IL (DF)
2.3.8.13.2 Louisville KY (FV)
2.3.8.13.3 Detroit MI (DS)
2.3.8.13.4 Tulsa OK (IH)
2.3.8.13.5 Central Pennsylvania (EU)

2.3.8.14 Conduct post construction conference (1 TOTAL).
TRIPS REQUIRED: 2

2.3.8.14.1 Chicago IL (DF)

2.3.8.15 Coordinate Furniture Requirements between local MIC/SEPO/CASC/Herman Miller/NOAA-DC (TOTAL 2)

2.3.8.15.1 Louisville KY (FV)
2.3.8.15.2 Detroit MI (DS)

2.3.8.16 Provide construction warranty assistance. TRIPS REQUIRED: 5

2.3.8.16.1 Sterling VA (BC)
2.3.8.16.2 St. Louis MO (BJ)
2.3.8.16.3 Amarillo TX (CE)
2.3.8.16.4 Grand Island NE (EM)
2.3.8.16.5 Houston/Galveston TX (EY)

2.3.9 Provide construction management and inspection services.

2.3.9.1 Provide construction management and inspection services for 7 projects. TOTAL 20 inspections, 11 contractor invoices. TRIPS REQUIRED: 20

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 597176/78**

**WORK PERFORMANCE DESCRIPTION**
**FY92 FIRST QUARTER WORK PLAN REV.1**

2.3.9.1.1 Chicago IL (DF)
2.3.9.1.2 Louisville KY (FV)
2.3.9.1.3 Detroit MI (DS)
2.3.9.1.4 Binghamton NY (CB)
2.3.9.1.5 Jackson MS Roof (FT)
2.3.9.1.6 Tulsa OK (IH) (Lease)
2.3.9.1.7 Central Pennsylvania (EU)(Lease)

2.3.9.2 Compliance inspection and coordinations.

2.3.9.3 Final inspection and acceptance.

2.3.9.4 Validate contractor payment requests and construction progress.

2.3.9.5 Review contractors schedules for compliance to program requirements.

2.3.9.6 Coordinate construction contract interfaces.

2.3.9.7 Construction project administration.

2.3.10 THRU 2.4.8 NOT USED...

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 597176/78**

**WORK PERFORMANCE DESCRIPTION**
**FY92 FIRST QUARTER WORK PLAN REV.1**

TASK ORDER - REAL PROPERTY ACQUISITION
PERFORMANCE PERIOD: OCTOBER 1, 1991 - DECEMBER 31, 1991

SCOPE: WORK TO BE PERFORMED UNDER CONTRACT 50WCNA606099 DURING FY 1992...

STATEMENT OF WORK:

**TASK 2.3 – SITE SPECIFIC ARCHITECTURE AND ENGINEERING (REFERENCE ARTICLE 2.3 OF THE CONTRACT)**

2.3.6 Perform market surveys, prepare documents, negotiate terms, accomplish land surveys, and obtain other information including appraisals of property values, legal descriptions, names of owners, recorded easements, site maps, zoning clearances, and other information necessary to allow the Government to obtain specified building sites.

2.3.6.1 Assist the government in selection of sites to be acquired.

2.3.6.2 Assist SEPO in preparation of Congressional responses.

2.3.6.3 Assist ASC's on drafting deeds.

2.3.6.4 Assist ASC's on title restrictions resolution.

2.3.6.5 Assist SEPO on interpreting utility tie-in fees and permits.

2.3.6.6 Assist SEPO in the preparation of courtesy review permit package submissions.

2.3.6.7 Assist SEPO in coordinating real estate environmental and permitting issues. TRIPS REQUIRED: 2

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 597176/78**

**WORK PERFORMANCE DESCRIPTION**
**FY92 FIRST QUARTER WORK PLAN REV.1**

2.3.6.8 FEE SIMPLE PURCHASE - Purchase land from private sources for construction by the Government of WFO facilities (TOTAL 7). TRIPS REQUIRED: 2

- 2.3.6.8.1 Eureka CA WFO(Partial)(CR6-012)(EC)
- 2.3.6.8.2 Minneapolis MN(Purchase Opt.)(Partial)FU
- 2.3.6.8.3 Minneapolis MN WFO/RFC (Partial)(GE)
- 2.3.6.8.4 Buffalo NY WFO (Partial) (CT)
- 2.3.6.8.5 Boston MA WFO/RFC(Partial)(CR)
- 2.3.6.8.6 North Platte NE WFO(Partial)(GR)
- 2.3.6.8.7 Charleston WV WFO(Partial)(DC)

