# In The United States Court of Federal Claims

**No: 00-207 C**
**March 24, 2005**

---

**Fluor Enterprises, Inc.**
**f/k/a Fluor Daniel, Inc.,**

***Plaintiff,***

**v.**

**THE UNITED STATES,**

***Defendant.***

41 U.S.C. § 254(b); Architectural and Engineering Services; 6% Fee Limitation; Cost-Plus-Fixed-Fee Type Contract; Project Estimate; Brooks Act of 1972; Property Act of 1949; Design-Bid-Build; Design-Build; Procurement; Void Ab Initio; Implied-In-Fact Contract; Quantum Meruit Recovery

---

*Frank M. Rapoport*, McKenna, Long & Aldridge, LLP, Washington, DC, for the plaintiff.

*Steven Jay Abelson*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for the defendant.

## OPINION AND ORDER

**Block, *Judge*.**

### I. Introduction

This case is one of first impression. It involves an action brought by the plaintiff, Fluor Daniel Enterprises, Inc. ("Fluor"), a government contractor, under the Contract Disputes Act.[1] The challenge is to a government contracting officer's "final decision" demanding repayment by Fluor of an alleged overpayment of fees which defendant claims exceeded the fees allowable under federal law. Specifically, the contracting officer challenged that Fluor was paid $2,560,413 more for architectural and engineering ("A&E"or "design") services rendered to the National Oceanographic and Atmospheric Administration ("NOAA") than is allowed by 41 U.S.C. § 254(b).

In fact, section 254 is at the heart of this case and, therefore, much of the court's analysis implicates issues of statutory construction and the application of the statute to the facts at hand. In pertinent part, § 254 provides that:

---

[1] *See* 41 U.S.C. § 609(a) ("[I]n lieu of appealing the decision of the contracting officer under section 605 of this title to an agency board, a contractor may bring an action directly on the claim in the United States Court of Federal Claims . . .").

> (a) . . . Except as provided in subsection (b) of this section, contracts awarded after using procedures other than sealed-bid procedures may be of any type which in the opinion of the agency head will promote the best interests of the Government. . . .
>
> (b) . . . [I]n the case of a cost-plus-a-fixed-fee contract . . . a fee inclusive of the contractor's costs and not in excess of 6 percent of the estimated cost, exclusive of fees, as determined by the agency head at the time of entering into the contract, of the project to which such fee is applicable is authorized in contracts for architectural or engineering services relating to any public works or utility project . . . .

41 U.S.C. § 254 (2000). One unique facet of the architectural and engineering industry that has been codified by federal statute is that price competition between competing contractors is ethically inappropriate. In a cost-plus-fixed-fee scenario then, where the contractor is reimbursed for his actual costs and receives a negotiated fixed fee for services,[2] the 6% fee limitation helps ensure the integrity of the contractor's A&E costs because the maximum amount of reimbursable costs, plus the fixed-fee, is fixed prior to contract performance. According to § 254(b), the fee limitation calculation must be based on an "estimate" of project costs "determined by the agency head at the time of entering into the contract." *Id.* This does not mean that other forms of contracts for A&E services cannot be used (at times, simpler negotiated fixed price contracts are employed),[3] but it is beyond doubt that the plain meaning of 41 U.S.C. § 254 triggers the imposition of § 254(b)'s fee limitation provision when cost-plus-fixed-fee contracts are used.

The instant dispute stems from NOAA's inability to estimate project costs before Fluor performed under the contract. Because of a confluence of factors, it was not possible to develop a reasonable estimate at the statutorily mandated time. Chief among those factors was the fact that the scope of NOAA's project was uncertain and Fluor was hired to perform an array of services, among which included tailoring the scope of NOAA's project and, therefore, Fluor's own undertaking. These factors that prohibited a timely estimate were compounded by the fact that the parties had to employ a form of the cost-plus-fixed-fee contract—called a "level of effort" or "term" contract—that obligated Fluor to provide only a predetermined number of man-hours towards the project rather than completing the project itself.

Despite this flaw, both parties performed under the contract, Fluor providing its services and NOAA paying for them. Nevertheless, nearly three years after performance concluded, the contracting officer sought to impose retroactively the statutory fee limitation. Notwithstanding the absence of the timely estimate called for by § 254(b), NOAA calculated the amount of Fluor's purported fee limitation (nearly ten years after the contract was negotiated) using a substitute for the estimate. That substitute was deemed to represent realistic project costs and comprised both *actual* construction costs and building estimates not determined until several years after the inception of

---

[2] *See*, *e.g.*, 48 C.F.R. § 16.306(a); John Cibinic & Ralph C. Nash, FORMATION OF GOVERNMENT CONTRACTS 1106-07 (3rd ed.1998).

[3] *See, e.g.*, 48 C.F.R. § 42.1305 (referring to contract clauses to be included in fixed-price contracts for A&E services).

the contract—and even then, the estimates were established not by NOAA, but by Fluor. It is the lawfulness of that action that led to this dispute.

Ultimately, defendant espouses an outcome in which § 254(b) could be construed to allow the fee limitation to be calculated after the project was completed even though the statute literally requires that the fee limitation be predicated upon the *initial estimate* of the project's cost. This proposed outcome *seems* both facially reasonable and consistent with one of Congress's apparent goals in creating the fee limitation, which was to preserve a proportional relationship between the costs of design services and the cost of construction in a public works project. In that sense, it would be terribly convenient for the court to simply adopt the defendant's substitute and be done with this troubling case.

Nevertheless, as Justice Cardozo long ago warned, judges are not free to roam the landscape of jurisprudence at will creating law to fit the facts. *See* B. CARDOZO, THE NATURE OF THE JUDICIAL PROCESS 141 (1921). Defendant's proposed outcome would work a mischief on the slight body of law dealing with this issue**.** Not only would it be contrary to the explicit and unambiguous terms of § 254(b), but it would also ignore one of the safeguards in the statute to which Fluor was entitled—namely, knowledge of the upper limit of its allowable costs at the outset of the undertaking. Furthermore, adopting defendant's interpretation would create an inherent conflict of interest that is contrary to congressional intent.

While *estimates* are usually nothing more than a convenient proxy for actual figures, in the context of A&E services (and the attendant fee limitation) the estimate required by the statute plays a unique and important role that is independent of any actual costs that may be ultimately incurred. To be sure, in predicating the fee limitation for A&E services on a calculation involving estimated project costs at the outset of the contract, Congress created a mechanism in which A&E contractors could *prospectively* monitor costs to ensure that those costs remained within the range of allowable, reimbursable costs. Consequently, in such a mechanism it is especially important to base the fee limitation for A&E services on the estimated project costs rather than the actual project costs simply because actual project costs are not available until after construction is complete, long after an A&E contractor has performed his design services. Hence, there is a practical need for an initial, transparent calculation of the A&E contractor's fee limitation, which an initial estimate allows. Indeed the statutory scheme implicitly recognizes that in a cost-plus-fixed-fee contract, the benefits of using a preliminary estimate to calculate the fee limitation outweigh any potential inconsistencies between that estimate and later-determined *actual* costs. One such benefit is to curtail any perverse incentive an architect may have to design an unnecessarily costly project, which might otherwise arise if the fee limitation was pegged to the actual project costs.

In any event, relying on actual costs to determine what Fluor's fee limitation *was* or *might have been*, as defendant suggests, is particularly troubling in this case. Doing so would ignore a key fact: Fluor's undertaking and the scope of NOAA's project was so open-ended and speculative that no reasonable estimate of project costs could have been calculated at the outset. In light of this, any after-the-fact calculation by the court of Fluor's fee limitation is simply inappropriate both as a matter of fact and statutory construction. Indeed, it would be *inherently speculative* to replace a prospective estimate of project costs that did not and could not exist "at the time of entering into the

contract" with some other calculation. 41 U.S.C. § 254(b). Accordingly, because NOAA was unable to establish a timely project estimate as required by § 254(b) for a variety of reasons, the court is compelled to conclude that NOAA's procurement of A&E services, using the level-of-effort type contract adopted by the parties, was *ultra vires* under these circumstances.

Fluor surprisingly argues to the contrary. Because the level-of-effort contract here mostly required work that did not involve A&E services, Fluor contends that the contract was lawful because in this circumstance the statute simply does not apply and there was therefore no need for a timely estimate. Consequently, to Fluor, any imposed fee limitation is inappropriate. Fluor's limited argument, however, must be rejected for the same reason given above: courts are not free to rewrite legislation; the plain meaning of § 254(b) mandates the imposition of the fee limitation to any contract, or parts of contracts, which call for the types of design services contemplated by the statutory scheme.

This case presents the court with a quandary. The intended contractual performance has already been completed and defendant has received all the benefits of Fluor's performance. Under these circumstances, to what fee is Fluor entitled, given the 6% limitation of § 254(b)? That decision here, of course, is made all the more troubling because even if it was possible to go back in time—worm hole[4] or not—the nature of facts as they existed at the time the parties entered into this contract would render any "estimate," and therefore any calculation of Fluor's purported fee limitation, inherently speculative. Under these circumstances, the law of *quantum meruit* applies and entitles Fluor to compensation for its services under an implied contract theory. *See Clark v. United States*, 95 (Mem.) U.S. 539, 542-43 (1877). Yet under *quantum meruit*, Fluor is only entitled to the *reasonable* value of those services. *See Urban Data Sys., Inc. v. United States*, 699 F.2d 1147, 1155 (Fed. Cir. 1983); *Yosemite Park and Curry Co. v. United States*, 582 F.2d 552, 558 (Ct. Cl. 1978). Any determination of the reasonableness of those payments, however, is a mixed issue of law and fact that must be preserved for later proceedings. Therefore, on the limited issue of the applicability of § 254(b) to Fluor's contract, plaintiff's motion for partial summary judgment will be denied, defendant's cross-motion will be granted, and the court will consider additional proceedings consistent with this opinion.

## II. Factual Background

### A. Fluor's Undertaking

In the mid-1980s, NOAA undertook a vast program to restructure and modernize the National Weather Service. *See* Pl.'s Resp. to Def.'s Proposed Findings of Uncontroverted Fact ("DPFUF") at 2. This program included the application of new technologies to better observe and process weather information, including implementation of the Next Generation Weather Radar ("NEXRAD") program, which required construction of radar sites throughout the United States. *Id.* at 2-3. A key component of the modernization program included consolidating 249 weather offices

[4] *See* S. Hawking, A BRIEF HISTORY OF TIME (1998) (arguing throughout the theoretical possibility of time travel through gravitational and other distortions in the space-time continuum, commonly referred to as "worm holes").

into approximately 116 Weather Forecasting Offices ("WFO") that were to be located near the planned NEXRAD sites. *Id.* at 4.

In 1986, NOAA contracted with Fluor, a global provider of construction and engineering services,[5] to provide comprehensive project planning and construction management services as part of the WFO modernization and consolidation plan. Pursuant to this contract, Fluor would oversee the construction and consolidation of the WFOs. The primary focus of Fluor's undertaking was to adapt a hypothetical floor-plan that had been developed by another contractor for a model WFO facility, and systematically apply it to the 116-odd consolidated WFO sites. Pl.'s Mot. for Summ. J. at 1-2; *see* Hearing Tr. at 21-25 (Oct. 28, 2004) ("Tr."). The undertaking was later expanded to include construction and land acquisition for the NEXRAD project. Pl.'s Mot. for Summ. J. at 4.

Fluor was thus responsible for designing a comprehensive plan that would systematically convert the pre-existing WFO floor-plan into actual facilities. *See* Tr. at 21. Fluor's role in this process was expansive. It would help NOAA determine whether existing facilities needed to be renovated or new ones constructed from whole cloth. It would evaluate the costs and benefits to NOAA of leasing certain facilities rather than owning them. It would also help identify the scope of individual construction and renovation projects, perform the architectural design work for some of those projects, and oversee the procurement of construction contractors. Once construction work began in earnest, Fluor would monitor the contractors to ensure that building progress complied with all plans and specifications. It is, of course, that portion of the contract that called on Fluor to perform the architectural and engineering services that is at issue in this case.

The initial agreement between Fluor and NOAA was a "letter contract"[6] on July 29, 1986 that was regularly extended through May 30, 1987 as the parties continued to negotiate the parameters of the agreement. The letter contract was later "definitized,"[7] resulting in a base period of performance through September 30, 1987 and government options to extend the contract for four additional one-year periods. DPFUF at 2. After initial general project planning that lasted nearly two years, Fluor engaged in site specific design work on a site-by-site basis that was followed by actual construction work performed by other construction contractors and overseen by Fluor.

Because of the broad, undefined nature of the work that the WFO modernization project would require,[8] it was not feasible to structure Fluor's contract as a fixed-price type contract, in

---

[5] *See generally* http://www.fluor.com/about/default.asp.

[6] *See* 48 C.F.R. § 16.603 ("A letter contract is a written preliminary contractual instrument that authorizes the contractor to begin immediately . . . performing services.").

[7] *See* 48 C.F.R. § 16.603-2(b). A letter contract is definitized when the parties negotiate all the parameters of their agreement and finalize it in a formal contract.

[8] As originally conceived, Fluor's services would potentially be applied to more than 100 WFO facilities. Pl.'s Proposed Findings of Uncontroverted Fact at 2-3. The project planning portion of Fluor's undertaking involved identifying and planning exactly which steps NOAA needed to

which Fluor's total compensation would be established up-front at the time of contracting. Instead, a more flexible form of contract was needed to permit Fluor to oversee the entire project, because once Fluor's project-planning was underway the scope of the overall project changed routinely. Therefore, Fluor's contract was structured as a "cost-plus-fixed-fee" contract with services to be rendered on a "level of effort" basis. Pl.'s Mot. for Summ. J. at 1, 4. This provided maximum project flexibility without placing any of the risk of such flexibility, such as increased performance costs or scope of performance, on Fluor.

The cost-plus-fixed-fee classification describes the manner in which Fluor would be paid for its services:

> A cost-plus-fixed-fee contract is a cost-reimbursement contract that provides for payment to the contractor of a negotiated fee that is fixed at the inception of the contract. The fixed fee does not vary with actual cost, but may be adjusted as a result of changes in the work to be performed under the contract. This contract type permits contracting for efforts that might otherwise present too great a risk to contractors, but it provides the contractor only a minimum incentive to control costs.

48 C.F.R. § 16.306(a). Essentially, the cost-plus-fixed-fee contract allows the contractor to be reimbursed for his allowable actual costs and ensures that he receives a fee (the fixed-fee) in addition to those actual costs. This is in contrast to a *fixed-price* undertaking, in which the contractor receives a predetermined price for his services, regardless of the costs that are actually incurred. A key difference between these two types of contracts is the allocation of risk. In a cost-plus-fixed-fee scenario, the contractor is typically well protected against unexpected increases in the cost of performance, because the government reimburses those costs. On the other hand, there is little incentive for the contractor to control or limit his actual costs for the same reason. By contrast, in the fixed-price undertaking, the contractor benefits from keeping actual costs of performance low (thereby increasing his profit), but bears the risk of any increase in the cost of performance (which might erode profit, or turn the contract into a losing contract). *See generally* CIBINIC & NASH, FORMATION OF GOVERNMENT CONTRACTS at 1079-81, 1106-07.