2.3.6.9 LEASES- Develop new leases for special purpose facility space (WFO) (TOTAL 6). TRIPS REQUIRED: 3

- 2.3.6.9.1 Albany NY WFO (CB)
- 2.3.6.9.2 Roanoke VA WFO(Partial)(HJ)
- 2.3.6.9.3 Raleigh NC WFO (HG)
- 2.3.6.9.4 Little Rock AR WFO(Partial)(FT)
- 2.3.6.9.5 Portland OR WFO/RFC(Partial)(HC)
- 2.3.6.9.6 Miami FL WFO (Partial)(GB)

2.3.6.10 AAIA LEASES- Obtain no-cost leases for use of airport property under the Airport and Airways Improvement Act (AAIA) for WFO facilities (TOTAL 4). TRIPS REQUIRED: 1

- 2.3.6.10.1 Charleston SC WFO(Partial)(DB)
- 2.3.6.10.2 Flagstaff AZ WFO (Partial)(EF)
- 2.3.6.10.3 Dallas TX WFO/RFC/UA/RDA (Partial) (DO)
- 2.3.6.10.4 Salt Lake City UT WFO(Partial)(HM)

2.3.6.11 MEMORANDUM OF AGREEMENT- Develop agreements for use of public domain under the control of another Government Agency for WFO facilities (TOTAL 3). TRIPS REQUIRED: 1

- 2.3.6.11.1 Elko NV WFO(Partial)(IR)

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 597176/78**

**WORK PERFORMANCE DESCRIPTION**
**FY92 FIRST QUARTER WORK PLAN REV.1**

2.3.6.11 CONT.

- 2.3.6.11.2 Missoula MT WFO (Partial) (GG)
- 2.3.6.11.3 New York NY WFO(Partial) (GP)

2.3.6.12 Prepare requirements and design development package for lease and lessor modification sites. (TOTAL 6) TRIPS REQUIRED: 5

- 2.3.6.12.1 Albany NY WFO (Lease) (CB)
- 2.3.6.12.2 Denver CO ERL WFO (Lease) (DQ)
- 2.3.6.12.3 Columbia SC WFO (Lessor Mod) (DK)
- 2.3.6.12.4 Cleveland OH WFO (Lessor Mod) (DI)
- 2.3.6.12.5 Little Rock AR WFO (Lessor Mod) (FT)
- 2.3.6.12.6 Memphis TN WFO/RFC (Lessor Mod) (FZ)

2.3.6.13 Perform Real Estate Program Management Activities

- 2.3.6.13.1 Real Estate Planning
- 2.3.6.13.2 Reporting
- 2.3.6.13.3 Real Estate Management and Supervision
- 2.3.6.13.4 Real Estate Coordination and Direction
- 2.3.6.13.5 Clerical Administration Support
- 2.3.6.13.6 Travel Arrangements
- 2.3.6.13.7 SRI Report Coordination

2.3.6.14 Prepare, issue and administer subcontracts for plats of survey (TOTAL 10), appraisals (TOTAL 4), title insurance (TOTAL 1) and tower analysis (TOTAL 1) as required to support real estate actions.

2.3.6.15 Develop monthly NEXRAD Real Estate Report (TOTAL 3)

2.3.6.16 Provide real estate administration and coordination support. TRIPS REQUIRED: 10

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 597176/78**

**WORK PERFORMANCE DESCRIPTION**
**FY92 FIRST QUARTER WORK PLAN REV.1**

2.3.6.17 LEASE ADMINISTRATION(Competitive Sites)-Administer the lease contracts for leases at competitive locations. This will include discussions with lessor, building contractor, and architect to clarify lease terms on requirements; and review of schedules and progress (TOTAL 8) TRIPS REQUIRED: 8

2.3.6.17.1 Albany NY (Partial) (CB)
2.3.6.17.2 Little Rock AR (Partial) (FT)
2.3.6.17.3 Sacramento CA (HL)
2.3.6.17.4 Raleigh NC (Partial) (HG)
2.3.6.17.5 Central Pennsylvania (Partial) (EV)
2.3.6.17.6 Columbia SC (Partial) (DK)
2.3.6.17.7 Tulsa OK (Partial) (IH)
2.3.6.17.8 Cleveland OH (Partial) (DI)

2.3.6.18 FEE SIMPLE PURCHASE - Purchase land from private sources for the construction by the Government of RDA and MLOS facilities (TOTAL 5). TRIPS REQUIRED: 2