When the letter contract was definitized, the contracting officer issued a statement of "Determination and Findings." This statement is required by § 254(b) and the Federal Acquisition Regulations ("FAR") as a condition to a cost-plus-fixed-fee procurement. Specifically, the regulations permit use of a cost-plus-fixed-fee contract only when "uncertainties involved in contract performance do not permit costs to be estimated with sufficient accuracy to use any type of fixed-

---

implement to bring online the WFO and NEXRAD designs. This included helping NOAA identify those sites where construction or renovation was necessary, determine the scope of construction at a given site, and in turn develop appropriate designs. *See* Compl. Ex. 9 at 13 (Statement of Work) (indicating that Fluor would be required to conduct market research to evaluate the cost effectiveness of various construction techniques such as on-site conventional, modular, and off-site fabrication construction models; requiring Fluor to aid the government in assessing the "life cycle" costs of ownership versus leasing of facilities; requiring Fluor to assess telecommunication needs for all facilities).

price contract" and "the level of effort [*i.e.*, the amount or extent of work required] is unknown." 48 C.F.R. §§ 16.301-2, 16.306(b)(1). Consistent with this requirement, NOAA's contracting officer made a finding that:

> An adequate estimate cannot be established because of the nature of the work. It is unknown what type of architectural or engineering tasks will be required or how many, depending on the number of sites. Because of the uncertainty of the volume of the work to be required, undertaking the work on fixed price bases is not advisable. . . . Based on the preceding findings a fixed-price contract is impracticable and not in the best interest of the Government. Authority to utilize a cost type contract is granted.

Pl.'s Mot. for Summ. J. App. 21, Ex. 1.

While the cost-plus-fixed-fee designation described how Fluor would be paid for its services, the "level-of-effort" designation described how much work Fluor was obligated to perform. There are two types of cost-plus-fixed-fee contracts, the "completion" form or the level-of-effort (or "term") form. The completion form describes a typical contract in which the scope of work is stated as a definite goal, usually resulting in some end product (in this case, such a completed product might have been the completed building plans and schematics for a single WFO facility). *See* 48 C.F.R. § 16.306(d)(1). By contrast, the FAR describes the level-of-effort (or "term") form of contracting as an open-ended form of delivery that is a relative of the variable quantity contract:

> The term form describes the scope of work in general terms and obligates the contractor to devote a specified level of effort for a stated time period. Under this form, if the performance is considered satisfactory by the Government, the fixed fee is payable at the expiration of the agreed-upon period, upon contractor statement that the level of effort specified in the contract has been expended in performing the contract work.

48 C.F.R. § 16.306(d)(2). As a level of effort contractor, Fluor was obligated to expend a pre-determined number of hours towards the completion of designated projects, rather than complete enumerated tasks or projects. "In this type of contract, the contractor receives the compensation called for by the contract upon expenditure of the required hours of effort, regardless of whether the anticipated work is completed. . . . In these types of contracts, the Government is primarily buying hours of labor from a contractor." CIBINIC & NASH, FORMATION OF GOVERNMENT CONTRACTS at 1173.

NOAA and Fluor relied on regular "task orders" to refine the scope of Fluor's contractual duties.[9] The task order was a formal negotiated statement that identified in detail the type of work that Fluor was expected to perform in the corresponding task order period. It specified the level-of-effort output for that given period (*i.e.*, it indicated how many man-hours Fluor had to provide),

---

[9] Under new legislation in 1994, Fluor's level-of-effort contract would have been deemed a "task order contract." *See* 41 U.S.C. § 253h-253k.

specified the particular projects to which those man-hours should be deployed, and provided an estimate of what Fluor's cost of performance would be for that period. This estimate of performance costs established Fluor's allowable costs that would be reimbursed by the government; it was a cost ceiling that Fluor could not exceed without approval of the contracting officer, except at its own risk. *See* 48 C.F.R. § 16.301-1. Based in part on the required level-of-effort and the estimated cost of performance, each task order also specified Fluor's fixed-fee for that period.

The task orders, then, were the ongoing addenda to the original contract that regularly narrowed the scope of Fluor's duties and deployed Fluor's services; they were executed on forms designated "modifications" although both parties indicated that the task orders were not, in fact, modifications to the contract as a matter of law. *See* Tr. at 47-49, 61-62. The estimates included in the task orders were not, however, estimates of the "project costs" called for in § 254(b), but rather Fluor's *own* cost of performance. The task order estimates were therefore entirely independent of the *project* cost estimates.

As a consequence of Fluor's cost-plus-fixed-fee, level-of-effort undertaking, Fluor was not obligated to expend any additional effort once its *actual* costs of performance under a given task order reached or exceeded the amount of the *estimated* cost of performance for that same task order period. Fluor would only be reimbursed for its *allowable* costs—those that were estimated to be the costs of performance at the outset of each task order. This principle is embodied in the FAR Limitation of Cost Clause, which was incorporated by reference into Fluor's contract. That clause states, in principle part: "The Contractor is not obligated to continue performance under this contract . . . or otherwise incur costs in excess of the estimated cost specified in the [Task Order], until the Contracting Officer (i) notifies the Contractor in writing that the estimated cost has been increased and (ii) provides a revised estimated total cost of performing this contract." *See* 48 C.F.R. § 52.232-20 (Limitation of Cost); Compl. Ex. 9 at 37. On the other hand, if the contracting officer were to authorize additional costs, Fluor was not entitled to any increase in the predetermined fixed fee unless the contracting officer also authorized additional work not called for in the corresponding task order. CIBINIC & NASH, FORMATION OF GOVERNMENT CONTRACTS at 1180.

In sum, NOAA and Fluor opted for a cost-plus-fixed-fee level-of-effort contract because the scope of services that Fluor would provide and the scope of the WFO modernization project were both broad and undefined. This form of contract selected for Fluor's undertaking was a reflection of the fact that, at the outset of the contract, neither NOAA nor Fluor were able to identify just how expansive the WFO modernization project would be. Consistent with Fluor's broad role in the WFO modernization project, its contract with NOAA contemplated other professional services to accommodate that role besides just project planning services, including architectural and engineering services, construction management, and construction inspection services. Pl.'s Compl., Ex. 9 at 8. The A&E services to be performed under the contract were only part of all services Fluor was to perform; they were, however, not an insignificant component of the contract. Fluor ultimately received $42,531,626 for all of its services, of which the contracting officer determined that $5,551,549 applied to A&E services. *See* Def.'s Resp. to Pl.'s Proposed Findings of Uncontroverted Fact ("PPFUF") at 1.

**B. Fluor's Design Services and the 6% Fee Limitation**

In terms of the WFO modernization objective, the consequence of NOAA entering into a long-term, open-ended contract were profound. Since it was unclear how much construction (and design work) would be needed to achieve the objective, NOAA was unable to estimate the project costs of either individual WFO facilities or the entire WFO modernization project. Indeed—perhaps the single most important fact in this entire case—both parties concede that *no such estimate was ever conducted by NOAA at the outset of this contract*. *See, e.g.*, Def.'s Resp. to PPFUF at 7-9; Def.'s Supp. Brief at 2 ("The Government agrees that, at the time of contract award, there was no estimate of construction."); Tr. at 69 ("[Establishing an estimate at the time of entering into the contract] couldn't be done in this case.") (statement of defendant's counsel); Def.'s Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J. at 12-13 ("Obviously, at the time Fluor entered the contract, there were no cost estimates."). Section 254(b), however, requires that such a project estimate in a cost-plus-fixed-fee contract must be "determined by the agency head at the time of entering into the contract." This estimate is the predicate for the calculation of the 6% fee limitation on A&E services. 41 U.S.C. § 254(b).

The contract itself and documents produced by NOAA memorializing the negotiations did not reference § 254(b) or the 6% limitation on A&E fees. *See* Pl.'s Mot. for Summ. J. at 5. In October 1986, NOAA requested that the Department of Commerce Investigator General review Fluor's pricing proposal, but neither that audit nor a subsequent review by the Defense Contract Audit Agency raised concerns about the 6% limitation on A&E fees. *Id.* at 6. An April 8, 1987 letter from Fluor to the contracting officer, however, indicated that the fee limitation was the subject of ongoing discussions between the parties. The letter reveals that Fluor did not consider the contract appropriately subject to the limitation because of the parties' inability to estimate project costs per § 254(b):

> If we could have estimated the cost of construction for each of the WFO's, then we could have negotiated two fee structures—one for Architect-Engineer and one for Program, Project and Construction Management. Assuming each WFO cost \$500,000; that would be about \$30,000 fee times say 90 (60-120) WFO's or \$2,700,000 fee for the Architect-Engineer services . . . . First, we could not estimate the cost back in July, 1986 and probably still cannot accurately. Therefore, we opted for a Level of Effort, Professional Services Contract.

Pl.'s Mot. for Summ. J., App. 12. The letter identifies two shortcomings in applying the 6% limitation at that time: (1) the parties were unable to estimate any costs for individual WFO projects because Fluor and NOAA had not yet determined what the scope of the building program would be, and (2) the parties could not determine the number of facilities for which Fluor would ultimately provide A&E design work under the contract.

In 1986-1987, the first two years of performance, Fluor's A&E work was scant because most of the services rendered during that period involved project planning, as Fluor and NOAA explored the scope of the project; during this period, "substantive A&E design was not the focus of [Fluor's] work." Def.'s Cross Mot. for Summ. J., App. at 71 (Fluor Position Paper). Fluor and the contracting

officer agreed that during this time the contract would not be subject to the 6% limitation "because the cost of construction—[the] basis for calculation of the A&E fee limit—could not be estimated at that time due to the undefined nature of NOAA's program and design requirements; and because [Fluor's] scope of work included many services other than A&E design." *Id.* at 17. "[N]either [Fluor] nor NOAA considered work under the Contract to come within the six per cent fee limitation during the early years, when program development, rather than A&E design, comprised virtually all of [Fluor's] scope of work." *Id.* It wasn't until 1988-89, about the third year of the contract, in which Fluor began to perform limited A&E services. *Id.* at 17. During the next two years, Fluor's design responsibilities largely overlapped with its project planning and management responsibilities.

Beginning in 1989 and into 1990, the Department of Commerce audited the WFO and NEXRAD programs. This audit raised concerns, seemingly for the first time, that Fluor's design services should be subject to the § 254(b) limitation. Pl.'s Mot. for Summ. J. at 7. This precipitated a meeting between Fluor and NOAA officials to discuss whether the statute, if applicable, affected any prior or prospective payments. *Id.*; DPFUF at 4. No contract modification was executed, but the parties did document an agreement regarding those design services they understood to be subject to the scope of the limitation, *if* the statute indeed applied to the contract. *See* Pl.'s Resp. to DPFUF at 17-20. The parties dispute whether at this time (or ever) they explicitly agreed that the limitation actually applied to the contract. *Id.* By 1991 (Option Year Four), Fluor's design effort was fully under way. Def.'s Cross Mot. for Summ. J., App. at 71 (Fluor Position Paper). That year marked a transition in Fluor's performance, because program planning was by then "relatively complete" and Fluor focused substantially on design work. *Id.* at 72.

In March 1992 Fluor generated the "1992 WFO Facilities Budget," a document that summarized the costs for all 116 WFO facilities. *See* Pl.'s Mot. for Summ. J., App. 29. For those facilities that had already been completed (construction included), the 1992 WFO Facilities Budget listed *actual* costs of the projects. *Id.*; Pl.'s Supp. Br. at 7-9 (identifying 22 facilities in the 1992 WFO Facilities Budget for which *actual* construction costs were used). For those WFO facilities whose design work was still pending, the Budget listed estimated costs of construction that Fluor had developed pursuant to clause 2.1.3 of its contract. *See* Compl., Ex. 9 at 10. This 1992 WFO Facilities Budget is especially relevant to this case, because it ultimately became the substituted "estimate" upon which the contracting officer later calculated the quantum of Fluor's fee limitation; it was used instead of the elusive phantom in this case, the "estimated cost . . . as determined by the agency at the time of entering into the contract" required by § 254(b).

In October 1992, Fluor's initial contract (including option years and three additional extensions of several months each that are not explained in the record) expired. The WFO modernization program, however, was a long-term project that was not yet complete by this time. DPFUF at 5. NOAA and Fluor would subsequently enter into two follow-on contracts in November 1992 and January 1994 to complete the program. *Id.* These contracts, however, are not at issue in the present dispute.

**C. The Contracting Officer's Final Decision**

In August 1993, after the initial contract was completed, the Department of Commerce issued an interim audit report of the WFO and NEXRAD projects that was extremely critical of NOAA's

broad delegation of authority to Fluor. Pl.'s Mot. for Summ. J., App. 18. This report also criticized NOAA for failing to apply the 6% fee limitation to Fluor's contract. *Id.* at 4-7. The final audit report issued two years later, in October 1995, calculated what the auditor concluded to be the maximum allowable fees for design services that Fluor was entitled to receive under the contract pursuant to § 254(b), based on the figures in the 1992 WFO Facilities Budget. Based on this calculation, the auditor determined that Fluor had received excessive payments for its services. Pl.'s Mot. for Summ. J. at 9-10.[10]

In an August 1995 report, the "Summary of the Contracting Officer's Analysis of Incurred Costs," NOAA's contracting officer (by this time, a different contracting officer than had handled the procurement of the contract back in 1986) indicated that she would follow the lead of the Department of Commerce's audit and challenge certain payments made to Fluor as excessive in light of § 254(b). *See* Pl.'s Mot. for Summ. J., App. 10 at 10. The summary indicated that the contracting officer would send Fluor a formal letter outlining her conclusion and computations, and then invite Fluor to negotiate or settle the matter. That letter and analysis followed on October 5, 1995, in which the contracting officer challenged $4,581,798 as excessive A&E payments. *See* Def.'s Cross Mot. for Summ. J., App. 2 at 9. The parties then tried to settle the matter through negotiations. *Id.* at 9-10.

Thereafter, on April 13, 1999, the contracting officer issued the final decision on the matter. The final decision embraced the methodologies of the Department of Commerce's audit and calculated the putative fee limitation using the 1992 WFO Facilities Budget in lieu of the estimate called for by § 254(b). Def.'s Resp. to PPFUF at 12.[11] Based on negotiations between 1996 and 1999, the contracting officer downsized the overpayment demand to $2,560,413. *See* Def.'s Cross Mot. for Summ. J., App. 2 at 11-12.[12]

---

[10] Among other things, the audit concluded that Fluor had only performed design services for 54 of the 116 WFO facilities, and that only the project costs of those 54 facilities should count towards the "estimate" that would serve as the "denominator" for calculating the fee limitation. Pl.'s Mot. for Summ. J. at 10. Furthermore, the report concluded that 12 of those 54 facilities had not received completed designs at the expiration of the contract, and therefore only a relative percentage of the project costs equal to the percentage of completed design work would be factored into the 6% calculation (i.e., if only 60% of the design work was completed by Fluor for a particular WFO facility, only 60% of that facility's actual or estimated cost from the "WFO Facilities Budget" would be used in the fee limitation calculation). *Id.* Similarly, the report excluded from its calculation the costs of those WFO facilities NOAA ultimately leased, rather than build itself, for which Fluor had performed only partial design services. *Id.* at 10.

[11] Similarly, it only factored into the calculation the project costs for facilities Fluor actually performed design work for, and then only a proportional figure for facilities that Fluor had completed only partial design work. *See, e.g.*, Def.'s Resp. to PPFUF at 14.

[12] In explaining her determination, the contracting officer wrote:

> It is my determination that the total estimated cost of construction of NOAA sites to which the 6% statutory fee limitation applies is $49,852,262. The maximum

On April 11, 2000, Fluor filed its complaint in this court, challenging the contracting officer's final decision and seeking a judgment that Fluor is not liable for any overpayment in violation of § 254(b). Compl. at 1, 33. Among other arguments, Fluor claimed that its contract was not subject to § 254(b) and that the fee limitation should therefore not be applied in this case. On that limited issue, the parties filed cross-motions for summary judgment. The court held a hearing on October 28, 2004 and later requested supplemental briefing from the parties on a number of issues.

## III. Discussion

### A. Jurisdiction and the Standard of Review

This case is an action by a federal government contractor to dispute the contracting officer's final decision brought pursuant to the Contract Dipsutes Act, 41 U.S.C. § 609(a)(1). The Tucker Act, 28 U.S.C. § 1491(a)(2), establishes this court's jurisdiction over such cases. The court reviews the contracting officer's decision *de novo*. 41 U.S.C. § 609(a)(1).