2.4.6.18.1 Charleston SC RDA(Partial)(DB)
2.4.6.18.2 Charleston SC MLOS (Partial)(DB)
2.4.6.18.3 Yuma AZ RDA (Partial)(IT)
2.4.6.18.4 Pueblo CO MLOS (Partial)(HE)
2.4.6.18.5 Raleigh NC RDA(Partial)(HG)

2.4.6.19 LEASES - Develop new leases for unimproved parcels (for RDA/MLOS facilities) (TOTAL 13). TRIPS REQUIRED: 4

2.4.6.19.1 Albany NY MLOS (Partial)(CB)
2.4.6.19.2 Boston MA RDA (Partial) (CR)
2.4.6.19.3 Elko NV RDA ACCESS (Partial)(IR)
2.4.6.19.4 Little Rock AR RDA (Partial)(FT)
2.4.6.19.5 North Platte NE MLOS (Partial)(GR)
2.4.6.19.6 Philadelphia PA MLOS(Partial)(GY)
2.4.6.19.7 Phoenix AZ MLOS (Partial)(GZ)
2.4.6.19.8 Raleigh NC MLOS(Partial)(HG)

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 597176/78**

**WORK PERFORMANCE DESCRIPTION**
**FY92 FIRST QUARTER WORK PLAN REV.1**

2.4.6.19 CONT.

- 2.4.6.19.9 Charleston SC MLOS (Partial)(DB)
- 2.4.6.19.10 Charleston WV RDA(Partial)(DC)
- 2.4.6.19.11 Wilmington NC MLOS(Partial)(IQ)
- 2.4.6.19.12 Tulsa OK MLOS(Partial)(IH)
- 2.4.6.19.13 Roanoke VA MLOS (Partial)(HJ)

2.4.6.20 MEMORANDA OF AGREEMENT - Develop agreements for use of public domain under control of another Government Agency for RDA/MLOS facilities (TOTAL 9). TRIPS REQUIRED: 2

- 2.4.6.20.1 Denver CO MLOS(Partial)(DQ)
- 2.4.6.20.2 Elko NV MLOS (Partial) (IR)
- 2.4.6.20.3 Elko NV MLOS (Partial)(IR)
- 2.4.6.20.4 Louisville KY RDA (Partial)(FY)
- 2.4.6.20.5 Portland OR MLOS(Partial)(HC)
- 2.4.6.20.6 Missoula MT RDA (Partial)(GG)
- 2.4.6.20.7 Flagstaff AZ RDA (Partial)(EF)
- 2.4.6.20.8 Medford OR RDA (Partial) (FY)
- 2.4.6.20.9 Sacramento CA RDA (Partial)(HL)

2.4.6.21 AAIA LEASES - Obtain no-cost leases for use of airport property under the Airport and Airways Improvement Act (AAIA) for RDA/MLOS facilities (TOTAL 2). TRIPS REQUIRED: 1

- 2.4.6.21.1 Key West FL RDA (Partial) (FJ)
- 2.4.6.21.2 Miami FL RDA/UAIB (Partial) (GB)