The issues before the court are framed by the parties' cross-motions for summary judgment. Per Rule 56(c) of the Rules of the Court of Federal Claims, summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Celotex v. Catrett*, 477 U.S. 317, 322 (1986). If both parties have moved for summary judgment, the court is not relieved of its duty to evaluate the presence or absence of disputed material facts or the appropriateness of summary judgment. "Simply because each party asserts a contradictory claim, it does not follow that 'if one is rejected the other necessarily is justified.'" *Scott Timber Co. v. United States*, – Fed. Cl. – , 2005 WL 318686 (2005) (quoting *Gen. Elec. Co. v. United States*, 60 Fed. Cl. 782, 789 (2004)).

In this case, the parties' cross-motions are limited to whether Fluor's contract is indeed subject to the strictures of § 254(b). In the course of evaluating that issue, however, it is clear to the court that as a matter of statutory construction the inchoate issue of the legality and validity of the underlying contract must be resolved. While this sub-issue was not raised, nor addressed, by the parties in their respective motions for summary judgment, the court did signal its concern and invited the parties to submit supplemental briefing on the issue. *See* October 29, 2005 Order at 1-2. In light of that opportunity to provide supplemental briefing, and given the relevant undisputed facts of this case, it is appropriate for the court to raise the issues of contract validity and legality *sua sponte* at this stage of proceedings. *See generally* Wright & Miller, FEDERAL PRACTICE AND PROCEDURE, Ch.

---

> allowable costs for the production and delivery of designs, plans, drawings, and specifications are therefore $2,991,136. I have determined that NOAA paid [Fluor] $5,551,549 in design costs for services which fall under the definition of architectural or engineering services in 41 U.S.C. 254(b). Therefore, NOAA paid to [Fluor] $2,560,413 in excess of the statutory limitation on design fees, and this amount should be repaid to the Government.

Def.'s Cross Mot. for Summ. J. App. 2 at 12. For perspective, Fluor received total payments of $42,531,626 under the contract. Def.'s Resp. to Pl.'s Uncontroverted Facts at 1.

8, § 2720 (2004) (citing *Celotex*, 477 U.S. at 325). "The Supreme Court has recognized that '[trial] courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that [it] had to come forward with all of [its] evidence.'" *CW Gov't Travel, Inc. v. United States*, 63 Fed. Cl. 459 (2005) (quoting *Celotex*, 477 U.S. at 326)).

**B. Background of the Statutory Fee Limitation Provision**

As an initial matter, it is helpful to briefly frame the parties' primary arguments in this case (these and other arguments will be examined in greater depth below). First, Fluor contends that § 254(b) and the 6% fee limitation on A&E services was never intended to apply to the type of contract in the present case. Fluor's contract is, it argues, *not* a contract for A&E services but rather one for a broad range of professional services of which Fluor's A&E services were only a minor part. According to Fluor, the 6% fee limitation was only intended by Congress to apply narrowly to those contracts that are exclusively for A&E services.

The government, of course, disputes Fluor's contention and claims that the fee limitation applies to any contract that calls for the performance of A&E services regardless of the extent of those services relative to other non-A&E services provided under the same contract. The government, however, has another problem on its hands. Despite the unambiguous language of § 254(b) (indicating that the 6% fee limitation shall be calculated based on "the estimated cost . . . of the project" that is to be "determined by the agency head" at the point in the procurement process where the parties are "entering into the contract") the government is trying to enforce a calculation of the 6% fee limitation based on the 1992 WFO Facilities Budget. The calculations in that Budget are troubling because it involved some *actual* costs, rather than estimates. Indeed, even the "estimates" that comprised part of the 1992 WFO Facilities Budget are of concern because they were established by Fluor during the course of its performance and not by the "agency head at the time of entering into the contract," as the statute requires.

Clearly, then, these issues are ones of statutory interpretation and application of law to fact. Accordingly, it is to the statute, itself, and then to its origin and history that the court now turns.

***1. 41 U.S.C. § 254***

For convenience sake it is worthwhile once again to summarize the relevant portions of the controlling statute, 41 U.S.C. § 254. This statute has two component subsections – (a) and (b):

> a) Contracts awarded using procedures other than sealed-bid procedures
>
> Except as provided in subsection (b) of this section, contracts awarded after using procedures other than sealed-bid procedures may be of any type which in the opinion of the agency head will promote the best interests of the Government. . . .
>
> (b) Barred contracts; fee limitation; determination of use; advance notification
>
> The cost-plus-a-percentage-of-cost system of contracting shall not be used, and in the case of a cost-plus-a-fixed-fee contract the fee shall not exceed 10 percent of the

> estimated cost of the contract, exclusive of the fee, as determined by the agency head at the time of entering into such contract (except that a fee not in excess of 15 percent of such estimated cost is authorized in any such contract for experimental, developmental, or research work and that a fee inclusive of the contractor's costs and not in excess of 6 percent of the estimated cost, exclusive of fees, as determined by the agency head at the time of entering into the contract, of the project to which such fee is applicable is authorized in contracts for architectural or engineering services relating to any public works or utility project). Neither a cost nor a cost-plus-a-fixed-fee contract nor an incentive-type contract shall be used unless the agency head determines that such method of contracting is likely to be less costly than other methods or that it is impractical to secure property or services of the kind or quality required without the use of a cost or cost-plus-a-fixed-fee contract or an incentive-type contract. . . .

41 U.S.C. § 254 (1988).

Subsection (a) indicates that it applies to "contracts awarded after using procedures *other* than sealed-bid procedures." 41 U.S.C. § 254(a) (emphasis added). In a procurement in which competitive price factors are not considered, which included every federal procurement of design services in 1986 when NOAA procured Fluor's services (as will be explained shortly), procedures other than sealed-bid procedures (*i.e.*, negotiated procurements) must be used. *See* 41 U.S.C. § 253(a)(2). In those cases where sealed-bid procedures are not used, § 254(a) generally grants broad contracting authority to the contracting officer to employ "any type" of contract that will be in "the best interest of the Government." Thus, the scope of § 254(a) is quite broad, but it is clear that this authority is not plenary. It is bounded in part by the conditions or restrictions set forth in subsection (b).

Subsection (b) prohibits the use of a cost-plus-percentage-of-cost contract.[13] It also

---

[13] The cost-plus-percentage-of-cost type contract is one in which the contractor is reimbursed for his allowable costs and also receives a fee that is measured as a percentage of his reimbursable costs. Accordingly, the contractor's fees increase proportionately with his costs. The reason for Congress's prohibition on these types of contract was explained by the Supreme Court in *Muschany v. United States*, 324 U.S. 49, 61-62 (1944):

> The purpose of Congress was to protect the Government against the sort of exploitation so easily accomplished under cost-plus-a-percentage-of-cost contracts under which the government contracts and is bound to pay costs, undetermined at the time the contract is made and to be incurred in the future, plus a commission based on a percentage of these future costs. The evil of such contracts is that the profit of the other party to the contract increases in proportion to that other party's costs expended in the performance. The danger guarded against by the Congressional prohibition was the incentive to a government contractor who already had a binding contract with the Government for payment of undetermined future costs to pay liberally for reimbursable items because higher costs meant a higher fee to him, his

establishes fee limitations for a cost-plus-fixed-fee type contract (see Part IIA above for a discussion of the cost-plus-fixed-fee type contract), two of which are relevant to the case at bar. The first is a general restriction for any cost-plus-fixed-fee contract and provides that the contractor's *fixed fee*—the negotiated fee that the contractor receives for his services which does not increase or decrease with the rise or fall of actual reimbursable costs—may not exceed 10% of the estimated cost of that contractor's contract. *Id*. In other words, the contractor's *profit*,[14] which is set as a fixed-fee at the outset of the contract, may not be more than 10% of what the contracting officer has estimated to be the allowable reimbursable costs of that contract.[15]

The second restriction is the one that is critical to this case for it limits the fees that may be paid to a contractor under a cost-plus-fixed-fee contract for A&E services. These fees must not be greater than 6% of the "estimated cost [of the project], exclusive of fees, as determined by the agency head at the time of entering into the contract." *See* § 254(b). The "fee" that is subject to this 6% limitation is comprised of *both* the contractor's reimbursable costs *and* his fixed-fee (or profit). Furthermore, the baseline against which the 6% limitation is calculated is the estimated cost of the entire project. These components of the 6% fee limitation are to be distinguished from the 10% limitation discussed above, which applies only to the contractor's "fixed-fee" (and does not include his reimbursable costs) and is calculated based upon the estimated cost of the contractor's own contractual performance (rather than the entire project). Despite these distinctions, the two fee limitations are to be read in concert with one another.

To illustrate these concepts, a hypothetical construction project is helpful. If the government were to procure A&E services for a building whose estimated total cost was $2 million (which would include materials and both design and construction services), then the 6% fee limitation applicable to A&E services under § 254(b) would limit the A&E contractor's allowable costs and fixed fee to no more than $120,000 (6% of $2 million is $120,000). However, if the estimated costs of the A&E contractor's services—those actual costs for which the contractor would be reimbursed under the

---

profit being determined by a percentage of cost.

*See also* NASH & CIBINIC, FORMATION OF GOVERNMENT CONTRACTS at 1065-73.

**14** The court uses the term "profit" loosely because not all costs that the contractor incurs in his performance are reimbursable, so the contractor's fee may not in fact represent his *pure profit* (*i.e.*, his income minus *all* costs), because some of the contractor's "fixed-fee" would be used to offset his costs that are not "reimbursable costs." *See, e.g.,* 48 C.F.R. § 15.404-4(a)(1) ("Profit or fee prenegotiation objectives do not necessarily represent net income to contractors. Rather, they represent that element of the potential total remuneration that contractors may receive for contract performance over and above allowable costs. . . . [T]he contractor's actual realized profit or fee may vary from negotiated profit or fee, because of such factors as efficiency of performance, incurrence of costs the Government does not recognize as allowable, and the contract type.").

**15** *See* THE GOVERNMENT CONTRACTOR, Briefing Papers, *Architect-Engineer Contracts* at 2-3 (Nov. 1963) [Compl., Ex. 2] ("If the estimated allowable costs to be incurred by you in performing the work (and for which the Govt [sic] will reimburse you) are $100,000, then your 'fixed fee' cannot exceed $10,000 (10% of $100,000)—which adds up to $110,000.").

cost-plus-fixed-fee scenario—were only $80,000, then the fixed fee that the contractor would receive could be no more than $8,000 because the 10% fee limitation applicable to all cost-plus-fixed-fee contracts under § 254(b) would apply (10% of $80,000 is $8,000).

Under that scenario, the A&E contractor's total fee, including both his reimbursable costs and his fixed-fee, would be no more than $88,000. This total fee would not run afoul of the 6% fee limitation because it is less than $120,000. On the other hand, if the same A&E contractor's estimated costs were not $80,000, but instead were $115,000, the maximum fixed-fee that the A&E contractor could receive would be $5,000. Even though 10% of $115,000 (the reimbursable costs) is $11,500, the 6% fee limitation would restrict the A&E contractor to no more than $120,000 for both reimbursable costs and fixed-fee. *See* Compl., Ex. 2 (THE GOVERNMENT CONTRACTOR, Briefing Papers, *Architect-Engineer Contracts* at 2-3 (Nov. 1963)).

### *2. The Origins of § 254(b)*

Just how 41 U.S.C. § 254(b) should be construed and applied in this case is the key that unlocks the juridical puzzle presented by the unique facts here. And exactly why the controversial fee limitation clause was inserted into 41 U.S.C. § 254(b) is clarified by both the legislative history behind the act and the custom and practices of the architect and engineering professions, all of which work as a background that sheds some light on both the fee limitation provision and the entire statutory scheme. It is to this background that the court now turns.

#### *a. Early Iterations of the 6% Fee Limitation on A&E Services*

Prior to 1893, delivery of design and construction services in federal projects were intertwined. The builder developed whatever rudimentary designs he would rely upon. *See* JOHN B. MILLER, PRINCIPLES OF PUBLIC AND PRIVATE INFRASTRUCTURE DELIVERY 115 (2000). It was only after professional disciplines emerged in the architectural and engineering industry, albeit in their infancy, that the advantages of a rigorous architectural and engineering training began to be recognized. *Id.* As a result, design work became segmented from the construction work, taking on an independent function of its own. In 1893, Congress first permitted the Secretary of the Treasury to seek the *assistance* of design professionals for public works projects. *See* Act of Feb. 20, 1893, 27 Stat. 468. The trend towards segmentation of design from construction continued with the Public Buildings Act of 1926, which *required* federal employees to prepare plans and specifications prior to construction; that Act permitted the solicitation of private design professionals to "assist" the federal employees in their task. 44 Stat. 630 (1926). Also in 1926, the Foreign Service Building Act granted the Secretary of State authority to hire private architects and engineers to independently provide the design services for new buildings or renovation projects as part of the Secretary's supervision and preservation of American diplomatic and consular properties abroad. Pub. L. 69-186, 44 Stat. 403, 404 (1926). Of particular note in this case, the Foreign Service Building Act of 1926 appears to be the first statute that adopted a fee limitation for design services, allowing design fees "not exceeding in any case 5 per centum of the cost of construction or remodeling of the properties in respect to which said special services are rendered." *Id.*

In 1939, separate Acts of Congress granted permission first to the Navy, and then to the Army, to procure architectural and engineering services from private firms on a cost-plus-fixed-fee

basis and without advertising and competitive bidding. *See* An Act to Authorize the Secretary of the Navy to Proceed With the Construction of Certain Public Works, and For Other Purposes, Pub. L. 76-43, 53 Stat. 590 (1939) (codified at 10 U.S.C. § 7212); An Act to Facilitate Certain Construction Work for the Army, and For Other Purposes, Pub. L. 76-309, 53 Stat. 1239 (1939) (codified at 10 U.S.C. § 4540). Up until the 1984 Competition in Contracting Act there was a general requirement for formal advertising and competitive price-related bidding in all government procurements (that is, sealed-bids as opposed to negotiated procurements).[16] However, the 1939 Acts carved out an exception to that general rule to facilitate the War Department's expansion to outlying military stations beyond the continental United States. *See generally* Pub. L 76-306 § 2, 53 Stat. at 1240 (permitting procurement for architectural and engineering services "without reference to the Classification Act of 1923 (42 Stat. 1488), as amended (5 U.S.C., ch 13), or to section 3709 of the Revised Statutes of the United States (41 U.S.C. 5) [1939]"). The 1939 Acts were developed with two primary goals in mind: to reduce costs to the government and to permit greater pace of construction procurement. *See generally* H. Rep. 76-667 (1939).

It appears that up until this time it was the practice of the military branches to procure design services based on competitive (*i.e.*, sealed) bids that resulted in fixed-price type contracts, in which the winning contractor would name the price for the project that would include both his costs and his profit. Addressing the potential for excessive prices, Congress noted inherent flaws in this practice of procuring *fixed-price* contracts after competitive bidding for the construction of new facilities at military bases far from the continental United States:

> The experience of the War Department has shown that it is impracticable to obtain competitive bids from reliable and experienced contractors on work at outlying stations except at substantially increased prices. This arises from the fact that unusual hazards, the uncertainty of weather conditions, the distance from material and labor markets, and the cost of overcoming unforeseen construction difficulties all contribute to the element of uncertainty which requires that a prudent bidder include in his bid a very large item for contingencies. If these contingencies do not arise the Government will pay an excessive profit to the contractor.