2.4.6.22 Perform Economic Analyses for T-1 Sensitivity.

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 597176/78**

**WORK PERFORMANCE DESCRIPTION**
**FY92 FIRST QUARTER WORK PLAN REV.1**

2.4.6.23 Provide Services in support of Real Estate Acquisition of FAA T-NEXRAD and TDWR sites. TOTAL REQUIRED: 18

| | | Plat | Appraisal | Acquisition | Title |
|---|---|---|---|---|---|
| 2.3.6.23.1 | Memphis TN (MEM) | x | x | | x |
| 2.3.6.23.2 | Houston TX (Inter-Cont) (IAH) | x | | | |
| 2.3.6.23.3 | Ft. Lauderdale FL (FLL) | x | x | x | x |
| 2.3.6.23.4 | Washington Nat'l DC (DCA) | x | x | | x |
| 2.3.6.23.5 | Atlanta GA (ATL) | x | x | x | x |
| 2.3.6.23.6 | Chicago (O'Hare) IL (ORD) | x | | | |
| 2.3.6.23.7 | New Orleans LA (MSY) | x | | | |
| 2.3.6.23.8 | St. Louis MO (STL) | x | | | |
| 2.3.6.23.9 | Orlando FL (MCO) | x | | x | |
| 2.3.6.23.10 | Tampa FL (TPA) | x | | x | x |
| 2.3.6.23.11 | Minneapolis MN (MSP) | x | x | | x |
| 2.3.6.23.12 | Dallas/Ft. Worth TX (DFW) | x | | | |
| 2.3.6.23.13 | Miami FL (MIA) | x | | x | |
| 2.3.6.23.14 | Houston (Hobby) TX (HOU) | x | | | |
| 2.3.6.23.15 | Denver CO (DEN) | x | | | |
| 2.3.6.23.16 | Andrews AFB | x | x | | |
| 2.3.6.23.17 | Philadelphia PA (PHL) | x | | | |
| 2.3.6.23.18 | New York (LaGuardia) (LGA) | x | | | |
| 2.3.6.23.19 | Phoenix AZ (PHX) | x | x | | |
| 2.3.6.23.20 | New York (Kennedy)(JFK) | x | x | | |
| 2.3.6.23.21 | Newark NJ (EWR) | x | x | | |
| 2.3.6.23.22 | Detroit MI (DTW) | x | x | | |
| 2.3.6.23.23 | Pittsburgh PA (PIT) | x | x | | |
| 2.3.6.23.24 | Kansas City MO (MCI) | x | | | |
| 2.3.6.23.25 | Charlotte NC (CLT) | x | | x | |
| 2.3.6.23.26 | Covington/Cincinnati OH (CVG) | x | | x | |
| 2.3.6.23.27 | Dallas (Love Field) TX (DAL) | x | | | |
| 2.3.6.23.28 | Salt Lake City UT (SLC) | x | | | |
| 2.3.6.23.29 | West Palm Beach FL (PBI) | x | | | |
| 2.3.6.23.30 | Raleigh/Durham NC (RDA) | x | | x | |
| 2.3.6.23.31 | Washington DC (Dulles) (IAD) | x | | | |
| 2.3.6.23.32 | Louisville KY (SDF) | x | | x | |

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 597176/78**

**WORK PERFORMANCE DESCRIPTION**
**FY92 FIRST QUARTER WORK PLAN REV.1**

TASK ORDER - SPO SUPPORT
PERFORMANCE PERIOD: OCTOBER 1, 1990 - DECEMBER 31,1991

SCOPE: WORK TO BE PERFORMED UNDER CONTRACT 50WCNA606099 DURING FY 1992...

STATEMENT OF WORK:

**TASK 2.2 – GENERAL ARCHITECTURE AND ENGINEERING (REFERENCE ARTICLE 2.2 OF THE CONTRACT)**

2.1.1 THRU 2.2.5 NOT USED...

2.2.6 Assist the SPO with the preparation, review, and coordination with UNISYS of PUP survey packages (TOTAL 42). TRIPS REQUIRED: 42

2.2.6.1 National Met Center #2 (NONA)
2.2.6.2 National Hurricane Center #2 (NONA)
2.2.6.3 Goodland WFO (EL)
2.2.6.4 Tallahassee WFO (BH)
2.2.6.5 Nas Agana (CG)
2.2.6.6 JTWC Agana (CG)
2.2.6.7 Andersen AB (CG)
2.2.6.8 Dover AFB (DV)
2.2.6.9 SAC WSU (NONA)
2.2.6.10 Amarillo WFO (CE)
2.2.6.11 Atlanta ARTCC (DX)
2.2.6.12 Birmingham WFO, SUPP #1 (DX)
2.2.6.13 Ft. Benning (DX))
2.2.6.14 Maxwell AFB (DX)
2.2.6.15 Little Rock WFO (FT)
2.2.6.16 Nas Cubi Pt (DH)
2.2.6.17 Clark AB (DH)
2.2.6.18 Jackson WFO (FC)
2.2.6.19 Nas Meridian (FC)

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 597176/78**

**WORK PERFORMANCE DESCRIPTION**
**FY92 FIRST QUARTER WORK PLAN REV.1**

2.2.6 CONT.

2.2.6.20 Los Angeles WFO, SUPP #1 (IR)
2.2.6.21 Western Region HQ (NONA)
2.2.6.22 Detroit WFO (DS)
2.2.6.23 Chicago WFO (DF)
2.2.6.24 Chicago ARTCC (DF)
2.2.6.25 Minneapolis ARTCC (EM)
2.2.6.26 Grand Island WFO (EM)
2.2.6.27 Pittsburgh WFO (HB)
2.2.6.28 Cleveland ARTCC (HB)
2.2.6.29 Cleveland WFO (DI)
2.2.6.30 Indianapolis WFO (FB)
2.2.6.31 Indianapolis ARTCC (FB)
2.2.6.32 NWS RFC State College (EU)
2.2.6.33 State College WFO (EU)
2.2.6.34 Binghamton WFO (CW)
2.2.6.35 Boston ARTCC (CB)
2.2.6.36 New York ARTCC (GY)
2.2.6.37 Kessler AFB (JA)
2.2.6.38 Ft. Worth SUPP #1 (DA)
2.2.6.39 Nas Meridian (DA)
2.2.6.40 Bergstrom AFB (DA)
2.2.6.41 Ft. Hood (DA)
2.2.6.42 Los Angeles ARTCC (IK)