*Id.* at 2. To remedy these flaws, Congress permitted the Navy and Army to employ cost-plus-fixed-fee contracts, instead of fixed-price contracts, for construction projects at outlying and overseas bases. Congress concluded that doing so would promote the "principle of noninsurance," since the government would only pay for those costs actually incurred by a contractor, rather than paying for contingencies that a contractor could possibly factor into his bid in a fixed-price contract. *Id.* The building contractor's fixed-fee under the cost-plus-fixed-fee contract authorized by Congress was limited to "10 per centum of the estimated cost of the contract, exclusive of the fee, as determined by the Secretary of War." 53 Stat. 1239. That fixed-fee was to "be determined at or before the time such contract is made." *Id.* However, "[f]or work within the continental limits of the United States, where it is practicable to obtain competitive bids and where the contingency item is not large, the usual procedure of competitive bidding is to be preferred." H. Rep. 76-667 at 2.

---

[16] *See* CIBINIC & NASH, FORMATION OF GOVERNMENT CONTRACTS at 311.

For architectural and engineering services that would result in the "production and delivery of the designs, plans, drawings, and specifications required for the accomplishment of any public works project" the Secretary of War was authorized to contract with private firms and forego formal advertising and competitive bidding otherwise required by statute whenever such exception would be "advantageous to the national defense." 53 Stat. 1240. It was believed that the War Department's reliance on its present, yet small, cadre of in-house architects and engineers was insufficient for the military's growing construction demands and that "neither the personnel nor the space required for their work can be obtained quickly." H. Rep. 76-667 at 2; *see also* H. REP. NO. 76-76 at 2-9 (1939); H. Doc. 76-65, *Report on the Need of Additional Naval Bases to Defend the Coasts of the United States, Its Territories, and Possessions* (Jan. 3, 1939). Under appropriate circumstances the advertising (*i.e.*, the solicitation of competitive bids) requirement was eliminated because it was thought that this process would delay procurement unnecessarily and, perhaps more importantly, "because responding to advertising for professional services of this character is considered unethical." H. Rep. 76-667 at 3. The leading architectural and engineering professional organizations had been opposed to the government's practice of soliciting competitive bids through the formal advertising procedures because that practice conflicted with professional standards established by those organizations. *Id.*

The solicitation of competitive bids from architects and engineers, in which price was an essential component of the selected contractor's qualifications, was deemed "illogical." *Id.* "Standard fees have been established by reputable professional societies for various kinds of engineering and architectural works, so that the question of the magnitude of the fee does not enter into the selection of an engineering or architectural firm. The question in each case should be decided upon the special qualifications of the firms under consideration." *Id.* Consequently, in the absence of price-related competition, Congress ensured price protection by implementing a *maximum* fee "set at 6 percent of the estimated cost of the project" on architectural or engineering services that were provided pursuant to the 1939 Acts. *A Bill to Facilitate Certain Construction Work for the Army, and for Other Purposes: Hearing on S. 2562 Before the Senate Comm. on Military Affairs*, 76th Cong. 13 (1939). This fee limitation for military construction projects reflected what Congress noted was the industry standard for similar projects in the private sector, in which fees for architectural and engineering services tended to vary between four and six percent of the overall project costs. *Id.*

### *b. Incorporation and Extension of the 6% Fee Limitation*

These 1939 wartime provisions were later incorporated into the Armed Services Procurement Act of 1947 ("the Procurement Act"). *See* An Act to Facilitate Procurement of Supplies and Services by the Department of the Army and the Air Force, the Coast Guard, and the National Advisory Committee for Aeronautics, and for Other Purposes, 62 Stat. 21 (1948). The 1947 Procurement Act was an attempt to draw on the procurement lessons learned during wartime while also compiling procurement provisions that had accumulated over time. *See* S. REP. NO. 571 (1947). Significantly, the Procurement Act retained the provisions of the 1939 Acts that permitted architectural and engineering services to be procured on a cost-plus-fixed-fee basis without regard to other statutes requiring advertising and price-related competitive bidding, and it preserved the 6% limitation on fees for such services. *See* 10 U.S.C. § 2306.

Even more significant in this case is that the Federal Property and Administrative Services Act of 1949 ("the Property Act") extended the 6% fee limitation on A&E services to federal nonmilitary projects as part of an attempt to streamline government property management and procurement. *See* An Act to Simplify the Procurement, Utilization, and Disposal of Government Property, to Reorganize Certain Agencies of the Government, and for Other Purposes, 63 Stat. 377 (1949). It is this portion of the Property Act of 1949 that is the progenitor of 41 U.S.C. § 254(b), the provision that is at the heart of this case. The Property Act of 1949 adopted the approach taken by the earlier military procurement laws (the 1939 Acts) toward architectural and engineering services nearly *verbatim*, allowing federal agencies to procure those services on a cost-plus-fixed-fee basis without advertisement or price-related competitive bidding. Of note, however, is that the language identifying those types of services that would be subject to the 6% fee limitation was changed from the "production and delivery of the designs, plans, drawings, and specifications" in the 1939 Acts to "architectural or engineering services" in the 1947 and 1949 Acts. Additionally, the 1949 Act added language directing that the estimate on which the fee limitation is based be "determined . . . at the time of entering into the contract."

By embracing the role of private design professionals in federal public works procurement, the Procurement Act of 1947 and the Property Act of 1949 hastened the complete separation of design from construction services. While these Acts *permitted* the procurement of design services according to the negotiated procedure without regard to price that the Acts espoused, that process was not required. *See* 63 Stat. 393-94 ("[P]urchases and contracts [for supplies and services] *may* be negotiated by the agency head without advertising if . . . for personal or professional services."). The approach that was permitted for procurement of design services was a carve-out or exception to the general rule requiring price-related competition.[17] On the other hand, construction services were required to be procured through "advertising," and not negotiation. *Id.* ("All purchases and contracts for supplies and services shall be made by advertising [unless an exception applies.]"). The "advertising" requirement was synonymous with today's notion of sealed bids. *See* 63 Stat. 395, § 303. This had the effect of separating the procurement of design and construction services (*i.e.*, they were not procured from the same contractor under the same procurement). Many agencies took advantage of the opportunity to select architects and engineers without regard to price, because it allowed the agencies to select the most highly-qualified contractors.

### *c. The Brooks Act Amendment to The Property Act of 1949*

In 1972, the Property Act of 1949 was amended by the Brooks Architect-Engineers Act ("Brooks Act"), which clarified federal policy regarding the selection of A&E professionals. *See* Publ. L. No. 92-582, 86 Stat. 1278 (1972) (codified at 40 U.S.C. §§ 541-44 (1988)).[18] The Brooks Act was a direct response to a request from the Comptroller General in 1967 to modify A&E

---

[17] *See* Michael C. Loulakis, *Design-Build*, in FEDERAL GOVERNMENT CONSTRUCTION CONTRACTS 101, 102 (Adrian Bastianelli, Andrew Ness & Joseph West, eds. 2003).

[18] In 2002 the codifications of the Brooks Act were revised and relocated at 40 U.S.C. §§ 1102-1105. For consistency the court will refer to the revision of the Brooks Act that was codified in the 1980s when Fluor's contract was negotiated and performed.

procurement policy to include competitive pricing procedures in which the amount of the fee to be paid to an A&E contractor would factor into the selection process. *See* S. Rep. No. 92-1219 (1972), reprinted in 1972 U.S.C.C.A.N. 4767, 4767. As an adjunct to the appeal for price competition, the Comptroller General requested that Congress repeal altogether the 6% limitation on A&E fees. *Id.* at 4768. The Comptroller General also suggested that the 6% fee limitation had been applied too broadly by various agencies and sought clarification of the scope of the fee limitation, should it be retained. *See* Pl.'s App. 20 at 1.

Rather than adopting the Comptroller General's request to repeal the exception that permitted A&E services to be procured through negotiation instead of competitive bidding generally required, Congress in the Brooks Act committed the government to a new policy in which negotiated procurement of design services would not only be a preferred approach, but rather the *exclusive* approach. Pursuant to the Brooks Act, *all* design services would be procured based solely on a contractor's "demonstrated competence and qualification[s]" subject to the procuring agency's negotiation of a "fair and reasonable price":

> The Congress hereby declares it to be the policy of the Federal Government to publicly announce all requirements for architectural and engineering services, and to negotiate contracts for architectural and engineering services on the basis of demonstrated competence and qualification for the type of professional services required and at fair and reasonable prices.

40 U.S.C. § 542 (1988). In effect, the Brooks Act dramatically altered the scope of federal construction project delivery. While the Property Act of 1949 had *allowed* procurement of A&E services in this manner, the Brooks Act effectively *required* that all A&E services be procured through negotiated procurement procedures that focused not on price competition but rather the "demonstrated competence and qualification" of each bidder. *See* 40 U.S.C. § 544 (1988) ("The agency head shall negotiate a contract with the highest qualified firm for architectural and engineering services at compensation which the agency head determines is fair and reasonable to the Government."). No longer were federal agencies permitted to procure A&E services through sealed-bid procedures that involved price-related evaluation factors. Accordingly, after the Brooks Act *every* contract for design services was procured through "procedures other than sealed-bid procedures," *see* 41 U.S.C. § 254(a), and was therefore subject to the strictures of § 254 and, in the event of a cost-plus-fixed-fee contract, the 6% fee limitation. Furthermore, Congress *explicitly* declined to repeal the 6% fee limitation:

> The [Brooks Act of 1972] does not affect existing statutes which limit architect-engineer fees to 6 percent of the estimated construction cost. The 6-percent limitation, when applied to the preparation of designs, plans, drawings, and specifications as Congress intended, is a valuable safeguard to the public. . . . [T]he 6-percent fee limitation is deemed to be an equitable ceiling. . . . The 6-percent limitation has been in existence since 1939 and is not changed by [this bill].

S. Rep. No. 92-1219, 1972 U.S.C.C.A.N. at 47678.

Finally, one goal of Congress in the Brooks Act was to clarify the scope of which services were subject to the § 254(b) fee limitation. The Brooks Act specifically defined "architectural and engineering services" (to which the § 254(b) fee is applicable) to include "those professional services of an architectural or engineering nature as well as incidental services that members of these professions and those in their employ may logically or justifiably perform." Pub. L. 92-582, 86 Stat. 1278, 1278-79 (1972) (codified at 40 U.S.C. § 541 (1988)). The letter from the Comptroller General that precipitated the Brooks Act suggested that federal agencies had misinterpreted the extent of the services covered by the 6% fee limitation, in some instances applying the fee limitation to *all* "architectural and engineering services" rendered by a design contractor. Pl.'s App. 20 at 1 (Letter from Rep. Jack Brooks to the Comptroller General, Nov. 16, 1967). Representative Brooks' response in 1967 (which preceded the subsequent Brooks Act) indicated that this broad application of the fee limitation was contrary to the spirit of prior codifications of the 6% limitation (the 1939 Acts) that served as the template for § 254(b). *Id.* at 2. The earlier forms of the limitation had confined the 6% limitation only to those fees incurred in the "production and delivery of the designs, plans, drawings, and specifications." *Id.* According to Rep. Brooks, the 1947 Procurement Act and 1949 Property Act, in switching the language describing the limitation's scope from the "production and delivery of plans, designs, drawings, and specifications" to "architectural and engineering services" was nothing more than a simplification of the language that was not intended to alter the scope of the fee limitation. Any ambiguity was therefore clarified in the Brooks Act by defining the term "architectural and engineering services," which was later clarified further by definition in the FAR. *See* 48 C.F.R. § 2.101.[19]

---

[19] In 1988, The Brooks Act was itself amended to clarify the scope of the definition of A&E services. *See* Pub. L. 100-656; Pub. L. 100-679. This amended definition is reflected in 48 C.F.R. § 2.101, which states:

> *Architect-engineer services*, as defined in 40 U.S.C. 541, means—
>
> (1) Professional services of an architectural or engineering nature, as defined by State law, if applicable, that are required to be performed or approved by a person licensed, registered, or certified to provide those services;
>
> (2) Professional services of an architectural or engineering nature performed by contract that are associated with research, planning, development, design, construction, alteration, or repair of real property; and
>
> (3) Those other professional services of an architectural or engineering nature, or incidental services, that members of the architectural and engineering professions (and individuals in their employ) may logically or justifiably perform, including studies, investigations, surveying and mapping, tests, evaluations, consultations, comprehensive planning, program management, conceptual designs, plans and specifications, value engineering, construction phase services, soils engineering, drawing reviews, prepartion of operating and maintenance manuals, and other related services.

**C. Analysis**

With the provisions of § 254 and the history of the fee limitation laid out, it is appropriate to turn next to the parties individual arguments in this case in more detail.

***1. Fluor's Contract is One for "Architectural or Engineering Services" to Which § 254(b) Applies***

As an initial matter, Fluor argues that its contract with NOAA should not be subject to any of the limitations in § 254(b) applicable to contracts for A&E services because, according to Fluor, this contract was *not* a contract for A&E services. Largely an issue of semantics, Fluor maintains that "the six percent limitation on fees prescribed [in § 254(b)] was intended to apply narrowly to contracts where A&E services represent the majority of the work required, and not to services contracts of the sort at issue here where only a minor portion of the required work constituted covered A&E services." Pl.'s Mot. for Summ. J. at 14-15.

Fluor's argument is really one that implicates the "plain meaning" of the statute. The court therefore begins its analysis, as it must, with the text of the statute itself because the plain language of a statute is controlling. *See Shoshone Indian Tribe of the Wind River Reservation v. United States*, 364 F.3d 1339, 1345 (Fed. Cir. 2004); *Int'l Bus. Machs. Corp. v. United States*, 201 F.3d 1367, 1373 (Fed. Cir. 2000). The court should look beyond the plain meaning of a statute only if the language is ambiguous or a literal interpretation would frustrate the purpose behind the statute. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 586 (1983). However, "[w]here the language is plain and admits of no more than one meaning the duty of interpretation does not arise and the rules which are to aid doubtful meanings needs no discussion." *Caminetti v. United States*, 242 U.S. 470, 485 (1917). It is only when an ambiguity is inherent in the statute, where the words might be reasonably susceptible to multiple meanings, that the courts turn to other aids or rules of statutory construction to discern the meaning of the statute itself. *See, e.g.*, *Jowett, Inc. v. United States*, 234 F.3d 1365, 1368 n.2 (Fed. Cir. 2000).

Turning to the statute, then, § 254(b) indicates that a fee not in excess of 6% of the estimated cost is "authorized in *contracts for architectural or engineering services* related to any public works." § 254(b) (emphasis added). At least facially, there is nothing ambiguous about this language that might suggest that its applicability should only extend to contracts *primarily* or *substantially* for A&E services or, alternatively, that A&E services to be rendered as part of a broad professional services contract like Fluor's might somehow be exempt from the statute's purview.

Fluor advances a syllogism that Congress intended the 6% limitation to apply only to "*contracts* for architectural and engineering services," with primary focus on the type of contract or manner in which the contract is classified rather than on the substantive services to be performed. According to Fluor, the statute "does not provide that the limitation applies to *any* contract that includes A&E services regardless of whether those services constitute only a minor portion of the work required." Pl.'s Mot. for Summ. J. at 16. Instead, so the syllogism goes, the statute was only

48 C.F.R. § 2.101.

intended to specifically apply to a contract that is properly characterized *in its entirety* (or, mostly) as an "A&E contract," and therefore the statute does not apply to Fluor's contract. In support of this argument, Fluor postulates that the legislative history of the 6% limitation contains "nothing that indicates a contrary intent." *Id.* However, Fluor has been unable to present any affirmative support that would lead the court to recognize any ambiguity in the language of the statute. Instead, Fluor points to the statutory progression of the 6% fee limitation, pointing out a legislative intent to circumscribe the *types of services* in a "contract[] for architectural and engineering services" that are subject to the 6% limitation. Out of this sound interpretation of the Brooks Act's policies, Fluor tries to imply a parallel legislative intent to narrowly define the *types of contracts* subject to the limitation.