2.2.7 NOT USED...

2.2.8 Provide NEXRAD Engineering support. TRIPS REQUIRED: 4

2.2.8.1 RDA Preliminary Conceptual Design - General Support
2.8.8.2 RDA Preliminary Conceptual Design - Boise (Partial 45%)
2.2.8.3 RDA Preliminary Conceptual Design - San Francisco (Partial 20%)
2.2.8.4 RDA Preliminary Conceptual Design - Pacific DOD Sites
2.2.8.5 FAA Project Management and Engineering Support
2.2.8.6 General Nexrad Engineering CAD Support

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 597176/78**

**WORK PERFORMANCE DESCRIPTION**
**FY92 FIRST QUARTER WORK PLAN REV.1**

**TASK 2.3 - SITE SPECIFIC ARCHITECTURE AND ENGINEERING (REFERENCE ARTICLE 2.3 OF THE CONTRACT)**

2.3.1 THRU 2.3.4 NOT USED...

2.3.5 Provide general support to SPO for the NEXRAD program. TRIPS REQUIRED: 10

2.3.5.1 Maintain NEXRAD schedules, prepare and monitor Government contract deliverables and monitor UNISYS Contract Deliverables.

2.3.5.2 Provide SPO assistance with contract management meetings.

2.3.5.3 Attend UNISYS management meetings.

2.3.5.4 Provide congressional support

2.3.6 NOT USED...

2.3.7 Utility coordination for RDA and user sites(TOTAL 26).

2.3.7.1 Andersen AFB (CG)
2.3.7.2 Kadena AB OKI (FF)
2.3.7.3 Dover AFB (DU)
2.3.7.4 Charleston WV (DC)
2.3.7.5 Louisville (FV)
2.3.7.6 Indianapolis (FB)
2.3.7.7 Chicago (DF)
2.3.7.8 Pittsburgh (HB)
2.3.7.9 Detroit (DS)
2.3.7.10 Kunsan AB ROK (FM)
2.3.7.11 Cleveland (DI)
2.3.7.12 Buffalo (CT)
2.3.7.13 Memphis (FZ)
2.3.7.14 East Alabama (DX)
2.3.7.15 Little Rock (FT)

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 597176/78**

**WORK PERFORMANCE DESCRIPTION**
**FY92 FIRST QUARTER WORK PLAN REV.1**

2.3.7 CONT.

| | |
|---|---|
| 2.3.7.16 | Camp Humphreys (CV) |
| 2.3.7.17 | Jackson (FC) |
| 2.3.7.18 | Slidell (HV) |
| 2.3.7.19 | Central Texas (DA) |
| 2.3.7.20 | San Francisco (HQ) |
| 2.3.7.21 | Los Angeles (FU) |
| 2.3.7.22 | Vandenberg AFB (IK) |
| 2.3.7.23 | Morehead City (EV) |
| 2.3.7.24 | Yokota AB JAP (IS) |
| 2.3.7.25 | Albany (CB) |
| 2.3.7.26 | Dyess AFB TX (DW) |

2.3.8 THRU 2.3.10 NOT USED...

**TASK 2.4 CONSTRUCTION MANAGEMENT AND INSPECTION (REFERENCE ARTICLE 2.4 IN THE CONTRACT)**

2.4.1 Assist the SPO/NEXRAD Program in reviewing NEXRAD Contractor design and NEXRAD Program materials. (18-35% Reviews, 14-90% Design Reviews, 8-100% Design Reviews).

| | | RDA DESIGN REVIEWS | | |
|---|---|---|---|---|
| | | 35% | 90% | 100% |
| 2.4.1.1 | Keesler AFB (MTC DPT)(TE) | | | X |
| 2.4.1.2 | Griffiss AFB (ES) | X | | |
| 2.4.1.3 | St. Louis (BJ) | | | X |
| 2.4.1.4 | Dodge City (DT) | | X | X |
| 2.4.1.5 | Houston/Galveston(EY) | | X | X |
| 2.4.1.6 | Denver (DQ) | X | | |
| 2.4.1.7 | Keesler AFB (DOD TRNG)(TB) | X | | |
| 2.4.1.8 | Andersen AFB (CG) | | X | X |
| 2.4.1.9 | Kansas City (FH) | | X | |
| 2.4.1.10 | Wichita (IP) | | X | X |
| 2.4.1.11 | Topeka (IE) | | X | |
| 2.4.1.12 | Tulsa (IH) | | X | X |
| 2.4.1.13 | Goodland (EL) | | X | |