The court rejects Fluor's attempt to take a facially unambiguous statute and render it ambiguous through clever contrivances. In construing statutes, "it has been truly stated to be the duty of the court to effect the intention of the legislature; but this intention is to be searched for in the words the legislature has employed to convey it." *Schooner Paulina's Cargo v. United States*, 11 U.S. (7 Cranch) 52, 60 (1812). Thus, the first step is to determine whether the applicable statutory provision possesses a plain and unambiguous meaning with regard to the particular issue in this case. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). At least initially, then, it strikes the court as counter-intuitive to read § 254(b) as Fluor would counsel—to imply a restriction on the types of contracts to which the statute applies—in the absence of specific language suggesting such a limitation. The facial reading of the statute seems to unambiguously require that, when architectural and engineering services are the subject of a contract, the fees for those services shall be subject to the statutory limitation. "Where there is no ambiguity in the words, there is no room for construction. The case must be a strong one indeed, which would justify a court in departing from the plain meaning of words . . . in search of an intention which the words themselves did not suggest." *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95-96 (1820) (Marshall, C.J.).

Even assuming, *arguendo*, that the statute is ambiguous as applied to the facts of this case as Fluor argues, which might permit the court to look to tools of statutory construction to divine the purpose or intent of the statute, *see*, *e.g.*, *Crandon v. United States*, 494 U.S. 152, 158 (1990) ("In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy."), there is no indication that the statutory history on which Fluor relies actually leads to the conclusion it espouses. As Fluor points out, the statutory progression of § 254(b) does reveal Congress' specific intent to narrowly construe the types of *services* that are subject to the 6% limitation in any given contract, but there is nothing in Congress' approach that indicates its intent to only apply the 6% limitation in certain types of contracts (*i.e.*, only those contracts primarily for A&E services).

As noted above, the Brooks Act of 1972 clarified the scope of those services to which § 254(b) applies. It specifically defined "architectural and engineering services" to include "those professional services of an architectural or engineering nature as well as incidental services that members of these professions and those in their employ may logically or justifiably perform." Pub. L. 92-582, 86 Stat. 1278, 1278-79 (1972) (codified at 40 U.S.C. § 541 (1988)). This codification seems to be a direct response to the Comptroller General's earlier suggestion that federal agencies had misinterpreted the extent of the services covered by the 6% limitation, in some instances applying the fee limitation to *all* "architectural and engineering services" rendered by a contractor

notwithstanding the relationship of those services to the "production and delivery of the designs, plans, drawings and speicifications" that had been emphasized in the 1939 Acts. Pl.'s App. 20 at 1.

This interpretation is reinforced in the Federal Acquisition Regulations. The applicable portions of the FAR that implement § 254(b) do not limit the scope of applicability to contracts *only* for A&E services, which is the crux of Fluor's argument, but rather require that the 6% limitation be applied to fees incurred for the performance of relevant *services*. Section 15-404 (former § 15-904-4(c)(4)(i)(B)) prohibits a contracting officer from negotiating a fee that exceeds the statutory limit whenever it procures "architect-engineer services for public works or utilities." The fees that are so limited are those attributable to the "production and delivery of designs, plans, drawings, and specifications." 48 C.F.R. § 15.404-4(c)(4)(i)(B). This regulation does not refer to "contracts" for A&E services, nor does it in any way limit the 6% limitation to undertakings that are exclusively, or primarily, for A&E services. Presumably, it is only the fees paid for the performance of actual design services, whether as part of a contract calling for *only* A&E services or as part of a contract calling for performance of a diverse range of services, that are subject to the 6% limitation of § 254(b). In other words, costs and fees incurred in providing non-A&E services under the contract escape the narrow 6% limitation.[20]

That interpretation of the fee limitation—that it only applies to a limited range of services despite the variety of services called for in the contract—is consistent with opinions from administrative bodies that have interpreted the statute. The Comptroller General has expressed the opinion that "the codifications of the 1939 statutes *apply to all types of contracts* and that costs which do not relate to the preparation of designs, plans, drawings, and specifications may be regarded as not subject to the 6-percent limitation imposed by those statutes." 46 Comp. Gen. 556, 560 (Dec. 12, 1966) (emphasis added). "In light of the legislative history of the Brooks Act, we have held that the Act applies to the procurement of services which uniquely or to a substantial or dominant extent logically requires performance by a professionally licensed and qualified A-E firm." *In re Assoc. of Soil and Foundation Engs.*, 61 Comp. Gen. 377, 378 (May 6, 1982). Logically, if services that do not properly fall within the Brooks Act's circumspection of "architectural or engineering services" or, even more apparent, are not architectural or engineering services at all, then the fees for those services are not rightly subject to the § 254(b) fee limitation. However, the presence of such services—even if they represent a substantial or predominant portion of the contract—does not exempt from the fee limitation the fees for those services that are properly within the scope of the Brooks Act provisions.[21]

---

[20] There is no indication in this case that the contracting officer attempted to recover costs attributable to the myriad professional services that Fluor provided independent of it's A&E undertakings. Indeed, payments made to Fluor over the life of the contract totaled $42,531,626, but it was only those payments attributable to A&E type services, which the contracting officer calculated to be $5,551,549, that came under scrutiny for overpayment in violation of § 254(b). *See* Pl.'s Resp. to DPFUF at 12.

[21] Defendant called to the court's attention several federal agencies that have "supplemented" the FAR with their own regulations, including the Department of Defense, the Army Corps of Engineers

Ultimately, there does not appear to be support for Fluor's position, other than a very strained reading of both the statute and its legislative history, that counters the natural reading of § 254(b) and the provisions of the FAR that implement that section. These provisions, along with the statutory history, seem to universally apply the 6% limitation to a limited range of design services as defined in the Brooks Act and in 48 C.F.R. § 2.101. The implication of this narrow approach would permit Fluor to exempt all costs and fees incurred performing services that fall outside the scope of 48 C.F.R. § 2.101. However, it cannot similarly exempt fees incurred performing those design services that are properly within the scope of the statute and regulations merely because there were other diverse services performed under the same contract. There is simply no support for such a strained interpretation of the law. *See Wiltberger*, 18 U.S. (5 Wheat.) at 95-96.

***2. Fluor's Contract Was Not a "Design-Build" Contract***

Next, in a related argument, Fluor contends that subjecting a contract of this type to the fee limitation in § 254(b) would lead to an absurd result because it would be contrary to the industry practice of "design-build" development contracts in which the § 254(b) fee limitation is not applied. Fluor accordingly argues that industry practice dictates that this contract be treated as a "design-build" contract, itself, and exempted from the fee limitation. *See* Pl.'s Supp. Br. at 16, 25 ("The US Army Corps of Engineers, which has decades of experience implementing the statutory limitation set forth in 41 U.S.C. § 254(b), *does not apply the 6 percent limitation to design-build contracts*!")

---

and the Department of Veterans Affairs. *See* Def.'s Cross Mot. for Summ. J. at 21. For example, the Department of Defense has indicated that:

> The six percent limit applies only to that portion of the contract (or modification) price attributable to the preparation of designs, plans, drawings, and specifications. If a contract or modification also includes other services, the part of the price attributable to the other services is not subject to the six percent limit.

48 C.F.R. § 236.606-70(c). While these supplements do not seem entitled to any degree of deference by the court for various reasons, *see Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council*, 467 U.S. 837, 842-45 (1984); *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 643 n.30 (1986); Pl.'s Supp. Br. at 13-15, they are consistent with and seem to reinforce the court's construction of § 254(b); the court therefore finds them persuasive.

Fluor argues that reference to such supplements have no bearing on the instant dispute because "these regulations deal only with implementation of the statute when it already is established that there is a contract for A&E services, but that contract contains both A&E services subject to the limitation and A&E services that are not. . . . The instant contract, however, is altogether not 'a contract for A&E services' as that term is understood by industry and agencies with experience implementing the statute." Pl.'s Supp. Br. at 14. Fluor's argument, then, mirrors the logic it applies to the applicability of § 254(b), in general. But this argument puts the proverbial cart before the horse, because there is nothing in the language of the supplements— 48 C.F.R. § 236.606-70(c) cited above, for instance—that would suggest that those sections be construed as exclusively or narrowly as Fluor would counsel.

(emphasis original); Pl.'s Resp. to Def.'s Cross-Mot. for Summ. J. at 2 ("Rather, like design-build contracts commonly used by federal agencies with the most experience in government construction, it was a contract that related to construction of public works that contained some element of A&E services, but was not subject to the six percent limitation set forth in the statute."), 6-7.

As Fluor makes it seem, the fee limitation is not applied in design-build contracts simply because the design work is *only* a minor portion of the services to be rendered under those types of contract. This argument, however, is wholly inaccurate and completely disregards the statutory and historical context in which the design-build delivery model emerged. As noted below, the reason that design-build contracts are not subject to the fee limitation of § 254(b) is because they proceed under sealed-bid or competitive price procurement procedures, which are specifically excepted from the Brooks Act through supervening law. Accordingly, in a sealed bid the protections of the fee limitation are simply not necessary because price competition obviates the need for external price controls, such as the 6% fee limitation. Contrary to Fluor's argument, whether the § 254(b) fee limitation is applied in a design-build delivery has *nothing* to do with the relative quantum of design services to be performed under that contract. Since Fluor's contract was procured not as a design-build contract, but rather after a negotiated award process as part of a "design-bid-build" delivery model, Fluor's effort to analogize its contract to a design-build delivery model is misplaced.

"Design-Bid-Build" and "Design-Build" are industry terms referring to the method by which infrastructure projects are procured. Design-bid-build is a "segmented delivery strategy in which design is fully separated from construction." JOHN B. MILLER, PRINCIPLES OF PUBLIC AND PRIVATE INFRASTRUCTURE DELIVERY at xxix (2000). In this model, the services of a design professional are procured first, and the building contractor is selected later, after the design work is completed. Conversely, in the design-build model, both design and construction services are procured from a single entity (which might be a single construction firm with in-house design professionals or a team of construction and design professionals assembled for a project) in a single procurement process.

As noted above, the only delivery model known prior to the late-nineteenth century in federal public works procurement was design-build because the concept of separating design services from construction services had not yet matured. Slowly over the next half-century, the marriage of design and construction services began to erode as Congress first authorized, and then required pre-construction designs and specifications. *See* Act of Feb. 20, 1893, 27 Stat. 468; Public Buildings Act of 1926, 44 Stat. 630.

Following the Procurement Act of 1947 and Property Act of 1949, discussed above, construction services could only be procured through competitive bidding, but design services could be procured through the more flexible negotiated procurement. This dichotomy resulted in more widespread use in the federal government of "design-bid-build" deliveries for public works as federal agencies took advantage of the opportunity to procure design services through negotiation.

The Brooks Act of 1972 entrenched design-bid-build as the *only* viable delivery model in federal procurement because it effectively required that *all* design services be procured through negotiation without regard to price. This requirement forced government agencies to always procure design and construction services separately, since by rule they had to proceed under different

procurement paths—one by negotiation, the other by competitive bidding. In effect, the Brooks Act acted as a bar to design-build delivery:

> With design procured separately by statute, all federal agencies were still required to advertise for construction services under the basic procurement statutes: the [Procurement Act and the Property Act]. With the design professional already retained through a separate statutory procurement, *none* of the integrated project delivery methods [such as design-build] is possible in public infrastructure. The combination of the 1972 Brooks Act and the underlying 1947 and 1949 general procurement statutes operated as a statutory bar to Design-Build.

MILLER, PRINCIPLES OF PUBLIC AND PRIVATE INFRASTRUCTURE DELIVERY at 117. It also precluded the procurement of A&E services through sealed-bid procedures since price-related factors were not considered. *See* 41 U.S.C. § 253(a)(2)(A). As a result, *all* contracts for A&E services fell within the scope of 41 U.S.C. § 254(a) and were subject to the restrictions in § 254(b) that applied to cost-plus-fixed-fee contracts.

For more than twenty years this bifurcated design-bid-build approach dominated the landscape of government infrastructure procurement. Although some federal agencies proceeded with design-build procurements by virtue of specific appropriating authority[22] most federal agencies, including the Department of Commerce (within which NOAA is organized), relied strictly upon design-bid-build delivery models. That general practice of design-bid-build was still in place throughout the entire period of Fluor's contract negotiation and performance. In the 1996 Federal Acquisition Reform Act (also known as the Clinger-Cohen Act), however, Congress adopted a new approach that granted all federal agencies general authority to use design-build procurement in limited circumstances. *See* Pub. L. 104-106, § 4001, 110 Stat. 642 (codified at 41 U.S.C. § 253m).

Under the Clinger-Cohen Act, when the circumstances appropriate for design-build procedures are in place, the agency may procure design and construction services *together* from a single entity and may ultimately award the contract on the basis of price factors and price competition. In this scheme, agencies may award contracts for construction services *without regard to the Brooks Act of 1972*, and therefore without the requirement of a negotiated bid process. *See* 40

---

[22] During this time, some federal agencies received specific authority to employ design-build delivery methods under limited circumstances or engaged in regulatory maneuvering to do so. *See* Military Construction Authorization Act of 1986, Pub. L. 99-167, § 807 (granting authority to each of the Secretaries of the military departments authority to enter into up to *three* design-build procurements each year); National Defense Authorization Act of 1992 and 1993, Pub. L. 102-190, § 2802 (1992) (extending the military's design-build procurement policy codified at 10 U.S.C. § 2862 ("The Secretary . . . may use . . . procedures . . . for the selection of a contractor on the basis of price and other evaluation criteria to perform, in accordance with the provisions of a firm fixed-price contract, both the design and construction of a facility.")). Among other agencies that engaged in design-build procurement were the General Services Administration, the Department of Energy, the Department of State, and the Department of Veterans Affairs. *See generally* Loulakis, *Design Build in* FEDERAL GOVERNMENT CONSTRUCTION CONTRACTS at 104.

U.S.C. § 542. Instead, since price factors may be considered for the overall project in design-build procurements under the Clinger-Cohen Act,[23] those procurements may proceed under sealed-bid procedures,[24] which necessarily removes them from the scope of § 254(b) and the fee limitation. Similarly, in the design-build mechanism of the Clinger-Cohen Act, the single construction entity receives a fixed price for all of its services—services that will include its design and construction work and any attendant cost. Thus, it is of little consequence how that fixed price is allocated internally by the single construction entity. Whether the single entity pours 1% or 20% of its fixed-price into design-type services, it does not affect the overall fee that the contractor receives. It therefore makes perfect sense that the § 254(b) fee limitation would not apply in the design-build scenario.

Fluor's contract in this case, however, was *not* a design-build contract, but was instead procured in a manner consistent with a design-bid-build delivery. *See, e.g.*, Compl. Ex. 9 at 16 (Clause 2.3.8). It was procured during the period after the Brooks Act of 1972 that effectively required all infrastructure procurement to proceed under the design-bid-build model, and long before the Clinger-Cohen Act in 1996 that granted general authority to all federal agencies to employ design-build. Therefore, despite the fact that other federal agencies may procure design services under a design-build model *today* without regard to the § 254(b) fee limitation, this is entirely a function of modern statutory development. The fact that the fee limitation is not applied in design-build contexts has little to do with the fact that design services may be a relatively small portion of the overall services procured, as Fluor contends. That argument belies the entire statutory scheme that existed for the duration of Fluor's contract negotiations and performance. Accordingly, the court declines to adopt Fluor's argument that this contract should be treated as a design-build contract and therefore not be subject to the 6% fee limitation. Such an interpretation would be inconsistent with both law and fact.

### *3. Section 254(b) and the Estimate of Project Costs*

Having concluded that Fluor's contract with NOAA was indeed subject to § 254(b) (notwithstanding the contract's provisions for a host of other professional services that are not subject to the 6% limitation), the court must next address the implications of NOAA's apparent inability to establish a timely estimate of project costs consistent with the statutory framework.

#### *a. Section 254(b) Requires a Timely Estimate*

Turning back to the plain language of § 254(b), while hardly a model of clarity, the statute explicitly states that the 6% fee limitation will be based on "the estimated cost . . . of the project to

---

[23] *See* 41 U.S.C. § 253m(c)(4).