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 597176/78**

**WORK PERFORMANCE DESCRIPTION**
**FY92 FIRST QUARTER WORK PLAN REV.1**

| | | RDA DESIGN REVIEWS | | |
|---|---|---|---|---|
| | | 35% | 90% | 100% |
| 2.4.1.14 | Grand Island (EM) | | X | X |
| 2.4.1.15 | Amarillo (CE) | | X | |
| 2.4.1.16 | Philadelphia (GY) | X | | |
| 2.4.1.17 | Clark AFB (DH) | | X | |
| 2.4.1.18 | Dover AFB (DU) | X | X | |
| 2.4.1.19 | Louisville (FV) | X | | |
| 2.4.1.20 | Chicago (DF) | | X | |
| 2.4.1.21 | Pittsburgh (HB) | X | | |
| 2.4.1.22 | Detroit (DS) | X | | |
| 2.4.1.23 | Kunsan AB ROK (FM) | X | | |
| 2.4.1.24 | Cleveland (DI) | X | | |
| 2.4.1.25 | East Alabama (DX) | X | X | |
| 2.4.1.26 | Little Rock (FT) | X | | |
| 2.4.1.27 | Camp Humphreys (CV) | X | | |
| 2.4.1.28 | Jackson (FC) | X | | |
| 2.4.1.29 | Central Texas (DA) | X | | |
| 2.4.1.30 | Los Angeles (FU) | X | | |
| 2.4.1.31 | Morehead City (EV) | X | | |
| 2.4.1.32 | Boston (CR) | X | | |

2.4.2 THRU 2.4.3 NOT USED...

2.4.4 Assist the SPO with construction inspection of building modifications (TOTAL 33) and NEXRAD RDA sites (TOTAL 8). TRIPS REQUIRED: 20

<u>BUILDING SITES</u>

2.4.4.1 Tulsa RFC (BA)
2.4.4.2 Tinker AFB (BA)
2.4.4.3 Dallas/Ft. Worth ARTCC (BA)
2.4.4.4 Oklahoma City (Norman) WFO (RPGOP) (BA)
2.4.4.5 Cape Canaveral (BB)
2.4.4.6 Melbourne WFO (RPGOP) (BB)
2.4.4.7 Patrick AFB (BB)
2.4.4.8 Miami ARTCC (BB)

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 597176/78**

**WORK PERFORMANCE DESCRIPTION**
**FY92 FIRST QUARTER WORK PLAN REV.1**

BUILDING SITES

2.4.4.9 National Meteorlogical Center #1 (NONA)
2.4.4.10 National Hurricane Center #1 (NONA)
2.4.4.11 National Severe Storm Center #1 (NONA)
2.4.4.12 MCAF Quantico (NONA)
2.4.4.13 Pax River (NONA)
2.4.4.14 Sterling (Washington DC) (RPGOP) (BC)
2.4.4.15 Andrews AFB (BC)
2.4.4.16 DCA (Washington) ARTCC (BC)
2.4.4.17 Southern Region HQ (NONA)
2.4.4.18 Eastern Region HQ (NONA)
2.4.4.19 Central Region HQ (NONA)
2.4.4.20 NWS HQ (Washington DC) (NONA)
2.4.4.21 NSSFC #2 (NONA)
2.4.4.22 National Data Center (NONA)
2.4.4.23 OSF2 (NONA)
2.4.4.24 FAA Flow Control (NONA)
2.4.4.25 Navpol Andrews (NONA)
2.4.4.26 Dodge City WFO (DT)
2.4.4.27 Scott AFB (BJ)
2.4.4.28 MAC WSU (NONA)
2.4.4.29 St. Louis WFO (BJ)
2.4.4.30 AFGWC #1-2 Offutt AFB (NONA)
2.4.4.31 Ft. Ritchie (NONA)
2.4.4.32 Keesler AFB (JA)
2.4.4.33 Keesler AFB (2 PUPS) (NONA)

RDA SITES

2.4.4.34 Washington (Sterling) (BC)
2.4.4.35 Frederick (SUP) (BF)
2.4.4.36 NW Florida (SUP) (BH)
2.4.4.37 Keesler AFB (MNTC DEPOT)(TE)
2.4.4.38 St. Louis (BJ)
2.4.4.39 Dodge City (DT)
2.4.4.40 Houston/Galveston (EY)