[24] *See* 41 U.S.C. § 253(a)(2) ("In determining the competitive procedures appropriate under the circumstance, an executive agency shall solicit sealed bids if (i) time permits the solicitation, submission, and evaluation of sealed bids; (ii) the award will be made on the basis of price and other price-related factors; (iii) it is not necessary to conduct discussions with the responding sources about their bids; (iv) and there is a reasonable expectation of receiving more than one sealed bid.").

which such fee is applicable" and that this estimate is to be "determined by the agency head at the time of entering into the contract." 41 U.S.C. § 254(b). Per FAR § 15.404-4(c)(4)(i) (former § 15-904), a contracting officer is prohibited from awarding a cost-plus-fixed-fee contract for A&E services unless the negotiated contract price for A&E services will not exceed 6% of the "estimated cost of construction of the public work." *See* 48 C.F.R. § 16.306(c); 48 C.F.R. § 15.404-4(c)(4)(i). These FAR provisions implicate the project estimate as an essential element of a contract for A&E services. Both the statute and the FAR require that the estimate be in place before the contracting officer awards the contract.[25] Section 254(b) states this requirement explicitly, placing the burden to establish the estimate on the "agency head at the time of entering into the contract." The timing of the estimate is implicit in the FAR, because the contracting officer is not permitted to award the contract without the estimate in place.

The absence of a timely estimate, or the inability to develop one, therefore disrupts the normal order of contract negotiation and award that the statute and regulations contemplate. This is so because if no timely estimate of project costs exists then the contracting officer will be unable to determine the quantum of the fee limitation for A&E services. If the contracting officer is unaware of the upper limit of the fee limitation, he will be unable to comply with the explicit requirement of 48 C.F.R. § 15.404-4(c)(4)(i) that the "contracting officer shall not negotiate a price or fee that exceeds the [statutory limitation] imposed by . . . 41 U.S.C. § 254(b)."

This facial reading of the statute's language is consistent with practical considerations that rely on the statutory estimate. The timely estimate of project costs contemplated by the statute plays an important role in safeguarding the contractor against performing work or incurring costs that would not be compensable under § 254(b). The Limitation of Cost clause that is required in any cost-reimbursable contract, *see* 48 C.F.R. § 52.232-20, relieves a contractor from his obligation to perform under a cost-reimbursable contract if the contractor's actual, incurred costs exceed the allowable costs.

That is to say, under a contract for A&E services, the contractor would have no obligation to perform and continue to incur costs if and when his incurred costs exceeded the 6% limitation, because any incurred costs above that limitation threshhold would not be reimbursable. *See Advanced Materials, Inc. v. Perry*, 108 F.3d 307, 310-11 (Fed. Cir. 1997). In the normal course of a contract for A&E services, when the timely estimate is properly conducted, an A&E contractor is on notice of the upper limit on his *allowable* fees and it is incumbent upon that contractor to complete the project within the allowable range. On the other hand, if no estimate were in place, the contractor would not be able to determine the upper limit on his allowable fees and would run the risk of incurring costs in excess of § 254(b)'s fee limitation—costs that would, by law, not be reimbursable. "The requirements of the cost limitation provision protect both the contractor and the government." *Id.* at 310. The provision "protects the contractor from discovering, after performing the contract at greater cost than anticipated, that its work has been financially disastrous" because

---

[25] *See also* Pl.'s App. 20 at 5 (Nov. 16, 1967 Letter from Rep. Jack Brooks to the Comptroller General) ("It is, of course, necessary incident to negotiations that a collateral determination be made to assure the parties that the fee under discussion falls within 6 percent of the estimated cost of the project in conformance with the statutory limitation.").

the government is not able to pay additional costs—in the A&E context, costs in excess of the 6% limitation. *Id.*

This plain language interpretation of the statute is also reinforced by the legislative history of the 6% fee limitation. In the Foreign Service Building Act of 1926, one of the first (if not the very first) statutes to impose a restriction on A&E fees (as noted above, the 5% fee limitation on A&E services required by the Secretary of State to build or maintain Foreign Service properties), that fee limitation was originally based on "the cost of construction or remodeling of the properties" to which the A&E services were rendered. Apparently, A&E fees calculated under the 1926 Act relied upon *actual* costs to establish the fee limitation. By 1939, however, when the Naval and War Department A&E procurement policies were enacted, Congress did not premise the fee limitation upon actual costs like the earlier 1926 Act, but instead specifically required that the 6% fee limitation be based upon "the estimated cost, as determined by the Secretary of the Navy [or War]." 53 Stat. at 591; 53 Stat. at 1240. Moreover, when the military provisions were extended to nonmilitary procurements in the Property Act of 1949, the language requiring a fee limitation premised upon "the estimated cost" was clarified even further, as Congress required that the fee limitation be calculated using "the estimated cost [of the project], as determined by the agency head *at the time of entering into the contract*." 41 U.S.C. § 254(b) (emphasis added). The statutory progression of the fee limitation therefore demonstrates an appreciable statutory trend to move *away* from calculating the fee limitation based on actual costs and towards the current requirement of a *timely* estimate established by *the agency head*.

***b. NOAA Did Not Establish A Timely Estimate; A Timely Estimate Was Impossible***

The parties agree that no estimate of project costs was properly in place at the outset of Fluor's undertaking, as required by the statute. Def.'s Resp. to PPFUF at 7-9; Def.'s Supp. Brief at 2 ("The Government agrees that, at the time of contract award, there was no estimate of construction."); Tr. at 69 ("[Establishing an estimate at the time of entering into the contract] couldn't be done in this case."). Fluor's undertaking was so broad, and the scope of the project was so speculative at the time the contract was negotiated that it was impossible for the parties to make any good faith estimate of what the project costs might be. Indeed, it was these very uncertainties that compelled the parties to pursue a level-of-effort type contract in the first place, in which NOAA essentially ordered hours of work from Fluor rather than completed projects. The parties did not know "what type of architectural or engineering tasks will be required" to site-adapt the preexisting floor plan, nor did they know with any specificity "how many" different sites for which Fluor's A&E services might be needed. *See* Pl.'s Mot. for Summ. J., App. 21, Ex. 1 (Contracting Officer's Determinations and Findings). According to Fluor's Project Controls Manager:

> [T]he government had not fully established its requirement prior to performance by [Fluor] under the Contract. As a result, of necessity, Fluor was required to assist in the development of concepts which would define space usage, facility size, general specifications, and other overall criteria such as construction materials and common equipment relative to design throughout the entire performance period of the Contract and concurrent with the performance of design work itself under the Contract.

Pl.'s Supp. Brief, Ex. 36 at 1 (Decl. of James Wagner). Both Fluor and NOAA were wholly uncertain not only of how much work was necessary to carry out the broadly-defined WFO modernization project, but also how much of that necessary work Fluor would be asked to complete. Pl.'s Mot. for Summ. J., App. 21, Ex. 1. Given these inherent uncertainties, it was *not even possible to develop an estimate* of the project costs to which Fluor's services would be applied. Ultimately, it is this inherent flaw—that, based on these facts, a timely estimate was an impossibility—that guides the rest of the court's analysis and its ultimate conclusion regarding the viability of the contract in this case.

***c. NOAA Could Not Delegate To Fluor The Task Of Developing The Estimate Required By § 254(b)***

Despite the absence of a timely estimate, defendant argues that the responsibility for establishing the estimate upon which the 6% limitation was to be based in this contract was delegated to Fluor, itself. Defendant contends that the contracting officer regularly approved of ongoing estimates that Fluor developed as the scope of the WFO project became more definite. *See* Def.'s Opp. to Pl.'s Mot. for Summ. J. at 18-19; Def.'s Reply to Pl.'s Resp. to Cross Mot. for Summ. J. at 11-3. Specifically, defendant points to contract clause 2.1.3 of the agreement, *see* Compl., Ex. 9 at 10, which obligated Fluor to "prepare cost estimates for construction contract packages prepared under this contract." These estimates were to be made in such detail "as is practical at the time the estimates are made, and shall be refined and updated as the program progresses." *Id.* The "1992 WFO Facilities Budget" that NOAA ultimately used to calculate the purported 6% limitation in this case was based, in part, on the running estimates that Fluor conducted for many of the project sites. *See, e.g.*, Pl.'s Supp. Brief at 8.

Simply put, the court concludes that this argument is unconvincing because it disregards the explicit statutory language that requires the estimate to be "determined by the agency head at the time of entering into the contract." The substituted estimates that defendant proffers are conducted by the wrong party, and are not established at the proper time so as to provide the contractor the adequate protections afforded by the aforementioned Limitation of Cost clause. This argument also seems to give rise to an inherent conflict of interest that should be avoided and misconstrue the nature of Fluor's obligation to conduct estimates.

First, the plain language of § 254(b) requires that the "agency head" establish the estimate used to determine the fee limitation. The agency head is defined in the FAR to include "the Secretary, Attorney General, Administrator, governor, Chairperson, or other chief official of an executive agency, unless otherwise indicated, including any deputy or assistant chief official of an executive agency." 48 C.F.R. § 2.101. This is entirely consistent with the Property Act of 1949 and subsequent Brooks Act amendments. *See* Pub. L. 81-152, 63 Stat. 377, 397 (1949); Pub. L. 95-582, 86 Stat. 1278, 1278 (1972). The Property Act of 1949 specifically allows the agency head to delegate to other agency officers or officials decisions such as the § 254(b) estimate, but there is no evidence in the record of any such delegation to an official involved in this case, such as the NOAA contracting officer. *See* Federal Property and Administrative Services Act of 1949, Pub. L. 81-152, § 307(a), 63 Stat. 377, 396. Nowhere in the statute or the regulations does it appear that the *contractor itself*, however, may conduct the estimate essential to the 6% limitation. Nor is there any

indication that the agency head may delegate such responsibility to some party outside the agency administration. *See id*.

Defendant's argument that the estimation responsibility was delegated to Fluor is also inconsistent with the *timing* requirement for the estimate. Section 254(b) requires the estimate to be in place "at the time of entering into the contract." 41 U.S.C. § 254(b). The FAR requires the contracting officer to negotiate the contract for A&E services *based on the estimate*. 48 C.F.R. § 15.404-4. The estimate must therefore exist—as a matter of law—at the outset of the contract. Defendant's argument that Fluor was to establish the statutory estimate that would be used to determine the fee limitation, as part of an ongoing contractual obligation, is therefore entirely inconsistent with the statute and regulations. Any estimate that Fluor might have produced as an incident of its contract would necessarily be produced *after* the "time of entering into the contract." Such an estimate therefore comes too late in the procurement process to stand in as a substitute for the estimate on which the § 254(b) fee limitation is to be premised.[26]

---

[26] Notwithstanding that NOAA could not delegate to Fluor the task of developing estimates on which to base the fee limitation, the court also considered whether the periods at which NOAA exercised options or task orders might be deemed new "time[s] of entering into the contract." This seems particularly plausible since all of the options and task orders were exercised on forms styled as "modifications." *See, e.g.*, Pl.'s Supp. Br., App. 34, 35. Potentially, appropriate estimates might have been in place during later stages of Fluor's performance, once project planning was more refined.

Older views of contract modification deemed modifications to be a mutual rescission of the original contract followed by a new contractual undertaking. *See* 3 WILLISTON ON CONTRACTS § 7:37 at 598 (4th ed. 1992). The modern approach, however, rejects that view and treats modifications as "adjustments in on-going transactions." *See* RESTATEMENT (SECOND) OF CONTRACTS § 89 & Cmt. a (1981). Following this modern view, the Court of Federal Claims has noted that "[a] contract modification does not necessarily create a new contract." *City of Tacoma v. United States*, 28 Fed. Cl. 637, 647 (1993). Especially in the case where the original contract contemplates administrative supplementation by later modification, such as NOAA did here with the task orders, "'[a]lteration of some details of a contract, while leaving undisturbed its general purpose, constitutes a mere modification of the original contract, and the latter remains in force as modified.' The modifications did not create a new contract because the general purpose remained intact." *Id.* (quoting *Stinnett v. Damson Oil Corp.*, 648 F.2d 576, 582 (9th Cir. 1981); 58 AM. JUR. 2D NOVATION § 26 (1989)). Therefore, if the modifications do not effect a material change to the parties' rights and obligations, then the modifications—in and of themselves—are not thought to give rise to a new contract or agreement. *See McKay Nissan, LTD v. Nissan Motor Corp.*, 764 F.Supp. 1318, 1319 (N.D. Ill. 1991).

In this case, none of the modifications materially altered the obligations of the parties beyond what was initially contemplated in the original agreement. Instead, the original contract specifically contemplated later refinement or detail of its general terms through subsequent task orders and government options extending the length of the contract. These "modifications," in form rather than substance, did not give rise to new contracts between NOAA and Fluor, and therefore did not present

Additional considerations lead the court to conclude that defendant could not have delegated to Fluor the responsibility to develop the estimate upon which Fluor's own 6% fee limitation would be based. One of two overriding concepts in the FAR general rules regarding conflicts of interest instruct that appropriate steps be taken to prevent "the existence of conflicting roles that might bias a contractor's judgment." 48 C.F.R. § 9.505(a). Here, if Fluor were delegated the task of creating the very estimate upon which its own fee limitation were based, an inherent conflict of interest would arise. Under those circumstances, Fluor would have a perverse incentive to develop higher construction cost estimates. Naturally, increasing the estimate would raise the ceiling on Fluor's *allowable* fees under the 6% limitation.[27] For this reason, the duty of establishing the estimate is incumbent upon government officials, rather than the contractor. Government officials are better situated to act independently, avoid conflicts of interest, and protect the public interest in preserving the fisc.[28]

This potential for a conflict of interest is *exactly* the same concern that Congress tried to avoid in *prohibiting* the cost-plus-percentage-of-cost type contract. *See* 41 U.S.C. § 254(b) ("The cost-plus-percentage-of-cost system of contracting shall not be used . . . ."). "The danger guarded against by the Congressional prohibition was the incentive to a government contractor who already had a binding contract with the Government for payment of undetermined future costs to pay liberally for reimbursable items because higher costs meant a higher fee to him, his profit being determined by a percentage of cost." *Muschany*, 324 U.S. at 61-62. While Fluor's contract would not technically be a "cost-plus-percentage-of-cost" type contract if Fluor were free to develop the

---

additional periods at which, had an appropriate estimate been in place, NOAA might have properly calculated Fluor's fee limitation.

The same holds true for the "options" that the government exercised to extend the original contract for each of the four option years. The law of the Federal Circuit is clear that the exercise of an option only gives rise to a new contract when the option, itself, is the principle subject of the underlying contract, *i.e.*, an "option contract." *See Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1275-76 (Fed. Cir. 1999). "Obligations arising from the exercise of an option are part of a new contract only when the option was the principal subject matter of the bargain. That rule has consistently been applied to government contracts." *Id.* Instead, options in government contracts generally create extensions of the obligations of the original contract rather than new, independent obligations. *Id.* at 1276; *see also* 48 C.F.R. § 17.201. That was the case in Fluor's contract.

[27] *See A Bill to Facilitate Certain Construction Work for the Army, and for Other Purposes: Hearing on S. 2562 Before the Senate Comm. on Military Affairs*, 76th Cong. 9 (1939) ("However, under the form of contract proposed in this bill, there is no advantage to the contractor in running up costs . . .").

[28] *See* Tr. at 45 ("The integrity of the whole clause is premised upon an independent estimate. Otherwise, I'm the architect, every time I do one of the estimates, that [defendant] says I'm somehow doing for the government they ratified later, I'm going to make sure this is a huge estimate so I never come in the 6 percent. That could not be the intention of this statute.") (statement of Fluor's counsel).

very estimates upon which its fee limitation were premised (Fluor's contract was a cost-plus-*fixed-fee* type contract), Fluor would have the very same incentive to design a more costly project that would lead to a greater range of allowable costs as would a cost-plus-percentage-of-cost contractor to inflate incurred costs. That would be especially true in this case, because Fluor's contract does not appear to have contained a "Design Within Funding Limitations" clause that might have otherwise restricted the overall project cost. *See generally* Compl. Ex. 9; Pl.'s Supp. Br. Exs. 34, 35.