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 597176/78**

**WORK PERFORMANCE DESCRIPTION**
**FY92 FIRST QUARTER WORK PLAN REV.1**

RDA SITES

2.4.4.41 Denver (DQ)

2.4.5 Provide RDA/MLOS site and user site construction cost estimates (35% and 90%) and schedules in conjunction with 2.4.1 above (TOTAL 38).

| | | COST ESTIMATES 35% | 90% |
|---|---|---|---|
| 2.4.5.1 | Keesler AFB (MTC DPT) (TE) | | X |
| 2.4.5.2 | Denver (DQ) | | X |
| 2.4.5.3 | Keesler AFB (TB) | | X |
| 2.4.5.4 | Kansas City (FH) | | X |
| 2.4.5.5 | Wichita (IP) | | X |
| 2.4.5.6 | Topeka (IE) | X | X |
| 2.4.5.7 | Tulsa (IH) | X | X |
| 2.4.5.8 | Goodland (EL) | | X |
| 2.4.5.9 | Kadena OKI (FF) | X | X |
| 2.4.5.10 | Grand Island (EM) | X | X |
| 2.4.5.11 | Amarillo (CE) | X | X |
| 2.4.5.12 | State College (EU) | X | X |
| 2.4.5.13 | Binghamton (CN) | X | X |
| 2.4.5.14 | Philadelphia (GY) | X | |
| 2.4.5.15 | Dover AFB (DU) | X | |
| 2.4.5.16 | Louisville (FV) | X | |
| 2.4.5.17 | Pittsburgh (HB) | X | |
| 2.4.5.18 | Kunsan AB ROK (FM) | X | |
| 2.4.5.19 | Cleveland (DI) | X | |
| 2.4.5.20 | Buffalo (CT) | X | |
| 2.4.5.21 | Memphis (FZ) | X | |
| 2.4.5.22 | East Alabama (DX) | X | X |
| 2.4.5.23 | Little Rock (FT) | X | |
| 2.4.5.24 | Camp Humphreys (CV) | X | |
| 2.4.5.25 | Jackson (FC) | X | |
| 2.4.5.26 | Slidell (HV) | X | |
| 2.4.5.27 | Central Texas (DA) | X | |

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 597176/78**

**WORK PERFORMANCE DESCRIPTION**
**FY92 FIRST QUARTER WORK PLAN REV.1**

| | | COST ESTIMATES 35% | 90% |
|---|---|---|---|
| 2.4.5 CONT. | | | |
| 2.4.5.28 | San Francisco (HQ) | X | |
| 2.4.5.29 | Los Angeles (FU) | X | |
| 2.4.5.30 | Morehead City (EV) | X | |

2.4.6 Support the Government in the inspection and acceptance effort at each site and for each system and PUP installation and provide necessary project management services (TOTAL 4). TRIPS REQUIRED: 8

2.4.6.1 Melbourne (BB)
2.4.6.2 Sterling (BC)
2.4.6.3 Frederick (BF)
2.4.6.4 NW Florida (BH)

2.4.7 Provide miscellaneous project management and contract administration services on the NEXRAD prime contract and the Site Surveying and Facility and Support Planning contract.

2.4.7.1 Perform MLOS versus Commercial T-1 analyses (TOTAL 41).

2.4.7.1.1 San Joaquin Valley (EH)
2.4.7.1.2 Elko (IR)
2.4.7.1.3 Boise (CQ)
2.4.7.1.4 Missoula (GG)
2.4.7.1.5 Billings (CM)
2.4.7.1.6 Pocatello (HW)
2.4.7.1.7 Grand Junction (EN)
2.4.7.1.8 Pueblo (HE)
2.4.7.1.9 North Platte (GR)
2.4.7.1.10 Oklahoma City (BA)
2.4.7.1.11 Springfield IL (HZ)
2.4.7.1.12 Medford (FY)
2.4.7.1.13 Seattle (HS)
2.4.7.1.14 Portland OR (HC)
2.4.7.1.15 Eureka (EC)