Although Fluor was indeed obligated to regularly update construction estimates pursuant to contract clause 2.1.3, it would be contrary to industry practice to allow NOAA to use those estimates as a substitute for the estimate on which the fee limitation is supposed to be based. In practice, A&E contractors regularly develop construction cost estimates that allow the procuring agency to best evaluate bids from construction contractors. *See* Compl. Ex. 2 at 3 (The Government Contractor, Briefing Papers (Nov. 1963)). Since specific designs (which the A&E contractor is hired to produce) provide a more accurate basis to estimate actual construction costs than do preliminary plans and specifications, it makes perfect practical sense that the architect—the very party designing the building project—should develop a detailed estimate of construction costs that the procuring agency can later use in procuring and evaluating bids for the building contractor. This is *not* to say, however, that the architect's estimate is an appropriate substitute for the *statutory estimate* upon which the § 254(b) 6% limitation is based:

> Both the 1939 statutes and the later codifications set the fee limitation as 6% of the *estimated* cost of the proposed construction project, as determined at the time of award of the A-E contract. The 1939 statutes said nothing about who was to make this determination, but the later codifications [the 1947 Procurement Act and 1949 Property Act] place the responsibility squarely on the agency head. Yet one of the standard requirements of A-E contracts calls for the *preparation by the A-E of an estimate of the cost of the proposed construction project*—which estimate is to be used by the Govt for bid evaluation purposes. Thus, the estimate which the *Govt* is required to follow, in determining the *maximum fee* it can pay you, must be made by the Govt, *prior* to the time it awards you the very contract which will produce the proposed project's plans and specifications upon the basis of which *you* [the A&E contractor] are requested to make an intelligent project cost estimate.

*Id.*

In sum, it is abundantly clear to this court that the estimate required by § 254(b) as a predicate to any cost-plus-fixed-fee A&E contract was not in place here. Defendant concedes as much. Defendant tries to overcome this deficiency by creating a *post hoc* rationalization that another estimate that Fluor was obligated under the contract to produce, on a rolling basis, is a suitable substitute for the statutorily prescribed estimate. The court concludes that this argument is unconvincing because it ignores the unambiguous language of the statute and regulations. Furthermore, this argument fails because it deprives the contractor of the opportunity to prospectively monitor his costs during performance of the contract.

The *only* estimate that defendant can use to determine the upper limit of an A&E contractor's

allowable costs and fees, as explicitly stated in § 254(b), is an estimate of project costs established "by the agency head at the time of entering into the contract." While the task of developing the estimate may be delegated to another official within the agency, it may not be delegated to the A&E contractor itself as part of the contract. There is no provision in the law permitting such a delegation. Moreover, any estimate that would be established by the A&E contractor as part of its contract performance would necessarily come far too late in the process to satisfy the requirement that the estimate be established "at the time of entering into the contract."

***d. Actual Costs Are An Improper Substitute For The Estimate Required By § 254(b)***

In addition to construction estimates of future WFO building projects that Fluor had established pursuant to its contract with NOAA, the "1992 WFO Facilities Budget" also included *actual* construction costs for those WFO buildings that had already been completed by 1992. *See* Pl.'s Supp. Br. at 7-9. In part, then, the contracting officer based her conclusion that Fluor had been overpaid based on a calculation that used actual, and not estimated, project costs. In light of the discussion above, the court concludes that this purported substitute for the statutory estimate required by § 254(b) is wholly inappropriate and arbitrary. Although the discussion in the prior section obviates the need to re-examine much of the analysis on which the court relies, the infirmities of the "1992 WFO Facilities Budget" as a substitute for the § 254(b) estimate that result from the use of *actual costs* are taken up here for completeness.

The first and most prominent flaw in relying on actual costs for the calculation of Fluor's fee limitation is that § 254(b) explicitly calls for the 6% limitation to be based on an "estimate" of project costs and not the actual project costs. There is no reference in the statute, the regulations, or even the legislative history that mentions limiting the A&E contractor's fees based on the actual cost of the project. Quite the contrary, as noted above in the discussion of the Foreign Service Building Act of 1926, the legislative trend seems to move away from the use of actual costs, in favor of the project estimate. In the subsequent 1939, 1947 and 1949 Acts that implement the 6% fee limitation to which Fluor's contract is subject, Congress specifically required an "estimate" on which to base that fee limitation calculation; the earlier fee limitation of the 1926 Act, relying upon actual construction costs, appears to have been wholly abandoned by Congress.

On one hand, using actual costs to calculate the fee limitation would best protect Congress' intention to ensure that design fees reflect a relative proportion of overall project costs that existed in the industry at large. *See*, *e.g.*, *A Bill to Facilitate Certain Construction Work for the Army, and for Other Purposes: Hearing on S. 2562 Before the Senate Comm. on Military Affairs*, 76th Cong. 13 (1939). In this sense, basing the 6% limitation on *actual costs* rather than estimated costs best maintains that relative interest that Congress hoped to preserve. On the other hand, however, using the construction project's actual costs may well deprive the government of the very protection that it sought from the 6% fee limitation. This is so because an A&E contractor would have an incentive to design a more costly project that would include higher construction costs and, hence, provide a larger range of allowable costs for that same A&E contractor. This is the same risk to the government and conflict of interest to the contractor that would be implicated if the government were permitted to delegate the duty of establishing the project estimate to the A&E contractor. Were the

6% fee limitation to be based on the actual costs of the project, the A&E contractor would have far too much control over those ultimate costs and, accordingly, its own fee limitation. As discussed above, such a result could not have been Congress' intent, and the explicit language employed in § 254(b) accordingly belies this outcome.

Similarly, using actual costs to calculate the fee limitation would not be viable in practice. Doing so would put every contractor performing A&E services at risk of incurring excessive costs and fees but would have zero opportunity to prospectively reign in such costs. A system in which design fees are retroactively limited based upon actual project costs—a calculation that would not be known until long after the A&E design services are performed—would chill interest among A&E contractors to undertake government contracts. Furthermore, were this court to condone substituting actual costs for the "project estimate" required by § 254(b), the court would deprive Fluor of the benefit of the Limitation of Cost provision, 48 C.F.R. § 52.232-20, incorporated by reference into its contract with NOAA.

The flaws involved in basing the fee limitation for A&E services on actual costs were avoided entirely by Congress by requiring that the fee limitation be premised instead on an estimate of project costs to be established at the outset of the contract. By relying on a forward-looking estimate, Congress ensured that the contractor would be protected against an arbitrary fee limitation determined long after the contractor's performance was rendered. Instead, the contractor would benefit from a transparent calculation of the fee limitation at the outset of his undertaking, and the contractor would be able to regulate his own costs over the life of the contract to avoid incurring actual costs in excess of its allowable costs. The contractor's prospective regulation of costs therefore allows it to best avoid the risk of incurring excessive costs in a losing-contract.

***e. Level-Of-Effort Contracts for Architectural And Engineering Services***

As a practical matter, it is doubtful that a level-of-effort undertaking like Fluor's, in which the contractor is obligated to expend a pre-determined number of man hours towards the completion of a project rather than actually complete the project, can ever be a viable form of contract delivery for architectural and engineering services. First, it seems that Fluor's contract was somewhat of an aberration in the construction industry. Fluor's own expert indicated that "In my 24-years of experience . . . I never saw, or even heard of, a level of effort cost reimbursement contract for A&E services." Compl. Ex. 21 at 2 (Aff. of Kenneth W. Forsyth). The logical explanation for the dearth of level-of-effort contracts for A&E services is that the § 254(b) fee limitation is simply inconsistent with that form of contract delivery.

The FAR provisions dealing with cost-plus-fixed-fee contracts note that such a contract may take one of two forms: "completion or term." 48 C.F.R. § 16.306(d). The *completion* form "describes the scope of work by stating a definite goal or target and specifying an end product." *Id.* It "normally requires the contractor to complete and deliver the specified end product." *Id.* The FAR indicates that this completion form of contract should be utilized when the goal of the contract is the development of some discreet project. "[T]he completion form is preferred over the term form whenever the work, or specific milestones for the work, can be defined well enough to permit developments of estimates within which the contractor can be expected to complete the work." *Id.*

In the context of architectural and engineering services, where statute requires the government to establish an estimate of project costs at the inception of the contract, the *completion* form of a cost-plus-fixed-fee contract is consistent with that statutory requirement. That is because there will likely be a defined scope of both the A&E work to be done and the building project to which that work will be applied. In sum, if the scope of work can be defined, the estimate of project costs that § 254(b) requires can be established.

On the other hand, the *term* form of contract, used here by the parties and referred to as a "level-of-effort" contract,[29] would be suitable in those situations where the work or milestones are *undefined* and nebulous. *See id.* Such a scenario, however, is entirely inconsistent with the § 254(b) requirement of a project estimate. If, as was the case here with NOAA's WFO modernization project, the scope of the project is unknown and the design goals are so open-ended as to require contracting for architectural and engineering services on a level-of-effort (or term) basis *instead* of a completion basis, then it would seem unlikely that an agency could *ever* develop a reasonable estimate of project costs on which to base the 6% limitation on A&E services. Instead, under those circumstances where the need for design services is undefined, the agency would not be able to contract for A&E services until later in the project's life-cycle, when the project and design goals become more developed and refined. In this case, NOAA could have avoided the inherent flaw—the inability to establish a timely estimate—in its contract with Fluor for A&E services by bifurcating the procurement of those A&E specific services from Fluor's broader undertaking to assume project development and project management duties. Ostensibly, once Fluor had performed those ancillary duties that would define the scope of NOAA's project, the scope of any A&E services needed would have been ascertainable and NOAA would have then been able to properly procure needed A&E services based on a timely estimate of project costs, as § 254(b) requires.

***4. The Implications Of The Impossibility Of A Timely Estimate Consistent With § 254(b)***

The court is therefore left to untangle the gnarly thicket that the unique facts of this case present. Simply put, we have a statute that plainly requires that any contract for architectural and engineering services falling within the scope of § 254(a) limit the allowable fee for those services to 6% of the estimated costs of the project. In turn, the parties contracted for A&E services in a manner that would otherwise subject the part of the contract calling for A&E services to the statutory fee limitation. However, the contracting officer was unable to comply with the explicit statutory provision requiring the timely estimate. Indeed, NOAA's failure to establish this timely estimate was the product of inherent impossibility, not oversight or omission. Given the unique circumstances under which Fluor's services were procured, there was no way that NOAA could have reasonably estimated its project costs for the WFO modernization project at the time of entering into this contract.

***a. The A&E Portion of Fluor's Contract Is Void As A Matter Of Law***

The real problem that is implicated by these facts is a rule of constitutional law that a

---

[29] The "term" form of contract is synonymous with a "level-of-effort" contract. *See* CIBINIC & NASH, FORMATION OF GOVERNMENT CONTRACTS at 1173-74.

government agency can not validly contract to pay funds in contravention of a federal statute because any "payment of funds from the Treasury must be authorized by a statute." *Office of Personnel Management v. Richmond*, 496 U.S. 414, 424 (1990) (citing U.S. Const. art. I, § 9 cl.7). It is "the duty of all courts to observe the conditions defined by Congress for charging the public treasury." *Urban Data Sys., Inc. v. United States*, 699 F.2d 1147, 1154 (Fed. Cir. 1983) (quoting *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 385 (1947)). The effect of § 254(b) is a plain limitation on the amount of money that a contracting officer may spend on A&E services of the type here. Congress has expressly stated that fee limitation in terms of (and as a function of), the project estimate that is supposed to accompany any cost-plus-fixed-fee contract for A&E services procured without price competition. Because the mandatory fee limitation is expressed only in terms of that project estimate, it is impossible to determine what the fee limitation should be without the proper estimate in place. As a general rule, then, any contract for A&E services that the contracting agent attempts to procure without establishing the fee limitation does not comport with the express provisions of the statute and regulations.[30]

Without the mandatory project estimate, the contracting officer lacked the authority to procure A&E services under § 254(b). "Failure to follow the applicable rules negates the agent's authority to enter into a contract binding on the government. To permit otherwise would be to nullify those very statutes, regulations, and determinations—a result clearly contrary to the public interest." *United States v. Amdahl Corp.*, 786 F.2d 387, 392 (Fed. Cir. 1986) (quoting Brous, *Termination for Convenience: A Remedy for the Erroneous Award*, 5 PUB. CONT.L.J. 221, 222-23 (1972)). In turn, courts adhere to "the maxim that the United States is not bound by its agents acting beyond their authority and contrary to regulation." *Urban Data Sys., Inc. v. United States*, 699 F.2d 1147, 1153 (Fed. Cir. 1983) (citing *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947)); *see also Richmond*, 496 U.S. at 420 ("Of this it is enough to say that the United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit.") (quoting *Utah Power & Light Co. v. United States*, 243 U.S. 389, 408-09 (1917)). Without the appropriate authority to procure services of the type here, the relevant (A&E) provisions of Fluor's contract were clearly in violation of § 254(b) and other relevant procurement laws and regulations. The 6% fee limitation on cost-plus-fixed-fee A&E services is not optional; the contracting officer is without capacity to waive it. Instead, it is a hard-and-fast rule imposed by statute. To require a contracting officer to comply with the provisions of § 254(b), "[s]urely it should not be necessary for Congress to have added: 'and we mean it,' or perhaps, 'and we mean it, and if you try [to avoid the limitation], it won't be any good, so don't even bother.'" *AT&T Co.*, 177 F.3d at 1380 (Plager, J., dissenting).

Despite the contracting officer's patent violation of procurement law, there is a "[j]udicial reluctance" to view a fully performed contract, as in this case, through the lense of illegality or invalidity. *See AT&T Co.*, 177 F.3d at 1376. "[T]he court should ordinarily impose the binding stamp of nullity only when the illegality is plain." *John Reiner & Co. v. United States*, 325 F.2d 438, 440 (Ct. Cl. 1963); *see also AT&T Co.*, 177 F.3d at 1366. The contractor should receive the "benefit

---

[30] *But see* 22 U.S.C. § 296 (authorizing the Secretary of State to pay for A&E services for Foreign Service properties abroad consistent with "professional fees as established by local authority, law or custom").

of reasonable doubts" as to the validity of a contract "unless its invalidity is clear." *John Reiner*, 325 F.2d at 440. "Therefore, when the deviation [by the contracting officer] is not egregious, the court has preferred to allow the contractor to recover on the ground that the contracts were not palpably illegal to the bidder's eyes." *Trilon Educ. Corp. v. United States*, 578 F.2d 1356, 1360 (Ct. Cl. 1978). On the other hand, there are circumstances in which "the departures from applicable statutes and regulations were both obvious to the bidder and *so substantial* as to require the conclusion that the putative contracts were void *ab initio*." *Id.* (emphasis added). It is this latter situation in which "the illegality is plain." *John Reiner*, 325 F.2d at 440.

The issue for the court therefore becomes whether the illegality in this case is "plain" and whether the departure from statute is "so substantial" as to render the portion of Fluor's contract dealing with A&E services void *ab initio*. In the normal course, a contracting officer would only have proper authority to procure architectural and engineering services when the procurement would comply with § 254(b). In this case, however, the contracting officer ignored statutory and regulatory requirements that should have guided this procurement. *See Prestex, Inc. v. United States*, 320 F.2d 367, 371 (Ct. Cl. 1963). That failure was the product not of oversight but rather impossibility, because the contract award came at a time when the scope of the building project was so open-ended. Given the informational deficiencies about the scope of the building project at the time NOAA entered into this contract, the contracting officer could not and did not procure the relevant A&E services in a manner that was consistent with § 254(b). This inherent impossibility notwithstanding, without the ability to establish an estimate, and without establishing the attendant fee limitation, the contracting officer lacked the ability to procure a contract that complied with § 254(b) and therefore lacked the necessary authority to enter into any contract with Fluor for architectural and engineering services.