**FLUOR DANIEL**
**CONTRACT NO. 50WCNA606099**
**FLUOR CONTRACTS 597176/78**

**WORK PERFORMANCE DESCRIPTION**
**FY92 FIRST QUARTER WORK PLAN REV.1**

2.4.7.1 CONT.

2.4.7.1.16 Sacramento Valley (HL)
2.4.7.1.17 San Francisco (HQ)
2.4.7.1.18 Los Angeles (FU)
2.4.7.1.19 Yuma (IT)
2.4.7.1.20 Tucson (IG)
2.4.7.1.21 Phoenix (GZ)
2.4.7.1.22 Flagstaff (EF)
2.4.7.1.23 Las Vegas (FR)
2.4.7.1.24 Reno (HI)
2.4.7.1.25 Charleston WV (DC)
2.4.7.1.26 Wilmington (IQ)
2.4.7.1.27 Roanoke (HJ)
2.4.7.1.28 Cedar City (CY)
2.4.7.1.29 Salt Lake City (HM)
2.4.7.1.30 Denver (DQ)
2.4.7.1.31 Albuquerque (CC)
2.4.7.1.32 Topeka (IE)
2.4.7.1.33 Tulsa (IH)
2.4.7.1.34 Memphis (FZ)
2.4.7.1.35 Louisville (FV)
2.4.7.1.36 Portland ME (HD)
2.4.7.1.37 Albany (CB)
2.4.7.1.38 State College (EU)
2.4.7.1.39 Philadelphia (GY)
2.4.7.1.40 Raleigh/Durham (HG)
2.4.7.1.41 Charleston SC (DB)

Declaration of James Wagner

I, James Wagner, do hereby declare under penalty of perjury under the laws of the United States that:

1. I have personal knowledge of the facts stated herein as a result of (a) having 13 years of experience both on contracts for A&E services and contracts involving performance of some A&E services that were not treated by the government as contracts for A&E services and (b) having acted as Project Controls Manager for Fluor Daniel, Inc. ("the Company" or "FDI") on Contract No. 50WCNA606099 with NOAA ("the Contract").

2. I previously have submitted a declaration in this case dated May 6, 2004.

3. As FDI's Project Controls Manager, I was personally involved in preparing task orders for the NOAA contract and tracking and reporting costs against the NOAA approved Work Breakdown Structure. In this capacity, I was required to be fully aware of FDI's contractual obligations and deliverables.

4. During the course of the Contract, FDI performed hundreds of construction package estimates, including numerous estimates for each site. These estimates, however, were prepared at the completion of each site's 15%, 35%, 90% and 100% design iterations, i.e., after performance of design work had commenced. The estimates, as well as actual construction costs as these were incurred, were used to populate FDI's estimating database, which was used to produce the 1992 WFO Facilities Budget. In my experience, creation of these iterative estimates is a standard practice/requirement of contractors performing design work (although the percentages of the stages of completion may vary). However, I am aware of no situation in which such estimates, prepared by the contractor after commencement of design work, have been used to limit the contractor's recovery of costs pursuant to the statutory 6% limitation.

5. I am not aware of, and to my knowledge the government never informed FDI of, any instance in which an estimate performed by Fluor was reviewed at any level above the Contracting Officer (CO) and the Contracting Officer's Technical Representative (COTR).

6. The government at no time provided FDI with any estimates of construction.

7. One reason that estimates were not available to FDI prior to the conduct of design work under the Contract is that the government had not fully established its requirement prior to performance by FDI under the Contract. As a result, of necessity, Fluor was required to assist in the development of concepts which would define space usage, facility size, general specifications, and other overall criteria such as construction materials and common equipment relative to design throughout the entire performance period of the Contract and concurrent with the performance of design work itself under the Contract. This development occurred through many iterations of design which went through a plethora of reviews by the government. The ultimate configuration of facilities

bore little resemblance to the generic concept expressed by the government prior to commencement of the contract.

8. I am aware of no contract for A&E services which has been conducted in this fashion. Moreover, I am aware of no contractor that has agreed (or would agree) to incur design costs the recovery of which potentially would be limited by future estimates of construction costs in a contract like this in which no definite and specific articulation of the government's requirement existed prior to commencement of design work on the contract.

9. As noted in my earlier declaration, A&E services were a minor part of the Contract. In my experience, not every contract requiring design work in the course of contract performance is a contract for A&E services. In my experience, contracts of which A&E services are a minor part are not contracts for A&E services. For example, the current contract on which I am working is an Army Corps of Engineers ("ACE") design-build contract. Although design work obviously is a component of this contract as it is every design build contract, the ACE does not consider the contract to be a contract for A&E services because A&E services are a minor part of the contract and therefore does not apply the 6% statutory limitation to this contract. The ACE's characterization of this contract is consistent with ACE EP 715-1-7 (attached) which specifies that no statutory limitation is applied to design-build contracts where design is a minor part of the contract.

I, James Wagner, pursuant to 28 U.S.C. 1746, declare that the above statements are true and correct to the best of my knowledge.

James Wagner 4 Jan 05

James Wagner Date