Fluor is not immune from these deficiencies. "[A] party contracting with the United States assumes the risk that the official with whom he deals is clothed with the actual authority to enter the subject contract sought to be enforced." *Yosemite Park and Curry Co. v. United States*, 582 F.2d 552, 560 (Ct. Cl. 1978) (citing *Jackson v. United States*, 573 F.2d 1189, 1197 (Ct. Cl. 1978)). The record is clear that Fluor was aware of the fee limitation in § 254(b), but was under the mistaken belief that the section did not apply given the broad spectrum of services called for by the contract. *See, e.g.*, Pl.'s Mot. for Summ. J., App. 12. Whatever the basis for this misconstruction of the law, Fluor bore the risk that the contracting officer's failure to comply with the statute might undermine his authority to enter into a contract of the type here and that the contract might be later deemed unenforceable. *See CACI, Inc. v. Stone*, 990 F.2d 1233, 1236 (Fed. Cir. 1993).

Ultimately, the court concludes that this is the type of case in which the illegality of contract is "plain" and "so substantial" as to nullify that portion of Fluor's contract dealing with A&E services. Procuring Fluor's services at the time and in the manner that the contracting officer pursued prevented the parties from properly applying the statutory fee limitation. This created a profound infirmity in the contract. Clearly, circumnavigation of § 254(b)—whether intended or accidental—renders this contract "plainly" inconsistent with that statute and therefore void *ab initio*.

This approach parallels the one taken by the Court of Claims in *Schoenbrod v. United States*, 410 F.2d 400 (Ct. Cl. 1969), in which the contracting officer failed to solicit competitive pricing

information from bidders in a procurement of sealskins under the 1949 Property Act. In *Schoenbrod*, the Court of Claims concluded that the contracting officer had failed to adhere to statute and regulation that required goods of that type to be procured "on a competitive basis." *Id.* at 403. With specific exception to certain types of services (such as architectural and engineering services, the type at issue in this case), the court concluded that price competition was the "major—if not the most important" competitive factor under the federal procurement scheme. *Id.*; *see id.* at 402. The contracting officer's failure to adhere to statute and regulation therefore made *Schoenbrod* a "case in which we find the illegality in the award to be plain on the face of the statute and the regulations." *Id.* at 404.

In *American Telephone & Telegraph Co. v. United States*, 177 F.3d 1368 (Fed. Cir. 1999), the Federal Circuit appears to have added another layer to the *John Reiner* analysis that is of particular concern when the legality or validity of a contract comes into question only after it has been fully performed. The Federal Circuit has instructed that:

> when a statute "does not specifically provide for the invalidation of contracts which are made in violation of [its provisions]" the court shall inquire "whether the sanction of nonenforcement is consistent with and essential to effectuating the public policy embodied in [the statute]." Thus the policy underlying the enactment must be considered in determining the remedy for its violation, when the statute itself does not announce the sanction of contract invalidity.

*Id.* at 1374 (quoting *United States v. Miss. Valley Generating Co.*, 364 U.S. 520, 563 (1961)) (alterations in original). The reason for pause is that "[i]nvalidation of the contract is not a necessary consequence when a statute or regulation has been contravened." *Id.* Especially in the case of a completed contract, there is a common law tendency or presumption to safeguard the fruits of full performance, and an especially "strong policy of supporting the integrity of contracts made by and with the United States." *Id.* Accordingly, "[t]he invalidation of a contract after it has been fully performed is not favored." *Id.* at 1375. Generally, precedent shows that those contracts that have been nullified based on a failure to comply with statutory or regulatory requirements have not been fully or substantially performed, although part of the reason for that trend is that much of the litigation raising issues of contract validity and legality comes under the guise of bid protests where the challenge is raised prior to any opportunity to fully perform. *Id.* (citing *Alabama Rural Fire Ins. Co. v. United States*, 572 F.2d 727, 733 (Ct. Cl. 1978); *Prestex, Inc. v. United States*, 162 Ct. Cl. 620 (1963); *CACI, Inc. v. Stone*, 990 F.2d 1233, 1235 (Fed. Cir. 1993); *Schoenbrod v. United States*, 187 Ct. Cl. 627 (1969)).

Section 254(b) does not expressly provide for the invalidation of contracts made in violation of its fee limitation requirement. The court therefore returns to the purpose and history of the statute—consistent with the Federal Circuit's instruction—to determine if nullification is appropriate in this particular case. *See id.* ("[I]llegality may be proved with reference to legislative history.") (quoting *Alabama Rural Fire Ins. Co.*, 572 F.2d at 733).

The purpose and intent of the 6% fee limitation, included in various statutes, was to help preserve price integrity in the absence of price competition during procurement of A&E services.

The fee limitation protects the public from excessive design costs and encourages cost efficiency in the design process. In the legislative history that frames the Brooks Act of 1972, Congress responded directly to a request that the fee limitation be abolished by reaffirming the fee limitation as "a valuable safeguard to the public." S. Rep. No. 92-1219, 1972 U.S.C.C.A.N at 47678. In essence, the fee limitation is part of a concession that Congress made to the architectural and engineering industries to eliminate competitive bidding from the procurement of design services, in response to industry guidelines that deemed such practice unethical.

The predetermined project estimate, which is the sole determining factor of the fee limitation in the system prescribed by statute, on one hand protects the contractor from absorbing costs later determined to be non-reimbursable. It also protects the public by helping to reign in overall building costs. The system removes any perverse incentive an A&E contractor may have, borne only of a desire to inflate his allowable reimbursable costs, to create designs that are unnecessarily costly. In sum, the fee limitation—predicated solely on the timely estimate—prevents the design professional's costs from running amuck. That is a necessary restriction given the absence of similar price protections (such as competitive bids) in the procurement process.

Congress entrenched this fundamental requirement for all subject A&E services—a fee limitation based on a project estimate—into the statutory and regulatory fabric early in the 20th century. It then reaffirmed its proper role as an integral component of A&E procurement policy in no fewer than three specific Acts since 1947. In this light, then, Congress can hardly be thought to have intended exceptions to the fee limitation that it has not itself specifically provided. At least this court refuses to read into § 254(b) any such exception for the rare instance in which the estimate of project costs is indeterminable at the outset of the contract. Especially in light of the policy concerns that are highlighted throughout the legislative history of the 6% fee limitation (see generally the discussion above in Part III(B)(2)), the court cannot conclude that an agency or contracting officer could abrogate the protections of the fee limitation by evading the statutory and regulatory requirements. Instead, it appears entirely consistent with the purpose and intent of Congress's action to conclude that a contract that did not and could not adhere to the fee limitation contravenes the statute and is therefore a nullity.

The root cause of the invalidity of this particular contract was NOAA's failure to comply with applicable laws, regulations, and departmental procedures. The Department of Commerce's own audit of the WFO program in 1993 charged NOAA with "significant weaknesses" in its administrative controls and statutory compliance. *see* Compl., Ex. 18 at 3. That audit recognized NOAA's failure to establish timely project estimates and tailor its procurement of services in a manner consistent with the FAR. *Id.* at 4. While the FAR provides a very flexible procurement system, it is not so flexible as to accommodate what NOAA did here. Indeed, NOAA's own parent agency (the Department of Commerce) essentially indicated that NOAA dropped the ball in procuring Fluor's services. The entire process was, according to the 1993 audit, riddled with improprieties and inefficiencies. *See id.* NOAA might have procured Fluor's design services properly, but that would have required NOAA to first develop the appropriate project cost estimates. Perhaps this requirement would have forced NOAA to bifurcate the procurement of design services from Fluor's project planning and development services to allow the scope of the project to better mature, but it would have resulted in a procurement that better complied with statute and regulation.

***b. Fluor Is Entitled To Recovery For A&E Services Based On An Implied Contract***

The court's reluctance to nullify a fully performed contract is tempered when recovery for performance is permitted under an implied contract theory and the entire contractual relationship, including performance and payment, is not unwound by the court. *See AT&T Co.*, 177 F.3d at 1366. "When a contract or a provision thereof is in violation of law but has been fully performed, the courts have variously sustained the contract, reformed it to correct the illegal term, or allowed recovery under an implied contract theory; the courts have not, however, simply declared the contract void ab initio." *Id.* at 1368. In those circumstances where *quantum meruit* or *quantum valebant* recovery[31] is appropriate, the court's conclusion that a contract provision is unenforceable does not have the same harshness as it might if a single party were to bear the entire risk and penalty of unenforceability.

The risk that Fluor bears in this particular case is mitigated by the fact that the A&E portion of the contract, though void, was fully performed. Despite the infirmities of the actual, unenforceable portion of the contract, the court recognizes the existence of an implied-in-fact contract between Fluor and NOAA for the architectural and engineering services Fluor provided. "Even though a contract be unenforceable against the Government, because not properly advertised, not authorized, or for some other reason, it is only fair and just that the Government pay for goods delivered or services rendered and accepted under it." *United States v. Amdahl Corp.*, 786 F.2d 387, 393 (Fed. Cir. 1986) (quoting *Prestex*, 320 F.2d at 373); *see also Clark v. United States*, 95 (Mem.) U.S. 539, 542 (1877); *Gould, Inc. v. United States*, 67 F.3d 925, 930 (Fed. Cir. 1995) ("[A] contractor can be compensated under an implied-in-fact contract when the contractor confers a benefit to the government in the course of performing a government contract that is subsequently declared invalid."). Under the implied-in-fact contract theory and *quantum meruit* recovery, the contractor is entitled to receive the value to the government of the benefits the contractor conferred. *See Amdahl Corp.*, 786 F.2d at 393.

This approach is consistent with Federal Circuit precedent. In *Yosemite Park and Curry Co. v. United States*, 582 F.2d 552 (Ct. Cl. 1978), the Court of Claims, the Federal Circuits's predecessor, contemplated the fate of a contract that ran afoul of § 254(b)'s 10% fee limitation on cost-plus-fixed-fee contracts in general (discussed above). The court implicitly deemed the contract, which provided for a fee equal to 12 1/2 percent of costs, an "illegality" because, like Fluor's, it contravened the plain language of the statute. *See Yosemite*, 582 F.2d at 560. While the court concluded that "the Government could no longer be bound by these terms of the Agreement" that conflicted with statute and rendered the contract invalid, the contractor was nonetheless "entitled to a *quantum meruit* recovery for the reasonable value of the services received by defendant." *Id.*

---

[31] At common law, *quantum meruit* refers to quasi-contractual recovery for the value of services rendered. *Quantum valebant*, on the other hand, refers to the value of goods provided. The distinction has lost some of its luster in this court, as the Court of Claims, predecessor to the Federal Circuit, "generally considered questions of recovery for any contract implied in fact—whether for services or goods—on a *quantum meruit* basis." *Urban Data Sys., Inc. v. United States*, 699 F.2d 1147, 1154 n. 8 (Ct. Cl. 1983) (citing *Cities Serv. Gas Co. v. United States*, 500 F.2d 448, 457 (Ct. Cl. 1974); *Allstates Van Lines Corp. v. United States*, 215 Ct. Cl. 1075 (1978)).

In *Urban Data Systems, Inc. v. United States*, 699 F.2d 1147 (Fed. Cir. 1983), the Federal Circuit reaffirmed the *Yosemite* approach when it invalidated a contract that contravened the § 254(b) proscription on cost-plus-percentage-of-cost type contracts. Despite this flaw, "the Government bargained for, agreed to pay for, and accepted the supplies delivered by Urban. It is also plain that only the price terms of the two subcontracts were invalid—not any other part of those agreements." *Id.* at 1154. Therefore, the contractor was "entitled to reimbursement on a *quantum valebant* basis for the reasonable value in the marketplace of the supplies." *Id.*

### *c. The Quantum of Fluor's Entitlement In* Quantum Meruit

This conclusion that Fluor is entitled to recovery in *quantum meruit* despite its illegal contract with Fluor does not resolve all of the issues in this case. That is because the quantum of Fluor's entitlement is a factual determination that is not amenable to resolution without further proceedings. There are, however, several principles that the court imparts to guide the parties during the pendency of this case.

First, Fluor is entitled to payment for the *reasonable value* of the benefit received by NOAA. *See Yosemite*, 582 F.2d at 561; *Urban Data Systems*, 699 F.2d at 1154. The reasonableness of the payments that Fluor has already received for its services is of course a matter of fact, but the negotiated fee structure that the parties agreed to at the inception of the contract and revisited with each subsequent task order is presumptively a strong indication of the reasonableness of those fees. *See Yosemite*, 582 F.2d at 561. It has been noted under similar circumstances that "[n]o better answer [to the issue of reasonable compensation] can be given than what the parties agreed upon." *Urban Data Systems*, 699 F.2d at 1155-56 (quoting *Pacific Maritime Assoc. v. United States*, 108 F.Supp. 603, 607 (Ct. Cl. 1952)). The court, however, declines to make any such determination at this time.

Second, in determining the reasonable amount of payments to which Fluor is entitled, the government is not deemed to have assented to any payment in excess of 6% of the estimated project costs, "since such assent would have been patently illegal." *Yosemite*, 582 F.2d at 561 (citing *W. Penn. Horological Inst., Inc. v. United States*, 146 Ct. Cl. 540 (1959)). This restriction, of course, is circular and leads right back to the core problem in this case. Since the contracting officer failed to establish the timely estimate on which the § 254(b) fee limitation is premised, there appears to be no possible way to calculate the fee limitation (indeed, had such a calculation been possible, the court's entire analysis would be unnecessary). This deficiency, however, is a problem for the government to overcome.

While this case is before the court on Fluor's challenge to the contracting officer's final decision demanding repayment by Fluor of the putative overpayment and Fluor is styled as the plaintiff in the case, it is ultimately the government that seeks to "undo" its payment to Fluor. It is therefore incumbent upon the government to prove that there has, in fact, actually been any overpayment to Fluor in violation of the 6% fee limitation. Based on the record currently before the court, it is clear that no such overpayment has been demonstrated. Instead, the contracting officer relied on the "1992 WFO Facilities Budget" to calculate the putative fee limitation and overpayment, but the court has already discussed why that calculation is deficient and inconsistent with § 254(b). As the party that bore responsibility for establishing the estimate at the outset of the contract, it is

consistent with § 254(b) to require the government to affirmatively demonstrate the quantum of Fluor's fee limitation and any attendant violation of that limitation. Unless and until it can be shown that Fluor has in fact been paid in excess of its statutory fee limitation, however, NOAA is not entitled to repayment.

## IV. Conclusion

For the reasons stated above, the court concludes that the portion of Fluor's contract that called for architectural and engineering services was indeed subject to the provisions of 41 U.S.C. § 254(b) and its attendant fee limitation. The court therefore **GRANTS** defendant's cross-motion for partial summary judgment on this limited issue and **DENIES** Fluor's motion on the same issue. However, because the contracting officer was unable to establish a timely estimate that is required by § 254(b) and procurement regulations, the court concludes that the contracting officer lacked the necessary authority to procure architectural and engineering services on a cost-plus-fixed-fee basis and the relative portions of the resulting contract were therefore void. Nonetheless, since Fluor has already fully performed the contract it is entitled to the reasonable value of its services under an implied-in-fact contract theory. The reasonableness of the payments that Fluor received for its services, however, is necessarily an issue of fact to be preserved for later proceedings in this court consistent with this opinion.

In closing, given the convoluted nature of the facts of this case, and the guidance provided in the opinion above, the court strongly urges the parties to seek settlement on the issue of the reasonableness of Fluor's payments.

**IT IS SO ORDERED**.

s/*Lawrence J. Block*

**Lawrence J. Block**
**Judge**